**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re:<br><br>WALTER ENERGY, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 15-_____(___)<br><br>Joint Administration Requested |

## DECLARATION OF WILLIAM G. HARVEY
## IN SUPPORT OF FIRST DAY MOTIONS

1. My name is William G. Harvey. I am over the age of 21 years. I am the Chief Financial Officer of Walter Energy, Inc. ("Walter Energy" and together with its U.S. subsidiaries who have filed for chapter 11 relief, the "Debtors" or "Walter US," and together with all of its subsidiaries, the "Company"). I have served in that capacity since July 9, 2012. Accordingly, I am familiar with the day-to-day operations of the Company, its business and financial affairs, books and records.

2. From 2007 to 2012, I served as Senior Vice President and Chief Financial Officer of Resolute Forest Products Inc. (formerly AbitibiBowater Inc.), a global forest products company

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Walter Energy, Inc. (9953); Atlantic Development and Capital, LLC (8121); Atlantic Leaseco, LLC (5308); Blue Creek Coal Sales, Inc. (6986); Blue Creek Energy, Inc. (0986); J.W. Walter, Inc. (0648); Jefferson Warrior Railroad Company, Inc. (3200); Jim Walter Homes, LLC (4589); Jim Walter Resources, Inc. (1186); Maple Coal Co., LLC (6791); Sloss-Sheffield Steel & Iron Company (4884); SP Machine, Inc. (9945); Taft Coal Sales & Associates, Inc. (8731); Tuscaloosa Resources, Inc. (4869); V Manufacturing Company (9790); Walter Black Warrior Basin LLC (5973); Walter Coke, Inc. (9791); Walter Energy Holdings, LLC (1596); Walter Exploration & Production LLC (5786); Walter Home Improvement, Inc. (1633); Walter Land Company (7709); Walter Minerals, Inc. (9714); and Walter Natural Gas, LLC (1198). The location of the Debtors' corporate headquarters is 3000 Riverchase Galleria, Suite 1700, Birmingham, Alabama 35244-2359.

listed on the New York Stock Exchange and the Toronto Stock Exchange. Previously, I served in various executive capacities for over ten years at Bowater Inc., including as Executive Vice-President and Chief Financial Officer (from 2006 to 2007); as Senior Vice-President, Chief Financial Officer and Treasurer (from 2005 to 2006); and, prior to that, as Vice-President and Treasurer (1998 to 2005).

3.     I submit this affidavit (the "<u>First Day Declaration</u>") in support of the Debtors' (a) voluntary petitions for relief under chapter 11 of title 11 of the U.S. Code (the "<u>Bankruptcy Code</u>"); (b) in support of the Debtors' petitions and contemporaneously filed request for relief in the form of motions and applications (the "<u>First Day Motions</u>"); and (c) to assist the Court and other interested parties in understanding the circumstances giving rise to the commencement of these chapter 11 cases.

4.     The First Day Motions seek to allow the Debtors to perform and meet the obligations necessary to fulfill their duties as debtors-in-possession and minimize any adverse effects that filing for bankruptcy protection may have on their business. I am familiar with the contents of each First Day Motion (including the exhibits thereto) and believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate in chapter 11 with minimum disruption or loss of productivity or value; (b) constitutes a critical element in achieving a successful restructuring of the Debtors' operations and balance sheet; (c) best serves the Debtors' estates and creditors' interests; and (d) is, in those instances where the relief seeks immediate payment of prepetition amounts, necessary to avoid immediate and irreparable harm.

5.     Except as otherwise indicated, all facts set forth in this First Day Declaration are based upon my personal knowledge, information supplied to me by other members of the Debtors' management and professionals, or learned from my review of relevant documents or based upon my

2

experience and knowledge of the Debtors' industry, operations and financial condition. If called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this First Day Declaration.

6. On July 15, 2015 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). The Debtors' Canadian and U.K. subsidiaries have not filed or commenced any insolvency or restructuring proceedings, either in the U.S. or elsewhere. Exhibit A attached hereto identifies the Debtors, the non-Debtor Canadian subsidiaries ("Walter Canada"), and the non-Debtor U.K. subsidiaries (as also defined below, "Walter U.K.").

## I. Introduction and Overview

7. The Company is a leading producer and exporter of metallurgical coal for the global steel industry from underground and surface mines with mineral reserves located in the United States ("U.S."), Canada and the United Kingdom ("U.K."). The Company also extracts, processes, markets and possesses mineral reserves of thermal coal and anthracite coal, as well as producing metallurgical coke and coal bed methane gas.[2]

8. The Company traces its roots back to 1946 when Jim Walter began a homebuilding business in Tampa, Florida. Although initially focused on homebuilding, the company Mr. Walter founded later became Jim Walter Corporation and branched out into different businesses, including the 1972 development of four underground coal mines in the Blue Creek coal seam near Brookwood,

---

[2] Metallurgical or "met" coal refers to the various grades of coal with suitable carbonization properties to make coke or to be used as a pulverized injection ingredient for steel manufacture.

Thermal coal is used by power plants and industrial steam boilers to produce electricity, steam or both. It generally is lower in Btu heat content and higher in volatile matter than metallurgical coal.

Anthracite coal is a hard natural coal containing few volatile hydrocarbons that burns slowly and gives intense heat almost without flame.

Case 15-02741-TOM11    Doc 3    Filed 07/15/15    Entered 07/15/15 11:43:01    Desc Main
Document    Page 3 of 86

Alabama. In 1987, a group of investors that included Jim Walter formed a new company, subsequently named Walter Industries, Inc. and the following year completed a leveraged buyout of most of the businesses of Jim Walter Corporation.

9.    In 1997, Walter Industries, Inc. began trading on the New York Stock Exchange (the "NYSE"). During 2008 and 2009, to focus on the operations related to mining, the Company closed its homebuilding business, among others and spun off its financing business. With its remaining businesses concentrated in coal and natural gas, the Company changed its name to Walter Energy, Inc. in April 2009.

10.    On April 1, 2011, the Company completed the acquisition of all the outstanding common shares of Western Coal Corp. ("Western Coal"). The acquisition included high-quality metallurgical coal mines in Northeast British Columbia (Canada), high-quality metallurgical coal and compliant thermal coal from mines in West Virginia (U.S.) and high-quality anthracite coal and compliant thermal coal from the mines in South Wales (U.K.). The acquisition of Western Coal substantially increased the Company's reserves available for future production, the majority of which is metallurgical coal and created a diverse geographical footprint with strategic access to high-growth steel-producing countries in both the Atlantic and Pacific basins.

11.    On May 6, 2011, the Company acquired from a subsidiary of Chevron Corporation mineral rights to the Blue Creek metallurgical coal reserves to the northwest of its existing Alabama mines. The mineral leases form the core of the Blue Creek Energy Project, a planned new underground metallurgical coal mine. In addition, the Company acquired Chevron Corporation's existing North River thermal coal mine in Fayette and Tuscaloosa Counties and a barge load-out facility near the Port of Mobile terminal in Mobile, Alabama. The North River Mine closed in the

4

fourth quarter of 2013 when the Company completed mining its economically recoverable reserves and on August 25, 2014, the Company completed the sale of the Blue Creek coal terminal in Mobile.

## II.    Business Overview

12.    The Company conducts its primary business – the mining and exporting of metallurgical coal for the steel industry – through two business segments: the U.S. Operations and the Canadian and U.K. Operations.  The Company currently operates four active coal mines (one of which is partially idled), a coke plant and a coal bed methane extraction operation.  The following map shows the major locations of the Company's mining operations and ports:



13.    The following table lists the Company's mining assets, location and their status of operation:

| Mine | Status of Operations | Location |
|------|---------------------|----------|
| Jim Walter No. 4 | Production | Alabama |
| Jim Walter No 7 | Production[3] | Alabama |
| Choctaw | Production | Alabama |
| Eagle | Idled | West Virginia |
| Maple | Partially idled | West Virginia |
| Tuscaloosa Resources Inc. | Idled | Alabama |
| Gauley Eagle | Idled | West Virginia |
| Wolverine's Perry Creek | Idled | Canada |
| Brazion's Brule | Idled | Canada |
| Brazion's Willow Creek | Idled | Canada |
| Aberpergym | Idled | U.K. |

A.    The U.S. Operations

14.    The U.S. segment includes the operation of underground mines, surface mines, a coke plant and natural gas operations located in Alabama and underground and surface mining operations located in West Virginia.

(i)    *Alabama Mining Operations*

15.    The Debtors' mining operations in Alabama consist of two underground metallurgical coal mines in the Blue Creek coal seam (the No. 7 Mine and the No. 4 Mine) and one active and one idle surface mine, both of which produce metallurgical and thermal coal (the Choctaw Mine and Swann's Crossing Mine).

---

[3]    As discussed below, the Company is taking steps to partially idle this mine.

16.     The Alabama underground mining operations are headquartered in Brookwood, Alabama and, as of December 31, 2014, were estimated to have approximately 188.9 million metric tons of recoverable reserves between Birmingham and Tuscaloosa (inclusive of reserves associated with the Blue Creek Energy Project, described below). Operating at up to 1,400 to 2,000 feet below the surface, the No. 4 and No. 7 mines are two of the deepest underground coal mines in North America. The coal is mined using longwall extraction methods with development support from continuous mining sections. Mines No. 4 and No. 7 are located near Brookwood, Alabama and are serviced by CSX rail. Both mines also have access to the Debtors' barge load-out facility on the Black Warrior River.

17.     In May 2011, the Debtors acquired mineral rights to approximately 68 million additional metric tons of recoverable Blue Creek metallurgical coal reserves located to the northwest of their No. 4 Mine. The related mineral leases are expected to form the core of the Blue Creek Energy Project, which is for the development of a new underground metallurgical coal mine that has an estimated life of 35 to 45 years.

18.     In 2014, the Debtors operated one surface mine in Alabama. The Choctaw Mine is located near Parrish in Walker County, Alabama, which produces thermal and metallurgical coal. The mine has an onsite rail facility serviced by Norfolk Southern rail. Additionally, access to Highway 269 provides delivery access to local customers via truck.

19.     On or about May 18, 2015, Jim Walter issued WARN Notices to all union (laborers or hourly employees) and all salaried employees at Jim Walter Resources Mine No. 7, and certain affected employees at the No. 5 preparation plant and the central shop, supply and management office. Jim Walter Resources is taking steps to partially idle Mine No. 7 West to reduce cash costs, running the longwall and one continuous miner section one shift per day.

7

(ii)　*Alabama Coking Operations*

20.　The Debtors also operate the Walter Coke Plant, located in Birmingham. The plant's major product line is metallurgical coke, which includes coke for furnace and foundry applications. Foundry coke is marketed to ductile iron pipe plants and foundries for use in producing castings for the automotive and agricultural equipment industries. Furnace coke is sold to the domestic steel industry for producing steel in blast furnaces. The Walter Coke Plant utilizes up to 120 coke ovens with a capacity to annually produce up to 400,000 tons of metallurgical coke and is the second-largest merchant foundry coke producer in the U.S.

(iii)　*Alabama Methane Gas Operations*

21.　The Debtors' Alabama natural gas operations extract and sell coal bed methane gas from the coal seams owned or leased by the Company and others. This business includes conventional gas wells, in-seam gas wells, pipeline infrastructure and related equipment located adjacent to their existing underground mining and coal bed methane business. These wells degasify methane from the Debtors' existing underground mines and the area where they intend to locate their new Blue Creek Energy Mine. As of December 31, 2014, the Debtors had 1,748 wells that produced approximately 11.2 billion cubic feet of natural gas in 2014. The degasification operations have improved mining operations and safety by reducing methane gas levels in the mines.

(iv)　*West Virginia Mining Operations:*

22.　Through the acquisition of Western Coal on April 1, 2011, the Debtors acquired four mines on two properties in West Virginia. The two properties are the Gauley Eagle and Maple properties and each has underground and surface mines. The mines produce both metallurgical and thermal coal. The Maple Coal mines are located in Fayette and Kanawha counties and the Gauley Eagle mines are located in Nicholas and Webster counties of West Virginia. These mines are

8

estimated to contain approximately 44.8 million metric tons of recoverable reserves within the Appalachian coal-producing region as of December 31, 2014.

23.     The Maple underground coal mine operates in the Eagle coal seam and employs the room-and-pillar mining method with continuous miners to produce premium high volatile metallurgical coal, which is used in the steelmaking process. The Sycamore surface mine produces steam and metallurgical coal from thirteen seams of coal. The Maple underground mine was idled in June 2015.

24.     The Gauley Eagle mine complex also consists of underground and surface operations. The underground mine also employs the room-and-pillar mining method to produce a semi-soft metallurgical coal, which is used in the steelmaking process or as a premium low-sulfur thermal coal. Coal produced at the Maple and Gauley Eagle surface mines is primarily sold in the thermal market. The Gauley Eagle underground mine and surface mine were idled in 2012 due to economic conditions and remained idle throughout 2013 and 2014.

B.     Canadian Operations

25.     The Canadian operations consist of three surface mines that produce metallurgical and low-volatile PCI coals in northeast British Columbia (the Wolverine Mine, the Brule Mine and the Willow Creek Mine). The Willow Creek mine was idled in April 2013, the Wolverine Mine was idled in April 2014 and the Brule Mine was idled in June 2014. The Company has continued to operate the preparation plant at the Willow Creek Mine to complete the processing of coal inventory that has already been mined. The Canadian mines are located adjacent to or near existing infrastructure established for the northeast British Columbia coalfields, including established rail and road networks that are available year-round. Coal produced from the mines is shipped by rail to a coal terminal facility at the Port of Prince Rupert, British Columbia. The Canadian operations are

9

estimated to have approximately 133.4 million metric tons of recoverable reserves as of December 31, 2014.

### C. U.K. Operations

26.     The U.K. operations consist of an underground development mine located in South Wales that produces anthracite coal, which can be sold as low-volatile PCI coal. Their underground operation is estimated to have approximately 15.5 million metric tons of recoverable reserves as of December 31, 2014.

27.     The U.K. operations' primary activity has been the development and expansion of the Aberpergym underground coal mine located at Glynneath in the Neath Valley. In the fall of 2011, the Company stopped continuous mine development operations to focus on completing a new drift opening. The Company completed the upper section of the drift during 2012, but due to challenges related to an oversupply of coal and decreased demand, the Company took steps to reduce development spending in the U.K. mine until market conditions improve. This has slowed the development of the drift opening. The U.K. mine produces anthracite coal, which can be sold as a low-volatile PCI coal.

28.     To further manage its liquidity, the Company has idled the U.K. operations. Towards that end, on or about June 5, 2015, the Company commenced a 30-day consultation period with the National Union of Mineworkers South Wales in connection with the Company's plans to idle the U.K. mine. On or about July 4, 2015, the majority of Energybuild's workers were rendered redundant, and the mine now retains only those employees necessary to keep the premises in safe, idled condition.

## III. Prior Chapter 11 Cases

29.     On December 27, 1989, the predecessor of Walter Energy, Hillsborough Holdings Corporation ("HHC") and most of its U.S. subsidiaries each filed a voluntary petition for

10

reorganization under Chapter 11 of Title 11 of the U.S. Bankruptcy Code (the "Prior Bankruptcy Proceedings") in the United States Bankruptcy Court for the Middle District of Florida, Tampa Division (the "Florida Court"). HHC and its subsidiaries emerged from bankruptcy on March 17, 1995 pursuant to the Amended Joint Plan of Reorganization dated as of December 9, 1994, as modified on March 1, 1995 (as so modified, the "Consensual Plan"). Despite the confirmation and effectiveness of the Consensual Plan, the Florida Court continues to have jurisdiction over, among other things, the resolution of disputed prepetition claims against the Debtors and other matters that may arise in connection with or related to the Consensual Plan, including claims related to federal income taxes.

30.     More specifically, in connection with the Prior Bankruptcy Proceedings, the Internal Revenue Service ("IRS") filed a proof of claim in the Florida Court (the "Proof of Claim") for a substantial amount of taxes, interest and penalties with respect to fiscal years ended August 31, 1983 through May 31, 1994. HHC filed an adversary proceeding in the Bankruptcy Court disputing the Proof of Claim (the "Adversary Proceeding") and the various issues have been litigated in the Florida Court. The Florida Court issued an opinion in June 2010 with respect to two of the disputed issues. The Florida Court instructed both parties to submit a final order addressing all issues that have been litigated for the tax years 1983 through 1995 in the Adversary Proceeding by late August 2010. At the request of both parties, the Florida Court granted an extension of time of 90 days from the initial submission date to submit the final order. Additional extensions of time to submit the proposed final order were granted in November 2010, February 2011, May 2011, September 2011, January 2013, May 2013 and December 2013. At the request of the IRS, in December 2013 the Florida Court granted an additional extension of time to submit the final order. As of

11

December 31, 2014, both parties were still reviewing the litigation issues in order to submit the final order.

31.     On June 24, 2015, the United States filed a motion seeking entry of a final judgement in the case, alleging that the parties reached agreement on a settlement amount.  The Debtors dispute these allegations, and the Prior Bankruptcy Proceedings remain open with respect to the IRS claim.

## IV.     Corporate Structure and Functions

32.     The Debtors comprise an integrated enterprise group.   A chart depicting the Company's organizational structure is attached as Exhibit B.

### A.     Legal Entity Overview – the Debtors

33.     The following provides a brief summary of the principal Debtors

(i)     *Mining: Jim Walter Resources, Inc.*

34.     Jim Walter Resources, Inc. ("Jim Walter") runs and operates Mines No. 4 and No. 7, the Debtors' principal mining assets.  It employs the majority of U.S. employees.  Mine No. 4 produces high-quality metallurgical coal from the Blue Creek and Marry Lee coal seams; Mine No. 7 produces high-quality metallurgical coal from the Blue Creek coal seam.   Jim Walter owns 50% of the stock of Black Warrior Methane Corp and 50% of the stock of Black Warrior Transmission Corp., two non-debtor corporations discussed in section IV.D below.

(ii)     *Mining: Taft Coal Sales & Associates, Inc.*

35.     The Walter Minerals Division operates one surface mine, the Choctaw Mine, located near Parrish in Walker County, Alabama, which produces thermal and metallurgical coal.  Taft Coal Sales & Associates, Inc. ("Taft Coal") runs and manages the Choctaw Mine.  Taft Coal is owned by Walter Energy's direct subsidiary, Walter Minerals.   Walter Minerals also owns Tuscaloosa Resources, Inc., which runs and operates the Swann's Crossing Mine located in Tuscaloosa County,

near Brookwood, Alabama.  The Swann's Crossing Mine produces both metallurgical and thermal coal, but is currently idled.

(iii)    *Mining:  Atlantic Development & Capital, LLC and Subsidiaries*

36.     As part of the Western Coal acquisition mentioned above, the Company acquired four mines on two properties in West Virginia – the Gauley Eagle and Maple Properties, each of which has an underground mine, a surface mine and a coal preparation plant.  Mines on these properties produce both metallurgical and thermal coal.

37.     The Maple mines are in Fayette and Kanawha counties and the Gauley Eagle mines are in Nicholas and Webster Counties.  Production at the Maple mines was recently curtailed due to weak market conditions.

38.     The Gauley Eagle underground and surface mine were idled in 2012 and remained idle throughout 2013 and 2014.  As of December 31, 2014, the Company determined that the idle Gauley Eagle operations, which contain approximately 13.7 million metric tons of recoverable reserves, met the criteria to be classified as "held for sale" and recorded an impairment charge of $28.5 million to reduce the carrying value of these assets to their fair value.

39.     The metallurgical coal produced by the West Virginia operations is sold to domestic steel mills and merchant coke plants and international steel mills, while the thermal coal is sold domestically to eastern U.S. regional electrical power plants and industrial customers.

40.     These mines are held and managed by subsidiaries of Jim Walter.  Specifically, Atlantic Leaseco LLC runs and operates the Gauley Eagle Plant (currently idled) and Maple Coal Co. LLC runs and operates the Maple and Sycamore coal mines.  Both subsidiaries are owned by Jim Walter's direct subsidiary, Atlantic Development & Capital, LLC, which is their 100% direct shareholder.

13

      (iv)    *Coke:  Walter Coke, Inc.*

41.    Walter Coke, Inc. runs and operates the Company's coking operations. Its roots can be traced back to 1881, when Sloss-Sheffield Steel and Iron Company first began producing pig iron in Birmingham, Alabama.  The operation now consists of three coke batteries with a total of 120 slot ovens, which produce approximately 400,000 tons of metallurgical coke each year.  The equipment used to remove coke from the ovens includes two complete oven pushing machines with enclosed cabs.  A land-based pushing emissions control system serves to capture the emissions generated during a push and a modern biological treatment facility treats the plant's wastewater.

      (v)    *Natural Gas:  Walter Black Warrior Basin, LLC*

42.    Walter Energy acquired the assets of Walter Black Warrior Basin, LLC ("<u>WBWB</u>") from Highmount Exploration and Production, LLC in May 2010.  WBWB operates 1,387 methane gas wells spread over 230,000 acres in Tuscaloosa and Walker Counties in central Alabama.

43.    WBWB has entered into a Joint Operating Agreement with ConocoPhillips ("<u>Conoco</u>") and certain other third parties known as the "Whitson Coalbed Gas Prospect" that dates back to 1999.  The purpose of the project was to enable the development of coalbed methane interests under various coal leases and coalbed methane leases.  In its present state, the project provides that WBWB and Conoco have a 70 and 30 percent working interest respectively in the development and drilling of new gas wells in the applicable area of "mutual interest."  Other parties to the Whitson Coalbed Gas Prospect include Atlas Resources, Saga Petroleum and Chevron USA.

44.    WBWB is also party to a joint operating agreement with the Dominion Resources Black Warrior Trust (the "<u>BW Trust</u>").  The BW Trust is a fixed investment trust formed to hold overriding royalty interests on natural gas rights on 512 active wells in the Black Warrior Basin.  WBWB owns and operates the wells with a 100% working interest, and receives a 20% revenue interest.  The BW Trust has 0% working interest and receives 65% revenue interest.  No additional

14

properties will be contributed or purchased by the BW Trust, which will deplete over time and ultimately terminate, among other things, at such time as the cash amounts received by the BW Trust on account of its royalty interests exceeds the administrative costs of maintaining the BW Trust.

              (vi)    *Other U.S. Subsidiaries*

45.      Various of Walter Energy's other U.S. subsidiaries filed for chapter 11 protection. In May 2011, Walter Energy acquired mineral rights for approximately 68 million additional metric tons of recoverable Blue Creek metallurgical coal reserves located to the northwest of Jim Walter's No. 4 Mine. The related mineral leases are expected to form the core of the Blue Creek Energy Project, which is for the development of a new underground metallurgical coal mine that has an estimated life of 35 to 45 years. Blue Creek Energy Inc. owns the mineral leaseholds.

46.      Other than Walter Energy Holdings, LLC ("<u>Walter LLC</u>"), the remaining Debtors comprise legacy entities dating back to the Jim Walter Homes era. They have no material assets or operations. Walter LLC is a financing entity created in connection with Walter Energy's acquisition of Western Coal Corp. in 2011, and is described in more detail in Section VI.G below.

          B.     <u>Legal Entity Overview – Walter Canada</u>

47.      Walter Energy Canada Holdings, Inc. ("<u>Canada Holdings</u>"), a direct subsidiary of Walter Energy, is the Canadian holding company for the Debtors' Canadian operations. The Canadian operations consist of three surface mines: the Wolverine Mine, the Brule Mine and the Willow Creek Mine.

48.      The Wolverine Mine, located approximately 15 miles south of Tumbler Ridge, British Columbia, is an open-pit metallurgical coal mine with a coal processing plant and a rail load-out facility capable of handling 2.0-2.5 million metric tons per year. The mine produces premium metallurgical coal. It is managed and operated by Wolverine Coal Partnership.

Case 15-02741-TOM11   Doc 3   Filed 07/15/15   Entered 07/15/15 11:43:01   Desc Main
Document      Page 15 of 86

49. The Brule Mine is an open pit metallurgical coal mine and produces a premium low-volatile pulverized coal injection (PCI) product. Coal from Brule is transported by truck to the Willow Creek Mine for processing and shipping. The Brule Mine is managed and operated by Brule Coal Partnership.

50. The Willow Creek Mine is an open-pit metallurgical coal mine with a coal processing plant and a rail load-out facility. Walter Canada currently operates the Willow Creek Mine with Brule as a combined "Brazion Group." The Willow Creek Mine produces both metallurgical and coal used for pulverized injection purposes. The coal reserves are comprised of an estimated one-third metallurgical coal and two-thirds low-volatile pulverized coal (PCI). The Willow Creek Mine is managed and operated by Willow Creek Coal Partnership.[4]

51. The Wolverine Mine was idled in April 2014 and the Brazion mining operations were idled in June 2014. The Company continues to operate the preparation plant at the Willow Creek Mine to complete processing of coal inventory that has already been mined.

52. The Company owns a 50% interest in the Belcourt Saxon Coal Limited Partnership, which includes two multi-deposit metallurgical coal properties comprising approximately 28.5 million metric tons of recoverable reserves which are located approximately 40 to 80 miles south of the Wolverine Mine. Walter Canada also has interests in other undeveloped coal properties (*e.g.,* EB, Hermann, Mink). None of the Canadian entities is in an insolvency proceeding.

---

[4]  Certain of the Willow Creek leaseholds are owned by Willow Creek Coal Partnership's subsidiary, Pine Valley Coal Ltd.

C.    Legal Entity Overview – the U.K. Operations

53.    The U.K. operation consists of the Aberpergym Mine, an underground development mine located near the town of Neath in South Wales.  The mine produces anthracite coal, which can be sold as a low-volatile PCI coal and other products used for domestic purposes.

54.    The Aberpergym Mine is held and operated by Energybuild Ltd., a U.K. company ("Energybuild").  Energybuild is indirectly owned by Energybuild Group Limited ("EB Group"), a U.K. holding company owned by a Canadian holding company, Cambrian Energybuild ULC.  EB Group also owns other legacy subsidiaries in the U.K., none of which have material assets or operations.  On or about June 5, 2015, the Company commenced a 30-day consultation period with the National Union of Mineworkers South Wales in connection with the Company's plans to idle the U.K. mine.  On or about July 4, 2015, the majority of the Energybuild's workers were rendered redundant, and the mine now retains only those employees necessary to keep the premises in safe, idling condition.  None of the U.K. companies is in an insolvency proceeding.

D.    Non-Debtors

(i)    *Black Warrior Methane Corp. and*
       *Black Warrior Transmission  Corp.*

55.    In 1979, Jim Walter began a pilot program to determine if it was economically feasible to degasify coal beds in advance of mining.  Originally, five wells were drilled in the area of Jim Walter's No. 4 Mine, located near Brookwood, Alabama, for the test.  The pilot project proved successful and, in 1981, Jim Walter and Enhanced Energy Resources formed the Brookwood Degasification Project.

56.    In 1983, a new company, Black Warrior Methane Corp. ("Black Warrior Methane"), was formed to replace Enhanced Energy Resources as operator of the degasification project.  Black Warrior Methane extracts methane gas from the Jim Walter No. 4 and No. 7 mines, rendering them

17

safe for mining. In addition, Black Warrior Transmission Corp., ("Black Warrior Transmission" and together with Black Warrior Methane, the "Black Warrior Companies") a separate company with a parallel corporate legacy, operates approximately 30 miles of high-pressure gas pipeline used to deliver the methane gas to third-party customers (Sonat Pipeline). The Black Warrior Companies exclusively service the Debtors' mines, degasifying and selling to third parties the methane gas that accumulates in Jim Walter's No. 4 and No. 7 mines, thereby rendering the mines safe for operation.

57. The Black Warrior Companies, along with Walter Black Warrior Basin ("WBWB"), one of the Debtors, degasify methane from Jim Walter's existing underground mines and the area where the Debtors' new Blue Creek Energy Mine will be located. As of December 31, 2014, together with WBWB, 1,748 wells produced approximately 11.2 billion cubic feet of natural gas in 2014. The degasification operations are critical to the mines' safe operations and have improved mining operations and safety by reducing methane gas levels in the Debtors' mines, while at the same time providing a source of revenue through the sale of extracted methane to third-party energy consumers. Without the Black Warrior Companies, the Debtors would need to contract with third-party providers to drill gas extraction wells and flare the gas, a more costly and less environmentally sound alternative.

58. Jim Walter Resources, Inc. and an unrelated third-party, ARP Production Company LLC ("ARP"), a subsidiary of Atlas Resource Partners, LP., each owns 50% of Black Warrior Methane and Black Warrior Transmission. In general, the Black Warrior Companies function as stand-alone corporations with two equal shareholders. They have their own boards of directors and for the most part perform their own accounting, cash management and banking, procurement and logistics and other functions. For sake of administrative convenience and to benefit from economies of scales, the Debtors perform certain back-office functions for the Black Warrior Companies for

18

which the Debtors get reimbursed. For example, the Debtors administer and pay the Black Warrior Companies' payroll and employees.

59.     As noted above, the Black Warrior Companies sell the methane they extract to third parties. The Black Warrior Companies have two metered sales points through which they flow gas to customers. Each of the shareholders, Jim Walter and ARP, is entitled to receive the revenues from these sales points based on the actual gas volume flowing through to customers and various other factors. The Black Warrior Companies calculate the actual revenue due to each shareholder based on the differences in the volumes at each sales point, as well as differences in well participation (ARP does not participate in all of the wells), and remit a sales settlement adjustment to Jim Walter. The Black Warrior Companies also calculate the royalties due to Jim Walter for the Black Warrior Companies' use of certain Jim Walter mineral rights, and remit such amount to Jim Walter.

60.     Jim Walter, in turn, calculates a monthly invoice to the Black Warrior Companies for payments made by Jim Walter on their behalf (including payroll for the Black Warrior Companies' employees and certain other vendor payments), as well as for direct charges to the Black Warrior Companies for services performed by Jim Walter (e.g., horizontal drilling and a management fee).

61.     Based on the various amounts owed to and from the shareholders discussed above, as well as amounts due to third party vendors, revenues credited to ARP, and the maintenance of a $400,000 cash balance at the Black Warrior Companies, the Black Warrior Companies calculate a monthly cash call invoice for each of Jim Walter and ARP. Jim Walter and ARP then each remits its portion of the cash call to the Black Warrior Companies so that the companies can fund their third party payments and make payments back to Jim Walter under the invoices.

Case 15-02741-TOM11    Doc 3    Filed 07/15/15    Entered 07/15/15 11:43:01    Desc Main
Document    Page 19 of 86

62. During the six months prior to the Petition Date, Jim Walter's monthly cash call obligations paid to the Black Warrior Companies, net of all amounts due by the Black Warrior Companies to Jim Walter, has averaged approximately $320,000.

(ii) *Belcourt Saxon Partnership*

63. In connection with the acquisition of Western Coal Corp., the Company acquired a 50% interest in the Belcourt Saxon Coal Limited Partnership ("Belcourt Saxon"). Belcourt Saxon owns two multi-deposit coal properties that are located approximately 40 to 80 miles south of the Wolverine Mine in northeast British Columbia. The joint venture was formed for the future exploration and development of surface coal mines. One of Walter Energy's indirect Canadian subsidiaries, Walter Canadian Coal Partnership owns the Company's 50% interest in Belcourt Saxon. The other 50% interest is owned by an unaffiliated third party, Peace River Coal Limited Partnership, a subsidiary of Anglo American plc.

(iii) *Cardem*

64. Cardem Insurance Co., Ltd. ("Cardem"), a Bermuda company, functions as the Debtors' captive insurance company. Cardem has historically issued insurance for the Debtors' legacy homebuilding and development business, including, for example, in the 1980s, when the Debtors had an active home-building business in Florida, for which Cardem wrote certain mortgage insurance policies.

65. Today, Cardem writes property and casualty insurance for the Company as a whole and also at times provided worker's compensation coverage for certain employee groups (past and present). Willis of Bermuda's Captive Management Services division ("Willis of Bermuda") manages Cardem. Since 2009, Cardem has written property insurance policies for the Debtors. The Debtors pay the premiums associated with such policies, plus a $500,000 mark-up (the "Mark-Up") to Cardem. The Debtors' insurance broker places the Debtors' property insurance policies into

20

reinsurance markets in London, Bermuda and the U.S. (such carriers, the "Reinsurers"), where 100% of the property insurance policies are reinsured. The Debtors' premium payments are then divided among the applicable Reinsurers and the Debtors pay a 3.5% commission to the insurance broker.

E.    Centralized Management

66.    Walter Energy manages its global operations centrally from its headquarters in Birmingham, Alabama ("Headquarters"). The Headquarters provide numerous administrative services to Walter US, Walter Canada and Walter U.K., including finance, tax, treasury, human resources, payroll, benefits and communications, information technology, legal, operations and health, safety and environment, among others.

67.    More specifically:

- Finance. Walter Energy's Finance department is responsible for creating and maintaining company-wide accounting policies and performing accounting research for all of Walter Energy's subsidiaries. The finance department is also responsible for financial reporting, including SEC reporting and consolidations, forecasts, and budgets. Finally, the finance department is involved in creating and monitoring company-wide internal controls.

- Tax. Walter Energy's Tax department maintains all income tax items for the Walter Energy global operations, including financial reporting, regulatory filings and audit controversy settlement in the U.S. The Tax department also is responsible for directing and concluding regulatory filings, audit and other tax controversy efforts for Walter Canada, as well as restructuring and financial tax reporting activities associated with the Canadian entities. Finally, the Tax department directs and manages all U.S., U.K., Canadian and state and provincial financial tax reporting to manage the accuracy and timeliness of tax disclosures and financial filings in addition to all regulatory filings required in these jurisdictions.

- Treasury. Walter Energy's Treasury department is involved in the monitoring of bank accounts and cash needs daily; the borrowing and repayment of debt; funds transfers; intercompany payments; bank services management, administration and communications; and foreign exchange transactions for Walter's global operations. Walter Energy also provides risk management activities, including risk identification and development of risk retention and transfer solutions (*e.g.,* the design and management of various insurance programs). The department also

handles claims management, which includes managing pollution legal liability, general liability, automobile liability and property damage claims, as well as managing loss control activities.

- Human Resources ("HR"). Walter Energy's HR department provides various HR activities, including compensation, equity and benefits, payroll and other related services for the Debtors and Walter Canada. The benefits department handles the day-to-day administration of the U.S. benefits programs, including implementation, resolution of complex benefit questions, analysis, reporting, etc.

- Information Technology ("IT"). Walter Energy's IT department is responsible for the maintenance of Walter Energy's IT resources, which include servers, backups, software, contractor work and hardware maintenance.

- Legal. Walter Energy's Legal department supports the Debtors and their U.S. operations. However, certain legal personnel are involved in activities that provide either a global benefit or a direct benefit to Walter Canada or Walter U.K.

- Operations and Health, Safety and Environment. Walter Energy is primarily responsible for the Debtors' domestic operations, including self-insurance filings with state agencies and regulatory items related to maintenance program insurance.

64. In the normal course of business, the Debtors, Walter Canada, Walter U.K., Cardem and other non-debtor affiliates engage in various intercompany activities which give rise to intercompany transactions (collectively, the "Intercompany Transactions"). The Intercompany Transactions give rise in the ordinary course to payables and receivables between, among and on behalf of the Debtors, Walter Canada, Walter U.K., Cardem and non-debtor affiliates (the "Intercompany Claims"). These Intercompany Transactions include, but are not limited to:

- Accounts Receivable, Accounts Payable and Payroll: Approximately half of the operating disbursements for the Debtors' U.S. operations are paid for by Walter Energy and allocated to the appropriate operating subsidiary through intercompany charges. Additionally, receipts of the Debtors' U.S. operations which are swept to concentration accounts create intercompany obligations from Walter Energy to the relevant subsidiaries.

22

- <u>Shared corporate expenses</u>: Walter Energy pays and incurs the costs for accounting, financial reporting, budgeting, tax, banking, cash management, payroll, human resources and other overhead expenses associated with the Company's general corporate functions. These costs are allocated among the Debtors and non-debtor affiliates using a methodology developed by independent third-party accountants to accurately and fairly reflect each entity's proportionate share.

- <u>Funding to Cardem and Walter U.K.</u>: As described above, the Debtors have funded: (a) ordinary course payments to Cardem in exchange for insurance coverage and (b) shortfalls associated with the U.K. Subsidiaries' operating expenses. Both transactions are necessary to preserve value for all stakeholders.

F.    Sourcing and Logistics

68.    Walter Energy's centralized Sourcing department is involved in purchasing, ordering, warehousing and inventory management, as well the oversight of inventory management systems, for the Debtors. Walter Energy's Sourcing department provides assistance in the negotiation and implementation of global supply contracts for the Company in order to reduce cost and improve delivery and service.

69.    Certain services are also provided to support Walter Canada and Walter U.K. directly. Prior to the idling of the Canadian mines, Walter Energy's sourcing personnel historically assisted with supplier selection and development, contract negotiations, competitive bid events and asset relocations.

70.    Supplies used in the Debtors' business include petroleum-based fuels, explosives, tires, conveyance structure and fabric, ventilation supplies, lubricants and other raw materials, as well as spare parts and other consumables used in the mining process. The Debtors use third-party suppliers for a significant portion of their equipment rebuilds and repairs, drilling services and construction.

71.    Walter Energy's logistics personnel are responsible for the daily management and coordination of the Debtors' transportation activities, which include both rail and port transportation.

23

Activities include negotiating and administrating contracts, operational oversight and management of staff, ports and railroads, as well as process management to improve efficiencies for all Debtors. The logistics department also provides analysis, forecasting, reporting and technical support associated with the transportation and inventory of coal.

G.   Customers

72.   The Company's primary business is the mining and exporting of metallurgical coal for the global steel industry. The Company's marketing strategy focuses on international markets mostly in Europe, South America and Asia, where it has a transportation cost advantage and where the Debtors' coal is in demand. The global economy and demand for steel are the major factors influencing the Debtors' business.

73.   The Debtors' underground mining operations in Alabama primarily produce and export metallurgical coal for the global steel industry. The Debtors' other key products include thermal coal sold to electric utilities and industrials, anthracite, metallurgical coke, coalbed methane gas (*i.e.,* natural gas) and related products. Approximately 92% of the metallurgical coal sales from the Debtors' Alabama underground mining operations consist of sales to international customers. The Debtors' thermal coal is primarily marketed to industrial and electrical utility customers in the U.S., generally under annual and long-term contracts.

74.   The Company relies on long-term customer relationships where a competitive advantage exists. The Debtors sell most of their metallurgical coal under fixed price supply contracts with pricing terms of three months and volume terms of up to one year. Sales of metallurgical coal can, however, occur in the spot market as dictated by available supply and market demand. For the years ended December 31, 2014, 2013 and 2012, the Company derived approximately 29%, 33% and 27%, respectively, of its total sales revenues from its five largest customers.

H.    Sales and Marketing

75.    Walter Energy's sales and marketing department manages sales of U.S. coal for the Debtors and also provides strategic marketing services for Walter Canada and Walter U.K.  These activities include setting the global sales and marketing strategy for the Company, the development of new sales and marketing procedures and similar activities.  Among other things, the Walter Energy sales and marketing personnel manage and oversee the integration of sales and marketing policies for the Debtors, including monitoring sales contracts, preparation of commercial invoices and assistance in securing new business and customers.

V.    **The Company's Workforce and Labor Obligations**

76.    Efficient coal mining that uses modern techniques and equipment requires skilled laborers who have both mining experience and proficiency, as well as qualified managers and supervisors.  The Employees perform a variety of functions critical to the Debtors' operations, including, but not limited to, coal and methane gas extraction, sales, marketing, accounting, administration and management.  The Debtors employ approximately 2,300 employees (collectively, the "U.S. Employees"), of which approximately 10 are part-time or seasonal workers, and most of whom work in Alabama and West Virginia.  In addition, Walter Canada and Walter U.K. employ approximately 90 and 7 employees respectively (the "Canadian Employees" and "UK Employees" respectively, and together with the "U.S. Employees," the "Employees"). The Employees include about 700 salaried and 1,600 hourly individuals.  Approximately 1,285 of the hourly Employees are represented by the United Mine Workers of America (the "UMWA") and 160 are represented by the United Steelworkers (the "USW"), all of whom are employed in Alabama.

77.    The majority of employees of the Debtors' underground mining operations in Alabama are represented by the United Mine Workers of America. Normally, the Company's negotiations with the UMWA follow the national contract negotiated between the UMWA and the

25

Bituminous Coal Operators Association ("BCOA"). The Debtors' collective bargaining agreement currently in place with the UMWA ("UMWA CBA") expires on December 31, 2016. The employees of Walter Coke, the coking operation in Birmingham, Alabama, are represented by the USW and the current contract expires on December 6, 2015.

78.     While the Company's Canadian operations are currently idled, during normal operations, a majority of Walter Canada's employees at the Wolverine and Willow Creek mining operations in Canada were also unionized. The Wolverine employees are represented by the United Steelworkers of America, Local 1-424 and the current collective bargaining agreement with the employees for that location expires on July 31, 2015. The employees at the Canadian Willow Creek mining operations are represented by Christian Labour Association of Canada ("CLAC"). The current collective bargaining agreement with CLAC for that location expired on November 30, 2014.Certain of the Debtors' subsidiaries participate in multiemployer pension and healthcare plan trusts established for UMWA-represented employees. Contributions to these funds could increase as a result of future collective bargaining with the UMWA, a shrinking contribution base as a result of the insolvency of other coal companies that currently contribute to these funds, and failure of the 1974 UMWA Pension Plan (the "1974 Pension Plan") to meet the Employee Retirement Income Security Act of 1974 ("ERISA") minimum funding requirements, lower than expected returns on pension fund assets, or other funding deficiencies.

79.     All assets contributed to the 1974 Pension Plan are pooled and available to provide benefits for all participants and beneficiaries. As a result, contributions made by the Debtors benefit the employees of other employers. If the 1974 Pension Plan fails to meet ERISA's minimum funding requirements or fails to develop and adopt a rehabilitation plan, a nondeductible excise tax of five percent of the accumulated funding deficiency may be imposed on an employer's

Case 15-02741-TOM11    Doc 3    Filed 07/15/15    Entered 07/15/15 11:43:01    Desc Main
Document      Page 26 of 86

contribution to this multi-employer pension plan. As a result of the 1974 Pension Plan entering "critical" status, the Pension Protection Act requires that a surcharge of up to 10% of the contributions otherwise required under the current collective bargaining agreement be contributed. This resulted in the Debtors' $5.50 per hour worked contribution rate under the UMWA CBA to increase to $6.05, effective July 1, 2015.

80.     Additionally, as a result of the 1974 Pension Plan's "critical" status, Federal law requires pension plans to adopt a rehabilitation plan aimed at restoring the financial health of the plan. The law permits pension plans to reduce, or even eliminate, benefits called "adjustable benefits" as part of a rehabilitation plan. Under current law governing multi-employer defined benefit plans, if the Debtors withdraw from the 1974 Pension Plan or if the plan trustees were to terminate the 1974 Pension Plan, the plan would assess the Debtors withdrawal liability which would approximate the Debtors' proportionate share of the Plan's unfunded vested benefit liabilities at the time of the withdrawal. The 1974 Pension Plan would require Debtors to make annual payments of their withdrawal liability pursuant to a statutory formula intended to approximate the annual contributions the Debtors were required to make prior to the withdrawal. The Debtors' estimated withdrawal liability for the 1974 Pension Plan amounted to $661.2 million for a withdrawal occurring between July 1, 2014 and June 30, 2015. Data for determining the amount of Debtors' liability for a withdrawal occurring after June 30, 2015 is not available at this time.

81.     The Debtors also provide a range of benefits to its employees and retirees, including pensions and postretirement healthcare (the "OPEB Obligations"). The Company records annual amounts relating to these plans based on calculations specified by generally accepted accounting principles, which include various actuarial assumptions. As of December 31, 2014, the Debtors'

estimated postretirement health care and life insurance plans' aggregate projected OPEB Obligations had a present value of approximately $598.4 million, which benefits are not required to be funded.

82.    The Debtors are also responsible for portions of their workers' compensation benefits for work-related injuries.  In addition, certain of the Debtors are responsible for medical and disability benefits for black lung disease under the Federal Coal Mine Health and Safety Act of 1969 and the Federal Mine Safety and Health Act of 1977, as amended and are self-insured for portions of this liability against black lung-related claims.

83.    The Debtors are also obligated by statute to provide benefits to certain retirees who retired before October 1, 1994 under the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. § 9701 *et seq.* (the "Coal Act").  The Coal Act created two multiemployer benefit plans: (1) the United Mine Workers of America Combined Benefit Fund ("Combined Fund"), into which two former UMWA Benefit Trusts were merged and (2) the 1992 Benefit Plan. The Combined Fund provides medical and death benefits for all beneficiaries of the former UMWA Benefit Trusts who were actually receiving benefits as of July 20, 1992.  The 1992 Benefit Plan provides medical and death benefits to UMWA retirees who were eligible for retirement on February 1, 1993 and who actually retired by September 30, 1994, and whose last UMWA-represented employer is out of business.

84.    The Coal Act provides for the assignment of beneficiaries to a former employer, and that their former signatory employer or related companies pay a premium for each such beneficiary and dependent to the Combined Fund. The Debtors' contributions to the Combined Fund and the 1992 Plan for the years ended December 31, 2014, 2013 and 2012 were insignificant.

85.    The UMWA 1993 Benefit Plan is a defined contribution plan that was created as the result of negotiations for the National Bituminous Coal Wage Agreement (NBCWA) of 1993.  This

28

plan provides healthcare benefits to orphan UMWA retirees who are not eligible to participate in the Combined Fund, the 1992 Benefit Plan, or whose last employer signed the 1993, or a later, NBCWA and subsequently goes out of business. Contributions to the trust under the UMWA CBA were $1.10 per hour worked by UMWA represented employees for the years ended December 31, 2014, 2013 and 2012. The Debtors' total contributions to the UMWA 1993 Benefit Plan in 2014, 2013 and 2012 were $3.6 million, $3.9 million and $4.2 million, respectively.

86. The 2011 NBCWA established the UMWA 2012 Retiree Bonus Account Trust and Plan. The UMWA Retiree Bonus Account Trust is a defined contribution plan that provides funding for single-sum payments to UMWA retirees in 2014, 2015 and 2016. Contributions to the trust under the UMWA CBA are currently $1.50 per hour worked by UMWA represented employees. If the trustees determine that there are not sufficient assets in the trust to pay the projected bonus amounts, the employer will be required to pay a "premium differential" to make up the difference to its retirees. The Debtors paid a premium differential of $147,415.78 to the Trust in November 2014. The Debtors' total contributions to the UMWA 2012 Retiree Bonus Account Trust in 2014, 2013 and 2012 were $5.1 million, $5.5 million and $5.7 million, respectively.

## VI. Capital Structure

87. As of the Petition Date, the Debtors' principal funded debt obligations comprised: (a) the First Lien Credit Facility; (b) the 9.500% Senior Secured First Lien Notes; (c) the 11.0%/12.0% Senior Secured Second Lien PIK Toggle Notes; (c) the 9.875% Senior Notes due 2020; and (d) the 8.500% Senior Notes due 2021, each of which is defined and described below.

88. The following table summarizes the principal amount of the Debtors' prepetition outstanding indebtedness:

29

| Facility | Outstanding Indebtedness |
|---|---|
| First Lien Credit Facility | <u>Term B Loan</u>: $978.2 million <br><br> <u>Revolver</u>: $ 73.0 million[5] |
| 9.500% Senior Secured First Lien Notes due October 15, 2019 | $970.0 million |
| 11.0% / 12% Senior Secured Second Lien PIK Toggle Notes due 2020 | $360.5 million |
| 9.875% Senior Notes due 2020 | $388.0 million |
| 8.500% Senior Notes due 2021 | $383.3 million |
| **Total Funded Debt:** | **$3,153.0 million** |

    A.    <u>First Lien Credit Facility</u>

    89.    On April 1, 2011, Walter Energy, Inc., as U.S. Borrower and Walter Energy Canada Holdings, Inc. and Western Coal Corp.[6], as Canadian Borrowers (and together with the U.S. Borrower, the "<u>Borrowers</u>"), various parties as financial institutions party thereto as lenders (collectively, as may have changed from time to time, the "<u>Bank Lenders</u>") and Morgan Stanley Senior Funding, Inc., as Administrative Agent (in such capacity, the "<u>Administrative Agent</u>") entered into that certain credit agreement dated as of April 1, 2011 (such credit agreement and additional documents and ancillary agreements, as amended and supplemented from time to time, the "<u>First Lien Credit Agreement</u>").  The First Lien Credit Agreement provides for the making of loans to and the issuance of letters of credit ("<u>Letters of Credit</u>") for the account of, the U.S. Borrower and

---

[5]    No revolving loans are currently outstanding, but there are approximately $73 million of outstanding commitments for letters of credit.

[6]    Western Coal Corp. was the Canadian Borrower at the time the First Lien Credit Agreement and related documents were entered into.  Through a series of restructurings described in Section VI.G, Western Coal Corp. was merged into Walter Canadian Coal Partnership.

Case 15-02741-TOM11    Doc 3    Filed 07/15/15    Entered 07/15/15 11:43:01    Desc Main
Document      Page 30 of 86

the Canadian Borrowers.  Specifically, the First Lien Credit Agreement provides for loans in the form of term and revolving loans.  As of the Petition Date, under the First Lien Credit Agreement: (a) $978.2 million in term loans were outstanding (the "Term B Loan") and (b) $10.3 million foreign exchange adjusted revolving loan commitments were available (the "Revolver").

90.     *The Term B Loan*.  The Term B Loan is guaranteed by all of Walter Energy's wholly-owned U.S. subsidiaries (other than certain Immaterial Subsidiaries (as defined in the First Lien Credit Agreement) and is secured on a first lien basis by a pledge of substantially all of the assets of Walter Energy and such wholly-owned U.S. subsidiaries.  Specifically, on April 1, 2012, Walter Energy, Inc. and certain subsidiaries of Walter Energy, Inc. (collectively, the "U.S. Guarantors") and Morgan Stanley Senior Funding, Inc., as Collateral Agent (in such capacity, the "Collateral Agent"), entered into that U.S. Guaranty and Collateral Agreement (such agreement and additional documents and ancillary agreements, as amended and supplemented from time to time, the "U.S. Guaranty and Collateral Agreement").  Pursuant to the U.S. Guaranty and Collateral Agreement, the U.S. Borrower and each of the U.S. Guarantors jointly and severally, unconditionally and irrevocably, guaranteed to the Collateral Agent, for the benefit of the Bank Lenders, the prompt and complete payment and performance when due of all Obligations (as defined in the U.S. Guaranty and Collateral Agreement) of the Borrowers, including the Term B Loan and the Revolver (defined above).  A list of the U.S. Guarantors is attached as Exhibit C.

91.     Also pursuant to the U.S. Guaranty and Collateral Agreement, the U.S. Borrower and the U.S. Guarantors have pledged as security in favor of the Bank Lenders and the other Secured Creditors (as defined in the U.S. Guaranty and Collateral Agreement) to secure the Obligations (as defined in the U.S. Guaranty and Collateral Agreement) on a first lien basis, substantially all of the Debtors' assets, including:

Case 15-02741-TOM11    Doc 3    Filed 07/15/15    Entered 07/15/15 11:43:01    Desc Main
Document      Page 31 of 86

- Substantially all personal property;

- All equity interests of U.S. subsidiaries owned by Walter Energy or any and each of the U.S. Guarantors;

- All equity interests in investments owned by Walter Energy or a U.S. Guarantor including the 50% beneficial equity interest owned by Jim Walter Resources, Inc. in Black Warrior Methane Corp. and Black Warrior Transmission Corp.;

- 66% of Walter Energy's equity interests in Walter Energy Canada Holdings, Inc. and certain other foreign subsidiaries; and

- Real property holdings including material mineral leaseholds in Alabama and elsewhere as well as property owned in fee simple.

92. *The Revolver*. The obligations of the Canadian Borrowers under the Revolver are guaranteed by all of the Canadian Borrowers' Canadian subsidiaries (other than certain immaterial subsidiaries) and are secured on a first lien basis by a pledge of substantially all of the assets of the Canadian Borrowers and such Canadian subsidiaries. Specifically, on July 31, 2012, Walter Energy Canada Holdings, Inc. and Walter Canadian Coal Partnership[7] and certain other subsidiaries of Walter Energy, Inc. (the "Canadian Guarantors") and Morgan Stanley Senior Funding, Inc., as Collateral Agent (in such capacity, the "Collateral Agent"), entered into that Amended and Restated Canadian Guaranty and Collateral Agreement (such agreement and additional documents and ancillary agreements, as amended and supplemented from time to time, the "Canadian Guaranty and Collateral Agreement"). Pursuant to the Canadian Guaranty and Collateral Agreement, each of the Canadian Borrowers and Canadian Guarantors jointly and severally, unconditionally and irrevocably, guaranteed to the Collateral Agent, for the benefit of the Bank Lenders, the prompt and complete payment and performance when due of all of the obligations of each of the Canadian

---

[7]    As discussed above, Western Coal Corp. was merged into Walter Canadian Coal Partnership.

Borrowers and Canadian Guarantors, under the First Lien Credit Agreement and related obligations (the "Canadian Obligations"). A list of the Canadian Guarantors is attached as Exhibit D.

93. Also pursuant to the Canadian Guaranty and Collateral Agreement, the Canadian Borrowers and the Canadian Guarantors have pledged as security in favor of the Bank Lenders, to secure the obligations on the Canadian Revolver (including reimbursement obligations with respect to Letters of Credit issued on account of the Canadian Borrowers), on a first lien basis, substantially all of the Debtors' assets located in Canada, including:

- All personal property and related assets capable of being pledged under the *Personal Property Security Act* (British Columbia) or similar legislation of any other Canadian jurisdiction;

- All equity interests in Canadian subsidiaries owned by the Canadian Borrowers or any and each of the Canadian Guarantors;

- 70.98% of equity interests in the U.K. operations through a pledge of equity in Energy Build Group Limited, the parent company for the U.K. operations; and

- Real property holdings including mineral leaseholds as well as property owned in fee simple.

B.     The 9.500% Senior Secured First Lien Notes

94. Pursuant to an indenture dated as of September 27, 2013, Walter Energy issued $970 million in aggregate principal amount of 9.500% senior secured notes with a maturity of October 15, 2019 (the "9.500% Senior Secured First Lien Notes"). The 9.500% Senior Secured First Lien Notes were issued on September 27, 2013, March 27, 2014 and July 14, 2014, under that certain Indenture dated as of September 27, 2013 for the 9.500% Senior Secured Notes due 2019. The 9.500% Senior Secured First Lien Notes have a cash coupon interest rate of 9.500% per annum, payable semi-annually in arrears on April 15 and October 15 of each year. The 9.500% Senior Secured First Lien Notes are guaranteed by all of Walter Energy's material U.S. subsidiaries (*i.e.*, the U.S. Guarantors) on a secured basis. The 9.500% Senior Secured First Lien Notes are secured by a first

33

priority lien in all or substantially all of the assets of Walter Energy and the U.S. Guarantors, including a 65% pledge from Walter Energy of its equity in Canada Holdings. The 9.500% Senior Secured First Lien Notes' first priority liens are of equal priority as and share *pro rata* with, the first priority liens granted to the Bank Lenders under the First Lien Credit Facility in the Debtors' U.S. assets. The rights of the Bank Lenders, the 9.500% Senior Secured First Lien Notes and the 11.0%/12.0% Senior Secured Second Lien PIK Toggle Notes (defined below) are governed by that certain Amended and Restated Intercreditor Agreement among Walter Energy, Inc., the Other Grantors Party Thereto, Morgan Stanley Senior Funding, Inc., Union Bank, N.A. and Wilmington Trust, National Association dated March 27, 2014 (the "Intercreditor Agreement").

95.    As of the Petition Date, the 9.500% Senior Secured First Lien Notes had a remaining principal balance of $970 million outstanding, plus accrued and unpaid interest of approximately $23 million.

C.    11.0%/12.0% Senior Secured Second Lien PIK Toggle Notes

96.    Pursuant to an indenture dated as of March 27, 2014, Walter Energy issued $350 million in aggregate principal amount of 11.0%/12.0% senior second lien PIK toggle notes with a maturity of April 1, 2020 (the "11.0%/12.0% Senior Secured Second Lien PIK Toggle Notes"). The 11.0%/12.0% Senior Secured Second Lien PIK Toggle Notes have a coupon interest rate of 11.0/12/0% per annum, payable semi-annually in arrears on April 1 and October 1 of each year. Interest is payable, at the election of Walter Energy, (a) entirely in cash ("Cash Interest"), or (b) with a combination of (i) 50% Cash Interest and 50% increasing the principal amount of the outstanding notes or issuing additional PIK notes ("PIK Interest") or (ii) 75% Cash Interest and 25% PIK Interest. The governing indenture requires that the first and final interest payments be paid with Cash Interest.

97.     The 11.0%/12.0% Senior Secured Second Lien PIK Toggle Notes are guaranteed by all of Walter Energy's material U.S. Subsidiaries (*i.e.*, the U.S. Guarantors) on a secured basis. The 11.0%/12.0% Senior Secured Second Lien PIK Toggle Notes are secured by a second priority lien in all or substantially all of the assets of Walter Energy and the U.S. Guarantors, including a 65% pledge from Walter Energy of its equity in Walter Energy Canada Holdings, Inc. The rights of the Bank Lenders, the 9.500% Senior Secured First Lien Notes and the 11.0%/12.0% Senior Secured Second Lien PIK Toggle Notes (defined below) are governed by the Intercreditor Agreement.

98.     As of the Petition Date, the 11.0%/12.0% Senior Secured Second Lien PIK Toggle Notes had a remaining principal balance of $360.5 million outstanding, plus accrued and unpaid interest of approximately $12 million.

D.      The 9.875% Senior Notes due 2020

99.     Pursuant to an indenture dated as of November 21, 2012, Walter Energy issued $500 million in aggregate principal amount of 9.875% senior unsecured notes with a maturity of December 15, 2020 (the "9.875% Senior Notes due 2020"). The 9.875% Senior Notes due 2020 have a cash coupon interest rate of 9.875% per annum, payable semi-annually in arrears on June 15 and December 15 of each year. The 9.875% Senior Notes due 2020 are guaranteed by all of Walter Energy's material U.S. Subsidiaries (*i.e.,* the U.S. Guarantors) on an unsecured basis. The 9.875% Senior Notes due 2020 are unsecured and subordinate in right of payment to the First Lien Credit Facility, the 9.500% Senior Secured First Lien Notes and the 11.0%/12.0% Senior Secured Second Lien PIK Toggle Notes. The 8.500% Senior Notes due 2021 are general unsecured senior obligations of Walter Energy and the U.S. Guarantors and rank *pari passu* in right of payment with all of Walter Energy's and the U.S. Guarantors' existing senior indebtedness, including the 8.500% Senior Notes due 2021.

100.     As of the Petition Date, the 9.875% Senior Notes due 2020 had a remaining principal balance of $388 million outstanding, plus accrued and unpaid interest including penalty interest of approximately 22.5 million.

E.     The 8.500% Senior Notes due 2021

101.     Pursuant to an indenture dated as of March 27, 2013, Walter Energy issued $450 million in aggregate principal amount of 8.500% senior unsecured notes with a maturity of April 15, 2021 (the "8.500% Senior Notes due 2021").  The 8.500% Senior Notes due 2021 have a cash coupon interest rate of 8.500% per annum, payable semi-annually in arrears on April 15 and October 15 of each year.  The 8.500% Senior Notes due 2021 are guaranteed by all of Walter Energy's material U.S. Subsidiaries (*i.e.,* the U.S. Guarantors) on an unsecured basis.  The 8.500% Senior Notes due 2021 are unsecured and subordinate in right of payment to the First Lien Credit Facility, the 9.500% Senior Secured First Lien Notes and the 11.0%/12.0% Senior Secured Second Lien PIK Toggle Notes.  The 8.500% Senior Notes due 2021 are general unsecured senior obligations of Walter Energy and the U.S. Guarantors and rank *pari passu* in right of payment with all of Walter Energy's and the U.S. Guarantors' existing senior indebtedness, including the 9.875% Senior Notes due 2020.

102.     As of the Petition Date, the 8.500% Senior Notes due 2021 had a remaining principal balance of $383.3 million outstanding, plus accrued and unpaid interest of approximately $8.1 million.

F.     Walter Energy's Common Stock

103.     Walter Energy is a publicly-traded company listed on the NYSE under the symbol "WLT."  As of the Petition Date, there were 80,714,128 shares of Walter Energy common stock outstanding held by 32,853 beneficial holders, with a trading price of $0.16 /share on the NYSE.  On July 8, 2015, Walter Energy received notice from the NYSE that the staff of the NYSE Regulation,

36

Inc. has determined to commence proceedings to delist the common stock of the Company from the NYSE. Trading of the Company's common stock on the NYSE was suspended prior to the opening of trading on July 8, 2015.

G.    Western Coal Corp. Acquisition and Canadian Hybrid Financing

104.    On December 2, 2010, Walter Energy, and Western Coal Corp. ("WCC"), a corporation formed under the laws of British Columbia, entered into an agreement pursuant to which Walter Energy agreed to purchase all of the issued and outstanding common shares of Western Coal Corp. (other than those shares already owned by Walter Energy, WCC or their affiliates) for $3.3 billion in cash and stock of Walter Energy (the "Acquisition"). In connection with financing the Acquisition, on March 28, 2011, Walter Energy formed Walter Energy Holdings, LLC ("Walter LLC"), a US limited liability company which has a single membership interest, and Walter Energy Canada Holdings, Inc. ("Canada Holdings"), a Canadian corporation. Walter LLC is not a special purpose or bankruptcy remote entity.

105.    As part of the Acquisition financing, the parties entered into a series of transactions, each of which occurred on April 1, 2011 (the "Hybrid Financing") under which Walter Energy, in substance, advanced approximately $2 billion in cash to Canada Holdings to enable Canada Holdings to purchase WCC in exchange for Walter Energy's right to receive a specified number of common shares of Canada Holdings in the future. The various agreements create U.S. and Canadian tax efficiencies.

106.    The Hybrid Financing steps specifically include:

(i)    Canada Holdings issued a $2 billion 10-year interest-only term note to Walter Energy (the "Secured Promissory Note") in exchange for $2 billion of cash. The Secured Promissory Note bears interest at a variable rate equal to three-month London Interbank Offered Rate ("LIBOR") plus 450 basis points ("bp"). The interest will be payable, at Canada Holdings' option, in either cash or common shares of Canada Holdings.

37

(ii)    Walter LLC entered into a forward subscription agreement (the "Subscription Agreement") with Canada Holdings, pursuant to which Walter LLC agreed to subscribe for 928,998 shares of Canada Holdings' common shares for an aggregate subscription price equal to the principal amount of the Secured Promissory Note (i.e., $2 Billion) on the maturity date of the Secured Promissory Note.

(iii)    Walter Energy agreed to make contributions to Walter LLC to purchase shares under a capital support agreement (the "Capital Support Agreement") to enable Walter LLC to satisfy its obligations under the Subscription Agreement.

(iv)    Walter Energy provided a Guarantee (the "Guarantee") to Canada Holdings of Walter LLC's performance of its obligations under the Subscription Agreement.

(v)    Canada Holdings used the proceeds from the Secured Promissory Note and newly issued Walter Energy common stock to carry out the Acquisition on April 1, 2011.

107.    Since its issuance, Canada Holdings has paid interest on the Secured Promissory Note in shares of Walter Energy, or cash, as permitted under the agreements.

## VII.    Events Leading to the Chapter 11 Cases

108.    Since 2011, metallurgical coal prices have declined dramatically due to several external pressures, including greatly reduced Chinese import demand, significantly increased sources of seaborne supply and the strength of the U.S. dollar against other currencies in coal producing countries, such as Australia.  Prices for both thermal and metallurgical coal declined steadily from 2011 through 2014.  The decline intensified in early 2015, with spot prices for metallurgical coal falling below US$110 per metric ton, down from $330 per metric ton in Q2 of 2011.  Today's benchmark metallurgical coal price for Q3 of 2015 recently settled at $93 per metric ton.

109.    Confronted with declining metallurgical coal prices, the Debtors' management focused their energies on reducing costs and preserving liquidity.  Among other things, in 2012, management reduced SG&A and capital expenditures by 20% ($32 million) and 10% ($45 million), and idled the Gauley Eagle mine in West Virginia.  In 2013, the Debtors further reduced SG&A and

38

capital expenditures by 25% ($33 million) and 61% ($238 million) and idled the Willow Creek mines in Canada. In addition, the Debtors idled or closed the North River, Reid School and Swann's Crossing mines in Alabama. The Debtors also reduced the cash cost of sales per metric ton by 14% and reduced cash dividends by 92%. In 2014, management further reduced SG&A and capital expenditures by 28% ($28 million) and approximately 40% ($61 million), while idling the remaining Canadian mining operations. The Debtors sold the Blue Creek Coal Terminal for $25 million, brought the cash cost of sales down per metric ton by 13% and reduced cash dividends to a nominal amount. In 2015, the Debtors terminated dividends entirely and implemented additional programs to lower costs, which included reductions to the Debtors' workforce and management, and the successful renegotiation of a take-or-pay contract with one of the Debtors' terminal operators. Most recently, the Debtors announced steps to partially idle the Jim Walter Resources No. 7 mine, which is expected to result in millions of dollars or annual savings, and fully idled the U.K. mines and Maple underground mine in West Virginia.

110. Despite these efforts, the burden on the Debtors of their funded debt obligations and labor-related liabilities has become unsustainable. The Debtors suffer from crippling legacy labor costs, principally in the form of medical benefits and pension obligations, as well as insupportable hourly labor costs. With cash reserves of approximately $270 million as of June 30, 2015, the Debtors continue to suffer substantial losses from operations despite the far-reaching cost cuts already taken. As such, the Debtors risk exhausting their liquidity by the end of 2015, given the declining metallurgical coal environment, over $3 billion in debt, annual interest expense of $264 million, and the weight of the Company's labor costs and legacy retiree obligations.

111. Recognizing the mounting risks and uncertainties that it faced, the Company retained Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss") and Bradley, Arant, Boult

Cummings LLP ("Bradley Arant") as its legal advisors, Blackstone Advisory Services L.P. ("Blackstone") as investment banker, and AlixPartners LLC as restructuring advisor, to assist the Company with developing responses to the worsening situation.

112. In late March 2015, an unofficial committee of holders of First Lien Claims (the "Steering Committee") retained Akin, Gump, Strauss, Hauer and Feld LLP ("Akin Gump") as legal advisor, and Lazard Frères & Co. LLC ("Lazard" and together with Akin Gump, the "Steering Committee Advisors") as financial advisor. Thereafter, the Debtors opened an "advisors' only" electronic data site for the Steering Committee Advisors containing extensive financial, legal and corporate diligence materials, and with the guidance and direction of the Company's Board of Directors, engaged with the Steering Committee Advisors regarding a comprehensive restructuring of the Debtors.

113. On April 15, 2015, as negotiations continued with the Steering Committee Advisors on a restructuring, the Company elected to enter the 30-day grace period under its 9.500% Senior Secured First Lien Notes and 8.500% Senior Unsecured Notes. Ultimately, however, more time was needed to negotiate a consensual resolution and, as a result, on or about May 15, the Debtors paid the interest on their 9.500% Senior Secured First Lien Notes and 8.500% Senior Unsecured Notes.

114. While making continued progress with the Steering Committee Advisors, the Debtors simultaneously explored other options. Advisors for certain unsecured noteholders approached the Debtors to explore restructuring alternatives, entered into a non-disclosure agreement with the Debtors, and conducted diligence thereafter. However, the Debtors' continued operating losses, lack of sufficient unencumbered assets, and limited flexibility under their secured debt documents

40

precluded the development of a meaningful alternative transaction to the one pursued with the First Lien Creditors.

115.    The Company and its Advisors ultimately reached an agreement in principle with the Steering Committee and its Advisors on the terms of a restructuring (the "Restructuring") that (a) contemplates a consensual debt-to-equity conversion of over $1.8 billion of the Company's prepetition secured debt pursuant to a prenegotiated chapter 11 plan (the "Plan"); and (b) permits the Debtors' consensual use of the Prepetition Secured Parties' (as defined in the Cash Collateral Motion) cash collateral for no more than seven (7) months to allow the Debtors to pursue confirmation of the Plan, while simultaneously pursuing a sale of the Company to the holders of First Lien Claims, subject to higher and better offers (the "Section 363 Sale").  In the event that the Debtors are unable to confirm a Plan or certain events specified in the RSA (defined below) occur while the Debtors are pursuing the Plan, the Debtors will seek to effectuate the Section 363 Sale.

116.    The Debtors are rapidly losing cash, even excluding interest expenses.  Thus, a successful Restructuring  demands more than just the elimination of funded debt.  To confirm the Plan, the Debtors must obtain material concessions from the UMWA and USW and otherwise reduce their existing and legacy labor and OPEB obligations.  While the Debtors will strive to reach a consensual resolution with the UMWA regarding these essential concessions, the Debtors may need to seek judicial relief to obtain such relief through the procedures and processes provided for in sections 1113 and 1114 of the Bankruptcy Code (collectively, the "1113/1114 Process") if no consensual resolution results.

117.    The terms of the Restructuring are set forth in a Restructuring Support Agreement (the "Restructuring Support Agreement" or "RSA") executed by the Debtors and the Steering

41

Committee.[8]  Pursuant to the RSA, the Debtors will pursue confirmation of the Plan.  However, if the Debtors fail to meet certain case milestones, the Debtors are required to abandon the Plan process and pursue a Section 363 Sale.  Such milestones include, without limitation:

- The Debtors must commence the 1113/1114 Process by making an initial proposal to the UMWA by August 12, 2015 and to the USW by August 26, 2015;

- The Debtors must commence the 363 Sale Process by August 19, 2015;

- The Debtors must achieve the necessary cost savings that are acceptable to the Debtors and Majority Holders (as defined in the RSA) through the 1113/1114 Process, either through negotiations with the unions and retirees, or by rejection under section 1113 of the Bankruptcy Code and termination or modification of retiree benefits under 1114 of the Bankruptcy Code, by December 9, 2015;

- This Disclosure Statement must be approved by the Bankruptcy Court by October 28, 2015; and

- The Plan must be confirmed by the Bankruptcy Court by January 13, 2015.

In addition, the RSA sets forth various events which, if they occur, will cause the RSA to terminate immediately.

118.    The Debtors' consensual use of the prepetition lenders' cash collateral ("Cash Collateral") lies at the core of the Restructuring.  Without the ability to use cash collateral, Debtors cannot operate.  To use Cash Collateral, the Debtors must operate pursuant to a budget (the "Cash Collateral Budget") and otherwise comply with the terms of the order authorizing the use of Cash Collateral (the "Cash Collateral Order").  The Cash Collateral Order and Budget are attached to and are more fully described below and in the motion seeking entry of the Cash Collateral Order (the

---

[8]    The RSA is attached to and described more fully in the contemporaneously filed motion to assume the RSA.

"Cash Collateral Motion"). Notably, the Debtors' ability to use Cash Collateral terminates upon the occurrence of certain triggering events, including:

- Conversion or dismissal of the chapter 11 cases;

- Failure to comply with the Cash Collateral Budget;

- Termination of the RSA; and

- Confirmation of the Plan or consummation of the Section 363 Sale.

119.     The Debtors believe that the Plan maintains the Company as a viable going-concern and positions the Company to weather the currently depressed met coal market. As negotiations with the Steering Committee continued, the Debtors elected to enter the 30-day grace period under its 9.500% Senior Secured First Lien Notes and 8.500% Senior Unsecured Notes. Accordingly, before the expiration of the grace period on July 15, 2015, the Debtors commenced these Chapter 11 Cases to pursue and consummate the Restructuring.

## VIII.   First Day Motions

120.     Concurrently with the filing of their chapter 11 petitions, the Debtors filed the First Day Motions. The Debtors have reviewed the payments requested in the First Day Motions with counsel to the Steering Committee, and all relief sought therein, including all payments, transfers and transactions, is subject to and in accordance with Interim Cash Collateral Order. The Debtors respectfully request that this Court grant each of the First Day Motions with respect to each of the Debtors. I believe that each First Day Motion constitutes a critical piece of the Debtors' successful and smooth transition into chapter 11. Collectively, the First Day Motions maximize value for the Debtors' estates and stakeholders by reducing unnecessary disruption and minimizing any negative impact of the Chapter 11 Cases on the Debtors' businesses and operations.

43

121.	The Debtors respectfully refer the Court to the individual First Day Motions for a more detailed description of the requested relief and relevant facts related thereto. I have read each of the First Day Motions and the descriptions and facts contained therein are complete and accurate. To the extent that this Declaration and the provisions of any of the First Day Motions are inconsistent, the terms of the First Day Motions shall control. Capitalized terms that are used in this Section VIII but not otherwise defined herein have the meanings ascribed to them in the applicable First Day Motion.

A.	Administrative Motions

(i)	*The Debtors' Emergency Motion to Set Expedited Hearings on First Day Motions (**"Expedited First Day Hearing Motion"**)*

122.	The Debtors seek entry of an order setting the First Day Motions for expedited hearing and granting them related relief. The Debtors seek an expedited hearing on the First Day Motions because it will best enable the Debtors to smoothly transition into the chapter 11 process. Granting the hearing on an expedited basis will minimize potential disruptions to the Debtors' operations by allowing the Debtors to continue operating in the ordinary course, including by allowing the Debtors to honor their employee payroll obligations.

123.	I am informed by counsel that the First Day Motions request relief that is common in restructurings of the size and complexity of the Chapter 11 Cases. Scheduling the hearing on the First Day Motions on an expedited basis will benefit the Debtors, the Debtors' creditors and all parties in interest.

(ii)	*The Debtors' Motion for an Order Directing Joint Administration of the Debtors' Chapter 11 Cases (**"Joint Administration Motion"**)*

124.	The Debtors seek entry of an order directing joint administration of these cases for procedural purposes only, pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

44

125. The Debtors intend to operate their business and to manage their properties as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code. In that regard, the Debtors anticipate that numerous notices, applications, motions and other filings in these Chapter 11 Cases will affect more than one of the Debtors. Moreover, as described more fully below, the Debtors' financial affairs and operations are highly integrated. Many of the motions, hearings and orders in these Chapter 11 Cases will affect each Debtor and its respective estate. Accordingly, joint administration of these cases for procedural purposes will reduce fees and costs, avoid needless duplicative filings and enable a more efficient and economical administration of the Chapter 11 Cases. Joint administration relieves the Court from the burden of entering duplicative orders and maintaining duplicative files. Notably, creditors' rights will not be adversely affected as this Motion seeks only administrative, not substantive, consolidation of the estates. Creditors thus maintain their ability to file claims against specific Debtor estates.

126. I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest and is necessary to achieve a successful and smooth transition into chapter 11. On behalf of all the Debtors, I respectfully submit that the Court should grant the Joint Administration Motion.

> (iii) *The Debtors' Motion for an Order (A) Authorizing the Debtors to File a Consolidated List of 50 Largest Unsecured Creditors; (B) Waiving the Requirement to File a List of Creditors, and (C) Establishing Procedures for Notifying Creditors of the Commencement of the Debtors' Chapter 11 Cases* (**"Consolidated Top 50 and Matrix Motion"**)

127. The Debtors seek entry of an order authorizing the Debtors to (a) file a consolidated mailing matrix on behalf of all Debtors and (b) file a consolidated list of 50 largest unsecured creditors. The Debtors determined that the most effective way for ensuring a committee of unsecured creditors that fairly represents the Debtors' creditor pool would be to file a consolidated list of the fifty largest unsecured creditors.

45

128.     As discussed above, the Debtors are centrally managed from their Birmingham headquarters.  The Debtors are affiliates with integrated assets and operations and their receivables and payables generally run through Walter Energy's cash management system.  They employ a consolidated and centralized cash management system for the entire corporate enterprise.  Consistent with their centralized cash management and accounting organization, the Debtors' receivables are routinely transferred from subsidiary accounts to Walter Energy's main concentration bank accounts, from which most disbursements are routinely made on behalf of Walter Energy and its various subsidiaries.  The Debtors' accounts payable are frequently paid from Walter Energy's bank accounts and the transactions are likewise recorded through intercompany accounting entries.

129.     Given the Debtors' centrally managed and integrated accounting and cash management functions, a Consolidated Matrix and Consolidated Fifty Largest List best and most efficiently reflect the Debtors' obligations and provide the most efficient and effective means of noticing the Debtors' stakeholders.  The Debtors' employees and professionals would have had to divert significant resources and effort to identify and reconcile which claims should be asserted against which Debtor.  Because the Consolidated Fifty Largest List fairly represents the Debtors' largest creditors, it suffices to appoint an unsecured creditors committee.  Indeed, by using a Consolidated Fifty Largest List, the Bankruptcy Administrator can quickly appoint an unsecured creditors committee that can evaluate the enterprise's assets, liabilities and operations and can assess the Debtors' restructuring proposal as the Debtors' circumstances require.

130.     I respectfully submit that the relief requested in the Consolidated Top 50 and Matrix Motion is in the best interests of the Debtors' estates, their creditors and all parties in interest and constitutes a critical element to achieving a smooth transition into chapter 11.  I respectfully submit that the requested relief be granted as to all Debtors.

46

(iv) *The Debtors' Motion Pursuant to 11 U.S.C. §§ 102 and 105(a) and Bankruptcy Rules 2002(m) and 9007 Seeking Authority to Implement Certain Notice and Case Management Procedures (**"Case Management Motion"**)*

131.     The Debtors seek entry of an order authorizing the Debtors to implement certain procedures to assist with the administration of the Chapter 11 Cases, including: (a) set procedures for the filing and service of notices, motions, applications, exhibits and objections and responses related thereto; (b) establish standards for notices of hearing and agenda letters; (c) establish mandatory procedures for scheduling hearings and objection deadlines; and (d) limit matters that are required to be heard by the Court.

132.     The Debtors also seek authorization to (a) with the Court's permission and cooperation, schedule omnibus hearing dates; (b) serve documents by email on certain parties in interest; (c) establish a website to provide interested parties with access to certain documents filed in these Chapter 11 Cases; and (d) use a claims and noticing agent to maintain a data site of documents and effect their appropriate distribution.

133.     The requested case management procedures will maximize the efficiency and orderliness of administering these Chapter 11 Cases and reduce the costs arising from traditional case management procedures.  The requested relief also limits the administrative burdens and costs on all parties associated with preparing for hearing and serving and mailing documents.  Finally, the Debtors' requested relief will enable the Debtors, their personnel and their professionals to organize and prioritize the numerous tasks attendant to these cases.

134.     I believe that the Case Management Motion requests relief that serves the best interests of the Debtors' estates, their creditors and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition into chapter 11.  I respectfully submit that the requested relief be granted as to all Debtors.

47

(v)  *The Debtors' Motion for an Order (A) Granting the Debtors an Extension of Time Within Which to File Schedules and Related Documents, and (B) Waiving the Requirements to File Lists of Equity Security Holders and Provide Notice to Equity Security Holders* (***"SOFAs / Schedules Extension / Waiver Motion"***)

135.    The Debtors seek entry of an order (a) extending the time within which the Debtors must file their Schedules and Statements through and include August 28, 2015, without prejudice to the Debtors' ability to request additional extensions or waivers for cause shown and (b) waiving the requirements to file lists of equity security holders and provide notice to equity holders.

136.    The Debtors are part of a global enterprise with integrated and diverse businesses.  In the ordinary course of their operations, the Debtors have entered into hundreds, if not thousands, of contracts and other commercial relationships.  Because of the size and scope of the Debtors' businesses, the complexity of their financial affairs and the numerous business matters incident to the commencement of the Chapter 11 Cases, the Debtors do not anticipate they will be able to complete the schedules of assets and liabilities, schedules of current income and expenditures, statements of executory contracts and unexpired leases and statements of financial affairs within the fourteen days that Bankruptcy Rule 1007(c) provides.

137.    The Debtors' accounting and legal personnel will need to address numerous critical operational matters in the early days of these Chapter 11 Cases in order to effect a smooth transition into the chapter 11 process, thereby maximizing estate value.  The requested extension will allow the Debtors and their personnel to focus on these operating exigencies for the benefit of all creditors and parties in interest.

138.    Further, the Debtors believe that preparing a list of Walter Energy's equity security holders with last-known addresses and sending notices to all parties will be extremely expensive and time-consuming and that, to the extent equity security holders are entitled to distributions from the Debtors' estates, those parties will be provided with notice of the bar date and, therefore, will not be

48

prejudiced.  I believe that waiving the requirement to file a list of equity security holders will help the Debtors make a smooth transition into chapter 11 and, therefore, maximize the value of the Debtors' estates to the benefit of creditors and all parties in interest.

139.    I believe that the SOFAs/Schedules Extension Motion requests relief that serves the best interests of the Debtors' estates, their creditors and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition into chapter 11.  I respectfully submit that the requested relief be granted as to all Debtors.

B.    Operational Motions Requesting Immediate Relief

140.    The Debtors seek a variety of relief related to their operations that will facilitate a smooth transition into chapter 11, minimize disruptions to the business from the restructuring and maximize the value of the estates for the benefit of stakeholders.

(i)    *The Debtors' Motion for Entry of Interim and Final Orders Under 11 U.S.C. §§ 105, 361, 362, 363, 507 and 552, Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014 and Local Rule 4001-2 (A) (I) Authorizing Postpetition Use of Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, and (III) Scheduling a Final Hearing; and (B) Granting Related Relief ("Cash Collateral Motion")*

141.    The Debtors seek entry of an order (i) authorizing the use of "cash collateral" as that term is defined in section 363 of the Bankruptcy Code, including any and all cash of any kind in which the Prepetition Secured Parties have a Lien or other security interest (the "Cash Collateral"), (ii) granting adequate protection to the Prepetition Secured Parties (as defined in the Cash Collateral Order), (iii) modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the Debtors to implement the terms of the Cash Collateral Orders; (iv) scheduling a final hearing for approval of the Final Order; and (v) and granting related relief.

142.    As described in detail in the Cash Collateral Motion, the Debtors ability to access and use cash is essential to ensuring continued operations during these Chapter 11 cases. In the normal

49

course of business, the Debtors use cash on hand and cash flow from operations and other sources to fund working capital and capital expenditures to operate their business. Specifically, the Debtors require access to the Prepetition Collateral, including Cash Collateral, to, among other things, satisfy payroll, pay suppliers, meet overhead, pay utility expenses, make adequate protection payments and pay professionals. Absent access to the Cash Collateral, the Debtors will not have adequate unencumbered cash on hand to pay these critical expenses. Ensuring that the Debtors have sufficient working capital on hand will allow the Debtors to preserve and maintain the going concern value of the business, thus enhancing the prospects for a successful reorganization under chapter 11 of the Bankruptcy Code.

143. The Debtors are seeking to use Cash Collateral of the Prepetition Secured Parties on a consensual basis to fund their operations throughout these Chapter 11 cases. To that end, the Debtors successfully engaged in good faith, arms-length negotiations to reach a consensual agreement regarding the terms of the use of Cash Collateral during these Chapter 11 cases with the Steering Committee.

144. In exchange for the use of Cash Collateral and to ensure that the Prepetition Secured Parties are adequately protected, the Debtors propose: (a) with respect to the First Lien Secured Parties (as defined in the Cash Collateral Motion), granting replacement liens on all Postpetition Collateral (as defined in the Cash Collateral Order), paying interest in cash when due at the applicable non-default rate, pursuant to the terms of the applicable first lien debt documents, and granting superpriority administrative expense claims against the Debtors on account of any diminution in value under section 507(b) of the Bankruptcy Code; and (b) with respect to the Second Lien Secured Parties, granting Junior Adequate Protection Liens and Junior Superpriority Claims (both as defined in the Cash Collateral Motion), subject to the Intercreditor Agreement. The Debtors

50

also seek the establishment of a "carve out" on the terms set forth in the Cash Collateral Order. As described above and in the Cash Collateral Motion, the Debtors' use of Cash Collateral terminates upon the occurrence of certain triggering events and the Debtors are required to use Cash Collateral in compliance with the terms of the Cash Collateral Order and related Budget.

145.    The Debtors submit that the protections proposed in the Cash Collateral Motion and the fact that the use of Cash Collateral will enable the Debtors to preserve value by continuing to operate in the ordinary course of business should adequately protect the Prepetition Secured Creditors from any diminution in the value of their respective interests in the Prepetition Collateral, including Cash Collateral.

146.    For the reasons set forth above and in the Cash Collateral Motion, the relief requested in the Cash Collateral Motion is in the best interests of the Debtors' estates and will enable the Debtors to continue to operate their business in chapter 11 without disruption so as to avoid immediate and irreparable harm to the Debtors' estates. I respectfully submit that the requested relief be granted as to all Debtors.

(ii)    *The Debtors' Motion for an Order (A) (I) Approving Continued Use of the Debtors' Existing Cash Management System, (II) Authorizing Use of Existing Bank Accounts and Checks, (III) Waiving the Requirements of 11 U.S.C. § 345(b), (IV) Granting Administrative Expense Status to Post-Petition Intercompany Claims, and (V) Authorizing the Continuation of Certain Intercompany Transactions; and (B) Granting Related Relief (***"Cash Management Motion"***)*

147.    The Debtors seek entry of an order (i) authorizing and approving the Debtors to continue using their existing cash management system; (ii) authorizing the Debtors to continue using prepetition bank accounts and existing checks (and to continue paying fees in connection with administering such bank accounts in the ordinary course); (iii) waiving the requirements of section 345(b) of the Bankruptcy Code with respect to the Debtors' deposit and investment practices; (iv) granting administrative expense status to postpetition intercompany claims between and among the

51

Debtors pursuant to section 503(b)(1) of the Bankruptcy Code, and requiring that any intercompany transfers made by a Debtor to any non-Debtor affiliate (excluding any transfers made to BW Methane and BW Transmission) be memorialized in the form of senior secured notes, which notes will be pledged to the first lien debt holders consistent with the Interim Cash Collateral Order (as defined below) and related final order; (v) authorizing the continuation of certain intercompany transactions postpetition; and (vi) granting related relief..

148.    As described in more detail in the Cash Management Motion, the Debtors maintain an integrated, centralized cash management system (the "Cash Management System") in the ordinary course of their business that allows them to effectively and efficiently administer their cash and financial affairs.  Pursuant to the Cash Management System, the Debtors collect, concentrate, invest and disburse funds generated by the Debtors' operations.  The Cash Management System also enables the Company to: (a) transfer funds between and among the Debtors and non-debtor affiliates; (b) properly allocate costs and revenues among the Company's various legal entities; and (c) generally manage the Company's operations, cash flow and cash needs.

149.    The Company's finances and general corporate functions, including the Cash Management System, are managed primarily at Walter Energy, Inc. ("Walter Energy"), the Company's Birmingham-based headquarters.  The treasury department of Walter Energy ("Treasury") exercises control and oversight over the Cash Management System.  Treasury has integrated the Cash Management System with the Debtors' sales, purchasing, supply and payroll, thereby facilitating the Company's cash forecasting and reporting needs and enabling the monitoring, collection and disbursement of funds through the bank accounts of the Debtors and their non-debtor affiliates (the "Bank Accounts").  The Company uses a sophisticated software system to manage its cash and to track intercompany accounting.

150.    The Cash Management System has been continuously utilized by the Debtors and constitutes a customary and essential business practice.  It is similar to other systems commonly employed by multinational corporate enterprises of comparable size and complexity.  The interrelationships between the Debtors' operations and those of their affiliates mandate the continuation and use of the Cash Management System for a successful reorganization of the Debtors' businesses, as well as the preservation and enhancement of their going-concern value for the benefit of all constituents.  Any disruption to the Cash Management System would have an immediate adverse impact on the Debtors' businesses and impede a successful reorganization.

(i)      *The Debtors' Bank Accounts and Flow of Funds*

151.    In 2011, the Company expanded its operations beyond Alabama through the acquisition of mining facilities in West Virginia, Canada and the United Kingdom.  The Cash Management System links the local account networks that service each region with Bank Accounts maintained by Walter Energy, enabling Treasury to centrally manage the Company's cash position and funding needs.

152.    With the exception of the Debtors' mines in West Virginia, revenue from the Debtors' mining, coking and gas operations in the U.S. is generally (a) collected through the Debtors' U.S. subsidiaries, (b) concentrated at Walter Energy in Master Concentration Accounts and (c) used to satisfy operational needs and invest in liquid assets such as mutual funds.

153.    Receipts. The Debtors engaged in mining, coking and gas operations in Alabama generally issue invoices in their own names and collect corresponding receipts in deposit accounts at Bank of America ("BofA") and JPMorgan Chase Bank, N.A. ("JPMorgan").[9]  Receipts from the

---

[9]      As of the Petition Date, the Debtors are in the process of moving their bank accounts from BofA to a nearly identical system with JPMorgan.  The BofA and JPMorgan accounts largely mirror each other and serve identical functions.

deposit accounts at BofA and JPMorgan are collected in Walter Energy's main concentration and operating accounts at BofA and JPMorgan (the "Master Concentration Accounts").

154.    Three of the Debtors with less active commercial operations – Blue Creek Energy, Inc. ("Blue Creek"), Walter Land Company, Walter Minerals – do not bank with BofA or JPMorgan and collect receipts in operating accounts at Regions Bank.  These receipts are automatically swept to the Master Regions Disbursement Account (described below).

155.    Disbursements.  Funds collected in the Master Concentration Accounts are typically invested or used by the Debtors to pay disbursements.  Managers at Walter Energy manually transfer funds for operating disbursements from the Master Concentration Accounts to Walter Energy's main concentration and ACH account at Regions Bank, from which the disbursements are made (the "Master Regions Disbursement Account").[10]  Because Regions Bank requires the Company to prefund payments made by ACH transfer, the Debtors typically maintain a balance in the Master Regions Disbursement Account sufficient to cover upcoming payments for two weeks.

156.    Funds needed to satisfy the obligations of Walter Energy's U.S. subsidiaries are either (a) transferred to the applicable operating subsidiary's disbursement account at Regions Bank and then paid to third parties or (b) paid directly to third parties from the Master Regions Disbursement Account at Walter Energy.  The Debtor subsidiaries typically make disbursements by check, whereas Walter Energy generally makes payments by ACH transfer on its own or the subsidiaries' behalves.  Payments made by Walter Energy on behalf of Debtors and non-debtors and the corresponding obligations due from such Debtors and non-debtors to Walter Energy, are charged to the subsidiaries' balance sheets and recorded on their books and records where they are added to each entity's respective intercompany balances.

---

[10]    Disbursements for debt service are paid directly from the Master Concentration Accounts.

157. The Debtors also satisfy certain disbursements through a purchasing card program (the "Purchase Card Program") that they maintain with the Bank of Nova Scotia ("Scotia") for purchases in U.S. and Canadian dollars. Scotia has issued approximately 134 purchasing cards ("Purchasing Cards") and Automotive Rentals, Inc. has issued approximately 75 fuel cards (the "ARI Fuel Cards") to the Debtors. Of these, approximately 5 Purchasing Cards and 28 ARI Fuel Cards are issued to Canadian employees. The Debtors' employees can only use the Purchasing Cards and ARI Fuel Cards in the ordinary course of business for certain authorized expenses and disbursements, which are enumerated in a corporate policy that is distributed to relevant employees. The policy establishes spending limits based on an employee's seniority and procedures for the review of purchases by each employee's direct supervisor, as well as by Treasury and accounting. Certain of the Purchasing Cards have also been issued to the Company's third-party travel agency for certain travel expenses. Employees can use the ARI Fuel Cards to fuel and repair various vehicles involved in the Debtors' businesses.

158. In early June, Scotia noticed the Debtors that it intended to terminate the Purchase Card Program. To address Scotia's concerns and to permit continued use of the Purchase Card Program, which the Debtors use to, among other, things, purchase essential parts and supplies for their operations, the Debtors negotiated revised terms. The Debtors now pre-fund the Purchase Card Program with $500,000, and the agreement exists on a month-to-month basis. It functions similarly to a commercial pre-paid debit card, and Purchasing Card advances are limited to the amounts the Debtors maintain on deposit with Scotia to fund the Purchase Card Program. As a result, as of the Petition Date, no prepetition balances exist with respect to the Purchase Card Program. Approximately $40,000 is due on account of the ARI Fuel Cards.

159. <u>Investments</u>. Funds not required by the Debtors in the near term are typically maintained in investment accounts.[11] The Debtors invest through a BofA money market account or an investment portal with Comerica Bank ("<u>Comerica</u>"). The Debtors can only invest in one of the six types of short-term and low-risk instruments enumerated in the Debtors' internal investment guidelines; investments cannot be made for speculative purposes. The Debtors' investment guidelines only permit investments for the purpose of protecting capital, maintaining liquidity and earning an appropriate return given the safety of an investment. Over the month of May 2015, the Debtors' investments have had an average daily balance of $200 million and have virtually all been invested in money market mutual funds.

(ii)  *West Virginia*

160. The Debtors that own and operate West Virginia mines – Atlantic Development and Capital LLC, Atlantic Leasco LLC and Maple Coal Co. LLC – maintain separate accounts at Branch Banking & Trust Corp. ("<u>BB&T</u>"). Receipts collected in operating accounts maintained by Atlantic Leaseco LLC and Maple Coal Co. LLC are automatically swept into a concentration account at Atlantic Development and Capital LLC. Disbursements may be made by wire and ACH transfer from each operating account at BB&T. Payroll is funded through the Maple Coal Co. LLC and Atlantic Leaseco LLC operating accounts. Checks are generally paid from each company's operating account and, in the case of workers' compensation claims, payments are made from a separate disbursement-only account administered by Rockwood Casualty, a third-party provider. Historically, the West Virginia mines have been economically self-sufficient and have not required funding from Walter Energy.

---

[11]  Treasury may also concentrate funds in the Master Concentration Accounts and Master Disbursement Account to minimize banking and transactional fees.

(iii)  *Walter Canada*

161.  Walter Canada utilizes an account network at Scotia.  The Canadian mines are currently idle and there are sufficient funds on deposit to satisfy their funding needs.  As described below, the Debtors incur costs on behalf of Walter Canada for shared corporate expenses.

(iv)  *Walter U.K.*

162.  The Company operates its U.K. mine through Energybuild Ltd., ("Energybuild" and together with the other U.K. subsidiaries, the "U.K. Subsidiaries" or "Walter U.K."), the  sole operating subsidiary in the U.K.  The U.K. Subsidiaries continue operating in the ordinary course of their business and are not in any insolvency or restructuring proceedings in any jurisdiction. Energybuild maintains a bank account in the United Kingdom with Lloyd's Bank.  Other than the shared expenses incurred by Walter Energy and which are charged to its subsidiaries through the Company's intercompany transfer pricing policies, Walter U.K. generally funds its own operations. However, when Energybuild generates insufficient revenue to cover operating expenses, Walter Energy has funded Walter U.K. through intercompany funding.  Such funding has averaged approximately $1 million during the 6 months prepetition.

(v)  *Bermuda*

163.  Cardem Insurance Co., Ltd. ("Cardem"), a Bermuda company, functions as the Debtors' captive insurance company.  It writes property and casualty insurance for the Company. The Debtors control an account at the Bank of Butterfield that is held in the name of Cardem. Payments from the Debtors to Cardem for insurance premiums and shared corporate expenses incurred by the Debtors on behalf of Cardem are necessary to preserve the value of the Debtors.

164.  Under the circumstances, maintenance of the Cash Management System is in the best interest of the Debtors' estates.  The basic structure of the Cash Management System constitutes the Debtors' ordinary and usual business practices and the Cash Management System is consistent with

Case 15-02741-TOM11   Doc 3   Filed 07/15/15   Entered 07/15/15 11:43:01   Desc Main
Document    Page 57 of 86

those utilized by corporate enterprises comparable to the Debtors in size and complexity. Moreover, the centralized and automated Cash Management System presently used by the Debtors is critical to their ability to manage their cash and centrally coordinate the transfer of funds to efficiently and effectively continue their operations.

165.    Any disruption to the Debtors' current cash management procedures would impair the Debtors' ability to successfully administer the Chapter 11 Cases. It would be time-consuming, difficult and costly for the Debtors to establish an entirely new system of accounts and a new cash management system. The attendant delays from revising cash management procedures and redirecting receipts would create unnecessary pressure on the Debtors and their employees while they work to meet the other administrative obligations imposed by chapter 11. Furthermore, preserving the "business as usual" atmosphere and avoiding the unnecessary and costly distractions that would inevitably be associated with any substantial disruption in the Cash Management System will facilitate the Debtors' efforts in this regard.

166.    For the reasons set forth above and in the Cash Management Motion, the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates and will enable the Debtors to continue to operate their business in chapter 11 without disruption so as to avoid immediate and irreparable harm to the Debtors' estates. I respectfully submit that the requested relief be granted as to all Debtors.

(iii) *The Debtors' Motion for (I) (A) an Order Authorizing, But Not Directing, the Debtors to Pay Certain Prepetition Wages, Compensation, Workers Compensation and Employee Benefits and to Maintain Employee Benefit Programs and Pay Related Administrative Obligations and (B) a Supplemental Order Authorizing, But Not Directing, the Debtors to Pay Certain Bonus and Severance Obligations; (II) Authorizing and Directing Applicable Banks and Other Financial Institutions to Process and Pay All Checks Presented for Payment and to Honor All Funds Transfer Requests Made by the Debtors Relating to the Foregoing; and (III) Granting Related Relief (**"Wages Motion"**)*

167.     The Debtors seek entry of an order (i) authorizing, but not directing, the Debtors, in accordance with their stated policies and in the ordinary course of business, to:   (a) pay all prepetition employee wages, salaries and certain other payments owed to employees, including holiday pay and other paid time off, (b) honor workers' compensation obligations, (c) make contributions to prepetition benefit programs and continue such programs, (d) make all payments for which prepetition payroll withholding deductions (including, but not limited to, payroll taxes) were made, (e) reimburse all prepetition employee business expenses and (f) pay and maintain certain of the Debtors' ordinary course bonus programs for non-insider Employees; (ii) authorizing, but not directing, the Debtors to continue payment of wages, compensation and employee benefit programs in the ordinary course of business and to pay other costs and expenses relating to the foregoing as described more fully below; (iii) authorizing and directing applicable banks and other financial institutions to honor and pay all checks and transfers drawn on the Debtors' bank accounts to make the foregoing payments; and (iv) granting related relief.

168.     The Debtors also request entry of a supplemental order, to be considered at the final hearing scheduled in these cases, authorizing (but not directing) the Debtors (i) to continue their severance policy and to make payments thereunder and to make cash payments with respect to outstanding paid time off obligations owing to any Employee as of the date of the Employee's termination and (ii) to pay and maintain the Debtors' ordinary course quarterly bonus program.

59

169.     In addition, the Black Warrior Companies employ approximately twelve individuals. Because the Black Warrior Companies exclusively service the Jim Walter mines, employees of the Black Warrior Companies are routinely at the mine sites.  In addition, the Black Warrior Companies' headquarters are located close to the Jim Walter mining operations.  Given the close proximity of the businesses and the relatively low number of employees employed by the companies (the "BW Employees") for sake of administrative ease and efficiency, and to benefit from economies of scale, the BW Employees are integrated into Jim Walter's payroll system.  Accordingly, the Debtors make payroll and benefit payments to the BW Employees, which amounts are expensed to the Black Warrior Companies and are repaid by the Black Warrior Companies.

170.     I have reviewed the Wages Motion, am familiar with the facts set forth therein and believe the facts to be accurate and complete.  As described in more detail in the Wages Motion, the Debtors seek authority to pay and honor their prepetition obligations to their Employees, including paying the BW Employees, in the ordinary course of their business, including by satisfying wage and other compensation-related obligations, paying employee withholding taxes and employer taxes (including but not limited to federal, state, employment and other payroll and withholding taxes), honoring holiday pay and other paid time off obligations, continuing the Debtors' workers' compensation program, maintaining employee benefits and honoring employee benefits obligations that the Debtors have traditionally provided in the ordinary course of business, continuing garnishment and Payroll Deductions (defined below) and reimbursing Employees for business expenses.  The Debtors also seek authority to continue the programs, plans and policies related thereto postpetition.

171.     To ensure that the Debtors continue operations without interruption, to preserve value for the estates and to maximize the value of the business as a going concern, the Debtors must

continue to pay their Employees, the BW Employees and the Canadian Employees certain prepetition wages, salaries, other cash and non-cash compensation, employee benefits and reimbursable expenses. The majority of the Employees rely on their compensation, benefits and reimbursement of expenses to satisfy their daily living expenses. Consequently, they will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid compensation, benefits and reimbursable expenses. Moreover, if the Debtors are unable to satisfy such obligations, Employee morale and loyalty will be jeopardized at a time when Employee support is critical. In the absence of such payments, members of the Debtors' workforce may seek alternative employment opportunities. The Debtors' workforce is necessary to maintain the safety and integrity of the mining operations. Mining operations require highly-skilled and specialized miners and managers. A loss of skilled talent of this kind would hinder the Debtors' ability to meet their customer obligations, may diminish customer confidence in the Debtors and may impair the safety of the mines.

172.    For the reasons set forth above and in the Wages Motion, the relief requested in the Wages Motion is in the best interests of the Debtors' estates and will enable the Debtors to continue to operate their business in chapter 11 without disruption so as to avoid immediate and irreparable harm to the Debtors' estates. I respectfully submit that the requested relief be granted as to all Debtors.

(iv)    *The Debtors' Motion for an Order Authorizing Debtors to Continue Prepetition Customer Programs and Granting Related Relief (**"Customer Programs Motion"**)*

173.    The Debtors seek entry of an order authorizing the Debtors to continue their ordinary course prepetition customer program and to honor prepetition obligations to their customers in connection therewith. I have reviewed the Customer Programs Motion, am familiar with the facts set forth therein and believe the facts to be accurate and complete.

61

174. As described in more detail in the Customer Programs Motion, the Debtors' marketing strategy focuses on international markets located in Europe, South America and Asia, areas where it has a transportation cost advantage and where the Debtors' coal is in demand. More specifically, the Debtors' underground mining operations in Alabama primarily produce and export metallurgical coal for the global steel industry. The Debtors' other key products include thermal coal and industrial coal, anthracite, metallurgical coke, coalbed methane gas (*i.e.,* natural gas) and related products. Approximately 92% of the metallurgical coal sales from the Debtors' Alabama underground mining operations consist of sales to international customers. The Debtors' thermal coal is primarily marketed to industrial and electrical utility customers in the U.S., generally under long-term contracts.

175. As noted above, the Debtors sell, among other things, metallurgical coal, coke, coal tar, sulfate and light oil (each a "Product" and, collectively, the "Products"). The Debtors have adopted their Customer Programs to promote sales related thereto. *First*, the Debtors offer certain discounts to certain significant customers in the form of quality adjustments (the "Quality Adjustment Program"). *Second*, the Debtors have adopted a demurrage program responsive to the effects that shipping and transportation logistics may have on their products (the "Demurrage Program"). *Finally*, the Debtors employ more traditional rebates and credits for certain Products (the "Rebate Program" and, together with the Quality Adjustment Program and the Demurrage Program, the "Customer Programs").[12]

176. Because of the limited customer base for the Debtors' products and the highly-competitive nature of the coal markets, the Debtors' customer relationships are among its most

---

[12] The terms of these Customer Programs are memorialized in the Company's contracts with their customers (collectively, the "Customer Agreements").

valuable assets. Any negative reaction by customers – many of whom are international buyers unfamiliar with the chapter 11 restructuring process – may impair the customers' attitudes and behavior towards the Debtors unless, among other things, the Debtors can assure customers that sale of the Debtors' services and products will continue uninterrupted. In particular, the Debtors' goodwill and ongoing business relationships may erode if their customers perceive that the Debtors are unable or unwilling to fulfill prepetition obligations under the Customer Programs. Moreover, the Debtors' competitors may exploit any perceived weakness in the Debtors' customer relationships they feel the Chapter 11 Cases engender.

177. The Debtors seek authority to continue to honor, in the ordinary course, all obligations arising from, or related to, the Customer Programs, whether or not such obligations were incurred or accrued prepetition. The common goals of the Customer Programs are to meet competitive pressures, ensure customer satisfaction and generate goodwill for the Debtors, thereby retaining customers, attracting new ones and ultimately enhancing net revenue. The Customer Programs are generally consistent with practices common to the coal mining industry.

178. Moreover, if the Debtors are not allowed to honor their Customer Programs, the Debtors' customers may lose confidence in the Debtors, their product and their reliability. Notably, the Debtors' product – coal – is a commodity. As a result, the relationships and trust between the Debtors and their customers prove critical to maintaining customers and attracting new ones. Alienating existing customers may cause customers to obtain coal from the Debtors' competitors. It is precisely this risk that the Customer Programs mitigate. In fact, the Debtors believe that the costs of honoring the Customer Programs and the prepetition obligations related thereto will be more than offset by the revenue from sales made because the Customer Programs are in place.

63

179.     The Debtors submit that approval of the Debtors' ability to continue the Customer Programs is necessary to avoid immediate and irreparable harm to the Debtors and their estates. The success and viability of the Debtors' businesses depend upon the loyalty and confidence of their customers. Moreover, the customers that participate in the Customer Programs are among the Debtors' most significant patrons. The continued support of this constituency is critical for the Debtors' successful restructuring. Any delay in honoring any of the Customer Programs or discontinuation of any of the Customer Programs as a result of the commencement of these cases likely will result in a severe and irreparable impairment of the Debtors' relationship with these important customers at a time when their loyalty and support are critical, which could lead to the erosion of the Debtors' market share position with respect to their Products.

180.     For the reasons set forth above and in the Customer Programs Motion, the relief requested in the Customer Programs Motion is in the best interests of the Debtors' estates and will enable the Debtors to continue to operate their business in chapter 11 without disruption so as to avoid immediate and irreparable harm to the Debtors' estates. I respectfully submit that the requested relief be granted as to all Debtors.

(v)     *The Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing (I) the Debtors to Pay Prepetition Claims of Certain Critical Vendors and Foreign Vendors and (II) Financial Institutions to Honor and Process Related Checks and Transfers; and (B) Granting Related Relief ("**Critical Vendor Motion**")*

181.    The Debtors seek an entry of an order (a) granting them the authority in their sole discretion, but not requiring them, to pay all or a portion of those prepetition obligations of certain Critical Vendors and foreign vendors, subject to an interim and final cap, (b) authorizing the Debtors to pay, in their sole discretion, the prepetition claims of certain critical vendors and foreign vendors and granting related relief; (c) authorizing banks to receive, process, honor and pay checks or electronic transfers used by the Debtors to pay the foregoing and (d) granting related relief. I have reviewed the Customer Programs Motion, am familiar with the facts set forth therein and believe the facts to be accurate and complete.

182.    As described in greater detail in the Critical Vendor Motion, the Debtors use a variety of supplies and vendors in their businesses, including petroleum-based fuels, explosives, tires, conveyance structure, ventilation supplies, lubricants and other raw materials as well as spare parts and other consumables used in the mining process. The Debtors use third-party suppliers for a significant portion of their equipment rebuilds and repairs, drilling services and construction. While substitute suppliers may exist for some of the Debtors' suppliers and service providers, the Debtors' mining operations use modern techniques and equipment that depend on highly specialized materials and skilled service to maintain in safe operating condition. Moreover, the Debtors operate in a highly specialized, highly regulated and highly-competitive industry. The unique nature of the coal mining industry leaves coal mining companies with few options (and often no practical option) when shopping for specialized vendors. Certain suppliers and service providers at various venues are simply the only options available to the Debtors. As a result, the Debtors' business depends upon

65

maintaining uninterrupted supply relationships with certain specialized critical vendors, suppliers, service providers and similar entities.

183. More specifically, the Debtors rely on their machinery suppliers and vendors to provide the necessary equipment needed for the Company's operations. The Debtors also rely on suppliers of certain products necessary to develop and maintain the infrastructure of the mines. Such equipment and supplies are typically only available from sole-source suppliers. Replacement vendors and suppliers, even if available, may result in substantially higher costs for the Debtors. In addition, the Debtors rely on two entities, BW Methane and BW Transmission (as defined below), to extract coalbed methane gas from the Debtors' underground mines at Jim Walter. Methane degasification is a critical service mandated by regulatory authorities to ensure the safety of the Debtors' mine workers. As a result, if the requested relief is not granted and certain essential trade vendors refuse to continue to supply goods and services to the Debtors post-petition, the Debtors may be unable to continue portions of their operations, thereby endangering the Debtors' successful reorganization and substantially harming all creditors.

184. For the reasons set forth above and in the Critical Vendor Motion, the relief requested in the Critical Vendor Motion is in the best interests of the Debtors' estates and will enable the Debtors to continue to operate their business in chapter 11 without disruption so as to avoid immediate and irreparable harm to the Debtors' estates. I respectfully submit that the requested relief be granted as to all Debtors

(vi) *The Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing (I) Payment of Certain Prepetition Claims of Shippers, Storage Providers and Service Providers and (II) Financial Institutions to Honor and Process Related Checks and Transfers; and (B) Granting Related Relief ("**Possessory Liens Motion**")*

185. The Debtors seek entry of an order (a) authorizing but not requiring the Debtors to pay, in their sole discretion, the prepetition labor, shipping and delivery charges owed to Shippers,

66

Storage Providers and Service Providers (each as defined below) that the Debtors determine, in their sole discretion, to be necessary or appropriate to obtain the release of goods, raw materials, parts, components, materials, equipment or other items (collectively, the "Products") held by any such Freight Carrier, Storage Provider or Service Provider, subject to an interim and final cap; (b) authorizing the Debtors' banks to receive, process, honor and pay checks or electronic transfers used by the Debtors to pay the foregoing; and (c) granting related relief. I have reviewed the Possessory Liens Motion, am familiar with the facts set forth therein and believe the facts to be accurate and complete.

186.    As more specifically described in the Possessor Liens Motion, in the operation of their businesses, the Debtors use and make payments to common carriers, shippers, barge, trucking and rail transport companies, freight and port terminal operators, entities that own and operate pipelines and other third-party service providers (collectively, the "Shippers") that transport, ship and otherwise facilitate the movement of the Debtors' products, including metallurgical coal, steam coal and coal bed methane gas. The Debtors also use and make payments to bailees, coal yards, storage facilities and storage providers (collectively, the "Storage Providers"), that store the Debtors' metallurgical coal at various stages of the Debtors' supply and delivery process. Finally, the Debtors use and make payments to mechanics, contractors and other service providers (collectively, the "Service Providers" and, together with the Shippers and Storage Providers, the "Lien Claimants") that repair, maintain and service essential machinery and equipment used in the Company's businesses.

187.    The Debtors typically depend on overland conveyor, trucks, rail or barges to transport their Products. Disruption of any of these transportation services, whether due to weather-related problems, strikes or lock-outs, accidents, transportation delays or other events could impair the

Debtors' ability to supply their products to their customers, thereby resulting in lost sales and reduced profitability. Transportation costs represent a significant portion of the total cost of delivering coal to the customer. Overall price increases in the Debtors' transportation costs could make the Debtors' coal less competitive with the same or alternative products from competitors with lower transportation costs.

188. All of the Debtors' metallurgical mines are served by a single rail carrier. In addition, the majority of the metallurgical coal produced by the Debtors' Alabama underground mining operations is exported and to coal customers through the state-run docks at the Port of Mobile, Alabama. Cost-effective alternatives to the port are limited. An interruption of rail or port services could significantly limit the Debtors' ability to operate and, to the extent that alternate sources of port and rail services are available, could increase transportation and port costs significantly.

189. Coal producers like the Debtors are typically responsible for transporting their coal from their mines to an export coal-loading facility. Exported coal is usually sold at the loading port, with the buyer responsible for further transportation from the port to the buyer's location. As a result, managing coal transportation costs proves essential to maximize coal revenue. The Debtors' Alabama mines are conveniently located near both river barge load-out facilities and CSX railroad transportation, both of which provide direct access to the Port of Mobile, minimizing the Debtors' transportation costs.

190. The Debtors rely heavily on certain Shippers and Storage Providers to transport and store the metallurgical coal and methane gas for delivery to their customers. Metallurgical coal produced by the No. 4 and No. 7 mines in Alabama is stored at the mine until it is loaded for transport by trucking companies or the CSX railroad to the Port of Mobile. Transport to the Port of Mobile proceeds in one of two ways: (a) from mine to rail to port or (b) from mine to truck to barge

68

to port.  Once the coal reaches the Port of Mobile, it is stored in the coal yard until it is loaded for shipment to the Debtors' customers.

191.    The Debtors' coking operations at Walter Coke, Inc. ("Walter Coke") utilize third-party barge operators, trucking and railroad companies to transport both (a) the coke and coke by-products produced by Walter Coke to its customers and (b) certain amounts of coal purchased by Walter Coke for use in its coke ovens.

192.    Similarly, the Debtors' West Virginia mines use third-party trucking companies to transport the metallurgical coal to two river docks, where it is stored pending shipment by barge to the Debtors' customers (including both outside customers and Walter Coke).  In connection with the Debtors' coal bed methane gas production, methane gas extracted from the Debtors' mine at Walter Black Warrior Basin ("WBWB") is injected directly into the transmission pipeline owned and operated by a third party for transmittal to the purchaser of the gas.

193.    The services provided by the Shippers and Storage Providers are essential to the day-to-day operation of the Debtors' businesses.  In 2014, the Debtors produced 7.6 million metric tons of metallurgical coal in the U.S.  The Debtors produce coal at a high volume on a daily basis and rely on the Shippers and Storage Providers to transport and store the coal efficiently and continuously to meet customer demand.  Accordingly, at any given time, there are numerous shipments from the Debtors' mines en route to the ports used by the Debtors, where the Debtors' coal is stored in the ports' coal yards until it is loaded for international shipment.

194.    Any disruption to the Debtors' supply network would have an immediate negative impact on the Debtors' businesses.  Fast and efficient transportation is necessary for the Debtors' successful operations, not only to avoid a back-up of excess inventory, but also to maximize the revenue from the coal shipments.  Metallurgical coal produced at the Debtors' underground mines

has a small particle size, which degrades over time as it absorbs moisture from exposure to weather elements. The Debtors' coal contracts with their customers include penalties for moisture content above certain agreed-upon thresholds. Accordingly, any delay caused by a disruption in the Debtors' supply network would not only cause an excess coal build-up at the Debtors' mining sites, but would also reduce the value of the coal already produced.

195.     If the freight and storage charges are not paid, the Shippers and Storage Providers may refuse to perform additional services for the Debtors. In many cases, the Debtors' Shippers and Storage Providers are "sole source" providers and cannot be replaced. For example, CSX, the Debtors' main rail carrier in Alabama is the sole North American Class 1 rail company with operational lines convenient to the Debtors' operations. The Debtors also are dependent on the operators of the key dock, port and rail terminals, which in nearly all instances are the only practicable, cost-effective means of transporting the Debtors' coal to their customers. If the Debtors were unable to locate replacements for these key Shippers and Storage Providers, the Debtors would very quickly deplete inventories at the ports and be unable to fulfill customer requirements. Given the highly-competitive market in which the Debtors operate, missing customer requirements could cause customers to seek alternative sources of supply, causing irreparable harm to the Debtors' business. Even if the Debtors were able to replace certain Shippers and Storage Providers (and in certain instances replacements are likely not available), the Debtors would incur significant additional expenses for replacement service providers, which the Debtors believe would vastly exceed the prepetition amounts sought to be paid in this Motion. Accordingly, the Debtors seek to pay the prepetition amounts owed to the Shippers and Storage Providers with respect to the goods in transit.

196.     The Debtors may also owe prepetition amounts to the Service Providers, many of which may be able to assert trade or mechanics' liens over the Debtors' essential parts, machinery and other equipment.  To ensure safe and orderly working conditions at their mines, the Debtors must repair or replace machine parts and make on-the-spot repairs to mining machinery with little or no notice.  Interruptions incurred as a result of failing to obtain necessary equipment and parts would cause some portions of the Debtors' operations to cease, which would cause immediate and substantial economic harm to the Debtors and erode their valuable customer base.

197.     The Debtors also rebuild certain key machinery and equipment at specified intervals to extend the useful life of the highly-specialized and expensive mining equipment.  Many of the machines and parts that the Debtors use are only available through a sole-source or at best, a handful of suppliers.  Moreover, because of the strict regulatory regime in which the Debtors operate and the heightened safety standards to which mining operations are subject, many of the machines and parts the Debtors use and the Service Providers themselves, must receive regulatory approval as part of the Debtors' permitting and licensing process.  In addition to the regulatory requirements that some Service Providers must satisfy, the Debtors have cultivated through the years valuable long-term relationships with their Service Providers to achieve maximum efficiency and effectiveness in dealing with the Debtors' highly-customized equipment.  A sudden switch to new suppliers – the quality and turn-around time of which may be untested – at the very least will generate unnecessary inefficiencies and expenses, but could also disrupt normal mining operations.

198.     For the reasons set forth above and in the Possessory Liens Motion, the relief requested in the Possessory Liens Motion is in the best interests of the Debtors' estates and will enable the Debtors to continue to operate their business in chapter 11 without disruption so as to

Case 15-02741-TOM11    Doc 3    Filed 07/15/15    Entered 07/15/15 11:43:01    Desc Main
Document      Page 71 of 86

avoid immediate and irreparable harm to the Debtors' estates. I respectfully submit that the requested relief be granted as to all Debtors.

> (vii) *The Debtors' Motion for an Order (A) Authorizing (I) Debtors to Pay Certain Prepetition Taxes, Governmental Assessments and Fees, and (II) Financial Institutions to Honor and Process Related Checks and Transfers; and (B) Granting Related Relief* (***"Taxes Motion"***)

199. The Debtors seek entry of an order (i) authorizing but not directing the Debtors, in their sole discretion, to pay certain covered taxes and fees ,whether asserted or accrued before or after the Petition Date and (ii) authorizing banks to receive, process, honor and pay checks or electronic transfers used by the Debtors to pay such Covered Taxes and Fees. I have reviewed the Taxes Motion, am familiar with the facts set forth therein and believe the facts to be accurate and complete.

200. As the Taxes Motion describes in more depth, in the ordinary course of their normal businesses, the Debtors collect, withhold and/or incur (a) production taxes, (b) excise taxes, (c) environmental and safety fees and assessments, (d) sales taxes and use taxes, (e) employment taxes and (f) franchise, privilege and property taxes, as well as other taxes, fees and charges (all such taxes, fees and charges, collectively, the "<u>Covered Taxes and Fees</u>").[13] The Debtors remit Covered Taxes and Fees to various federal, state and local governments, including taxing and licensing authorities (collectively, the "<u>Governmental Authorities</u>").

201. Covered Taxes and Fees are remitted by the Debtors through checks and electronic transfers that are processed through the Debtors' disbursement banks and other financial institutions (the "<u>Disbursement Banks</u>"). The Covered Taxes and Fees are paid monthly, bimonthly, quarterly or

---

[13]  The Debtors also incur taxes based on or measured by their net income (including, but not limited to, the federal corporate income tax, state income taxes and related interest and penalties), but no relief is sought with respect to the payment of such taxes.

annually to the respective Governmental Authorities, depending on the given Covered Taxes or Fees and Governmental Authority to which they are paid.

202.    I have been advised by counsel that many of the Covered Taxes and Fees collected prepetition are not property of the Debtors' estates and must for that reason be turned over to the Governmental Authorities.  I have further been advised that, to the extent that they are not actually the property of the Governmental Authorities, such taxes may well give rise to priority claims.  The Debtors also seek to pay prepetition Covered Taxes and Fees to prevent Governmental Authorities from taking actions that might interfere with the Debtors' successful reorganization, including by blocking the receipt or renewal of permits required for the Debtors' continued operations or possibly subjecting directors, officers and other employees to personal liability in connection with nonpayment of Covered Taxes and Fees.  Actions against the Debtors' directors, officers and other employees would distract key personnel, whose full-time attention to the Debtors' reorganization efforts is required and may cause potential business disruptions.  Any such business disruptions may erode the Debtors' customer base and negatively impact these Chapter 11 Cases.

203.    Some federal and state statutes prevent the issuance of certain mining permits to an entity if it or certain related entities have outstanding delinquent penalties or assessments for violations of certain environmental or other laws or regulations.  Non-payment of such penalties or assessments could preclude the receipt or renewal of permits required for the Debtors' continued operations and thus could interfere with their successful reorganization.

204.    Payment of certain of the prepetition Covered Taxes and Fees is critical to the Debtors' continued, uninterrupted operations and to avoid immediate and irreparable harm to the Debtors' estates.  Non-payment of the Covered Taxes and Fees may cause certain Governmental Authorities to take precipitous action, including but not limited to conducting audits, filing liens,

pursuing payment of Covered Taxes and Fees from the Debtors' directors, officers and other employees and seeking to lift the automatic stay, any of which would disrupt the Debtors' day-to-day operations and could potentially impose significant costs and burdens on the Debtors' estates. Prompt payment of the Covered Taxes and Fees will avoid these unnecessary and potentially costly governmental actions.

205.    For the reasons set forth above and in the Taxes Motion, the relief requested in the Taxes Motion is in the best interests of the Debtors' estates and will enable the Debtors to continue to operate their business in chapter 11 without disruption so as to avoid immediate and irreparable harm to the Debtors' estates.  I respectfully submit that the requested relief be granted as to all Debtors.

> (viii)  *The Debtors' Motion for entry of Interim and Final Orders (A) (I) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Performance, (III) Establishing Procedures for Determining Adequate Assurance of Payment, and (IV) Setting a Final Hearing Related Thereto; and (B) Granting Related Relief (***"Utilities Motion"***)*

206.    The Debtors seek entry of an order (a) prohibiting the Debtors' utility service providers from altering, refusing or discontinuing utility services on account of unpaid prepetition invoices; (b) deeming the Debtors' utility service providers adequately assured of future performance; (c) establishing procedures for determining additional adequate assurance of future payment and authorizing the Debtors to provide adequate assurance of future payment of the Debtors' utility service providers; (d) setting a final hearing related thereto; and (e) granting related relief.  I have reviewed the Utilities Motion, am familiar with the facts set forth therein and believe the facts to be accurate and complete.

207.    As described in more detail in the Utilities Motion, in connection with the operation of their business and their facilities and the management of their properties, the Debtors obtain

Case 15-02741-TOM11    Doc 3    Filed 07/15/15    Entered 07/15/15 11:43:01    Desc Main
Document      Page 74 of 86

water, sewer, electricity, gas, telephone, waste disposal and similar utility products and services from various utility companies. The Debtors filed the Utilities Motion requesting that this Court (a) approve the Debtors' proposed form of adequate assurance of postpetition payment to the Utility Companies, as that term is used in section 366 of the Bankruptcy Code; (b) approve procedures for resolving any objections by the Utility Companies relating to the Proposed Adequate Assurance; and (c) prohibit the Utility Companies from altering, refusing or discontinuing service to or discriminating against the Debtors, because such Utility Services are critical to the Debtors' going-concern value. The Proposed Adequate Assurance will consist of, for each Utility Company, a deposit into a newly created, interest-bearing, segregated account equivalent to approximately one half (1/2) of one month of Utility Services. Based on the average monthly cost of the Utility Services, the aggregate of all such deposits will be approximately $1.8 million.

208.    The Debtors' reorganization efforts depend on the continued provision of utility services uninterrupted after the expiration of the stay period mandated by section 366 of the Bankruptcy Code. If the Utility Services are discontinued or altered, even briefly, the Debtors' ability to continue operations could be jeopardized. Such a result could potentially impair the Debtors' reorganization effort and, ultimately, the value of the Debtors' business. In my opinion, it is critical that Utility Services continue uninterrupted during the Chapter 11 Cases. I believe that the procedures the Debtors have proposed for the Utility Companies adequately protect the Utility Companies' rights that I have been advised are provided to the Utility Companies under the Bankruptcy Code, while also protecting the Debtors' need to continue to receive, for the benefit of its estate, the Utility Services upon which its business depends.

209.    For the reasons set forth above and in the Utilities Motion, the relief requested in the Utilities Motion is in the best interests of the Debtors' estates and will enable the Debtors to continue

to operate their business in chapter 11 without disruption so as to avoid immediate and irreparable harm to the Debtors' estates. I respectfully submit that the requested relief be granted as to all Debtors.

(ix)   *The Debtors' Motion for an Order, Pursuant to Sections 105(a), 363(b), 363(c) and 1107(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004(h) (A) Authorizing the Debtors to (I) Continue Insurance Policies and Agreements Relating Thereto, and (II) Honor Certain Prepetition Obligations in Respect Thereof; and (B) Granting Related Relief (**"Insurance Motion"**)*

210.   The Debtors seek entry of an order (i) authorizing the Debtors to (a) continue insurance policies and agreements relating thereto and (b) honor certain prepetition obligations in respect thereof; and (ii) granting related relief. I have reviewed the Insurance Motion, am familiar with the facts set forth therein and believe the facts to be accurate and complete.

211.   As the Insurance Motion describes in more depth, in the ordinary course of their operations, the Debtors maintain workers' compensation, directors and officers liability, fiduciary, crime, umbrella and excess liability and various other liability, property, pollution and automobile insurance programs with respect to their domestic and foreign operations, described in part below (collectively, the "Insurance Programs"). The Insurance Programs include both self-insured programs and ones obtained from several different insurance carriers (the "Insurance Carriers") pursuant to the insurance contracts. The Insurance Programs cover the Debtors' multiple business lines and various mines and plants.

212.   To preserve the value of the estates and the Debtors' business, the Debtors must maintain the Insurance Programs in the ordinary course of their business on an uninterrupted basis. This includes renewing the Insurance Programs in accordance with the same practices and procedures that were in effect before the Petition Date and to pay all premiums (including taxes), deductibles, claims, broker fees and all other obligations arising under or in connection with the

76

Insurance Programs (collectively, the "Insurance Obligations") relating to the periods before and after the Petition Date.

213.    The nonpayment of any premiums (including taxes), related fees, deductibles, claims or other obligations under any of the Insurance Programs could result in one or more of the Insurance Carriers increasing future insurance premiums, declining to renew the Insurance Programs or refusing to enter into new Insurance Policies.  Moreover, if the Insurance Policies lapse without renewal, the Debtors risk being exposed to substantial liability at a later date to the detriment of all parties-in-interest.  Finally, maintenance of the Insurance Policies is necessary to provide adequate protection of the Debtors' prepetition secured lenders' collateral.

214.    For the reasons set forth above and in the Insurance Motion, the relief requested in the Insurance Motion is in the best interests of the Debtors' estates and will enable the Debtors to continue to operate their business in chapter 11 without disruption so as to avoid immediate and irreparable harm to the Debtors' estates.  I respectfully submit that the requested relief be granted as to all Debtors.

(x)    *The Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Continue and Renew Their Surety Bond Program and (B) Granting Related Relief (**"Surety Bond Program Motion"**)*

215.    The Debtors seek entry of an order authorizing the Debtors to maintain, continue and renew, in their sole discretion, their surety bonds and related obligations owed to the surety bond issuers and other third parties (the "Surety Bond Program") on an uninterrupted basis and in accordance with the same practices and procedure as were in effect before the Petition Date (including, but not limited to, the maintenance of cash collateral) and granting related relief.  I have reviewed the Surety Bond Program Motion, am familiar with the facts set forth therein and believe the facts to be accurate and complete.

216.     As described in more detail in the Surety Bond Program Motion, the Debtors require authorization (i) to pay all amounts arising under the Surety Bond Program due and payable after the Petition Date and (ii) to renew or obtain new surety bonds as needed in the ordinary course of business, including, but not limited to, as may be required by law or judicial authority. If the requested relief is not granted and the Surety Bond Program lapses or terminates, the Debtors' operations could be severely affected, thereby endangering the Debtors' successful reorganization and substantially harming all creditors.

217.     For the reasons set forth above and in the Surety Bond Program Motion, the relief requested in the Surety Bond Program Motion is in the best interests of the Debtors' estates and will enable the Debtors to continue to operate their business in chapter 11 without disruption so as to avoid immediate and irreparable harm to the Debtors' estates.  I respectfully submit that the requested relief be granted as to all Debtors.

     C.     <u>Tax Motions Requesting Immediate Relief</u>

218.     The Debtors seek to enforce the automatic stay by implementing court-ordered procedures intended to protect the Debtors' estates against the possible loss of valuable tax benefits that could flow from inadvertent stay violations.

     (i)     *The Debtors' Motion for an Order (A) Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Interests in the Debtors' Estates; and (B) Granting Related Relief (**"NOL Trading Motion"**)*

219.     The Debtors seek entry of an order authorizing the Debtors to establish notification procedures  and approve restrictions regarding the ownership (as it relates to tax consequences under the Internal Revenue Code) and certain transfers of Walter Energy's common stock.  I have reviewed the NOL Trading Motion, am familiar with the facts set forth therein and believe the facts to be accurate and complete.

78

220. As described in more detail in the NOL Trading Motion, the Debtors have incurred and are currently incurring, significant NOLs and NOL carryforwards for U.S. federal income tax purposes totaling approximately $550 million, and NOLs for U.S. federal alternative minimum tax purposes totaling approximately $425 million. These NOLs and other tax attributes could translate into potential future federal income tax savings for the Debtors.

221. The Debtors' NOLs are a valuable asset because the Debtors generally can carry forward their NOLs to offset their future taxable income and tax liability, thereby potentially freeing up funds to meet working capital requirements and service debt. In particular, the NOLs may be available to the Debtors to offset taxable income generated by transactions completed during the course of the Chapter 11 Cases.

222. I have been advised that the Debtors' ability to use their tax attributes, however, could be severely limited under Section 382 of title 26 of the U.S. Code as a result of the trading and accumulation of their equity interests prior to consummation of a chapter 11 plan. The Debtors thus seek to preclude certain transfers of their equity interests and to monitor and possibly object to other changes in the ownership of their equity interests, so that the Debtors can preserve their tax attributes where trading may jeopardize their ability to use of their NOLs under Section 382.

223. For the reasons set forth above and in the NOL Trading Motion, the relief requested in the NOL Trading Motion is in the best interests of the Debtors' estates and is necessary to avoid an irrevocable loss of the Debtors' tax attributes and the resulting harm to the Debtors' estates. I respectfully submit that the requested relief be granted as to all Debtors.

D. <u>Professional Retention Application</u>

(i) *The Debtors' Application for an Order Authorizing the Employment, Retention and Appointment of Kurtzman Carson Consultants LLC as Claims and Noticing Agent and Administrative Advisor for the Debtors Nunc Pro Tunc to the Petition Date (**"KCC Applications"**)*

224. The Debtors seek entry of an order appointing KCC, LLC ("<u>KCC</u>") to act as the claims and noticing agent in order to assume full responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the Chapter 11 Cases. The Debtors have obtained and reviewed engagement proposals from two other court-approved claims and noticing agents to ensure selection through a competitive process. Moreover, based on all engagement proposals obtained and reviewed, I believe that KCC's rates are competitive and reasonable given KCC's quality of services and expertise. Accordingly, on behalf of the Debtors, I respectfully submit that the KCC Retention Application should be granted.

**Conclusion**

225. For the reasons stated herein and in each of the First Day Motions filed concurrently or in connection with the commencement of these cases, I respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as this Court deems just and proper.

[*Remainder of Page Intentionally Left Blank*]

80

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

Date: July 15, 2015

Name: William G. Harvey
Title: Chief Financial Officer of Walter Energy, Inc. and its Subsidiaries

## EXHIBIT A

| Debtors | Non-Debtor Subsidiaries (Canada) | Non-Debtor Subsidiaries (U.K. and Other) |
|---|---|---|
| Walter Energy, Inc. | Walter Energy Canada Holdings, Inc. | Energybuild Group Limited |
| Atlantic Development and Capital, LLC | Walter Canadian Coal Partnership | Energybuild Holdings Ltd. |
| Atlantic Leaseco, LLC | Wolverine Coal ULC | Energybuild Opencast Ltd. |
| Blue Creek Coal Sales, Inc. | Wolverine Coal Partnership | Energybuild Mining Ltd. |
| Blue Creek Energy, Inc. | Brule Coal ULC | Energybuild Ltd. |
| J.W. Walter, Inc. | Brule Coal Partnership | Mineral Extraction and Handling Ltd. |
| Jefferson Warrior Railroad Company, Inc. | Cambrian Energybuild Holdings ULC | Black Warrior Methane Corp. |
| Jim Walter Homes, LLC | Willow Creek Coal ULC | Black Warrior Transmission Corp. |
| Jim Walter Resources, Inc. | Willow Creek Coal Partnership | Cardem Insurance Co. Ltd. |
| Maple Coal Co., LLC | Pine Valley Coal Ltd. | |
| Sloss-Sheffield Steel & Iron Company | 0541237 BC, Ltd. | |
| SP Machine, Inc. | Belcourt Saxon Coal Ltd. | |
| Taft Coal Sales & Associates, Inc. | Belcourt Saxon Coal Limited Partnership | |
| Tuscaloosa Resources, Inc. | | |
| V Manufacturing Company | | |
| Walter Black Warrior Basin LLC | | |
| Walter Coke, Inc. | | |

| | | |
|---|---|---|
| Walter Energy Holdings, LLC | | |
| Walter Exploration & Production LLC | | |
| Walter Home Improvement, Inc. | | |
| Walter Land Company | | |
| Walter Minerals, Inc. | | |
| Walter Natural Gas, LLC | | |

Case 15-02741-TOM11   Doc 3   Filed 07/15/15   Entered 07/15/15 11:43:01   Desc Main
Document      Page 83 of 86

**EXHIBIT B**

**CORPORATE CHART**



## EXHIBIT C

## U.S. GUARANTORS

Walter Energy, Inc.[*]

Walter Energy Holdings, LLC

Blue Creek Coal Sales, Inc.

J.W. Walter, Inc.

Jim Walter Resources, Inc.

Taft Coal Sales & Associates, Inc.

Tuscaloosa Resources, Inc.

Walter Black Warrior Basin LLC

Walter Coke, Inc.

Walter Exploration & Production LLC

Walter Land Company

Walter Minerals, Inc.

Walter Natural Gas, LLC

Maple Coal Co., LLC

Atlantic Development and Capital, LLC

Atlantic Leaseco, LLC

---

[*] Walter Energy, Inc. does not guarantee its own obligations; guarantees Canadian Revolver and U.S. Guarantor obligations only.

## EXHIBIT D

## CANADIAN GUARANTORS[+]

Willow Creek Coal ULC

Willow Creek Coal Partnership

Pine Valley Coal Ltd.

0541237 B.C. Ltd.

Wolverine Coal ULC

Wolverine Coal Partnership

Brule Coal Partnership

Brule Coal ULC

Walter Canadian Coal Partnership

Walter Canadian Coal ULC

Cambrian Energybuild Holdings ULC

Walter Canadian Coal Partnership[*]

---

[+]    Canadian Guarantors guarantee only the obligations incurred under the Canadian Revolver.

[*]    Walter Canadian Coal Partnership does not guarantee its own obligations.