# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

In re:

WALTER ENERGY, INC., *et al.*,[1]

                Debtors.

Chapter 11

Case No. 15-_____(___)

Joint Administration Requested

## THE DEBTORS' MOTION FOR ENTRY OF
## INTERIM AND FINAL ORDERS UNDER 11 U.S.C. §§ 105, 361, 362, 363, 507 AND 552, BANKRUPTCY RULES 2002, 4001, 6003, 6004 AND 9014 (A) (I) AUTHORIZING POSTPETITION USE OF CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, AND (III) SCHEDULING A FINAL HEARING; AND (B) GRANTING RELATED RELIEF

Walter Energy, Inc. ("Walter") and certain of its subsidiaries, the debtors and debtors in possession (collectively, the "Debtors") in the above-captioned cases (the "Chapter 11 Cases"), submit this motion (the "Motion") for entry of an interim order, in substantially the form attached hereto as **Exhibit A** (the "Interim Order"),[2] and a final order in substantially the form of the Interim Order, (the "Final Order," collectively with the Interim Order, the "Cash Collateral Orders"), under sections 105, 361, 362, 363, 507(b) and 552 of title 11 of the United States Code (the "Bankruptcy Code"),  and Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (a) authorizing the use of

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Walter Energy, Inc. (9953); Atlantic Development and Capital, LLC (8121); Atlantic Leaseco, LLC (5308); Blue Creek Coal Sales, Inc. (6986; Blue Creek Energy, Inc. (0986); J.W. Walter, Inc. (0648); Jefferson Warrior Railroad Company, Inc. (3200); Jim Walter Homes, LLC (4589); Jim Walter Resources, Inc. (1186); Maple Coal Co., LLC (6791); Sloss-Sheffield Steel & Iron Company (4884); SP Machine, Inc. (9945); Taft Coal Sales & Associates, Inc. (8731); Tuscaloosa Resources, Inc. (4869); V Manufacturing Company (9790); Walter Black Warrior Basin LLC (5973); Walter Coke, Inc. (9791); Walter Energy Holdings, LLC (1596); Walter Exploration & Production LLC (5786); Walter Home Improvement, Inc. (1633); Walter Land Company (7709); Walter Minerals, Inc. (9714); and Walter Natural Gas, LLC (1198).  The location of the Debtors' corporate headquarters is 3000 Riverchase Galleria, Suite 1700, Birmingham, Alabama 35244-2359.

[2]    Capitalized terms used herein that are not defined shall have the meaning set forth in the Interim Order.

"cash collateral" as that term is defined in section 363 of the Bankruptcy Code, including the Cash Collateral of the Prepetition Secured Parties (as defined below), (b) granting adequate protection to the Prepetition Secured Parties, (c) modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the Debtors to implement the terms of the Cash Collateral Orders; and (d) scheduling a final hearing for approval of the Motion on a final basis (the "<u>Final Hearing</u>").  In support of this Motion, the Debtors submit and rely on the *Declaration of William G. Harvey in Support of Chapter 11 Petitions and First Day Relief* (the "<u>First Day Declaration</u>"),[3] filed with the Court concurrently herewith and incorporated by reference herein.   In further support of the Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.       This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these Chapter 11 Cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.       The statutory predicates for the relief requested herein are sections 105, 361, 362, 363, 507(b) and 552 of the Bankruptcy Code, and  Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014.

## PRELIMINARY STATEMENT

3.       The Debtors are seeking to use Cash Collateral of the Debtors' Prepetition Secured Parties on a consensual basis to fund operations, maintain their properties and administer these Chapter 11 Cases.  The Debtors access to Cash Collateral is critical to preserving the Debtors' operations and maximizing value for the Debtors' stakeholders.  Absent

---

[3]      The First Day Declaration has been filed contemporaneously with this Motion and is incorporated by reference herein.

approval of the Interim Order, the Debtors would not have sufficient liquidity to operate their businesses as currently conducted, to maintain their properties and to pay administrative and restructuring costs associated with these Chapter 11 Cases. Thus, the Debtors respectfully request immediate authority to use Cash Collateral, subject to the terms and conditions set forth in the Interim Order, and request authority to use Cash Collateral on a final basis, subject to the terms and conditions set forth in the Final Order.

4.    Recognizing the need to access cash, in advance of the filing of these Chapter 11 Cases, the Debtors and an *ad hoc* group of First Lien Lenders and First Lien Noteholders (the "Steering Committee") successfully engaged in good faith, arms-length negotiations with respect to the consensual use of Cash Collateral during these Chapter 11 Cases. As further described herein, in exchange for such use of Cash Collateral, the Interim Order (and Final Order) provides the Prepetition Secured Parties, as applicable, with adequate protection in the form of, among other things, superpriority claims, replacement liens, the payment of fees and expenses and eighty (80%) percent of any interest on the First Lien Obligations (as defined below) accruing at the non-default rate, in each case, to protect against the diminution in value of the Prepetition Secured Parties' respective interests in Prepetition Collateral arising from, among other things, the Debtors' use of Prepetition Collateral, including Cash Collateral, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.

5.    Prior to the Petition Date, the Debtors also discussed and negotiated the terms of a consensual restructuring with the Steering Committee. These efforts proved fruitful as, prior to the Petition Date, the Debtors and members of the Steering Committee entered into a restructuring support agreement, dated as of July 15, 2015 (as amended from time to time in accordance therewith, the "RSA"), that provides a framework for a consensual resolution of

3

these Chapter 11 Cases.[4]  Access to Cash Collateral will provide the Debtors with the liquidity necessary to pursue the Restructuring (as defined in the RSA) contemplated by the RSA and preserve and maintain the going-concern value of the Debtors' estates.  Without such access to liquidity, the Debtors' ability to navigate through the chapter 11 process will be jeopardized, all to the detriment of the Debtors' stakeholders.  As a result, the Debtors have an immediate need to use Cash Collateral to ensure sufficient liquidity and to avoid immediate and irreparable harm to the Debtors' estates.

## RELIEF REQUESTED

6.  By this Motion, the Debtors seek entry of an Interim Order and a Final Order (a) authorizing the Debtors to (i) use Cash Collateral in accordance with the Cash Collateral Orders and the Initial Budget attached hereto as **Exhibit A** to the Interim Order (as updated from time to time in accordance with the Cash Collateral Orders, the "Approved Budget"), subject to the Budget Covenant; and (ii) provide adequate protection to the Prepetition Secured Parties in connection with, among other things, the use of such Cash Collateral; (b) scheduling the Final Hearing on the Motion; and (c) granting related relief.

## BACKGROUND

7.  On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing the instant cases (the "Chapter 11 Cases").  The Debtors continue to manage and operate their businesses as debtors-in-possession under sections 1107 and 1108 of the Bankruptcy Code.

8.  No trustee, examiner, or official committee has been appointed in the Chapter 11 Cases.

9.  Information regarding the Debtors' businesses, their capital and debt structure and

---

[4] Simultaneously herewith, the Debtors filed a motion seeking authorization to assume the RSA.

Case 15-02741-TOM11    Doc 42    Filed 07/15/15    Entered 07/15/15 13:29:28    Desc Main
Document      Page 4 of 88

the events leading to the filing of the Chapter 11 Cases is contained in the First Day Declaration.

**OVERVIEW OF SECURED FACILITIES**

10.     As of the Petition Date, the Debtors' principal secured debt facilities were comprised of: (a) the First Lien Credit Facility (as defined below); (b) the 9.50% Senior Secured Notes due 2019 (the "First Lien Notes"); and (c) the 11.0%/12.0% Senior Secured Second Lien PIK Toggle Notes due 2020 (the "Second Lien Notes") (collectively, the "Prepetition Secured Facilities").

11.     As of the Prepetition Date, the outstanding principal amount of the Debtors' Prepetition Secured Facilities was approximately as follows:

| Facility | Outstanding Principal Indebtedness |
|---|---|
| **First Lien Credit Facility** | |
| **Term B Loan:** | **$978.2 million** |
| **Revolver/Letters of Credit:** | **$73.0 million** |
| **First Lien Notes** | **$970.0 million** |
| **Second Lien Notes** | **$360.5 million** |
| **Total Amount of Prepetition Secured Facilities:** | **$2,381.7 Million** |

**A.     First Lien Credit Facility**

12.     Walter, as U.S. Borrower, and Walter Energy Canada Holdings, Inc. ("Walter Canada Holdings") and Western Coal Corp. (now known as Western Canadian Coal Partnership), as Canadian Borrowers (and together with the U.S. Borrower, the "Borrowers"), the various financial institutions party thereto (the "First Lien Lenders") and Morgan Stanley Senior Funding, Inc., as administrative agent (in such capacity, the "Administrative Agent") are parties to that certain Credit Agreement dated as of April 1, 2011 (as amended, restated,

amended and restated, waived, supplemented or otherwise modified from time to time, the "<u>First Lien Credit Agreement</u>"). The First Lien Credit Agreement provides for the making of term and revolving loans to, and the issuance of letters of credit ("<u>Letters of Credit</u>") for the account of, the Borrowers as provided therein (the "<u>First Lien Credit Facility</u>"). As of the Petition Date, borrowings under the First Lien Credit Facility consisted of: (a) $978.2 million in term loans (the "<u>Term B Loan</u>") and (b) $73 million in outstanding Letters of Credit plus accrued and unpaid interest, fees (including any prepayment fees), expenses, penalties, premiums and other obligations incurred in connection therewith, in each case in accordance with the terms of the First Lien Credit Documents (as defined below) (the "<u>Credit Agreement Obligations</u>").[5]

13. The Credit Agreement Obligations are unconditionally guaranteed by those domestic subsidiaries of Walter party thereto as guarantors (the "<u>U.S. Subsidiary Guarantors</u>")[6], each of which is a debtor in these Chapter 11 Cases, and are secured by first priority security interests in and liens on (the "<u>Credit Agreement Liens</u>") substantially all of the assets of Walter and the U.S. Subsidiary Guarantors, including Cash Collateral (the "<u>Prepetition Collateral</u>"), pursuant to and on the terms set forth in (A) the U.S. Guaranty and Collateral Agreement, dated as of April 1, 2011 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>1L Security Agreement</u>"), among Walter, the U.S. Subsidiary Guarantors and Morgan Stanley Senior Funding, Inc., as collateral agent (in such capacity, the "<u>Credit Agreement Collateral Agent</u>"), (B) the Grant of Security Interest in United States Trademarks, dated as of April 1, 2011, made by Walter to the Credit Agreement Collateral Agent, and (C) such other mortgage, security, pledge, guaranty and collateral agreements executed in connection with the First Lien Credit Agreement (collectively, the "<u>First Lien Credit Documents</u>").

---

[5]    Borrowings by the Canadian Borrowers are guaranteed by Walter and the U.S. Subsidiary Guarantors, and are therefore included in the Credit Agreement Obligations.

[6]    A list of the U.S. Subsidiary Guarantors is attached as an exhibit to the First Day Declaration.

6

Included in the Credit Agreement Obligations are Letters of Credit in the face amount of approximately C$24 million (together with fees, interests and other amounts payable in connection therewith, the "Canadian Obligations") that have been issued for the account of the Canadian Borrowers and are unconditionally guaranteed by Walter Energy, the Subsidiary Guarantors and by all of the Canadian Borrowers' wholly owned Canadian subsidiaries (together with the Canadian Borrowers, the "Canadian Obligors"). The Canadian Obligations are secured by the Credit Agreement Liens as well as liens on substantially all of the assets of the Canadian Obligors.

**B.      First Lien Notes**

14.      Pursuant to that certain Indenture dated as of September 27, 2013 (as amended, waived, supplemented or otherwise modified from time to time) by and among Walter, as issuer, the U.S. Subsidiary Guarantors, and Wilmington Trust, National Association, as successor trustee and collateral agent (the "First Lien Trustee;" together with the Administrative Agent and the Credit Agreement Collateral Agent, the "Senior Agents;" and together with the First Lien Lenders and the First Lien Noteholders (as defined below), the "First Lien Secured Parties"), Walter issued the First Lien Notes as follows: (i) $450 million in aggregate principal amount of Initial Notes (as defined in the First Lien Indenture) and (ii) $520 million of Additional Notes (as defined in the First Lien Indenture). As of the Petition Date, the outstanding principal balance of the First Lien Notes was $970 million plus accrued and unpaid interest, fees, penalties, premiums, expenses and other obligations incurred in connection therewith, in each case in accordance with the terms of the First Lien Indenture Documents (as defined below) (the "First Lien Indenture Obligations;" together with the Credit Agreement Obligations, the "First Lien Obligations").

7

The First Lien Indenture Obligations are unconditionally guaranteed by the U.S. Subsidiary Guarantors and are secured, *pari passu* with the Credit Agreement Liens, by first priority security interests in and liens on the Prepetition Collateral (collectively with the Credit Agreement Liens, the "Prepetition First Priority Liens"), pursuant to and in accordance with the terms of (A) the First-Lien Notes Collateral Agreement, dated as of September 27, 2013 (as amended, restated, supplemented or otherwise modified from time to time, the "1L Notes Collateral Agreement"), among Walter, the U.S. Subsidiary Guarantors and the First Lien Trustee as collateral agent for the First Lien Noteholders ( the "1L Notes Collateral Agent"), (B) the Grant of Security Interest in United States Trademarks, dated as of September 27, 2013, made by Walter to the 1L Noted Collateral Agent, and (C) such other mortgage, security, pledge, guaranty and collateral agreements executed in connection with the First Lien Indenture (collectively, the "First Lien Indenture Documents").

## C.      Second Lien Notes

15.      Pursuant to an Indenture dated as of March 27, 2014 by and among Walter, as issuer, the U.S. Subsidiary Guarantors and Wilmington Trust, National Association, as successor trustee and collateral agent (the "Second Lien Trustee"), Walter issued $350 million in aggregate principal amount of Second Lien Notes.  As of the Petition Date, the outstanding principal balance of the Second Lien Notes, including paid-in-kind interest, was $360.5 million, plus any additional accrued and unpaid interest, fees, penalties, premiums, expenses and other obligations incurred in connection therewith, in each case in accordance with the terms of the Second Lien Indenture Documents (as defined below) (the "Second Lien Indenture Obligations," together with the Credit Agreement Obligations and the First Lien Indenture Obligations, the "Prepetition Obligations").

The Second Lien Indenture Obligations are unconditionally guaranteed by the same entities that have guaranteed the First Lien Indenture Obligations and secured by second priority security interests in and liens on the Prepetition Collateral (the "<u>Prepetition Second Priority Liens</u>" and together with the Prepetition First Priority Liens, the "<u>Prepetition Liens</u>"), pursuant to and in accordance with the terms of (A) the Second-Lien Notes Collateral Agreement, dated as of March 27, 2014 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>2L Notes Collateral Agreement</u>"), among Walter, the U.S. Subsidiary Guarantors and the Second Lien Trustee, as collateral agent (the "<u>2L Notes Collateral Agent</u>"), (B) the Grant of Security Interest in United States Trademarks, dated as of March 27, 2014, made by Walter to the 2L Notes Collateral Agent, and (C) all other mortgage, security, pledge, guaranty and collateral agreements executed in connection with the Second Lien Indenture (collectively, the "<u>Second Lien Indenture Documents</u>," together with the First Lien Credit Documents and the First Lien Indenture Documents, the "<u>Prepetition Debt Documents</u>").

**D.**     **<u>Prepetition Collateral</u>**

16.    The Prepetition Collateral includes, among other things, (i) substantially all personal property, including cash, deposit accounts and investments, (ii) equity interests in all material (direct and indirect) domestic subsidiaries of Walter, 66% of Walter's interest in Walter Canada Holdings, and Walter's direct or indirect fifty (50%) percent equity interest in certain joint ventures, and (iii) substantially all material real property holdings, including mineral leaseholds in Alabama and elsewhere and "as extracted" collateral.[7] Based on the searches performed by the Debtors prior to the Petition Date, the Prepetition Secured Parties have valid

---

[7]    On information and belief, property not subject to the Prepetition Liens include the assets of Blue Creek Energy Inc., an immaterial subsidiary, real property having a value of less than $10 million, leaseholds with annual royalty payments of less than $1.5 million, certain real property comprising the Walter Coke plant and miscellaneous mineral leases and immaterial properties. Prepetition Collateral also excludes Excluded Collateral (as defined in the applicable Prepetition Debt Documents).

and perfected Prepetition Liens on all or substantially all of the Prepetition Collateral.[8] The Prepetition Liens are subject, solely as among the Prepetition Secured Parties, to the terms of the Intercreditor Agreement (as defined herein) and those other liens explicitly permitted by the applicable Prepetition Debt Documents (in each case, only to the extent such permitted exceptions were valid, properly perfected, non-avoidable liens senior in priority to the respective liens and security interests of the Prepetition Secured Parties on the Petition Date) (the "Permitted Priority Liens"), if any.

**E.     Intercreditor Agreement**

17.     The lien and payment priorities among the Prepetition Secured Parties and other matters involving the Prepetition Collateral are subject to the terms and conditions of the Amended and Restated Intercreditor Agreement, dated as of March 27, 2014 (as amended, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), among Walter, the U.S. Subsidiary Guarantors, the Senior Agents, the Second Lien Trustee and each additional Collateral Agent (as defined in the Intercreditor Agreement) and Authorized Representative (as defined in the Intercreditor Agreement) from time to time party thereto. In particular, the Intercreditor Agreement provides that the Prepetition Second Priority Liens are junior in priority to the Prepetition First Priority Liens. In addition, pursuant to Section 2.09(b) of the Intercreditor Agreement, the First Lien Trustee, the 1L Notes Collateral Agent, the holders of the First Lien Notes (the "First Lien Noteholders"), the Second Lien Trustee, the 2L Notes Collateral Agent and the holders of the Second Lien Notes (the "Second Lien Noteholders;" together with the First Lien Secured Parties and the Second Lien Trustee, the "Prepetition Secured Parties") are precluded from objecting to the use of Cash Collateral under

---

[8]     While no deposit account control agreements were put in place, substantially all of the Debtors' cash is either (i) in investment accounts, (ii) in deposit accounts with financial institutions constituting First Lien Lenders or Senior Agents or (iii) identifiable proceeds of other Prepetition Collateral.

Case 15-02741-TOM11    Doc 42    Filed 07/15/15    Entered 07/15/15 13:29:28    Desc Main
Document      Page 10 of 88

certain circumstances, including if the Credit Agreement Collateral Agent has consented thereto and the adequate protection provisions set forth herein are adhered to.

## CONCISE STATEMENT OF RELIEF REQUESTED[9]

18.    In accordance with Bankruptcy Rule 4001(b), the following is a summary of the material terms of the proposed form of Interim Order, together with references to the applicable sections of the Interim Order.[10]

| | |
|---|---|
| **Entities with Interest in the Cash Collateral** *Bankruptcy Rule 4001(b)(1)(B)(i)* | The Prepetition Secured Parties (Interim Order, ¶ 5(a)) |
| **Purposes for Use of Cash Collateral** *Bankruptcy Rule 4001(b)(1)(B)(ii);* | Subject to the Budget Covenant, the Debtors shall be authorized to use Cash Collateral for: (a) working capital requirements; (b) general corporate purposes; (c) making adequate protection payments; and (d) paying the costs and expenses of administering the Chapter 11 Cases, including fees and expenses of estate professionals; <u>provided</u> that the Debtors shall not be authorized to use Cash Collateral to pay fees or expenses (x) in excess of $50,000 per month (the "<u>Committee Monthly Cap</u>"), on account of Professional Persons (as defined herein) retained by any official committee appointed in these Chapter 11 Cases, including any Creditors' Committee, (y) in excess of $25,000 (the "<u>Investigation Budget</u>") for the Creditors' Committee to investigate (but not prepare, initiate or prosecute) Claims and Defenses (as defined herein) against the Prepetition Secured Parties before the termination of the Challenge Period (as defined herein), or (z) to initiate or prosecute proceedings or actions on account of any Claims and Defenses against the Prepetition Secured Parties.<br><br>The Debtors shall not transfer or use any Collateral, including any Cash Collateral, to or for the benefit of any direct or indirect foreign or non-debtor affiliate or subsidiary of the Debtors, including, without limitation, in connection with any professional fees and expenses incurred with respect to any restructuring of such subsidiary or affiliate, <u>provided</u> that the Debtors shall be permitted to make payments for the benefit of its foreign and non-debtor affiliates or subsidiaries (i) as expressly provided in an Approved Budget or (ii) with the prior consent of the Steering Committee, which consent shall be in its sole discretion ("<u>Permitted Non-Debtor Affiliate Payments</u>") and, other than with |

---

[9]    The description of the terms of the proposed Interim Order provided in this Motion is intended only as a summary.  In the event of any inconsistency between the descriptions set forth herein and the terms of the Interim Order, the terms of the Interim Order will govern.

[10]    The Debtors intend for the terms of the Final Order to be substantially similar to the terms of the Interim Order.

| | respect to any payments made to or for the benefit of Black Warrior Methane Corp. and Black Warrior Transmission Corp., any such Permitted Non-Debtor Affiliate Payments shall be made pursuant to senior secured notes, which notes shall be pledged to the First Lien Secured Parties. For the avoidance of doubt, in the event that any Permitted Non-Debtor Affiliate Payment is made to any one or more Canadian Entity, each such Canadian Entity shall grant liens against all of its present and future property, assets and undertaking, and all other Canadian Entities shall (i) guarantee repayment of such Permitted Non-Debtor Affiliate Payment and (ii) grant liens against all of their respective present and future property, assets and undertaking as security for such guarantee obligations, and each such Permitted Non-Debtor Affiliate Payment and all of such guarantees and security shall be assigned and pledged by the maker of such Permitted Non-Debtor Affiliate Payment in favor of the First Lien Secured Parties, and in each such case, the form of the note(s), security and guarantees shall be in form and substance satisfactory to the Steering Committee in its sole discretion.<br><br>(Interim Order, ¶¶ 8; 11(j)) |
|---|---|
| **Material Terms: Duration and Use of Cash Collateral/Termination Events** *Bankruptcy Rule 4001(b)(1)(B)(iii)* | The Debtors' right to use the Cash Collateral pursuant to the Interim Order shall automatically terminate (the date of any such termination, the "<u>Termination Date</u>") without further notice or court proceeding on the earliest to occur of (i) 45 days after the Petition Date (unless such period is extended with the consent of the Steering Committee and the Administrative Agent, each in its sole discretion), if the Final Order (provided that such Final Order has not been reversed, vacated, stayed, unless such stay has been vacated, or appealed, unless such appeal has been dismissed or otherwise finally resolved), which Final Order shall be consistent with the Interim Order or otherwise acceptable to the Steering Committee and the Administrative Agent, each in its sole discretion, has not been entered by this Court on or before such date, (ii) February 3, 2016 or such later date as may be agreed to by the Steering Committee in writing in its sole discretion, (iii) the effective date of any confirmed chapter 11 plan in any of the Chapter 11 Cases, (iv) the date of the consummation of a sale or other disposition of all or substantially all of the assets of the Debtors, and (v) the occurrence of any of the following events, unless waived by the Administrative Agent and the Steering Committee, each in its sole discretion (each, a "<u>Termination Event</u>"):<br><br>(a) the Debtors' failure to: (i) use the Collateral, including without limitation Cash Collateral, in a manner consistent with the Approved Budget, but subject to the Budget Covenant, and otherwise comply in any respect with any provision of the Interim Order (including, without limitation, the failure to make adequate payments when due in accordance with and under the terms of the Interim Order); or (ii) comply with any other covenant or agreement specified in the Interim Order (including any obligations to comply with the provisions of paragraph 11 or the covenants and other obligations of the Debtors contained therein); in each case where such failure shall have continued |

unremedied for five (5) business days following receipt of written notice by the Debtors from the Administrative Agent or the Steering Committee of such failure;

(b) (i) an application, motion or other pleading shall have been filed by any Debtor seeking to amend, stay, supplement, vacate, extend or modify in any manner the Interim Order; or (ii) an order shall have been entered reversing, amending, supplementing, extending, staying, vacating, or otherwise modifying in any manner the Interim Order, in each case, without the prior written consent of the Steering Committee and the Administrative Agent, each in its sole discretion;

(c) the date any provision of the Interim Order (or the Final Order, as applicable) shall for any reason cease to be valid and binding or any Debtor shall so assert in any pleading filed in any court;

(d) the date (i) any Chapter 11 Case shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code or any Debtor shall file a motion or other pleading seeking the dismissal or conversion of any Chapter 11 Case pursuant to Bankruptcy Code section 1112 or otherwise other than as expressly contemplated by the Restructuring (as defined in the RSA); or (ii) a trustee, responsible officer or an examiner under Bankruptcy Code section 1104 (other than a fee examiner) is appointed or elected in any Chapter 11 Case, any Debtor applies for, consents to, or acquiesces in, any such appointment, or the Court shall have entered an order providing for such appointment, in each case without the prior written consent of the Steering Committee in its sole discretion;

(e) the Court shall have entered an order granting relief from the automatic stay to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure of the like) on any of the Debtor's assets (other than in respect of insurance proceeds or with respect to assets having a fair market value of less than $1,000,000);

(f) any Debtor shall have filed a motion or application for the approval of any superpriority claim or any lien in the Chapter 11 Cases (other than such claim or lien granted or permitted pursuant to the Cash Collateral Orders), which is *pari passu* with or senior to any of the Adequate Protection Liens, Superpriority Claims or Prepetition Liens, without the prior consent of the Steering Committee and the Administrative Agent, each in its sole discretion;

(g) other than with respect to the Carve-Out and the Approved Liens, any Debtor shall create or incur, or the Court enters an order granting, any claim which is *pari passu* with or senior to any of the Prepetition Liens or Prepetition Obligations or the Adequate Protection Liens and Adequate Protection Obligations granted under the Interim Order;

(h) unless otherwise agreed to in writing by the Steering Committee in

13

its sole discretion, the (i) consummation of a sale or disposition of any material assets of the Debtors other than in the ordinary course of business or as expressly provided for in the RSA, or (ii) termination of the RSA;

(i)  commencement of any action, including the filing of any pleading, by any Debtor or direct or indirect non-debtor affiliate or subsidiary of a Debtor, against any of the Prepetition Secured Parties with respect to any of the Prepetition Obligations or Prepetition Liens other than as expressly contemplated in the RSA;

(j)  unless otherwise agreed to in writing by the Steering Committee in its sole discretion, the direct or indirect Canadian subsidiaries of Walter that are formed, incorporated or otherwise domiciled in Canada (collectively, the "Canadian Entities") commence, or become subject to, any restructuring or insolvency proceeding in any jurisdiction;

(k)  unless otherwise agreed to in writing by the Steering Committee in its sole discretion or as contemplated by the RSA, commencement of a sale process or other actions in furtherance of a disposition of any material assets of the Canadian Entities;

(l)  unless otherwise agreed to in writing by the Steering Committee in its sole discretion, incurrence of any new secured debt or any unsecured debt that is incurred outside the ordinary course of business by any of the Canadian Entities, other than as it relates to the Permitted Non-Debtor Affiliate Payments or cash collateralization of the Canadian LCs using the cash on hand as of the Petition Date held the Canadian Entities) by any of the Canadian Entities; or

(m) unless the order approving the RSA Assumption Motion (as defined in the RSA), which order includes a waiver or modification of the automatic stay to provide any notices contemplated by and in accordance with the RSA or the Interim Order, as applicable, has been entered by the Court within 60 days of the Petition Date.

(Interim Order, ¶ 12)

Upon a Termination Event, the Debtors shall immediately provide notice to the Steering Committee, the Administrative Agent and each of the Indenture Trustees (with a copy to counsel for the Creditors' Committee (if any) and the Bankruptcy Administrator), of the occurrence of any Termination Event, at which time the Debtors' ability to use Cash Collateral hereunder shall terminate and the Adequate Protection Obligations shall become due and payable.  Upon the occurrence of a Termination Event and following the giving of not less than four (4) business days' advance written notice (the "Enforcement Notice") to counsel to the Debtors, counsel to the Creditors' Committee (if any) and the Bankruptcy Administrator (the "Notice Period"), the Prepetition Secured Parties (subject as among themselves to the terms of the Intercreditor Agreement), may exercise any remedies available to

14

| | |
|---|---|
| | them under the Interim Order, the Prepetition Debt Documents and applicable non-bankruptcy law, including but not limited to (a) set off and apply immediately any and all amounts in accounts maintained by the Debtors against the Adequate Protection Obligations and Prepetition Obligations owed to the Prepetition Secured Parties and otherwise enforce rights against the Collateral for application towards the Adequate Protection Obligations and Prepetition Obligations; (b) take any and all actions necessary to take control of the Prepetition Collateral and/or the Collateral, including any Cash Collateral; and (c) take any other actions or exercise any other rights or remedies permitted under the Interim Order, the Prepetition Debt Documents or applicable law to effect the repayment and satisfaction of the Adequate Protection Obligations and Prepetition Obligations owed to the Prepetition Secured Parties.<br><br>(Interim Order, ¶ 13) |
| **Liens, Cash Payments or Adequate Protection Provided for Use of Cash Collateral** *Bankruptcy Rule 4001(b)(1)(b)(iv)* | (a) As adequate protection, the First Lien Secured Parties shall be granted:<br><br>   i. Subject to the Carve-Out, allowed joint and several superpriority administrative expense claims (the "<u>Senior Superpriority Claims</u>") against the Debtors with priority over any and all administrative expenses and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, as provided under section 507(b) of the Bankruptcy Code. (Interim Order, ¶ 10(a)(i))<br><br>   ii. Subject to the Carve-Out and Approved Liens (as defined below), senior replacement liens, senior liens on unencumbered property, junior liens on prepetition and postpetition property of the Debtors which is subject to certain existing permitted liens and, subject to entry of a Final Order, a lien on the proceeds of Avoidance Actions (the "<u>First Lien Adequate Protection Liens</u>"). (Interim Order, ¶ 10(a)(ii))<br><br>(b) As adequate protection, the Second Lien Secured Parties shall be granted:<br><br>   i. Subject to the Carve-Out and the Senior Superpriority Claims, allowed joint and several superpriority administrative expense claims ("<u>Junior Superpriority Claims</u>;" together with the Senior Superpriority Claims, the "<u>Superpriority Claims</u>") against the Debtors with priority over any and all administrative expenses and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, as provided under section 507(b) of the Bankruptcy Code. (Interim Order, ¶ 10(b)(i))<br><br>   ii. Subject to the Carve-Out, the Prepetition Liens, certain existing permitted liens, the Approved Liens and the First Lien |

Adequate Protection Liens, junior replacement liens on the Collateral, the "Junior Adequate Protection Liens," together with the First Lien Adequate Protection Liens, the "Adequate Protection Liens"). (Interim Order, ¶ 10(b)(ii))

(c) The Adequate Protection Liens will not be (1) subject or subordinate to, or *pari passu* with, (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code; or (ii) any lien or security interest arising on or after the Petition Date (other than the Carve-Out) or (2) subordinated to or made *pari passu* with any other lien or security interest under sections 363 or 364 of the Bankruptcy Code or otherwise, other than the Carve-Out. (Interim Order, ¶ 10(a)(ii)(C))

(d) Fees and Expenses. The Debtors shall promptly pay, in cash, (x) all Letter of Credit Fees and Facing Fees (each as defined in the Credit Agreement), and any annual administrative agent fees and other fees set forth in Section 4.01(b) through (e) of the Credit Agreement (including, in each case, all amounts set forth in Section 4.01(a) through (e) of the Credit Agreement accrued with respect to periods on or prior to the Petition Date) on the respective dates for the payment (or, in the case of all amounts accrued as of the Petition Date, promptly upon entry of the Interim Order) of all such fees as provided in the Credit Agreement, at the applicable non-default rate provided for in the First Lien Credit Documents with respect to such fees and (y) upon presentment of an applicable invoice to the Debtors (with a copy of such invoice to be presented contemporaneously to both the Bankruptcy Administrator and counsel for the Creditors' Committee, if any), all reasonable, actual, and documented (in customary detail, redacted for privilege and work product) fees, costs and expenses incurred by each of the Administrative Agent and the First Lien Trustee, including, without limitation, the fees, costs and expenses of one lead counsel, one local counsel (if necessary) and, if needed, one Canadian counsel for each of the Administrative Agent and the First Lien Trustee, in each case in accordance with the applicable engagement letters (if any) and the Prepetition Debt Documents and without further order of, or application to, the Court or notice to any party. (Interim Order, ¶ 11(b))

The Debtors shall promptly pay in cash upon presentment of an applicable invoice to the Debtors (with a copy of such invoice to be presented contemporaneously to both the Bankruptcy Administrator and counsel for the Creditors' Committee, if any), all reasonable, actual, and documented (in customary detail, redacted for privilege and work product) fees, costs and expenses of (i) Akin Gump Strauss Hauer & Feld LLP ("Akin Gump"), as lead counsel, Burr Forman LLP ("Burr Forman"), as Alabama counsel, Cassels Brock & Blackwell LLP ("Cassels"), as Canadian counsel, and Lazard Frères & Co. LLC, as financial advisor, to the Steering Committee ("Lazard" and together with Akin Gump, Burr Forman and Cassels, the "Steering Committee Advisors") and (ii) any consultants or other advisors retained by the Steering Committee (and not by individual Steering Committee

16

members) (the parties described in (ii) collectively, the "Consultants") in connection with the Restructuring (as defined in the RSA); provided that the Steering Committee shall provide notice to the Debtors prior to retaining any such Consultants, in each case, in accordance with engagement letters (if any) of such professional (including the Restructuring Fee as defined in Lazard's engagement letter), and in each case, without further order of, or application to, the Court or notice to any party other than as provided in this paragraph; provided, however, that Lazard's Restructuring Fee shall be subject to the entry of the Final Order; provided further that no success fees shall be payable to any Consultant. In addition, the Debtors shall promptly reimburse each Steering Committee member in cash for all reasonable and documented out-of-pocket costs and expenses (without limiting the Debtors' obligations pursuant to the previous sentence, which out-of-pocket costs and expenses should not include any advisor and professional fees for such individual Steering Committee member) incurred by such member in connection with the Restructuring. (Interim Order, ¶ 11(c))

(e) Payments. As additional adequate protection, the Debtors are authorized and directed to pay to the Administrative Agent, for the ratable benefit of the First Lien Lenders (including in respect of any unreimbursed drawings on letters of credit), and to the First Lien Trustee, for the ratable benefit of the First Lien Noteholders, any accrued but unpaid interest due as of the Petition Date and postpetition interest, in cash, under and pursuant to the terms of, the First Lien Credit Documents (with the LIBO Rate under the First Lien Credit Documents fixed at 1.00% per annum for purposes of such postpetition interest payments under the First Lien Credit Documents) and the First Lien Indenture Documents, respectively, in each case calculated based on eighty (80%) percent of the applicable contract non-default rate set forth therein and due and payable on a monthly basis (with all payments of interest to be without prejudice to the rights of the Administrative Agent and the First Lien Trustee (and any party-in-interest's right to object thereto) to assert a claim for payment of additional interest at any other rates in accordance with the applicable governing documents) but without prejudice to the right of any party-in-interest with standing to do so to seek to recharacterize such payments as principal; provided any accrued, due but unpaid interest as of the Petition Date shall be paid promptly upon entry of the Interim Order. (Interim Order, ¶ 11(a))

(f) Credit Bid. The Administrative Agent (on behalf of the First Lien Lenders), the First Lien Trustee (on behalf of the First Lien Noteholders) and the Second Lien Trustee (on behalf of the Second Lien Noteholders) (but only if any such credit bid provides, to the extent set forth in the Intercreditor Agreement, for the payment in full and in cash of all Prepetition Obligations owed to the First Lien Secured Parties and any amounts due and owing to the First Lien Secured Parties under the Interim Order and the Final Order, and provides for the cash collateralization of any letters of credit in accordance with the First Lien Credit Documents and the Interim Order and the Final Order), as applicable, shall have the right to credit bid (X) up to the full amount of

Case 15-02741-TOM11    Doc 42    Filed 07/15/15    Entered 07/15/15 13:29:28    Desc Main
Document      Page 17 of 88

the remaining Prepetition Obligations under the First Lien Credit Documents, First Lien Indenture Documents and the Second Lien Indenture Documents, respectively and (Y) the First Lien Superpriority Claims, the Second Lien Superpriority Claims, and any unpaid amounts due and owing under paragraph 11(a) through (c) of the Interim Order, as applicable, in the sale of any of the Collateral, including, without limitation, (a) pursuant to Bankruptcy Code section 363, (b) a plan of reorganization or a plan of liquidation under Bankruptcy Code section 1129, or (c) a sale or disposition by a chapter 7 trustee for any Debtor under Bankruptcy Code section 725. (Interim Order, ¶ 11(d))

(g) Executory Contracts and Unexpired Leases. The Debtors will work with the Steering Committee and its advisors to determine which executory contracts and unexpired leases should be assumed or rejected by the Debtors. The Debtors will provide the Steering Committee and its advisors with all necessary information in order to analyze such a decision. Other than in connection with the 363 Sale (as defined in the RSA) where the Purchaser (as defined in the Sale Term Sheet attached as Exhibit C to the RSA) is not the winning bidder for the Assets (as defined in the RSA), the Debtors shall not make any decision with regard to the assumption or rejection of executory contracts and unexpired leases without first obtaining the consent of the Steering Committee, which consent shall be in its sole discretion. (Interim Order, ¶ 11(g))

(h) Employee Incentive/Retention Plans. The Debtors shall not seek approval of any employee incentive or retention plans (or any similar sort of retention or incentive program) without the prior written consent of the Steering Committee, which consent shall be in its sole discretion. (Interim Order, ¶ 11(h))

(i) Other Covenants.

    i. The Debtors shall maintain their cash management arrangements in a manner consistent in all material respects with that described in the Debtors' motion for authority to maintain its existing cash management system (the "Cash Management Motion"). (Interim Order, ¶ 11(i)(1))

    ii. Except as expressly permitted under the RSA, the Sale Motion (as defined in the RSA) or other "first day" pleadings, the Debtors shall not use, sell or lease any material assets outside the ordinary course of business, or seek authority of this Court to the extent required by Bankruptcy Code section 363, without obtaining the prior written consent of the Steering Committee, which consent shall be in its sole discretion, and prior consultation with the Administrative Agent and the First Lien Trustee at least five (5) business days prior to the date on which the Debtors seek the Court's authority for such use, sale or lease. Subject to paragraph 10(a)(iii) of the Interim Order and the rights of any holder of a Permitted Priority Lien thereon, in

the event of any such sale, lease, transfer, license, or other disposition of property of the Debtors (other than a disposition of all or substantially all of the Debtors' assets) that constitutes Collateral outside the ordinary course of business (to the extent permitted by the Prepetition Debt Documents and the Interim Order) the Debtors are authorized and directed, without further notice or order of this Court, to immediately pay to the Administrative Agent or Indenture Trustees, as appropriate under the Intercreditor Agreement, for the benefit of the applicable Prepetition Secured Parties, 100% of the net cash proceeds resulting therefrom no later than the second business day following receipt of such proceeds. In the event of any casualty, condemnation, or similar event with respect to property that constitutes Collateral, the Debtors are authorized and directed to pay to the Administrative Agent or Indenture Trustees, as appropriate under the Intercreditor Agreement, for the benefit of the applicable Prepetition Secured Parties, any insurance proceeds, condemnation award, or similar payment (excluding any amounts on account of any D&O policies) in excess of $2,000,000 no later than the second business day following receipt of payment by the Debtors unless the applicable Prepetition Secured Parties consent, each in their sole discretion but subject to the Intercreditor Agreement, in writing, to the funds being reinvested by the Debtors. (Interim Order. (Interim Order, ¶ 11(i)(2))

iii. Within a reasonable period of time prior to taking any steps towards commencing a sale, marketing, restructuring or similar process with respect to the Canadian Entities, Walter shall cause to be appointed to the board of Walter Energy Canada Holdings, Inc. an independent director mutually agreeable to the Steering Committee and the Debtors or if the RSA is assumed, the Debtors and the Majority Holders (as defined in the RSA) (and, upon the request of such independent director, Walter shall cause such independent director to be appointed to the board of any other Canadian Entity so requested). (Interim Order, ¶ 11(l))

| | |
|---|---|
| **Stipulations of the Debtors**<br>*Bankruptcy Rule 4001(c)(1)(B)(iii) and (d)(1)(B)* | Subject in to the Challenge Period, the Interim Order contains certain stipulations and releases by the Debtors, including, as to the amount and validity of the claims and liens of the Prepetition Secured Parties. (Interim Order, ¶ 5) |
| **Modification of the Automatic Stay**<br>*Bankruptcy Rule 4001(b)(1)(B)(iii)* | The automatic stay is modified as necessary to effectuate the terms of the Interim Order, including the granting of liens contemplated by the Interim Order and to allow for the exercise of remedies following a Termination Event. (Interim Order, ¶ 29) |
| **Carve-Out** | The Prepetition Liens, Adequate Protection Liens and Superiority |

| | |
|---|---|
| *Bankruptcy Rule*<br>*4001(b)(1)(B)(iii)* | Claims will be subject and subordinate to the Carve-Out. The "<u>Carve-Out</u>" shall mean, following the Termination Date, the sum of:<br><br>(a) all fees required to be paid to the clerk of the Court and the Bankruptcy Administrator (without regard to the Carve-Out Trigger Notice (as defined herein));<br><br>(b) reasonable fees and expenses up to $25,000 in the aggregate incurred by a trustee appointed under Bankruptcy Code section 726(b) (without regard to the Carve-Out Trigger Notice);<br><br>(c) subject to the Committee Monthly Cap with respect to Professional Fees incurred by Professional Persons retained by the Creditors' Committee or any other statutory committee appointed in the Chapter 11 Cases, and subject to any Professional Fees permitted to be incurred under the Investigation Budget, to the extent allowed, whether by interim order, procedural order or otherwise, all accrued and unpaid reasonable fees, costs, and expenses (the "<u>Professional Fees</u>") incurred by persons or firms retained by the Debtors, the Creditors' Committee or any other statutory committee appointed in the Chapter 11 Cases (if any) pursuant to Bankruptcy Code section 327, 328, or 363 (collectively, the "<u>Professional Persons</u>") at any time before or on the day of delivery by the Administrative Agent or Steering Committee of a Carve-Out Trigger Notice (the "<u>Pre-Trigger Date Fees</u>"); and<br><br>(d) after the delivery by the Administrative Agent or Steering Committee of the Carve-Out Trigger Notice (the "<u>Trigger Date</u>"), to the extent allowed at any time, whether by interim order, procedural order or otherwise, the payment of (1) all Professional Fees of Professional Persons retained by the Debtors and (2) subject to the Committee Monthly Cap, the payment of Professional Fees of Professional Persons incurred by the Creditors' Committee or any other statutory committee appointed in the Chapter 11 Cases, not to exceed $5 million in the aggregate for clauses (1) and (2) incurred after the Trigger Date (the amount set forth in this clause (d) being the "<u>Post-Carve Out Trigger Notice Cap</u>"); <u>provided</u> that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (c) or (d) above, on any grounds.<br><br>On the day on which a Carve-Out Trigger Notice is given to the Debtors, such Carve-Out Trigger Notice also shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an aggregate amount equal to the accrued and unpaid Pre-Trigger Date Fees plus the Post-Carve Out Trigger Notice Cap, and the Debtors shall deposit and hold any such amounts in escrow in a segregated account at a financial institution to be selected for such purpose and solely for the benefit of the Professional Persons entitled thereto. The escrow agent |

20

upon written request shall release such reserved funds from time to time from the segregated account to pay when due any Pre-Trigger Date Fees and any fees and expenses incurred after Post-Carve Out Trigger Notice that are included in the Post-Carve Out Trigger Notice Cap under clause (D) above. Such account and amounts therein shall be free and clear of all liens, claims and interests of any party other than the Professional Persons entitled thereto.

Notwithstanding the foregoing, (X) the Carve-Out shall not include, apply to or be available for any fees or expenses incurred by any party in connection with (1) the investigation, preparation, initiation or prosecution of any claims, causes of action, proceeding, adversary proceeding or other litigation against any of the Prepetition Secured Parties (in such capacity), including challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the Prepetition Obligations and the Prepetition Liens granted under the Prepetition Debt Documents in favor of the Prepetition Secured Parties, including, without limitation, for lender liability or pursuant to Bankruptcy Code section 105, 510, 544, 547, 548, 549, 550 or 552, applicable nonbankruptcy law or otherwise; (2) attempts to modify any of the rights granted to the Prepetition Secured Parties hereunder (other than with the consents contemplated hereunder); (3) attempts to prevent, hinder or otherwise delay any of the Prepetition Secured Parties' enforcement or realization upon any Collateral in accordance with the Prepetition Debt Documents and the Interim Order; or (4) paying any amount on account of any claims arising before the Petition Date unless such payments are approved by an order of this Court, in the Approved Budget or otherwise consented to by the Steering Committee in its sole discretion, and (Y) so long as the Carve-Out Trigger Notice shall not have been delivered, the Carve-Out shall not be reduced by the payment of Professional Fees allowed at any time by this Court. Any claim incurred in connection with any of the activities described above (other than as permitted in connection with the Investigation Budget in an amount not exceeding such Investigation Budget) shall not be allowed, treated or payable as an administrative expense claim for purposes of section 1129(a)(9)(A) of Bankruptcy Code. For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by the Administrative Agent or the Steering Committee to the Debtors, Debtors' counsel, the Bankruptcy Administrator, and counsel to the Creditors' Committee (if any), upon the occurrence and during the continuance of a Termination Event, stating that the Post-Carve Out Trigger Notice Cap has been invoked. For the avoidance of doubt and notwithstanding anything to the contrary herein or in the Prepetition Debt Documents, the Carve-Out shall be senior to all liens and claims arising out of the Prepetition Debt Documents, including the Prepetition Liens, the Adequate Protection Liens, the Superpriority Claims, and any and all other forms of adequate protection, liens or claims securing or relating to the Prepetition

21

| | |
|---|---|
| | Obligations.<br><br>(Interim Order, ¶ 10(a)(iii)) |
| **Budget Covenant and**<br>**Reporting:**<br>*Bankruptcy Rule*<br>*4001(b)(1)(B)(ii)* | <u>Reporting and Budget Compliance</u>.  The Debtors shall comply in all respects with the provisions of paragraph 11(e) of the Interim Order (the "<u>Budget Covenant</u>").  The initial budget shall cover the 12-week period beginning the business week of the Petition Date (the "<u>Initial Budget Period</u>") and be in the form attached to the Interim Order as **Exhibit A** (the "<u>Initial Budget</u>").  On or before the last business day of the tenth week of the Initial Budget Period, the Debtors shall deliver an updated budget (the "<u>Second Budget</u>") for the 12-week period following the Initial Budget Period (the "<u>Second Budget Period</u>").  On or before the last business day of the tenth week of the Second Budget Period, the Debtors shall deliver an updated budget (the "<u>Third Budget</u>" and, together with the Initial Budget and the Second Budget, collectively, the "<u>Budgets</u>") for the 12-week period following the Second Budget Period (the "<u>Third Budget Period</u>").  The Budgets shall be delivered to the Steering Committee and the Administrative Agent, with a copy delivered to the Creditors' Committee; <u>provided</u> that, the Budgets may be shared on a confidential basis with those Prepetition Secured Parties that have signed a confidentiality agreement or are otherwise subject to confidentiality restrictions pursuant to the Prepetition Debt Documents.  The Initial Budget will be the first budget utilized for reporting and permitted variance purposes (the "<u>Approved Budget</u>").  The Second Budget and the Third Budget provided thereafter shall be of no force and effect unless and until it is approved by the Steering Committee and the Administrative Agent, each in its sole discretion.  The Steering Committee and the Administrative Agent, each in its sole discretion, shall approve or reject the Second Budget or the Third Budget within eleven (11) days after the last day that delivery thereof is permitted as set forth above; <u>provided</u> that, each of the Second Budget and the Third Budget shall be deemed approved upon the passage of such eleven (11) day period with no objection raised by the Steering Committee and the Administrative Agent.  Upon the approval by the Steering Committee and the Administrative Agent, each of the Second Budget and the Third Budget shall become the "Approved Budget" for the Second Budget Period and the Third Budget Period, as applicable.  Every week (beginning with the first full week after the Petition Date), on the fifth business day of such week, the Debtors shall deliver to the Steering Committee Advisors, the advisors to the Administrative Agent and the advisors to the Creditors' Committee, a weekly variance report from the previous week comparing the actual cash receipts and disbursements of the Debtors with the receipts and disbursements in the Approved Budget (the "<u>Budget Variance Report</u>"); <u>provided</u> that, the Budget Variance Report may be shared with the Administrative Agent and the Steering Committee.  The Budget Variance Report shall include, among other things, (a) details regarding amounts paid under any order of the |

22

Court; (b) a detailed comparison, including commentary, of each week's performance against the Approved Budget; and (c) a detailed comparison, including commentary, of aggregate performance since the commencement of the Approved Budget against such Approved Budget. The Debtors shall not allow (x) (i) "Cumulative Net Cash Flow" for the relevant Testing Period to have a negative variance of more than $20 million from the "Cumulative Net Cash Flow" line item set forth in the Initial Budget and (ii) "Cumulative Disbursements" for the relevant Testing Period to have a negative variance of more than the greater of (a) $7.5 million and (b) 5% of "Cumulative Disbursements" set forth in the Initial Budget for the relevant Testing Period from the "Cumulative Disbursements" line item set forth in the Initial Budget, (y) (i) "Cumulative Net Cash Flow" for the relevant Testing Period to have a negative variance of more than $20 million from the "Cumulative Net Cash Flow" line item set forth in the Second Budget and (ii) "Cumulative Disbursements" for the relevant Testing Period to have a negative variance of more than the greater of (a) $7.5 million and (b) 5% of "Cumulative Disbursements" set forth in the Second Budget for the relevant Testing Period from the "Cumulative Disbursements" line item set forth in the Second Budget and (z) (i) "Cumulative Net Cash Flow" for the relevant Testing Period to have a negative variance of more than $20 million from the "Cumulative Net Cash Flow" line item set forth in the Third Budget and (ii) "Cumulative Disbursements" for the relevant Testing Period to have a negative variance of more than the greater of (a) $7.5 million and (b) 5% of "Cumulative Disbursements" set forth in the Third Budget for the relevant Testing Period from the "Cumulative Disbursements" line item set forth in the Third Budget. For purposes of the Cumulative Net Cash Flow and Cumulative Disbursements variance tests set forth above, (i) "Testing Period" shall mean (x) with respect to clause (x) in the prior sentence, the first two week period of the Initial Budget Period, and each cumulative period beginning with the beginning of the Initial Budget Period and ending every two weeks after the first two week period, (y) with respect to clause (y) in the prior sentence, the first two week period of the Second Budget Period, and each cumulative period beginning with the beginning of the Second Budget Period and ending every two weeks after the first two week period, and (z) with respect to clause (z) in the prior sentence, the first two week period of the Third Budget Period, and each cumulative period beginning with the beginning of the Third Budget Period and ending every two weeks after the first two week period and (ii) "Cumulative Net Cash Flow" and "Cumulative Disbursements" shall not include, but shall otherwise be permitted to be paid in accordance herewith, (1) adequate protection payments, (2) fees and expenses of professionals retained outside the ordinary course of business, (3) the Debtors' use of the Cash Collateral to collateralize any new, replaced or renewed letters of credit, surety bonds or workers' compensation obligations, in each case that has been consented to by the Steering Committee in its sole discretion (collectively, the

| | |
|---|---|
| | "Approved Collateralized Obligations") and (4) key employee retention payments approved by both the Steering Committee and the Court. The Debtors shall not allow cumulative capital expenditures beginning July 1, 2015, as calculated on a GAAP basis, to exceed the amounts set forth in the Debtors' projected capital expenditure budget attached as an exhibit to the Initial Budget by more than the greater of (x) $5 million and (y) 20%. Such capital expenditure variance shall be tested as of the end of each calendar month, and the Debtors shall deliver to the Steering Committee Advisors, the advisors to the Administrative Agent and the advisors to the Creditors' Committee a variance report calculating such variance no later than 15 business days following the end of each calendar month, beginning with July 2015.<br><br>(Interim Order, ¶ 11(e))<br><br>Access to Records/Financial Reporting. In addition to, and without limiting, whatever rights of access the Prepetition Secured Parties have under the Prepetition Debt Documents, upon reasonable notice, at reasonable times and subject to appropriate confidentiality protections, the Debtors shall permit representatives and agents of the Steering Committee and the Administrative Agent (i) to have access to and inspect the Debtors' properties, subject to reasonable safety precautions, (ii) to examine the Debtors' books and records, and (iii) to discuss the Debtors' affairs, finances and condition with the Debtors' officers and financial advisors. In addition, the Debtors shall provide to the Steering Committee Advisors and the advisors to the Administrative Agent, on a monthly basis, reports setting forth (i) substantive mine-by-mine details of the Debtors' operating performance, including its non-debtor subsidiaries and (ii) a detailed comparison, including commentary, of the month's actual operating performance against the projections, substantially in form and substance consistent with the Company's historical monthly reporting to the Board of Directors, as modified to include summary mine-level operating and financial data.<br><br>(Interim Order, ¶ 11(f), 18) |
| **506(c), 552(b) and 1141(d)(4) Waiver**<br>*Bankruptcy Rule 4001(c)(1)(B)(x)* | Subject to the entry of a Final Order, except to the extent of the Carve-Out, no costs or expenses of administration of the Chapter 11 Cases, which have been or may be incurred in any of the Chapter 11 Cases at any time shall be charged against or recovered from any Prepetition Secured Party, any of the Prepetition Obligations, any of their respective claims, or the Collateral pursuant to Bankruptcy Code sections 105(a) or 506(c), or otherwise, without the prior written consent of the affected Administrative Agent, First Lien Trustee or Second Lien Trustee and the Steering Committee, each in its sole discretion, and no such consent shall be implied from any other action, inaction, or acquiescence by any of the Prepetition Secured Parties or |

24

| | |
|---|---|
| | their respective representatives. (Interim Order, ¶ 20)<br><br>Subject to, and effective upon entry of the Final Order, the "equities of the case" exception under Bankruptcy Code section 552(b) shall not apply to the Prepetition Secured Parties with respect to proceeds, products, or profits of any of the Prepetition Collateral. (Interim Order, ¶ 6)<br><br>Pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any unpaid Adequate Protection Obligations; <u>provided</u> that any plan of reorganization or liquidation approved in accordance with the RSA, or otherwise with the consent of the Steering Committee in its sole discretion, shall supersede and replace the terms of the Interim Order upon its effectiveness in accordance therewith. (Interim Order, ¶ 15(c)) |
| **Challenge Period**<br>*Bankruptcy Rule 4001(b)(1)(B)(iii)* | The stipulations, releases and admissions by the Debtor contained in the Interim Order, including in paragraph 5 thereof, shall be binding upon the Debtors and any successor thereto in all circumstances. The stipulations, releases and admissions contained in the Interim Order, including in paragraph 5 thereof, shall be binding upon all other parties in interest, including the Creditors' Committee (if any) or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors (a "<u>Trustee</u>"), unless and to the extent (a) the Creditors' Committee (if any) or any other party in interest other than any Debtor (including any Trustee), in each case, after obtaining requisite standing, has duly filed an adversary proceeding challenging in whole or part the validity, enforceability, priority or extent of the Prepetition Obligations or the liens on the Prepetition Collateral securing the Prepetition Obligations held by or on behalf of the Prepetition Secured Parties or otherwise asserting or prosecuting any Avoidance Actions, recharacterization, subordination, "lender liability", or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "<u>Claims and Defenses</u>") against the Prepetition Secured Parties in connection with any matter related to the Prepetition Obligations, or the Prepetition Collateral or the Prepetition Liens by no later than the later of (i) in the case of any such adversary proceeding filed by a party in interest with requisite standing other than the Creditors' Committee, seventy-five (75) days after the date of entry of the Interim Order, (ii) in the case of any such adversary proceeding filed by the Creditors' Committee (if any), sixty (60) days after the appointment of the Creditors' Committee (if any), and (iii) any such later date agreed to in writing by the Steering Committee and the Administrative Agent, First Lien Trustee or Second Lien Trustee, as applicable, each in its sole discretion (the time period established by the later of the foregoing clauses (i), (ii) and (iii), the "<u>Challenge Period</u>"), and (b) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such challenge or claim in any such duly filed adversary proceeding. If no such adversary proceeding is timely filed prior to the expiration of the Challenge Period |

25

| | by the Creditors' Committee or a party in interest, in any case which has been granted the appropriate standing, without further order of this Court: (x) the Prepetition Obligations shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, defense, avoidance, contest, attack, objection, recoupment, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined in the Bankruptcy Code), impairment, subordination (whether equitable, contractual or otherwise) or other challenge of any kind pursuant to the Bankruptcy Code or applicable nonbankruptcy law, for all purposes in these Chapter 11 Cases and any subsequent chapter 7 cases; and (y) the Prepetition Obligations, the Administrative Agent's, the First Lien Trustee's and the Second Lien Trustee's respective Prepetition Liens on the Prepetition Collateral and the respective Prepetition Secured Parties in such capacity shall not be subject to any other or further challenge and any party in interest shall be forever enjoined and barred from seeking to exercise the rights of the Debtors' estates or taking any such action, including any successor thereto (including any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge Period). If any such adversary proceeding is timely filed by a party in interest with appropriate standing prior to the expiration of the Challenge Period, the stipulations and admissions contained in the Interim Order, including in paragraph 5 thereof, shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on any Creditors' Committee and any other Person (as defined in the Credit Agreement), including any Trustee, except as to any such findings and admissions that were expressly and successfully challenged in such adversary proceeding. Nothing in the Interim Order vests or confers on any person, including a Creditors' Committee (if any) or a Trustee, standing or authority to pursue any cause of action belonging to the Debtors or their estates.

(Interim Order, ¶ 16) |

## BASIS FOR RELIEF

### F.   The Debtors' Use of Cash Collateral Is Necessary

19.     The Debtors require access to the Prepetition Collateral, including Cash Collateral, to satisfy payroll, pay suppliers, meet overhead, pay utility expenses, make adequate protection payments, pay professionals as well as to make any other payments permitted or required under the Interim Order. The ability to satisfy these expenses as and when due is essential to the continued management, operation and preservation of the Debtors' business and property during the pendency of these proceedings and avoid immediate and irreparable harm to

26

their estates. In the normal course of business, the Debtors use cash on hand and cash flow from operations and other sources to fund working capital, capital expenditures and for maintenance of their business and properties. Absent access to Cash Collateral, the Debtors will not have adequate unencumbered cash on hand to pay these necessary expenses, and therefore, the uninterrupted use of Cash Collateral is critical.

20.     The use of Cash Collateral by the Debtors will be subject to the Approved Budget in accordance with the Budget Covenant. The Interim Budget is anticipated to be adequate, considering all available assets, to pay the amounts sought in the "first day" motions, including payment of critical vendors and other administrative expenses due or accruing during the period covered thereby.

21.     The terms and conditions of the Debtors' use of Cash Collateral as set forth in the proposed Interim Order and the Approved Budget (a) are, taken as a whole, fair and reasonable under the circumstances; (b) reflect the Debtors' reasonable exercise of business judgment consistent with their fiduciary duties; and (c) are supported by reasonably equivalent value and fair consideration. Accordingly, the relief is warranted under the circumstances.

**G.     <u>The Adequate Protection Provisions are Appropriate</u>**

22.     The Debtors' use of property of their estates, including "cash collateral," is governed by section 363 of the Bankruptcy Code.[11] Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may use cash collateral as long as "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use,

---

[11]    The Bankruptcy Code defines "cash collateral" as follows:

Cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(C)(2.) The Prepetition Secured Parties have either consented to the use of Cash Collateral on the terms described herein, or, upon information and belief, are deemed to have consented or have agreed pursuant to the Intercreditor Agreement not to object to such use. In exchange for the use of Cash Collateral and other transactions contemplated hereby, the Debtors propose, as adequate protection pursuant to sections 361 and 363 of the Bankruptcy Code, to grant the Prepetition Secured Parties replacement liens on all Postpetition Collateral and liens on unencumbered Collateral to compensate the Prepetition Secured Creditors for any Diminution in Value in the Prepetition Collateral resulting from, among other things, the use of their respective interests in any Cash Collateral or the use, sale or other disposition of their respective interests in other Prepetition Collateral, the establishment of the Carve-Out and the imposition of the automatic stay. The Debtors further propose that the Prepetition Secured Parties be granted super-priority administrative expense claims pursuant to sections 503(b) and 507(a)(1) of the Bankruptcy Code on account of any Diminution in Value, subject and subordinate to the Carve-Out. The Debtors have also agreed to pay the reasonable fees and expenses (including attorneys' fees) of the Administrative Agent, the First Lien Trustee and the Steering Committee and to pay eighty (80%) percent of the cash interest at the non-default rate on account of the First Lien Obligations, in each case, on the terms set forth in the Interim Order.

23. Adequate protection can be provided in various forms. See, e.g., In re Continental Airlines, Inc., 154 B.R. 176, 180-181 (Bankr. D. Del. 1993) (courts have discretion to in determining what form of adequate protection to grant). Although the Bankruptcy Code does not define the term "adequate protection," it provides a non-exhaustive list of types of adequate protection, including lump sum or periodic cash payments, replacement liens, administrative

priority claims and "other relief" resulting in the "indubitable equivalent" of the secured creditor's interest in such property. See 11 U.S.C. § 361. What constitutes adequate protection is determined on a case-by-case basis. See, e.g., In re George Ruggiere Chrysler-Plymouth, Inc., 727 F.2d 1017, 1019 (11th Cir. 1984) (recognizing that there must be "an individual determination" of whether a secured creditor's interest in cash collateral is adequately protected); In re Columbia Gas Sys., Inc., 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992; *In re N.J. Affordable Homes Corp.*, No. 05-60442, 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) ("The term 'adequate protection' is intended to be a flexible concept.").

24.     The essential purpose of adequate protection is to protect against the diminution of a secured creditor's collateral during the period when such collateral is being used by the debtor in possession. See In re Delta Res., Inc., 54 F.3d 722, 730 (11th Cir. 1995) ("creditor's interest in property which must be adequately protected encompasses the decline in the value of the collateral only, rather than perpetuating the ratio of the collateral to the debt."); In re Cent. Park Avenue Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) ("The goal of adequate protection is to safeguard the secured creditor from diminution in value of its interest during the chapter 11 reorganization."); In re Monroe Park, 17 B.R. 934 (D. Del. 1982) (adequate protection requires a debtor to propose some form of relief that will preserve the secured creditor's interest in collateral during the case).

25.     Courts recognize that the preservation of the going concern value of secured lenders' collateral constitutes adequate protection of such secured lenders' interest in such collateral. See, e.g., In re Wrecclesham Grange, Inc., 221 B.R. 978, 981 (Bankr. M.D. Fla. 1997) ("as long as the debtor generates a continuous income stream, the debtor's use of the rental income does not diminish the value of the collateral."); In re 499 W. Warren St. Assocs., Ltd.

P'ship, 142 B.R. 53, 56 (Bankr. N.D.N.Y. 1992) (finding a secured creditor's interest in collateral adequately protected when cash collateral was applied to normal operating and maintenance expenditures on the collateral property); In re Cardinal Indus. Inc., 118 B.R. 971, 981 (Bankr. S.D. Ohio 1990) (ruling that secured lenders were adequately protected by debtor's use of funds to maintain and manage encumbered properties).

26.     The Debtors submit that the foregoing protections as well as the fact that the use of Cash Collateral will enable the Debtors to preserve value by maintaining their properties and businesses and adequately protect the Prepetition Secured Parties from any Diminution in Value. Hence, the Debtors' requested use of Cash Collateral and the protections afforded the Prepetition Secured Parties are reasonable and appropriate under the circumstances.

27.     Finally, the terms of the Interim Order, were negotiated in good faith and at arm's length, with all relevant parties represented by experienced counsel, are fair and reasonable. Accordingly, the Prepetition Secured Parties should be provided with the benefit and protection of section 363(m) of the Bankruptcy Code, such that if any provision of the Cash Collateral Orders are later modified, vacated, stayed or terminated by subsequent order of this or any other court, such reversal, stay, modification or vacatur shall not affect: (i) the validity, priority or enforceability of any Adequate Protection Obligations arising or incurred prior to the date of the entry of an order granting such reversal, stay, modification or vacatur; or (ii) the validity, priority or enforceability of the Adequate Protection Liens securing such Adequate Protection Obligations.

28.     In sum, the Debtors, together with the assistance of their financial and legal advisors, have concluded in the sound exercise of their business judgment that the use of Cash

Collateral as contemplated under the Interim Order and the proposed Final Order will help preserve the Debtors' value as a going concern.

29.     For the foregoing reasons, the Debtors submit that the requested use of Cash Collateral and the proposed protections afforded to the Prepetition Secured Parties are reasonable and appropriate and in the best interests of the Debtors, their estates and creditors, and therefore should be authorized and approved by this Court.

## MODIFICATION OF THE AUTOMATIC STAY

30.     Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition.  The Debtors request, as contemplated in the Interim Order, a modification of the automatic stay (to the extent applicable) to permit the Debtors to (i) grant the security interests, liens and superpriority claims described above as well as to perform such acts as may be requested to assure the perfection and priority of such security interests and liens, and (ii) otherwise implement the terms of the Cash Collateral Orders, including the termination and remedies provisions.

31.     Stay modification provisions of this kind are ordinary and standard features of post-petition debtor-in-possession cash collateral orders and are, in the Debtors' business judgment, reasonable under the present circumstances.  Accordingly, the Debtors respectfully request that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the proposed Interim Order.

## IMMEDIATE RELIEF IS NECESSARY TO AVOID IMMEDIATE AND IRREPARABLE HARM

32.     Bankruptcy Rule 4001(b)(2) governs the procedures for obtaining authorization to use cash collateral and provides, in relevant part:

> The court may commence a final hearing on a motion for authorization to use cash collateral no earlier than 14 days after service of the motion.  If

Case 15-02741-TOM11    Doc 42    Filed 07/15/15    Entered 07/15/15 13:29:28    Desc Main
Document    Page 31 of 88

> the motion so requests, the court may conduct a preliminary hearing
> before such 14-day period expires, but the court may authorize the use of
> only that amount of cash collateral as is necessary to avoid immediate and
> irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(b)(2).

33.     With little to no unencumbered cash, the Debtors have an immediate need to use Cash Collateral, otherwise the Debtors will have difficulty paying their suppliers, employees and otherwise satisfying their on-going obligations.  The Debtors will also not be able to pay the professionals necessary for a successful chapter 11 process.  Thus, funds are urgently needed to meet all of the Debtors' working capital and other liquidity needs.

34.     The Debtors' ability to fund their operations through the use of Cash Collateral is vital to the preservation and maintenance of the going-concern value of the Debtors' estates. Accordingly, the Debtors request that the Court conduct a preliminary hearing on the Motion and authorize the Debtors to use Cash Collateral on an emergency interim basis on the terms set forth in the Interim Order to prevent immediate and irreparable harm to their estates pending the Final Hearing pursuant to Bankruptcy Rule 4001(b).

35.     In light of the foregoing, the Debtors have satisfied the requirements of Bankruptcy Rule 4001(b) to support immediate use of Cash Collateral pending the Final Hearing.  Accordingly, to forestall the irreparable harm that will inure to the Debtors' estates, creditors and parties in interest absent Court approval of this Motion, the Debtors respectfully request that the Court grant the relief requested herein and authorize the immediate use of the Cash Collateral pursuant to the terms and conditions set forth in the Interim Order.

36.     The Debtors seek immediate authorization for the relief contemplated by this Motion.  Pursuant to Bankruptcy Rule 6003(b), the Court cannot grant "a motion to use, sell, lease or otherwise incur an obligation regarding property of the estate, including a motion to pay

all or part of a claim that arose before the filing of the petition" within twenty-one (21) days of the filing of the petition unless the relief is "necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003(b). In the absence of immediate relief, the Debtors' attempts to maintain the value of their estates during the pendency of these Chapter 11 Cases will be immediately and irreparably jeopardized. Thus, the Debtors submit that the requirements of Bankruptcy Rule 6003(b) are met and that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

37. In addition, by this Motion, the Debtors seek a waiver of any stay of the effectiveness of the order approving this Motion. Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). For the reasons set forth above, the Debtors submit that ample cause exists to justify a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h).

<u>**REQUEST FOR FINAL HEARING**</u>

38. Pursuant to Bankruptcy Rule 4001(b)(2), the Debtors request that the Court schedule the Final Hearing as soon as practicable, but in no event later than 30 days following the entry of the Interim Order and establish the deadline prior to the final hearing for parties to file objections to the Motion pursuant to the terms of the Interim Order.

33

## NOTICE

39.     Notice of this Motion will be provided to: (i) the Office of the Bankruptcy Administrator for the Northern District of Alabama; (ii) counsel to the Administrative Agent and the Credit Agreement Collateral Agent; (iii) counsel to the First Lien Trustee and the 1L Notes Collateral Agent; (iv) counsel to the Second Lien Trustee; (v) counsel to the Steering Committee; (vi) the Internal Revenue Service; (vii) the Securities and Exchange Commission; (viii) the U.S. Environmental Protection Agency; (ix) counsel to the United Mine Workers of America; (x) counsel to the United Steel Workers; (xi) the holders of the fifty (50) largest unsecured claims against the Debtors, on a consolidated basis; (xii) the United States Attorney for the Northern District of Alabama; and (xiii) counsel to all persons and entities that have filed a request for service of filings in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, no other or further notice is necessary.

## NO PRIOR REQUEST

40.     No previous request for the relief sought herein has been made to this Court or any other court.

*[Remainder of Page Intentionally Left Blank]*

34

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form annexed hereto, granting the relief requested in this Motion and such other and further relief as may be just and proper.

Dated: July 15, 2015
      Birmingham, Alabama

BRADLEY ARANT BOULT CUMMINGS LLP


By: _____Patrick Darby_____
Patrick Darby
Jay Bender
Cathleen Moore
James Bailey
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama  35203
Telephone:  (205) 521-8000
Email: pdarby@babc.com, jbender@babc.com,
      ccmoore@babc.com, jbailey@babc.com

- and -

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Stephen J. Shimshak (*pro hac vice pending*)
Kelley A. Cornish (*pro hac vice pending*)
Claudia R. Tobler (*pro hac vice pending*)
Diane Meyers (*pro hac vice pending*)
Ann K. Young (*pro hac vice pending*)
Michael S. Rudnick (*pro hac vice pending*)
1285 Avenue of the Americas
New York, New York  10019
Telephone:  (212) 373-3000
Email: sshimshak@paulweiss.com, kcornish@paulweiss.com,
      ctobler@paulweiss.com, dmeyers@paulweiss.com,
      ayoung@paulweiss.com, mrudnick@paulweiss.com,

*Proposed Counsel to the Debtors and Debtors-in-Possession*

# EXHIBIT A

## PROPOSED INTERIM ORDER

**THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| WALTER ENERGY, INC., *et al.* | ) | Case No. 15-_____ (___) |
|  | ) |  |
| Debtors.[1] | ) | (Joint Administration Requested) |
|  | ) |  |
|  | ) |  |

**INTERIM ORDER (A) AUTHORIZING
POSTPETITION USE OF CASH COLLATERAL,
(B) GRANTING ADEQUATE PROTECTION TO PREPETITION
SECURED PARTIES, (C) SCHEDULING A FINAL HEARING PURSUANT
TO BANKRUPTCY RULE 4001(b) AND (D) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] dated July 15, 2015 of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), pursuant to sections 105, 361, 362, 363, 507(b) and 552(b) of title 11 of the United States Code (the "Bankruptcy Code") and Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") 2002, 4001, 6003, 6004 and 9014, seeking entry of this interim order (this "Interim Order") and a final order:

(I)     authorizing the Debtors, subject and pursuant to the terms and conditions set forth in this Interim Order, to (a) use the Cash Collateral (as defined herein), which Cash Collateral shall be used in accordance with the

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Walter Energy, Inc. (9953); Atlantic Development and Capital, LLC (8121); Atlantic Leaseco LLC (5308); Blue Creek Coal Sales, Inc. (6986); Blue Creek Energy, Inc. (0986); J.W. Walter, Inc. (0648); Jefferson Warrior Railroad Company, Inc. (3200); Jim Walter Homes, LLC (4589); Jim Walter Resources, Inc. (1186); Maple Coal Co. LLC (6791); Sloss-Sheffield Steel & Iron Company (4884); SP Machine, Inc. (9945); Taft Coal Sales & Associates, Inc. (8731); Tuscaloosa Resources, Inc. (4869); V Manufacturing Company (9790); Walter Black Warrior Basin LLC (5973); Walter Coke, Inc. (9791); Walter Energy Holdings, LLC (1596); Walter Exploration & Production LLC (5786); Walter Home Improvement, Inc. (1633); Walter Land Company (7709); Walter Minerals, Inc. (9714); and Walter Natural Gas, LLC (1198). The location of the Debtors' corporate headquarters is 3000 Riverchase Galleria, Suite 1700, Birmingham, Alabama 35244-2359. Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of the Debtors' bankruptcy cases.

[2]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

Budget Covenant (as defined herein), including a budget acceptable in all respects to the Steering Committee (as defined herein) and Administrative Agent (as defined herein), each in their sole discretion, including any variances therefrom and the financial covenants (as such budget may be extended, varied, supplemented, or otherwise modified in accordance with the provisions of this Interim Order or the Final Order (as defined herein), the "Approved Budget") and (b) provide adequate protection on account of the diminution in the value of the Prepetition Collateral (as defined herein) as a consequence of the Debtors' use, sale or lease of the Prepetition Collateral, including any Cash Collateral (as defined below), and/or the imposition of the automatic stay to the Prepetition Secured Parties (as defined herein) who have been granted prepetition liens and security interests under the following documents (collectively, the "Prepetition Debt Documents"):

(a)     the Credit Agreement, dated as of April 1, 2011 (as amended, restated, amended and restated, waived, supplemented or otherwise modified from time to time, the "Credit Agreement" and together with all mortgage, security, pledge, guaranty and collateral agreements, including the 1L Security Agreement (as defined below) and all other documentation executed in connection with any of the foregoing, each as amended, restated, amended and restated, waived, supplemented or otherwise modified from time to time, the "First Lien Credit Documents"), among Walter Energy, Inc. ("Walter"), as U.S. borrower, Western Coal Corp. and Walter Energy Canada Holdings, Inc., as Canadian borrowers, the lenders from time to time party thereto (collectively, the "First Lien Lenders"), and Morgan Stanley Senior Funding, Inc., as administrative agent (in such capacity, the "Administrative Agent");

(b)     the Indenture, dated as of September 27, 2013 (as amended, waived, supplemented or otherwise modified from time to time, the "First Lien Indenture" and together with all mortgage, security, pledge, guaranty and collateral agreements, including the 1L Notes Collateral Agreement (as defined below) and all other documentation executed in connection with the foregoing, each as amended, restated, amended and restated, waived, supplemented or otherwise modified from time to time, the "First Lien Indenture Documents" and together with the First Lien Credit Documents, the "First Lien Documents"), among Walter, as issuer, certain of its subsidiaries, as guarantors, and Wilmington Trust, National Association (as successor to Union Bank, N.A.), as trustee (in such capacity, the "First Lien Trustee") and collateral agent for the noteholders from time to time of the 9.50% Senior Secured Notes due 2019 (collectively, the "First Lien Noteholders" and, together

2

with the First Lien Trustee, the Administrative Agent and the First Lien Lenders, the "<u>First Lien Secured Parties</u>");

(c)    the Indenture, dated as of March 27, 2014 (as amended, waived, supplemented or otherwise modified from time to time, the "<u>Second Lien Indenture</u>" and together with all mortgage, security, pledge, guaranty and collateral agreements, including the 2L Collateral Agreement (as defined below) and all other documentation executed in connection with the foregoing, each as amended, restated, amended and restated, waived, supplemented or otherwise modified from time to time, the "<u>Second Lien Indenture Documents</u>"), among Walter, as issuer, certain of its subsidiaries, as guarantors, and Wilmington Trust, National Association, as trustee (in such capacity, the "<u>Second Lien Trustee</u>" and, together with the First Lien Trustee, the "<u>Indenture Trustees</u>") and collateral agent for the noteholders from time to time of the 11.0%/12.0% Senior Secured Second Lien PIK Toggle Notes due 2020 (collectively, the "<u>Second Lien Noteholders</u>" and, together with the Second Lien Trustee and the First Lien Secured Parties, collectively, the "<u>Prepetition Secured Parties</u>");

(II)    scheduling, pursuant to Bankruptcy Rule 4001, an interim hearing (the "<u>Interim Hearing</u>") on the Motion to be held before this Court to consider entry of this Interim Order, which, among other things, authorizes the Debtors' use of Cash Collateral and grants adequate protection to the Prepetition Secured Parties;

(III)    subject to entry of the Final Order (as defined herein) and to the extent set forth herein, waiving the Debtors' right to surcharge the Prepetition Collateral pursuant to Bankruptcy Code section 506(c);

(IV)    modifying the automatic stay imposed by Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms of this Interim Order;

(V)    scheduling, pursuant to Bankruptcy Rule 4001, a final hearing (the "<u>Final Hearing</u>") granting the relief requested in the Motion on a final basis pursuant to the final order (the "<u>Final Order</u>"); and

(VI)    waiving any applicable stay with respect to the effectiveness and enforceability of this Interim Order (including a waiver pursuant to Bankruptcy Rule 6004(h)).

The Interim Hearing having been held by this Court on July 15, 2015; and upon the

record made by the Debtors at the Interim Hearing (including the First Day Declaration); and this

3

Court having heard and resolved or overruled all objections to the interim relief requested in the Motion; and it appearing that the interim relief requested in the Motion is in the best interests of the Debtors, their estates and creditors; and after due deliberation and consideration and sufficient cause appearing therefor,

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1. *The Motion*. The Motion is granted on an interim basis as set forth herein. Any objection to the Motion to the extent not withdrawn or resolved is hereby overruled.

2. *Jurisdiction*. This Court has core jurisdiction over the above-captioned chapter 11 cases (the "Chapter 11 Cases") commenced on July 15, 2015 (the "Petition Date"), this Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. *Statutory Committees.* As of the date hereof, no official committee of unsecured creditors (the "Creditors' Committee") or any other official committee has been appointed in the Chapter 11 Cases.

4. *Notice*. The Debtors have caused notice of the Motion, the relief requested therein and the Interim Hearing to be served on: (a) the Office of the Bankruptcy Administrator for the Northern District of Alabama (the "Bankruptcy Administrator"); (b) counsel to the Administrative Agent; (c) counsel to the First Lien Trustee; (d) counsel to the Second Lien Trustee; (d) counsel to a steering committee (the "Steering Committee") of First Lien Lenders and First Lien Noteholders; (e) the Internal Revenue Service; (f) the Securities and Exchange Commission; (g) the U.S. Environmental Protection Agency; (h) counsel to the United Mine Workers of America; (i) counsel to the United Steel Workers; (j) the holders of the fifty (50) largest unsecured claims against the Debtors, on a consolidated basis; and (k) the United States

4

Attorney for the Northern District of Alabama. Under the circumstances, the notice given by the Debtors of the Motion, the relief requested therein and of the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 2002 and 4001(b) and (d).

5.    *Debtors' Stipulations*.  Subject to the rights granted to certain parties, other than the Debtors, to challenge the Prepetition Secured Parties' claims and liens before the termination of the Challenge Period (as defined herein) as set forth below in paragraph 16, the Debtors admit, stipulate, and agree that:

(a)    As of the Petition Date, all of the Debtors (excluding Jefferson Warrior Railroad Company, Inc., Jim Walter Homes, LLC, Walter Home Improvement, Inc., Blue Creek Energy, Inc., Sloss-Sheffield Steel & Iron Company, SP Machine, Inc., and V Manufacturing Company) (collectively, the "Obligated Debtors") were unconditionally indebted and liable to the Prepetition Secured Parties, without defense, counterclaim or offset of any kind, for the following:

(i)    all debts, liabilities and obligations of every kind and nature owed by the Obligated Debtors under the First Lien Credit Documents, including, without limitation, the Loans (as defined in the Credit Agreement) made by the First Lien Lenders to such Debtors in the outstanding aggregate principal amount of $978,178,601.35 of term loans, and US$ 54,153,604.00 and C$24,070,494.00 (the "Canadian LCs") in outstanding letters of credit, plus accrued and unpaid interest, fees (including any prepayment fees), expenses, penalties, premiums and other obligations incurred in connection therewith, in each case in accordance with the terms of the First Lien Credit Documents (collectively, the "Credit Agreement Obligations"); the Credit Agreement Obligations are unconditionally guaranteed by the U.S. Subsidiary Guarantors (as defined in the Credit Agreement) and are secured by first priority security interests in and liens (the "Credit Agreement Liens") substantially all of the assets of Walter and the U.S. Subsidiary Guarantors, including Cash Collateral (as defined herein) (the "Prepetition Collateral"), pursuant to and on the terms set forth in (A) the U.S. Guaranty and Collateral Agreement, dated as of April 1, 2011 (as amended, restated, supplemented or otherwise modified from time to time, the "1L Security Agreement"), among

5

Walter, the U.S. Subsidiary Guarantors and Morgan Stanley Senior Funding, Inc., as collateral agent (in such capacity, the "Credit Agreement Collateral Agent"), (B) the Grant of Security Interest in United States Trademarks, dated as of April 1, 2011, made by Walter to the Credit Agreement Collateral Agent, and (C) such other mortgage, security, pledge, guaranty and collateral agreements executed in connection with the Credit Agreement;

(ii)     all debts, liabilities and obligations of every kind and nature owed by the Obligated Debtors under the First Lien Indenture Documents (collectively, the "First Lien Indenture Obligations" and together with the Credit Agreement Obligations, the "First Lien Obligations"), including, without limitation, the Notes (as defined in the First Lien Indenture) issued to the First Lien Noteholders in the outstanding aggregate principal amount of $970,000,000 under the First Lien Indenture, plus accrued and unpaid interest, fees, penalties, premium, expenses and other obligations incurred in connection therewith, in each case in accordance with the terms of the First Lien Indenture Documents; the First Lien Indenture Obligations are unconditionally guaranteed by the same entities that have guaranteed the Credit Agreement Obligations and secured, *pari passu* with the Credit Agreement Liens, by first priority security interests in and liens on the Prepetition Collateral (collectively with the Credit Agreement Liens, the "Prepetition First Priority Liens"), pursuant to and in accordance with the terms of (A) the First-Lien Notes Collateral Agreement, dated as of September 27, 2013 (as amended, restated, supplemented or otherwise modified from time to time, the "1L Notes Collateral Agreement"), among Walter, certain of its subsidiaries from time to time party thereto and Wilmington Trust, National Association (as successor to Union Bank, N.A.), as collateral agent (in such capacity, the "1L Notes Collateral Agent"), (B) the Grant of Security Interest in United States Trademarks, dated as of September 27, 2013, made by Walter to the 1L Notes Collateral Agent, and (C) such other mortgage, security, pledge, guaranty and collateral agreements executed in connection with the First Lien Indenture; and

(iii)    all debts, liabilities and obligations of every kind and nature owed by the Obligated Debtors under the Second Lien Indenture Documents (collectively, the "Second Lien Indenture Obligations" and together with the First Lien Obligations, the "Prepetition Obligations"), including, without limitation, the Notes (as defined in the Second Lien Indenture) issued to the Second Lien Noteholders in the outstanding aggregate principal amount (including interest that has been capitalized) of $360.5 million under the Second Lien Indenture, plus accrued and unpaid interest, fees, penalties, premium, expenses and other obligations incurred in connection therewith, in each case in

6

accordance with the terms of the Second Lien Indenture Documents; the Second Lien Indenture Obligations are unconditionally guaranteed by the same entities that have guaranteed the First Lien Obligations and secured by second priority security interests in and liens on the Prepetition Collateral (the "Prepetition Second Priority Liens" and together with the Prepetition First Priority Liens, the "Prepetition Liens"), pursuant to and in accordance with the terms of (A) the Second-Lien Notes Collateral Agreement, dated as of March 27, 2014 (as amended, restated, supplemented or otherwise modified from time to time, the "2L Notes Collateral Agreement"), among Walter, certain of its subsidiaries from time to time party thereto and Wilmington Trust, National Association, as collateral agent (in such capacity, the "2L Notes Collateral Agent"), (B) the Grant of Security Interest in United States Trademarks, dated as of March 27, 2014, made by Walter to the 2L Notes Collateral Agent, and (C) all other mortgage, security, pledge, guaranty and collateral agreements executed in connection with the Second Lien Indenture.

(b)     The Prepetition Obligations constitute the legal, valid, binding, non-avoidable obligations of the Obligated Debtors.

(c)     The Prepetition Liens are valid, binding, perfected, non-avoidable, and enforceable liens on and security interests in the Prepetition Collateral, subject in each case, solely as among the Prepetition Secured Parties, to the terms of the Intercreditor Agreement (as defined herein) and, prior to giving effect to this Interim Order, those other liens explicitly permitted by the applicable Prepetition Debt Documents (in each case, only to the extent such permitted exceptions were valid, properly perfected, non-avoidable liens senior in priority to the respective liens and security interests of the Prepetition Secured Parties on the Petition Date) (the "Permitted Priority Liens"), if any.

(d)     (i) No portion of the Prepetition Obligations, the Prepetition Debt Documents, and the transactions contemplated thereby is subject to contest, attack, objection, recoupment, defense, setoff, counterclaim, avoidance, recharacterization, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined in the

7

Bankruptcy Code), impairment, subordination or other challenge pursuant to the Bankruptcy Code or applicable nonbankruptcy law; (ii) the Debtors do not have any claims, challenges, counterclaims, causes of action, defenses, recoupment, disgorgement, or setoff rights related to the Prepetition Obligations or the Prepetition Debt Documents, whether arising under the Bankruptcy Code or applicable nonbankruptcy law, on or prior to the date hereof, against the Prepetition Secured Parties and their respective affiliates, subsidiaries, agents, officers, directors, employees, attorneys and advisors; and (iii) the Debtors each irrevocably waive, for themselves, and their subsidiaries, shareholders, and affiliates, any right to challenge or contest in any way the perfection, validity, priority and enforceability of the Prepetition Liens or the validity or enforceability of the Prepetition Obligations and the Prepetition Debt Documents. Any order entered by the Court in relation to the establishment of a bar date for any claims (including without limitation administrative expense claims) in any of the Chapter 11 Cases or any successor cases shall not apply to the Prepetition Secured Parties. The Prepetition Obligations, Prepetition Liens, interests, rights, priorities and protections granted to, or in favor of the Prepetition Secured Parties, as set forth in this Interim Order and in the applicable Prepetition Debt Documents shall be deemed a timely filed proof of claim on behalf of these Prepetition Secured Parties in each of these Chapter 11 Cases, and none of the Prepetition Secured Parties shall be required to file a proof of claim with respect thereto.

(e)     Each of the Debtors and the Debtors' estates, on its own behalf and on behalf of its past, present and future predecessors, successors, heirs, subsidiaries, and assigns (collectively, the "Releasors") shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably, fully and forever release, remise, acquit, relinquish, irrevocably waive and discharge each of the Prepetition Secured Parties and each of their respective former,

8

current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, the "Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description that exist on the date hereof relating to any of the Prepetition Debt Documents, or the transactions contemplated under such documents, including, without limitation, (i) any so-called "lender liability," equitable subordination, equitable disallowance or recharacterization claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, perfection or avoidability of the Prepetition Liens and the Prepetition Obligations. The Debtors' acknowledgments, stipulations, and releases shall be binding on the Debtors and their respective representatives, successors and assigns and, only subject to any action timely commenced by a Creditors' Committee (to the extent appointed) or any other party in interest, and in any case which is granted the requisite standing before the expiration of the Challenge Period (as defined herein) as provided in paragraph 16, on each of the Debtors' estates, all creditors thereof and each of their respective representatives, successors and assigns, including, without limitation, any trustee or other representative appointed by the Court, whether such

9

trustee or representative is appointed in cases under chapter 11 or chapter 7 of the Bankruptcy Code.

(f)     For purposes of this Interim Order, the term "Cash Collateral" shall mean and include all "cash collateral" as defined in section 363 of the Bankruptcy Code in which the Prepetition Secured Parties have a perfected lien, security interest or other interest, in each case whether existing on the Petition Date, arising pursuant to this Interim Order, or otherwise. The Debtors stipulate that any and all of the Debtors' cash, cash equivalents, negotiable instruments, investment property, securities, and any amounts generated from the use, sale, lease or other disposition of the Prepetition Collateral, in each case wherever located, constitute Cash Collateral and Prepetition Collateral of the Prepetition Secured Parties.

(g)     As of the Petition Date, the Debtors have not brought and are not aware of any claims, objections, challenges, causes of action, including without limitation, avoidance claims under chapter 5 of the Bankruptcy Code against the Prepetition Secured Parties arising out of or related to the Prepetition Obligations.

(h)     To the Debtors' knowledge, as of the Petition Date, there were no other perfected liens on or security interests in the Prepetition Collateral except for the Prepetition Liens and the Permitted Priority Liens.

6.     *Section 552(b).*  Each of the Prepetition Secured Parties shall be entitled to all of the rights and benefits of Bankruptcy Code section 552(b).  Subject to, and effective upon entry of the Final Order, the "equities of the case" exception under Bankruptcy Code section 552(b) shall not apply to the Prepetition Secured Parties with respect to proceeds, products, or profits of any of the Prepetition Collateral.

10

7.      *Findings Regarding the Use of Cash Collateral and Prepetition Collateral.*

(a)      Good cause has been shown for the entry of this Interim Order.

(b)      The Debtors have an immediate need to use the Cash Collateral to permit, among other things, the orderly continuation of their businesses, pay their operating expenses and preserve the going concern value of the Debtors.

(c)      The preservation and maintenance of the Debtors' businesses and assets is necessary to maximize value.  Absent the Debtors' ability to use Cash Collateral in accordance with the terms hereof (including, without limitation, the Budget Covenant), the continued operation of the Debtors' businesses would not be possible, and irreparable harm to the Debtors, their estates, and their creditors would occur.  Authorization to use the Cash Collateral is therefore (i) critical to the Debtors' ability to maximize the value of these chapter 11 estates, (ii) in the best interests of the Debtors and their estates, and (iii) necessary to avoid immediate and irreparable harm to the Debtors, their creditors, and their assets, businesses, goodwill, reputation, and employees.

(d)      The terms of the use of the Cash Collateral pursuant to this Interim Order are fair and reasonable, and reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.

(e)      The Steering Committee, the Administrative Agent, the Credit Agreement Collateral Agent, the First Lien Trustee, the Second Lien Trustee, the 1L Notes Collateral Agent, and the 2L Notes Collateral Agent, as applicable, have consented to (or, as applicable, has been directed to, or it has been asserted that they are deemed to have, consented to pursuant to the Intercreditor Agreement referred to below), conditioned upon the entry of this Interim Order, the Debtors' proposed use of Cash Collateral, on the terms and conditions set forth in this Interim

11

Order and in accordance with the Budget Covenant. Pursuant and subject to the terms of the Amended and Restated Intercreditor Agreement, dated as of March 27, 2014 (as amended, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), among Walter, the other grantors from time to time party thereto, the Credit Agreement Collateral Agent, the 1L Notes Collateral Agent, the 2L Notes Collateral Agent, and each additional Collateral Agent (as defined in the Intercreditor Agreement) and Authorized Representative (as defined in the Intercreditor Agreement) from time to time party thereto, the 1L Notes Collateral Agent, the First Lien Noteholders, the 2L Notes Collateral Agent and the Second Lien Noteholders are precluded from objecting to the use of Cash Collateral under certain circumstances, including if the Credit Agreement Collateral Agent has consented thereto and the adequate protection provisions set forth herein are adhered to.

(f)     The continued use of Cash Collateral has been negotiated in good faith and at arms' length among the Debtors, the Steering Committee, the Credit Agreement Collateral Agent (on behalf of the First Lien Lenders) and the Administrative Agent, as applicable, and, therefore, the use of the Cash Collateral by the Debtors in accordance with the terms of this Interim Order shall be deemed to have been extended, issued, or made in "good faith".

(g)     The Debtors and certain of the Prepetition Secured Parties have entered into that certain Restructuring Support Agreement (as amended from time to time in accordance therewith, the "RSA"), which contains the parties' agreements and undertakings with respect to the Debtors' restructuring.

8.     *Authorization of Use of Cash Collateral.*  Subject to the terms hereof and in accordance with the Budget Covenant, the Debtors are hereby authorized to use the Cash Collateral during the period from the Petition Date through and including the Termination Date

Case 15-02741-TOM11     Doc 42     Filed 07/15/15     Entered 07/15/15 13:29:28     Desc Main
Document     Page 48 of 88

for: (a) working capital requirements; (b) general corporate purposes; (c) adequate protection payments to the Prepetition Secured Parties as contemplated herein; and (d) the costs and expenses of administering these Chapter 11 Cases (including payments benefiting from the Carve-Out) incurred in the Chapter 11 Cases; provided that the Debtors shall not be authorized to use Cash Collateral to pay fees or expenses (x) in excess of $50,000 per month (the "Committee Monthly Cap"), on account of Professional Persons (as defined herein) retained by any official committee appointed in these Chapter 11 Cases, including any Creditors' Committee, (y) in excess of $25,000 (the "Investigation Budget") for the Creditors' Committee to investigate (but not prepare, initiate or prosecute) Claims and Defenses (as defined herein) against the Prepetition Secured Parties before the termination of the Challenge Period (as defined herein), or (z) to initiate or prosecute proceedings or actions on account of any Claims and Defenses against the Prepetition Secured Parties. For the avoidance of doubt and notwithstanding any other provision of this Interim Order, other than the Investigation Budget (which may be used solely for the purposes authorized in this paragraph 8), no Cash Collateral, Prepetition Collateral, Collateral or any proceeds thereof, or any portion of the Carve-Out may be used directly or indirectly by any Debtor, any official committee appointed in the case, including the Creditors' Committee, or any trustee appointed in the Chapter 11 Cases or any successor case, or any other person, party or entity to (i) investigate, object, contest, or raise any defense to the validity, perfection, priority, extent, or enforceability of the Prepetition Obligations, the Prepetition Liens or any action purporting to do any of the foregoing; (ii) investigate, assert or prosecute any Claims and Defenses against the Prepetition Secured Parties or their respective predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors or any action purporting to do the foregoing in respect of the Prepetition Obligations

13

and/or the Prepetition Liens; (iii) prevent, hinder, or otherwise delay the Prepetition Secured Parties' enforcement, or realization on the Prepetition Obligations, Cash Collateral, the Prepetition Liens, the Adequate Protection Obligations, or the Adequate Protection Liens in accordance with the Interim Order; (iv) seek to modify any of the rights granted to the Prepetition Secured Parties hereunder (other than with the consents contemplated hereunder); (v) apply to the Court for authority to approve superpriority claims or grant liens (other than the Approved Liens (as defined below)) in the Collateral or any portion thereof that are senior to, or on parity with, the Adequate Protection Liens, Superpriority Claims or Prepetition Liens, unless all Prepetition Obligations and claims under this Interim Order and the Final Order have been refinanced or paid in full in cash (including the cash collateralization of any letters of credit) or otherwise agreed to in writing by the Administrative Agent and the Steering Committee, each in its sole discretion; or (vi) seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are agreed to in writing by the Steering Committee in its sole discretion, are authorized in any "first day" orders, or are otherwise included in the Approved Budget.

9.        *Entitlement to Adequate Protection.*  The Prepetition Secured Parties are entitled to adequate protection of their respective interests in the Prepetition Collateral (including, without limitation, the Cash Collateral) on which the Prepetition Secured Parties hold perfected security interests as of the Petition Date in an amount equal to the aggregate postpetition diminution in value of the Prepetition Collateral, including any Cash Collateral, from and after the Petition Date (such diminution in value, the "Diminution in Value"), including, without limitation, to the extent such diminution results from the sale, lease or use by the Debtors of the Prepetition Collateral, the subordination of the Prepetition Liens to the Carve-Out, or the

14

imposition of the automatic stay pursuant to Bankruptcy Code section 362 (such adequate protection, as set forth in paragraphs 10 and 11 below, the "Adequate Protection Obligations").

10. *Adequate Protection Claims and Liens*.

(a) Adequate Protection for the First Lien Secured Parties. As adequate protection for the Diminution in Value of the Prepetition Collateral, the First Lien Secured Parties are hereby granted the following claims, liens, rights and benefits:

(i) ***First Lien Superpriority Claim***. The Adequate Protection Obligations due to the First Lien Secured Parties (the "First Lien Adequate Protection Obligations") shall constitute allowed joint and several superpriority claims against each of the Debtors as provided in Bankruptcy Code section 507(b) (collectively, the "First Lien Superpriority Claim"), with priority over any and all administrative expenses and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all other administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b), and over any and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including, without limitation, Bankruptcy Code sections 105, 326, 327, 328, 330, 331, 365, 503, 506, 507(a), 507(b), 546, 552, 726, 1113 or 1114, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy or attachment, subject and subordinate only to the Carve-Out;

(ii) ***First Lien Adequate Protection Liens***. Subject to the Carve-Out, as security for the First Lien Adequate Protection Obligations, effective as of the Petition Date and perfected without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the First Lien Secured Parties of any Postpetition Collateral (as defined below), the following security interests and liens are hereby granted to the First Lien Secured Parties (all such liens and security interests, the "First Lien Adequate Protection Liens"):

(A) Pursuant to Bankruptcy Code sections 361(2) and 363(c)(2), a valid, binding, continuing, enforceable, fully-perfected, non-avoidable additional and replacement first priority lien on, and security interest in, all property (including any previously unencumbered property), whether now owned or

15

hereafter acquired or existing and wherever located, of each Debtor and each Debtor's "estate" (as created pursuant to Bankruptcy Code section 541(a)), of any kind or nature whatsoever, real or personal, tangible or intangible, and now existing or hereafter acquired or created, including, without limitation, all cash, accounts, inventory, goods, contract rights, mineral rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor (other than Walter), other equity or ownership interests held by a Debtor, including equity interests in subsidiaries and non-wholly-owned subsidiaries, money, investment property, and causes of action (including causes of action arising under Bankruptcy Code section 549 and any related action under Bankruptcy Code section 550) and, subject to entry of the Final Order, the proceeds of any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 550 (except as provided above) or 553 or the proceeds of any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law (collectively, the "Avoidance Actions"), Cash Collateral, and all cash and non-cash proceeds, rents, products, substitutions, accessions, and profits of any of the collateral described above, documents, vehicles, intellectual property, securities, partnership or membership interests in limited liability companies and capital stock, including, without limitation, the products, proceeds and supporting obligations thereof, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located (all such property (including the Junior Collateral (as defined herein)), other than the Prepetition Collateral in existence immediately prior to the Petition Date, being collectively referred to as, the "Postpetition Collateral" and collectively with the Prepetition Collateral, the "Collateral"), which liens and security interests shall be senior to any and all other liens and security interests other than the Carve-Out and the Permitted Priority Liens, if any, and liens granted to third parties on Cash Collateral to secure Approved Collateralized Obligations (as defined below) (the "Approved Liens").

(B)     Subject to the Carve-Out, pursuant to Bankruptcy Code sections 361(2) and 363(c)(2), a valid, binding, continuing,

16

enforceable, fully-perfected non-avoidable junior priority replacement lien on, and security interest in, all property, whether now owned or hereafter acquired or existing and wherever located, of each Debtor and each Debtor's "estate" (as created pursuant to Bankruptcy Code section 541(a)), property of any kind or nature whatsoever, real or personal, tangible or intangible, and now existing or hereafter acquired or created, including, without limitation, all cash, accounts, inventory, goods, contract rights, mineral rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor (other than Walter), other equity or ownership interests held by a Debtor, including equity interests in subsidiaries and non-wholly-owned subsidiaries, money, investment property, causes of action, Cash Collateral, and all cash and non-cash proceeds, rents, products, substitutions, accessions, and profits of any of the collateral described above, documents, vehicles, intellectual property, securities, partnership or membership interests in limited liability companies and capital stock, including, without limitation, the products, proceeds and supporting obligations thereof, whether now existing or hereafter acquired, that is subject only to (x) the Permitted Priority Liens, or (y) valid and non-avoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date to the extent permitted by Bankruptcy Code section 546(b), which valid, perfected and unavoidable liens are senior in priority to the security interests and liens in favor of the Administrative Agent and the First Lien Trustee (the "Junior Collateral").

(C)      The Adequate Protection Liens shall not be (1) subject or subordinate to, or *pari passu* with, (a) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under Bankruptcy Code section 551 or (b) any lien or security interest arising on or after the Petition Date subject to the Carve-Out, or (2) except as otherwise set forth in paragraphs 10(a)(ii)(A) and 10(a)(ii)(B) hereof, subordinated to or made *pari passu* with any other lien, claim or security interest under Bankruptcy Code sections 363 or 364 or otherwise.

17

(iii) **_Carve-Out_**.    For purposes hereof, the "Carve-Out" shall mean, following the Termination Date, the sum of:  (A) all fees required to be paid to the clerk of the Court and the Bankruptcy Administrator (without regard to the Carve-Out Trigger Notice (as defined herein)); (B) reasonable fees and expenses up to $25,000 in the aggregate incurred by a trustee appointed under Bankruptcy Code section 726(b) (without regard to the Carve-Out Trigger Notice); (C) subject to the Committee Monthly Cap with respect to Professional Fees incurred by Professional Persons retained by the Creditors' Committee or any other statutory committee appointed in the Chapter 11 Cases, and subject to any Professional Fees permitted to be incurred under the Investigation Budget, to the extent allowed, whether by interim order, procedural order or otherwise, all accrued and unpaid reasonable fees, costs, and expenses (the "Professional Fees") incurred by persons or firms retained by the Debtors, the Creditors' Committee or any other statutory committee appointed in the Chapter 11 Cases (if any) pursuant to Bankruptcy Code section 327, 328, or 363 (collectively, the "Professional Persons") at any time before or on the day of delivery by the Administrative Agent or Steering Committee of a Carve-Out Trigger Notice (the "Pre-Trigger Date Fees"); and (D) after the delivery by the Administrative Agent or Steering Committee of the Carve-Out Trigger Notice (the "Trigger Date"), to the extent allowed at any time, whether by interim order, procedural order or otherwise, the payment of (1) all Professional Fees of Professional Persons retained by the Debtors and (2) subject to the Committee Monthly Cap, the payment of Professional Fees of Professional Persons incurred by the Creditors' Committee or any other statutory committee appointed in the Chapter 11 Cases, not to exceed $5 million in the aggregate for clauses (1) and (2) incurred after the Trigger Date (the amount set forth in this clause (D) being the "Post-Carve Out Trigger Notice Cap"); provided that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (C) or (D) above, on any grounds.  On the day on which a Carve-Out Trigger Notice is given to the Debtors, such Carve-Out Trigger Notice also shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an aggregate amount equal to the accrued and unpaid Pre-Trigger Date Fees plus the Post-Carve Out Trigger Notice Cap, and the Debtors shall deposit and hold any such amounts in a segregated account at a financial institution selected by the Debtors for such purpose and solely for the benefit of the Professional Persons entitled thereto.  The reserved funds shall be released from time to time from the segregated account to pay when due any Pre-Trigger Date Fees and any fees and expenses incurred after Post-Carve Out Trigger Notice that are included in the Post-Carve Out Trigger Notice Cap under

18

clause (D) above. Such account and amounts therein shall be free and clear of all liens, claims and interests of any party other than the Professional Persons entitled thereto. Notwithstanding the foregoing, (X) the Carve-Out shall not include, apply to or be available for any fees or expenses incurred by any party in connection with (1) the investigation, preparation, initiation or prosecution of any claims, causes of action, proceeding, adversary proceeding or other litigation against any of the Prepetition Secured Parties (in such capacity), including challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the Prepetition Obligations and the Prepetition Liens granted under the Prepetition Debt Documents in favor of the Prepetition Secured Parties, including, without limitation, for lender liability or pursuant to Bankruptcy Code section 105, 510, 544, 547, 548, 549, 550 or 552, applicable nonbankruptcy law or otherwise; (2) attempts to modify any of the rights granted to the Prepetition Secured Parties hereunder (other than with the consents contemplated hereunder); (3) attempts to prevent, hinder or otherwise delay any of the Prepetition Secured Parties' enforcement or realization upon any Collateral in accordance with the Prepetition Debt Documents and this Interim Order; or (4) paying any amount on account of any claims arising before the Petition Date unless such payments are approved by an order of this Court, in the Approved Budget or otherwise consented to by the Steering Committee in its sole discretion, and (Y) so long as the Carve-Out Trigger Notice shall not have been delivered, the Carve-Out shall not be reduced by the payment of Professional Fees allowed at any time by this Court. Any claim incurred in connection with any of the activities described above (other than as permitted in connection with the Investigation Budget in an amount not exceeding such Investigation Budget) shall not be allowed, treated or payable as an administrative expense claim for purposes of section 1129(a)(9)(A) of Bankruptcy Code. For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by the Administrative Agent or the Steering Committee to the Debtors, Debtors' counsel, the Bankruptcy Administrator, and counsel to the Creditors' Committee (if any), upon the occurrence and during the continuance of a Termination Event (as defined below), stating that the Post-Carve Out Trigger Notice Cap has been invoked. For the avoidance of doubt and notwithstanding anything to the contrary herein or in the Prepetition Debt Documents, the Carve-Out shall be senior to all liens and claims arising out of the Prepetition Debt Documents, including the Prepetition Liens, the Adequate Protection Liens, the Superpriority Claims, and any and all other forms of adequate protection, liens or claims securing or relating to the Prepetition Obligations.

(b)　　Adequate Protection for the Second Lien Trustee and Second Lien Noteholders.  As adequate protection for the Diminution in Value of their liens and interests in the Prepetition Collateral, the Second Lien Trustee and the Second Lien Noteholders are hereby granted the following claims, liens, rights and benefits:

(i)　*Second Lien Superpriority Claims*.  The Adequate Protection Obligations due to the Second Lien Trustee and the Second Lien Noteholders (the "Second Lien Adequate Protection Obligations") shall constitute joint and several superpriority claims against the Debtors as provided in Bankruptcy Code section 507(b) (the "Second Lien Superpriority Claim" and together with the First Lien Superpriority Claim, the "Superpriority Claims"), subject and subordinate only to the Carve Out, the First Lien Superpriority Claim and the First Lien Obligations.

(ii)　*Second Lien Adequate Protection Liens*.  As security for the Second Lien Adequate Protection Obligations, effective as of the Petition Date and perfected without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the Second Lien Indenture Trustee of any Postpetition Collateral, security interests and liens are hereby granted to the Second Lien Indenture Trustee for the benefit of the Second Lien Noteholders on the Postpetition Collateral, subject and subordinate only to the (A) the Carve-Out, (B) the First Lien Adequate Protection Liens, (C) the liens and security interests securing the First Lien Obligations, (D) the Permitted Priority Liens, and (E) Approved Liens, and subject further to the Intercreditor Agreement (all such liens and security interests, the "Second Lien Adequate Protection Liens," and collectively with the First Lien Adequate Protection Liens, the "Adequate Protection Liens").

11.　*Additional Adequate Protection*.  As additional adequate protection:

(a)　Payments:  The Debtors are authorized and directed to pay to the Administrative Agent, for the ratable benefit of the First Lien Lenders (including in respect of any unreimbursed drawings on letters of credit), and to the First Lien Trustee, for the ratable benefit of the First Lien Noteholders, any accrued, but unpaid interest due as of the Petition Date and postpetition interest, in cash, pursuant to the terms of, the First Lien Credit Documents (with

20

the LIBO Rate under the First Lien Credit Documents fixed at 1.00% per annum for purposes of such postpetition interest payments under the First Lien Credit Documents) and the First Lien Indenture Documents, respectively, in each case calculated based on 80% of the applicable contract non-default rate set forth therein and due and payable on a monthly basis (with all payments of interest to be without prejudice to the rights of the Administrative Agent and the First Lien Trustee (and any party-in-interest's right to object thereto) to assert a claim for payment of additional interest at any other rates in accordance with the applicable governing documents) but without prejudice to the right of any party-in-interest with standing to do so to seek to recharacterize such payments as principal; provided, any accrued, due but unpaid interest as of the Petition Date shall be paid promptly upon entry of this Interim Order.

(b)     Agent/Indenture Trustee Fees and Expenses:  The Debtors shall promptly pay, in cash, (x) all Letter of Credit Fees and Facing Fees (each as defined in the Credit Agreement), and any annual administrative agent fees and other fees set forth in Section 4.01(b) through (e) of the Credit Agreement (including, in each case, all amounts set forth in Section 4.01(a) through (e) of the Credit Agreement accrued with respect to periods on or prior to the Petition Date) on the respective dates for the payment (or, in the case of all amounts accrued as of the Petition Date, promptly upon entry of this Interim Order) of all such fees as provided in the Credit Agreement, at the applicable non-default rate provided for in the First Lien Credit Documents with respect to such fees and (y) upon presentment of an applicable invoice to the Debtors (with a copy of such invoice to be presented contemporaneously to both the Bankruptcy Administrator and counsel for the Creditors' Committee, if any), all reasonable, actual, and documented (in customary detail, redacted for privilege and work product) fees, costs and expenses incurred by each of the Administrative Agent and the First Lien Trustee, including,

21

without limitation, the fees, costs and expenses of one lead counsel, one local counsel (if necessary) and, if needed, one Canadian counsel for each of the Administrative Agent and the First Lien Trustee, in each case in accordance with the applicable engagement letters (if any) and the Prepetition Debt Documents and without further order of, or application to, the Court or notice to any party other than as provided in this paragraph 11(b).

      (c)    <u>Steering Committee Fees and Expenses</u>. The Debtors shall promptly pay in cash upon presentment of an applicable invoice to the Debtors (with a copy of such invoice to be presented contemporaneously to both the Bankruptcy Administrator and counsel for the Creditors' Committee, if any), all reasonable, actual, and documented (in customary detail, redacted for privilege and work product) fees, costs and expenses of (i) Akin Gump Strauss Hauer & Feld LLP ("<u>Akin Gump</u>"), as lead counsel, Burr Forman LLP ("<u>Burr Forman</u>"), as Alabama counsel, Cassels Brock & Blackwell LLP ("<u>Cassels</u>"), as Canadian counsel, and Lazard Frères & Co. LLC, as financial advisor, to the Steering Committee ("<u>Lazard</u>" and together with Akin Gump, Burr Forman and Cassels, the "<u>Steering Committee Advisors</u>") and (ii) any consultants or other advisors retained by the Steering Committee (and not by individual Steering Committee members) (the parties described in this paragraph 11(c)(ii) collectively, the "<u>Consultants</u>") in connection with the Restructuring (as defined in the RSA); <u>provided</u> that the Steering Committee shall provide notice to the Debtors prior to retaining any such Consultants, in each case, in accordance with engagement letters (if any) of such professional (including the Restructuring Fee as defined in Lazard's engagement letter), and in each case, without further order of, or application to, the Court or notice to any party other than as provided in this paragraph 11(c); <u>provided</u>, <u>however</u>, that Lazard's Restructuring Fee shall be subject to the entry of the Final Order; <u>provided</u> further that no success fees shall be payable to any Consultant. In

22

addition, the Debtors shall promptly reimburse each Steering Committee member in cash for all reasonable and documented out-of-pocket costs and expenses (without limiting the Debtors' obligations pursuant to the previous sentence, which out-of-pocket costs and expenses should not include any advisor and professional fees for such individual Steering Committee member) incurred by such member in connection with the Restructuring.

(d)     _Credit Bidding_.   The Administrative Agent (on behalf of the First Lien Lenders), the First Lien Trustee (on behalf of the First Lien Noteholders) and the Second Lien Trustee (on behalf of the Second Lien Noteholders) (but only if any such credit bid provides, to the extent set forth in the Intercreditor Agreement, for the payment in full and in cash of all Prepetition Obligations owed to the First Lien Secured Parties and any amounts due and owing to the First Lien Secured Parties under this Interim Order and the Final Order, and provides for the cash collateralization of any letters of credit in accordance with the First Lien Credit Documents and this Interim Order and the Final Order), as applicable, shall have the right to credit bid (X) up to the full amount of the remaining Prepetition Obligations under the First Lien Credit Documents, First Lien Indenture Documents and the Second Lien Indenture Documents, respectively and (Y) the First Lien Superpriority Claims, the Second Lien Superpriority Claims, and any unpaid amounts due and owing under paragraph 11(a) through (c) hereof, as applicable, in the sale of any of the Collateral, including, without limitation, (a) pursuant to Bankruptcy Code section 363, (b) a plan of reorganization or a plan of liquidation under Bankruptcy Code section 1129, or (c) a sale or disposition by a chapter 7 trustee for any Debtor under Bankruptcy Code section 725.

(e)     _Reporting and Budget Compliance_.   The Debtors shall comply in all respects with the provisions of this paragraph 11(e) (the "Budget Covenant").  The initial budget

23

shall cover the 12-week period beginning the business week of the Petition Date (the "Initial Budget Period") and be in the form attached hereto as **Exhibit A** (the "Initial Budget").  On or before the last business day of the tenth week of the Initial Budget Period, the Debtors shall deliver an updated budget (the "Second Budget") for the 12-week period following the Initial Budget Period (the "Second Budget Period").  On or before the last business day of the tenth week of the Second Budget Period, the Debtors shall deliver an updated budget (the "Third Budget" and, together with the Initial Budget and the Second Budget, collectively, the "Budgets") for the 12-week period following the Second Budget Period (the "Third Budget Period").  The Budgets shall be delivered to the Steering Committee and the Administrative Agent, with a copy delivered to the Creditors' Committee; provided that, the Budgets may be shared on a confidential basis with those Prepetition Secured Parties that have signed a confidentiality agreement or are otherwise subject to confidentiality restrictions pursuant to the Prepetition Debt Documents.  The Initial Budget will be the first budget utilized for reporting and permitted variance purposes (the "Approved Budget").  The Second Budget and the Third Budget provided thereafter shall be of no force and effect unless and until it is approved by the Steering Committee and the Administrative Agent, each in its sole discretion.  The Steering Committee and the Administrative Agent, each in its sole discretion, shall approve or reject the Second Budget or the Third Budget within eleven (11) days after the last day that delivery thereof is permitted as set forth above; provided that, each of the Second Budget and the Third Budget shall be deemed approved upon the passage of such eleven (11) day period with no objection raised by the Steering Committee and the Administrative Agent.  Upon the approval by the Steering Committee and the Administrative Agent, each of the Second Budget and the Third Budget shall become the "Approved Budget" for the Second Budget Period and the Third Budget

24

Period, as applicable. Every week (beginning with the first full week after the Petition Date), on the fifth business day of such week, the Debtors shall deliver to the Steering Committee Advisors, the advisors to the Administrative Agent and the advisors to the Creditors' Committee, a weekly variance report from the previous week comparing the actual cash receipts and disbursements of the Debtors with the receipts and disbursements in the Approved Budget (the "Budget Variance Report"); provided that, the Budget Variance Report may be shared with the Administrative Agent and the Steering Committee. The Budget Variance Report shall include, among other things, (a) details regarding amounts paid under any order of the Court; (b) a detailed comparison, including commentary, of each week's performance against the Approved Budget; and (c) a detailed comparison, including commentary, of aggregate performance since the commencement of the Approved Budget against such Approved Budget. The Debtors shall not allow (x) (i) "Cumulative Net Cash Flow" for the relevant Testing Period to have a negative variance of more than $20 million from the "Cumulative Net Cash Flow" line item set forth in the Initial Budget and (ii) "Cumulative Disbursements" for the relevant Testing Period to have a negative variance of more than the greater of (a) $7.5 million and (b) 5% of "Cumulative Disbursements" set forth in the Initial Budget for the relevant Testing Period from the "Cumulative Disbursements" line item set forth in the Initial Budget, (y) (i) "Cumulative Net Cash Flow" for the relevant Testing Period to have a negative variance of more than $20 million from the "Cumulative Net Cash Flow" line item set forth in the Second Budget and (ii) "Cumulative Disbursements" for the relevant Testing Period to have a negative variance of more than the greater of (a) $7.5 million and (b) 5% of "Cumulative Disbursements" set forth in the Second Budget for the relevant Testing Period from the "Cumulative Disbursements" line item set forth in the Second Budget and (z) (i) "Cumulative Net Cash Flow" for the relevant Testing

Period to have a negative variance of more than $20 million from the "Cumulative Net Cash Flow" line item set forth in the Third Budget and (ii) "Cumulative Disbursements" for the relevant Testing Period to have a negative variance of more than the greater of (a) $7.5 million and (b) 5% of "Cumulative Disbursements" set forth in the Third Budget for the relevant Testing Period from the "Cumulative Disbursements" line item set forth in the Third Budget. For purposes of the Cumulative Net Cash Flow and Cumulative Disbursements variance tests set forth above, (i) "Testing Period" shall mean (x) with respect to clause (x) in the prior sentence, the first two week period of the Initial Budget Period, and each cumulative period beginning with the beginning of the Initial Budget Period and ending every two weeks after the first two week period, (y) with respect to clause (y) in the prior sentence, the first two week period of the Second Budget Period, and each cumulative period beginning with the beginning of the Second Budget Period and ending every two weeks after the first two week period, and (z) with respect to clause (z) in the prior sentence, the first two week period of the Third Budget Period, and each cumulative period beginning with the beginning of the Third Budget Period and ending every two weeks after the first two week period and (ii) "Cumulative Net Cash Flow" and "Cumulative Disbursements" shall not include, but shall otherwise be permitted to be paid in accordance herewith, (w) adequate protection payments, (x) fees and expenses of professionals retained outside the ordinary course of business, (y) the Debtors' use of the Cash Collateral to collateralize any new, replaced or renewed letters of credit, surety bonds or workers' compensation obligations, in each case, that has been consented to by the Steering Committee in its sole discretion (collectively, the "Approved Collateralized Obligations") and (z) key employee retention payments approved by both the Steering Committee and the Court. The Debtors shall not allow cumulative capital expenditures beginning July 1, 2015, as calculated on

26

a GAAP basis, to exceed the amounts set forth in the Debtors' projected capital expenditure budget attached as an exhibit to the Initial Budget by more than the greater of (x) $5 million and (y) 20%. Such capital expenditure variance shall be tested as of the end of each calendar month, and the Debtors shall deliver to the Steering Committee Advisors, the advisors to the Administrative Agent and the advisors to the Creditors' Committee a variance report calculating such variance no later than 15 business days following the end of each calendar month, beginning with July 2015.

(f)      Access to Records/Financial Reporting.   In addition to, and without limiting, whatever rights of access the Prepetition Secured Parties have under the Prepetition Debt Documents, upon reasonable notice, at reasonable times and subject to appropriate confidentiality protections, the Debtors shall permit representatives and agents of the Steering Committee and the Administrative Agent (i) to have access to and inspect the Debtors' properties, subject to reasonable safety precautions, (ii) to examine the Debtors' books and records, and (iii) to discuss the Debtors' affairs, finances and condition with the Debtors' officers and financial advisors.   In addition, the Debtors shall provide to the Steering Committee Advisors and the advisors to the Administrative Agent, on a monthly basis, reports setting forth (i) substantive mine-by-mine details of the Debtors' operating performance, including its non-debtor subsidiaries and (ii) a detailed comparison, including commentary, of the month's actual operating performance against the projections, substantially in form and substance consistent with the Company's historical monthly reporting to the Board of Directors, as modified to include summary mine-level operating and financial data.

(g)      Executory Contracts and Unexpired Leases.  The Debtors will work with the Steering Committee and its advisors to determine which executory contracts and unexpired

27

leases should be assumed or rejected by the Debtors. The Debtors will provide the Steering Committee and its advisors with all necessary information in order to analyze such a decision. Other than in connection with the 363 Sale (as defined in the RSA) where the Purchaser (as defined in the Sale Term Sheet attached as Exhibit C to the RSA) is not the winning bidder for the Assets (as defined in the RSA), the Debtors shall not make any decision with regard to the assumption or rejection of executory contracts and unexpired leases without first obtaining the consent of the Steering Committee, which consent shall be in its sole discretion.

(h)     <u>Employee Incentive/Retention Plans</u>.  The Debtors shall not seek approval of any employee incentive or retention plans (or any similar sort of retention or incentive program) without the prior written consent of the Steering Committee, which consent shall be in its sole discretion.

(i)     <u>Other Covenants</u>.

1.  The Debtors shall maintain their cash management arrangements in a manner consistent in all material respects with that described in the Debtors' motion for authority to maintain its existing cash management system.

2.  Except as expressly permitted under the RSA, the Sale Motion (as defined in the RSA) or other "first day" pleadings, the Debtors shall not use, sell or lease any material assets outside the ordinary course of business, or seek authority of this Court to the extent required by Bankruptcy Code section 363, without obtaining the prior written consent of the Steering Committee, which consent shall be in its sole discretion, and prior consultation with the Administrative Agent and the First Lien Trustee at least five (5) business days prior to the date on which the Debtors seek the Court's authority for such use, sale or lease.  Subject to paragraph 10(a)(iii) hereof and the rights of any holder of a Permitted Priority Lien thereon, in the event of any such sale, lease, transfer, license, or other disposition of property of the Debtors (other than a disposition of all or substantially all of the Debtors' assets) that constitutes Collateral outside the ordinary course of business (to the extent permitted by the Prepetition Debt Documents and this Interim Order) the Debtors are authorized and directed, without further notice or order of this Court, to immediately pay to the

28

Administrative Agent or Indenture Trustees, as appropriate under the Intercreditor Agreement, for the benefit of the applicable Prepetition Secured Parties, 100% of the net cash proceeds resulting therefrom no later than the second business day following receipt of such proceeds. In the event of any casualty, condemnation, or similar event with respect to property that constitutes Collateral, the Debtors are authorized and directed to pay to the Administrative Agent or Indenture Trustees, as appropriate under the Intercreditor Agreement, for the benefit of the applicable Prepetition Secured Parties, any insurance proceeds, condemnation award, or similar payment (excluding any amounts on account of any D&O policies) in excess of $2,000,000 no later than the second business day following receipt of payment by the Debtors unless the applicable Prepetition Secured Parties consent, each in their sole discretion but subject to the Intercreditor Agreement, in writing, to the funds being reinvested by the Debtors.

(j)    <u>Restrictions on the Use of Collateral with Respect to Foreign and Non-Debtor Affiliates</u>.  The Debtors shall not transfer or use any Collateral, including any Cash Collateral, to or for the benefit of any direct or indirect foreign or non-debtor affiliate or subsidiary of the Debtors, including, without limitation, in connection with any professional fees and expenses incurred with respect to any restructuring of such subsidiary or affiliate, <u>provided</u> that the Debtors shall be permitted to make payments for the benefit of its foreign and non-debtor affiliates or subsidiaries (i) as expressly provided in an Approved Budget or (ii) with the prior consent of the Steering Committee, which consent shall be in its sole discretion ("<u>Permitted Non-Debtor Affiliate Payments</u>") and, other than with respect to any payments made to or for the benefit of Black Warrior Methane Corp. and Black Warrior Transmission Corp., any such Permitted Non-Debtor Affiliate Payments shall be made pursuant to senior secured notes, which notes shall be pledged to the First Lien Secured Parties.  For the avoidance of doubt, in the event that any Permitted Non-Debtor Affiliate Payment is made to any one or more Canadian Entity (as defined below), each such Canadian Entity shall grant liens against all of its present and future property, assets and undertaking, and all other Canadian Entities shall (i) guarantee

29

repayment of such Permitted Non-Debtor Affiliate Payment and (ii) grant liens against all of their respective present and future property, assets and undertaking as security for such guarantee obligations, and each such Permitted Non-Debtor Affiliate Payment and all of such guarantees and security shall be assigned and pledged by the maker of such Permitted Non-Debtor Affiliate Payment in favor of the First Lien Secured Parties, and in each such case, the form of the note(s), security and guarantees shall be in form and substance satisfactory to the Steering Committee in its sole discretion.

(k) <u>Right to Seek Additional Adequate Protection</u>. This Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Secured Parties to request additional forms of adequate protection at any time or any party-in-interest's right to object thereto. Any such request must be consistent with the Intercreditor Agreement.

(l) <u>Independent Director of Canadian Entities</u>. Within a reasonable period of time prior to taking any steps towards commencing a sale, marketing, restructuring or similar process with respect to the direct or indirect subsidiaries of Walter that are formed, incorporated or otherwise domiciled in Canada (each, a "<u>Canadian Entity</u>" and collectively, the "<u>Canadian Entities</u>"), Walter shall cause to be appointed to the board of Walter Energy Canada Holdings, Inc. an independent director mutually agreeable to the Debtors and the Steering Committee, or if the RSA is assumed, the Debtors and the Majority Holders (as defined in the RSA) (and, upon the request of such independent director, Walter shall cause such independent director to be appointed to the board of any other Canadian Entity so requested).

12. *Termination*. The Debtors' right to use the Cash Collateral pursuant to this Interim Order shall automatically terminate (the date of any such termination, the

"Termination Date") without further notice or court proceeding on the earliest to occur of (i) 45 days after the Petition Date (unless such period is extended with the consent of the Steering Committee and the Administrative Agent, each in its sole discretion), if the Final Order (provided that such Final Order has not been reversed, vacated, stayed, unless such stay has been vacated, or appealed, unless such appeal has been dismissed or otherwise finally resolved), which Final Order shall be consistent with this Interim Order or otherwise acceptable to the Steering Committee and the Administrative Agent, each in its sole discretion, has not been entered by this Court on or before such date, (ii) February 3, 2016 or such later date as may be agreed to by the Steering Committee in writing in its sole discretion, (iii) the effective date of any confirmed chapter 11 plan in any of the Chapter 11 Cases, (iv) the date of the consummation of a sale or other disposition of all or substantially all of the assets of the Debtors, and (v) the occurrence of any of the events set forth in this paragraph 12(a) through (m) below, unless waived by the Administrative Agent and the Steering Committee, each in its sole discretion (each of the following events, a "Termination Event" and collectively, the "Termination Events"):

(a)     the Debtors' failure to:  (i) use the Collateral, including without limitation Cash Collateral, in a manner consistent with the Approved Budget, but subject to the Budget Covenant, and otherwise comply in any respect with any provision of this Interim Order (including, without limitation, the failure to make the payments identified in paragraphs 11(a), (b) and (c) when due in accordance with and under the terms hereof); or (ii) comply with any other covenant or agreement specified in this Interim Order (including any obligations to comply with the provisions of paragraph 11 or the covenants and other obligations of the Debtors contained therein); in each case where such failure shall have continued unremedied for five (5)

31

business days following receipt of written notice by the Debtors from the Administrative Agent or the Steering Committee of such failure;

(b)     (i) an application, motion or other pleading shall have been filed by any Debtor seeking to amend, stay, supplement, vacate, extend or modify in any manner this Interim Order; or (ii) an order shall have been entered reversing, amending, supplementing, extending, staying, vacating, or otherwise modifying in any manner this Interim Order, in each case, without the prior written consent of the Steering Committee and the Administrative Agent, each in its sole discretion;

(c)     the date any provision of this Interim Order (or the Final Order, as applicable) shall for any reason cease to be valid and binding or any Debtor shall so assert in any pleading filed in any court;

(d)     the date (i) any Chapter 11 Case shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code or any Debtor shall file a motion or other pleading seeking the dismissal or conversion of any Chapter 11 Case pursuant to Bankruptcy Code section 1112 or otherwise other than as expressly contemplated by the Restructuring (as defined in the RSA); or (ii) a trustee, responsible officer, or an examiner (other than a fee examiner) pursuant to Bankruptcy Code section 1104 is appointed or elected, as applicable, in any Chapter 11 Case, any Debtor applies for, consents to, or acquiesces in, any such appointment, or the Court shall have entered an order providing for such appointment, in each case without the prior written consent of the Steering Committee in its sole discretion;

(e)     the Court shall have entered an order granting relief from the automatic stay to the holder or holders of any security interest to permit foreclosure (or the granting of a

Case 15-02741-TOM11    Doc 42    Filed 07/15/15    Entered 07/15/15 13:29:28    Desc Main
Document     Page 68 of 88

deed in lieu of foreclosure of the like) on any of the Debtor's assets (other than in respect of insurance proceeds or with respect to assets having a fair market value of less than $1,000,000);

(f)     any Debtor shall have filed a motion or application for the approval of any superpriority claim or any lien in the Chapter 11 Cases (other than such claim or lien granted or permitted pursuant to this Interim Order), which is *pari passu* with or senior to any of the Adequate Protection Liens, Superpriority Claims or Prepetition Liens, without the prior consent of the Steering Committee and the Administrative Agent, each in its sole discretion;

(g)     other than with respect to the Carve-Out and the Approved Liens, any Debtor shall create or incur, or the Court enters an order granting, any claim which is *pari passu* with or senior to any of the Prepetition Liens or Prepetition Obligations or the Adequate Protection Liens and Adequate Protection Obligations granted under this Interim Order;

(h)     unless otherwise agreed to in writing by the Steering Committee in its sole discretion, the (i) consummation of a sale or disposition of any material assets of the Debtors other than in the ordinary course of business or as expressly provided for in the RSA, or (ii) termination of the RSA;

(i)     commencement of any action, including the filing of any pleading, by any Debtor, or direct or indirect non-debtor affiliate or subsidiary of a Debtor, against any of the Prepetition Secured Parties with respect to any of the Prepetition Obligations or Prepetition Liens other than as expressly contemplated in the RSA;

(j)     unless otherwise agreed to in writing by the Steering Committee in its sole discretion, the Canadian Entities commence, or become subject to, any restructuring or insolvency proceeding in any jurisdiction;

33

(k)     unless otherwise agreed to in writing by the Steering Committee in its sole discretion, commencement of a sale process or other actions in furtherance of a disposition of any material assets of the Canadian Entities;

(l)     unless otherwise agreed to in writing by the Steering Committee in its sole discretion, incurrence of any new secured debt or any unsecured debt, which unsecured debt is incurred outside of the ordinary course of business (other than as it relates to the Permitted Non-Debtor Affiliate Payments or cash collateralization of the Canadian LCs using the cash on hand as of the Petition Date held by the Canadian Entities), by any of the Canadian Entities; or

(m)     unless the order approving the RSA Assumption Motion (as defined in the RSA), which order includes a waiver or modification of the automatic stay to provide any notices contemplated by and in accordance with the RSA or this Interim Order, as applicable, has been entered by the Court within sixty (60) days of the Petition Date.

13.     *Remedies Upon a Termination Event.*  The Debtors shall immediately provide notice to the Steering Committee, the Administrative Agent and each of the Indenture Trustees (with a copy to counsel for the Creditors' Committee (if any) and the Bankruptcy Administrator), of the occurrence of any Termination Event, at which time the Debtors' ability to use Cash Collateral hereunder shall terminate and the Adequate Protection Obligations shall become due and payable.  Upon the occurrence of a Termination Event and following the giving of not less than four (4) business days' advance written notice (the "Enforcement Notice") to counsel to the Debtors, counsel to the Creditors' Committee (if any) and the Bankruptcy Administrator (the "Notice Period"), the Prepetition Secured Parties (subject as among themselves to the terms of the Intercreditor Agreement), may exercise any remedies available to them under this Interim Order, the Prepetition Debt Documents and applicable non-bankruptcy law, including but not

34

limited to (a) set off and apply immediately any and all amounts in accounts maintained by the Debtors against the Adequate Protection Obligations and Prepetition Obligations owed to the Prepetition Secured Parties and otherwise enforce rights against the Collateral for application towards the Adequate Protection Obligations and Prepetition Obligations; (b) take any and all actions necessary to take control of the Prepetition Collateral and/or the Collateral, including any Cash Collateral; and (c) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the Prepetition Debt Documents or applicable law to effect the repayment and satisfaction of the Adequate Protection Obligations and Prepetition Obligations owed to the Prepetition Secured Parties. The rights and remedies of the Prepetition Secured Parties specified herein are cumulative and not exclusive of any rights or remedies that they may otherwise have. The only permissible basis for the Debtors, the Creditors' Committee (if any), the Bankruptcy Administrator or any other party to contest, challenge or object to an Enforcement Notice shall be solely with respect to the validity of the Termination Event(s) giving rise to such Enforcement Notice (*i.e.* whether such Termination Events validly occurred and have not been cured or waived in accordance with this Interim Order). The automatic stay pursuant to Bankruptcy Code section 362 shall be automatically terminated at the end of the Notice Period, without further notice or order of the Court, unless the Prepetition Secured Parties elect otherwise in a written notice to the Debtors, and the Prepetition Secured Parties shall be permitted to exercise all rights and remedies, including with respect to the Collateral (including, without limitation, any Cash Collateral), set forth in this Interim Order, the Prepetition Debt Documents and the Intercreditor Agreement, and as otherwise available at law without further order or application or motion to the Court, and without restriction or restraint by any stay under Bankruptcy Code sections 362 or 105 or otherwise.

14.     *Perfection of Adequate Protection Liens.*

(a)     The Administrative Agent, the Credit Agreement Collateral Agent, the First Lien Trustee, the 1L Notes Collateral Agent, the Second Lien Trustee and the 2L Notes Collateral Agent are each hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted to it hereunder. Whether or not the Administrative Agent, the Credit Agreement Collateral Agent, the First Lien Trustee, the 1L Notes Collateral Agent, the Second Lien Trustee or the 2L Notes Collateral Agent, each in its respective sole discretion, chooses to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute, subordination, contest, attack, objection, recoupment, defense, setoff, counterclaim, avoidance, recharacterization, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined in the Bankruptcy Code), impairment, subordination (whether equitable, contractual or otherwise) or other challenge of any kind pursuant to the Bankruptcy Code or applicable nonbankruptcy law as of the date of entry of this Interim Order.  If the Administrative Agent, the Credit Agreement Collateral Agent, the First Lien Trustee, the 1L Notes Collateral Agent, the Second Lien Trustee or the 2L Notes Collateral Agent determines to file any financing statements, notices of liens or similar instruments, the Debtors will cooperate and assist in any such filings as reasonably requested by the Administrative Agent, the Credit Agreement Collateral Agent, the First Lien Trustee, the 1L Notes Collateral Agent, the Second Lien Trustee or the 2L Notes Collateral Agent, as applicable, and the automatic stay shall be modified to allow such filings.

36

(b)     The Administrative Agent, the Credit Agreement Collateral Agent, the First Lien Trustee, the 1L Notes Collateral Agent, the Second Lien Trustee or the 2L Notes Collateral Agent, may, each in its respective discretion, cause a certified copy of this Interim Order to be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording.

(c)     The Debtors shall execute and deliver to the Administrative Agent, the Credit Agreement Collateral Agent, the First Lien Trustee, the 1L Notes Collateral Agent, the Second Lien Trustee or the 2L Notes Collateral Agent all such agreements, financing statements, instruments and other documents as each such party may reasonably request to evidence, confirm, validate or perfect the Adequate Protection Liens.

(d)     Notwithstanding anything to the contrary in the Motion or this Interim Order, for purposes of this Interim Order, in no event shall the Collateral include or the Adequate Protection Liens granted under this Interim Order attach to, any lease, license, permit, contract, or agreement (including any operating and joint venture agreements) or other property right, to which any Debtor is a party, or any of such relevant Debtor's rights or interests thereunder, if and for so long as the grant of such security interest would constitute or result in: (i) the abandonment, invalidation, unenforceability, or other impairment of any right, title, or interest of any Debtor therein, or (ii) a breach or termination pursuant to the terms of, or a default under, any such lease, license, contract, agreement, or other property right pursuant to any provision thereof, unless, in the case of each of clauses (i) and (ii), the applicable provision is rendered ineffective by applicable non-bankruptcy law or the Bankruptcy Code (such leases, licenses, contracts or agreements, or other property rights are collectively referred to as the "Specified

37

Contracts"); provided that the foregoing shall not preclude any counterparty to a Specified Contract from an opportunity to be heard in this Court on notice with respect to whether applicable non-bankruptcy law or the Bankruptcy Code renders such provision ineffective. Notwithstanding the foregoing, the Adequate Protection Liens shall in all events attach to all proceeds, products, offspring, or profits from all sales, transfers, dispositions, or monetizations of any and all Specified Contracts.

15. *Preservation of Rights Granted Under this Interim Order.*

(a) Notwithstanding any order dismissing any of these Chapter 11 Cases under Bankruptcy Code section 1112 or otherwise entered at any time, (i) the Superpriority Claims, the other administrative claims granted pursuant to this Interim Order, the Carve-Out and the Adequate Protection Liens shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all Adequate Protection Obligations and the Carve Out shall have been paid and satisfied in full (and such Superpriority Claims, the other administrative claims granted pursuant to this Interim Order, the Carve Out and the Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest), and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (i) above.

(b) If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacatur shall not affect: (i) the validity, priority or enforceability of any Adequate Protection Obligations incurred prior to the date of the entry of an order granting such reversal, stay, modification or vacatur (the "Reversal Order"); or (ii) the validity, priority or enforceability of the Adequate Protection Liens securing such Adequate Protection Obligations. Notwithstanding any such reversal, stay, modification or

38

vacatur, any use of the Collateral (including the Cash Collateral) or any Adequate Protection Obligations incurred by the Debtors hereunder, as the case may be, prior to the date of the entry of the Reversal Order shall be governed in all respects by the original provisions of this Interim Order, and (x) the First Lien Secured Parties shall be entitled to all of the rights, remedies, privileges and benefits granted in Bankruptcy Code section 363(m) with respect to all uses of the Collateral (including the Cash Collateral) and such First Lien Adequate Protection Obligations for periods prior to the date of the entry of the Reversal Order and (y) subject to the Intercreditor Agreement, the Second Lien Trustee and the Second Lien Noteholders shall be entitled to all of the rights, remedies, privileges and benefits granted in Bankruptcy Code section 363(m) with respect to all uses of the Collateral (including the Cash Collateral) (other than Collateral constituting setoff rights of the First Lien Secured Parties) and all Second Lien Adequate Protection Obligations for periods prior to the date of the entry of the Reversal Order.

(c)     Except as expressly provided in this Interim Order, the Adequate Protection Obligations, the Superpriority Claims and all other rights, claims, security interests and remedies of the Prepetition Secured Parties granted by the provisions of this Interim Order shall survive, and shall not be modified, impaired or discharged by the entry of an order (i) converting any of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, dismissing any of these Chapter 11 Cases or by any other act or omission or (ii) confirming a plan of reorganization in any of the Chapter 11 Cases, and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining Adequate Protection Obligations; provided that any plan of reorganization or liquidation approved in accordance with the RSA, or otherwise with the consent of the Steering Committee in its sole discretion, shall supersede and replace the terms of the Interim Order upon its effectiveness in

39

accordance therewith.  The terms and provisions of this Interim Order shall continue in these Chapter 11 Cases, in any successor cases if these Chapter 11 Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code, and the Adequate Protection Liens, Superpriority Claims, other administrative claims granted pursuant to this Interim Order, and all other rights, claims, security interests and remedies of the Prepetition Secured Parties granted by the provisions of this Interim Order shall continue in full force and effect as provided herein.

16. *Effect of Stipulations on Third Parties*.  The stipulations, releases and admissions contained in this Interim Order, including in paragraph 5 hereof, shall be binding upon the Debtors and any successor thereto in all circumstances.  The stipulations, releases and admissions contained in this Interim Order, including in paragraph 5 hereof, shall be binding upon all other parties in interest, including the Creditors' Committee (if any) or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors (a "Trustee"), unless and to the extent (a) the Creditors' Committee (if any) or any other party in interest other than any Debtor (including any Trustee), in each case, after obtaining requisite standing, has duly filed an adversary proceeding challenging in whole or part the validity, enforceability, priority or extent of the Prepetition Obligations or the liens on the Prepetition Collateral securing the Prepetition Obligations held by or on behalf of the Prepetition Secured Parties or otherwise asserting or prosecuting any Avoidance Actions, recharacterization, subordination, "lender liability", or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Claims and Defenses") against the Prepetition Secured Parties in connection with any matter related to the Prepetition Obligations, or the Prepetition Collateral or the Prepetition Liens by no later than the later of (i) in the case of any such adversary proceeding filed by a party in interest

40

with requisite standing other than the Creditors' Committee, seventy-five (75) days after the date of entry of the Interim Order, (ii) in the case of any such adversary proceeding filed by the Creditors' Committee (if any), sixty (60) days after the appointment of the Creditors' Committee (if any), and (iii) any such later date agreed to in writing by the Steering Committee and the Administrative Agent, First Lien Trustee or Second Lien Trustee, as applicable, each in its sole discretion (the time period established by the later of the foregoing clauses (i), (ii) and (iii), the "Challenge Period"), and (b) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such challenge or claim in any such duly filed adversary proceeding.  If no such adversary proceeding is timely filed prior to the expiration of the Challenge Period by the Creditors' Committee or a party in interest, in any case which has been granted the appropriate standing, without further order of this Court: (x) the Prepetition Obligations shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, defense, avoidance, contest, attack, objection, recoupment, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined in the Bankruptcy Code), impairment, subordination (whether equitable, contractual or otherwise) or other challenge of any kind pursuant to the Bankruptcy Code or applicable nonbankruptcy law, for all purposes in these Chapter 11 Cases and any subsequent chapter 7 cases; and (y) the Prepetition Obligations, the Administrative Agent's, the First Lien Trustee's and the Second Lien Trustee's respective Prepetition Liens on the Prepetition Collateral and the respective Prepetition Secured Parties in such capacity shall not be subject to any other or further challenge and any party in interest shall be forever enjoined and barred from seeking to exercise the rights of the Debtors' estates or taking any such action, including any successor thereto (including any estate representative or a Trustee, whether such Trustee is

41

appointed or elected prior to or following the expiration of the Challenge Period). If any such adversary proceeding is timely filed by a party in interest with appropriate standing prior to the expiration of the Challenge Period, the stipulations and admissions contained in this Interim Order, including in paragraph 5 hereof, shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on any Creditors' Committee and any other Person (as defined in the Credit Agreement), including any Trustee, except as to any such findings and admissions that were expressly and successfully challenged in such adversary proceeding. Nothing in this Interim Order vests or confers on any Person, including a Creditors' Committee (if any) or Trustee, standing or authority to pursue any cause of action belonging to the Debtors or their estates.

17. *Reservation of Rights of the Prepetition Secured Parties and the Steering Committee*.

(a)     Notwithstanding any other provision in this Interim Order to the contrary, this Interim Order is without prejudice to, and does not constitute a waiver, expressly or implicitly, or relinquishment, of the Prepetition Secured Parties' or the Steering Committee's respective rights with respect to any person or entity, or with respect to any other collateral owned or held by any person or entity. The rights of the Prepetition Secured Parties and the Steering Committee, respectively, are expressly reserved and entry of this Interim Order shall be without prejudice to, and does not constitute a waiver, expressly or implicitly, or relinquishment, of:

(i)     the Prepetition Secured Parties' or the Steering Committee's respective rights to bring or be heard on any matter brought before this Court;

(ii)     the Prepetition Secured Parties' or the Steering Committee's respective rights under the Prepetition Debt Documents, the Bankruptcy Code or applicable nonbankruptcy law, including, without limitation the rights,

42

if any, to (v) request modification of the automatic stay, (w) sell or foreclose on any Collateral under applicable law, (x) request dismissal of any of the Chapter 11 Cases, conversion of any of the Chapter 11 Cases to a case under chapter 7, or appointment of a chapter 11 trustee, examiner or receiver, (y) propose, subject to the provisions of Bankruptcy Code section 1121, a chapter 11 plan; or (z) take any action specified in paragraph 11(k) above;

(iii)    the Prepetition Secured Parties' or the Steering Committee's respective rights to seek any other or supplemental relief in respect of the Debtors;

(iv)    the Administrative Agent's and the First Lien Trustee's rights, and subject to the Intercreditor Agreement, the Second Lien Trustee's right, to seek modification of the grant of adequate protection provided under this Interim Order so as to provide different or additional adequate protection; or

(v)    any other respective rights, claims, or privileges (whether legal, equitable, or otherwise) of the Prepetition Secured Parties or the Steering Committee;

(b)    Nothing contained herein shall be deemed a finding by the Court or an acknowledgement by the Prepetition Secured Parties or the Steering Committee, respectively, that the adequate protection granted herein does in fact adequately protect the Prepetition Secured Parties against the Diminution in Value of their interests in the Prepetition Collateral.

18.    *Compliance with the Prepetition Debt Document Covenants*.  Unless otherwise agreed to by the Steering Committee in its sole discretion, notwithstanding the Debtors' additional reporting requirements and obligations set forth in paragraph 11 hereof, the Debtors shall comply in all respects with all of the reporting requirements set forth in Section 9.01 (except for clauses (d) and (e)) of the Credit Agreement.

19.    *Prepetition Intercreditor Agreements*.  Nothing in this Interim Order shall amend or otherwise modify the terms and enforceability of the Intercreditor Agreement, which shall remain in full force and effect. The rights of the Prepetition Secured Parties shall at all times remain subject to the Intercreditor Agreement and any other applicable intercreditor agreements.

43

20.     *506(c) Waiver*.  Subject to the entry of a Final Order, except to the extent of the Carve-Out, no costs or expenses of administration of the Chapter 11 Cases, which have been or may be incurred in any of the Chapter 11 Cases at any time shall be charged against or recovered from any Prepetition Secured Party, any of the Prepetition Obligations, any of their respective claims, or the Collateral pursuant to Bankruptcy Code sections 105(a) or 506(c), or otherwise, without the prior written consent of the affected Administrative Agent, First Lien Trustee or Second Lien Trustee and the Steering Committee, each in its sole discretion, and no such consent shall be implied from any other action, inaction, or acquiescence by any of the Prepetition Secured Parties or their respective representatives.

21.     *No Marshaling/Application of Proceeds*.  The Administrative Agent, the First Lien Trustee and the Second Lien Trustee, as applicable, shall be entitled to apply the payments or proceeds of the Collateral in accordance with this Interim Order and the provisions of the Prepetition Debt Documents and the Intercreditor Agreement, and in no event shall any of the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral or otherwise.

22.     *Limitation on Use of Collateral*.  For the avoidance of doubt, the Debtors shall not be allowed to use the Cash Collateral to pay fees and expenses of any Professional Person retained by a Creditors' Committee or any other statutory committee in excess of the Committee Monthly Cap; provided that any unused amounts may be carried forward to a subsequent month.

23.     *Binding Effect; Successors and Assigns*.  The provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including the Prepetition Secured Parties, any Creditors' Committee, the Debtors and their respective successors and assigns (including any Trustee hereinafter appointed or elected

44

for the estates of any of the Debtors, an examiner appointed pursuant to Bankruptcy Code section 1104, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) as provided herein. The protections afforded to the Prepetition Secured Parties under this Interim Order and any actions taken pursuant thereto, shall survive the entry of an order dismissing any or all of the Chapter 11 Cases or converting any or all of the Chapter 11 Cases into a case(s) under chapter 7 of the Bankruptcy Code, and the Adequate Protection Liens and the Superpriority Claims shall continue in the Chapter 11 Cases, in any such successor case(s) or after any such dismissal. Except as otherwise provided herein, the Adequate Protection Liens and the Superpriority Claims shall maintain their priorities as provided in this Interim Order and the Final Order, and not be modified, altered or impaired in any way by any other financing, extension of credit, incurrence of indebtedness, or any conversion of any of the Chapter 11 Cases into a case(s) pursuant to chapter 7 of the Bankruptcy Code or dismissal of any of the Chapter 11 Cases, or by any other act or omission until the Prepetition Obligations are indefeasibly paid in full in cash (and any letters of credit cash collateralized in accordance with the terms of the First Lien Credit Documents).

24. *Limitation of Liability.* In permitting the use of the Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order, subject to entry of the Final Order, the Prepetition Secured Parties shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute), nor shall they owe any fiduciary duty to any of the Debtors, their creditors or estates, or shall

45

constitute or be deemed to constitute a joint venture or partnership with any of the Debtors. Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in Bankruptcy Code section 101(2)).

25.     *No Modification of Interim Order*.  Each Debtor irrevocably waives any right to seek any amendment, modification or extension of this Interim Order without the prior written consent of the Steering Committee and the Administrative Agent, each in its sole discretion, and no such consent shall be implied by any action, inaction or acquiescence of the Steering Committee or the Administrative Agent.

26.     *Priorities Among Prepetition Secured Parties.*  Notwithstanding anything to the contrary herein or in any other order of this Court, in determining the relative priorities and rights of the Prepetition Secured Parties (including, without limitation, the relative priorities and rights of the Prepetition Secured Parties with respect to the adequate protection granted hereunder), such relative priorities and rights shall continue to be governed by the Prepetition Debt Documents and the Intercreditor Agreement.

27.     *Rights of Administrative Agent.*  Nothing in this Interim Order shall be construed to limit or affect the Administrative Agent's right to request instructions from the Required Lenders (as defined in the Credit Agreement) in accordance with Section 12.04 of the Credit Agreement.  It being understood that since the Steering Committee constitutes the Required Lenders and can therefore direct the Administrative Agent in taking actions in connection with the Credit Agreement, in any instance in this Interim Order where the Administrative Agent is indicated as having given its consent, as the Steering Committee has also given its consent in

46

such case, the Administrative Agent shall be deemed to have given its consent at the direction of the Required Lenders.

28. *No Waiver*.  This Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that the Prepetition Secured Parties may have to bring or be heard on any matter brought before this Court.

29. *Automatic Stay Modified*.  The automatic stay shall be modified or lifted to the extent necessary to allow the relevant Prepetition Secured Parties or the Majority Holders, as applicable, to provide any notices to the Debtors as contemplated by and in accordance with this Interim Order or the RSA, as applicable.

30. *Rights Preserved*.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly the Prepetition Secured Parties' or the Steering Committee's right to seek any other or supplemental relief in respect of the Debtors, including the right to seek additional adequate protection.

31. *Effectiveness*.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon entry hereof, and there shall be no stay of execution of effectiveness of this Interim Order.  To the extent that any finding of fact shall be determined to be a conclusion of law it shall be so deemed and vice versa.

32. *Controlling Effects of Interim Order*.  To the extent of any conflict between or among (a) the Motion, any other order of this Court, or any other agreements, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" or "as more fully described in" or "as provided in" or words to that effect with respect to the Prepetition Debt Documents, the terms

47

and provisions of this Interim Order shall govern. This Interim Order shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof, notwithstanding the possible application Bankruptcy Rules 6004(g), 7062, 9014, or otherwise, and the Clerk of this Court is hereby directed to enter this Interim Order on this Court's dockets in the Chapter 11 Cases.

33. *Final Hearing*. The Final Hearing is scheduled for _____, 2015 at _____ _.m., prevailing Central time, before this Court. The Debtors shall promptly mail or otherwise serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with this Court and to any Creditors' Committee. Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections; which objections shall be served upon (a) the Debtors, 3000 Riverchase Galleria, Suite 1700, Birmingham, AL 35244, Attn: Earl Doppelt; (b) proposed counsel to the Debtors, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019, Attn: Kelley A. Cornish and Stephen J. Shimshak; (c) proposed co-counsel to the Debtors, Bradley Arant Boult Cummings LLP, One Federal Place, 1819 Fifth Avenue North, Birmingham, AL 35203, Attn: Patrick Darby; (d) counsel to any statutory committee appointed in these Chapter 11 Cases; (e) counsel to the Steering Committee, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, Attn: Ira S. Dizengoff and Kristine Manoukian, and Akin Gump Strauss Hauer & Feld LLP, 1333 New Hampshire Ave, N.W., Washington, DC 20036, Attn: James Savin; (f) co-counsel to the Steering Committee, Burr Forman LLP, 420 North 20th Street, Suite 3400, Birmingham, AL 35203, Attn: Michael L. Hall; (g) counsel to the Administrative Agent and the Credit Agreement Collateral Agent, White & Case LLP, 1155

48

Avenue of the Americas, New York, NY 10036, Attn: Scott Greissman and Elizabeth Feld; (h) any co-counsel to the Administrative Agent and the Credit Agreement Collateral Agent; (i) counsel to the First Lien Trustee and the 1L Notes Collateral Agent, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY 10036-8704, Attn: Mark R. Somerstein; (j) counsel to the Second Lien Trustee and the 2L Notes Collateral Agent; (k) the Office of the Bankruptcy Administrator for the Northern District of Alabama, 1800 5th Avenue North, Birmingham, AL 35203, Attn: Jon Dudeck; (l) all persons and entities that have filed a request for service of filings in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002; and (m) the United States Attorney for the Northern District of Alabama, in each case to allow actual receipt by the foregoing no later than _____, 2015 at 4:00 p.m. (prevailing Central Time).

34.    *Jurisdiction*.  This Court shall retain jurisdiction to enforce the terms of this Interim Order and to adjudicate any and all matters arising from or related to the interpretation or implementation of this Interim Order.

Dated: _____, 2015                      _____

                                                          United States Bankruptcy Judge

Case 15-02741-TOM11    Doc 42    Filed 07/15/15    Entered 07/15/15 13:29:28    Desc Main
Document    Page 85 of 88

**EXHIBIT A**

**Initial Budget**

**Walter Energy, Inc. and Domestic Subsidiaries**
Cash Collateral Budget

*(Amounts in USD)*

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Total for 12 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actual / Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | |
| Week Ending | 7/18/15 | 7/25/15 | 8/1/15 | 8/8/15 | 8/15/15 | 8/22/15 | 8/29/15 | 9/5/15 | 9/12/15 | 9/19/15 | 9/26/15 | 10/3/15 | |
| **TOTAL NET CASH FLOW** | | | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | | | |
| Sales/AR Receipts | $ 10,844,222 | $ 15,024,788 | $ 18,727,363 | $ 12,585,487 | $ 15,645,125 | $ 15,402,161 | $ 5,956,529 | $ 4,358,090 | $ 10,743,138 | $ 15,994,156 | $ 23,583,227 | $ 13,187,610 | $ 162,051,895 |
| Other | 200,000 | 575,000 | 970,000 | 3,000 | 300,000 | 575,000 | 190,000 | 1,008,272 | - | 106,250 | 200,000 | 980,000 | 5,107,522 |
| **Total Cash Receipts** | **11,044,222** | **15,599,788** | **19,697,363** | **12,588,487** | **15,945,125** | **15,977,161** | **6,146,529** | **5,366,362** | **10,743,138** | **16,100,406** | **23,783,227** | **14,167,610** | **167,159,417** |
| | | | | | | | | | | | | | |
| **Disbursements** | | | | | | | | | | | | | |
| Payroll, Benefits & Pension | (6,331,258) | (5,695,298) | (7,292,681) | (5,722,640) | (7,483,164) | (3,345,640) | (7,495,664) | (3,905,289) | (7,060,189) | (6,297,764) | (4,536,189) | (6,797,764) | (71,963,540) |
| Leases, Taxes, Utilities, Fuel, Insurance | (1,394,453) | (577,000) | (1,227,145) | (3,345,140) | (2,295,615) | (969,600) | (587,753) | (3,916,145) | (696,809) | (2,092,836) | (959,000) | (3,806,753) | (21,868,249) |
| Freight & Royalties | (6,125,550) | (2,753,000) | (2,534,071) | (2,426,025) | (5,384,014) | (2,924,500) | (2,542,221) | (2,522,479) | (2,495,560) | (4,765,760) | (2,850,935) | (2,136,025) | (39,460,140) |
| Other Expenditures | (652,712) | (13,482,552) | (16,547,260) | (9,315,901) | (2,571,463) | (2,504,010) | (3,579,217) | (2,660,096) | (2,409,086) | (2,967,733) | (4,932,558) | (6,422,468) | (68,045,056) |
| **Total Disbursements**[1] | **(14,503,973)** | **(22,507,850)** | **(27,601,157)** | **(20,809,706)** | **(17,734,256)** | **(9,743,750)** | **(14,204,855)** | **(13,004,009)** | **(12,661,644)** | **(16,124,093)** | **(13,278,682)** | **(19,163,010)** | **(201,336,985)** |
| | | | | | | | | | | | | | |
| **TOTAL NET CASH FLOW**[2] | **$ (3,459,751)** | **$ (6,908,062)** | **$ (7,903,794)** | **$ (8,221,219)** | **$ (1,789,131)** | **$ 6,233,411** | **$ (8,058,326)** | **$ (7,637,648)** | **$ (1,918,506)** | **$ (23,687)** | **$ 10,504,544** | **$ (4,995,400)** | **$ (34,177,568)** |

**Cash Collateral Budget Metrics**

*Cumulative Totals*

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Disbursements | (14,503,973) | (37,011,822) | (64,612,979) | (85,422,685) | (103,156,941) | (112,900,691) | (127,105,546) | (140,109,556) | (152,771,200) | (168,895,293) | (182,173,975) | (201,336,985) | |
| Total Net Cash Flow | (3,459,751) | (10,367,813) | (18,271,607) | (26,492,826) | (28,281,957) | (22,048,546) | (30,106,872) | (37,744,520) | (39,663,026) | (39,686,713) | (29,182,168) | (34,177,568) | |

*Notes:*

[1] Although permitted pursuant to the terms of the Cash Collateral Order, the figures above exclude (i) adequate protection payments, (ii) fees and expenses of professionals retained outside the ordinary course of business, (iii) the Debtors' use of the Cash Collateral to collateralize any new, replaced or renewed letters of credit, surety bonds or workers' compensation obligations in each case, that have been consented to by the Steering Committee in its sole discretion and (iv) key employee retention payments approved by both the Steering Committee and the Court that are approved to be paid pursuant to the Approved Budget and the Cash Collateral Order.

[2] Budget assumes continuation of ordinary course transactions between the Debtors and Non-Debtor Affiliates Black Warrior Methane and Black Warrior Transmission.

**Walter Energy - Domestic Capital Expenditures Budget**

*$ in 000s*

| | 2015 | | | | | | 2016 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Jul-15 | Aug-15 | Sep-15 | Oct-15 | Nov-15 | Dec-15 | Jan-16 | Cumulative |
| Capital Expenditures | 8,460 | 6,044 | 4,551 | 3,315 | 4,514 | 5,739 | 8,273 | 40,897 |