# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| WALTER ENERGY, INC. *et al*.,[1] | Case No. 15-02741-TOM11 |
| Debtors. | Jointly Administered |

## DISCLOSURE STATEMENT FOR DEBTORS' JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Stephen J. Shimshak
Kelley A. Cornish
Claudia R. Tobler
Ann K. Young
Michael S. Rudnick
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

**BRADLEY ARANT BOULT CUMMINGS LLP**
Patrick Darby
Jay R. Bender
Cathleen C. Moore
James B. Bailey
1819 5th Avenue North
Birmingham, Alabama 35203
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

*Proposed Counsel for the Debtors and Debtors-in-Possession*
Dated: August 26, 2015

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Walter Energy, Inc. (9953); Atlantic Development and Capital, LLC (8121); Atlantic Leaseco, LLC (5308); Blue Creek Coal Sales, Inc. (6986); Blue Creek Energy, Inc. (0986); J.W. Walter, Inc. (0648); Jefferson Warrior Railroad Company, Inc. (3200); Jim Walter Homes, LLC (4589); Jim Walter Resources, Inc. (1186); Maple Coal Co., LLC (6791); Sloss-Sheffield Steel & Iron Company (4884); SP Machine, Inc. (9945); Taft Coal Sales & Associates, Inc. (8731); Tuscaloosa Resources, Inc. (4869); V Manufacturing Company (9790); Walter Black Warrior Basin LLC (5973); Walter Coke, Inc. (9791); Walter Energy Holdings, LLC (1596); Walter Exploration & Production LLC (5786); Walter Home Improvement, Inc. (1633); Walter Land Company (7709); Walter Minerals, Inc. (9714); and Walter Natural Gas, LLC (1198). The location of the Debtors' corporate headquarters is 3000 Riverchase Galleria, Suite 1700, Birmingham, Alabama 35244-2359.

# TABLE OF CONTENTS

**Page**

ARTICLE I. INTRODUCTION ........................................................................................4
    A.    The Debtors ......................................................................................4
    B.    The Plan ...........................................................................................4
    C.    The Disclosure Statement .................................................................5
    D.    Overview of Chapter 11 Proceedings ...............................................7
    E.    Voting and Solicitation Procedures ..................................................8
    F.    Confirmation Hearing .....................................................................11

ARTICLE II. OVERVIEW OF THE PLAN ...................................................................14
    A.    Summary ........................................................................................14
    B.    Summary of Classification and Treatment of Claims and
           Interests under the Plan..................................................................14

ARTICLE III. COMPANY BACKGROUND ...................................................................15
    A.    General...........................................................................................15
    B.    History ...........................................................................................16
    C.    Operational Segments ....................................................................17
    D.    Corporate Structure and Functions.................................................22
    E.    The Debtors' Workforce and Labor Obligations.............................28
    F.    The Debtors' Prepetition Capital Structure ....................................29
    G.    Intercompany Debt .........................................................................35
    H.    Hybrid Financing ...........................................................................35
    I.    Management of the Debtors.............................................................37
    J.    Compensation and Benefits Programs............................................40

ARTICLE IV. EVENTS LEADING TO COMMENCEMENT OF THE
           CHAPTER 11 CASES.............................................................................44
    A.    Global Overproduction of, and Declines in Prices for, Coal...................44
    B.    Governmental Regulation, Permitting Requirements, and
           Compliance Costs ..........................................................................46
    C.    Prepetition Litigation and Disputes ...............................................48
    D.    Labor Contracts and Labor Liabilities............................................54
    E.    Prepetition Restructuring Initiatives...............................................56
    F.    Negotiations with the Steering Committee of First Lien
           Lenders and First Lien Noteholders and the Restructuring
           Support Agreement.........................................................................57

ARTICLE V THE CHAPTER 11 CASES.......................................................................59
    A.    Significant "First Day" Motions.....................................................59
    B.    Retention Applications ...................................................................60
    C.    Cash Collateral Motion...................................................................60
    D.    Motion to Approve the Restructuring Support Agreement .....................61

| | | |
|---|---|---|
| E. | Appointment of Creditors' Committee | 61 |
| F. | Appointment of Retiree Committee | 62 |
| G. | Meeting of Creditors | 62 |
| H. | The Debtors' Bankruptcy Schedules and Statements of Financial Affairs | 62 |
| I. | Bar Date Motion | 62 |
| J. | The Dominion Trust Adversary Proceeding | 63 |

**ARTICLE VI SUMMARY OF THE PLAN** ... 63
| | | |
|---|---|---|
| A. | Classification and Treatment of Claims and Interests | 63 |
| B. | Voting and Distributions | 71 |
| C. | Procedures for Determination of Claims and Interests | 77 |
| D. | Treatment of Executory Contracts, Unexpired Leases, Employee Benefits and Insurance Policies | 78 |
| E. | Implementation of the Plan | 84 |
| F. | Conditions Precedent | 91 |
| G. | Effect of the Plan on Assets, Claims and Interests | 94 |
| H. | Miscellaneous Provisions | 99 |

**ARTICLE VII CONFIRMATION OF THE PLAN** ... 106
| | | |
|---|---|---|
| A. | Confirmation Hearing | 106 |
| B. | Statutory Requirements for Confirmation of the Plan in Chapter 11 Cases | 108 |
| C. | Valuation of the Reorganized Debtors | 114 |

**ARTICLE VIII. CERTAIN RISK FACTORS TO BE CONSIDERED** ... 115
| | | |
|---|---|---|
| A. | Risks Relating to the Plan | 115 |
| B. | Risks Relating to the Debtors' and the Reorganized Debtors' Financial Results and Condition | 119 |
| C. | Risks Relating to the Debtors' Business | 124 |
| D. | Risks Relating to the New Walter Energy Common Stock | 142 |

**ARTICLE VIII. CERTAIN TAX CONSEQUENCES OF THE PLAN** ... 146
| | | |
|---|---|---|
| A. | Certain U.S. Federal Income Tax Consequences to the Company | 148 |
| B. | Certain U.S. Federal Income Tax Considerations for U.S. Holders of First Lien Other Debt Claims | 152 |
| C. | U.S. Federal Income Tax Considerations for Non-U.S. Holders | 156 |
| D. | Withholding and Reporting Requirements | 160 |
| E. | Reservation of Rights | 161 |

Case 15-02741-TOM7    Doc 567    Filed 08/26/15    Entered 08/26/15 16:51:48    Desc Main
Document    Page 3 of 178

ARTICLE X.  CERTAIN U.S. SECURITIES LAW CONSIDERATIONS...................162

ARTICLE XI  ALTERNATIVES TO CONFIRMATION AND
            CONSUMMATION OF THE PLAN .....................................................163
       A.    Section 363 Sale .....................................................................163
       B.    Liquidation Under Chapter 7 or Chapter 11 ...........................164

ARTICLE XII.  CONCLUSION AND RECOMMENDATION ...................................165

3

## **EXHIBITS**

**Exhibit A**    The Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code

**Exhibit B**    Company Organizational Structure

**Exhibit C**    List of U.S. Guarantors of First Lien Credit Agreement

**Exhibit D**    List of Canadian Guarantors of First Lien Credit Agreement

**Exhibit E**    Projected Financial Information

**Exhibit F**    Liquidation Analysis

**Exhibit G**    Valuation

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

This Disclosure Statement provides information regarding the Debtors' Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code, dated August 26, 2015, (as may be amended and supplemented from time to time according to its terms, the "Plan"). A copy of the Plan is attached hereto as Exhibit A. The Debtors are Walter Energy, Inc. and its U.S. subsidiaries that have filed for chapter 11 relief as further defined in Article I.A below.

**References to the "Plan" and the "Plan of Reorganization" are to the Plan attached as Exhibit A hereto. All capitalized terms used but not otherwise defined herein, including in any Exhibits attached hereto, shall have the meaning ascribed to them in the Plan; provided, however, that any capitalized term used herein that is not defined herein or in the Plan, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to such term in the Bankruptcy Code or the Bankruptcy Rules.**

**Unless the context requires otherwise, reference to "we", "our", and "us" are to Walter Energy, Inc. and its subsidiaries that have filed for chapter 11 relief.**

The statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified herein, and the delivery of this Disclosure Statement shall not create an implication that there has been no change in information stated since the date hereof.

The Debtors believe that the Plan will enable them to successfully reorganize and accomplish the objectives of Chapter 11. The Debtors believe that acceptance of the Plan is in the best interests of the Debtors, their Chapter 11 estates, and their creditors.

**The Debtors urge creditors to vote to accept the Plan.**

The Confirmation of the Plan and effectiveness of the Plan are subject to certain material conditions precedent, as described in Article VII of the Plan. No assurance exists that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied will be satisfied or waived.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT, INCLUDING THE FOLLOWING SUMMARY, ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, EXHIBITS ANNEXED TO THE PLAN, AND THE DISCLOSURE STATEMENT AND THE PLAN SUPPLEMENTS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT

AT ANY TIME AFTER SUCH DATE. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE PLAN SUMMARY CONTAINED HEREIN AND THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN. ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN. **THOSE CREDITORS THAT ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ CAREFULLY THE "RISK FACTORS" SECTION HEREOF BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SEE ARTICLE VIII BELOW, "CERTAIN RISK FACTORS TO BE CONSIDERED."**

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), OR ANY STATE AUTHORITY. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS OR INTERESTS IN THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED. NONE OF THE SECURITIES TO BE ISSUED PURSUANT TO THE PLAN HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (AS AMENDED, THE "SECURITIES ACT") OR SIMILAR STATE SECURITIES OR "BLUE SKY" LAWS. ALL OFFERS, SALES, EXCHANGES, AND ISSUANCES ARE BEING MADE IN RELIANCE ON THE EXEMPTION FROM REGISTRATION SPECIFIED IN (A) SECTION 1145 OF THE BANKRUPTCY CODE TO THE MAXIMUM EXTENT PERMITTED BY LAW AND APPLICABLE AND (B) TO THE EXTENT THAT THE EXEMPTION SPECIFIED IN SECTION 1145 IS EITHER NOT PERMITTED OR NOT APPLICABLE, THE EXEMPTION SET FORTH IN SECTION 4(2) OF THE SECURITIES ACT OR REGULATION D PROMULGATED THEREUNDER. NONE OF THE SECURITIES TO BE ISSUED ON THE EFFECTIVE DATE HAS BEEN APPROVED OR DISAPPROVED BY THE SEC OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

SAFE HARBOR STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995: CERTAIN STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE NOT REPORTED FINANCIAL RESULTS OR OTHER HISTORICAL INFORMATION OF THE DEBTORS ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THEY INCLUDE, FOR EXAMPLE, STATEMENTS RELATING TO THE DEBTORS' EXPECTATIONS WITH REGARD TO

2

THE DEBTORS' REORGANIZATION PROCESS; ABILITY TO OBTAIN SATISFACTORY EXIT FINANCING FACILITIES; PROJECTIONS AND THE RELATED ASSUMPTIONS; ABILITY TO SUCCESSFULLY RESTRUCTURE THE DEBTORS' DEBT AND OTHER OBLIGATIONS; EFFORTS TO REDUCE COSTS AND INCREASE REVENUES AND PROFITABILITY, INCLUDING THE DEBTORS' COST REDUCTION INITIATIVES; BUSINESS OUTLOOK; CURTAILMENT OF CERTAIN MINING OPERATIONS AND THE PRODUCTION OF CERTAIN PRODUCTS; ASSESSMENT OF MARKET CONDITIONS; ABILITY TO SELL NON-CORE ASSETS IN LIGHT OF THE CURRENT GLOBAL ECONOMIC CONDITIONS; AND STRATEGIES FOR ACHIEVING THE DEBTORS' GOALS GENERALLY. FORWARD-LOOKING STATEMENTS MAY BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS THE WORDS "SHOULD," "WOULD," "COULD," "WILL," "MAY," "EXPECT," "BELIEVE," "ASSUME," "ANTICIPATE," "ATTEMPT" AND OTHER TERMS WITH SIMILAR MEANING INDICATING POSSIBLE FUTURE EVENTS OR POTENTIAL IMPACT ON THE DEBTORS OR THEIR STAKEHOLDERS. RISKS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER FROM FORWARD-LOOKING STATEMENTS INCLUDE THOSE ENUMERATED UNDER ARTICLE VIII OF THIS DISCLOSURE STATEMENT. THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS. ALL FORWARD-LOOKING STATEMENTS IN THIS DISCLOSURE STATEMENT ARE EXPRESSLY QUALIFIED BY THE CAUTIONARY STATEMENTS CONTAINED OR REFERRED TO IN THIS SECTION AND IN THE COMPANY'S FILINGS WITH THE SEC. THE DEBTORS DISCLAIM ANY OBLIGATION TO PUBLICLY UPDATE OR REVISE ANY FORWARD-LOOKING INFORMATION, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE.

CERTAIN INFORMATION ABOUT INDUSTRY OR GENERAL ECONOMIC CONDITIONS CONTAINED IN THIS DISCLOSURE STATEMENT IS DERIVED FROM THIRD-PARTY SOURCES AND CERTAIN TRADE PUBLICATIONS THAT THE DEBTORS BELIEVE ARE WIDELY ACCEPTED AND ACCURATE; HOWEVER, THE DEBTORS HAVE NOT INDEPENDENTLY VERIFIED THIS INFORMATION AND CANNOT PROVIDE ASSURANCES OF ITS ACCURACY.

ALTHOUGH THE DEBTORS BELIEVE THAT THE FINANCIAL INFORMATION CONTAINED HEREIN FAIRLY AND ACCURATELY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF, EXCEPT AS OTHERWISE SPECIFICALLY NOTED, SUCH FINANCIAL INFORMATION HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT NECESSARILY BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

AS TO CONTESTED MATTERS, EXISTING LITIGATION INVOLVING, OR POSSIBLE ADDITIONAL LITIGATION TO BE BROUGHT BY, OR AGAINST,

THE DEBTORS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION, OR A WAIVER, BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER BY ANY PERSON, PARTY OR ENTITY. AS SUCH, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING INVOLVING THE DEBTORS, ANY AFFILIATES OF THE DEBTORS, OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS.

## ARTICLE I.

## INTRODUCTION

### A.     The Debtors

On July 15, 2015, Walter Energy, Inc. ("Walter Energy") and certain of its U.S. subsidiaries in the above captioned jointly administered Chapter 11 Cases (collectively with Walter Energy, the "Debtors", and each of them a "Debtor") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Northern District of Alabama, Southern Division (the "Bankruptcy Court").  A list of the U.S. subsidiaries that have filed for chapter 11 relief and are Debtors is set forth on Exhibit A hereto.  The Debtors and their non-debtor domestic and foreign subsidiaries are referred to collectively herein as the "Company."

Walter Energy's Annual Report on Form 10-K for the fiscal year ended December 31, 2014, as amended, is available for inspection online at the SEC's website at www.sec.gov.

### B.     The Plan

The Plan contemplates a comprehensive reorganization of the Debtors through a consensual debt-to-equity conversion of approximately $1.9 billion of the Debtors' prepetition secured debt.  If the Plan is confirmed and becomes effective, the Debtors will emerge from chapter 11 as going concerns with substantially the same assets and corporate structure as they had prior to the Chapter 11 Cases.  Details regarding the terms of the Plan are set forth in Article VI below.

Confirmation of the Plan depends on the Debtors' ability to materially reduce their legacy labor liabilities and existing labor costs.  Thus, the Debtors will engage in negotiations with the United Mine Workers of America (the "UMWA") (which represents approximately half of the Debtors' workforce), among other parties, to obtain cost-savings in

4

respect of the Debtors' employees and retirees. The Debtors are currently operating at a significant loss and must achieve material concessions from the UMWA to remain viable. While the Debtors hope to reach a consensual resolution with the UMWA regarding right-sizing their labor costs, as discussed in greater detail in Article III.F below, the Debtors may seek judicial relief to obtain such relief by invoking the procedures and processes provided for in sections 1113 and 1114 of the Bankruptcy Code (collectively, the "1113/1114 Process") to ensure that they are able to quickly and efficiently achieve the necessary cost savings.

The Restructuring Support Agreement (as defined below) requires the Debtors to pursue the 363 Sale Process (as defined below) concurrently with their efforts to pursue the Plan. If the Debtors fail to rationalize their labor costs and liabilities or achieve certain other case milestones set forth in the Restructuring Support Agreement (each milestone, a "Triggering Event"), the Debtors will exclusively use their best efforts to pursue and consummate a sale of substantially all of their assets (the "363 Sale") through a court-approved sale process (the "363 Sale Process") and will withdraw and cease to pursue the Plan.

Prior to the Petition Date, the Debtors negotiated certain terms relating to their restructuring with the Consenting First Lien Creditors, which hold approximately 70.73% of the first lien indebtedness, as set forth in the Restructuring Support Agreement (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Restructuring Support Agreement" or "RSA") dated as of July 15, 2015 executed by the Debtors and the Consenting First Lien Creditors. Descriptions in this Disclosure Statement of the terms set forth in the RSA are qualified in their entirety by reference to the RSA, which all creditors are advised to read in its entirety. On the Petition Date, the Debtors filed with the Bankruptcy Court their motion to assume the Restructuring Support Agreement [Docket No. 44], which motion is currently scheduled to be heard by the Bankruptcy Court on September 2, 2015. The Restructuring Support Agreement contains various case milestones, including those set forth in Article IV.F.

The Plan does not provide for the substantive consolidation of any of the Debtors' estates. The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Bankruptcy Court. Accordingly, the Plan constitutes a separate plan of reorganization for each Debtor in the Chapter 11 Cases. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

C.     **The Disclosure Statement**

This Disclosure Statement is submitted pursuant to section 1125 of the Bankruptcy Code to holders of Claims that are entitled to vote on the Plan in connection with (i) the solicitation of acceptances of the Debtors' Plan and (ii) the hearing to consider confirmation of the Plan (the "Confirmation Hearing") scheduled for [DATE], at [___:___ __.m.], prevailing Central Time.

**The Debtors have filed additional pleadings with the Bankruptcy Court with respect to the materials for soliciting votes to accept or reject the Plan (collectively, the "Solicitation Materials"). All Creditors are advised and encouraged to read the Solicitation Materials and the Disclosure Statement Approval Order (as defined below) in their entirety.**

In connection with the solicitation of votes to accept or reject the Plan, holders of Claims entitled to vote on the Plan will receive, among other things:

- The Plan;

- An Order of the Bankruptcy Court (excluding the exhibits thereto) dated [DATE] (the "Disclosure Statement Approval Order"), among other things, approving the Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan;

- The Solicitation Materials; and

- One or more Ballots and a postage-paid return envelope, which will be used by holders of Claims that are entitled to vote on the Plan.

The Disclosure Statement Approval Order determines that the Disclosure Statement contains "adequate information" as that term is defined in section 1125 of the Bankruptcy Code. Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and the history of the debtor and the condition of the debtor's books and records…that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan."

NO STATEMENTS OR INFORMATION CONCERNING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY HAVE BEEN AUTHORIZED OTHER THAN THE STATEMENTS AND INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE INFORMATION ACCOMPANYING THIS DISCLOSURE STATEMENT. ALL OTHER STATEMENTS REGARDING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER WRITTEN OR ORAL, ARE UNAUTHORIZED.

**THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION IT CONTAINS OR AN APPROVAL OF, OR AN ENDORSEMENT OF, THE MERITS AND FAIRNESS OF THE PLAN BY THE BANKRUPTCY COURT.**

The Disclosure Statement Approval Order establishes the deadlines, procedures and instructions for voting to accept or reject the Plan, for filing objections to confirmation of the Plan, for making any elections as provided thereon, the record date for voting purposes, and the applicable standards for tabulating Ballots. In addition, detailed voting instructions will accompany each Ballot. Each holder of a Claim that is entitled to vote on the Plan should read this Disclosure Statement, the Plan, the Disclosure Statement Approval Order and the instructions accompanying the Ballots in their entirety before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes. No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

### D. Overview of Chapter 11 Proceedings

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and equity holders. In addition to permitting rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth, among other things, the treatment of, and means for satisfying, claims against and equity interests in the debtor. Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the confirmation order discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes the obligations specified under the confirmed plan.

After a plan of reorganization has been filed, the holders of claims against or equity interests in a debtor that are impaired and entitled to receive distributions under the plan are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. The Debtors are submitting this Disclosure Statement to satisfy the requirements of section 1125 of the Bankruptcy Code.

7

### E. Voting and Solicitation Procedures

On [DATE], the Debtors filed the Solicitation Materials with the Bankruptcy Court. The Solicitation Materials contain detailed information for holders of Allowed Claims in Classes of Claims that are entitled to vote to accept or reject the Plan. The voting procedures provide substantially as follows:

#### 1. Creditors of Chapter 11 Debtors Entitled to Vote Generally

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. If you hold a Claim in more than one Class, you will receive separate Ballots that must be used for each separate Class. After carefully reviewing the materials included herein and the instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan.

#### 2. Voting Generally

In order for your vote to be counted, you must complete and sign your original Ballot and return it in the envelope provided (only original signatures will be accepted) to Kurtzman Carson Consultants LLC, as solicitation agent (the "Solicitation Agent"). If you received a Ballot(s) from a broker, bank or other institution, return the completed Ballot(s) to such broker, bank or other institution promptly so that it can be forwarded to the Solicitation Agent as appropriate.

All Ballot(s) must be returned directly to the Solicitation Agent at the following address:

> Kurtzman Carson Consultants LLC
> <u>Attn.</u>: Walter Energy Ballot Processing Center
> _____
> _____
> Tel.: _____

More detailed instructions regarding how to vote on the Plan are contained on the Ballots and the other Solicitation Materials distributed to holders of Claims that are entitled to vote on the Plan.

**DO <u>NOT</u> RETURN ANY DEBT INSTRUMENTS, NOTES, CERTIFICATES, OR EQUITY SECURITIES THAT YOU MAY HAVE WITH YOUR BALLOT(S).**

TO BE COUNTED OR TO EXERCISE ANY ELECTIONS PROVIDED ON SUCH BALLOT, YOUR BALLOT(S) INDICATING ACCEPTANCE OR REJECTION OF THE PLAN AND THE EXERCISE OF ANY ELECTIONS MUST BE ACTUALLY **<u>RECEIVED</u> BY THE SOLICITATION AGENT NO LATER THAN 12:00 P.M. (NOON), PREVAILING CENTRAL TIME, ON [_____], 2015**.

8

ANY EXECUTED BALLOT THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR INDICATES BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN SHALL NOT BE COUNTED FOR VOTING PURPOSES.

Pursuant to the Disclosure Statement Approval Order, the Bankruptcy Court set [DATE], 2015, as the record date (the "Voting Record Date") for voting on the Plan. Accordingly, only holders of record as of [DATE], 2015 that are otherwise entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

If you are a holder of a Claim entitled to vote on the Plan and did not receive a Ballot(s), received a damaged Ballot(s) or lost your Ballot(s), or if you have any questions concerning the Disclosure Statement, the Plan or the procedures for voting on the Plan, please call Kurtzman Carson Consultants LLC at [_____] (for U.S. / Canada calls) or [_____] (for non-U.S. / Canada calls).

Votes cannot be transmitted orally, by facsimile or by electronic mail. Accordingly, you are urged to return your signed and completed Ballot promptly.

### 3. Withdrawal or Change of Votes on the Plan

After the Voting Deadline, no vote may be withdrawn or changed without the prior consent of the Debtors, which consent shall be given in the Debtors' sole discretion.

Any holder that has submitted to the Solicitation Agent, as applicable, prior to the Voting Deadline a properly completed Ballot may change its vote by submitting to the Solicitation Agent, as applicable, prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan. If more than one timely, properly completed Ballot is received with respect to the same Claim, the Ballot that will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received will be the Ballot that the Solicitation Agent determines was the last to be received.

### 4. Voting Requirements

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (⅔) in amount and more than one-half (½) in number of the Allowed Claims in such Class that have voted on the Plan in accordance with the Disclosure Statement Approval Order.

If you are a beneficial holder of a funded debt claim that receives a Ballot from a bank, broker, agent or nominee (a "Voting Nominee"), in order for your vote to be counted, your Ballot must be completed in accordance with the voting instructions on the Ballot and received by the Voting Nominee by the deadline set by such Voting Nominee so that the Voting Nominee can process your Ballot and transmit a master ballot to the Solicitation Agent so that it is actually received no later than the Voting Deadline. If you are the holder of any other type of Claim, in order for your vote to be counted, your Ballot must

9

be properly completed in accordance with the voting instructions on the Ballot and returned to the Solicitation Agent so that it is received no later than the Voting Deadline. Any Ballot received after the Voting Deadline shall be counted at the sole discretion of the Debtors.

THE DEBTORS INTEND TO SEEK TO SATISFY THE REQUIREMENTS FOR CONFIRMATION OF THE PLAN IN THE CHAPTER 11 CASES UNDER THE CRAMDOWN PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE AS TO ANY CLASS DEEMED TO REJECT, OR AS TO ANY CLASS THAT VOTES TO REJECT, THE PLAN, AND, IF REQUIRED, MAY AMEND THE PLAN TO CONFORM TO THE STANDARDS OF SUCH SECTION.

### 5. Holders of Claims and Interests Entitled to Vote

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired and entitled to receive distributions under the plan are entitled to vote to accept or reject a proposed chapter 11 plan. Classes of claims or equity interests in which the holders of claims or equity interests are unimpaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan. Classes of claims or equity interests in which the holders of claims or equity interests are impaired but are not entitled to receive or retain any property on account of such claims or equity interests are deemed to have rejected the plan and similarly are not entitled to vote to accept or reject the plan.

The following summarizes which Classes are entitled to vote on the Plan and which are not:

- The Debtors are seeking votes from the holders of Claims in Class 2.

- Voting rights for Claims in Classes 3 and 6 [TBD].

- The Debtors, as the holders of Intercompany Claims and Intercompany Equity Interests in Class 7, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the holders of Intercompany Claims and Intercompany Equity Interests.

- The Debtors are not seeking votes from holders of Old Common Stock Claims and Interests in Class 8 because those Old Common Stock Claims and Stock are Impaired under the Plan and the holders are receiving no distribution on account of such Claims and Interests. These holders will be deemed to have voted to reject the Plan.

- The Debtors are not seeking votes from holders of Claims in Classes 1, 4 and 5 because those Claims are Unimpaired under the Plan, and the

10

holders of Claims in each of these Classes are conclusively presumed to have accepted the Plan and are not entitled to vote on the Plan.

For a more detailed summary of the Classes of Claims and Interests and their treatment under the Plan, *see* Article VI below.

The Bankruptcy Code defines "acceptance" of a plan by (i) a class of claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and represent more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the plan and (ii) a class of interests as acceptance by holders of such interests in that class that hold at least two-thirds (2/3) in amount that cast ballots for acceptance or rejection of the plan. For a more detailed description of the requirements for confirmation of the Plan, *see* Article VII.B below.

Since there is at least one (1) Class of Claims or Interests that is deemed to reject the Plan, the Debtors will seek to have the Bankruptcy Court confirm the plan under section 1129(b) of the Bankruptcy Code. Under that section, a chapter 11 plan may be confirmed if it does not "discriminate unfairly" and is "fair and equitable" with respect to each nonaccepting class. For a more detailed description of the requirements for confirmation of a nonconsensual plan, *see* Article VII.B below.

**F.      Confirmation Hearing**

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan for [DATE] at [_____ __].m. prevailing Central Time before the Honorable Tamara O. Mitchell, United States Bankruptcy Court, Robert S. Vance Federal Building, 1800 Fifth Avenue North, Birmingham, Alabama 35203-2111 (the "Confirmation Hearing"). The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

Any objection to Confirmation of the Plan must be made in accordance with the requirements of section 1128(b) of the Bankruptcy Code and Bankruptcy Rule 9014 and be filed with the Bankruptcy Court, together with proof of service, and served so that they are received **on or before [DATE], at [___ _.]m., prevailing Central Time**, by the following parties:

11

**Counsel to the Debtors:**

Paul, Weiss, Rifkind, Wharton &
Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Facsimile: (212) 757-3990
Attn:   Stephen J. Shimshak
       Kelley A. Cornish
       Claudia R. Tobler
       Ann K. Young
       Michael S. Rudnick

Bradley Arant Boult Cummings LLP
1819 5th Avenue North
Birmingham, Alabama 35203
Facsimile: (205) 521-8800
Attn:   Patrick Darby
       Jay R. Bender
       Cathleen C. Moore
       James B. Bailey

**The Bankruptcy Administrator:**

Office of the United States Bankruptcy Administrator
Robert S. Vance Federal Building
1800 Fifth Avenue North
Birmingham, Alabama 35203
Facsimile: (205) 909-0435
Attn: J. Thomas Corbett, Esq.

**Counsel to the Steering Committee:**

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Facsimile: (212) 872-1002
Attn: Ira Dizengoff, Esq.
Kristine Manoukian, Esq.

Burr & Forman LLP
420 North 20th Street, Suite 3400
Birmingham, AL 35203
Facsimile: (2005) 244-5617
Attn: Michael L. Hall
D. Christopher Carson

Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, DC 20036
Facsimile: (202) 887-4288
Attn.: James Savin, Esq.

**Counsel to the Official Committee of Unsecured Creditors:**

Morrison & Foerster LLP
250 West 55th Street
New York, NY 10019
Facsimile: (212) 209-1835
Attn: Brett H. Miller, Esq.
Lorenzo Marinuzzi, Esq.
Jennifer L. Marines, Esq.

Christian & Small LLP
505 North 20th Street, Suite 1800
Birmingham, Alabama 35203-2696
Facsimile: (205) 328-7234
Attn: Bill B. Bensinger, Esq.
Daniel D. Sparks, Esq.

12

**Counsel to Morgan Stanley Senior Funding, Inc., as the Administrative Agent:**

White & Case LLP
1155 Avenue of the Americas
New York, NY 10036
Facsimile: (212) 354-8113
Attn: Scott Greissman, Esq.
Elizabeth Feld, Esq.

**Counsel to Wilmington Trust, National Bank, as First Lien Trustee:**

Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036-8706
Facsimile: (212) 596-9090
Attn: Mark R. Somerstein

Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Facsimile: (617) 951-7050
Attn: Patricia Chen

**Counsel to BOKF, N.A., as Second Lien Trustee:**

Arent Fox LLP
1675 Broadway
New York, NY 10019
Tel: (212) 484-3900
Facsimile: (212) 484-3990
Attn: Andrew I. Silfen

**Counsel to Delaware Trust Company, as 9.875%
Unsecured Trustee:**

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo,
P.C.
One Financial Center
Boston, Massachusetts 02111
Facsimile: 617-542-2241
Attn: William W. Kannel

**Counsel to UMB Bank National Association, as
8.5% Unsecured Trustee:**

Foley & Lardner LLP
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
Facsimile: (312) 832-4700
Attn: Harold L. Kaplan

13

# ARTICLE II.

## OVERVIEW OF THE PLAN

### A.        Summary

The Plan contemplates a consensual debt-to-equity conversion of approximately $1.9 billion of the Debtors' prepetition secured debt. Under the Plan, in exchange for the cancellation of their prepetition secured claims, the holders of First Lien Other Debt Claims will receive [TBD]% of reorganized Walter Energy's common stock on a pro rata basis, subject to Dilution. Administrative Claims, inclusive of Claims against any of the Debtors arising under section 503(b)(9) of the Bankruptcy Code, and priority claims against the Debtors shall be paid in cash in full. In addition, the Plan provides for the treatment of other Allowed Claims against, and Interests in, the Debtors as detailed below.

If the Plan is confirmed and becomes effective, the Debtors will emerge from chapter 11 as going concerns with substantially the same assets and corporate structure as they had prior to the Chapter 11 Cases. If, however, the Debtors are not able to confirm the Plan by January 13, 2016 or, prior to such date, meet certain other conditions and milestones set forth in the RSA, then the Debtors will withdraw the Plan and exclusively use their best efforts to pursue and consummate the 363 Sale in accordance with the 363 Sale Process. Details regarding the 363 Sale Process are described more fully in Article V.D.3 below.

### B.        Summary of Classification and Treatment of Claims and Interests under the Plan

The following chart summarizes the projected distributions to holders of Allowed Claims against and Interests in each of the Debtors under the Plan. Although every reasonable effort was made to be accurate, the projections of estimated recoveries are only estimates. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court. As a result of the foregoing and other uncertainties which are inherent in the estimates, the estimated recoveries in this Disclosure Statement may vary from the actual recoveries received. In addition, the ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation of the Plan and meet the conditions to Confirmation and effectiveness of the Plan, as discussed in this Disclosure Statement. The recoveries set forth below are projected recoveries only and may change based upon changes in the amount of Allowed Claims as well as other factors related to the Debtors' business operations and general economic conditions. Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Allowed Claims against and Interests in each of the Debtors. Holders of New Walter Energy Common Stock may be subject to Dilution as a result of, among other things, the issuance of New Walter Energy Common Stock pursuant to the Reorganized Company's Management Incentive Plan. The issuance of additional shares of New Walter Energy Common Stock, whether as a result of the above or otherwise, may cause recoveries for holders of certain Claims to be

14

meaningfully different from the percentage recoveries listed in the table below. The Debtors urge all Creditors to read the Risk Factors in Article VIII of this Disclosure Statement.

The following chart summarizes the anticipated recoveries for holders of Allowed Claims and Interests under the Plan. THE EXPECTED RECOVERIES SET FORTH BELOW ARE FOR ILLUSTRATIVE PURPOSES ONLY AND ARE SUBJECT TO MATERIAL CHANGE.

**SUMMARY OF ANTICIPATED RECOVERIES UNDER THE PLAN**

| Class | Claims and Interests | Status | Voting Rights | Projected Recovery Under the Plan |
|---|---|---|---|---|
| Class 1 | First Lien Undrawn Revolving Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |
| Class 2 | First Lien Other Debt Claims | Impaired | Entitled to Vote | [TBD] |
| Class 3 | Second Lien Note Claims | Impaired | [TBD] | [TBD] |
| Class 4 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |
| Class 5 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |
| Class 6 | Unsecured Claims | Impaired | [TBD] | [TBD] |
| Class 7 | Intercompany Claims and Intercompany Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |
| Class 8 | Old Common Stock Claims and Old Common Stock | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% |

**ARTICLE III.**

**COMPANY BACKGROUND**

A.      **General**

Walter Energy is incorporated in Delaware and headquartered in Birmingham, Alabama. The Company is a leading producer and exporter of metallurgical coal for the global steel industry from underground and surface mines located in the United States, Canada and the United Kingdom. It also extracts, processes, markets and possesses mineral reserves of thermal coal and anthracite coal, as well as produces metallurgical coke and coalbed methane gas. The Company realized sales of approximately $1.374 billion in 2014. Its total assets and liabilities were approximately $2.218 billion and $4.360 billion, respectively, as of June 30, 2015.

15

The Company currently operates four active coal mines (one of which is partially idled), a coke plant and a coal bed methane extraction operation located in Alabama and West Virginia. The diversity of its operations enables it to source coal from multiple locations to blend and meet virtually any quality specifications that its customers request. With access to both the Atlantic and the Pacific, the Company is able to market and supply metallurgical coal in Latin America, Asia and Europe. The Company has a diversified global customer base with customers in North America, South America, Europe and Asia.

In 2014, the Company produced 9.3 million metric tons of metallurgical coal, of which 89% was metallurgical coal. As of December 31, 2014, the Company had estimated reserves totaling 392.7 million metric tons, of which 212.4 million metric tons, or approximately 54%, are "assigned" recoverable reserves that are either currently being mined, are controlled and accessible from a currently active mine or located at idled facilities where limited capital expenditures would be required to initiate operations when conditions warrant. The Company's reserves are some of the highest quality metallurgical coal reserves in the world.

The Company's marketing strategy has focused on international markets mostly in Europe, South America and Asia, where it has a transportation cost advantage and where the Company's metallurgical coal is in demand. Approximately 92% of the metallurgical coal sales from the Company's Alabama underground mining operations are made to international customers. The Company sells most of its metallurgical coal under fixed price supply contracts, primarily with pricing terms of three months and volume terms of up to one year. Some of the sales of metallurgical coal, however, occur in the spot market as dictated by available supply and market demand. The Company's thermal coal is primarily marketed to industrial and electrical utility customers in the U.S., generally under annual and long-term contracts.

## B.    History

The Company traces its roots to 1946 when Mr. Jim Walter began a homebuilding business in Tampa, Florida. Although initially focused on homebuilding, the company Mr. Walter founded later became Jim Walter Corporation and branched out into different businesses, including the 1972 development of four underground coal mines in the Blue Creek coal seam near Brookwood, Alabama. In 1987, a group of investors that included Mr. Walter formed a new company, subsequently named Walter Industries, Inc., and the following year completed a leveraged buyout of most of the businesses of Jim Walter Corporation. In 1997, Walter Industries, Inc. began trading on the New York Stock Exchange. In 2009, the Company closed its homebuilding business, spun off its financing business and certain other businesses and closed others to focus on the operations related to mining. With its remaining businesses concentrated in coal and natural gas, the Company changed the name of its parent corporation to Walter Energy, Inc. in April 2009.

On April 1, 2011, Walter Energy completed the acquisition of all the outstanding common shares of Western Coal Corp. ("Western Coal"). The acquisition included high quality metallurgical coal mines in Northeast British Columbia (Canada), high

quality metallurgical coal and compliant thermal coal from mines in West Virginia (U.S.), and high quality anthracite coal and compliant thermal coal from the mines in South Wales (U.K.). The acquisition of Western Coal substantially increased the Company's reserves available for future production, the majority of which is metallurgical coal, and created a diverse geographic footprint with strategic access to high-growth steel-producing countries in both the Atlantic and Pacific basins. The Company reports all of its operations located in the U.S. under the U.S. Operations segment, and reports its mining operations located in Northeast British Columbia and South Wales under the Canadian and U.K. Operations segment.

On May 6, 2011, Walter Energy acquired mineral rights of Blue Creek metallurgical coal reserves to the northwest of its existing Alabama mines from a subsidiary of Chevron Corporation. The mineral leases form the core of the Blue Creek Energy Project, which is a planned new underground metallurgical coal mine to be operated by one of the Debtors, Blue Creek Energy, Inc. ("Blue Creek Energy"). In addition, Walter Energy acquired Chevron Corporation's existing North River thermal coal mine in Fayette and Tuscaloosa Counties of Alabama and a barge ocean to vessel load-out facility near the Port of Mobile terminal in Mobile, Alabama. The North River Mine closed in the fourth quarter of 2013 when the Company completed mining its economically recoverable reserves. On August 25, 2014, the Company completed the sale of the Blue Creek coal terminal in Mobile.

### C. Operational Segments

The Company's primary business, the mining and exporting of metallurgical coal for the steel industry, is conducted through its U.S., Canadian and U.K. Operations, which are discussed more fully below.

The Company currently operates four active coal mines, a coke plant and a coalbed methane extraction operation. The following map shows the major locations of the Company's mining operations and ports:[1]

---

[1] In addition to these active operations, the Company owns or leases various idled mines or reserves. A detail of the Debtors' property and estimated coal reserves is included in the 10-K for the fiscal year ended December 31, 2014.



### 1.    U.S. Operations

The Company's U.S. Operations segment includes metallurgical coal and thermal coal mines in both Alabama and West Virginia, a coke plant in Alabama, and coalbed methane extraction operations located in Alabama. The U.S. Operations' metallurgical coal production totaled 7.7 million metric tons and thermal coal production totaled 621 thousand metric tons in 2014.

#### (a)    *Alabama Mining Operations*

The Debtors' mining operations in Alabama consist of two underground metallurgical coal mines in Southern Appalachia's Blue Creek coal seam (the No. 7 Mine and the No. 4 Mine) operated by Jim Walter Resources, Inc. ("Jim Walter"), a direct subsidiary of Walter Energy and a Debtor in the Chapter 11 Cases, and one surface metallurgical and thermal coal mine (the Choctaw Mine) operated by Taft Coal Sales & Associates, Inc. ("Taft Coal"), a Debtor in these proceedings and a direct subsidiary of Walter Minerals, Inc. ("Walter Minerals"), which is a wholly-owned subsidiary of Walter Energy and a Debtor in these Chapter 11 Cases.

The Debtors' Alabama underground mining operations are headquartered in Brookwood, Alabama and as of December 31, 2014 were estimated to have approximately 188.9 million metric tons of recoverable reserves located in west central Alabama between the cities of Birmingham and Tuscaloosa. Operating at approximately 2,000 feet below the surface, the No. 4 and No. 7 mines are two of the deepest underground coal mines in North America. The coal is mined using longwall extraction technology with development support from continuous miners. The Company extracts coal primarily from Alabama's Blue Creek seam, which contains high-quality bituminous coal. Blue Creek coal offers high coking strength with low coking pressure, low sulfur and low-to-medium ash content with high Btu values that can be sold either as metallurgical coal (used to produce coke) or as compliance thermal coal (used by electric utilities because it meets current environmental compliance specifications). Pricing for metallurgical coal has historically been significantly higher than for that of compliance thermal coal.

18

The coal from the No. 4 and 7 mines is currently sold as a high quality low and mid-vol metallurgical coal. Based on forecasted production levels and the reserves that can be economically and legally extracted as of December 31, 2014, the Company estimates the life of mine for No. 4 and 7 mines to be 19 and 15 years, respectively. Mines No. 4 and No.7 are located near Brookwood, Alabama, and are serviced by CSX rail. Both mines also have access to the Company's barge load-out facility on the Black Warrior River. Service via both rail and barge culminates in delivery to the Port of Mobile, where shipments are exported to international customers via ocean vessels. Approximately 92% of the metallurgical coal sales from the Alabama underground mining operations consists of sales to international customers. In May 2011, the Company acquired mineral rights for approximately 68 million additional metric tons of recoverable Blue Creek metallurgical coal reserves located to the northwest of the No. 4 Mine. The related mineral leases form the core of the Blue Creek Energy Project to be operated by Blue Creek Energy, which project contemplates the development of a new underground metallurgical coal mine that has an estimated life of 40 to 45 years.

In 2014, the Company operated one surface mine in Alabama. The Choctaw Mine is located near Parrish in Walker County, Alabama and produces thermal and metallurgical coal. The mine has an onsite rail facility serviced by Norfolk Southern rail. Additionally, access to Highway 269 provides delivery access to local customers via truck. During the fourth quarter of 2014, the Company sold its Flat Top surface mineable coal reserve located in Adamsville, Alabama.

The Company's coal mines have preparation and blending facilities convenient to each mine. The coal preparation and blending facilities receive, blend, process and ship coal that is produced from the mines. Using these facilities, the Company is able to ensure a consistent quality and efficiently blend its coal to meet customers' specifications.

(b)     *Alabama Coking Operations*

The Company operates the Walter Coke Plant located in Birmingham, Alabama, through its subsidiary Walter Coke, Inc. ("Walter Coke"), one of the Debtors in these proceedings. The plant's major product line is metallurgical coke, which includes coke for furnace and foundry applications. Foundry coke is marketed to ductile iron pipe plants and foundries producing castings, such as for the automotive and agricultural equipment industries. Furnace coke is sold to the domestic steel industry for producing steel in blast furnaces. The plant utilizes up to 120 coke ovens with a capacity to annually produce up to 400,000 short tons of metallurgical coke and is the second largest merchant foundry coke producer in the United States.

(c)     *Alabama Coalbed Methane Gas Operations*

The Company's Alabama natural gas operations extract and sell coalbed methane gas from the coal seams owned or leased by the Company and others. This business includes conventional gas wells, pipeline infrastructure and related equipment located adjacent to the Company's existing underground mining and coalbed methane

business. These wells degasify methane from the Company's existing underground mines and the area where the new Blue Creek Energy Mine will be located. As of December 31, 2014, the Company had 1,748 wells that produced approximately 11.2 billion cubic feet of natural gas in 2014. The degasification operations have improved mining operations and safety by reducing methane gas levels in the Company's mines.

(d)     *West Virginia Operations*

The Company acquired four mines on two properties in West Virginia through the 2011 acquisition of Western Coal. The mines on these properties produce both metallurgical and thermal coal. The two properties are the Gauley Eagle and Maple properties and each has an underground mine, a surface mine, and a coal preparation plant. The Maple Coal mines are located in Fayette and Kanawha counties, and the Gauley Eagle mines are located in Nicholas and Webster Counties of West Virginia. Production at the Maple mines was recently curtailed due to weak market conditions. The Gauley Eagle underground and surface mine were idled in 2012 and remained idle throughout 2013 and 2014. As of December 31, 2014, the Company determined that the idle Gauley Eagle operations, which contain approximately 13.7 million metric tons of recoverable reserves, met the criteria to be classified as "held for sale" and recorded an impairment charge of $28.5 million to reduce the carrying value of these assets to its fair value. The metallurgical coal produced by the West Virginia operations is sold to domestic steel mills and merchant coke plants and international steel mills, while the thermal coal is sold domestically to eastern U.S. regional electrical power plants and industrial customers. These mines are held and managed by subsidiaries of Jim Walter. Specifically, Atlantic Leaseco LLC ("Atlantic Leaseco") runs and operates the Gauley Eagle Plant (currently idled) and Maple Coal Co. LLC ("Maple Coal") runs and operates the Maple and Sycamore coal mines (the Maple underground mine currently idled). Both Atlantic Leaseco and Maple Coal are Debtors and are wholly-owned by Jim Walter's direct subsidiary, Atlantic Development and Capital, LLC ("Atlantic Development"), another Debtor in these proceedings.

## 2.     Canadian and U.K. Operations

(a)     *Canadian Operations*

The Canadian mining operations consist of three surface metallurgical coal mines in Northeast British Columbia's coalfields (the Wolverine Mine, the Brule Mine, and the Willow Creek Mine). Within British Columbia, the Company holds the right to two large multi-deposit coal property groups: the Wolverine group, including the Perry Creek (Wolverine Mine), EB and Hermann deposits; and the "Brazion Group", including the Brule Mine and the Willow Creek Mine and less explored portions of these properties and adjacent properties. The Company also has a 50% interest in the Belcourt-Saxon multi-deposit coal property groups, as described below.

The Company's Canadian surface mining operations are located in Northeast British Columbia near the district municipalities of Tumbler Ridge and Chetwynd. Its Canadian operations are estimated to have approximately 133.4 million metric tons of

20

recoverable metallurgical coal reserves including 91.3 million metric tons at potential future mine sites as of December 31, 2014. The Wolverine Mine is located near the district municipality of Tumbler Ridge and produces a high grade metallurgical coal. The Company estimates the current reserves in the Wolverine Mine to have a life of 6 to 8 years at forecasted production levels. Future projects at Wolverine include the EB and Hermann surface mines which are expected to each have lives of 10 years at lower production levels. The Brule Mine is located near the district municipality of Chetwynd and produces a premium grade low-volatile pulverized coal injection ("PCI") coal. The Company expects the Brule Mine to have a life of at least 8 years with additional reserves for use thereafter. The Willow Creek Mine, also located near the district municipality of Chetwynd, produces metallurgical coal with production plans of one third metallurgical coal and two thirds low-volatile PCI coal over the mine's life which is currently expected to be at least 10 years if running at full production. The Willow Creek Mine includes a processing plant and a load-out facility that serves the Brule Mine.

The Wolverine Mine was idled in April 2014 and the Brazion operations (which include the Company's Brule and Willow Creek mines) were idled in June 2014. The Company operated the preparation plant at the Willow Creek Mine until August 2015 to complete processing of coal inventory that had already been mined.

The metallurgical coal produced by the Company's Canadian operations is sold to international customers located primarily in Asia to meet the demand for steel produced in the region.

Additionally, the Company has a 50% interest in the Belcourt Saxon Coal Limited Partnership which includes two multi-deposit metallurgical coal properties comprising approximately 28.5 million metric tons of recoverable reserves which are located approximately 40 to 80 miles south of the Company's Wolverine Mine.

The Company is also engaged in planning for the proposed EB and Hermann mines located near its existing Wolverine Mine. These mines have approximately 23.8 million metric tons of recoverable high quality metallurgical coal reserves.

(b)     *U.K. Operation*

The Company's U.K. mining operation consists of an underground mine located in South Wales.

The Company's U.K. underground operation is estimated to have approximately 15.5 million metric tons of recoverable reserves as of December 31, 2014. The U.K. operation's primary activity has been the development and expansion of the Aberpergwm underground coal mine located at Glynneath in the Neath Valley. In the fall of 2011, the U.K. operations stopped continuous miner development operations to focus attention on completing the new drift opening. While it was able to complete the upper section of the drift during 2012, due to challenges related to an oversupply of coal and decreased demand, the Company took steps to reduce development spending in this U.K.

21

mine until market conditions improve. These steps have slowed the development of the drift opening. This mine produces anthracite coal, which can be sold as a low-volatile PCI coal.

To further manage its liquidity, the Company has idled the U.K. operations. To that end, on or about June 5, 2015, the Company commenced a 30-day consultation period with the National Union of Mineworkers South Wales in connection with the Company's plans to idle the U.K. mine. On or about July 4, 2015, the majority of the Company's U.K. mineworkers were rendered redundant, and the mine now retains only those employees necessary to keep the premises in safe, idled condition.

### D. Corporate Structure and Functions

The Debtors comprise an integrated enterprise group. Exhibit B to this Disclosure Statement is a chart showing the organizational structure of Walter Energy and its subsidiaries.

#### 1. Legal Entity Overview – the Debtors

The following provides a brief summary of the principal Debtors:

##### (a) *Mining: Jim Walter Resources, Inc.*

Jim Walter runs and operates Mines No. 4 and No. 7, the Debtors' principal mining assets. It employs the majority of the Debtors' U.S. employees. Mines No. 4 and No. 7 produce high-quality metallurgical coal from the Blue Creek coal seam. Jim Walter owns 50% of the stock of Black Warrior Methane Corp. and 50% of the stock of Black Warrior Transmission Corp., two non-debtor corporations discussed in Article III below.

On or about May 18, 2015, Jim Walter issued WARN Notices to all hourly (laborers and other union employees) and all salaried employees at Mine No. 7, and certain affected employees at the No. 5 preparation plant and the central shop, supply and management office. In July 2015, Jim Walter partially idled Mine No. 7 West to reduce cash costs, running the longwall and one continuous miner section one shift per day. On July 31, 2015, Jim Walter issued WARN notices at No. 4 Mine to all union and salaried employees.

##### (b) *Mining: Taft Coal Sales & Associates, Inc.*

Taft Coal runs and manages the Choctaw Mine, a surface mine, located near Parrish in Walker County, Alabama, which produces thermal and metallurgical coal. Taft Coal is owned by Walter Minerals, a direct subsidiary of Walter Energy. Walter Minerals also owns Tuscaloosa Resources, Inc., another of the Debtors in the Chapter 11 Cases. Tuscaloosa Resources runs and operates the currently idled Swann's Crossing Mine located near Brookwood, Alabama, which mine produced both metallurgical and thermal coal.

22

(c) **_Mining: Atlantic Development and Capital, LLC and Subsidiaries_**

As discussed above in Article III.C.1, as part of the Western Coal acquisition, the Company acquired four mines on two properties in West Virginia – the Gauley Eagle and Maple Properties, each of which has an underground mine, a surface mine, and a coal preparation plant. These mines are held and managed by subsidiaries of Jim Walter. Specifically, Atlantic Leaseco runs and operates the Gauley Eagle Plant (currently idled), and Maple Coal runs and operates the Maple (underground mine currently idled) and Sycamore coal mines. Both subsidiaries are wholly-owned by Atlantic Development.

(d) **_Coke: Walter Coke, Inc._**

Walter Coke, a direct subsidiary of Walter Energy, runs and operates the Company's coking operations described in Article III.C.1 above.

(e) **_Natural Gas: Walter Black Warrior Basin, LLC_**

Walter Energy acquired the assets of Walter Black Warrior Basin, LLC ("WBWB") from Highmount Exploration and Production, LLC in May 2010. Out of the Debtors' 1,748 wells, WBWB currently operates 1,387 methane gas wells which are spread over 230,000 acres in Tuscaloosa and Fayette Counties in Central Alabama.

WBWB has entered into a Joint Operating Agreement with ConocoPhillips ("Conoco") and certain other third parties known as the "Whitson Coalbed Gas Prospect" that dates back to 1999. The purpose of the project was to enable the development of coalbed methane interests under various coal leases and coalbed methane leases. In its present state, the project provides that WBWB and Conoco have a 70 and 30 percent working interest respectively in the development and drilling of new gas wells in the applicable area of "mutual interest." Other parties to the Whitson Coalbed Gas Prospect include Atlas Resources, Saga Petroleum and Chevron USA.

WBWB is also a party to an agreement with the Dominion Resources Black Warrior Trust (the "Dominion Trust"). The Dominion Trust is a fixed investment trust formed to hold the Dominion Trust's rights with respect to approximately 512 of the active wells in the Black Warrior Basin. WBWB owns and operates those wells with a 100% working interest, and typically receives a 28% revenue interest, which varies by gas well. The Dominion Trust has a 0% working interest and asserts a 55% of WBWB's revenue interest in those wells (the "Dominion Trust Asserted Interest"). The Dominion Trust has commenced an adversary proceeding in the Bankruptcy Court against WBWB regarding the Dominion Trust's interests in the affected wells, which adversary proceeding is described in Article V.J below.

(f) **_Walter Energy Holdings, LLC_**

Walter Energy Holdings, LLC ("Energy Holdings") is a Delaware limited liability company wholly-owned by Walter Energy and through which Walter Energy holds

its ownership interest in its Canadian subsidiaries and operations. Energy Holdings holds 100% of the equity of Walter Energy Canada Holdings, Inc. ("Canada Holdings"), a Canadian corporation which in turn owns 99.99% of Walter Canadian Coal Partnership. Through a series of restructuring transactions in 2012, Western Coal and its assets were merged into Walter Canadian Coal Partnership.

(g)    *Other U.S. Subsidiaries*

Among Walter Energy's other wholly-owned U.S. subsidiaries that have filed for chapter 11 protection is Blue Creek Energy. In May 2011, Walter Energy acquired mineral rights for approximately 68 million additional metric tons of recoverable Blue Creek metallurgical coal reserves located to the northwest of Jim Walter's No. 4 Mine. The related mineral leases are expected to form the core of the Blue Creek Energy Project, which is a planned new underground metallurgical coal mine that has an estimated life of 40 to 45 years. Blue Creek Energy owns the mineral leaseholds with respect to this planned mine.

The remaining Debtors comprise legacy entities that have no material assets or operations.

**2.    Legal Entity Overview – the Canadian Operations**

As discussed in Article III.C.2 above, the Company's Canadian operations consist of three surface mines: the Wolverine Mine, the Brule Mine and the Willow Creek Mine. Those operations are operated by the following.

Wolverine Coal Partnership operates the Wolverine Mine, located approximately 15 miles south of Tumbler Ridge, British Columbia. Brule Coal Partnership manages and operates the Brule Mine. Willow Creek Coal Partnership manages and operates the Willow Creek Mine.[2] The Wolverine Mine was idled in April 2014 and the Brazion mining operations, which include the Brule Mine and Willow Creek Mine, were idled in June 2014. The Company operated the preparation plant at the Willow Creek Mine until August 2015 to complete processing of coal inventory that has already been mined.

Through these entities, the Company owns a 50% interest in the Belcourt Saxon Coal Limited Partnership, which includes two multi-deposit metallurgical coal properties comprising approximately 28.5 million metric tons of recoverable reserves which are located approximately 40 to 80 miles south of the Wolverine Mine. These entities also have interests in other coal properties (e.g., EB, Hermann, Mink).

The Canadian companies are not the subject of any insolvency proceedings.

---

[2]    Certain of the Willow Creek leaseholds are owned by Willow Creek Coal Partnership's subsidiary, Pine Valley Coal Ltd.

### 3. Legal Entity Overview – the U.K. Operations

The U.K. operation consists of the Aberpergwm Mine, an underground development mine located near the town of Neath in South Wales. The mine produces anthracite coal, which can be sold as a low-volatile PCI coal, and other products used for domestic purposes.

The Aberpergwm Mine is held and operated by Energybuild Ltd., a U.K. company ("Energybuild"). Energybuild is indirectly owned by Energybuild Group Limited ("EB Group"), a U.K. holding company owned by Cambrian Energybuild ULC. EB Group also owns other legacy subsidiaries in the U.K., none of which have material assets or operations. On or about June 5, 2015, the Company commenced a 30-day consultation period with the National Union of Mineworkers South Wales in connection with the Company's plans to idle the U.K. mine. On or about July 4, 2015, the majority of the Energybuild's workers were rendered redundant, and the mine now retains only those employees necessary to keep the premises in safe, idling condition.

The U.K. companies are not the subject of any insolvency proceedings.

### 4. Legal Entity Overview – Other Non-Debtors

(a) ***Black Warrior Methane Corp. and Black Warrior Transmission Corp.***

In 1979, Jim Walter began a pilot program to determine if it was economically feasible to degasify coalbeds in advance of mining. Originally, five wells were drilled in the area of Jim Walter's No. 4 Mine, located near Brookwood, Alabama, for the test. The pilot project proved successful, and, in 1981, Jim Walter and Enhanced Energy Resources formed the Brookwood Degasification Project.

In 1983, a new company, Black Warrior Methane Corp. ("Black Warrior Methane"), was formed to replace Enhanced Energy Resources as operator of the degasification project. Black Warrior Methane extracts methane gas from the Jim Walter number 4 and 7 mines, a process necessary for safe mining operations. In addition, Black Warrior Transmission Corp. ("Black Warrior Transmission" and, together with Black Warrior Methane, the "Black Warrior Companies"), a separate company with a parallel corporate legacy, operates approximately 30 miles of high-pressure gas pipeline used to deliver the methane gas to third-party customers.

Each of the Black Warrior Companies is currently owned 50% by Jim Walter and 50% by ARP Production Company LLC ("ARP"), a subsidiary of Atlas Resource Partners, LP. The Black Warrior Companies function as stand-alone corporations with two equal shareholders. They have their own boards of directors and for the most part perform their own accounting, cash management and banking, procurement and logistics and other functions. For the sake of administrative convenience and to benefit from economies of scale, the Debtors perform certain back-office functions for the Black Warrior Companies for

which the Debtors get reimbursed. For example, the Debtors administer and pay the Black Warrior Companies' payroll and employees.

Debtor WBWB and non-Debtor Black Warrior Methane degasify methane from Jim Walter's existing underground mines and the area where the Debtors' new Blue Creek Energy Mine will be located. In 2014, Black Warrior Methane and Debtor WBWB together operated approximately 1,748 wells, which together produced approximately 11.2 billion cubic feet of natural gas in 2014; of this, WBWB operates 1,375 wells and Black Warrior Methane operates the balance. The degasification operations are critical to the mines' safe operations and have improved mining operations and safety by reducing methane gas levels in the Debtors' mines, while at the same time providing a source of revenue through the sale of extracted methane to third party energy consumers. To the extent the Black Warrior Companies' revenues fall short of their operating expenses, the companies make capital calls on their shareholders. Without the Black Warrior Companies, the Debtors would need to contract with third-party providers to drill gas extraction wells and flare the gas, a more costly and less environmentally sound alternative.

The Black Warrior Companies have two metered sales points through which they flow gas to customers. Each of the Black Warrior Companies' shareholders, Jim Walter and ARP, is entitled to receive the revenues from these sales points based on the actual gas volume flowing through to customers and various other factors. The Black Warrior Companies calculate the actual revenue due to each shareholder based on the differences in the volumes at each sales point, as well as differences in well participation (ARP does not participate in all of the wells), and remit a sales settlement adjustment to Jim Walter. The Black Warrior Companies also calculate the royalties due to Jim Walter for the Black Warrior Companies' use of certain Jim Walter mineral rights, and remit such amount to Jim Walter. Jim Walter, in turn, calculates a monthly invoice to the Black Warrior Companies for payments made by Jim Walter on their behalf (including payroll for the Black Warrior Companies' employees and certain other vendor payments), as well as for direct charges to the Black Warrior Companies for services performed by Jim Walter (e.g., horizontal drilling and a management fee).

Based on the various amounts owed to and from the shareholders discussed above, as well as amounts due to third party vendors, revenues credited to ARP, and the maintenance of a $400,000 cash balance at the Black Warrior Companies, the Black Warrior Companies calculate a monthly cash call invoice for each of Jim Walter and ARP. Jim Walter and ARP then each remits its respective portion of the cash call to the Black Warrior Companies so that the companies can fund their third party payments and make payments back to Jim Walter under the invoices. During the six months prior to the Petition Date, Jim Walter's monthly cash call obligations paid to the Black Warrior Companies, net of all amounts due by the Black Warrior Companies to Jim Walter, has averaged approximately $320,000.

The Black Warrior Companies are not debtors in the Chapter 11 Cases or any other insolvency proceeding.

26

In connection with the acquisition of Western Coal, the Company acquired a 50% interest in the Belcourt Saxon Coal Limited Partnership ("Belcourt Saxon").  Belcourt Saxon owns two multi-deposit coal properties comprising approximately 28.5 million tons of recoverable reserves located approximately 40 to 80 miles south of the Wolverine Mine in Northeast British Columbia.  The joint venture was formed for the future exploration and development of surface coal mines.  Walter Canadian Coal Partnership owns the Company's 50% interest in Belcourt Saxon.  The other 50% interest is owned by an unaffiliated third party, Peace River Coal Limited Partnership, a subsidiary of Anglo American plc.

Belcourt Saxon is not a debtor in the Chapter 11 Cases or any other insolvency proceeding.

(c)    *Cardem*

Cardem Insurance Co., Ltd. ("Cardem"), a Bermuda company, functions as the Debtors' captive insurance company.  Cardem has historically issued insurance for the Debtors' legacy homebuilding and development business, including, for example, in the 1980s, when the Debtors had an active home building business in Florida, for which Cardem wrote certain mortgage insurance policies.

Cardem currently writes property and casualty insurance for the Company as a whole, and also provides workers' compensation coverage for certain employee groups (past and present).  Willis of Bermuda's Captive Management Services division manages Cardem.  Since 2009, Cardem has written property insurance policies for the Debtors.  The Debtors pay the premiums associated with such policies, plus a $500,000 mark-up to Cardem.  The Debtors' insurance broker places the Debtors' property insurance policies into reinsurance markets in London, Bermuda and the U.S. (such carriers, the "Reinsurers"), where 100% of the property insurance policies are reinsured.  The Debtors' premium payments are then divided among the applicable Reinsurers, and the Debtors pay a 3.5% commission to the insurance broker.

Cardem is not a debtor in the Chapter 11 Cases or any other insolvency proceeding.

5.    **The Prior Chapter 11 Proceedings**

On December 27, 1989, the predecessor of Walter Energy, Hillsborough Holdings Corporation ("HHC"), and most of its U.S. subsidiaries each filed a voluntary petition for reorganization under chapter 11 of the Bankruptcy Code (the "Prior Bankruptcy Proceedings") in the United States Bankruptcy Court for the Middle District of Florida, Tampa Division (the "Florida Bankruptcy Court").  HHC and its subsidiaries emerged from bankruptcy on March 17, 1995 pursuant to the Amended Joint Plan of Reorganization dated as of December 9, 1994, as modified on March 1, 1995 (as so modified the "1995 Consensual Plan").  Despite the confirmation and effectiveness of the 1995 Consensual Plan,

the Florida Bankruptcy Court continues to have jurisdiction over, among other things, the resolution of disputed prepetition claims against the Company and other matters that may arise in connection with or related to the Consensual Plan, including claims related to federal income taxes.

More specifically, in connection with the Prior Bankruptcy Proceedings, the Internal Revenue Service ("IRS") filed a proof of claim in the Florida Court (the "IRS Proof of Claim") for a substantial amount of taxes, interest and penalties with respect to fiscal years ended August 31, 1983 through May 31, 1994. HHC filed an adversary proceeding in the Florida Bankruptcy Court disputing the IRS Proof of Claim (the "IRS Adversary Proceeding"), and the various issues have been litigated in the Florida Bankruptcy Court. The Florida Bankruptcy Court issued an opinion in June 2010 with respect to two of the disputed issues. The Florida Bankruptcy Court instructed both parties to submit a final order addressing all issues that have been litigated for the tax years 1983 through 1995 in the IRS Adversary Proceeding by late August 2010. At the request of both parties, the Florida Bankruptcy Court granted an extension of time of 90 days from the initial submission date to submit the final order. Additional extensions of time to submit the proposed final order were granted in November 2010, February 2011, May 2011, September 2011, January 2013, May 2013 and December 2013. At the request of the IRS, in December 2013, the Florida Bankruptcy Court granted an additional extension of time to submit the final order. As of December 31, 2014, both parties were still reviewing the litigation issues in order to submit the final order.

On June 24, 2015, the United States filed a motion seeking entry of a final judgment in the case, alleging that the parties reached agreement on a settlement amount. The Debtors dispute these allegations, and the Prior Bankruptcy Proceedings remained open with respect to the unsettled IRS matters as of the Petition Date.

On August 18, 2015, the Debtors filed a motion requesting that the Florida Bankruptcy Court transfer the IRS Adversary Proceeding to the Bankruptcy Court. This motion will be heard by the Florida Bankruptcy Court on September 17, 2015.

## E. The Debtors' Workforce and Labor Obligations

The Debtors employ approximately 2,300 employees (collectively, the "Employees"), most of whom work in Alabama or West Virginia. The Debtors' workforce comprises approximately 700 salaried Employees and 1,600 hourly Employees. Approximately 1,285 of the hourly Employees, are represented by the UMWA, and approximately 160 Employees are production workers represented by the USW. The Employees perform a variety of functions critical to the Debtors' operations, including, but not limited to, coal and methane gas extraction, sales, marketing, accounting, administration and management. In addition, two non-debtor affiliates of the Debtors – Black Warrior Methane and Black Warrior Transmission – together employ approximately 12 additional employees supporting the Company's Alabama operations. The Canadian entities also employ approximately 75 employees, and the Company's subsidiaries in the U.K. employ approximately 7 other persons.

The majority of Employees of the Debtors' underground mining operations in Alabama are represented by the UMWA. Normally, the Debtors' labor contract with the UMWA mirrors the national contract negotiated with the UMWA by the Bituminous Coal Operators Association. The Debtors' collective bargaining agreement currently in place with the UMWA expires on December 31, 2016 following requisite notice. The Employees of Walter Coke, the coking operation in Birmingham, Alabama, are represented by the USW, and the current collective bargaining agreement with the USW expires on December 6, 2015 following requisite notice.

Although the Company's Canadian operations are currently idled, during normal operations, a majority of the Canadian entities' employees at the Wolverine and Willow Creek mining operations in Canada are also unionized. The Wolverine employees are represented by the United Steelworkers of America, Local 1-424, and the current collective bargaining agreement with the employees for that location expired on July 31, 2015. The employees at the Canadian Willow Creek mining operations are represented by Christian Labour Association of Canada ("CLAC"). The collective bargaining agreement with CLAC for that location expired on November 30, 2014.

A discussion of the compensation and benefit plans provided to current and former Employees of the Debtors is provided in Article III.J below.

## F. The Debtors' Prepetition Capital Structure

### 1. Indebtedness

#### (a) Overview

As of the Petition Date, the Debtors' principal funded debt obligations comprise the following:

- the First Lien Credit Agreement;

- Walter Energy's 9.500% Senior Secured Notes due 2019;

- Walter Energy's 11.0%/12.0% Senior Secured Second Lien PIK Toggle Notes due 2020;

- Walter Energy's 9.875% Senior Notes due 2020; and

- Walter Energy's 8.500% Senior Notes due 2021, each of which is defined and described below.

As described below, Walter Energy's first and second lien funded debt is secured by substantially all of its real and personal property, and is guaranteed on a secured basis by Walter Energy's material U.S. subsidiaries.

29

The following table summarizes the principal amount of the Debtors' outstanding funded indebtedness as of the Petition Date:

| Funded Indebtedness | Outstanding Amount |
|---|---|
| First Lien Credit Agreement | Term B Loan (as hereinafter defined): $978.2 million<br><br>Revolver/Letters of Credit (each as defined below): US$ 54.2 million and C$ 24.1 million in outstanding Letters of Credit. |
| 9.500% Senior Secured Notes due 2019 | $970.0 million |
| 11.0%/12.0% Senior Secured Second Lien PIK Toggle Notes due 2020 | $360.5 million |
| 9.875% Senior Notes due 2020 | $388.0 million |
| 8.500% Senior Notes due 2021 | $383.3 million |
| **Total Funded Debt:** | **$3,153 million** |

(b)     First Lien Credit Facility

On April 1, 2011, Walter Energy, as U.S. Borrower (the "U.S. Borrower"), Western Coal[3] and Walter Energy Canada Holdings, Inc. ("Canada Holdings"), as Canadian Borrowers (the "Canadian Borrowers" and together with the U.S. Borrower, the "Borrowers"), various financial institutions party thereto as lenders (collectively, as may have changed from time to time, the "First Lien Lenders"), and Morgan Stanley Senior Funding, Inc., as Administrative Agent (in such capacity, the "Administrative Agent") entered into that certain credit agreement dated as of April 1, 2011 (such credit agreement and additional documents and ancillary agreements, as amended, amended and restated, waived and supplemented from time to time, the "First Lien Credit Agreement"). The First Lien Credit Agreement provides for the making of loans to, and the issuance of letters of credit ("Letters of Credit") for the account of, the U.S. Borrower and the Canadian Borrowers. Specifically, the First Lien Credit Agreement provides for loans in the form of term loans and revolving loans, and for the issuance of Letters of Credit (which utilize revolving loan capacity). As of the Petition Date, under the First Lien Credit Agreement (a) $978,178,601.35 in the principal amount of the term loans (the "Term B Loan") plus accrued and unpaid interest of approximately $8.8 million was outstanding and (b)

---

[3]     Western Coal was the Canadian Borrower at the time of entry into the First Lien Credit Agreement and related documents. In connection with a 2012 restructuring, substantially all of Western Coal's assets were transferred to Walter Canadian Coal Partnership and Western Coal was dissolved, with its remaining assets (including its partnership interest in Walter Canadian Coal Partnership) distributed to Canada Holdings.

US$ 54,153,604.00 and C$ 24,070,494.00 in Letters of Credit were outstanding under the revolving loan facility (collectively, the "Revolver" and, together with the Term B Loan, the "Loans"), and, to the extent the following are payable in accordance with the First Lien Credit Agreement Documents, fees (including any prepayment fees), expenses, penalties, premiums and other obligations incurred in connection with the Loans.

*Guarantees and Collateral Provided by U.S. Entities.* The Loans are guaranteed by all of Walter Energy's wholly-owned U.S. subsidiaries (other than certain Immaterial Subsidiaries (as defined in the First Lien Credit Agreement)) (the "U.S. Subsidiary Guarantors"), and are secured on a first lien basis by a pledge of substantially all of the assets of Walter Energy and such U.S. Subsidiary Guarantors. Specifically, on April 1, 2011, the U.S. Borrower, the U.S. Subsidiary Guarantors (the U.S. Borrower and the U.S. Subsidiary Guarantors collectively, the "U.S. Guarantors"), and Morgan Stanley Senior Funding, Inc., as Collateral Agent (in such capacity, the "U.S. Collateral Agent"), entered into that certain U.S. Guaranty and Collateral Agreement (such agreement and additional documents and ancillary agreements, as amended and supplemented from time to time, the "U.S. Guaranty and Collateral Agreement"). Pursuant to the U.S. Guaranty and Collateral Agreement, each of the U.S. Guarantors, jointly and severally, unconditionally and irrevocably, guaranteed to the U.S. Collateral Agent, for the benefit of the First Lien Lenders, the prompt and complete payment and performance when due of all Obligations (as defined in the U.S. Guaranty and Collateral Agreement) of the Borrowers and each other Credit Party (as defined in the U.S. Guaranty and Collateral Agreement), including the Loans, except that the U.S. Borrower did not guarantee its own Obligations. A list of the current U.S. Guarantors is attached as Exhibit C.

Also pursuant to the U.S. Guaranty and Collateral Agreement, the U.S. Guarantors have pledged as security to the Collateral Agent, for the benefit of the First Lien Lenders and the other Secured Creditors (as defined in the U.S. Guaranty and Collateral Agreement), to secure the Obligations on a first lien basis, substantially all of the U.S. Guarantors' assets, including:

- substantially all personal property;

- all equity interests of U.S. subsidiaries owned by Walter Energy or any and each of the U.S. Guarantors;

- all equity interests in investments owned by Walter Energy or a U.S. Guarantor including the 50% beneficial equity interest owned by Jim Walter in each of the Black Warrior Companies;

- 66% of Walter Energy's equity interests in Walter Energy Canada Holdings, Inc. and certain other foreign subsidiaries; and

- certain real property holdings including material mineral leaseholds in Alabama and West Virginia as well as property owned in fee simple.

31

*Guarantees and Collateral Provided by Canadian Entities.* The obligations of the Canadian Borrowers under the Revolver are guaranteed by all of the Canadian Borrowers' wholly owned Canadian subsidiaries (other than certain Immaterial Subsidiaries) (the "Canadian Subsidiary Guarantors") and the Canadian Borrowers, and are secured on a first lien basis by a pledge of substantially all of the assets of the Canadian Borrowers and the Canadian Subsidiary Guarantors. The pledge is evidenced by that certain Canadian Guaranty and Collateral Agreement dated April 1, 2011 (such agreement and additional documents and ancillary agreements, as amended, amended and restated, and supplemented from time to time, the "Canadian Guaranty and Collateral Agreement") by and among the Canadian Borrowers, the Canadian Subsidiary Guarantors (the Canadian Subsidiary Guarantors and the Canadian Borrowers, collectively, the "Canadian Guarantors"), and Morgan Stanley Senior Funding, Inc., as Collateral Agent (in such capacity, the "Canadian Collateral Agent"). Pursuant to the Canadian Guaranty and Collateral Agreement, each of the Canadian Guarantors, jointly and severally, unconditionally and irrevocably, guaranteed to the Canadian Collateral Agent, for the benefit of the First Lien Lenders, the prompt and complete payment and performance when due of all of the obligations of each of the Canadian Guarantors under the First Lien Credit Agreement and related obligations (the "Canadian Obligations"), except that no Canadian Guarantor guaranteed its own Canadian Obligations. A list of the current Canadian Guarantors is attached as Exhibit D.

Also pursuant to the Canadian Guaranty and Collateral Agreement, the Canadian Guarantors pledged as security to the Canadian Collateral Agent, for the benefit of the First Lien Lenders, to secure the Canadian Obligations, on a first lien basis, substantially all of the Canadian Guarantors' assets located in Canada, including:

- all personal property and related assets capable of being pledged under the *Personal Property Security Act* (British Columbia) or similar legislation of any other Canadian jurisdiction;

- equity interests, including (i) equity interests in the Canadian Subsidiary Guarantors (as well as certain other Canadian subsidiaries) owned by the Canadian Borrowers and each of the other Canadian Guarantors and (ii) equity interests in U.K. operations by way of a pledge of 70.98% of the shares of Energybuild;

- all debt securities and promissory notes held by or owed to such Canadian Guarantor; and

- certain real property holdings including mineral leaseholds as well as property owned in fee simple.

(c)     First Lien Notes

Prior to the Petition Date, Walter Energy issued 9.500% senior secured notes (the "First Lien Notes") due October 15, 2019 in the aggregate principal amount of $970 million to certain noteholders (collectively, the "First Lien Noteholders") pursuant to an

indenture dated as of September 27, 2013, among Walter Energy, the guarantors party thereto, and Wilmington Trust, National Association (as successor to Union Bank, N.A.), as trustee (in such capacity, the "First Lien Trustee") and collateral agent. The First Lien Notes were originally issued in the aggregate principal amount of $450 million, and were subsequently upsized to $970 million. The First Lien Notes have a cash coupon interest rate of 9.500% per annum, payable semi-annually in arrears on April 15 and October 15 of each year. The First Lien Notes are guaranteed by the U.S. Subsidiary Guarantors on a secured basis. The First Lien Notes are secured by a first priority lien in all or substantially all of the assets of Walter Energy and the U.S. Guarantors, including a pledge from Walter Energy of 66% of its equity interests in Canada Holdings. The First Lien Notes' first priority liens are of equal priority as, and share *pro rata* with, the first priority liens granted to the First Lien Lenders under the U.S. Guaranty and Collateral Agreement in the U.S. Guarantors' assets. The rights of the First Lien Lenders, the First Lien Noteholders, and the Second Lien Noteholders (as defined below) are governed by that certain Amended and Restated Intercreditor Agreement dated March 27, 2014, among Walter Energy, the other grantors party thereto, Morgan Stanley Senior Funding, Inc., as U.S. Collateral Agent, Wilmington Trust, National Association (as successor to Union Bank, N.A.), as collateral agent for the First Lien Notes, and BOKF, N.A. (as successor to Wilmington Trust, National Association), as collateral agent for the Second Lien Notes (as defined below) (such agreement and additional documents and ancillary agreements, as amended, amended and restated, and supplemented from time to time, the "Intercreditor Agreement").

As of the Petition Date, the First Lien Notes had a remaining principal balance of $970,000,000.00 outstanding, plus accrued and unpaid interest of approximately $23 million, and, to the extent the following are payable in accordance with the First Lien Note Documents, fees (including any prepayment fees), expenses, penalties, premiums and other obligations incurred in connection with the First Lien Notes.

(d)     Second Lien Notes

Prior to the Petition Date, Walter Energy issued 11.0%/12.0% senior second lien PIK toggle notes (the "Second Lien Notes") due April 1, 2020 in aggregate principal amount of $350 million to certain noteholders (collectively, the "Second Lien Noteholders") pursuant to an indenture dated as of March 27, 2014, among Walter Energy, the guarantors party thereto and BOKF, N.A. (as successor to Wilmington Trust), as trustee (in such capacity, the "Second Lien Trustee" and together with the Second Lien Noteholders, the First Lien Trustee, the First Lien Noteholders, the Administrative Agent and the First Lien Lenders, the "Prepetition Secured Parties") and collateral agent. The Second Lien Notes have a coupon interest rate of 11.0/12.0% per annum, payable semi-annually in arrears on April 1 and October 1 of each year. Interest is payable, at the election of Walter Energy, (a) entirely in cash ("Cash Interest"), or (b) with a combination of (i) 50% Cash Interest and 50% increasing the principal amount of the outstanding notes or issuing additional PIK notes ("PIK Interest") or (ii) 75% Cash Interest and 25% PIK Interest. The governing indenture requires that the first and final interest payments be paid with Cash Interest.

33

The Second Lien Notes are guaranteed by the U.S. Subsidiary Guarantors on a secured basis. The Second Lien Notes are secured by a second priority lien in all or substantially all of the assets of Walter Energy and the U.S. Guarantors, including a pledge from Walter Energy of 66% of its equity interests in Canada Holdings. The rights of the First Lien Lenders, the First Lien Notes, and the Second Lien Notes are governed by the Intercreditor Agreement.

As of the Petition Date, the Second Lien Notes had a remaining principal balance of $360,500,000.00 outstanding, plus accrued and unpaid interest of approximately $12 million, and, to the extent the following are payable in accordance with the Second Lien Note Documents, fees (including any prepayment fees), expenses, penalties, premiums and other obligations incurred in connection with the Second Lien Notes.

(e)     9.875% Unsecured Notes

Pursuant to an indenture dated as of November 21, 2012, among Walter Energy, the guarantors party thereto and Delaware Trust Company (as successor to Union Bank, N.A.), as trustee, Walter Energy issued $500 million in aggregate principal amount of 9.875% senior unsecured notes with a maturity of December 15, 2020 (the "9.875% Unsecured Notes"). The 9.875% Unsecured Notes have a cash coupon interest rate of 9.875% per annum, payable semi-annually in arrears on June 15 and December 15 of each year. The 9.875% Unsecured Notes are guaranteed by the U.S. Subsidiary Guarantors on an unsecured basis. The 9.875% Unsecured Notes are unsecured and are effectively subordinated to the extent of the value of any collateral securing the First Lien Credit Facility, the First Lien Notes, and the Second Lien Notes. The 9.875% Unsecured Notes are general unsecured senior obligations of the U.S. Guarantors and rank *pari passu* in right of payment with the U.S. Guarantors' existing senior unsecured indebtedness.

As of the Petition Date, the 9.875% Unsecured Notes had a remaining principal balance of $388,000,000.00 outstanding, plus accrued and unpaid interest of approximately $22.5 million.

(f)     8.500% Unsecured Notes

Pursuant to an indenture dated as of March 27, 2013, among Walter Energy, the guarantors party thereto and UMB Bank, N.A. (as successor to Union Bank, N.A.), as trustee, Walter Energy issued $450 million in aggregate principal amount of 8.500% senior unsecured notes with a maturity of April 15, 2021 (the "8.500% Unsecured Notes"). The 8.500% Unsecured Notes have a cash coupon interest rate of 8.500% per annum, payable semi-annually in arrears on April 15 and October 15 of each year. The 8.500% Unsecured Notes are guaranteed by all of the U.S. Subsidiary Guarantors on an unsecured basis. The 8.500% Unsecured Notes are unsecured and are effectively subordinated to the extent of the value of any collateral securing the First Lien Credit Facility, the First Lien Notes, and the Second Lien Notes. The 8.500% Unsecured Notes are general unsecured senior obligations of the U.S. Guarantors and rank *pari passu* in right of payment with the U.S. Guarantors' existing senior unsecured indebtedness.

As of the Petition Date, the 8.500% Unsecured Notes had a remaining principal balance of $383.3 million outstanding, plus accrued and unpaid interest of approximately $8.1 million.

## 2. Common Stock

Walter Energy's shares of common stock have been listed on the New York Stock Exchange (the NYSE) under the symbol "WLT." On July 8, 2015, the Company received notice from NYSE that the staff of NYSE Regulation, Inc. determined to commence proceedings to delist the common stock of Walter Energy from the NYSE. Trading of Walter Energy's common stock on the NYSE was suspended prior to the opening of trading on July 8, 2015. The Company's common stock resumed trading on the OTC Pink Market under the symbol "WLTG" on July 9, 2015. Following the filing of the Chapter 11 Cases on July 15, 2015, the Company's ticker symbol was changed to "WLTGQ" and stock continues to trade on the OTC Pink Market.

As of the Petition Date, there were approximately 80,714,128 shares of common stock in Walter Energy outstanding, with approximately 488 shareholders of record.

## G. Intercompany Debt

In the normal operations of the Company's businesses, the Debtors and certain of their non-debtor affiliates engage in various intercompany transactions. Certain receivables and payables among the Debtors and the other Debtors or non-debtor subsidiaries of Walter Energy are evidenced by intercompany notes. In addition, the Debtors and other Debtors or non-debtor subsidiaries of Walter Energy engaged in the ordinary course of business in intercompany trading transactions which give rise to Claims between Debtors and other Debtors or non-debtor subsidiaries (together with any obligations arising under any intercompany notes, the "Intercompany Claims"). As a result, on any given date, there are numerous Intercompany Claims that reflect intercompany receivables and payables made or accrued in the ordinary course between and among the Debtors and between and among the Debtors and certain of their non-debtor affiliates. At the end of the calendar year, the Debtors typically equitize intercompany balances, as either a contribution to capital or a dividend. As a result, intercompany balances do not generally accrue and remain outstanding beyond a 12-month period, other than the Hybrid Secured Promissory Note described in Article III.P below.

## H. Hybrid Financing

On December 2, 2010, Walter Energy and Western Coal entered into an agreement pursuant to which Walter Energy agreed to purchase all of the issued and outstanding common shares of Western Coal for $3.7 billion in cash and stock of Walter Energy (the "Western Acquisition").

In connection with the agreement, Walter Energy purchased $291.0 million of Western Coal common shares (the "Initial Western Shares") on January 20, 2011. Walter Energy then formed Walter Energy Canada Holdings, Inc. ("Canada Holdings"), a Canadian corporation, on March 9, 2011. Walter Energy transferred the Initial Western Shares to Canada Holdings in exchange for newly issued common shares in the capital of Canada Holdings.

On March 28, 2011, Walter Energy formed Walter Energy Holdings, LLC ("Energy Holdings"), a Delaware limited liability company which has a single membership interest. Energy Holdings is not a special purpose or bankruptcy remote entity.

As part of the Western Acquisition, Walter Energy and Canada Holdings entered into a series of transactions, which occurred on April 1, 2011. Walter Energy advanced $3.4 billion in cash and Walter Energy common stock to Canada Holdings to enable Canada Holdings to purchase Western Coal. The $3.4 billion in cash and stock advanced to Canada Holdings was in exchange for $1.4 billion of newly issued common shares in the capital of Canada Holdings and $2.0 billion in rights to receive a specified number of common shares of Canada Holdings in the future (the "Hybrid Financing"). The various agreements created U.S. and Canadian tax efficiencies.

Pursuant to the Hybrid Financing:

- Canada Holdings issued a $2.0 billion 10-year interest-only term note to Walter Energy (the "Hybrid Secured Promissory Note") in exchange for $2 billion of cash and shares of Walter Energy. The Hybrid Secured Promissory Note bears interest at a variable rate equal to three-month London Interbank Offered Rate ("LIBOR") plus 450 basis points. The interest is payable, at Canada Holdings' option, in either cash or common shares of Canada Holdings.

- Energy Holdings entered into a forward subscription agreement (the "Western Subscription Agreement") with Canada Holdings, pursuant to which Energy Holdings agreed to subscribe for 928,998 shares of Canada Holdings' common shares for an aggregate subscription price equal to the principal amount of the Hybrid Secured Promissory Note (i.e., $2.0 Billion) on the maturity date of the Hybrid Secured Promissory Note.

- Walter Energy agreed to make contributions to Energy Holdings to purchase shares of Canada Holdings under a capital support agreement (the "Capital Support Agreement") to enable Energy Holdings to satisfy its obligations under the Subscription Agreement.

- Walter Energy provided a Guarantee (the "Guarantee") to Canada Holdings of Energy Holdings performance of its obligations under the Western Subscription Agreement.

36

Canada Holdings used the proceeds from the Hybrid Secured Promissory Note to carry out the Western Acquisition on April 1, 2011.

Since its issuance, Canada Holdings has paid interest on the Hybrid Secured Promissory Note in shares of Walter Energy, or cash, as permitted under the agreements. The unwinding of the Hybrid Financing may present adverse tax consequences, as discussed in greater detail in Article VIII.B.

**I.      Management of the Debtors**

**1.      Board of Directors**

The Board of Directors of Walter Energy currently consists of eight members. Seven of the eight members are independent directors, as defined in the corporate governance standards of the NYSE. Set forth below are the directors of Walter Energy as of the date of this Disclosure Statement.

<u>Name</u>:

| | |
|---|---|
| Michael T. Tokarz | Mr. Tokarz has been a director since 1987, and has served as Walter Energy's non-executive Chairman since December 2006. Since 2002, Mr. Tokarz has been a member of The Tokarz Group, LLC, a private merchant bank. Prior to this, from 1996, Mr. Tokarz was a senior General Partner and Administrative Partner at Kohlberg Kravis Roberts & Co., a private equity firm specializing in management buyouts. Mr. Tokarz has served as a director of Walter Investment Management Corp., a mortgage servicer and mortgage portfolio owner (2009-present), Mueller Water Products, Inc., a manufacturer and marketer of water infrastructure and flow control products (2006-present), MVC Capital, Inc., a registered investment company (2004-present), CNO Financial Group, Inc., an insurance provider (2003-present), IDEX Corporation, a manufacturer of engineered specialty industrial products (1987-2015) and Dakota Growers Pasta Company, Inc., a manufacturer and marketer of dry pasta products (2004-2010). |
| Mary R. "Nina" Henderson | Ms. Henderson has been a director since 2013. She is the Managing Partner of Henderson Advisory, a consulting practice providing marketing perspective and business evaluation to investment management firms in the consumer products and food industries where she has worked since 2001. She was previously a corporate vice president of Bestfoods and president of Bestfoods Grocery. During her 30-year career with Bestfoods and its predecessor company, CPC International, Ms. Henderson held a wide variety of |

37

| | international and North American general management and executive marketing positions. Currently, Ms. Henderson is a director of the Visiting Nurse Service of New York and the Foreign Policy Association, and is a trustee of Drexel University. Ms. Henderson has served as a director of Regus PLC (2014-present), CNO Financial Group (2012-present), AXA Financial Inc. (1996-2011), Del Monte Foods Company (2002-2011), Pactiv Corporation (2000-2010) and Royal Dutch Shell plc and its predecessor company, The Shell Transport and Trading Company (2001-2009). |
|---|---|
| Jerry W. Kolb | Mr. Kolb has been a director since 2003. Mr. Kolb was previously a General Partner and Vice Chairman of Deloitte & Touche LLP from 1986 until his retirement in 1998. Mr. Kolb also served as the Chief Financial Officer of Deloitte from 1985 until 1992 and Chief Administrative Officer from 1985 until 1991. Mr. Kolb is a certified public accountant. Since 2006, Mr. Kolb has also served as a director of Mueller Water Products, Inc., a manufacturer and marketer of water infrastructure and flow control products. |
| Patrick A. Kriegshauser | Mr. Kriegshauser has been a director since 2006. He has been Executive Vice President, Chief Financial Officer and a principal owner of Sachs Electric Company, a specialty electrical and design firm, since 2000. During 1985 to 2000, Mr. Kriegshauser served in various executive capacities for Arch Coal, Inc., a coal producer and marketer, last serving as Senior Vice President and Chief Financial Officer from 1996 through 2000. Mr. Kriegshauser is a certified public accountant. |
| Joseph B. Leonard | Mr. Leonard has been a director since 2009, and served previously as a director from June 2005 to April 2007. Mr. Leonard served as interim Chief Executive Officer of Walter Energy from March 12, 2010 through April 1, 2011 and again from August 1, 2011 through September 11, 2011. Mr. Leonard previously served as Chairman of AirTran Holdings, Inc., an airline holding company, from 2007 until his retirement in 2008. From 1999 through 2007, he served as Chairman and Chief Executive Officer of AirTran Holdings, Inc., with the additional title of President from 1999 through 2001. From 1993 to 1998, Mr. Leonard served in various executive positions with Allied Signal Aerospace, a diversified global technology and manufacturing leader of aerospace products, last serving as President and Chief Executive Officer of its Marketing, Sales and Service |

38

| | |
|---|---|
| | Divisions. Mr. Leonard has served as a director of Air Canada, a full service airline company (2008-present), and Mueller Water Products, Inc., a manufacturer and marketer of water infrastructure and flow control products (2006-present). |
| Bernard G. Rethore | Mr. Rethore has been a director since 2002. Mr. Rethore has been Chairman of the Board, Emeritus of Flowserve Corporation, a global manufacturer of pumps, valves, seals and components, since April 2000. He has held various executive positions and has served as Flowserve Corporation's Chairman, Chief Executive Officer, and President. In 1997, Mr. Rethore served as Chairman of BW/IP, Inc., a supplier of fluid transfer and control systems to the petroleum and power industries, also serving as President, Chief Executive Officer and a director from 1995 through 1997. From 1989 to 1995, Mr. Rethore held various senior positions with Phelps Dodge Corporation, a copper mining and metals and chemical manufacturer, including Senior Vice President of Phelps Dodge Corporation, member of its Senior Management Committee and President of Phelps Dodge Industries. He began his business career at McKinsey & Company, Inc., a general management consulting firm. Mr. Rethore has served as a director of Mueller Water Products, Inc., a manufacturer and marketer of water infrastructure and flow control products (2006-present) and Dover Corp., a manufacturer of a wide range of proprietary products world-wide (2001-present). He has also served as a director of Belden, Inc., a manufacturer of signal transmission products (1997-2012). |
| Walter J. Scheller, III | Mr. Scheller has been a director since 2011. Mr. Scheller was appointed Chief Executive Officer of Walter Energy in September 2011 after serving as President and Chief Operating Officer of the Company's primary subsidiary, Jim Walter, beginning in June 2010. Mr. Scheller has 30 years of experience in the coal mining industry. He served as Senior Vice President with Peabody Energy Corporation in various operational roles from 2006 to 2010. Mr. Scheller has also worked for CNX Gas Corporation as Vice President, and prior to that, for CONSOL Energy in executive and operational roles. |
| A.J. Wagner | Mr. Wagner has been a director since 2007. Mr. Wagner served in various executive capacities for Ford Motor Company beginning in 1973, culminating in his appointment as President of Ford Motor Credit North America and Vice |

39

President of Ford Motor Company prior to his retirement in 2007. Mr. Wagner has served as President and CEO of AJ Wagner & Associates, LLC, a business consulting organization specializing in automotive, financial, lending and insurance advisory services since 2007. Mr. Wagner served as a director of Lithia Motors, Inc., an automotive company (2008-2009).

### 2. Executive Officers

Set forth below are the executive officers of the Company as of the date of this Disclosure Statement and each officer's position within the Company.

| Name | Position |
| --- | --- |
| Walter J. Scheller, III | Chief Executive Officer |
| William G. Harvey | Executive Vice President and Chief Financial Officer |
| Earl H. Doppelt | Executive Vice President, General Counsel and Secretary |
| Richard A. Donnelly | President, Jim Walter Resources, Inc. |
| Michael T. Madden | Senior Vice President and Chief Commercial Officer |

## J. Compensation and Benefits Programs

### 1. Health Care Programs

The Debtors offer several programs to their employees and retirees for coverage including medical, prescription, dental, vision, life, short-term and long-term disability, accidental death and dismemberment, mental health and substance abuse, health flexible spending accounts and dependent care flexible spending accounts, business travel and accident insurance, long-term care insurance, other voluntary insurance programs and employee assistance programs (collectively, the "Health Care and Welfare Programs" and all amounts owed under or with respect to such programs, the "Health Care and Welfare Obligations"). Certain of the Debtors' Health Care and Welfare Programs are self-insured by the Debtors, and others are fully insured by third-party insurers. The Debtors have stop-loss coverage for certain self-insured Health Care and Welfare Programs. In 2014, the Company's total claims pay-out under its self-insured Health Care and Welfare Programs was approximately $82.4 million in the aggregate in the U.S. The Debtors estimate that the monthly cost of the Health Care and Welfare Obligations, including administrative payments to third-party administrators, is approximately $7.3 million, of which approximately $5 million is paid pursuant to collective bargaining agreements, $530,000 is paid pursuant to the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. § 9701 *et seq.*, and

40

approximately $400,000 for the Canadian employees. Each of the Debtor's Health Care and Welfare Programs are able to be amended or terminated, without the payment of consideration, except as required pursuant to collective bargaining agreements in effect.

Pursuant to the RSA, the Debtors have agreed to engage in negotiations with certain key constituencies, including their unionized employees and their union and non-union retirees, regarding modifications to the Debtors' obligations to such parties, or otherwise seek to reject or terminate such obligations under the Bankruptcy Code. The Debtors' Health Care and Welfare Programs are likely to be materially impacted by these actions.

## 2. Bonus Plans and Long-Term Incentive Plans

Some of the Debtors maintain certain bonus plans, including ordinary course bonus plans and a quarterly cash bonus plan (each a "Bonus Plan" and, collectively, the "Bonus Plans") at specific businesses.

The Debtors' ordinary course Bonus Plan (the "OC Bonus Plan") is tied to productivity and safety and provides small hourly bonuses to applicable hourly Employees. Payments under these Bonus Plans range from $50–500, and are paid monthly, quarterly or annually, as applicable.

The Debtors' quarterly cash Bonus Plan (the "QC Bonus Plan") is tied to achieving targets related to EBITDA, production volume, safety, and cost per ton set quarterly, and an annual individual objective. This QC Bonus Plan covers approximately 730 of the Company's employees, which represents the Debtors' entire salaried workforce and salaried Canadian employees of the Company, including certain of the Debtors' senior management. Payments are made on a quarterly basis, with the most recent payment of approximately $1.5 million having been made on July 10, 2015.

The Debtors received authorization to continue to make payments under the OC Bonus Plan and the QC Bonus Plan pursuant to an order of the Bankruptcy Court [Docket No. 218] dated July 28, 2015.

In addition to the OC and QC Bonus Plans, the Debtors also have a long-term employee incentive plan that has both cash and equity-based components (the "Long Term Incentive Plan"). In 2014, grants of equity were made on account of the equity-based component of the Long Term Incentive Plan. The cash-based component of the Long Term Incentive Plan was established in late 2014 and covers approximately 130 key Employees. Payments under the cash-based component were made in June 2015 in the total amount of $822,000. The Debtors have not sought authorization from the Bankruptcy Court to continue the Long Term Incentive Plan.

## 3. Severance

Generally, the Debtors provide severance ("Severance") to Employees who have been terminated in the ordinary course of business, which has been authorized by the

41

Bankruptcy Court [Docket No. 218]. To assist a terminated Employee's transition to unemployment, the Debtors provide severance commensurate with the Employee's tenure.

Typically, a non-represented Employee of the Debtors whose employment is terminated in the ordinary course of business is entitled to Severance equal to one payroll period (one week, two weeks or half a month depending on the pay cycle of the employee) of his or her gross base wages, before any withholdings or deductions, plus one week for every year of his or her employment, with certain age premiums (if applicable), up to a maximum of 26 weeks.

Certain of the Debtors' senior management are entitled to severance on different terms, according to the terms of their employment agreements. These agreements provide for, among other things, severance of one to two years, and severance payable upon a change of control. The Debtors have not sought any relief in connection with these agreements.

Health benefits are generally provided at the active Employee rate to the Debtors' Employees who are terminated through the period they receive severance. Following the final severance payment, eligible Employees may continue to participate in the Debtors' medical, dental and vision benefits provided that he or she pays the entire cost of coverage (plus up to a two (2) percent administration fee, as allowed by state and federal law), under the federal law known as the Consolidated Omnibus Reconciliation Act ("COBRA"). COBRA services are currently provided by Conexis Benefits Administrators, LP.

The Debtors generally have paid severance payments in installments, less withholdings as required by law, based on the current pay schedule of the eligible employee at the time of separation, beginning generally within 7 days following the latest of (a) the date of termination or (b) the last day of the first pay period immediately following the pay period in which the eligible employee returns a fully and properly executed release or separation agreement.

### 4. Savings Plans, Pension Plans, and Retirement Obligations

The Company has numerous savings plans, pension plans and retirement obligations on account of its Employees, the employees of the Black Warrior Companies, and the Company's retirees.

The Company has two savings plans that meet the requirements of section 401(k) of the Internal Revenue Code of 1986, the Walter Industries 401(k) Plan and the Walter Energy Retirement Savings Plan both administered by Wells Fargo, N.A. ("Wells Fargo"), which plans generally cover non-represented employees (together, the "Savings Plans"). Generally, under the Walter Industries 401(k) Plan, the Company makes mandatory matching contributions equal to 50% of employee contributions up to 6% of eligible compensation for non-represented employees. Generally, under the Walter Energy Retirement Savings Plan, the Company makes mandatory safe harbor matching contributions

42

equal to 100% of employee contributions up to 4% of eligible compensation for non-represented employees. Contributions from participating employees are withheld from gross pay during each payroll cycle, and the Company transfers those contributions into the Savings Plan as directed by the employees.

Certain of the Debtors also have additional payment obligations related to five other post-employment benefit plans (the "OPEB Plans"), one of which covers non-represented retirees and four of which cover represented Employees and retirees on account of the OPEB Plans. The Debtors estimate their annual obligations to be approximately $31 million; of this amount, approximately $120,000 is on account of obligations for non-unionized retirees.

As of December 31, 2014, the Company estimated that the postretirement health care and life insurance plans' aggregate projected benefit obligation had a present value of approximately $598.4 million and such benefits were not funded.

There are three single employer pension plans with Wells Fargo as the trustee: two plans sponsored by the Debtors, one for eligible represented Employees of Walter Coke and one for eligible salaried Employees of Walter Energy and certain of its subsidiaries (the "Single Employer Pension Plans"); and a third pension plan sponsored by the Black Warrior Companies. The Single Employer Pension Plans are funded by periodic payments to the Walter Energy, Inc. Subsidiaries Master Pension Trust. The Company has no contributions planned for any of the Single Employer Pension Plans for 2015. As of December 31, 2014, the Company estimated that the Single Employer Pension Plans' aggregate projected benefit obligation had a present value of approximately $316.5 million, and the fair value of the plan assets was approximately $244.6 million. Underfunding values may be greater if calculated based on different actuarial assumptions.

Pursuant to the RSA, the Debtors have agreed to engage in negotiations with the PBGC regarding the terms of an agreement pursuant to which the Debtors' qualified Single Employer Pension Plans will be terminated, or to otherwise file a motion with the Bankruptcy Court seeking to terminate such plans. Pursuant to the RSA, the Debtors are required to file motions with the Bankruptcy Court seeking to terminate the Debtors' excess and supplemental non-qualified pension plans.

Walter Energy has also established two supplemental executive retirement plans (together, the "WEI Retirement Plans"), one that is self-administered (the "Self-Administered Plan"), and one administered by Wells Fargo (the "Wells Fargo Plan"). The Self-Administered Plan provides lump sum payments to executives whose tax qualified pension benefits under the Pension Plan for Salaried Employees of Walter Energy, Inc. Subsidiaries, Divisions and Affiliates are limited by tax law. Such lump-sum payments are made on the first day of the seventh month following a participant's retirement or separation from the Company. The Debtors estimate that the earliest date a payment could be due under such Self-Administered Plan is November 2015. The Wells Fargo Plan provides additional payments to executives whose tax qualified elective contributions under the Walter Energy Retirement Savings Plan are limited by tax law. Under the Wells Fargo Plan,

43

annual discretionary payments are made each March on account of the prior year into a deferred compensation account. Under both WEI Retirement Plans, a "change in control" transaction may trigger vesting and payment of benefits. The Debtors have not sought authorization from the Bankruptcy Court to make any payments relating to the WEI Retirement Plans.

Certain of the Debtors participate in a defined benefit multi-employer pension plan (the "UMWA 1974 Pension Plan") pursuant to a collective bargaining agreement with UMWA, which expires on December 31, 2016 (the "UMWA CBA"). In addition to the UMWA 1974 Pension Plan, pursuant to the UMWA CBA, the Debtors also participate in a deferred cash savings plan (the "Deferred Cash Savings Plan") administered by the UMWA Health and Retirement Funds and Prudential for certain UMWA-represented Employees.

Under current law governing multi-employer defined benefit plans, if the Company were to withdraw from the UMWA 1974 Pension Plan or if the plan trustees were to terminate the plan, the currently underfunded multi-employer defined benefit plan would require the Company to make payments to the plan which would approximate the proportionate share of the multiemployer plan's unfunded vested benefit liabilities at the time of the withdrawal. Through June 30, 2014, the Company's estimated withdrawal liability for the multiemployer pension plans amounted to $661.2 million.

**ARTICLE IV.**

**EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASES**

    **A.**    **Global Overproduction of, and Declines in Prices for, Coal**

Over the past several years, prices for metallurgical coal have declined and returned to price levels seen before the recent strong growth of China (which is now experiencing some economic slowdown). In 2010, quarterly settlement prices for premium metallurgical coal ranged between $200 and $225 per metric ton (FOB). In the first quarter of 2011, those prices surged to $330 per metric ton. Since then, however, prices for metallurgical coal have steadily eroded, with settlement prices for the fourth quarter of 2014 averaging around $119 per metric ton. The trend continues downward, with the benchmark metallurgical coal price for the third quarter of 2015 recently settling at $93 per metric ton and may decline even further as the economic slowdown in China is expected to continue.

Numerous factors account for the steady fall in metallurgical coal prices. These factors are global in nature, as exports to foreign markets account for approximately two-thirds of U.S. producers' metallurgical coal sales. First, international demand for metallurgical coal has been less than expected. Demand from China – the key driver of the global coal industry – has been particularly sluggish. In 2014, metallurgical coke and coal demand was flat in China as higher demand from export-driven steel growth was offset by lower coke demand from the non-steel sector. Flat coal demand, coupled with higher domestic metallurgical coal production, led to a fall in Chinese imports of almost 20 million metric tons in 2014. Contributing to China's weakening demand for metallurgical coal

44

imports are the host of coal-related policy initiatives recently adopted by Chinese officials that negatively affect trade and prices. Last year, the Chinese government placed restrictions on the quality of coal that can be consumed domestically, implemented import tariffs on metallurgical coal, imposed informal quotas on the volume of imports, adopted domestic coal use reduction plans, and reduced the export tariff applicable to Chinese-produced coal. The future of metallurgical coal prices will be somewhat dependent on the continued growth of China (which has slowed and may continue slow for the foreseeable future).

While global demand for metallurgical coal has fallen short of expectations, supply has not adjusted accordingly, resulting in a saturated supply market. Production growth in Australia, among other foreign markets, over the past several years is mainly responsible for the excess metallurgical coal supply. In 2014, for example, while metallurgical coal prices continued their fall, Australia increased metallurgical coal exports by around 12 million metric tons. Russian volumes of metallurgical coal also soared in 2014. While global export growth was lower in 2014 than in 2013, the reduction in import demand in 2014 nevertheless caused the metallurgical coal market to become even more oversupplied than before. As a result of this oversupply, more than 30% of the seaborne metallurgical coal supply in the fourth quarter of 2014 generated negative cash margins. With the declines in coal prices experienced so far in 2015, that percentage almost certainly is higher now.

Recently, currency exchange rates have hit U.S. metallurgical coal producers particularly hard relative to their foreign competition. In the year preceding the Petition Date, the Australian dollar depreciated by approximately 20% against the U.S. dollar, effectively lowering Australian costs of production relative to those of their American competitors. Russia's sudden growth in exports last year was fueled by a 40% devaluation of the Russian ruble against the U.S. dollar during the second half of 2014. Although the Russian ruble has rebounded some in 2015, current exchange rates still favor Russian metallurgical coal exports more so than in recent history.

For these and other reasons, many industry experts forecast that the global metallurgical coal market will remain depressed and metallurgical coal prices will remain low in the short-term. Some analysts foresee Chinese metallurgical coal demand declining in 2015 and staying below 2014 levels until 2017. On the supply side, many producers are shuttering mines and reducing metallurgical coal production, but not to the extent necessary for prices to rebound meaningfully. Meanwhile, competition for the highest quality material is likely to increase in the seaborne trade, as the metallurgical coal industry in Mozambique, Mongolia, Indonesia, and other overseas markets develops, adding to the competition U.S. producers already confront from Australia, Russia, Canada, and South Africa.

45

**B.    Governmental Regulation, Permitting Requirements, and Compliance Costs**

**1.    Increasing Regulation**

The Debtors' businesses are subject to numerous federal, state, local and provincial laws and regulations with respect to matters such as permitting and licensing, employee health and safety, reclamation and restoration of property and protection of the environment.  In the U.S., environmental laws and regulations include, but are not limited to, the federal Clean Air Act and its state and local counterparts with respect to air emissions and greenhouse gases; the Clean Water Act and its state counterparts with respect to water discharges; the Resource Conservation and Recovery Act and its state counterparts with respect to solid and hazardous waste generation, treatment, storage and disposal, as well as the regulation of underground storage tanks; and the Comprehensive Environmental Response, Compensation and Liability Act and its state counterparts with respect to releases, threatened releases and remediation of hazardous substances. Other environmental laws and regulations require reporting, even though the impact of that reporting is unknown. Compliance with these laws and regulations is often costly and time-consuming and can delay commencement, continuation or expansion of exploration or production at the Company's operations.  These laws are constantly evolving and are becoming increasingly stringent.  The ultimate impact of complying with existing laws and regulations is not always clearly known or determinable due in part to the fact that certain implementing regulations for these environmental laws have not yet been promulgated and in certain instances are undergoing revision.   These laws and regulations, particularly new legislative or administrative proposals (or judicial interpretations of existing laws and regulations) related to the protection of the environment, could result in substantially increased capital, operating and compliance costs and could have a material adverse effect on the Company's operations and the ability of the Company's customers to use its products.

The Company strives to conduct its mining, natural gas and coke operations in compliance with all applicable federal, provincial, state and local laws and regulations. However, due in part to the extensive and comprehensive regulatory requirements, along with changing interpretations of these requirements, violations occur from time to time.  In recent years, the Debtors' expenditures for regulatory or environmental obligations in the United States have been for safety or process changes, as well as, complying with ongoing monitoring or investigation obligations.  Expenditures relating to environmental compliance are a major cost consideration for the Debtors' operations, and environmental compliance is a significant factor in mine design, both to meet regulatory requirements and to minimize long-term environmental liabilities.   The costs and operating restrictions necessary for compliance with domestic environmental laws and regulations generally has an adverse effect on the Debtors' competitive position with regard to foreign producers and operators who are not required to undertake equivalent costs in their overseas operations.

46

(a)     Climate Change

Global climate change continues to attract considerable public and scientific attention, with widespread concern about the impacts of human activity, especially the emission of greenhouse gases ("GHGs") such as carbon dioxide and methane.  Combustion of fossil fuels, primarily related to thermal coal and methane gas, results in the creation of carbon dioxide that is emitted into the atmosphere by coal and gas end-users.  Further, some of the Company's operations, such as coal mining and coke production, directly emit GHGs. Laws and regulations governing emissions of GHGs have been adopted by foreign governments, including the European Union and member countries, individual states in the United States and regional governmental authorities.  Further, numerous proposals have been made and are likely to continue to be made at the international, national, regional and state levels of government that are intended to limit emissions of GHGs by enforceable requirements and voluntary measures.

The Environmental Protection Agency ("EPA"), under President Obama's Climate Action Plan, has been working on an approach to cut carbon pollution from power plants. In 2013, the EPA proposed standards to limit carbon pollution from new power plants. In 2014, the EPA proposed the Clean Power Plan to limit carbon pollution from existing power plants as well as proposed standards to limit carbon pollution from modified and reconstructed power plants. On August 3, 2015, the EPA announced the Clean Power Plan to reduce carbon pollution from power plants.  Fifteen states have challenged the EPA's Clean Power Plan and other groups have expressed a desire to follow suit.

(b)     Permitting and Approvals

Numerous governmental permits and approvals are required for mining operations.  The Debtors are required to prepare and present to federal, state, provincial and local authorities data pertaining to the effect or impact that any proposed exploration project for production of coal or gas may have upon the environment, the public and the Debtors' employees.  In addition, the Debtors must submit a comprehensive plan for mining and reclamation upon the completion of mining operations.  The requirements are costly and time-consuming and can delay commencement or continuation of exploration, production or expansion at the Debtors' operations.

Walter Coke's coking operation is subject to numerous regulatory permits and approvals, including air and water permits.  These permits subject the Debtors to certain monitoring and reporting requirements.

Applications for permits and permit renewals at the Debtors' mining, coking and gas operations are subject to public comment and may be subject to litigation from third parties seeking to deny issuance of a permit or to overturn the applicable agency's grant of the permit application, which can also delay commencement, continuation or expansion of the Debtors' mining, coking and gas operations.  Further, regulations provide that applications for certain permits or permit modifications in the United States can be delayed, refused or revoked if an officer, director or a stockholder with a 10% or greater interest in the

47

entity is affiliated with or is in a position to control another entity that has outstanding permit violations. In the current regulatory environment, the Debtors anticipate approvals will take even longer than previously experienced, and some permits may not be issued at all.

### C. Prepetition Litigation and Disputes

#### 1. Tax Disputes

##### (a) The IRS Proof of Claim and the IRS Adversary Proceeding

As more particularly described in Article III.D.5 above, certain of the Debtors are involved in ongoing litigation with the IRS regarding the IRS Proof of Claim filed in the Prior Bankruptcy Proceedings.

##### (b) Subsequent Audit Disputes

After the IRS completed its audits of the Company's federal income tax returns for the years ended May 31, 2000 through December 31, 2008, the IRS issued 30-Day Letters to the Company in June 2010 and July 2012, proposing changes for these tax years. The Company filed a formal protest with the IRS within the prescribed 30-day time limit for those issues which have not been previously settled or conceded. The IRS filed a rebuttal to the Company's formal protest and the case was assigned to the Appeals Division of the IRS. The Appeals Division convened a hearing on March 8, 2011 and heard arguments from both parties as to issues not settled or conceded for the 2000 through 2008 audit periods. In September 2014, the IRS Appeals Office returned these tax periods to the IRS Examination Division to be placed into suspense pending the resolution of the IRS Proof of Claim and the IRS Adversary Proceeding by the Florida Bankruptcy Court. The disputed issues in these audit periods are similar to the issues remaining in the IRS Proof of Claim and the IRS Adversary Proceeding.

The IRS is conducting an audit of the Company's income tax returns filed for the 2009 through 2012 tax years. Since the examination is ongoing, any resulting tax deficiency or overpayment cannot be estimated at this time.

##### (c) Alabama Tax Disputes

On July 2, 2015, the Alabama Department of Revenue ("ADR") entered three final assessments against Walter Energy and certain of its subsidiaries for tax year 2009 (the "Final Assessments"). Walter Energy disputes the Final Assessments and timely filed a notice of appeal of the Final Assessments on August 6, 2015, with the Alabama Tax Tribunal.

Also, on July 9, 2015, the ADR entered a preliminary assessment against Walter Energy and certain of its subsidiaries for its 2010 tax year (the "Preliminary Assessment"). The Company disputes the Preliminary Assessment, which involves similar

disputed adjustments proposed by the ADR in the Final Assessments, and filed a petition for review of the Preliminary Assessment with the ADR on August 10, 2015.

### 2. Securities Class Actions and Shareholder Derivative Actions

#### (a) *In re Walter Energy, Inc. Securities Litigation*

On January 26, 2012 and March 15, 2012, putative class actions were filed against Walter Energy and some of its current and former senior executive officers in the U.S. District Court for the Northern District of Alabama (*Rush v. Walter Energy, Inc., et al.*). The three executive officers named in the complaints are: Keith Calder, Walter Energy's former CEO; Walter Scheller, Walter Energy's current CEO and a director; and Neil Winkelmann, former President of the Company's Canadian and U.K. Operations (collectively the "Individual Rush Defendants"). The complaints were filed by Peter Rush and Michael Carney, purported shareholders of Walter Energy who each seek to represent a class of Walter Energy shareholders that purchased common stock between April 20, 2011 and September 21, 2011.

These complaints allege that Walter Energy and the Individual Rush Defendants made false and misleading statements regarding Walter Energy's operations outlook for the second quarter of 2011. The complaints further allege that Walter Energy and the Individual Rush Defendants knew that these statements were misleading and failed to disclose material facts that were necessary in order to make the statements not misleading. Plaintiffs claimed violations of section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"), Rule 10b-5 promulgated thereunder, and section 20(a) of the 1934 Act. On May 30, 2012, the two actions were consolidated into *In re Walter Energy, Inc. Securities Litigation*, and the state court appointed the parties to serve as lead plaintiffs and approved the lead plaintiffs' selection of counsel for the consolidated action. On August 20, 2012, the lead plaintiffs filed a consolidated amended class action complaint in this action. The consolidated amended complaint names as an additional defendant Joseph Leonard, a current director and former interim CEO of Walter Energy, in addition to the previously named defendants. The defendants filed a motion to dismiss the amended complaint on October 4, 2012. On January 29, 2013, the court denied that motion without prejudice. The defendants answered the complaint on February 15, 2013. The plaintiffs filed a motion for class certification on August 15, 2013. On March 18, 2014, the court denied the plaintiffs' motion for class certification without prejudice to refiling and rebriefing and stayed this litigation pending a decision by the United States Supreme Court in *Halliburton Co., et al. v. Erica P. John Fund, Inc. ("Halliburton II")*. Following the U.S. Supreme Court's decision in *Halliburton II* on June 23, 2014, the plaintiffs filed a renewed motion for class certification on August 29, 2014. The defendants' filed their opposition on October 28, 2014, and the plaintiffs' reply was filed on January 30, 2015. On May 14, 2015, the Court denied plaintiffs' renewed motion for class certification without prejudice. All other deadlines have been stayed by the Court. On June 12, 2015, the Court issued a stipulated order dismissing, without prejudice, all claims brought against Walter Energy.

On July 15, 2015, the remaining parties in the securities class action executed a settlement agreement which resolves all claims for $25.0 million. The settlement payment will be funded by proceeds of the Company's Directors and Officers insurance policy. The settlement also provides for a release of all claims against the defendants and against Walter Energy. The settlement is subject to approval of the federal district court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715. On July 15, 2015, plaintiffs filed a motion for preliminary approval of the settlement agreement with the federal district court, and the settlement is subject to that court's approval.

Counsel for certain of the defendants in the securities class action filed a motion with the Bankruptcy Court requesting the court to enter an order either (i) determining that payment of the settlement amount by the insurers is not subject to the automatic stay or (ii) modifying the automatic stay to allow the settlement amount to be paid (the "Securities Class Action Motion for Relief"). The Securities Class Action Motion for Relief is scheduled for hearing on September 2, 2015 before the Bankruptcy Court. At the request of the parties, federal district court is holding the Securities Class Action in abeyance pending the Bankruptcy Court's ruling on the Securities Class Action Motion for Relief.

(b)     **The State Court Shareholder Derivative Litigation**

On February 7, 2012, a shareholder derivative lawsuit was filed in the 10th Judicial Circuit of Alabama (*Israni v. Clark et al.*). On February 10, 2012, a second shareholder derivative suit was filed in the same court (*Himmel v. Scheller et al.*), and on February 16, 2012 a third derivative suit was filed (*Walters v. Scheller et al.*). All three complaints named as defendants Walter Energy's then current board of directors, Keith Calder and Neil Winkelmann. Walter Energy was named as a nominal defendant in each complaint. The three complaints allege similar claims to those alleged in the *Rush* complaint. The complaints variously assert state law claims for breaches of fiduciary duties for alleged failures to maintain internal controls and to properly manage the Company, unjust enrichment, waste of corporate assets, gross mismanagement and abuse of control. The three derivative actions seek among other things, recovery for Walter Energy for damages that Walter Energy allegedly suffered as a result of alleged wrongful conduct. On April 11, 2012, the state court consolidated these shareholder derivative suits. Walter Energy thereafter entered into a stipulation with the lead plaintiffs in the consolidated derivative suit, pursuant to which all proceedings in the derivative action were stayed pending the filing of the consolidated amended complaint in the *Rush* class action. On September 19, 2012, lead plaintiffs filed a consolidated shareholder derivative complaint. This action was stayed pending the resolution of summary judgment motions in the putative securities class action. The derivative plaintiffs had certain rights to participate in discovery taken in the *In re Walter Energy, Inc. Securities Litigation* action.

Walter Energy and the other named defendants believe that there is no merit to the claims alleged in these lawsuits and have vigorously defended these actions. These actions are automatically stayed as a result of the Debtors' commencement of their Chapter 11 Cases, because, among other things, the derivative claims asserted therein are property of the Debtors' bankruptcy estates under section 541 of the Bankruptcy Code.

50

(c)     **The Federal Court Shareholder Derivative Litigation**

On March 1, 2012, a shareholder derivative lawsuit was filed in the U.S. District Court for the Northern District of Alabama (*Makohin v. Clark, et al.*).   On September 27, 2012, a second shareholder derivative lawsuit was filed in the same court (*Sinerius v. Beatty, et al.*).  Both complaints name as defendants Walter Energy's then current board of directors and Keith Calder.  Walter Energy was named as a nominal defendant in each complaint.  These complaints, like the state court derivative claims, allege similar facts to those alleged in the *Rush* complaint.  The *Makohin* complaint asserts state law claims for breaches of fiduciary duties and unjust enrichment, while the *Sinerius* complaint asserts these same claims as well as claims for abuse of control and gross mismanagement.  Both actions seek, among other things, recovery for Walter Energy for damages that Walter Energy suffered as a result of alleged wrongful conduct and restitution from defendants of all profits, benefits and other compensation that they wrongfully obtained.  Like the state court derivative action, both of these cases were stayed pending resolution of summary judgment motions in the putative securities class action.  The federal derivative plaintiffs also had certain rights to participate in discovery taken in the *In re Walter Energy, Inc. Securities Litigation* action.

Walter Energy and the other named defendants believe that there is no merit to the claims alleged in these lawsuits and have vigorously defended these actions.  These actions are automatically stayed as a result of the Debtors' commencement of their Chapter 11 Cases, because, among other things, the derivative claims asserted therein are property of the Debtors' bankruptcy estates under section 541 of the Bankruptcy Code.

3.     **Environmental Matters**

(a)     *General Matters*

The Debtors are subject to a wide variety of laws and regulations concerning the protection of the environment, both with respect to the construction and operation of their plants, mines and other facilities and with respect to remediating environmental conditions that may exist at their own and other properties.

The Debtors believe that they are in substantial compliance with federal, state and local environmental laws and regulations.  They accrue for environmental expenses resulting from existing conditions that relate to past operations when the costs are probable and can be reasonably estimated.

(b)     *Walter Coke Facility*

Walter Coke entered into a decree order in 1989 (the "1989 Order") relative to a Resource Conservation Recovery Act ("RCRA") compliance program mandated by the EPA.  A RCRA Facility Investigation ("RFI") Work Plan was prepared which proposed investigative tasks to assess the presence of contamination at the Walter Coke facility.  In 2004, the EPA re-directed Walter Coke's RFI efforts toward completion of the

51

Environmental Indicator ("EI") determinations for the Current Human Exposures, which were approved and finalized for Walter Coke's Birmingham facility in 2005. In 2008, as a follow-up to the EI determination, the EPA requested that Walter Coke perform additional soil sampling and testing in the neighborhoods surrounding its facility. The results of this sampling and testing were submitted to the EPA for review in 2009. In conjunction with the plan, Walter Coke agreed to remediate portions of 23 properties based on the 2009 sampling and that process was completed in 2012.

In 2011, the EPA notified Walter Coke in the form of a General Notice Letter that it proposed that the offsite remediation project ("35th Avenue Superfund Site") be classified and managed as a Superfund site under Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), allowing other Potentially Responsible Parties ("PRPs") to potentially be held responsible. Under CERCLA authority, the EPA proceeded directly with the offsite sampling work and deferred any further enforcement actions or decisions. In March 2013, the EPA released the North Birmingham Air Toxics Risk Assessment showing the air quality around Walter Coke's facilities to be acceptable. In August 2013, the Agency for Toxic Substances and Disease Registry ("ATSDR") released a report concerning past, present and future exposures to residential soils in North Birmingham and concluded that there is no public health hazard. In September 2013, the EPA sent an "Offer to Conduct Work" letter to Walter Coke and four other PRPs notifying them that the EPA had completed sampling at 1,100 residential properties and that 400 properties exceeded Regional Removal Management Levels ("RMLs") and offered the PRPs an opportunity to cleanup 50 Phase I properties. The Company has notified the EPA that it has declined the Offer to Conduct Work. In July 2014, the Jefferson County Department of Health ("JCDH") said there are no apparent health risks to individuals living in North Birmingham. In August 2014, the EPA sent an "Offer to Conduct Work" letter to Walter Coke and five other PRPs and offered the PRPs an opportunity to clean up 30 Phase II properties. The Company has notified the EPA that it has declined the Offer to Conduct Work. In September 2014, the EPA proposed to add the 35th Avenue Superfund Site to the National Priorities List ("NPL"). On January 20, 2015, Walter Coke submitted objections to the proposed listing, challenging the evidentiary basis for attributing the existing conditions to the identified parties and the EPA's failure to consider other industrial and anthropogenic sources. The EPA has accepted and is reviewing comments to the proposed listing. In April 2015, ATSDR released an evaluation of air exposures to communities adjacent to the 35th Avenue Superfund Site and concluded that current exposures are unlikely to result in harmful effects in individuals and that the current estimated cumulative cancer risks are within the EPA's target risk range.

In response to an informal EPA request, on June 30, 2015, the Company corresponded with the EPA declining to negotiate a potential consent order concerning the performance of future work and the EPA's past costs. The Company understands that the EPA made a similar request to the other identified PRPs. In connection with that request, the EPA informally indicated that, as of April 2015, it had incurred approximately $17.0 million in costs at the 35th Avenue Superfund Site. The Company has not been provided any documentation for or otherwise independently verified that claim. The EPA also indicated that it will continue expending additional monies at the 35th Avenue Superfund Site if no

52

PRP agrees to assume the work. The EPA has thus far not responded to various technical showings that the Company has made indicating that the conditions at the 35th Avenue Superfund Site appear to be inconsistent with Walter Coke's operations and that they are more likely the result of other industrial and/or non-industrial sources. For this and other reasons, the Company continues to believe that Walter Coke has meritorious defenses to any claim for response costs that the EPA or a third party may assert. The Company also notes that if Walter Coke were found liable, numerous issues would require determination in order to ascertain the extent of such liability, including without limitation the relative contributions of other PRPs thus far identified and possible PRPs not thus far named by the EPA.

A RCRA Section 3008(h) Administrative Order on Consent (the "2012 Order") with the effective date of September 24, 2012 was signed by Walter Coke and the EPA. The 2012 Order declared that all of the approved investigation tasks of the RFI Work Plans required by the 1989 Order had been completed by Walter Coke and that the 1989 Order was terminated and is no longer in effect. The objectives of the 2012 Order are to perform Corrective Measure Studies, implement remedies if necessary, and implement and maintain institutional controls if required at the Walter Coke facility.

The Debtors have incurred costs to investigate the presence of contamination at the Walter Coke facility and to define remediation actions to address this environmental liability in accordance with the agreements reached with the EPA under the RFI and the residential soil sampling conducted by Walter Coke in the neighborhoods surrounding its facility. It is probable that the Debtors will incur additional future costs to remediate environmental liabilities at the Walter Coke facility, but the amount of such additional costs cannot be reasonably estimated at this time. No assurances can be given that the Debtors will not be required in the future to make material expenditures relating to the Walter Coke site or other sites.

### 4. Employee Matters

In connection with the idling of the Wolverine Mine in April 2014, approximately 302 unionized employees represented by the United Steelworkers of America, Local 1-424 ("USW Local 1-424") were laid off. There were also a number of non-union staff employees whose jobs were affected by the idling. If the Company does not recall the affected unionized employees to work prior to April 15, 2016, then the Company would be required to pay contractual severance of two weeks' pay per year of service, to a maximum of ten weeks, for each unionized employee pursuant to USW Local 1-424, and additional sums that would be payable pursuant to local labour laws to both unionized and non-union employees. The Company has estimated the additional severance costs of up to CAD $12.0 million, subject to various defenses the Company believes it has to the amount of individual severance claims. The Company continues to evaluate operating strategies to achieve value from the Wolverine reserves which could impact the potential future severance payments. For example, if the Company recalls employees to work within 24 months of its date of layoff, no severance payments would be owed. The Company has not accrued any of this potential severance liability because the ultimate outcome is uncertain.

53

### D. Labor Contracts and Labor Liabilities

The Debtors' ongoing and legacy labor costs are substantial and, under current and projected market conditions, unsustainable. Those costs primarily constitute compensation for union workers, pension obligations and healthcare benefits.

#### 1. Union Labor Costs

As of the Petition Date, approximately 55.9% of the Debtors' workforce was represented by the UMWA. Those Employees are covered under the Debtors' collective bargaining agreement with the UMWA, which was effective December 9, 2011 and expires December 31, 2016 if requisite notice is provided. In addition, approximately 160 of the Debtors' hourly Employees are represented by the USW. The USW collective bargaining agreement expires on December 6, 2015 if requisite notice is provided. The Debtors also employed approximately 155 non-union hourly workers as of the Petition Date.

#### 2. UMWA Pension and Benefit Trusts

Jim Walter, which operates the Debtors' principal mining assets and employs the majority of the Debtors' employees, is required under its agreement with the UMWA to contribute to multi-employer plans providing pension, healthcare and other postretirement benefits.

##### (a) UMWA 1974 Pension Plan

Jim Walter is required under the agreement with the UMWA to pay amounts to the UMWA 1974 Pension Plan based on hours worked by UMWA- represented Employees. The required contribution called for by the current collective bargaining agreement is $5.50 per hour worked. Jim Walter was listed in the UMWA 1974 Pension Plan's Form 5500, filed April 11, 2014, as providing more than 5 percent of the total contributions for the 2012 plan year.

As of June 30, 2014, the UMWA 1974 Pension Plan was determined by its actuaries to be underfunded. In October 2014, the Company received notice from the trustees of the UMWA 1974 Pension Plan stating that, under the Pension Protection Act (the "Pensions Act"), the UMWA 1974 Pension Plan is considered to be in "critical" status for the plan year beginning July 1, 2014, as certified by the actuary for the UMWA 1974 Pension Plan because, in part, the funding percentage of such plan was determined to be less than 65.0%. As a result of the UMWA 1974 Pension Plan entering "critical" status, the Pensions Act imposes a surcharge of up to 10% of the contributions otherwise required under the current collective bargaining agreement which increased the contribution rate from $5.50 to $6.05 per hour, effective July 1, 2015. Additionally as a result of the UMWA 1974 Pension Plan's "critical" status, Federal law requires it to adopt a rehabilitation plan that will allow it to emerge from critical status or, if such is not possible, to forestall insolvency. Federal law permits pension plans to reduce, or even eliminate, certain benefits called "adjustable benefits" as part of a rehabilitation plan.

Under current law governing multiemployer defined benefit plans, if Jim Walter withdrew from the UMWA 1974 Pension Plan, it would be assessed withdrawal liability reflecting its proportionate share of the multiemployer plan's unfunded vested benefits (assets less liabilities) at the time of the withdrawal. This liability is payable in annual payments which would approximate the Jim Walter's historical annual contributions. If Jim Walter had withdrawn from the UMWA 1974 Pension Plan between July 1, 2014 and June 30, 2015, the estimated withdrawal liability would have been $661.2 million.

(b)    **UMWA Benefit Trusts**

The Coal Industry Retiree Health Benefit Act of 1992 (the "Coal Act") created two multiemployer benefit plans: (1) the United Mine Workers of America Combined Benefit Fund (the "Combined Fund") into which the former UMWA 1950 and 1974 Benefit Trusts were merged, and (2) the 1992 Benefit Plan (the "1992 Plan"). The Combined Fund provides medical and death benefits for all beneficiaries of the former UMWA Benefit Trusts who were actually receiving benefits as of July 20, 1992. The 1992 Plan provides medical and death benefits principally to orphan UMWA-represented members eligible for retirement on February 1, 1993, and who actually retired between July 20, 1992 and September 30, 1994 who are eligible to receive benefits from their last employer, but such responsible employer has gone out of business. The Company's contributions to these funds for the years ended December 31, 2014, 2013 and 2012 were insignificant.

The UMWA 1993 Benefit Plan (the "1993 Plan") is a defined contribution plan that was created as the result of negotiations for the National Bituminous Coal Wage Agreement (NBCWA) of 1993. This plan provides healthcare benefits to orphan UMWA retirees who retired under a 1993, or a later, NBCWA and whose employer subsequently goes out of business. Contributions to the 1993 Plan under the 2011 labor agreement were $1.10 per hour worked by UMWA represented employees. Total contributions by the Company to the UMWA 1993 Benefit Plan in 2014, 2013 and 2012 were $3.6 million, $3.9 million and $4.2 million, respectively.

The NBCWA of 2011 established the UMWA 2012 Retiree Bonus Account Trust and Plan (the "UMWA 2012 Retiree Bonus Account"). The UMWA Retiree Bonus Account Trust is a defined contribution plan that provides funding for continued single sum payments to UMWA retirees. The 2012 Retiree Bonus Account Trust provides benefits to beneficiaries of the UMWA 1974 Pension Plan who have retired by July 1, 2011 or who retire by October 31, 2016. Contributions to the trust under the 2011 NBCWA are currently $1.50 per hour worked by UMWA-represented employees, during the term of the 2011 labor agreement. Total contributions by the Company to the UMWA 2012 Retiree Bonus Account Trust in 2014, 2013 and 2012 were $5.1 million, $5.5 million, and $5.7 million, respectively.

### E. Prepetition Restructuring Initiatives

#### 1. Implementation of Cost-Cutting Measures

In the face of decreased global demand for coal and plummeting commodity prices, the Debtors' management undertook aggressive initiatives prior to the Petition Date to manage the Debtors' liquidity. Among other things, in 2012, management reduced SG&A and capital expenditures by 20% ($32 million) and 10% ($45 million), and idled the Gauley Eagle mine in West Virginia. In 2013, the Debtors further reduced SG&A and capital expenditures by 25% ($33 million) and 61% ($238 million) and idled the Willow Creek mines in Canada. In addition, the Debtors idled or closed the North River, Reid School and Swann's Crossing mines in Alabama. The Debtors also reduced the cash cost of sales per metric ton by 14% and reduced cash dividends by 92%. In 2014, management further reduced SG&A and capital expenditures by 28% ($28 million) and approximately 40% ($61 million), while idling the remaining Canadian mining operations. The Debtors sold the Blue Creek Coal Terminal for $25 million, brought the cash cost of sales down per metric ton by 13% and reduced cash dividends to a nominal amount. In 2015, the Debtors terminated dividends entirely and implemented additional programs to lower costs, which included reductions to the Debtors' workforce and management, and the successful renegotiation of a take-or-pay contract with one of the Debtors' terminal operators. Most recently, the Debtors partially idled the Jim Walter Resources No. 7 mine, which is expected to result in millions of dollars of annual savings, idled the No. 5 Mine Preparation Plant, and fully idled the U.K. mines and Maple underground mine in West Virginia.

The Company is continuing to pursue additional cost-cutting measures. Among other things, on May 18, 2015, the Company sent a notice to certain Employees of Jim Walter of the anticipated reductions in force at the No. 7 Mine, the No. 5 Mine Preparation Plant, and the Central Shop pursuant to the federal Worker Adjustment and Retraining Notification Act (the "WARN Act Notice"). The WARN Act Notice advised such Employees of the anticipated reductions to begin on or about July 14, 2015, if market conditions were not to improve in the interim. On July 31, 2015, Jim Walter issued WARN notices at No. 4 Mine to all union and salaried employees.

#### 2. Prepetition Financing Transactions

In 2014, the Company completed notes offerings totaling $870 million, improving the Company's debt maturity profile and enhancing its liquidity position. The Company also completed three debt-for-equity exchange transactions during the year, issuing 9.3 million shares of Walter Energy common stock and paying $5.2 million in exchange for the retirement of $112 million in debt and reducing future annual cash interest expense by approximately $11.0 million.

56

**F.** **Negotiations with the Steering Committee of First Lien Lenders and First Lien Noteholders and the Restructuring Support Agreement**

On March 15, 2015 and April 1, 2015, an informal group of certain unaffiliated First Lien Lenders and First Lien Noteholders (the "Steering Committee") retained Akin, Gump, Strauss, Hauer and Feld LLP ("Akin Gump") as legal advisor, and Lazard Frères & Co. LLC ("Lazard" and together with Akin Gump, the "Steering Committee Advisors") as financial advisor, respectively. Thereafter, the Debtors opened an "advisors' only" electronic data site for the Steering Committee Advisors containing financial, legal and corporate diligence materials and, with the guidance and direction of the Company's board of directors, engaged with the Steering Committee Advisors regarding a comprehensive restructuring of the Debtors.

On April 15, 2015, while negotiations were proceeding with the Steering Committee, Walter Energy exercised the 30-day grace period under the terms of the First Lien Notes and the 8.500% Unsecured Notes to extend the timeframe for making approximately $62 million in interest payments due on April 15, 2015 (the "April 15 Interest Payments"). Ultimately, however, more time was needed to negotiate the terms of a consensual restructuring transaction with the First Lien Lenders and the First Lien Noteholders. Accordingly, on May 7, 2015, Walter Energy announced that on May 15, 2015 it would pay the April 15 Interest Payments, which payments Walter Energy made as announced.

While making continued progress with the Steering Committee Advisors, the Debtors simultaneously explored other restructuring options. Advisors for certain unsecured noteholders approached the Debtors to explore restructuring alternatives, entered into a non-disclosure agreement with the Debtors, and conducted diligence thereafter. However, the Debtors' continued operating losses, lack of sufficient unencumbered assets, and limited flexibility under their secured debt documents precluded the development of a meaningful alternative transaction to the one pursued with the Steering Committee.

Throughout this period, negotiations among the Debtors and the Steering Committee proceeded. After months of good faith, arms' length negotiations, the Debtors reached an agreement with the Steering Committee on the terms of the Restructuring Support Agreement that (a) contemplated a consensual debt-to-equity conversion of approximately $1.9 billion of the Company's prepetition secured debt pursuant to the Plan, and (b) would permit the Debtors' consensual use of the Prepetition Secured Parties' cash collateral for no more than seven (7) months to allow the Debtors to pursue confirmation of the Plan, while simultaneously pursuing the 363 Sale.

Pursuant to the Restructuring Support Agreement, the Consenting First Lien Creditors have agreed to support the Plan, provided that the Debtors are, among other things, successful in taking the steps necessary to meet various agreed upon milestones, which include the following:

57

- The Debtors shall have commenced the 1113/1114 Process by making an initial proposal to the UMWA by August 26, 2015 and to the USW by September 4, 2015;

- The Debtors shall have commenced the 363 Sale Process by September 9, 2015 by filing a motion for approval of the 363 Sale;

- The Bankruptcy Court shall have approved this Disclosure Statement by October 28, 2015; and

- The Debtors shall have achieved the necessary cost savings that are acceptable to the Debtors and Majority Holders (as defined in the Restructuring Support Agreement) through the 1113/1114 Process, either through negotiations with the unions and retirees, or by rejection under section 1113 of the Bankruptcy Code and termination or modification of retiree benefits under 1114 of the Bankruptcy Code, by December 9, 2015;

- The Bankruptcy Court shall have confirmed the Plan by January 13, 2016.

Pursuant to the terms of the Restructuring Support Agreement, if the Company is unable to meet these milestones, among others: the Debtors must withdraw the Plan and exclusively use their best efforts to pursue and consummate the 363 Sale. The Restructuring Support Agreement requires the Debtors to pursue the 363 Sale Process concurrently with their efforts to confirm the Plan. Specifically, the Restructuring Support Agreement requires the Debtors to meet the following additional milestones in respect of the 363 Sale:

- The Bankruptcy Court shall have entered an order approving the bidding procedures in connection with the 363 Sale by September 30, 2015; and

- The 363 Sale shall have been substantially consummated by February 3, 2016.

The Restructuring Support Agreement also requires the Debtors to comply with certain milestones in respect of their efforts to obtain cost savings through negotiations with their unions and retirees and, if necessary, the 1113/1114 Process. The key milestones related to the 1113/1114 Process are as follows:

- The Debtors must have filed motion(s) seeking the approval of settlement(s) with respect to the Collective Bargaining Agreements entered into with representatives of the UMWA and/or USW employees, or, if no such motion(s) have been filed, a motion under section 1113 of the Bankruptcy Code seeking the rejection of Collective Bargaining

Agreements of the Company with the UMWA and the USW by October 21, 2015;

- The Debtors must have filed a motion seeking a settlement with each Retiree Group (as set forth in the RSA), or, if no such motion has been filed, a motion under section 1114 of the Bankruptcy Code with respect to "retiree benefits" being received by the UMWA retirees, USW retirees and nonunion retirees, by October 21, 2015;

- The Bankruptcy Court shall have approved a Labor Settlement or Retiree Settlement (as defined in the RSA) by November 11, 2015; and

- The Bankruptcy Court shall have approved any motions filed pursuant to section 1113 or 1114 of the Bankruptcy Code by December 9, 2015.

If the Debtors are unable to achieve sufficient cost savings through these efforts, the Restructuring Support Agreement requires the Debtors to withdraw the Plan and exclusively use their best efforts to pursue and consummate the 363 Sale.

## ARTICLE V

## THE CHAPTER 11 CASES

### A. Significant "First Day" Motions

On the Petition Date, the Debtors filed various "first day" motions seeking authority to, among other things: (i) pay prepetition compensation, benefits and reimbursable employee expenses; (ii) continue certain workers' compensation programs and insurance policies; (iii) continue certain customer practices and programs; (iv) substantially maintain their existing bank accounts and continue the Company's integrated cash management system; (v) pay certain prepetition claims of shippers and warehousemen; (vi) pay prepetition claims of certain critical vendors; (vii) prohibit utility companies from discontinuing, altering or refusing service; (viii) retain the Solicitation Agent to serve as the Debtors' claims, noticing, soliciting and balloting agent; and (ix) continue the Debtors' surety bond program. The Bankruptcy Court held hearings on such motions on the Petition Date. All of the Debtors' first day motions were approved by the Bankruptcy Court in substantially the manner requested by the Debtors. Among other things, the Bankruptcy Court granted the Debtors authority, in their discretion, to continue prepetition practices with respect to their consolidated cash management system, and to satisfy certain obligations with respect to their insurance policies and taxes [Docket Nos. 60, 62, 68]. The Debtors were also granted interim authority to pay certain prepetition claims, including up to $5.7 million for critical vendors and up to $8.7 million for prepetition shipping, storage, or other services [Docket Nos. 70, 71].

The Bankruptcy Court also granted the Debtors authority to pay and honor prepetition wages, workers compensation, and other compensation related obligations,

59

including holiday pay, paid time off obligations, and other reimbursable employee expenses [Docket Nos. 17, 61]. On July 28, 2015, the Bankruptcy Court entered a supplemental order authorizing the debtors to pay certain bonus and severance obligations [Docket No. 218]. Furthermore, on August 19, 2015, the Bankruptcy Court granted stay relief to the extent necessary to allow prepetition workers' compensation and Black Lung claims to proceed against the Debtors [Docket No. 508].

On August 18, 2015, the Bankruptcy Court held a final hearing on certain first-day motions for which only interim approval was requested by the Debtors at the first-day hearings. In particular, the Bankruptcy Court entered final orders authorizing the Debtors to maintain their surety bond program and approved procedures for providing adequate assurance of payment to the Debtors' utilities [Docket Nos 505, 506].

At the request of the Creditors' Committee, the Debtors consented to continuing the final hearings on certain first-day motions, including the Debtors' motions to approve their use of cash collateral and the payment of certain prepetition claims of the Debtors' critical vendors, shippers, storage providers, and service providers. The Bankruptcy Court has scheduled the continued final hearing on these matters for September 2, 2015.

**B.      Retention Applications**

The Debtors have filed applications to retain various professionals (collectively, the "Employment Applications") in connection with the prosecution and administration of their Chapter 11 Cases, as well as the operation of their day-to-day businesses. Among the professionals the Debtors seek to retain are: (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP and Bradley Arant Boult Cummings LLP, as bankruptcy co-counsel; (ii) Ogletree, Deakins, Nash, Smoak & Stewart, P.C., as special labor counsel; (iii) Maynard Cooper & Gale PC, as special litigation and corporate counsel; (iv) Blackstone Advisory Partners, L.P. ("Blackstone"), as investment banker; (v) AlixPartners, LLP, as restructuring advisor; (vi) Ernst & Young, LLP, as auditors and tax advisors; and (vii) KPMG LLP as tax, valuation, accounting and bankruptcy administration advisors. The hearing on the Employment Applications is scheduled for September 2, 2015.

In addition to the Debtors' filing of the Employment Applications for specific professionals, the Bankruptcy Court has approved certain procedures by the Debtors for the retention and compensation of other professionals in the ordinary course of business [Docket No. 507].

**C.      Cash Collateral Motion**

On the Petition Date, the Debtors filed a motion (the "Cash Collateral Motion") with the Bankruptcy Court to obtain authorization to, among other things, use the cash collateral in which the Prepetition Secured Parties have perfected liens and security interests (collectively, the "Cash Collateral") and to provide adequate protection to the Prepetition Secured Parties for the use thereof.

60

In consideration of the Debtors' use of Cash Collateral and to ensure that the Prepetition Secured Parties are adequately protected, the Cash Collateral Motion requested, among other things, that the Prepetition Secured Parties (i) be granted replacement liens on all real and personal property of the Debtors and their estates (including, subject to entry of the final order approving the Cash Collateral Motion, proceeds of avoidance actions arising under chapter 5 of the Bankruptcy Code), subject only to designated carve-out for funding of certain administrative expenses and certain permitted liens, (ii) be paid, in cash, accrued but unpaid interest due as of the Petition Date as well as postpetition interest, which postpetition interest is calculated at 80% of the applicable non-default rate, pursuant to the terms of the applicable first lien debt documents, and (iii) be granted superpriority administrative expense claims against the Debtors on account of any diminution in value of the Prepetition Secured Parties' collateral under section 507(b) of the Bankruptcy Code.

At the first-day hearings held on the Petition Date, the Bankruptcy Court entered an interim order approving the Cash Collateral Motion (the "Interim Cash Collateral Order"), pursuant to which the Debtors received interim approval to use the Cash Collateral in accordance with the terms of the Interim Cash Collateral Order and the consolidated cash collateral budget attached to the Interim Cash Collateral Order (as such budget is amended in accordance with the terms of the Interim Cash Collateral Order and any related final order, the "Cash Collateral Budget"). Under the terms of the Cash Collateral Motion and the Interim Cash Collateral Order, the Debtors' ability to use Cash Collateral terminates upon the occurrence of certain triggering events, including, without limitation, (i) conversion or dismissal of the Chapter 11 Cases, (ii) failure to comply with the Cash Collateral Budget, (iii) termination of the Restructuring Support Agreement, and (iv) confirmation of the Plan or consummation of the 363 Sale.

As set forth above, the Bankruptcy Court has scheduled a final hearing on the Cash Collateral Motion for September 2, 2015.

### D. Motion to Approve the Restructuring Support Agreement

As discussed above in Article I.B., on the Petition Date, the Debtors filed a motion to assume the Restructuring Support Agreement under section 365 of the Bankruptcy Code [Docket No. 44] (the "RSA Assumption Motion"). The terms of the Restructuring Support Agreement are discussed generally in Article IV.F above. The RSA Assumption Motion is currently scheduled to be heard by the Bankruptcy Court on September 2, 2015. The UMWA and the Dominion Trust have filed objections to the RSA Assumption Motion, with certain other parties joining in those objections.

### E. Appointment of Creditors' Committee

On July 30, 2015, the Bankruptcy Administrator for the Northern District of Alabama (the "Bankruptcy Administrator"), appointed the Creditors' Committee in the Chapter 11 Cases consisting of eleven members [Docket No. 268]. On August 4, 2015, following the hearing and entry of an order by the Bankruptcy Court on the PBGC's motion for an order to add the PBGC to the Creditors' Committee, the Bankruptcy Administrator

61

amended its notice of appointment to add the PBGC and Nelson Brothers, LLC to the Creditors' Committee [Docket No. 342].

### F. Appointment of Retiree Committee

On the Petition Date, the Debtors filed a motion (the "Retiree Committee Motion") [Docket No. 48] requesting, among other things, that the Bankruptcy Court appoint an official committee of retirees pursuant to sections 1114(c)(2) and 1114(d) of the Bankruptcy Code to act as the sole authorized representative of all non-union retirees formerly employed by one or more of the Debtors (the "Retiree Committee"). The Debtors filed the Retiree Committee Motion to facilitate prompt negotiations regarding certain benefits paid by the Debtors to or for the benefit of their retirees, as the modification of such benefits is critical to the Debtors' reorganization efforts. At a hearing held on July 28, 2015, the Bankruptcy Court granted the Retiree Committee Motion and entered an order approving the same (the "Retiree Committee Order") [Docket No. 264]. The Retiree Committee Order provides for the appointment of both the UMWA and the USW to the Retiree Committee as the authorized representative for the retirees they respectively represent. On August 24, 2015, The Bankruptcy Administrator filed the "Appointment of Committee of Retired Employees" [Docket No. 541], appointing additional persons to serve on the Retiree Committee with the UMWA and the USW. The Debtors will meet and confer with such committee and its representatives regarding the Chapter 11 Cases, the Plan, and the modification of the Debtors' obligations to the retirees.

### G. Meeting of Creditors

The Debtors and the Bankruptcy Administrator agreed to hold an initial meeting of creditors under section 341 of the Bankruptcy Code on August 20, 2015. The Debtors' representative, Debtors' counsel, and the Bankruptcy Administrator appeared at the initial meeting of creditors, at which the Bankruptcy Administrator continued the meeting until September 10, 2015.

### H. The Debtors' Bankruptcy Schedules and Statements of Financial Affairs

The Debtors intend to file their Bankruptcy Schedules and Statements by August 28, 2015.

### I. Bar Date Motion

On August 12, 2015, the Debtors filed *Debtors' Motion for an Order (A) Establishing Bar Dates for Filing Prepetition Proofs of Claim, Including Section 503(b)(9) Claims, (B) Approving the Form and Manner of Notice Thereof and (C) Granting Related Relief* [Docket No. 453] (the "Bar Date Motion"). Pursuant to the Bar Date Motion, the Debtors requested that the Bankruptcy Court set October 12, 2015 at 4:00 p.m. prevailing central time as the deadline for any person or entity holding a prepetition Claim against the

Debtors to file a written proof of claim with the Solicitation Agent. The Bankruptcy Court has scheduled the hearing on the Bar Date Motion for September 2, 2015.

### J. The Dominion Trust Adversary Proceeding

On August 11, 2015, the Dominion Trust filed a complaint and application for preliminary and permanent injunction against WBWB (the "Dominion Trust AP Complaint") seeking (i) declaratory relief that the Dominion Trust Asserted Interest is not property of WBWB's bankruptcy estate; and (ii) a preliminary injunction prohibiting WBWB from commingling the funds attributable to the Dominion Trust Asserted Interest with other funds of the Debtors, encumbering said funds, or refusing to pay them to the Dominion Trust. The Dominion Trust also sought a temporary restraining order (the "Dominion Trust TRO Application") in connection therewith.

The Dominion Trust's central argument in support of the relief sought in the Dominion Trust AP Complaint and the Dominion Trust TRO Application is that the Dominion Trust Asserted Interest is a real property interest of the Dominion Trust, and therefore not property of the Debtors' estate under section 541 of the Bankruptcy Code, and that the Debtors therefore have no right to encumber the funds associated with the Dominion Trust Asserted Interest, commingle them with other funds that belong to the Debtors, or refuse to pay them to the Dominion Trust. The Debtors dispute the Dominion Trust's characterization of the Dominion Trust Asserted Interest.

WBWB filed an opposition to the Dominion Trust TRO Application, as did the Steering Committee, which intervened in the adversary proceeding. On August 18, 2015, the Bankruptcy Court denied the Dominion Trust TRO Application and set the Dominion Trust AP Complaint for status conference on September 29, 2015 at 10:00 a.m. The Debtors intend to defend against the allegations set forth in the Dominion Trust AP Complaint.

## ARTICLE VI

## SUMMARY OF THE PLAN

**THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN. THE SUMMARY OF THE PLAN CONTAINED HEREIN IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN.**

### A. Classification and Treatment of Claims and Interests

#### 1. General

Only administrative expenses, claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan. An "allowed" administrative expense, claim or equity interest simply means that the debtors agree, or in the event of a dispute, that the Bankruptcy Court determines, that the administrative expense, claim or interest,

including the amount thereof, is in fact a valid obligation of, or interest in, the Debtors. Section 502(a) of the Bankruptcy Code provides that a timely filed administrative expense, claim or interest is automatically "allowed" unless the debtor or another party in interest objects. However, section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in a bankruptcy case even if a proof of claim is filed. These include, without limitation, claims that are unenforceable under the governing agreement or applicable non bankruptcy law, claims for unmatured interest on unsecured and/or undersecured obligations, property tax claims in excess of the debtor's equity in the property, claims for certain services that exceed their reasonable value, nonresidential real property lease and employment contract rejection damage claims in excess of specified amounts, and late filed claims. In addition, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim or equity interest that either is not listed on the debtor's schedules or is listed as disputed, contingent, or unliquidated if the holder has not filed a proof of claim or equity interest before the deadline to file proofs of claim and interests.

The Bankruptcy Code also requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against, and equity interests in, the Debtors into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together, as are interests of a substantially similar legal nature. Because an entity may hold multiple claims and/or interests which give rise to different legal rights, the holders of such claims and/or equity interests may find themselves as members of multiple classes of claims and/or equity interests.

Under a chapter 11 plan, the separate classes of claims and interests must be designated either as "impaired" (altered by the plan in any way) or "unimpaired" (unaltered by the plan). If a class of claims or interests is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims or interests, such as the right to vote on the plan (unless the plan provides for no distribution to the holder, in which case, the holder is deemed to reject the plan), and the right to receive an amount under the chapter 11 plan that is not less than the value that the holder would receive if the debtor were liquidated under chapter 7. Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless, with respect to each claim or interest of such class, the plan (i) does not alter the legal, equitable or contractual rights of the holders of such claims or interests or (ii) irrespective of the holders' right to receive accelerated payment of such claims or interests after the occurrence of a default, cures all defaults (other than those arising from, among other things, the debtor's insolvency or the commencement of a bankruptcy case), reinstates the maturity of the claims or interests in the class, compensates the holders of such claims or interests for any damages incurred as a result of their reasonable reliance upon any acceleration rights and does not otherwise alter their legal, equitable or contractual rights. Typically, this means that the holder of an unimpaired claim will receive on the later of the effective date of the plan of reorganization or the date on which amounts owing are due and payable, payment in full, in cash, with post-petition interest to the extent permitted and provided under the governing agreement between the parties (or, if there is no agreement, under applicable non bankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms. Thus, other than its right

to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the same position it would have been in had the debtor's case not been commenced.

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, the following designates the Classes of Claims and Interests under the Plan. A Claim or Interest is in a particular Class for purposes of voting on, and of receiving Distributions pursuant to, the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date. A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. All Claims and Interests, except Administrative Claims, Priority Tax Claims and Fee Claims, are placed in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims and Fee Claims have not been classified, although the treatment of such Claims is set forth in the Plan and summarized below.

As summarized in Article II of the Plan, the Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only. The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

## 2. Unclassified Claims

(a) Administrative Claims

(i) Administrative Claims in General

Except with respect to Administrative Claims that are Fee Claims or Priority Tax Claims, and unless a Holder of an Allowed Administrative Claim (including a Claim arising under section 503(b)(9) of the Bankruptcy Code that has not been paid pursuant to a motion filed with the Bankruptcy Court) and the Debtors agree to a less favorable treatment, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction of such Administrative Claim, Cash equal to the Allowed amount of such Administrative Claim on the later to occur of (i) the Initial Distribution Date under the Plan, (ii) the date such Administrative Claim is Allowed, or as soon thereafter as is practicable, (ii) the date such Allowed Administrative Expense Claim becomes due and payable, or (iv) on such other date as the Bankruptcy Court may order or to which the Debtors (or the Reorganized Debtors) and the Holder of such Administrative Claim may agree; provided, however, that Allowed Administrative Claims that arise in the ordinary course of the Debtors' business, including Administrative Claims arising from or with respect to the sale of goods or services on or after the Petition Date, Executory Contracts and Unexpired Leases, and all Administrative Claims that are Intercompany Claims, shall be paid or otherwise satisfied in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such

65

transactions, without further action by the Holders of such Administrative Claims or further approval by the Bankruptcy Court.

(ii)     Statutory Fees

All fees payable pursuant to 28 U.S.C. § 1930 after the Effective Date shall be paid by the applicable Reorganized Debtor in accordance therewith until the earlier of the conversion or dismissal of the applicable Chapter 11 Case under section 1112 of the Bankruptcy Code or the closing of the applicable Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code.

(iii)    Pre-Effective Date Professional Fee and Expense Claims

All final requests for payment of Fee Claims must be filed with the Bankruptcy Court and served on the Reorganized Debtors and the Office of the Bankruptcy Administrator for the Northern District of Alabama no later than sixty (60) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and any prior orders of the Bankruptcy Court, the Allowed amounts of such Fee Claims shall be determined by the Bankruptcy Court; provided, however, that any party who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order without further Bankruptcy Court review or approval (except as otherwise provided in the Ordinary Course Professionals Order). Objections to any Fee Claim must be filed and served on the Reorganized Debtors and the requesting party no later than ninety (90) days after the Effective Date.

(iv)    Post-Effective Date Professionals' Fee and Expense Claims

Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented fees and expenses of the Professionals on or after the Effective Date, in each case, related to implementation and consummation of the Plan. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or any order of the Bankruptcy Court entered before the Effective Date governing the retention of, or compensation for services rendered by, Professionals after the Effective Date shall terminate, and the Reorganized Debtors may employ or pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

66

(v)     Bar Date for Administrative Claims

Except as otherwise provided in the Plan, requests for payment of Administrative Claims must be filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order no later than thirty (30) days after the Effective Date.  Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be filed and served on the Reorganized Debtors and the requesting party no later than sixty (60) days after the Effective Date.

(b)     Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtors agree to a less favorable treatment, each Holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Reorganized Debtors, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Priority Tax Claim, either: (i) Cash in an amount equal to such Allowed Priority Tax Claim on the later of the Initial Distribution Date and the date such Claim becomes an Allowed Claim (or as soon thereafter as is practicable); (ii) through equal annual installment payments in Cash, of a total value, as of the Effective Date, equal to the Allowed amount of such Claim, over a period ending not later than five (5) years after the Petition Date; or (iii) treatment in a manner not less favorable than the most favored nonpriority Unsecured Claim provided for by the Plan.

3.     **Classified Claims and Interests**

(a)     Class 1 – First Lien Undrawn Revolving Claims

Class 1 consists of all First Lien Undrawn Revolving Claims. ("Class 1 Claims").  The First Lien Undrawn Revolving Claims shall be Allowed in the aggregate amount of US$50,688,432.80 and C$24,070,494.00 less the aggregate amount of any Letters of Credit that have been drawn after the Petition Date and prior to the Effective Date.

In full and final satisfaction, settlement, release and discharge of each First Lien Undrawn Revolving Claim, each Holder of an Allowed First Lien Undrawn Revolving Claim shall have its Allowed First Lien Undrawn Revolving Claim either (x) if such Holder consents, reinstated in its Face Amount as part of a letter of credit facility under the Exit Financing, and the First Lien Undrawn Revolving Claim commitments related thereto (if any) shall be canceled on the Effective Date, or (y) replaced in full by letters of credit issued under the Exit Financing or issued by a bank that is not part of the Exit Financing, and the Letters of Credit related to such First Lien Undrawn Revolving Claims shall be canceled; provided that, for the avoidance of doubt, if the relevant issuing bank of any Letter of Credit does not agree to reinstate (or roll-over) such Letter of Credit as part of a new letter of credit facility (including the Exit Financing), such Letter of Credit shall be cancelled and replaced.

67

Class 1 Claims are Unimpaired under the Plan. Holders of Allowed First Lien Undrawn Revolving Claims in Class 1 are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

(b)     Class 2 – First Lien Other Debt Claims

Class 2 consists of all First Lien Other Debt Claims ("Class 2 Claims"). Class 2 Claims shall be Allowed in the aggregate amount of $1,979,708,980.25, plus the amount of any First Lien Funded Revolving Claims plus, to the extent the following are payable in accordance with the First Lien Credit Agreement Documents and First Lien Note Documents, fees (including any prepayment fees), expenses, penalties, premiums and other obligations incurred in connection with First Lien Debt Claims.

Each Holder of an Allowed First Lien Other Debt Claim shall receive, on the Effective Date, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Allowed First Lien Other Debt Claim, its Pro Rata Share of the First Lien Stock Distribution, subject to Dilution. Immediately upon the Effective Date, except as otherwise provided in Sections 6.3 and 6.7, the First Lien Other Debt Claims shall be cancelled and extinguished, and all Liens, encumbrances and security interests securing such First Lien Other Debt Claims shall be released and forever discharged, without limitation, and without any further action by any party.

Class 2 Claims are Impaired under the Plan. Holders of Allowed First Lien Other Debt Claims in Class 2 are entitled to vote to accept or reject the Plan.

(c)     Class 3 – Second Lien Note Claims

Class 3 consists of all Second Lien Note Claims ("Class 3 Claims"). Second Lien Note Claims shall be allowed in the aggregate principal amount of $360,500,000.00, plus accrued and unpaid interest of $11,976,611, plus, to the extent the following are payable in accordance with the Second Lien Note Documents, fees (including any prepayment fees), expenses, penalties, premiums and other obligations incurred in connection with Second Lien Note Claims. Treatment [TBD].

Immediately upon the Effective Date, Second Lien Note Claims shall be discharged and cancelled and all Liens, encumbrances and security interests securing such Second Lien Note Claims shall be released and forever discharged, without limitation, and without any further action by any party.

Class 3 Claims are Impaired under the Plan.

(d)     Class 4 – Other Secured Claims

Class 4 consists of all Other Secured Claims ("Class 4 Claims"). Except to the extent that a Holder of an Allowed Other Secured Claim agrees with the Debtors, which agreement shall be subject to the consent of the Required Consenting First Lien Creditors, or

68

the Reorganized Debtors, in writing to less favorable treatment, in full and final satisfaction, settlement release and discharge of, and in exchange for, such Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall either (i) be reinstated and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the Holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, (ii) receive Cash in an amount equal to such Allowed Other Secured Claim as determined in accordance with section 506(a) of the Bankruptcy Code, on the later of (A) the Initial Distribution Date and (B) thirty (30) days after the date such Other Secured Claim becomes an Allowed Other Secured Claim (or as soon thereafter as is practicable), or (iii) receive the Collateral securing its Allowed Other Secured Claim on the later of (A) the Initial Distribution Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim (or as soon thereafter as is practicable), in each case as determined by the Debtors and consented to by the Required Consenting First Lien Creditors. Although all Other Secured Claims have been placed into Class 4 for purposes of nomenclature, each Other Secured Claim, to the extent secured by a Lien on Collateral different than that securing any Other Secured Claim, shall be treated as being in a separate sub-Class for the purpose of receiving Distributions under the Plan.

Class 4 Claims are Unimpaired under the Plan. Holders of Allowed Other Secured Claims in Class 4 are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

(e)     Class 5 – Other Priority Claims

Class 5 consists of all Other Priority Claims ("Class 5 Claims").

Except to the extent that a Holder of an Allowed Other Priority Claim and the Debtors agree to less favorable treatment, in full and final satisfaction, settlement release and discharge of, and in exchange for, such Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall be paid in full in Cash on (i) the later of the Initial Distribution Date and (ii) thirty (30) days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim; provided, however, that Other Priority Claims that arise in the ordinary course of the Debtors' business and are not due and payable on or before the Effective Date shall be paid in such ordinary course of business in accordance with the terms thereof.

Class 5 Claims are Unimpaired under the Plan. Holders of Allowed Other Priority Claims in Class 5 are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

(f)     Class 6 – Unsecured Claims

Class 6 consists of all Unsecured Claims ("Class 6 Claims"), including, without limitation, Unsecured Note Claims, First Lien Deficiency Claims, Second Lien

69

Deficiency Claims, OPEB Claims, if applicable, claims arising from the Company's withdrawal from the UMWA 1974 Multiemployer Pension Plan, any other unsecured labor-related claims and unsecured trade claims.  Treatment [TBD].

Immediately upon the Effective Date, the Unsecured Claims shall be discharged and cancelled and shall be of no force and effect.   Class 6 Claims are Impaired under the Plan.

(g)     Class 7 – Intercompany Claims and Intercompany Interests

Class 7 consists of all Intercompany Claims and Intercompany Interests ("Class 7 Claims").

Except as otherwise provided in the Plan or the Restructuring Support Agreement, on the Effective Date, each Intercompany Claim and Intercompany Interest shall, at the option of the Reorganized Debtors, be either (i) reinstated, (ii) released, waived, and discharged, (iii) treated as a dividend, or (iv) contributed to capital or exchanged for equity of a subsidiary of Walter Energy.

Class 7 Claims and Interests are Unimpaired under the Plan.  Holders of Intercompany Claims and Intercompany Interests are presumed to have accepted the Plan and will not be entitled to vote to accept or reject the Plan.

(h)     Class 8 – Old Common Stock Claims and Old Common Stock

Class 8 consists of all Old Common Stock Claims and Old Common Stock ("Class 8 Claims").

Holders of Class 8 Claims shall not receive any Distribution under the Plan on account of such Class 8 Claims.  On the Effective Date, Class 8 Claims shall be discharged, cancelled and extinguished and shall be of no further force and effect.  Class 8 Claims and Interests are Impaired under the Plan.

Holders of Class 8 Claims are presumed to reject the Plan and are not entitled to vote to accept or reject the Plan.

4.     **Enforcement of Subordination Provisions**

In accordance with and pursuant to section 510(a) of the Bankruptcy Code and the Intercreditor Agreement, all Distributions to Holders of Second Lien Debt Claims and Second Lien Deficiency Claims under the Plan shall be made directly to Holders of First Lien Debt Claims in accordance with and subject to the Intercreditor Agreement until all First Lien Debt Claims are paid in full in Cash, and only thereafter to Holders of Second Lien Note Claims and Second Lien Deficiency Claims.

70

B. **Voting and Distributions**

1. **Voting of Claims**

Each Holder or beneficial Holder of an Allowed Claim in an Impaired Class of Claims that is entitled to vote on the Plan pursuant to Article II of the Plan shall be entitled to vote separately to accept or reject the Plan as provided in such order as is entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.

(a)     Non-Consensual Confirmation

Since there is at least one (1) Class of Claims or Interests that is deemed to reject the Plan, the Debtors hereby seek to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code.

(b)     Deemed Acceptance if No Votes Cast

If no Holders of Claims or Interests eligible to vote in a particular Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the Holders of such Claims or Interests in such Class.

(c)     Elimination of Vacant Classes

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

2. **Designation of Reorganized Debtors to Make Distributions**

(a)     Distributions by the Reorganized Debtors

The Reorganized Debtors or any Disbursing Agent acting on their behalf shall make all Distributions required to be made under the Plan, provided however, that with respect to any Holder of a Claim whose Claim is governed by an agreement and is administered by a Servicer, such Distributions shall be deposited with or made to the appropriate Servicer, as applicable, who shall act as Disbursing Agent and deliver such Distributions to the Holders of such Claims in accordance with the provisions of the Plan and the terms of any governing agreement; provided, further, that the Bank Agent and the First Lien Notes Indenture Trustee shall not have any obligation to act as a Disbursing Agent with respect to any Distributions in the form of equity interests (including the disbursement of any New Walter Energy Common Stock).  No Disbursing Agent or Servicer shall be required to give any bond or surety or other security for the performance of its duties.

71

(b)     The Rights and Powers of the Reorganized Debtors

The Reorganized Debtors shall (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform their duties under the Plan and the Plan Supplement Documents, (ii) make all applicable Distributions or payments contemplated hereby and thereto, (iii) be empowered to employ professionals to represent them with respect to their responsibilities and (iv) be empowered to exercise such other powers as may be vested in the Reorganized Debtors by order of the Bankruptcy Court (including any order issued after the Effective Date), pursuant to the Plan, or as deemed by the Reorganized Debtors to be necessary and proper to implement the provisions of the Plan.

(c)     Expenses Incurred by the Disbursing Agent and Servicers

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent and each Servicer that is delivering Distributions hereunder, on or after the Effective Date (including, without limitation, reasonable attorney and other professional fees and expenses) shall be paid in Cash by the Reorganized Debtors without the need for application to or further order of the Bankruptcy Court.

3.     **Distributions on Account of Claims Allowed as of the Effective Date**

(a)     Delivery of Distributions in General

Except as otherwise provided in the Plan, a Final Order, or as otherwise agreed to by the relevant parties, the Disbursing Agent shall make the Initial Distribution on the Initial Distribution Date to Holders of Allowed Claims and subsequent Distributions (if any) on Interim Distribution Dates and the Final Distribution Date, as applicable.

(b)     Delivery of Distributions to Servicers

In the case of Holders of Claims whose Claims are governed by an agreement and administered by a Servicer, the respective Servicer shall be deemed to be the Holder of such Claims for purposes of receiving Distributions from the Distributing Agent under the Plan. Subject to the second proviso in Section 3.2(a) of the Plan, the Distributing Agent shall make all Distributions on account of such Claims to the Servicers or as directed by the Servicers. The Servicers shall hold or direct such Distributions for the benefit of Holders of such Allowed Claims, as applicable; provided however, each Servicer shall retain all rights under its respective agreement in connection with delivery of distributions to Holders of such Claims; and provided further, however, that the Debtors' obligations to make Distributions in accordance with the Plan shall be deemed satisfied upon delivery of Distributions to each Servicer or the entity or entities designated by the Servicers.

## 4. Miscellaneous Distribution Provisions

### (a) Record Date

All Distributions on account of Allowed Claims shall be made to the Record Holders of such Claims. As of the close of business of the Record Date, the Claims register maintained by the Claims and Noticing Agent shall be closed, and there shall be no further changes regarding the Record Holder of any Claim. The Reorganized Debtors, the Servicers and any Disbursing Agents shall have no obligation to recognize any transfer of any Claim occurring after the Record Date. The Reorganized Debtors, the Servicers and any Disbursing Agents shall instead be entitled to recognize and deal for all purposes under the Plan solely with the Record Holders. Notwithstanding the foregoing, if a Claim or Interest, other than one based on a publicly traded certificate, is transferred less than 20 days before the Effective Date, the Disbursing Agent shall make distributions to the transferee only to the extent practical and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor. As of the close of business on the Record Date, the transfer ledgers for the Servicers shall be deemed closed, and the Servicers may take whatever action is necessary to close the transfer ledgers and there shall be no further transfers or changes in the Record Holders of such securities in such transfer ledgers; provided that the Record Date shall not apply to any Distributions made through Cede & Co. PLEASE NOTE THAT IF YOU ACQUIRE A CLAIM FOLLOWING THE RECORD DATE, YOU WILL NOT RECEIVE A DISTRIBUTION FROM THE DEBTORS OR THE REORGANIZED DEBTORS ON ACCOUNT OF SUCH CLAIM. IN ADDITION, IF YOU SELL OR TRANSFER YOUR CLAIM BEFORE THE RECORD DATE, YOU WILL NOT RECEIVE A DISTRIBUTION ON ACCOUNT OF SUCH CLAIM.

### (b) Delivery of Distributions

Distributions to Holders of Allowed Claims shall be made by the Disbursing Agent or the appropriate Servicers, as applicable, (i) at the addresses set forth on the Proof of Claim filed by such Holders of Claims or at the last known addresses of such Holders of Claims if no Proof of Claim is filed or if the Debtor has been notified in writing of a change of address), (ii) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim, (iii) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Disbursing Agent has not received a written notice of a change of address, or (iv) in the case of a Holder of a Claim whose Claim is governed by an agreement and administered by a Servicer, at the addresses contained in the official records of such Servicer. The Debtor, the Reorganized Debtor, any Servicer and the Disbursing Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan.

### (c) Undeliverable Distributions

If any Distribution to a Holder of a Claim is returned as undeliverable, no further Distributions to such Holder of such Claim shall be made unless and until the

73

Disbursing Agent or the appropriate Servicer is notified of the then-current address of such Holder of the Claim, at which time all missed Distributions shall be made to such Holder of the Claim without interest, dividends, or accruals of any kind on the next Interim Distribution Date. Amounts in respect of undeliverable distributions shall be returned to the Reorganized Debtor until such Distributions are claimed or become Unclaimed Property.

(d)     No Interest

Except as specifically provided for in the Plan, no Claims (including Administrative Claims), Allowed or otherwise, shall be entitled, under any circumstances, to receive any interest on such Claim under the Plan.

(e)     Foreign Currency Exchange Rate

Except as specifically provided for in the Plan or an order of the Bankruptcy Court, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the then applicable noon spot rate for such non-U.S. currency as of the Petition Date for all purposes under the Plan, including voting, allowance and distribution.

(f)     Fractional Plan Securities and De Minimis Distributions

Notwithstanding any other provision of the Plan, only whole numbers of shares of New Walter Energy Common Stock shall be issued. When any Distribution on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Walter Energy Common Stock that is not a whole number, the actual Distribution of such shares shall be rounded to the next higher or lower whole number of shares as follows: (i) fractions equal to or greater than one-half (½) shall be rounded to the next higher whole number; and (ii) fractions less than one-half (½) shall be rounded to the next lower number. No consideration shall be provided in lieu of fractional shares that are rounded down.

The Debtors or the Reorganized Debtors, as the case may be, shall not be required to, but may in their sole and absolute discretion, make Cash Distributions to any Holder of a Claim in an amount less than $25. In addition, the Debtors and the Reorganized Debtors shall not be required to, but may in their sole and absolute discretion, make any payment on account of any Claim in the event that the costs of making such payment exceeds the amount of such payment.

(g)     Fractional Cents

Any other provision of the Plan notwithstanding, no Cash Distribution of fractional cents will be made. Whenever any Cash Distribution of a fraction of a cent would otherwise be called for, the actual Cash Distribution shall reflect a rounding down of such fraction to the nearest whole cent.

(h)       Distributions on Non-Business Days

Any payment or Distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day.

(i)       Partial Distributions on Disputed Claims

No payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order of the Bankruptcy Court, and the Disputed Claim has become an Allowed Claim.

(j)       Disputed Payments

If any dispute arises as to the identity of the Holder of an Allowed Claim entitled to receive any Distribution under the Plan, the Reorganized Debtors may retain such Distribution until its disposition is determined by a Final Order or written agreement among the interested parties to such dispute.

(k)       Unclaimed Property

Holders of Allowed Claims to Unclaimed Property shall cease to be entitled thereto, and such Unclaimed Property shall revert to the Reorganized Debtors, and to the extent such Unclaimed Property constitutes New Walter Energy Common Stock, such New Walter Energy Common Stock shall revert to Reorganized Walter and shall be deemed treasury shares thereof.

(l)       Voting of New Walter Energy Common Stock

New Walter Energy Common Stock that is Unclaimed Property or reserved for Disputed Claims shall be voted by the Disbursing Agent at any meeting of the stockholders of Reorganized Walter Energy in an equal proportion to the votes of other stockholders.  For the avoidance of doubt, no Servicer shall be obligated to vote any New Walter Energy Common Stock that is Unclaimed Property or reserved for Disputed Claims.

(m)       Post-Consummation Effect of Evidence of Claims or Interests

Notes, stock certificates and other evidence of Claims against or Interests in the Debtors shall, effective on the Effective Date, represent only the right to participate in the Distributions contemplated by the Plan and shall not be valid or effective for any other purpose.

(n)       Setoffs and Recoupment

The Reorganized Debtors may, but shall not be required to, setoff or recoup against any Allowed Claim and the Distributions to be made pursuant to the Plan on account

75

of such Claim, any Claims that the Debtors or Reorganized Debtors may have against the Holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim against the Debtors or the Reorganized Debtors shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any setoff or recoupment claim that the Debtors or the Reorganized Debtors may possess against such Holder.

(o)      Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all Distributions pursuant to the Plan that may be necessary or appropriate to comply with such withholding and reporting requirements. Notwithstanding any other provision of the Plan, each Person that has received any Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligation imposed by any governmental unit, including income, withholding and other tax obligations, on account of such Distribution. Any party issuing any instrument or making any Distribution under the Plan has the right, but not the obligation, not to make a Distribution until such Holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such withholding Tax obligations and, if any party issuing any instrument or making any Distribution under the Plan fails to withhold with respect to any such Holder's Distribution, and is later held liable for the amount of such withholding, such Holder shall reimburse such party promptly upon demand therefor. The Disbursing Agent and any Servicer may require, as a condition to the receipt of a Distribution, that a Holder complete the appropriate Form W-8 or Form W-9, as applicable to each Holder. If a Holder fails to comply with such a request within six (6) months, such Distribution shall be deemed an unclaimed Distribution.

(p)      Expungement or Adjustment to Claims

Any Claim that has been paid, satisfied or superseded may be expunged on the claims register by the Claims and Noticing Agent, the Debtors or the Reorganized Debtors, as applicable, and any Claim that has been amended may be adjusted thereon by the Claims and Noticing Agent, the Debtors or the Reorganized Debtors, as applicable, without a Claim objection.

(q)      Insured Claims

Notwithstanding anything to the contrary in the Plan, any Allowed Insured Claim shall first be paid from proceeds of the applicable Debtors' insurance policy, with the balance, if any, of such Claim being treated in accordance with the provisions of the Plan governing the Class applicable to such Claim.

(r)      Allocation of Plan Distribution Between Principal and Interest

Except as otherwise required by law (as reasonably determined by the Debtors), distributions with respect to a Claim shall be allocated first to the principal portion

76

of such Claim (as determined for U.S. federal income tax purposes) and, thereafter, to the remaining portion of such Claim, if any.

## C.    Procedures for Determination of Claims and Interests

### 1.    Objections to Claims

Objections to any Claim filed by any party other than the Debtors (other than Administrative Claims governed by Section 2.4 of the Plan) must be filed no later than twenty (20) days before the Effective Date; provided, however, that the Reorganized Debtors and only the Reorganized Debtors may file objections to Claims subsequent to the Effective Date through and including the Claims Objection Deadline.  To the extent property is distributed to a Person on account of a Claim that is not an Allowed Claim, such property shall be held in trust for and shall promptly be returned to the Reorganized Debtors. On and after the Effective Date, the Reorganized Debtors shall have authority to continue to prosecute, settle or withdraw objections to Claims and shall be entitled to compromise or settle any Disputed Claim.

### 2.    Estimation of Disputed Claims

The aggregate Face Amount of (a) Disputed Claims and (b) Allowed Claims in any Class shall set the maximum allowable aggregate amount of Claims in such Class. The existence of a Disputed Claim in any Class shall not impair or impede the making of a Distribution to Allowed Claims in such Class or any other Class.  If the Allowed amount of any particular Disputed Claim is reconsidered under section 502(j) of the Bankruptcy Code and Bankruptcy Rule 3008 and/or is Allowed in an amount that is greater than the estimated amount of such Claim, or the ultimately Allowed amount of all Disputed Claims in any given Claim is greater than the estimated aggregate amount of such Claims, no Holder of Claims shall have recourse against the Reorganized Debtors (or any property thereof), any Distributions made to a creditor in any other Class under the Plan, or any Distribution previously made on account of any Allowed Claim (however, nothing in the Plan shall modify any right of a Holder of a reconsidered Claim under the penultimate sentence of section 502(j) of the Bankruptcy Code).

### 3.    Payments and Distributions on Disputed Claims

(a)    Disputed Claims Reserve

From and after the Effective Date, and until such time as all Disputed Claims have been compromised and settled or determined by Final Order, the Disbursing Agent shall reserve and hold in escrow (the "Disputed Claims Reserve") for the benefit of each Holder of a Disputed Claim, New Walter Energy Common Stock in an amount equal to the Pro Rata Share of Distributions which would have been made to the Holder of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (i) the Disputed Claim amount, (ii) the amount in which the Disputed Claim shall be estimated by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code for purposes of allowance, which

77

amount, unless otherwise ordered by the Bankruptcy Court, shall constitute and represent the maximum amount in which such Claim may ultimately become an Allowed Claim, or (iii) such other amount as may be agreed upon by the Holder of such Disputed Claim and the Debtors or the Reorganized Debtors. The Disputed Claims Reserve is intended to be treated for U.S. income tax purposes as a grantor trust of the Debtors.

   (b)  Distributions on Disputed Claims Upon Allowance

   The Disbursing Agent shall distribute to the Holder of a Disputed Claim that becomes an Allowed Claim, in whole or in part, the Distribution to which such Holder is then entitled under the Plan for such Allowed Claim, in the Disbursing Agent's sole discretion, (i) as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim becomes a Final Order, (ii) at the next applicable Interim Distribution Date, or (iii) at such other time the Disbursing Agent reasonably determines is appropriate under the circumstances, but in any event, no later than the Final Distribution Date.

  **D.**  **Treatment of Executory Contracts, Unexpired Leases, Employee Benefits and Insurance Policies**

   **1.**  **Rejection of Executory Contracts and Unexpired Leases**

   (a)  Automatic Rejection

   Except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, including all Executory Contracts or Unexpired Leases set forth on the schedule of "Rejected Executory Contracts and Unexpired Leases" in Plan Supplement 9A, unless any such Executory Contract or Unexpired Lease: (a) is listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" contained in Plan Supplement 9B; (b) has been previously assumed by the Debtor by Final Order of the Bankruptcy Court or has been assumed by the Debtor by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (c) is the subject of a motion to assume or reject pending as of the Effective Date; (d) is an Executory Contract related to any Intercompany Claim or Intercompany Interest; (e) is an Executory Contract with a Governmental Unit related to any of the Debtor's business licenses, permits or similar agreement; (f) is an Executory Contract related to any of the Debtor's mineral oil, gas or other hydrocarbon leaseholds (including all ancillary agreements related thereto, such as pooling agreements, unitization agreements, easements and surface leases), or other real property interests unless such Executory Contract is set forth on Plan Supplement 9A; or (g) is otherwise assumed pursuant to the terms of the Plan.

   The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Counterparties to Executory Contracts or Unexpired Leases that are

deemed rejected as of the Effective Date shall have the right to assert any Claim on account of the rejection of such Executory Contracts or Unexpired Leases, including under section 502(g) of the Bankruptcy Code, subject to compliance with the requirements in the Plan.

(b)     Preexisting Obligations to the Debtor Under Executory Contracts and Unexpired Leases

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such Executory Contract or Unexpired Lease. In particular, notwithstanding any applicable non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtor or the Reorganized Debtor, as applicable, from counterparties to rejected or repudiated Executory Contracts.

(c)     Claims Procedures Related to Rejection of Executory Contracts or Unexpired Leases

Unless otherwise provided by a Bankruptcy Court order, any proofs of Claim asserting Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan must be filed with the Claims and Noticing Agent no later than thirty (30) days after the later of the Effective Date or the effective date of rejection. Any Proofs of Claim arising from the rejection of an Executory Contract or Unexpired Lease that is not timely filed shall be disallowed automatically and forever barred, estopped, and enjoined from assertion and shall not be enforceable against the Debtors or the Reorganized Debtors, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of an Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of an Executory Contract or Unexpired Lease shall be classified as Unsecured Claims unless such Claim is subject to subordination.

(d)     Reservation of Rights

Notwithstanding anything to the contrary in the Plan, prior to the Effective Date, the Debtors may amend any decision with respect to the rejection of any Executory Contract or Unexpired Lease. Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on Plan Supplement 9A, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.

## 2.     Assumption of Executory Contracts and Unexpired Leases

Upon the occurrence of the Effective Date, each Executory Contract or Unexpired Lease listed on the schedule of "Assumed Executory Contracts and Unexpired

79

Leases" in Plan Supplement 9B shall be assumed, or assumed and assigned, as applicable, and shall vest in and be fully enforceable by the Reorganized Debtors or their assignees in accordance with its terms, except as modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing or providing for its assumption or applicable federal law. With respect to each such Executory Contract and Unexpired Lease listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" in Plan Supplement 9B, the Debtors shall have designated a proposed Cure, and the assumption of such Executory Contracts and Unexpired Leases may be conditioned upon the disposition of all issues with respect to such Cure. The Confirmation Order shall constitute an order of the Bankruptcy Court approving any such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

### 3. Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated pursuant to the Plan. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### 4. Proofs of Claim Based on Executory Contracts or Unexpired Leases that Have Been Assumed

Any and all Proofs of Claims based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including those which are assumed under the Plan, except Proofs of Claims asserting Cure amounts, pursuant to the order approving such assumption, including the Confirmation Order, shall be deemed disallowed and expunged from the claims register as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court.

### 5. Limited Extension of Time to Assume or Reject

In the event of a dispute as to whether a contract is executory or a lease is unexpired, the right of the Debtors or the Reorganized Debtors, as applicable, to move to assume or reject such contract or lease shall be extended until the date that is thirty (30) days after the entry of a Final Order by the Bankruptcy Court determining that the contract is executory or the lease is unexpired. The deemed assumptions and rejections provided for in Article V of the Plan shall not apply to such contract or lease.

In the event the Reorganized Debtors become aware after the Effective Date of the existence of an Executory Contract or Unexpired Lease, the right of the Reorganized Debtors to move to assume or reject such contract or lease shall be extended until the date that is thirty (30) days after the date on which the Reorganized Debtors become aware of the existence of such contract or lease. The deemed rejection provided for in Article V of the Plan shall not apply to any such Executory Contract or Unexpired Lease. The Debtors reserve the right, with the consent of the Required Consenting First Lien Creditors, to amend the Plan Supplements 9A and 9B to add or remove any Executory Contract or Unexpired Lease from such Plan Supplements at any time prior to the Confirmation Hearing.

## 6. Cure

The applicable Debtor or the Reorganized Debtor, as the case may be, except as otherwise agreed by the parties, will cure any and all undisputed defaults under any Executory Contract or Unexpired Lease that is assumed or assigned by such Debtor in accordance with, and to the extent required by, section 365 of the Bankruptcy Code.

On or about twenty 20 days prior to the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices with respect to any proposed assumption or assignment of any Executory Contracts or Unexpired Leases, including any proposed amounts of Cure Claims to the applicable third parties, including all Executory Contract and Unexpired Lease counterparties. The Cure Notices shall include (a) procedures for objecting to proposed assumptions or assignments of Executory Contracts and Unexpired Leases, (b) Cure amount to be paid in connection therewith and (c) procedures for resolution by the Bankruptcy Court of any related disputes. Any objection by an Executory Contract or Unexpired Lease counterparty to a proposed assumption or assignment or related Cure amount must be filed, served and actually received by the Debtors and the counsel to the Consenting First Lien Creditors at least ten (10) days before the date of the first scheduled Confirmation Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or assignment or Cure amount will be deemed to have assented to such assumption, assignment, or Cure amount.

In the event there is a dispute as of the Effective Date regarding the amount required to cure defaults under any Executory Contract or Unexpired Lease that the Debtors propose to assume or assign, the Debtors or Reorganized Debtors, as applicable, shall have until thirty (30) days after entry of a Final Order determining the amount, if any, of the applicable Debtor's or Reorganized Debtor's liability with respect thereto, or as may otherwise be agreed by the parties, to determine whether to assume, assign or reject the related Executory Contract or Unexpired Lease. In the event the applicable Debtor or the Reorganized Debtor determines to assume or assign the applicable Executory Contract or Unexpired Lease related to the disputed Cure, such disputed Cure amount shall be paid either within thirty (30) days of the entry of a Final Order determining the amount, if any, of the applicable Debtor's or the Reorganized Debtor's liability with respect thereto, or as may otherwise be agreed to by the parties.

81

Postpetition Contracts and Leases  The Debtors shall not be required to assume or reject any contract or lease entered into by the Debtors after the Petition Date. Any such contract or lease shall continue in effect in accordance with its terms after the Effective Date, unless the Debtors or the Reorganized Debtors have obtained a Final Order of the Bankruptcy Court approving termination of such contract or lease.

### 7.    Benefit Plan

As of and subject to the Effective Date, all benefit plans providing retiree benefits (as defined in the section 1114 of the Bankruptcy Code) listed on the schedule of Assumed Executory Contracts and Unexpired Leases filed as part of the Plan Supplement shall be deemed to be, and shall be treated as though they are, Executory Contracts that are assumed under the Plan, and the Debtors' obligations under such agreements and programs shall survive the Effective Date, without prejudice to the Reorganized Debtors' rights under applicable non-bankruptcy law to modify, amend, or terminate the foregoing arrangements. All (i) employment and severance agreements, plans or policies, (ii) any other benefits plans providing retiree benefits (including those previously rejected, modified or terminated by order of the Bankruptcy Court), and (iii) all other employee compensation and benefit plans, policies, programs, arrangements, and agreements of the Debtors applicable generally to their employees in effect on the Effective Date, including, without limitation, all savings plans, retirement plans, health care plans, disability plans, incentive plans, and life, accidental death, and dismemberment insurance plans, shall be deemed to be, and shall be treated as though they are, Executory Contracts rejected as of the Effective Date unless they are listed on the schedule of Assumed Executory Contracts and Unexpired Leases filed as part of the Plan Supplement, in which case they will be deemed to be assumed as of the Effective Date and the Debtors' obligations under such assumed plans, policies, programs, arrangements, and agreements shall survive the Effective Date, without prejudice to the Reorganized Debtors' rights under applicable non-bankruptcy law to modify, amend, or terminate such agreements, plans policies and programs.

Collective Bargaining Agreements  Unless otherwise specified in the Plan, and unless previously assumed, rejected or modified by the Debtors in accordance with sections 1113 and 1114 of the Bankruptcy Code, as applicable, on the Effective Date, the Debtors, pursuant to section 365 of the Bankruptcy Code, shall assume and continue to perform all obligations required under its Collective Bargaining Agreements listed on the schedule of Collective Bargaining Agreements to be filed as part of the Plan Supplement (subject to the terms and conditions of any such Collective Bargaining Agreement including as modified pursuant to sections 1113 and 1114 as the case may be, and, in the event that a Collective Bargaining Agreement expires pursuant to its terms and subject to applicable law, the agreement of the Debtor(s) and the applicable union on new terms). All Proofs of Claim filed by any union or any other Persons for amounts due under any Collective Bargaining Agreement shall be considered satisfied by the agreement and obligation to assume and cure in the ordinary course as provided in the Plan.

82

### 8. Workers Compensation Claims and Other Insured Claims

As of the Effective Date, except as otherwise set forth in the Plan or Plan Supplement, the Reorganized Debtors shall continue to honor their obligations under: (a) all applicable federal and state workers' compensation laws; and (b) the Reorganized Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds, policies, programs and plans for workers' compensation and workers' compensation insurance. Any Workers Compensation Claims and, subject Section 3.4(q) of the Plan, any Insured Claims (including, but not limited to, employer liability Claims and tort Claims) shall be paid in the ordinary course of business. Any dispute regarding a Workers Compensation Claim or Insured Claim shall be resolved in the ordinary course without the need for court approval.

### 9. Utility Agreements

To the extent that (a) the Debtors are party to any utility service contract or similar agreement with a utility, (b) such agreement constitutes an Executory Contract, and (c) such agreement (i) has not been previously rejected or assumed by order of the Bankruptcy Court, (ii) is not subject to a motion to reject such Executory Contract filed on or prior to the Effective Date, (iii) is not listed on Plan Supplement 9A or Plan Supplement 9B, and (iv) has not been designated for rejection in accordance with Section 5.1 of the Plan, such utility service contract or similar agreement with a utility (including any modifications, amendments, supplements, restatements or other related agreements) will be deemed assumed by the applicable Debtor(s) in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. The Cure amount to be paid in connection with the assumption of a utility service contract or similar agreement with a utility that is not specifically identified in Plan Supplement 9B shall be [$0.00].

### 10. Preservation of Insurance

Any and all directors and officers liability and fiduciary insurance or tail policies, and any other insurance policies of the Debtors in existence as of the Effective Date, shall be reinstated and continued in accordance with their terms and, to the extent applicable, shall be deemed assume or assumed and assigned by the applicable Debtor or Reorganized Debtor pursuant to section 365 of the Bankruptcy Code and Article V of the Plan. Nothing in the Plan shall affect, impair or prejudice the rights of the insurance carriers or the Reorganized Debtors under the insurance policies in any manner, and such insurance carriers and Reorganized Debtors shall retain all rights and defenses under such insurance policies, and such insurance policies shall apply to, and be enforceable by and against, the Reorganized Debtors in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Effective Date. The Debtors' discharge and release from all Claims as provided in the Plan, except as necessary to be consistent with the Plan, shall not diminish or impair the enforceability of any insurance policy that may cover Claims against the Debtors, the Reorganized Debtors or any other Person or entity. The Debtors' tail coverage under their existing directors' and officers' liability insurance policies covering their current and former senior executive officers and current and former directors

83

for Claims arising prior to the Effective Date brought against them shall be maintained after the Effective Date for the duration and according to the terms set forth therein.

## 11. Indemnification Obligations Owed by the Debtors

The Reorganized Debtors shall only indemnify any Person for an Indemnification Obligation who served or was employed by the Debtors as one of the Debtors' directors, officers, employees or agents if such Person served or was employed in such capacity as of the Petition Date and as of the Effective Date for any Claims arising from and after the Petition Date to the Effective Date; provided, however, that in no event shall any of the Reorganized Debtors be obligated for any such Indemnity Obligation that has been determined by Final Order to have resulted from gross negligence, willful misconduct, fraud, intentional tort or criminal conduct. For the avoidance of doubt, all other Indemnification Obligations, to the extent Allowed as Claims, shall constitute Unsecured Claims, unless an Indemnification Obligation arises under an agreement entered into post-petition or pursuant to an Executory Contract that the Debtors assume under section 365 of the Bankruptcy Code.

## E. Implementation of the Plan

### 1. Nonconsensual Confirmation

If all applicable requirements for confirmation of the Plan are met as set forth in section 1129(a)(1) through (16) of the Bankruptcy Code, except subsection (8) thereof, then the Plan shall be treated as a request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code, notwithstanding the failure to satisfy the requirements of section 1129(a)(8), on the basis that the Plan is fair and equitable and does not discriminate unfairly with respect to each class of Claims that is Impaired under, and has not accepted, the Plan.

### 2. Distributions in Satisfaction

Except for the obligations expressly imposed by the Plan and the property and rights expressly retained under the Plan, if any, the Distributions and rights that are provided in the Plan shall be in complete satisfaction and release of all Claims against, liabilities in, Liens on, obligations of and Interests, whether known or unknown, that arose or existed prior to the Effective Date.

### 3. Cancellation of Securities and Agreements

On the Effective Date, except as otherwise specifically provided for in the Plan, (a) the obligations of the Debtors under the First Lien Credit Agreement, 9.500% Notes Indenture, 11.0%/12.0% Notes Indenture, 9.875% Notes Indenture and the 8.500% Notes Indenture and all the guarantee agreements related thereto, and any other certificate, share, note, purchase right, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest, membership interest, equity,

84

or profits interest in Walter Energy or any warrants, options, or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership, or profits interests in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors and ownership interests that are specifically reinstated pursuant to the Plan including the Intercompany Claims and Intercompany Interests), shall be canceled as to the Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (b) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, guarantees, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be fully released, settled, and compromised except as expressly provided in the Plan; provided, however, that notwithstanding the occurrence of the Effective Date, any such agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of allowing such Holders to receive Distributions under the Plan as provided therein (and all distribution provisions in any such agreement shall terminate completely upon completion of all such Distributions), to allow Holders of Claims to retain their respective rights and obligations vis-à-vis other Holders of Claims pursuant to applicable governing documents, and to preserve any charging Liens of any Servicer; provided, further, that the Intercreditor Agreement and the rights of the Bank Agent and the parties thereto other than the Debtors to enforce the provisions of the Intercreditor Agreement as against and amongst themselves shall not be affected by and shall survive the Plan, entry of the Confirmation Order and the occurrence of the Effective Date. For the avoidance of doubt, the Intercreditor Agreement shall not be enforceable against the Debtors after the Effective Date. As a condition precedent to receiving any Distribution on account of its First Lien Other Debt Claim, each Record Holder of a First Lien Other Debt Claim shall be deemed to have surrendered its First Lien Other Debt Claim or other documentation (including any notes) underlying such First Lien Other Debt Claim and all such surrendered First Lien Other Debt Claims and other documentation (including any notes) shall be deemed to be cancelled pursuant to Section 6.3 of the Plan, except to the extent otherwise provided herein. Subsequent to the performance by the First Lien Notes Indenture Trustee and the Bank Agent, as applicable, or their respective agents of any duties that are expressly required under the Plan and the Confirmation Order, the First Lien Notes Indenture Trustee and the Bank Agent, and their respective agents shall be (i) fully relieved of, and released from, all obligations arising under the First Lien Notes Indenture and the First Lien Credit Agreement, as applicable, or under any other applicable agreements or law and (ii) deemed to be fully discharged.

### 4. Enforcement of Subordination

The classification and manner of satisfying all Claims and Interests and the respective Distributions and treatments under the Plan take into account or conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise, and any and all such rights are settled, compromised and released pursuant to the Plan. The

85

Plan and Confirmation Order shall enjoin, effective as of the Effective Date, all Persons and entities from enforcing or attempting to enforce any such contractual, legal and/or equitable rights so satisfied, compromised and settled. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.

5. **Surety Bonds and Letters of Credit**

On the Effective Date, all of the Debtors' existing surety and reclamation bonds shall continue in place, on commercially reasonable terms and as may be agreed to by the Required Consenting First Lien Creditors. Except as otherwise provided in the Plan, on the Effective Date, subject to Section 2.6 of the Plan, all outstanding Letters of Credit that currently backstop the Debtors' existing surety and reclamation bonds shall be reinstated or replaced in their face amount under the Exit Financing.

6. **Reinstatement and Continuation of Insurance Policies**

From and after the Effective Date, each of the Debtors' insurance policies in existence as of the Effective Date shall be reinstated and continued in accordance with its terms and, to the extent applicable, shall be deemed assumed by the applicable Reorganized Debtor pursuant to section 365 of the Bankruptcy Code and Section 5.12 of the Plan.

7. **Release of Liens**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and consistent with the treatment provided for Claims and Interests in Article II of the Plan, all Liens, mortgages, deeds of trust or other security interests, including any Liens granted as adequate protection against the property of any Estate, shall be fully released and discharged, and all of the right, title and interest of any Holder of such Liens, mortgages, deeds of trust or other security interests, including any rights to any collateral thereunder, shall revert to the applicable Reorganized Debtor and its successors and assigns. For the avoidance of doubt, the charging Liens of the First Lien Notes Indenture Trustee under the First Lien Notes Indenture may be asserted on the Distributions to Holders of Allowed Claims in Class 2 and, to the extent asserted, shall remain in place until the reasonable and documented fees and expenses of the First Lien Notes Indenture Trustee are satisfied as provided in the Plan. As of the Effective Date, the Reorganized Debtors, the Bank Agent and the First Lien Notes Indenture Trustee and their respective counsel (each at the Reorganized Debtors' sole expense) shall be authorized to execute and file on behalf of creditors Form UCC-3 termination statements, mortgage releases or such other forms as may be necessary or appropriate to implement the provisions of Section 6.7 of the Plan.

86

## 8. Special Provision Governing Unimpaired Claims

Except as otherwise provided therein, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claim.

### (a) Exit Financing

On the Effective Date, the Reorganized Debtors shall be authorized to consummate the Exit Financing (if obtained) and to execute, deliver and enter into the Exit Financing Documents, and any related agreements or filings, without the need for any further corporate or other organizational action and without further action by the Holders of Claims or Interests, and the Exit Financing Commitment Agreements and any related documents, agreements or filings shall be executed and delivered and the applicable Reorganized Debtors shall enter into the Exit Financing and be permitted to incur or issue the indebtedness available thereunder. The material terms of the Exit Financing (to the extent known) shall be included in the Plan Supplement.

### (b) Issuance of New Walter Energy Common Stock

On the Effective Date, Reorganized Walter Energy shall authorize and issue [•] shares of New Walter Energy Common Stock. The New Walter Energy Common Stock shall be distributed in accordance with and pursuant to the Plan and shall be deemed issued on the Effective Date. Any shares not necessary to satisfy obligations under the Plan shall have the status of authorized but not issued shares of Reorganized Walter Energy. Each Distribution and issuance of the New Walter Energy Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such Distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such Distribution or issuance, which terms and conditions shall bind each Person receiving such Distribution or issuance. The New Walter Energy Common Stock is authorized without the need for any further corporate action or without any further action by the Debtors or the Reorganized Debtors, as applicable.

## 9. Exemptions from Securities Act Registration Requirements

The offering, issuance, and distribution of any securities pursuant to the Plan, including the issuance and distributions of New Walter Energy Common Stock and any and all settlement agreements incorporated therein will be exempt from the registration requirements of Section 5 of the Securities Act pursuant to (x) section 1145 of the Bankruptcy Code to the maximum extent permitted by law and applicable and (y) to the extent that the exemption specified in section 1145 is either not permitted or not applicable, section 4(a)(2) of the Securities Act, or any other available exemption from registration under the Securities Act, as applicable. section 4(a)(2) of the Securities Act exempts transactions not involving a public offering, and Section 506 of Regulation D of the Securities Act provides a safe harbor under section 4(a)(2) for transactions that meet certain

requirements. In addition, under section 1145 of the Bankruptcy Code, if applicable, any securities issued pursuant to the Plan and any and all settlement agreements incorporated therein will be freely transferable under the Securities Act by the recipients thereof, subject to (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(ll) of the Securities Act, and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments, and (b) any other applicable regulatory approval. In reliance upon these exemptions, the offer, issuance, and distribution of securities under the Plan will not be registered under the Securities Act or any applicable state Blue Sky Laws, and may not be transferred, encumbered or otherwise disposed of in the absence of such registration or an exemption therefrom under the Securities Act or under such laws and regulations thereunder.

### 10. Amendments to Charter Documents

#### (a) Walter Energy

On the Effective Date, or as soon thereafter as is practicable, the articles of incorporation and bylaws of Walter Energy shall be amended, among other modifications, to (i) authorize the issuance of the New Walter Energy Common Stock, (ii) provide for the cancellation of all outstanding Old Common Stock, and (iii) prohibit the issuance of nonvoting equity securities only so long as, and to the extent that, the issuance of nonvoting equity securities is prohibited by the Bankruptcy Code. Reorganized Walter Energy is authorized to issue or cause to be issued the New Walter Energy Common Stock for Distribution in accordance with the terms of the Plan and the amended certificate of incorporation without the need for any further corporate action. The New Organizational Documents shall be included in the Plan Supplement. On the Effective Date, at the option of the Required Consenting First Lien Creditors, Reorganized Walter Energy and all Holders of New Walter Energy Common Stock may enter into, or be deemed to enter into, one or more corporate governance, organizational or similar documents, including a shareholders agreement or similar document and/or a registration rights agreement, each of which shall be acceptable to the Required Consenting First Lien Creditors, and all Holders of New Walter Energy Common Stock will be bound thereby in all respects, whether or not they execute or agree to be bound by such documents. The material terms of any such documents will be set forth in the Plan Supplement Documents.

#### (b) Subsidiaries

On the Effective Date, the New Organizational Documents of each reorganized subsidiary of Walter Energy shall be amended as may be required to be consistent with the provisions of the Plan and the Bankruptcy Code, including to prohibit the issuance of nonvoting equity securities only so long as, and to the extent that, the issuance of nonvoting equity securities is prohibited by the Bankruptcy Code.

88

(c)     Directors and Officers of the Reorganized Debtors

On the Effective Date, the terms of the current directors or managers of the Debtors, as the case may be, shall expire.  On the Effective Date, the officers of each of the Reorganized Debtors shall be appointed in accordance with the New Organizational Documents and other constituent documents of each Reorganized Debtor.  Pursuant to Section 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the initial officers of the Reorganized Debtors will be disclosed in the Plan Supplement, with such officers to be designated by the Required Consenting First Lien Creditors in accordance with applicable law.

The initial board of directors of Reorganized Walter Energy and any principal operating subsidiary of Reorganized Walter Energy that has a board of directors, board of managers, or similar governing body shall be identified in the Plan Supplement and the members shall be designated by the Required Consenting First Lien Creditors in accordance with applicable law.  Pursuant to Section 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the initial members of the boards of directors and similar governing bodies of Reorganized Walter Energy and any principal operating subsidiary of Reorganized Walter Energy will be disclosed in the Plan Supplement.  Any successors to the Reorganized Debtors' initial boards and other governing bodies will be appointed in compliance with the applicable Reorganized Debtor's New Organizational Documents, and each such director shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors.

(d)     Powers of Officers

The senior executive officers of the Debtors or the Reorganized Debtors, as the case may be, shall have the power to enter into or execute any documents or agreements that they deem reasonable and appropriate to effectuate the terms of the Plan.

(e)     Restructuring Transactions

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may simplify and rationalize their corporate structure by eliminating certain entities that are deemed no longer essential to the Reorganized Debtors and may take all actions that may be necessary or appropriate to effect such transactions, including any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, including:  (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy applicable requirements of law and any other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; (iv) the

89

execution and delivery of appropriate resolutions, agreements or other documents to create such new corporate entities as are necessary to change any Debtor's state of incorporation; and (v) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law (collectively, the "Restructuring Transactions").

(f)     Management of Reorganized Debtors

The Reorganized Debtors' senior executive officers shall serve in accordance with any employment agreement with the Reorganized Debtors and applicable non-bankruptcy law.  The Debtors will disclose the material terms of any such employment agreements in the Plan Supplement.

(g)     Management Incentive Plan

Following the Effective Date, Reorganized Walter Energy shall reserve an aggregate amount of up to ten percent (10%) of the New Walter Energy Common Stock (on an as-diluted basis) for distribution to certain of its employees pursuant to the Management Incentive Plan.  The terms of the Management Incentive Plan and any awards thereunder shall be determined by the board of directors of Reorganized Walter Energy.

(h)     Corporate Action

Except as set forth in the Plan, any action under the Plan to be taken by or required of the Debtors or the Reorganized Debtors, including, without limitation, the adoption or amendment of certificates of formation and other charter documents, the issuance of securities and instruments or the selection of senior executive officers or directors, shall be authorized and approved in all respects, without any requirement of further action by any of the Debtors' or Reorganized Debtors' boards of directors or managers, as applicable, or security or Interest Holders.

The Debtors (with the consent of the Required Consenting First Lien Creditors) or the Reorganized Debtors, as applicable, shall be authorized to execute, deliver, file, and record such documents (including the Plan Supplement Documents), contracts, instruments, releases and other agreements, and take such other action as may be necessary to effectuate and further evidence the terms and conditions of the Plan, without the necessity of any further court, corporate, board, member or shareholder approval or action.  In addition, the selection of the Persons who will serve as the initial directors, senior executive officers and managers of the Reorganized Debtors as of the Effective Date shall be deemed to have occurred and be effective on and after the Effective Date without any requirement of further action by the board of directors, board of managers, or members of the applicable Reorganized Debtor.

F.     **Conditions Precedent**

1.     **Conditions Precedent to Confirmation**

The following are conditions precedent to Confirmation of the Plan that may be satisfied or waived in accordance with Section 7.3 of the Plan:

(a)     the Restructuring Support Agreement shall not have been terminated in accordance with its terms;

(b)     the Bankruptcy Court shall have entered the Disclosure Statement Order in form and substance acceptable to the Debtors and the Required Consenting First Lien Creditors;

(c)     the Plan and the Plan Supplement Documents, including any exhibits, schedules, amendments, modifications or supplements thereto shall have been filed in substantially final form and shall be in form and substance acceptable to the Debtors and the Required Consenting First Lien Creditors; provided, however, that the New Organizational Documents only need to be acceptable to the Required Consenting First Lien Creditors;

(d)     the Bankruptcy Court shall have entered an order or orders approving (i) a settlement with the authorized representative for the UMWA and the USW, in form and substance acceptable to the Debtors and the Required Consenting First Lien Creditors, with respect to the applicable Collective Bargaining Agreement, or (ii) a motion under Section 1113 of the Bankruptcy Code rejecting the Collective Bargaining Agreements with the UMWA and/or USW, as applicable, in each case in form and substance acceptable to the Debtors and the Required Consenting First Lien Creditors; and

(e)     the Bankruptcy Court shall have entered an order or orders with respect to each Retiree Group approving (i) a settlement with respect to each Retiree Group with the applicable authorized representative of the respective retirees or the Section 1114 Committee, in form and substance acceptable to the Debtors and the Required Consenting First Lien Creditors, or (ii) a motion under Section 1114 of the Bankruptcy Code authorizing termination of retiree benefits (as defined in Section 1114 of the Bankruptcy Code) being received by the UMWA retirees, USW retirees, and non-union retirees, as

91

applicable, in each case in form and substance acceptable to the Debtors and the Required Consenting First Lien Creditors.

### 2. Conditions Precedent to Effectiveness

The following are conditions precedent to the Effective Date that may be satisfied or waived in accordance with Section 7.3 of the Plan:

(a) the Restructuring Support Agreement shall have been assumed by the Debtors pursuant an order of the Bankruptcy Court, which order shall be in form and substance acceptable to the Debtors and the Required Consenting First Lien Creditors, and such Restructuring Support Agreement shall not have been terminated in accordance with its terms;

(b) the Bankruptcy Court shall have entered the Confirmation Order in form and substance acceptable to the Debtors and the Required Consenting First Lien Creditors, and the Confirmation Order shall be a Final Order;

(c) negotiation, execution and delivery of definitive documentation with respect to the Plan and any Plan Supplement Document, each in form and substance acceptable to the Debtors and the Required Consenting First Lien Creditors, and otherwise consistent with the terms and conditions of the Plan or the Restructuring Support Agreement, as applicable; provided, however, that the New Organizational Documents only need to be acceptable to the Required Consenting First Lien Creditors.

(d) all authorizations, consents, regulatory approvals, rulings or documents (if any) that are necessary for the Plan's effectiveness shall have been obtained;

(e) the New Organizational Documents for each of the Debtors shall have been amended as provided in Section 6.11 of the Plan;

(f) the New Walter Energy Common Stock shall have been issued and authorized and shall be consistent with the Plan;

(g) as of the Effective Date, the aggregate amount of all Allowed or projected non-ordinary course Administrative Claims and non-ordinary course Priority Claims (as specified in Section 7.2(g) of the Plan) shall not exceed

92

$10.0 million, which projections the Debtors, in consultation with the Consenting First Lien Creditors' Advisors, shall reasonably formulate in advance of the Confirmation Hearing. For purposes of Section 7.2(g) of the Plan, non-ordinary course Administrative Claims and non-ordinary course Priority Claims do not include any Fee Claims, claims arising under Sections 503(b)(9) or 507(b) of the Bankruptcy Code, post-petition operating expenses, severance obligations and payments, ordinary course Administrative Claims and Priority Tax Claims, Cures, reclamation and environmental obligations, Coal Act and Black Lung obligations, and employee and retiree benefit obligations accrued in the ordinary course of the Debtors' business prior to implementing the relief under Sections 1113 and 1114 of the Bankruptcy Code;

(h)     on and simultaneously with the occurrence of the Effective Date, the Reorganized Debtors shall have closed on the Exit Financing, which Exit Financing shall be in form and substance acceptable to the Debtors and Required Consenting First Lien Creditors; and

(i)     all of the documented fees, costs and expenses of (a) the Consenting First Lien Creditors' Advisors, the Consultants (as defined in the Restructuring Support Agreement), and documented out-of-pocket costs or expenses of the Consenting First Lien Creditors, each in accordance with section 4(b) of the Restructuring Support Agreement, and (b) the Bank Agent and the First Lien Notes Indenture Trustee and their respective counsel in accordance with the Cash Collateral Order shall have been paid in full in Cash.

3.     **Waiver of Conditions**

The conditions to Confirmation and effectiveness set forth in Sections 7.1 and 7.2 of the Plan may be waived only by the consent of both the Debtors and the Required Consenting First Lien Creditors (and with respect to Section 7.2(i) therein, the consent of the Bank Agent and the First Lien Notes Indenture Trustee), in each case, without notice, leave or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

4.     **Effect of Failure of Conditions**

In the event that the Effective Date does not occur: (a) the Confirmation Order shall be vacated, (b) no Distributions under the Plan shall be made, (c) the Debtors and all Holders of Claims and Interests shall be restored to the status quo ante as of the day

93

immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and (d) the Debtors' obligations with respect to the Claims and Interests shall remain unchanged and nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims or Interests by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors unless extended by Bankruptcy Court order.

### 5. Substantial Consummation

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

### 6. Order Denying Confirmation

If a Final Order denying confirmation of the Plan is entered, or if the Confirmation Order is vacated, then the Plan shall be null and void in all respects and nothing contained in the Plan shall (a) constitute a waiver or release of any Claims against or Interests in the Debtors, (b) prejudice in any manner the rights of the Holder of any Claim against, or Interest in, the Debtors, (c) prejudice in any manner any right, remedy, claim or Cause of Action of the Debtors, or (d) be deemed an admission against interest by the Debtors.

## G. Effect of the Plan on Assets, Claims and Interests

### 1. Revesting of Assets

On the Effective Date, all property of the Debtors' Estates, to the fullest extent provided by Section 541 of the Bankruptcy Code, and any and all other rights and assets of the Debtors of every kind and nature, shall automatically vest or revest in the Reorganized Debtors free and clear of all Liens, Claims and Interests, other than those Liens, Claims and Interests retained (including the Intercompany Claims and Intercompany Interests) or created pursuant to the Plan.

### 2. Discharge of Claims and Termination of Interests

**The Reorganized Debtors shall receive the benefit of any and all discharges under the Plan.  On and after the Effective Date, except as otherwise provided in the Plan or in the Confirmation Order or for some other specified reason, the Reorganized Debtors may operate the Debtors' business and may use, acquire or dispose of property and compromise or settle any Claims or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.**

**As discussed in detail in this Disclosure Statement and otherwise provided in the Plan, pursuant to Section 1123 of the Bankruptcy Code, and in consideration for the classification, Distributions, releases and other benefits provided under the Plan,**

94

upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests and controversies related to the contractual, legal and equitable rights that a Holder of a Claim or Interest may have in respect of such Claim or Interest. All Distributions made to Holders of Allowed Claims or Interests in any Class are intended to, and shall be, final.

The rights afforded in the Plan and the treatment of all Claims and Interests in the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Claims, Interests and Causes of Action of any nature whatsoever, including any interest accrued thereon from and after the Petition Date and any Claims that are or may be subject to Section 1141(d)(6) of the Bankruptcy Code, against the Debtors, or any of their respective assets or properties, arising prior to the Effective Date. Except as otherwise expressly specified in the Plan, the Confirmation Order shall act as of the Effective Date as a discharge of all debts of, Claims or Interests against or in, and Liens on the Debtors, their respective assets and properties, arising at any time before the Effective Date, regardless of whether a Proof of Claim with respect thereto was filed, whether the Claim or Interest is Allowed, or whether the Holder thereof votes to accept the Plan or is entitled to receive a Distribution under the Plan. Except as otherwise expressly specified in the Plan, after the Effective Date, any Holder of such discharged Claim or Interest shall be precluded from asserting against the Debtors, the Reorganized Debtors, or any of their respective assets or properties, any other or further Claim or Interest based on any document, instrument, act, omission, transaction, or other activity of any kind or nature that occurred before the Effective Date, including any Claims that may be subject to Section 1141(d)(6) of the Bankruptcy Code.

3.    Injunctions

Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold or may hold a Claim or other debt or liability that is discharged or released pursuant to the Plan or an Interest or other right of an equity security Holder that is terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions on account of any such discharged Claims, debts or liabilities or terminated Interests or rights: (i) commencing or continuing in any manner any action or other proceeding against the Debtors or the Reorganized Debtors or their respective property; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors or the Reorganized Debtors or their respective property; (iii) creating, perfecting or enforcing any Lien or encumbrance against the Debtors or the Reorganized Debtors or their respective property; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors or the Reorganized Debtors or their respective property; (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan; and (vi) taking any actions to interfere with the consummation or implementation of the Plan.

95

In exchange for the Distributions pursuant to the Plan, each Holder of an Allowed Claim receiving any Distribution pursuant to the Plan will be deemed to have specifically consented to the injunctions set forth in Section 8.3 of the Plan.

4.      Releases by the Debtors and Reorganized Debtors

On the Effective Date, the Debtors and the Reorganized Debtors, on behalf of themselves and their Estates, shall be deemed to release unconditionally (a) all of their Representatives and (b) the Released Parties from any and all Claims, obligations, suits, judgments, damages, rights, Causes of Action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon actions taken solely in their capacities described above for any omission, transaction, agreement or event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors or their business and affairs, the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Restructuring Transactions or any other transactions proposed in connection with the Chapter 11 Cases or any other contract, instrument, release or other agreement or document created or entered into or any other act taken or omitted to be taken in connection therewith or in connection with any obligations arising under the Plan or the obligations assumed thereunder; provided, however, that the foregoing provisions of Section 8.4 of the Plan shall not affect (i) the liability of any Person nor shall any such Person be released from any act or omission that constitutes gross negligence, willful misconduct, fraud or criminal acts as determined by a Final Order, (ii) any rights to enforce the Plan or the other contracts, instruments, releases, agreements or documents to be, or that were previously, entered into in connection with the Plan, (iii) except as otherwise expressly set forth in the Plan, any objections by the Debtors or the Reorganized Debtors to Claims or Interests filed by any Person against any Debtor and/or the Estates, including rights of setoff, refund, recoupment or other adjustments, (iv) the rights of the Debtors or the Reorganized Debtors to assert any applicable defenses in litigation or other proceedings, including with their employees, or any claim of the Debtors or the Reorganized Debtors, including (but not limited to) cross-claims or counterclaims or other Causes of Action against employees or other parties, arising out of or relating to actions for personal injury, wrongful death, property damage, products liability or similar legal theories of recovery to which the Debtors or Reorganized Debtors are a party, and (v) obligations arising under the Exit Financing Agreements.  The releases in Section 8.4 of the Plan apply only to the Released Parties solely in their respective capacities as such.

5.      Releases by Holders of Claims

On the Effective Date, the Released Parties and all Persons and their Representatives who directly or indirectly have held, hold, or may hold Claims against the Debtors, whether known or unknown, shall be deemed by virtue of their receipt of Distributions or the other treatment contemplated under the Plan, to have forever

96

waived and released all such right or Claims, whether based upon tort or contract or otherwise, that they heretofore, now or hereafter possess or may possess against the Debtor Released Parties or the Released Parties and shall be deemed to have covenanted with the Debtors and the Debtor Released Parties to release and not to (a) sue or otherwise seek recovery from any of the Debtor Released Parties or any of the Released Parties on account of any Claim or Cause of Action, obligation, suit, judgment, damages, right and liability whatsoever, in any way related to the Debtors or their business and affairs, the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Restructuring Transactions or any other transactions proposed in connection with the Chapter 11 Cases or any other contract, instrument, release or other agreement or document created or entered into or any other act taken or omitted to be taken in connection therewith or in connection with any obligations arising under the Plan or the obligations assumed thereunder, including but not limited to any Claim based upon tort, breach of contract, violations of federal or state securities laws or otherwise, based in whole or in part upon any act, occurrence, or failure to act from the beginning of time through the Effective Date or (b) assert against any of the Debtor Released Parties or any Released Party any Claim, obligation, suit, judgment, damages, right, cause of action or liability that any Holder of a Claim or Interest may be entitled to assert, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, based in whole or in part on any act or omission, transaction, or occurrence from the beginning of time through the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Restructuring Transactions or any other transactions proposed in connection with the Chapter 11 Cases or any other contract, instrument, release or other agreement or document created or entered into or any other act taken or omitted to be taken in connection therewith or in connection with any obligations arising under the Plan or the obligations assumed thereunder, *provided*, *however*, (i) none of the Debtor Released Parties or the Released Parties shall be released from any Claim primarily based on any act or omission that constitutes gross negligence, willful misconduct, fraud or criminal acts as determined by a Final Order, (ii) the foregoing release shall not apply to obligations arising under the Plan, (iii) the foregoing release shall not be construed to prohibit a party in interest from seeking to enforce the terms of the Plan, (iv) the foregoing release does not apply to obligations arising under the Exit Financing Agreements, and (v) the foregoing release shall not apply to any indemnification or other surviving obligation or assumed Executory Contract or Unexpired Lease as expressly set forth in the Plan.

6.    Exculpation and Injunction in Respect of Released Parties

As of the Effective Date, the Debtor Released Parties and the Released Parties shall have no liability whatsoever to any Holder or purported Holder of a Claim or an Interest for any act or omission occurring during or in connection with the Chapter 11 Cases through the Effective Date in connection with, or arising out of, the Plan, the Disclosure Statement, entry into and negotiation of the Restructuring Support

97

Agreement, the negotiation of the Plan and the Disclosure Statement, the negotiation of the Plan Supplement Documents, the pursuit of approval of the Disclosure Statement or the solicitation of votes for confirmation of the Plan, the Chapter 11 Cases, the consummation of the Plan, the Disclosure Statement or in furtherance thereof except for any act or omission that constitutes gross negligence, willful misconduct, fraud or a criminal act as determined by a Final Order. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rule protecting such Debtor Released Parties and Released Parties from liability.

### 7.    Preservation and Retention of Causes of Action

Except as expressly provided otherwise in the Plan, the Reorganized Debtors shall retain any and all Causes of Action, including all Causes of Action identified on Plan Supplement 8, now owned or hereafter acquired by the Debtors (the "Retained Causes of Action"). Except as expressly provided in the Plan or the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any such Retained Causes of Action. Nothing contained in the Plan or the Confirmation Order shall be deemed a waiver or relinquishment of any Claim, Retained Cause of Action, right of setoff, or other legal or equitable defense, including, but not limited to rights of recoupment, that the Debtors had immediately prior to the Petition Date that is not specifically waived or relinquished by the Plan. The Reorganized Debtors shall have, retain, reserve, assert and be entitled to enforce, sue on, settle, or compromise (or decline to do any of the foregoing) any and all such (a) Claims, (b) Retained Causes of Action, including all potential Avoidance Actions, (c) rights of setoff and recoupment, and (d) any other legal or equitable defenses, including, but not limited to rights of recoupment, that the Debtors had immediately prior to the Petition Date as fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights respecting any Claims that are not specifically waived or relinquished by the Plan may be asserted after the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced. Except as expressly provided in the Plan or the Confirmation Order, the Reorganized Debtors may settle any Retained Causes of Action after the Effective Date without further notice or order from the Bankruptcy Court.

### 8.    Votes Solicited in Good Faith

The Debtors have, and upon confirmation of the Plan shall be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code. The Debtors (and each of their respective affiliates, agents, directors, officers, members, employees, advisors, and attorneys) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of the securities offered and sold under the Plan and therefore have not been, and on account of such offer and issuance will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances

or rejections of the Plan or the offer or issuance of the securities offered and distributed under the Plan.

### 9. Claims Incurred After the Effective Date

Claims incurred by the Reorganized Debtors after the Effective Date, including, without limitation, Fee Claims incurred after such date, may be paid by the Reorganized Debtors, as the case may be, in the ordinary course of business and without application for or Bankruptcy Court approval, subject to any agreements with any such Claim Holders.

### 10. Term of Bankruptcy Injunction or Stays

All injunctions or stays provided for in the Chapter 11 Cases under Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

### 11. Dissolution of Official Committees

Except to the extent provided in the Plan, upon the Effective Date, the current and former members of the Creditors' Committee, the Section 1114 Committee and any other creditor, equity or other committee appointed in the Chapter 11 Cases pursuant to Sections 1102 or 1114 of the Bankruptcy Code, and their respective officers, employees, counsel, advisors and agents, shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases and such committees shall be dissolved; provided, however, that following the Effective Date, the Creditors Committee shall continue in existence and have standing and a right to be heard solely for the limited purposes of applications for compensation by Professionals and requests for allowance of Administrative Claims for substantial contribution pursuant to Section 503(b)(3)(D) of the Bankruptcy Code. Following the completion of the Creditors Committee's remaining duties set forth above, the Creditors Committee shall be dissolved, and the retention or employment of the Creditors Committee's respective attorneys, accountants and other agents shall terminate without the need for any further action by the Reorganized Debtors or approval by the Bankruptcy Court.

### H. Miscellaneous Provisions

### 1. Retention of Jurisdiction

Following the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising from or relating to the Chapter 11 Cases to the fullest extent of applicable law, including, without limitation:

        (a)     to determine the validity under any applicable law, allowability, classification, dischargeability under Section

99

1141(d)(6) of the Bankruptcy Code, and priority of Claims and Interests upon objection, or to estimate, pursuant to Section 502(c) of the Bankruptcy Code, the amount of any Claim that is or is anticipated to be contingent or unliquidated as of the Effective Date;

(b)     to construe and to take any action authorized by the Bankruptcy Code and requested by the Reorganized Debtors or any other party in interest to enforce the Plan and the documents and agreements filed in connection with the Plan, issue such orders as may be necessary for the implementation, execution and consummation of the Plan, including, without limiting the generality of the foregoing, orders to expedite regulatory decisions for the implementation of the Plan and to ensure conformity with the terms and conditions of the Plan, such documents and agreements and other orders of the Bankruptcy Court, notwithstanding any otherwise applicable non-bankruptcy law;

(c)     to determine any and all applications for allowance of compensation and expense reimbursement of Professionals retained by the Debtors, the Reorganized Debtors, the Creditors' Committee or any official committee of retirees, and for members of the Creditors' Committee and of any official committee of retirees, for periods on or before the Effective Date, and to determine any other request for payment of administrative expenses;

(d)     to determine all matters that may be pending before the Bankruptcy Court on or before the Effective Date;

(e)     to resolve any dispute regarding the implementation or interpretation of the Plan, or any related agreement or document that arises at any time before the Chapter 11 Cases are closed, including the determination, to the extent a dispute arises, of the entities entitled to a Distribution within any particular Class of Claims and of the scope and nature of the Reorganized Debtors' obligations to cure defaults under assumed contracts, leases, franchises and permits;

(f)     to determine any and all matters relating to the rejection, assumption or assignment of Executory Contracts or Unexpired Leases entered into prior to the Petition Date, the nature and amount of any Cure required for the

100

assumption of any Executory Contract or Unexpired Lease, and the allowance of any Claim resulting therefrom, including the amount, validity and treatment under any applicable law of any Claim for damages arising from or related to the rejection of any such contract;

(g)     to determine all applications, adversary proceedings, contested matters and other litigated matters that were brought or that could have been brought in the Bankruptcy Court on or before the Effective Date;

(h)     to determine matters concerning local, state and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code, and to determine any tax Claims that may arise against the Debtors or the Reorganized Debtors as a result of the transactions contemplated by the Plan; and

(i)     to modify the Plan pursuant to Section 1127 of the Bankruptcy Code or to remedy any apparent nonmaterial defect or omission in the Plan, or to reconcile any nonmaterial inconsistency in the Plan so as to carry out its intent and purposes.

From the Confirmation Date through the Effective Date, the Bankruptcy Court shall retain jurisdiction with respect to each of the foregoing items and all other matters that were subject to its jurisdiction prior to the Confirmation Date.

## 2.     Terms Binding

Upon the entry of the Confirmation Order, all provisions of the Plan, including all agreements, instruments and other documents filed in connection with the Plan and executed by the Debtors or the Reorganized Debtors in connection with the Plan, shall be binding upon the Debtors, the Reorganized Debtors, all Claim and Interest Holders and all other Persons that are affected in any manner by the Plan. All agreements, instruments and other documents filed in connection with the Plan shall have full force and effect, and shall bind all parties thereto as of the entry of the Confirmation Order, whether or not such exhibits actually shall be executed by parties other than the Debtors or the Reorganized Debtors, or shall be issued, delivered or recorded on the Effective Date or thereafter. The rights, benefits and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

## 3.     Governing Law

Unless a rule of law or procedure is supplied by Federal law (including the Bankruptcy Code and Bankruptcy Rules), (a) the laws of the State of New York (without

reference to the conflicts of laws provisions thereof) shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, unless otherwise specified and (b) the laws of the state of formation of the Debtors shall govern corporate matters with respect to the Debtors, in each case without giving effect to the principles of conflicts of law thereof.

### 4. Severability

If the Bankruptcy Court determines at or before the Confirmation Hearing that any term or provision of the Plan is invalid, void or unenforceable, the Bankruptcy Court may alter or interpret that term so it is valid and enforceable to the maximum extent possible consistent with the original purpose of that term or provision. That term or provision will then be applicable as altered or interpreted. In the event that the Bankruptcy Court cannot interpret such provision in a manner acceptable to the Debtors and Required Consenting First Lien Creditors, then such provision (subject to Section 1127 of the Bankruptcy Code) shall be severable from the Plan and shall be null and void. Notwithstanding any such holding, alteration, or interpretation, the remaining terms and conditions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated. The Confirmation Order will constitute a judicial determination providing that each Plan term and provision, as it may have been altered or interpreted in accordance with Section 9.4 of the Plan, is valid and enforceable under its terms, is integral to the Plan and may not be deleted or modified without the Debtors' and the Required Consenting First Lien Creditors' consent, and is nonseverable and mutually dependent upon all other Plan terms and provisions.

### 5. Inconsistencies

Except as otherwise provided in the Plan, in the event of any inconsistency between the Plan, on the one hand, and the Disclosure Statement, the Restructuring Support Agreement, or any Ballot, on the other, the Plan shall control. In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control. Unless otherwise specifically provided in the Confirmation Order, agreements entered into on or after the Effective Date, including the Exit Financing, shall be governed by their own terms.

### 6. Incorporation by Reference

Each exhibit, schedule or supplement to the Plan (including the Plan Support Documents) is incorporated in the Plan by reference.

### 7. Modifications to the Plan

The Debtors, with the consent of the Required Consenting First Lien Creditors, may amend or modify the Plan, and any exhibit, schedule or supplement to the Plan (including the Plan Support Documents), at any time prior to the Confirmation Date in accordance with the Bankruptcy Code and Bankruptcy Rules. A Holder of a Claim or

102

Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified or supplemented, if the proposed alteration, amendment, modification or supplement does not materially and adversely change the treatment of the Claim or Interest of such Holder.

### 8. Revocation, Withdrawal or Non-Consummation

Subject to the Restructuring Support Agreement, the Debtors, with the consent of the Required Consenting First Lien Creditors, reserve the right to revoke or withdraw the Plan at any time prior to the Effective Date. If the Debtors revoke or withdraw the Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, then the Plan, any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), the assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be null and void; provided, however, that all orders of the Bankruptcy Court and all documents executed pursuant thereto, except the Confirmation Order, shall remain in full force and effect. In such event, nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall be deemed to constitute a waiver or release of any Claims by or against any of the Debtors or any other Person, to prejudice in any manner the rights of any of the Debtors or any Person in any further proceedings or to constitute an admission of any sort by any of the Debtors or any other Person.

### 9. Post-Confirmation Date Retention of Professionals

Upon the Effective Date, any requirement that Professionals employed by the Reorganized Debtors comply with Sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and the Reorganized Debtors will be authorized to employ and compensate professionals in the ordinary course of business and without the need for Bankruptcy Court approval.

### 10. Exemption from Transfer Taxes

Pursuant to Section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents under the Plan, (b) the creation of any mortgage, deed of trust, Lien, pledge or other security interest under the Plan, (c) the making or assignment of any lease or sublease pursuant to the Plan, or (d) the making or delivery of any deed or other instrument of transfer under, pursuant to, or in connection with the Plan, including, without limitation, any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, assignments, and transfers of tangible property executed in connection with the Plan, or the Confirmation Order, shall not be subject to any document recording, stamp, real estate transfer, sales and use, mortgage recording or other or similar tax or government assessment to the fullest extent provided for under the Bankruptcy Code.

**11.     Payment of Statutory Fees**

All fees payable pursuant to Section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.

**12.     Notice**

All notices, requests and demands to or upon the Debtors or the Consenting First Lien Creditors to be effective shall be in writing and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

**If to the Debtors**:

Walter Energy, Inc.
3000 Riverchase Galleria, Suite 1700
Birmingham, AL 35244
Facsimile: 205-776-7859
Email: earl.doppelt@walterenergy.com
Attention: Earl H. Doppelt, Esq.

with a copy to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Facsimile: (212) 757-3990
Attention: Kelley A. Cornish, Esq. (kcornish@paulweiss.com) and
Claudia R. Tobler, Esq. (ctobler@paulweiss.com)

- and -

Bradley Arant Boult Cummings LLP
1819 Fifth Avenue North
Birmingham, Alabama 35203
Facsimile: (205) 521-88--
Attention:  Patrick Darby, Esq. (pdarby@babc.com) and
Jay Bender, Esq. (jbender@babc.com)

104

**If to the Consenting First Lien Creditors**:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Facsimile: (212) 872-1002
Attention: Ira Dizengoff, Esq. (idizengoff@akingump.com) and Kristine
Manoukian, Esq. (kmanoukian@akingump.com)

Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, DC 20036
Facsimile: (202) 887-4288
Attention: James Savin, Esq. (jsavin@akingump.com)

- and -

Burr Forman LLP
420 North 20th Street, Suite 3400
Birmingham, AL 35203
Facsimile: (205) 244-5617
Attention: Michael L. Hall (mhall@burr.com) and D. Christopher Carson
(ccarson@burr.com)

### 13.    Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

### 14.    No Waiver

Neither the failure of a Debtor to list a Claim or Interest in the Debtor's Schedules, the failure of a Debtor to object to any Claim, Administrative Expense Claim or Interest for purposes of voting, the failure of a Debtor to object to a Claim, Administrative Expense Claim or Interest prior to the Confirmation Date or the Effective Date, nor the failure of a Debtor to assert a Retained Cause of Action prior to the Confirmation Date or the Effective Date shall, in the absence of a legally-effective express waiver or release executed by the Debtor with the approval of the Bankruptcy Court, if required, and with any other consents or approvals required under the Plan, be deemed a waiver or release of the right of a Debtor, a Reorganized Debtor or their respective successors, either before or after solicitation of votes on the Plan, the Confirmation Date or the Effective Date, to (a) object to or examine such Claim, Administrative Expense Claim or Interest, in whole or in part, or (b)

105

retain or either assign or exclusively assert, pursue, prosecute, utilize, or otherwise act or enforce any Retained Cause of Action against the Holder of such Claim, Administrative Expense Claim or Interest.

<h1 style="text-align:center">ARTICLE VII</h1>

<h2 style="text-align:center">CONFIRMATION OF THE PLAN</h2>

**A.     Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan. The Confirmation Hearing pursuant to section 1128 of the Bankruptcy Code will be held on [DATE], at [____ __].m., prevailing Central Time, before the Honorable Tamara O. Mitchell, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Northern District of Alabama, Robert S. Vance Federal Building, 1800 Fifth Avenue North, Birmingham, Alabama 35203-2111. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of adjournment at the Confirmation Hearing, or at any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to Confirmation of the Plan must: (i) be made in writing; (ii) state the name and address of the objecting party and the nature of the claim or interest of such party; (iii) state with particularity the legal and factual basis and nature of any objection to the Plan; and (iv) be filed with the Bankruptcy Court, together with proof of service, and served so that they are received **on or before [DATE] at 12:00 p.m. (noon), prevailing Central Time** by the following parties (the "Notice Parties"):

**Counsel to the Debtors:**

| | |
|---|---|
| Paul, Weiss, Rifkind, Wharton & Garrison LLP | Bradley Arant Boult Cummings LLP |
| 1285 Avenue of the Americas | 1819 5th Avenue North |
| New York, New York 10019-6064 | Birmingham, Alabama 35203 |
| Facsimile: (212) 757-3990 | Facsimile: (205) 521-8800 |
| Attn: Stephen J. Shimshak | Attn: Patrick Darby |
| Kelley A. Cornish | Jay R. Bender |
| Claudia R. Tobler | Cathleen C. Moore |
| Ann K. Young | James B. Bailey |
| Michael S. Rudnick | |

**The Bankruptcy Administrator:**

Office of the United States Bankruptcy Administrator
Robert S. Vance Federal Building
1800 Fifth Avenue North
Birmingham, Alabama 35203
Facsimile: (205) 909-0435
Attn: J. Thomas Corbett, Esq.

<p style="text-align:center">106</p>

**Counsel to the Steering Committee:**

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Facsimile: (212) 872-1002
Attn:   Ira Dizengoff, Esq.
        Kristine Manoukian, Esq.

Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, DC 20036
Facsimile: (202) 887-4288
Attn.: James Savin, Esq.

Burr & Forman LLP
420 North 20th Street, Suite 3400
Birmingham, AL 35203
Facsimile: (205) 244-5617
Attn:   Michael L. Hall
        D. Christopher Carson

**Counsel to the Official Committee of Unsecured Creditors:**

Morrison & Foerster LLP
250 West 55th Street
New York, NY 10019
Facsimile: (212) 209-1835
Attn:   Brett H. Miller, Esq.
        Lorenzo Marinuzzi, Esq.
        Jennifer L. Marines, Esq.

Christian & Small LLP
505 North 20th Street, Suite 1800
Birmingham, Alabama 35203-2696
Facsimile: (205) 328-7234
Attn:   Bill B. Bensinger, Esq.
        Daniel D. Sparks, Esq.

**Counsel to Morgan Stanley Senior Funding, Inc. as the Administrative Agent:**

White & Case LLP
1155 Avenue of the Americas
New York, NY 10036
Facsimile: (212) 354-8113
Attn:   Scott Greissman, Esq.
        Elizabeth Feld, Esq.

107

**Counsel to Wilmington Trust, National Bank, as First Lien Trustee:**

Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036-8706
Facsimile: (212) 596-9090
Attn:    Mark R. Somerstein

Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Facsimile: (617) 951-7050
Attn:    Patricia Chen

**Counsel to BOKF, N.A., as Second Lien Trustee**

Arent Fox LLP
1675 Broadway
New York, NY 10019
Tel: (212) 484-3900
Facsimile: (212) 484-3990
Attn:    Andrew I. Silfen

**Counsel to Delaware Trust Company, as 9.875%
Unsecured Trustee**

MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
AND POPEO, P.C.
One Financial Center
Boston, Massachusetts 02111
Facsimile: 617-542-2241
Attn:    William W. Kannel

**Counsel to UMB Bank National Association, as
8.5% Unsecured Trustee**

Foley & Lardner LLP
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
Facsimile: (312) 832-4700
Attn:    Harold L. Kaplan

> Objections to Confirmation of the Plan are governed by Bankruptcy Rule 9014.  UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY AND PROPERLY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

### B.    Statutory Requirements for Confirmation of the Plan in Chapter 11 Cases

> At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the

108

requirements for confirmation are that the Plan (i) is accepted by all Classes of Claims and Interests or, if rejected by an impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (ii) is feasible and (iii) is in the "best interests" of holders of Claims and Interests impaired under the Plan.

AS EXPLAINED ABOVE, THE BANKRUPTCY CODE CONTAINS PROVISIONS FOR CONFIRMATION OF A PLAN EVEN IF IT IS NOT ACCEPTED BY ALL CLASSES. THESE SO-CALLED "CRAMDOWN" PROVISIONS ARE SET FORTH IN SECTION 1129(b) OF THE BANKRUPTCY CODE, WHICH PROVIDES THAT A PLAN OF REORGANIZATION CAN BE CONFIRMED EVEN IF IT HAS NOT BEEN ACCEPTED BY ALL IMPAIRED CLASSES OF CLAIMS AND INTERESTS AS LONG AS AT LEAST ONE IMPAIRED CLASS OF NON-INSIDER CLAIMS HAS VOTED TO ACCEPT THE PLAN.

### 1. Acceptance

Claims in Class 2 are impaired under the Plan, and, therefore, must accept the Plan in order for it to be confirmed without application of the "fair and equitable test," described below, to such Classes. As stated above, impaired Classes of Claims will have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in dollar amount and a majority in number of the Claims of each such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

Classes 1, 4, and 5 are unimpaired under the Plan, and the holders of Allowed Claims in each of these Classes are conclusively presumed to have accepted the Plan.

The Debtors, as the holders of Intercompany Claims and Intercompany Equity Interests in Class 7, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the holders of Intercompany Claims and Intercompany Equity Interests.

Claims in Classes 3 and 6 are impaired and the holders of Class 3 and 6 Claims will receive [TBD] under the Plan. [Voting rights TBD].

Claims in Class 8 are impaired and the holders of Old Common Stock Claims and Interests in Class 8 will not receive or retain any property under the Plan. Accordingly, this Class is deemed not to have accepted the Plan and Confirmation of the Plan will require application of the "fair and equitable test," described below.

### 2. Fair and Equitable Test

The Debtors will seek to confirm the Plan notwithstanding the non-acceptance or deemed non-acceptance of the Plan by any impaired Class of Claims or Interests. To obtain such confirmation, it must be demonstrated that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such dissenting impaired Class. A plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner

consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class receives more than it is entitled to on account of its claims or interests. The Debtors believe that the Plan satisfies these requirements.

The Bankruptcy Code establishes different "fair and equitable" tests for secured claims, unsecured claims and equity interests, as follows:

(a) <u>Secured Creditors</u>. Either (i) each holder of an impaired secured claim retains its liens securing their secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens, with such liens attaching to the proceeds of the sale and the treatment of such liens on proceeds is as provided in clauses (i) or (ii) above.

(b) <u>Unsecured Creditors</u>. Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan.

(c) <u>Interest Holders</u>. Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greater of the fixed liquidation preference to which such holder is entitled, or the fixed redemption price to which such holder is entitled or the value of the equity interest, or (ii) the holders of equity interests that are junior to the nonaccepting class will not receive or retain any property under the plan.

THE DEBTORS BELIEVE THAT THE PLAN MAY BE CONFIRMED ON A NONCONSENSUAL BASIS (PROVIDED AT LEAST ONE IMPAIRED CLASS OF CLAIMS VOTES TO ACCEPT THE PLAN). ACCORDINGLY, THE DEBTORS WILL DEMONSTRATE AT THE CONFIRMATION HEARING THAT THE PLAN SATISFIES THE REQUIREMENTS OF SECTION 1129(b) OF THE BANKRUPTCY CODE AS TO ANY NON-ACCEPTING CLASS.

### 3. Feasibility

Pursuant to section 1129(a)(11) of the Bankruptcy Code, among other things, the Bankruptcy Court must determine that confirmation of the Plan is not likely to be followed by the liquidation or need for further financial reorganization of the Debtors or any

successors to the Debtors under the Plan. This condition is often referred to as the "feasibility" of the Plan. The Debtors believe that the Plan satisfies this requirement.

For purposes of determining whether the Plan meets this requirement, the Debtors and their financial advisors have prepared consolidated projections attached hereto as Exhibit E (the "Projections"). Based upon the Projections, the Debtors believe that the Reorganized Debtors will be able to perform their obligations under the Plan, and therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

The Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement and in the Plan in their entirety, and the historical consolidated financial statements (including the notes and schedules thereto) and other financial information set forth in Walter Energy's Annual Report on Form 10-K for the fiscal year ended December 31, 2014, as amended, and other reports filed by Walter Energy with the SEC filed prior to the Bankruptcy Court's approval of this Disclosure Statement. These filings are available by visiting the SEC's website at www.sec.gov.

The Debtors prepared the Projections based upon, among other things, the anticipated future financial condition and results of operations of the Reorganized Debtors. The Debtors do not, as a matter of course, publish their business plans, strategies, projections, or their anticipated results of operations or financial condition. Accordingly, the Debtors and the Reorganized Debtors do not intend to update or otherwise revise the Projections, or to include such information in documents required to be filed with the SEC or otherwise make such information public to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even in the event that any or all of the underlying assumptions are shown to be in error.

THE PROJECTIONS WERE NOT PREPARED TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE FINANCIAL ACCOUNTING STANDARDS BOARD. THE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE ACCOMPANYING PROJECTIONS AND ACCORDINGLY DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE PROJECTIONS AND DISCLAIM ANY ASSOCIATION WITH THE PROJECTIONS.

THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH WILL BE BEYOND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS

CAUTION THAT NO REPRESENTATIONS CAN BE OR ARE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. *SEE* ARTICLE VIII, "CERTAIN RISK FACTORS TO BE CONSIDERED."

IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

### 4. Best Interests Test

The "best interests" test under section 1129 of the Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each holder of impaired claims or impaired interests receive property with a value not less than the amount such holder would receive in a chapter 7 liquidation. The liquidation analysis attached hereto as Exhibit F (the "Liquidation Analysis") demonstrates that the Plan satisfies the requirements of the "best interests" test by showing that holders of Claims and Interests in all Impaired Classes will receive at least as much as a result of Confirmation of the Plan as they would recover through a hypothetical chapter 7 liquidation.

To estimate potential returns to holders of Claims and Interests in a chapter 7 liquidation, the Debtors determined, the amount of liquidation proceeds that might be available for distribution (net of liquidation related costs) and the allocation of such proceeds among the Classes of Claims and Interests based on their relative priority as set forth in the Bankruptcy Code. The Debtors considered many factors and data and have assumed that the liquidation of all assets would be conducted in an orderly manner. The liquidation proceeds available for distribution to holders of Claims against and Interests in the Debtors would consist of the net proceeds from the disposition of the Debtors' assets, augmented by any other cash that the Debtors held and generated during the assumed holding period and after deducting the incremental expenses of operating the business pending disposition.

In general, as to each entity, liquidation proceeds would be allocated in the following priority:

- first, to the Claims of secured creditors to the extent of the value of their collateral;

112

- second, to the costs, fees and expenses of the liquidation, as well as other administrative expenses of the Debtors' chapter 7 cases, including tax liabilities;

- third, to the unpaid Administrative Claims;

- fourth, to Priority Tax Claims and other Claims entitled to priority in payment under the Bankruptcy Code;

- fifth, to Unsecured Claims; and

- sixth, to Interests.

The Debtors' liquidation costs in a chapter 7 case would include the compensation of a bankruptcy trustee, as well as compensation of counsel and other professionals retained by such trustee, asset disposition expenses, applicable taxes, litigation costs, Claims arising from the Debtors' operation during the pendency of the chapter 7 cases, and all unpaid Administrative Claims that are allowed in the chapter 7 cases. The liquidation itself might trigger certain Priority Non-Tax Claims, and would likely accelerate Claims or, in the case of taxes, make it likely that the Internal Revenue Service would assert all of its claims as Priority Tax Claims rather than asserting them in due course as is expected to occur under the Chapter 11 Cases. These Priority Tax and Non-Tax Claims would be paid in full out of the net liquidation proceeds, after payment of secured Claims, chapter 7 costs of administration and other Administrative Claims, and before the balance would be made available to pay Unsecured Claims or to make any distribution in respect of Interests.

The Liquidation Analysis is based on a number of estimates and assumptions that are inherently subject to significant economic, competitive and operational uncertainties and contingencies that are beyond the control of a trustee under Chapter 7. Further, the actual amounts of claims against the Debtors' estates could vary materially from the estimates set forth in the Liquidation Analysis, depending on, among other things, the claims asserted during the liquidation proceedings under Chapter 7. Accordingly, while the information contained in the Liquidation Analysis is necessarily presented with numerical specificity, the Debtors cannot assure that the values assumed would be realized or the claims estimates assumed would not change if the Liquidating Debtors were in fact liquidated, nor can assurances be made that the Bankruptcy Court would accept this analysis or concur with these assumptions in making its determination under section 1129(a) of the Bankruptcy Code.

The Liquidation Analysis was prepared using the Liquidating Debtors' books and records, unaudited financial information, certain independent appraisals prepared in conjunction with financings and valuation information prepared in conjunction with the Plan.

113

## C.     Valuation of the Reorganized Debtors

        In conjunction with formulating the Plan and the Plan Transactions, the Company determined that it was necessary to estimate its consolidated value on a going-concern basis (the "Enterprise Value").  Accordingly, the Company, with the assistance of Blackstone, its financial advisor, prepared an estimate of the Enterprise Value of the Reorganized Debtors, attached hereto as Exhibit G (the "Valuation").

        Although Blackstone reviewed the Company's business, operating assets and liabilities and business plan, Blackstone assumed that the Projections prepared by the Company's management were reasonably prepared in good faith and on a basis reflecting the Company's most accurate currently available estimates and judgments as to the future operating and financial performance of the Company.  In addition, Blackstone did not independently verify the Projections in connection with preparing estimates of Enterprise Value, and no independent valuations or appraisals of the Debtors were sought or obtained in connection herewith.  Such estimates were developed solely for the purposes of the formulation and negotiation of the Plan and the analysis of implied recoveries to holders of Allowed Claims thereunder.

        Blackstone's estimated Enterprise Value of the Company does not constitute a recommendation to any holder of Allowed Claims as to how such person should vote or otherwise act with respect to the Plan.  Blackstone has not been asked to and does not express any view as to what the trading value of the Company's securities would be when issued pursuant to the Plan or the prices at which they may trade in the future.

        Blackstone's estimate of Enterprise Value reflects the application of standard valuation techniques and does not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than set forth herein.  The value of an operating business is subject to numerous uncertainties and contingencies which are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business.  As a result, the estimated Enterprise Value range of the Company set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein.  Neither the Company, nor Blackstone, nor any other person assumes responsibility for any difference between the Enterprise Value range and such actual outcomes.  Actual market prices of such securities at issuance will depend upon, among other things, the operating performance of the Company, prevailing interest rates, conditions in the financial markets, the anticipated holding period of securities received by prepetition creditors (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), developments in the Company's industry and economic conditions generally, and other factors which generally influence the price of securities.

        The Valuation will be market-tested as the Debtors engage in the 363 Sale Process described more particularly in Article IV.F of this Disclosure Statement.  The Debtors may receive through the Sale Process one or more bona fide offers from qualified

buyers for the purchase of all or substantially all of the Debtors' assets. If any such offers are received, those offers may serve to confirm the range of Enterprise Value provided herein or may cause Blackstone to adjust – up or down – such Enterprise Value.

## ARTICLE VIII.

## CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST ANY OF THE DEBTORS SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN) PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION, OR ALTERNATIVES TO THE PLAN.

### A. Risks Relating to the Plan

#### 1. Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2. Consummation of the Plan is subject to creditor acceptance and approval by the Bankruptcy Court

The Debtors have operated their business and managed their assets under the supervision of the Bankruptcy Court since the Petition Date. Before it can be consummated, the Plan must be accepted by at least two-thirds in dollar amount and a majority in number of the Claims of Classes (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) entitled to vote to accept or reject the Plan. There can be no assurance that the Plan will be approved by the required majority of impaired creditors, and that even if approved, the Bankruptcy Court will confirm the Plan. The failure of any of these conditions will delay the consummation of the Plan.

The Plan provides that the Debtors reserve the right to seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code, to the extent applicable. In the event

115

that any Class of Claims fails to accept the Plan in accordance with sections 1126(c) and 1129(a)(8) of the Bankruptcy Code, the Debtors reserve the right to request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code and/or modify the Plan in accordance with Section 9.7 thereof. While the Debtors believe that the Plan satisfies the requirements for non-consensual confirmation under section 1129(b) of the Bankruptcy Code because it does not "discriminate unfairly" and is "fair and equitable" with respect to the Classes that reject or are deemed to reject the Plan, there can be no assurance that the Bankruptcy Court will reach the same conclusion. In addition, there can be no assurance that any challenge to the requirements for non-consensual confirmation will not delay the Debtors' emergence from chapter 11 or prevent confirmation of the Plan.

### 3. Occurrence of the Effective Date of the Plan is subject to a number of significant conditions

The occurrence of the Effective Date is subject to certain conditions precedent as described in the Plan, including, among others, the requirement that the Debtors obtain material concessions from the UMWA and the USW. Failure to meet any of these conditions could result in the Plan not being consummated or the Confirmation Order being vacated.

If the Plan is not consummated, any settlement, compromise or release embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), the assumption or rejection of executory contracts or unexpired leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be null and void.

### 4. If any of the conditions to Confirmation and/or consummation are not satisfied, or an alternative plan is not approved, the Debtors will be forced to sell or otherwise liquidate their assets

If any of the conditions precedent as described in the Plan, including confirmation of the Plan by the Bankruptcy Court and the satisfaction of conditions to the Effective Date are not satisfied and the Plan is not consummated, or an alternative plan is not approved, there can be no assurance that the Chapter 11 Cases will continue, or that an alternative plan of reorganization, if any, would be approved on comparable terms for holders of Claims. The Restructuring Support Agreement executed by the Debtors requires the Debtors to abandon efforts to confirm the Plan and to exclusively use their best efforts to pursue and consummate the 363 Sale by February 3, 2016 if any Triggering Event has occurred under the Restructuring Support Agreement.

As more thoroughly discussed in Article IV.F above, the Debtors have agreed to pursue the 363 Sale Process at the same time they proceed with their efforts to confirm the Plan. If the Plan is not confirmed, the Debtors will exclusively use their best efforts to pursue and consummate the 363 Sale Process and seek to sell the Debtors' assets. There is no assurance that the Debtors will be able to close the 363 Sale in accordance with the

116

requirements of the Restructuring Support Agreement. If the Debtors fail to timely consummate the 363 Sale, a liquidation of the Debtors' assets (including through a conversion to Chapter 7) may occur.

### 5. The actual amount of Allowed Claims may differ from the estimated Claims and adversely affect the percentage recovery of Claims

The estimated Claims set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Such differences may materially and adversely affect, among other things: the percentage recoveries to holders of Allowed Claims under the Plan; the Debtors' ability to consummate the Plan; the Debtors' ability to realize the Projections; and the Debtors' need to raise additional debt or equity financing.

### 6. Undue delay may significantly disrupt the Debtors' operations

Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is not possible to predict the amount of time the Debtors may spend in such proceedings or to provide any assurance as to whether or not the Plan will be confirmed, as further described above. The continuation of the Chapter 11 Cases, if the Plan is not approved or confirmed in the time frame that is required by the Restructuring Support Agreement or if a Triggering Event occurs, will require the Debtors to exclusively use their best efforts to pursue and consummate the 363 Sale. This process could materially and adversely affect the Debtors' operations and relationships with their customers, vendors, service providers, employees, regulators and partners. Also, transactions outside the ordinary course of business are subject to the prior approval of the Bankruptcy Court, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. In addition, if confirmation and consummation of the Plan do not occur expeditiously, the Chapter 11 Cases could result in, among other things, increased costs, professional fees, and similar expenses, and may also make it more difficult to retain and attract management and other key personnel, and would require senior management to continue to spend a significant amount of time and effort dealing with the Debtors' financial reorganization instead of focusing on the operation of the Debtors' businesses.

### 7. The Chapter 11 Cases may adversely affect the Debtors' operations going forward

The fact that the Debtors have been subject to the Chapter 11 Cases may adversely affect the Debtors' operations going forward, including their ability to negotiate favorable terms from suppliers, hedging counterparties and others and to attract and retain customers. The failure to obtain such favorable terms and retain customers could adversely affect the Debtors' profitability and financial condition and performance.

8. **The Debtors may not achieve the financial performance projected under the Plan**

The Projections attached hereto as <u>Exhibit E</u> are the projections of future performance of the Debtors' operations on a consolidated basis through fiscal year [_____], after giving effect to the Plan and do not purport to represent what the Debtors' actual financial position will be upon emergence from the Chapter 11 Cases or represent what the fair value of the Debtors' assets and liabilities will be at the Effective Date. These Projections are based on numerous estimates of values and assumptions including the timing, confirmation and consummation of the Plan in accordance with their terms, the expected terms of any exit financing facility, the anticipated future performance of the Debtors, industry performance, general business and economic conditions and other matters, many of which are beyond the control of the Company and some or all of which may not materialize. These estimates and assumptions are based on management's judgment based on facts available and determinations made at the time the Projections were prepared, and may turn out to have been incorrect over time, which could have a material effect on the Debtors' ability to meet the Projections. It is also not possible to predict with certainty that the actions taken in connection with the Chapter 11 Cases based on the estimates and assumptions will result in an improved financial and operating condition that ensures the long-term viability of the Debtors.

In addition, unanticipated events and circumstances occurring subsequent to the date hereto may affect the actual financial results of the Debtors' operations. Except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement. The Debtors do not intend to update the Projections; thus, the Projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Projections.

9. **Certain liabilities will not be fully extinguished as a result of the Confirmation of the Plan by the Bankruptcy Court**

While a significant amount of the Debtors' current liabilities will be discharged upon emergence from the Chapter 11 Cases, a number of obligations may not be subject to discharge in the Chapter 11 Cases. These may include, among other things, reclamation and environmental remediation obligations, workers compensation and other employee-related obligations, and other contracts that, even if modified during the Chapter 11 Cases, may subject the Debtors to substantial ongoing obligations and liabilities.

10. **The termination of the Single Employer Pension Plans may have adverse consequences for the reorganized Debtors.**

Pursuant to the RSA, the Debtors will seek to terminate the Single Employer Pension Plans. The termination of the Single Employer Pension Plans may have certain adverse consequences for the Reorganized Debtors, including termination premiums that may be owed on account of the Single Employer Pension Plans.

118

**11.** **Debtors may not have sufficient financing to operate their business and meet future obligations**

There can be no assurance as to the Debtors' ability to maintain sufficient financing sources to fund their business and meet future obligations. The Debtors intend to finance their operations during their reorganization using the Cash Collateral. There can be no assurance that the Debtors are able to operate pursuant to the terms of the Interim Cash Collateral Order and related final order, including the covenants and restrictions contained therein, or to negotiate and obtain necessary approvals, amendments, waivers, or other types of modifications, and to otherwise fund and execute the Debtors' business plans throughout the duration of the Chapter 11 Cases.

**B.** **Risks Relating to the Debtors' and the Reorganized Debtors' Financial Results and Condition**

**1.** **The Debtors may require significant financing in order to emerge from the Chapter 11 Cases**

At or prior to Confirmation, the Debtors will require substantial exit financing, which may consist of a combination of revolving credit facilities, term loan facilities and debt securities. The Debtors' entry into any exit financing facilities is a condition to consummation of the Plan. There can be no assurance at this time that this financing will be available, or that it will be available on terms that are favorable to the Debtors, in which case the Debtors may be forced to accept unfavorable terms that could affect their ability to succeed in the future.

The allocation and terms and provisions of any exit financing facilities (including interest rates, maturity dates, amortization schedules and other significant terms) have not been negotiated with any prospective lenders and will be subject to such negotiations, which will be influenced materially by conditions in the capital markets and other factors that may affect the availability of such financing. Such allocation, terms and provisions are likely not to have been determined definitively prior to the Voting Deadline. As a result, the allocation and terms and provisions of any exit financing facilities may be significantly different from those described in or contemplated by this Disclosure Statement and the Projections, and the Debtors' capital structure may differ significantly from that described in or contemplated by this Disclosure Statement and the Projections. Furthermore, the other terms and provisions of any exit financing facilities may cause the timing and magnitude of the Debtors' interest expense and other debt service obligations to be different from those described in or contemplated by this Disclosure Statement and the Projections, and the Debtors may be subject to significant additional covenants or restrictions as a result of negotiations with their prospective lenders or because of market conditions.

The Debtors cannot provide any assurance that they will be able to obtain financing in the future if and when required, or that they will be able to obtain financing on favorable terms. The Debtors' profitability and ability to generate cash flow will likely depend upon their ability to successfully implement their business strategy and meet or

119

exceed the results forecasted in the Projections, but the Debtors cannot ensure that they will be able to accomplish these results if they do not have the appropriate financing to do so.

**2. Despite the expected post-emergence indebtedness levels of the Reorganized Debtors, they may still be able to incur substantially more debt, and additional indebtedness could exacerbate the risks associated with the substantial leverage of the Reorganized Debtors**

The Reorganized Debtors may be able to incur substantial additional indebtedness, including additional secured indebtedness, in the future. The terms of any exit financing facilities and the other indebtedness of the Reorganized Debtors will likely restrict, but will not completely prohibit, the Reorganized Debtors from doing so. If new debt or other liabilities are added to the Reorganized Debtors' post-emergence debt levels, the related risks that they face could intensify.

**3. The Reorganized Debtors' ability to generate the significant amount of cash needed to service their debt and financial obligations, to refinance all or a portion of their indebtedness or obtain additional financing depends on many factors beyond their control**

The Reorganized Debtors' ability to make payments on and to refinance their post-emergence indebtedness depends on their ability to generate cash in the future. The Reorganized Debtors will be subject to general economic, climatic, industry, financial, competitive, legislative, regulatory and other factors that are beyond their control. In particular, economic conditions have caused the price of coal to fall and the Company's revenue to decline. In the future, those and other economic conditions could cause the price of coal to remain at current depressed levels or to fall further, which may have an adverse effect on the Reorganized Debtors' operations, liquidity, and their ability to service their indebtedness. As a result, the Reorganized Debtors might need to refinance, in whole or in part, any of their post-emergence indebtedness on or before maturity. The Reorganized Debtors' ability to refinance their post-emergence debt or obtain additional financing will depend on, among other things:

- their financial condition at the time;

- restrictions in the agreements governing their indebtedness; and

- other factors, including conditions in the financial and capital markets or coal industry.

If their cash flows and capital resources are insufficient to fund their debt service obligations, the Reorganized Debtors could face substantial liquidity problems and could be forced to reduce or delay investments and capital expenditures or to dispose of

material assets or operations, seek additional debt or equity capital or restructure or refinance their indebtedness. The Reorganized Debtors may not be able to affect any such alternative measures on commercially reasonable terms or at all and, even if successful, those alternative actions may not allow the Reorganized Debtors to meet their scheduled debt service obligations. The Debtors expect that any exit financing facilities will restrict the Reorganized Debtors' ability to dispose of assets and use the proceeds from those dispositions and may also restrict their ability to raise capital from debt or equity financings to repay other indebtedness when it becomes due. Additionally, the Reorganized Debtors may not be able to consummate such dispositions or to obtain proceeds in an amount sufficient to meet any debt service obligations when due.

In addition, the Company conducts a substantial portion of its operations through its subsidiaries. Accordingly, repayment of Walter Energy's indebtedness is dependent on the generation of cash flow by its subsidiaries and their ability to make such cash available to it by dividend, debt repayment or otherwise. Unless they are guarantors or otherwise obligors with respect to such indebtedness, Walter Energy's subsidiaries do not have any obligation to pay amounts due to its indebtedness or to make funds available for that purpose. The Company's subsidiaries may not be able to or be permitted to make distributions to enable it to make payments in respect to Walter Energy's indebtedness. Each subsidiary is a distinct legal entity and under certain circumstances, legal and contractual restrictions may limit the Company's ability to obtain cash from its subsidiaries. While the Debtors expect that the Exit Financing Facilities will limit the ability of the Company's subsidiaries to incur consensual restrictions on their ability to pay dividends or make other intercompany payments to the Company, these limitations are subject to qualifications and exceptions. In the event that the Company does not receive distributions from its subsidiaries it may be unable to make required principal and interest payments on its indebtedness.

The Reorganized Debtors may not be able to refinance any of their post-emergence indebtedness on commercially reasonable terms or at all. If the Reorganized Debtors' operations do not generate sufficient cash flows, and additional borrowings or refinancing are not available to them, the Reorganized Debtors may not have sufficient cash to enable them to meet all of their obligations.

If the Reorganized Debtors cannot make scheduled payments on their debt or are not in compliance with their covenants and they are not able to amend those covenants, the Reorganized Debtors will be in default and holders of the Reorganized Debtors' post-emergence debt could declare all outstanding principal and interest to be due and payable, and the lenders could foreclose against the assets securing their borrowings. Defaults on any post-emergence debt of the Reorganized Debtors and the exercise of remedies by the holders of such debts likely may have an adverse market effect on the value of the New Walter Energy Common Stock and could also precipitate a bankruptcy filing or liquidation by the Reorganized Debtors.

121

4. **Changes in the Reorganized Debtors' credit ratings could adversely affect their costs and expenses**

Any downgrade in the Reorganized Debtors' credit ratings could adversely affect their ability to borrow and result in more restrictive borrowing terms, including increased borrowing costs and more restrictive covenants. This could affect their internal cost of capital estimates and therefore impact operational and investment decisions.

5. **Unwinding the Hybrid Financing Structure could cause adverse tax consequences**

The Hybrid Financing structure entered into between Walter Energy, Energy Holdings, and Canada Holdings must, according to its terms, be unwound on March 31, 2021 (i.e., on the ten-year maturity date of the Hybrid Secured Promissory Note). The Hybrid Financing agreements provide that Energy Holdings will then subscribe for shares of Canada Holdings under the Western Subscription Agreement, the proceeds of which will be used by Canada Holdings to repay the Hybrid Secured Promissory Note. Pursuant to the Capital Support Agreement, Walter Energy is required to provide Energy Holdings $2.0 Billion to fund the shares subscription and subsequent note repayment. Walter Energy has also guaranteed Energy Holdings' performance on the unwinding of the Hybrid Financing under the Guarantee. At the time the Hybrid Financing structure is unwound, if Walter Energy does not have the necessary funds to contribute to Energy Holdings, or is otherwise unable to provide the necessary credit support under the Guarantee, to permit the Hybrid Financing structure to be unwound according to its terms, with full repayment of the Hybrid Secured Promissory Note by Canada Holdings, material adverse Canadian federal income tax consequences could arise.

6. **Failure to obtain or renew surety bonds on acceptable terms could affect the Reorganized Debtors' ability to secure reclamation and coal lease obligations and, therefore, their ability to mine or lease coal**

Federal, state and provincial laws require the Reorganized Debtors to obtain surety bonds or post other financial security to secure performance or payment of certain long-term obligations, such as mine closure or reclamation costs, federal and state workers' compensation costs, coal leases and other obligations. The Reorganized Debtors may have difficulty procuring or maintaining the requisite surety bonds. The Reorganized Debtors' bond issuers may demand higher fees or additional collateral, including letters of credit or other terms less favorable to them upon those renewals. Because the Reorganized Debtors will be required by state and federal law to have these bonds in place before mining by the Reorganized Debtors can commence or continue, their failure to maintain surety bonds, letters of credit or other guarantees or security arrangements would materially and adversely affect their post-emergence ability to mine or lease coal. That failure could result from a variety of factors, including lack of availability, higher expense or unfavorable market terms, the exercise by third party surety bond issuers of their right to refuse to renew their bonds,

122

and restrictions on availability of collateral for current and future third party surety bond issuers under the terms of the Reorganized Debtors' financing arrangements.

**7.    The Debtors are responsible for portions of their workers' compensation and certain medical and disability benefits, and greater than expected claims could reduce the Reorganized Debtors' profitability**

The Debtors are responsible for portions of their workers' compensation benefits for work-related injuries. Workers' compensation liabilities, including those related to claims incurred but not reported, are recorded principally using annual valuations based on discounted future expected payments using historical data of the specific subsidiary or combined insurance industry data when historical data is limited. In addition, certain of the Company's subsidiaries are responsible for medical and disability benefits for black lung disease under the Federal Coal Mine Health and Safety Act of 1969 and the Federal Mine Safety and Health Act of 1977, as amended, and are self-insured for portions of this liability against black lung related claims. The Debtors perform periodic evaluations of their black lung liability, using assumptions regarding rates of successful claims, discount factors, benefit increases and mortality rates, among others. See additional information under the heading "Critical Accounting Estimates—Employee Benefits" in "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" included in the Company's Annual Report on Form 10-K for the year ended December 31, 2014 filed with the SEC.

If the number or severity of claims increases, or the Reorganized Debtors are required to accrue or pay additional amounts because the claims prove to be more severe than their original assessment, their operating results could be reduced.

**8.    The Reorganized Debtors may be subject to litigation, the disposition of which could negatively affect their profitability and cash flow in a particular period, or have a material adverse effect on their business, financial condition and results of operations**

The Reorganized Debtors' profitability or cash flow in a particular post-emergence period could be affected by an adverse ruling in any litigation filed against any of them in the future. Such litigation could have a material adverse effect on their business, financial condition and results of operations.

**9.    The Reorganized Debtors' financial results may be volatile and may not reflect historical trends**

Following the Reorganized Debtors' emergence from the Chapter 11 Cases, the Reorganized Debtors expect that their financial results may continue to be volatile, as asset impairments, asset dispositions and restructuring activities (including mine closures and idlings), as well as continuing global economic uncertainty, may significantly impact the Projections. As a result, the Debtors' historical financial performance is likely not indicative

of the Reorganized Debtors' financial performance post-emergence. In addition, upon emergence, the amounts reported in the Reorganized Debtors subsequent financial statements may materially change relative to the Company's historical financial statements, including as a result of revisions to their operating plans and changes in the terms and provisions of any of the exit financing facilities pursuant to the Plan.

In addition, to the extent actual results or conditions differ from the assumptions made by the Debtors in preparing their Projections, the actual results and financial condition of the Reorganized Debtors may differ materially from those presented in the Projections. Among the factors that may cause actual results or conditions to differ from the assumptions made by the Debtors in preparing the Projections are those risk factors presented in this Article VIII.

## C. Risks Relating to the Debtors' Business

The Debtors' business is subject to general risks and uncertainties that could materially adversely affect the Debtors' business, financial condition, results of operations or stock price. Additional risks and uncertainties not currently known to the Debtors or that they may deem immaterial may also materially adversely affect their business, financial condition, results of operations or stock price.

### 1. The Debtors' businesses may suffer as a result of a substantial or extended decline in pricing, demand and other factors beyond the Debtors' control, which could negatively affect the Debtors' operating results and cash flows

The Debtors' businesses are cyclical and have experienced significant difficulties in the past. The Debtors' financial performance depends, in large part, on varying conditions in the international and domestic markets that they serve, which fluctuate in response to various factors beyond the Debtors' control. The prices at which the Debtors sell their coal, coke and natural gas are largely dependent on prevailing market prices for those products. The Debtors have experienced significant price fluctuations in their coal, coke and natural gas businesses, and they expect that such fluctuations will continue. Demand for, and therefore the price of, coal, coke and natural gas are driven by a variety of factors, including, without limitation, to the following:

- the domestic and foreign supply and demand for coal;

- the quantity and quality of coal available from competitors;

- adverse weather, climatic and other natural conditions, including natural disasters;

- domestic and foreign economic conditions, including economic slowdowns;

- global and regional political events;

- legislative, regulatory and judicial developments, environmental regulatory changes and changes in energy policy and energy conservation measures that could adversely affect the coal industry, such as legislation limiting carbon emissions or providing for increased funding and incentives for the use of alternative energy sources;

- capacity, reliability, availability and cost of transportation and port facilities, and the proximity of available coal to such transportation and port facilities; and

- market price fluctuations for emission allowances.

In addition, reductions in the demand for metallurgical coal caused by reduced steel production by the Debtors' customers, increases in the use of substitutes for steel (such as aluminum, composites or plastics) and the use of steel-making technologies that use less or no metallurgical coal can significantly affect the Debtors' financial results and impede growth.

As described above in Section 4.A, the Debtors' businesses suffered significantly in the years preceding the Petition Date due to, among other things, the global overproduction of metallurgical coal, lower demand for metallurgical coal from the steel industry, the precipitous decline in the benchmark price for metallurgical coal, and the strength of the U.S. dollar relative to the currencies of Australia and other large, metallurgical coal-producing countries. These adverse market conditions have not improved since the Petition Date and may have worsened as the global supply of metallurgical coal continues to outstrip demand and metallurgical coal prices remain depressed. The decline in the metallurgical coal industry has negatively affected not only the Debtors, but also their domestic competitors and their customers. For example, on August 3, 2015, Alpha Natural Resources, the largest U.S. producer of metallurgical coal, filed for Chapter 11 bankruptcy protection. Meanwhile, on August 17, 2015, United States Steel Corporation announced its proposed intent to close its blast furnace and steelmaking operations at its facility in Fairfield, Alabama, which facility is the largest customer of Walter Coke.

As noted in Section 4.A above, some industry experts have forecast that the market conditions affecting the Debtors' operations are not likely to improve materially in the near future. Because of the volatile nature of the metallurgical coal and steel industries and the other factors cited herein, the Debtors are not able to predict whether or when the global economic conditions currently depressing their businesses will continue, worsen or improve, or the impact that these variables may have on the Reorganized Debtors' future operations or performance.

125

## 2. The failure of the Debtors' customers to honor or renew contracts could adversely affect the Debtors' business

A significant portion of the sales of the Debtors' coal, coke and natural gas are to long-term customers. The success of the Debtors' businesses depends on their ability to retain the Debtors' current customers, renew the Debtors' existing customer contracts and solicit new customers. The Debtors' ability to do so generally depends on a variety of factors, including the quality and price of the Debtors' products, the Debtors' ability to market these products effectively, the Debtors' ability to deliver on a timely basis and the level of competition that they face. If current customers do not honor current contract commitments, or if they terminate agreements or exercise *force majeure* provisions allowing for the temporary suspension of performance, the Debtors' revenues will be adversely affected. If the Debtors are unsuccessful in renewing contracts with their long-term customers and they discontinue purchasing coal, coke or natural gas from the Debtors or renew contracts on terms less favorable than in the past, or if the Debtors are unable to sell their coal, coke or natural gas to new customers on terms favorable to them, the Debtors' revenues could suffer significantly.

## 3. The failure of the Debtors' suppliers to honor or renew contracts could adversely affect the Debtors' business

The Debtors rely on certain key suppliers. If current suppliers do not honor current contract commitments, or if they terminate agreements or exercise force majeure provisions allowing for the temporary suspension of performance, the Debtors' business could be adversely affected. If the Debtors are unsuccessful in renewing contracts or renew contracts on terms less favorable than in the past, or if the Debtors are unable to negotiate contracts with different suppliers on terms favorable to them, the Debtors' business could be adversely impacted.

## 4. The Debtors' ability to collect payments from the Debtors' customers could be impaired if the customers' creditworthiness deteriorates

The Debtors' ability to receive payment for coal, coke and natural gas sold and delivered depends on the continued creditworthiness of the Debtors' customers. If the Debtors determine that a customer is not creditworthy, they may not be required to deliver coal, coke or natural gas sold under the customer's sales contract. If this occurs, the Debtors may decide to sell the customer's coal, coke or natural gas on the spot market, which may be at prices lower than the contracted price, or they may be unable to sell the coal, coke or natural gas at all. Furthermore, the bankruptcy of any of the Debtors' customers could materially and adversely affect the Debtors' financial position. In addition, competition with other coal, coke or natural gas suppliers could cause the Debtors to extend credit to customers on terms that could increase the risk of payment default.

126

5. **Coal mining is subject to inherent risks and is dependent upon many factors and conditions beyond the Debtors' control, which may cause the Debtors' profitability and the Debtors' financial position to decline**

Coal mining is subject to inherent risks and is dependent upon a number of conditions beyond the Debtors' control that can affect the Debtors' costs and production schedules at particular mines. These risks and conditions include, without limitation:

- variations in geological conditions, such as the thickness of the coal seam and amount of rock embedded in the coal deposit and variations in rock and other natural materials overlying the coal deposit;

- mining, process and equipment or mechanical failures and unexpected maintenance problems;

- adverse weather and natural disasters, such as heavy rains or snow, flooding and other natural events affecting the operations, transportation or customers;

- environmental hazards, such as subsidence and excess water ingress;

- delays and difficulties in acquiring, maintaining or renewing necessary permits or mining rights;

- availability of adequate skilled employees and other labor relations matters;

- unexpected mine accidents, including rock-falls and explosions caused by the ignition of coal dust, natural gas or other explosive sources at the Debtors' mine sites or fires caused by the spontaneous combustion of coal or similar mining accidents; and

- competition and/or conflicts with other natural resource extraction activities and production within the Debtors' operating areas, such as coalbed methane extraction or oil and gas development.

These risks and conditions could result in damage to or the destruction of the Debtors' mineral properties or production facilities, personal injury or death, environmental damage, delays in mining, monetary losses and legal liability. For example, an explosion and fire occurred in the Debtors' Alabama underground No. 5 Mine in September 2001. This accident resulted in the deaths of thirteen employees and caused extensive damage to the mine. The Debtors' insurance coverage may not be available or sufficient to fully cover claims that may arise from these risks and conditions.

127

The Debtors have also experienced adverse geological conditions in their mines, such as variations in coal seam thickness, variations in the competency and make-up of the roof strata, fault-related discontinuities in the coal seam and the potential for ingress of excessive amounts of methane gas or water. The Debtors are not able to quickly increase production at one mine to offset an interruption in production at another mine. Such adverse conditions may increase the Debtors' cost of sales and their profitability, and may cause them to decide to close a mine. Any of these risks or conditions could have a negative impact on the Debtors' profitability, the cash available from their operations or their financial position.

6.      **Defects in title of any real property or leasehold interests in the Debtors' properties or associated coal and gas reserves could limit the Debtors' ability to mine or develop these properties or result in significant unanticipated costs**

The Debtors' right to mine some of the Debtors' coal reserves and extract natural gas may be materially adversely affected by defects in title or boundaries. The Debtors may not adequately verify title to their leased properties or associated coal or gas reserves until they have committed to developing those properties or coal or gas reserves. The Debtors may not commit to developing property or coal or gas reserves until they have obtained necessary license and permits and completed exploration. Any challenge to the Debtors' title could delay the development of the property and could ultimately result in the loss of some or all of the Debtors' interest in the property or coal or gas reserves and could increase the Debtors' costs. In addition, if the Debtors mines or conduct their natural gas operations on property that they do not own or lease, they could incur liability for such mining and gas operations. Some leases have minimum production requirements or require the Debtors to commence mining or gas operations in a specified term to retain the lease. Failure to meet those requirements could result in losses of prepaid royalties and, in some rare cases, could result in a loss of the lease itself.

7.      **Currently the Debtors have significant mining operations located predominately in central Alabama, making them vulnerable to risks associated with having their production concentrated in one geographic area**

The Debtors' mining operations are primarily geographically concentrated in central Alabama. As a result of this concentration, the Debtors may be disproportionately exposed to the impact of delays or interruptions in production caused by significant governmental regulation, transportation capacity constraints, curtailment of production, extreme weather conditions, natural disasters or interruption of transportation or other events that impact this areas.

128

8. **A significant reduction of, or loss of, purchases by the Debtors' largest customers could adversely affect the Debtors' profitability**

For the year ended December 31, 2014, the Company derived approximately 29% of its total sales revenues from sales to its five largest customers. The Debtors expect to renew, extend or enter into new supply agreements with these and other customers; however, they may be unsuccessful in obtaining such agreements with these customers and these customers may discontinue purchasing coal from the Debtors. If any of the Debtors' major customers were to significantly reduce the quantities of coal they purchase from the Debtors and the Debtors are unable to replace these customers with new customers, or if the Debtors are otherwise unable to sell coal to those customers or on terms favorable to them, the Debtors' profitability could suffer significantly.

9. **If transportation for the Debtors' coal becomes unavailable or uneconomic for the Debtors' customers, the Debtors' ability to sell coal could suffer**

Transportation costs can represent a significant portion of the total cost of coal to be delivered to the customer and, as a result, overall price increases in the Debtors' transportation costs could make the Debtors' coal less competitive with the same or alternative products from competitors with lower transportation costs. In addition, disruption of any of the transportation services due to weather related problems, which are variable and unpredictable; strikes or lock-outs; accidents; transportation delays or other events could impair the Debtors' ability to supply their products to their customers, thereby resulting in lost sales and reduced profitability.

Each of the Debtors' U.S. metallurgical mines is served by only one rail carrier, which increases the Debtors' vulnerability to these risks, although the Debtors' access to barge transportation partially mitigates that risk. In addition, the majority of the metallurgical coal produced by the Debtors' Alabama underground mining operations is sold to coal customers who typically arrange and pay for transportation through the state-run docks at the Port of Mobile, Alabama to the point of use. As a result, disruption at the docks, port congestion and delayed coal shipments may result in demurrage fees to us. If this disruption were to persist over an extended period of time, demurrage costs could significantly impact the Debtors' profits. In addition, there are limited cost effective alternatives to the port. An interruption of rail or port services could significantly limit the Debtors' ability to operate and, to the extent that alternate sources of port and rail services are available, could increase transportation and port costs significantly. Further, the inconsistent nature of the shipping industry could affect the Debtors' revenues as a result of delays of ocean vessels and could significantly affect the Debtors' costs and relative competitiveness compared to the supply of coal and other products from the Debtors' competitors.

10.    **Significant competition and foreign currency fluctuations could harm the Debtors' sales, profitability and cash flows**

The consolidation of the coal industry over the last several years has contributed to increased competition among coal producers. Some of the Debtors' competitors have significantly greater financial resources than the Debtors do. This competition may affect domestic and foreign coal supply and associated prices and impact the Debtors' ability to retain or attract coal customers. In addition, the Debtors' metallurgical coal business faces competition from foreign producers that sell their coal in the export market. The general economic conditions in foreign markets and changes in currency exchange rates are factors outside of the Debtors' control that may affect international coal prices. If the Debtors' competitors' currencies decline against the Debtors' local currency or against the Debtors' customers' currencies, those competitors may be able to offer lower prices to the Debtors' customers. Furthermore, if the currencies of the Debtors' overseas customers significantly decline in value in comparison to the U.S. dollar, on which the Debtors' sales contracts are based those customers may seek decreased prices for the coal that the Debtors sells to them. In addition, these factors may negatively impact the Debtors' collection of trade receivables from their customers. These factors could reduce the Debtors' profitability or result in lower coal sales.

11.    **The Debtors' businesses are subject to risk of cost increases and fluctuations and delay in the delivery of raw materials, mining equipment and purchased components**

The Debtors' businesses require significant amounts of raw materials, mining equipment and labor. As a result, shortages or increased costs of raw materials, mining equipment and labor could adversely affect the Debtors' business or results of operations. The Debtors' coal mining operations rely on the availability of steel, petroleum products and other raw materials for use in various mining operations. The availability and market prices of these materials are influenced by various factors that are beyond the Debtors' control. Over the last year petroleum prices have fluctuated significantly and pricing for steel scrap has fluctuated markedly. Any inability to secure a reliable supply of these materials or shortages in raw materials used in the operation and manufacturing of mining equipment or replacement parts could negatively impact the Debtors' operating results.

12.    **Work stoppages, labor shortages and other labor relations matters may harm the Debtors' business**

The majority of employees of the Debtors' underground mining operations in Alabama are represented by the UMWA. Normally, the Debtors' labor contract with the UMWA mirrors the national contract negotiated with the UMWA by the Bituminous Coal Operators Association. The Debtors' collective bargaining agreement currently in place expires on December 31, 2016 following requisite notice. At the Debtors' coking operation in Birmingham, Alabama, the Debtors' Employees are represented by the USW, and the current contract expires on December 6, 2015 following requisite notice. The Debtors

experienced a strike at Walter Coke's coke facilities at the end of 2001 that lasted eight months.

While the Debtors intends to seek renegotiation or rejection of their existing collective bargaining agreements in the Chapter 11 Cases, there can be no assurance that they will be able to do so, or that such actions will not result in work stoppages. Future work stoppages, union issues or labor disruptions at the Debtors' operations, and those of key customers or service providers could impede the Debtors' ability to produce and deliver their products, to receive critical equipment and supplies or to collect payment. This may increase the Debtors' costs or impede their ability to operate one or more of their operations. As set forth in the RSA, the Company must cease pursuing and withdraw from the Plan upon the occurrence of a strike, work slowdown or other concerted labor activity that lasts for more than three (3) days and reduces production by over 100,000 tonnes, as measured against the Company's mining plan.

13. **The Debtors require a skilled workforce to run their business. If the Debtors cannot hire qualified people to meet replacement or expansion needs, they may not be able to achieve planned results**

Efficient coal mining using modern techniques and equipment requires skilled laborers with mining experience and proficiency as well as qualified managers and supervisors. The demand for skilled employees sometimes causes a significant constriction of the labor supply resulting in higher labor costs. When coal producers compete for skilled miners, recruiting challenges can occur and employee turnover rates can increase, which negatively affect operating efficiency and costs. If a shortage of skilled workers exists, and the Debtors are unable to train and retain the necessary number of miners, it could adversely affect the Debtors' productivity, costs and ability to expand production.

14. **The Debtors have reclamation and mine closure obligations. If the assumptions underlying the Debtors' accruals are inaccurate, they could be required to expend greater amounts than anticipated**

The Surface Mining Control and Reclamation Act and counterpart state laws and regulations in the United States; the Mines Act and the Reclamation Code for Mines in British Columbia, Canada; and the Environmental Protection Act 1990, Environment Act 1995, Environmental Permitting Regulations 2010 and Town and Country Planning Act 1990 in the U.K. have established operational, reclamation and closure standards for all aspects of surface mining as well as most aspects of deep mining. The Company accrues for reclamation costs associated with final mine closure. Estimates of the Company's total reclamation and mine-closing liabilities are based upon permit requirements and its experience for similar activities. The amounts recorded are dependent upon a number of variables, including the estimated timing and amounts of future retirement costs, estimated proven reserves, assumptions involving profit margins, inflation rates and the assumed credit-adjusted risk-free interest rates. Furthermore, these obligations are unfunded. If these accruals are insufficient or the Company's liability in a particular year is greater than

131

currently anticipated, its future operating results could be adversely affected. As of December 31, 2014, the Company had accrued $112.3 million for all its asset retirement obligations.

### 15. Inaccuracies in the Debtors' estimates of their coal reserves could result in decreased profitability from lower than expected revenues or higher than expected costs

The Debtors' future performance depends on, among other things, the accuracy of their estimates of their proven and probable coal reserves. Reserve estimates are based on a number of sources of information, including engineering, geological, mining and property control maps, the Debtors' operational experience of historical production from similar areas with similar conditions and assumptions governing future pricing and operational costs. The Debtors updates their estimates of the quantity and quality of proven and probable coal reserves at least annually to reflect the production of coal from the reserves, updated geological models and mining recovery data, the tonnage contained in new lease areas acquired and estimated costs of production and sales prices. There are numerous factors and assumptions inherent in estimating coal quantities, qualities and costs to mine, including many factors beyond the Debtors' control such as the following:

- quality of the coal;

- geological and mining conditions, which may not be fully identified by available exploration data and/or may differ from the Company's experiences in areas where it currently mines;

- the percentage of coal ultimately recoverable;

- the assumed effects of regulation, including the issuance of required permits, taxes, including severance and excise taxes and royalties, and other payments to governmental agencies;

- assumptions concerning the timing of the development of the reserves; and

- assumptions concerning the equipment and operational productivity, future coal prices, operating costs, including for critical supplies such as fuel, tires and explosives, capital expenditures and development and reclamation costs.

As a result, estimates of the quantities and qualities of economically recoverable coal attributable to any particular group of properties, classifications of reserves based on risk of recovery, estimated cost of production, and estimates of future net cash flows expected from these properties as prepared by different engineers or by the same engineers at different times, may vary materially due to changes in the above factors and assumptions. Actual production recovered from identified reserve areas and properties, and

132

revenues and expenditures associated with the Debtors' mining operations may vary materially from estimates. Any inaccuracy in the Debtors' estimates related to their reserves could result in decreased profitability from lower than expected revenues and/or higher than expected costs.

16. **The Debtors' inability to develop coal reserves in an economically feasible manner or their inability to acquire additional coal reserves may adversely affect their business**

The Debtors' long-term profitability depends in part on their ability to cost effectively mine and process coal reserves that possess the quality characteristics desired by their customers. As the Debtors mine, their coal reserves decline. As a result, the Debtors' future success depends upon their ability to develop or acquire additional coal reserves that are economically recoverable. The Debtors may not be able to obtain adequate economically recoverable replacement reserves when they require them. If available, replacement reserves may not be available at favorable prices or the Debtors may not be capable of mining those reserves at costs that are comparable with their existing coal reserves.

Additionally, the Debtors may not be able to accurately assess the geological characteristics of reserves that they now own or subsequently acquire, which may adversely affect their profitability and financial condition. Exhaustion of reserves at particular mines also may have an adverse effect on the Debtors' operating results that is disproportionate to the percentage of overall production represented by those mines. The Debtors' ability to acquire other reserves in the future could be limited by, among other factors, their financial position, restrictions under their existing or future debt agreements, competition from other coal companies for attractive properties, and the lack of suitable acquisition candidates available on commercially reasonable terms. If the Debtors are unable to replace or increase their coal reserves on acceptable terms, their production and revenues will decline as their reserves are depleted and their future profits will be detrimentally impacted.

17. **The Company's operations in foreign jurisdictions are subject to risks and uncertainties that may have a negative impact on their profitability**

The Company sells to customers in a number of foreign countries where there are added risks and uncertainties due to the different economic, cultural and political environments. The Company also faces risks from trade barriers, exchange controls and material changes in taxation which could negatively impact their ability to sell into foreign markets, as well as their profitability.

18. **Additional business and operational risks exist with respect to the Debtors' non-Debtor affiliates.**

Certain material affiliates of the Debtors are not a part of these Chapter 11 Cases, including the Company's Canadian Operations and U.K. Operations. See Section III(L)(4) of this Disclosure Statement for further details regarding the Non-Debtor entities.

These entities and operations may be subject to other material business and financial risks that are not addressed in this Disclosure Statement, because they differ from risks posed for the Debtors. For a full description of the risks these entities and operations may face, please refer to the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2014, as amended, which is available for inspection online at the SEC's website at www.sec.gov.

> **19.** **Extensive environmental, health and safety laws and regulations impose significant costs on the Debtors' operations and future regulations could increase those costs, limit their ability to produce or adversely affect the demand for their products**

The Debtors' businesses are subject to numerous federal, state, provincial and local laws and regulations with respect to matters such as:

- employee health and safety, including:

- occupational safety and health;

- mine health and safety;

- workers' compensation; and

- black lung;

- reclamation and restoration of property; and

- environmental laws and regulations, including:

- greenhouse gases and climate change;

- air quality standards;

- water quality standards;

- management of materials generated by mining and coking operations;

- the storage, treatment and disposal of wastes;

- remediation of contaminated soil and groundwater; and

- protection of human health, plant-life and wildlife, including endangered species, and emergency planning and community right to know.

134

Compliance with these regulations may be costly and time-consuming and may delay commencement or interrupt continuation of exploration or production at one or more of the Debtors' operations. These laws are constantly evolving and becoming increasingly stringent. The ultimate impact of complying with existing laws and regulations is not always clearly known or determinable due in part to the fact that certain implementing regulations for these laws have not yet been promulgated and in certain instances are undergoing revision. These laws and regulations, particularly new legislative or administrative proposals (or judicial interpretations of existing laws and regulations), could result in substantially increased capital, operating and compliance costs and could have a material adverse effect on the Debtors' operations or their customers' ability to use the Debtors' products. In addition, the coal industry in the U.S. is affected by significant legislation mandating certain benefits for current and retired coal miners.

The Debtors strive to conduct their mining, natural gas and coke operations in compliance with all applicable federal, provincial, state and local laws and regulations. However, due in part to the extensive and comprehensive regulatory requirements, along with changing interpretations of these requirements, violations occur from time to time in the Debtors' industry and at their operations. In recent years, expenditures at the Debtors' U.S. operations for regulatory or environmental obligations have been for safety or process changes as well as complying with ongoing monitoring or investigation obligations. Although it is not possible at this time to predict the final outcome of these rule-making and standard-setting efforts, it is possible that the magnitude of these changes will require an unprecedented compliance effort on the Debtors' part, could divert management's attention, and may require significant expenditures. To the extent that these expenditures, as with all costs, are not ultimately reflected in the prices of the Debtors' products and services, operating results will be detrimentally impacted. The Debtors believe that their major North American competitors are confronted by substantially similar conditions and thus do not believe that their relative position with regard to such competitors is materially affected by the impact of environmental laws and regulations. However, the costs and operating restrictions necessary for compliance with environmental laws and regulations, which is a major cost consideration for the Debtors' operations, may have an adverse effect on their competitive position with regard to foreign producers and operators who may not be required to undertake equivalent costs in their operations. In addition, the specific impact on each competitor may vary depending on a number of factors, including the age and location of its operating facilities, applicable state or provincial legislation and its production methods.

20. **Federal, state or provincial regulatory agencies have the authority to order certain of the Debtors' mines to be temporarily or permanently closed under certain circumstances, which could materially and adversely affect their ability to meet their customers' demands**

Federal, state and local regulatory agencies have the authority under certain circumstances following significant health and safety incidents, such as fatalities, to order a mine to be temporarily or permanently closed. If this occurred, the Debtors may be required to incur capital expenditures to re-open the mine. In the event that these agencies order the

135

closing of the Debtors' mines, the Debtors' coal sales contracts generally permit them to issue *force majeure* notices, which would suspend their obligations to deliver coal under these contracts; however, their customers may challenge their issuances of *force majeure* notices. If these challenges are successful, the Debtors may have to purchase coal from third-party sources, if available, to fulfill these obligations or incur capital expenditures to re-open the mines and/or negotiate settlements with the customers, which may include price reductions, the reduction of commitments, and the extension of time for delivery or terminate customers' contracts. Any of these actions could have a material adverse effect on the Debtors' business and results of operations.

> **21.** **Increased focus by regulatory authorities on the effects of coal mining on the environment and recent regulatory developments related to coal mining operations could make it more difficult or increase the Debtors' costs to receive new permits or to comply with their existing permits to mine coal or otherwise adversely affect the Debtors**

Regulatory agencies are increasingly focused on the effects of coal mining on the environment, particularly relating to water quality, which has resulted in more rigorous permitting requirements and enforcement efforts.

The Surface Mining Control and Reclamation Act of 1977 ("SMCRA"), requires that comprehensive environmental protection and reclamation standards be met during the course of and following completion of mining activities. The SMCRA and the agency it creates, the Surface Mining and Reclamation Commission, regulate both surface and underground coal mining Permits for all mining operations must be obtained from the Federal Office of Surface Mining Reclamation and Enforcement or, where state regulatory agencies have adopted federally approved state programs under the Act, the appropriate state regulatory authority. In Alabama, the Alabama Surface Mining Commission reviews and approves SMCRA permits and the West Virginia Department of Environmental Protection reviews and approves SMCRA permits in West Virginia.

SMCRA permit provisions include requirements for coal prospecting, mine plan development, topsoil removal, storage and replacement, selective handling of overburden materials, mine pit backfilling and grading, subsidence control for underground mines, surface drainage control, mine drainage and mine discharge control, treatment and revegetation. These requirements seek to limit the adverse impacts of coal mining and more restrictive requirements may be adopted from time to time.

Before a SMCRA permit is issued, a mine operator must submit a bond or otherwise secure the performance of reclamation obligations. The Abandoned Mine Land Fund, which is part of SMCRA, imposes a general funding fee on all coal produced. The proceeds are used to reclaim mine lands closed or abandoned prior to 1977. On December 7, 2006, the Abandoned Mine Land Program was extended for another 15 years.

136

SMCRA stipulates compliance with many other major environmental statutes, including: the Clean Air Act, the Clean Water Act, the Resource Conservation and Recovery Act, and the Comprehensive Environmental Response, Compensation and Liability Act.

Section 404 of the U.S. Clean Water Act ("CWA") requires mining companies to obtain United States Army Corps of Engineers ("USACE") permits to place material in streams for the purpose of creating slurry ponds, water impoundments, refuse areas, valley fills or other mining activities. As is the case with other coal mining companies, the Debtors construction and mining activities require Section 404 permits. The issuance of permits to construct valley fills and refuse impoundments under Section 404 of the CWA has been the subject of many court cases and increased regulatory oversight, resulting in additional permitting requirements that are expected to delay or even prevent the opening of new mines. Stringent water quality standards for materials such as selenium have recently been issued. The Debtors have begun to incorporate these new requirements into their permit applications; however, there can be no guarantee that they will be able to meet these or any other new standards with respect to their permit applications.

In April 2010, the EPA issued comprehensive guidance to provide clarification as to the water quality standards that should apply when reviewing CWA permit applications for Appalachian surface coal mining operations. This guidance establishes threshold conductivity levels to be used as a basis for evaluating compliance with narrative water quality standards. To obtain necessary permits, the Debtors' and other mining companies are required to meet these requirements. The U.S. District Court for the District of Columbia ruled that the EPA overstepped its statutory authority under the CWA and SMCRA, and infringed on the authority reserved to state regulators under those statutes when it issued the guidance. The EPA appealed the decision and the D.C. Circuit Court reversed the ruling and upheld the EPA's guidance document relating to such permits, against challenges from the mining industry and two states. Surface mining water permits could be subject to more substantial review in the future.

The West Virginia Highlands Conservancy, the Ohio Valley Environmental Coalition and Sierra Club — represented by Appalachian Mountain Advocates and Public Justice — recently settled a lawsuit challenging a coal company's violation of narrative water quality standards. Narrative water quality standards do not place numeric limits on pollutants, but instead require pollution to remain below a level that would impair a stream's aquatic ecosystem.

Previously, the company lost a similar case, in a ruling that found that conductivity pollution from mountaintop removal mining caused damage to streams in Southern West Virginia.

Conductivity measures the ability of water to transmit electricity, making it a measure of the level of ionic pollution in a stream. The abatement solutions to conductivity can be prohibitively expensive.

Additionally, in January 2011, the EPA rescinded a federal CWA permit held by another coal mining company for a surface mine in Appalachia citing associated environmental damage and degradation. While the Debtors' operations are not directly impacted, this could be an indication that other surface mining water permits could be subject to more substantial review in the future. A federal judge reversed the decision by the EPA to revoke the permit and the EPA appealed the decision. On April 23, 2013, the D.C. Circuit ruled that the EPA has the power under the CWA to retroactively veto a section 404 dredge and fill permit "whenever" it makes a determination about certain adverse effects, even years after the USACE has granted the permit to an applicant. The owner of the coal mine, coal industry groups and others, including several states petitioned the U.S. Supreme Court to review and reverse the ruling; on March 24, 2014, the Court denied the petitions for review. In September 2014, the D.C. District Court ruled again in the EPA's favor, and the coal mining company has appealed the decision.

On June 29, 2015, the EPA and the USACE jointly promulgated a rule redefining the scope of waters protected under the CWA. The rule revised regulations that have been in place for more than 25 years in response to 2001 and 2006 Supreme Court rulings that interpreted the regulatory scope of the CWA more narrowly than previously, but created uncertainty about the precise effect of the Court's decisions.

On July 16, 2015, the federal Office of Surface Mining (OSM) published a draft Environmental Impact Statement (EIS) on its proposed revisions to the federal stream buffer zone rule, referred to now as the "stream protection rule" (SPR). The comment period on the draft EIS will close on September 15, 2015 and the agency has scheduled public hearings on the draft rule. The SPR proposes changes in the federal mining regulations governing fill construction, stream mine throughs, underground mine subsidence, mine reclamation, and the conditions for post-mining bond release.

It is unknown what future changes will be implemented to the permitting review and issuance process or to other aspects of mining operations, but the increased regulatory focus, future laws and judicial decisions and any other future changes could materially and adversely affect all U.S. coal mining companies.

In particular, in each jurisdiction in which the Company operates, the Company will incur additional permitting and operating costs, could be unable to obtain new permits or maintain existing permits and could incur fines, penalties and other costs, any of which could materially adversely affect its business. If surface coal mining methods are limited or prohibited, it could significantly increase the Company's operational costs and make it more difficult to economically recover a significant portion of its reserves. In the event that the Company cannot increase the price it charges for coal to cover the higher production costs without reducing customer demand for its coal, there could be a material adverse effect on its financial condition and results of operations. In addition, increased public focus on the environmental, health and aesthetic impacts of surface coal mining could harm the Company's reputation and reduce demand for coal.

## 22. Climate change concerns could negatively affect the Debtors' results of operations and cash flows

The combustion of fossil fuels, such as the coal, coke and natural gas that the Debtors produce, results in the creation of carbon dioxide that is currently emitted into the atmosphere by end-users. Further, some of the Debtors' operations emit greenhouse gases ("GHGs") directly, such as methane release resulting from coal mining and carbon dioxide during its coke production. Methane and carbon dioxide are considered GHGs, and each is a major source of concern with respect to global warming, also known as climate change. Climate change continues to attract public and scientific attention and increasing government attention is being paid to reducing GHG emissions.

There are many legal and regulatory approaches currently in effect or being considered to address GHGs, including possible future U.S. treaty commitments, new federal or state legislation that may impose a carbon emissions tax or establish a "cap and trade" program, and regulation by the EPA.

The EPA, under President Obama's Climate Action Plan, has been working on an approach to cut carbon pollution from power plants. In 2013, the EPA proposed standards to limit carbon pollution from new power plants. In 2014, the EPA proposed the Clean Power Plan to limit carbon pollution from existing power plants as well as proposed standards to limit carbon pollution from modified and reconstructed power plants. On August 3, 2015, the EPA announced the Clean Power Plan to reduce carbon pollution from power plants. EPA's rulemaking package includes a final rule on performance standards for new, modified and reconstructed fossil fuel-fired power plants under Section 111(b) of the Clean Air Act (CAA); a final rule on emission guidelines for existing fossil fuel-fired power plants under Section 111(d) of the CAA; and a proposed rule seeking comment on the proposed "model state rules" and the proposed Federal Implementation Plan (FIP), which will be used to implement the Section 111(d) guideline if states fail to submit a State Implementation Plan (SIP). Fifteen states have filed a legal challenge against the Environmental Protection Agency's (EPA) Clean Power Plan and other groups have expressed a desire to follow suit. The litigation stemming from the landmark greenhouse gas standards for power plants promises to be extensive and will likely reach the Supreme Court. This primarily impacts thermal coal.

In November 2014, the U.S. and China announced a bilateral agreement to reduce GHG emissions. The U.S. agreed to reduce GHGs by 26-28% below 2005 levels by 2025. China pledged to stabilize its GHG emissions by 2030, to be accomplished in part by increasing its percentage of renewable energy sources such as solar and wind to 20% of the nation's total energy production.

Existing laws and regulations or other current and future efforts to stabilize or reduce GHG emissions, could adversely impact the demand for, price of and value of the Company's products and reserves. Passage of additional state, provincial, federal or foreign laws or regulations regarding GHG emissions or other actions to limit GHG emissions could result in users switching from coal to other alternative clean fuel substitutes. The anticipation

139

of such additional requirements could also lead to reduced demand for some of the Company's products. Alternative clean fuels, including non-fossil fuels, could become more attractive than coal in order to reduce GHG emissions, which could result in a reduction in the demand for coal, and therefore the Company's revenues. As the Company's operations also emit GHGs directly, current or future laws or regulations limiting GHG emissions could increase its own costs. Although the potential impacts on the Company of additional climate change regulation are difficult to reliably quantify, they could be material.

### 23. The Debtors' operations may impact the environment or cause exposure to hazardous substances and their properties may have environmental contamination, which could result in material liabilities

The Debtors' operations currently use hazardous materials and generate hazardous wastes from time to time. The Debtors could become subject to claims for toxic torts, natural resource damages and other damages as well as for the investigation and cleanup of soil, surface water, groundwater and other media. Such claims may arise, for example, out of conditions at sites that the Debtors currently own or operate, as well as at sites that the Debtors previously owned or operated, or may acquire. The Debtors' liability for such claims may be joint and several, so that they may be held responsible for more than their share of the contamination or other damages, or even for the entire amount of damages assessed.

EPA's final coal ash rule was published in April, 2015 and regulates coal ash as a solid waste under Subtitle D of RCRA as opposed to regulation as a Subtitle C hazardous waste. It also requires closure of sites that fail to meet prescribed engineering standards or retrofitting with liners, requires regular inspections of impoundments, establishes limits on the location of new sites, and requires immediate remediation and closure of unlined ponds that are polluting ground water. The issue represents added costs for coal-fired power plants.

The Debtors maintain extensive coal refuse areas and slurry impoundments at their mining complexes. Such areas and impoundments are subject to extensive regulation. Slurry impoundments have been known to fail, releasing large volumes of coal slurry into the surrounding environment. Structural failure of an impoundment can result in extensive damage to the environment and natural resources, such as bodies of water that the coal slurry reaches, as well as create liability for related personal injuries, property damages and injuries to wildlife. Some of the Debtors' impoundments overlie mined out areas, which can pose a heightened risk of failure and the assessment of damages arising out of such failure. If one of the Debtors' impoundments were to fail, they could be subject to substantial claims for the resulting environmental contamination and associated liability, as well as for related fines and penalties.

Drainage flowing from or caused by mining activities can be acidic with elevated levels of dissolved metals, a condition referred to as "acid mine drainage" ("AMD"). Treatment of AMD can be costly. Although the Debtors do not currently face

140

material costs associated with AMD, it is possible that they could incur significant costs in the future.

These and other similar unforeseen impacts that the Debtors' operations may have on the environment, as well as exposures to hazardous substances or wastes associated with the Debtors' operations, could result in costs and liabilities that could materially and adversely affect them.

See also "Environmental and Other Regulatory Matters" in "Item 1—Business" of the Company's Annual Report on Form 10-K for the year ended December 31, 2014 filed with the SEC.

24. **The Debtors' executive officers and other key personnel are important to their success and the loss of one or more of these individuals could harm their business**

The Debtors' executive officers and other key personnel have significant experience in the businesses in which they operate and the loss of certain of these individuals could harm their business. Although the Debtors have been successful in attracting qualified individuals for key management and corporate positions in the past, there can be no assurance that the Debtors will continue to be successful in attracting and retaining a sufficient number of qualified personnel in the future. The loss of key management personnel could harm the Debtors' ability to successfully manage their business functions, prevent the Debtors from executing their business strategy and have an adverse effect on their results of operations and cash flows.

25. **Terrorist attacks and threats, escalation of military activity in response to such attacks or acts of war may negatively affect the Debtors' business, financial condition and results of operations**

Terrorist attacks against U.S. targets, rumors or threats of war, actual conflicts involving the U.S. or their allies, as well as military or trade disruptions affecting the Debtors' customers or the economy as a whole may materially adversely affect the Debtors' operations or those of their customers. As a result, there could be delays or losses in transportation and deliveries of coal to the Debtors' customers, decreased sales of their coal and extension of time for payment of accounts receivable from their customers. Strategic targets such as energy-related assets may be at greater risk of future terrorist attacks than other targets in the U.S. In addition, disruption or significant increases in energy prices could result in government-imposed price controls. Any of these occurrences, or a combination of them, could have a material adverse effect on the Debtors' business, financial condition or results of operations.

26. **The Debtors are exposed to significant liability, reputational harm, loss of revenue, increased costs or other risks if they sustain cyber-attacks or other security breaches that disrupt their operations or result in the dissemination of proprietary or**

**confidential information about the Debtors, their customers or other third-parties**

The Debtors have implemented security protocols and systems with the intent of maintaining the physical security of their operations and protecting them and their counterparties' confidential information and information related to identifiable individuals against unauthorized access. Despite such efforts, the Debtors may be subject to security breaches, which could result in unauthorized access to their facilities or the information they are trying to protect. Unauthorized physical access to one of the Debtors' facilities or electronic access to their information systems could result in, among other things, unfavorable publicity, litigation by affected parties, damage to sources of competitive advantage, disruptions to their operations, loss of customers, financial obligations for damages related to the theft or misuse of such information and costs to remediate such security vulnerabilities, any of which could have a substantial impact on the Debtors' results of operations, financial condition or cash flows.

**D.    Risks Relating to the New Walter Energy Common Stock**

**1.    The Plan exchanges senior securities for equity**

If the Plan is confirmed, holders of certain Claims will receive New Walter Energy Common Stock.  Thus, in agreeing to the Plan, certain of such holders will be consenting to the exchange of their interests in senior debt, which has, among other things, a stated interest rate, a maturity date, and a liquidation preference over equity securities, for New Walter Energy Common Stock, which will be subordinated to all future creditor and non-equity based Claims.

**2.    There is no existing trading market for the New Walter Energy Common Stock**

There is no existing trading market for the New Walter Energy Common Stock nor is it known with certainty whether or when a trading market will develop.  The lack of liquidity for the New Walter Energy Common Stock may make it more difficult for the Reorganized Debtors to raise additional capital, if necessary, and it may affect the price volatility of the New Walter Energy Common Stock.  There can also be no assurance that a holder will be able to sell its shares of New Walter Energy Common Stock at a particular time or that the prices such holder receives when it sells will be favorable.  Future trading prices of the New Walter Energy Common Stock will depend on many factors, including the operating performance and financial condition of the Reorganized Debtors.  The Reorganized Debtors may not be required to file periodic reports with the SEC or otherwise provide any other financial or other information to the public which may further impair liquidity and prevent brokers or dealers from publishing quotations.

142

3. **Reorganized Walter Energy does not intend to pay dividends with respect to the New Walter Energy Common Stock in the foreseeable future**

For the foreseeable future, Reorganized Walter Energy does not anticipate paying any dividends with respect to the New Walter Energy Common Stock. Any future determination to pay dividends will be at the discretion of the board of directors of Reorganized Walter Energy and will be dependent on then-existing conditions, including the financial condition, results of operations, capital requirements, contractual restrictions, business prospects and other factors that the board of directors of Reorganized Walter Energy considers relevant. As a result, the trading price of the New Walter Energy Common Stock could be materially and adversely affected.

4. **Upon consummation of the Plan, there may be significant holders of the New Walter Energy Common Stock**

Upon consummation of the Plan, certain holders of Claims will receive distributions of the shares of New Walter Energy Common Stock representing a substantial percentage of the outstanding shares of the New Walter Energy Common Stock. If such holders obtain a sufficiently sizeable position of New Walter Energy Common Stock, such holders could be in a position to influence the outcome of actions requiring shareholder approval, including, among other things, the election of Reorganized Walter Energy board members. This concentration of ownership could also facilitate or hinder a negotiated change of control of Reorganized Walter Energy and, consequently, impact the value of the New Walter Energy Common Stock. Furthermore, the possibility that one or more holders of a significant number of shares of the New Walter Energy Common Stock may sell all or a large portion of their shares of the New Walter Energy Common Stock in a short period of time may adversely affect the trading prices of the New Walter Energy Common Stock.

5. **Ownership of New Walter Energy Common Stock may be concentrated in a limited number of holders**

Upon consummation of the Plan, ownership of the outstanding New Walter Energy Common Stock may be concentrated in a limited number of holders who may not actively trade the New Walter Energy Common Stock. Lack of trading volume in shares of the New Walter Energy Common Stock may limit the liquidity and the ability of other holders to dispose of shares of New Walter Energy Common Stock in a timely, orderly fashion and may serve to depress the trading price of shares of New Walter Energy Common Stock.

6. **The trading price for the New Walter Energy Common Stock may be depressed following the Effective Date**

Following the Effective Date, recipients of New Walter Energy Common Stock under the Plan may seek to dispose of such securities to obtain liquidity, which could cause the initial trading prices for these securities to be depressed, particularly in light of the

143

lack of established trading markets for these securities. Further, the possibility that recipients of New Walter Energy Common Stock may determine to sell all or a large portion of their shares in a short period of time may adversely affect the market price of the New Walter Energy Common Stock.

> 7. **The price of the New Walter Energy Common Stock may be volatile and may be affected by market conditions beyond the Reorganized Debtors' control**

Like the Company's share price has in the past, the Reorganized Walter Energy's share price is likely to fluctuate in the future because of the volatility of the stock market in general and a variety of factors, many of which are beyond the Reorganized Debtors' control, including:

- general global economic conditions that impact infrastructure activity, including interest rate and currency movements and the effect this could have on commodity prices for the Reorganized Debtors' products;

- quarterly variations in actual or anticipated results of the Reorganized Debtors' operations;

- speculation in the press or investment community;

- changes in financial estimates by securities analysts;

- actions or announcements by the Reorganized Debtors' competitors or customers;

- actions by Reorganized Walter Energy's principal stockholders;

- trading volumes of Reorganized Walter Energy's common stock;

- regulatory actions;

- litigation;

- U.S. and international economic, legal and regulatory factors unrelated to the Reorganized Debtors' performance;

- loss or gain of a major customer;

- additions or departures of key personnel; and

- future issuances of the Reorganized Walter Energy's common stock.

Market fluctuations have and could continue to result in extreme volatility in the share price of the New Walter Energy Common Stock, which could cause a decline in the value of the stock. Price volatility may be greater if the public float and trading volume of shares of the New Walter Energy Common Stock is low. In addition, if the Reorganized Debtors' operating results and net income fail to meet the expectations of stock analysts and investors, then Reorganized Walter Energy may experience an immediate and significant decline in the trading price of their stock.

### 8. The discussion of the Reorganized Debtors' valuation and the estimated recoveries to holders of Claims are not intended to represent the trading value of the New Walter Energy Common Stock

The discussion of the Reorganized Debtors' valuation in Section VII.C hereof upon emergence is based on the Projections developed by the Company with the assistance of its financial advisors and on certain generally accepted valuation principles. It is not intended to represent the trading values of the Reorganized Walter Energy's securities in public or private markets. The discussion of the Reorganized Debtors' valuation upon emergence is based on numerous assumptions (the realization of many of which are beyond the Debtors' control), including the Debtors' successful reorganization, an assumed Effective Date on or about February 3, 2016, the Reorganized Debtors' ability to achieve the operating and financial results included in the Projections, the definitive allocation, sizing and terms and provisions of the exit financing facilities and the Reorganized Debtors' ability to maintain adequate liquidity to fund operations. Even if the Reorganized Debtors realizes the Projections, the trading market values for the New Walter Energy Common Stock could be adversely impacted by the lack of trading liquidity for these securities, lack of institutional research coverage, and concentrated selling by recipients of these securities.

### 9. The New Walter Energy Common Stock may be issued in odd lots

Holders of Allowed Claims in Class 2 may receive odd lot distributions (i.e., less than 100 shares or units) of New Walter Energy Common Stock under the Plan. These holders may find it more difficult to dispose of odd lots in the marketplace and may face increased brokerage charges in connection with any such disposition.

### 10. Upon consummation of the Plan, there may be restrictions on the transfer of New Walter Energy Common Stock by certain holders

Holders of New Walter Energy Common Stock issued pursuant to the Plan who are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code, including those holders who are deemed to be "issuers" within the meaning of the Securities Act and the rules promulgated thereunder, will be unable freely to transfer or to sell their New Walter Energy Common Stock except pursuant to (a) "ordinary trading transactions" by a holder that is not an "issuer" within the meaning of section 1145(b), (b) an effective

registration of such securities under the Securities Act and under equivalent state securities or "blue sky" laws, or (c) pursuant to the provisions of Rule 144 or Regulation S under the Securities Act or another available exemption from the registration requirements of the Securities Act. Moreover, the Reorganized Debtors may not be required to file periodic reports with the SEC and may not make publicly available the information required by Rule 144, thereby limiting the ability of holders of New Walter Energy Common Stock to avail themselves of Rule 144 following the applicable holding period.

In addition, the corporate governance, organizational or similar documents binding upon holders of New Walter Energy Common Stock may contain additional provisions, including (a) restrictions and/or prohibitions on transfers on account of tax, securities law, other regulatory circumstances or otherwise, (b) different approval rights among shareholders based on ownership, including with respect to the election of directors, (c) provisions limiting information rights for holders of New Walter Energy Common Stock, (d) 'drag-along' or similar provisions in respect of certain transactions and/or (e) other provisions which may limit the rights of holders of New Walter Energy Common Stock.

<div style="margin-left: 2em;">

**11.  Upon consummation of the Plan, certain corporate governance documents may become binding on Reorganized Walter Energy and all holders of New Walter Energy Common Stock**

</div>

Pursuant to the Plan, on the Effective Date, Reorganized Walter Energy and all holders of New Walter Energy Common Stock then outstanding may enter into, or be deemed to enter into, one or more corporate governance, organizational or similar documents, including a shareholders agreement or similar document and/or a registration rights agreement, each of which shall be acceptable to the Required Consenting First Lien Creditors, and all holders of New Walter Energy Common Stock will be bound thereby. The material terms of any such documents will be set forth in the Plan Supplement Documents.

## ARTICLE VIII.

## CERTAIN TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain significant U.S. federal income tax consequences arising from the consummation of the Plan to the Debtors and certain beneficial owners of Allowed Claims that are entitled to vote on the Plan (such holders, the "Holders"). This description is for informational purposes only and, due to a lack of certain facts and of definitive judicial or administrative authority or interpretation, uncertainties exist with respect to various tax consequences of the Plan, as discussed herein. Only the principal U.S. federal income tax consequences of the Plan for the Company and the Holders are described below.

This summary is based upon the U.S. Internal Revenue Code of 1986, as amended (the "Code"), existing and proposed Treasury Regulations promulgated thereunder ("Treasury Regulations") and U.S. judicial decisions and administrative pronouncements, all as in effect as of the date hereof. All of the preceding authorities are subject to change,

146

possibly with retroactive effect, which may result in U.S. federal income tax consequences different from those discussed below. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan. No rulings or determinations of the U.S. Internal Revenue Service (the "IRS") or any other tax authorities have been sought or obtained with respect to any tax consequences of the Plan and the discussion below is not binding on the IRS or such other authorities. In addition, a significant amount of time may elapse between the date of this Disclosure Statement and the consummation of the Plan. Events occurring after the date of the Disclosure Statement, including changes in law and changes in administrative positions, could affect the U.S. federal income tax consequences of the Plan. No representations are being made regarding the particular tax consequences of the confirmation and consummation of the Plan to the Company or any Holder. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

Except as otherwise specifically stated herein, this summary does not address any estate, gift, state, local, or foreign law tax consequences of the Plan. Furthermore, this discussion does not address all tax considerations that might be relevant to particular Holders in light of their personal circumstances or to persons that are subject to special tax rules. In addition, this description of certain U.S. federal income tax consequences does not address the tax treatment of special classes of Holders, such as financial institutions, regulated investment companies, real estate investment trusts, tax-exempt entities, insurance companies, Holders holding Claims as part of a hedging, integrated or conversion transaction, constructive sale or "straddle," U.S. expatriates, persons subject to the alternative minimum tax, Holders that have a "functional currency" other than the U.S. dollar and dealers or traders in securities or currencies.

For purposes of this discussion, a "U.S. Holder" is a Holder that is: (1) an individual citizen or resident of the U.S. for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the U.S. or any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of their source; or (4) a trust (A) if a court within the U.S. is able to exercise primary jurisdiction over their administration and one or more U.S. persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

For purposes of this discussion, a "Non-U.S. Holder" is a Holder that is neither a U.S. Holder nor an entity treated as a partnership for U.S. federal income tax purposes.

If a partnership or other pass-through entity is a Holder, the tax treatment of a partner or other owner generally will depend upon the status of the partner (or other owner) and the activities of the entity. Partners (or other owners) of pass-through entities that are Holders should consult their own tax advisors regarding the tax consequences of the Plan.

147

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOLLOWING DISCUSSION IS FOR GENERAL INFORMATION ONLY, DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION, AND IS NOT INTENDED TO BE, NOR SHOULD IT BE CONSTRUED TO BE, LEGAL OR TAX ADVICE TO ANY HOLDER. NO OPINION OR REPRESENTATION WITH RESPECT TO THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO ANY SUCH HOLDER IS MADE. EACH HOLDER IS URGED TO CONSULT THE HOLDER'S OWN TAX ADVISOR REGARDING THE PARTICULAR TAX CONSEQUENCES TO IT OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICATION OF U.S. FEDERAL, STATE AND LOCAL TAX LAWS, AS WELL AS ANY APPLICABLE FOREIGN TAX LAWS, TO A HOLDER'S PARTICULAR SITUATION, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

\* \* \* \*

## A.    Certain U.S. Federal Income Tax Consequences to the Company

Pursuant to the Plan, prior to the Effective Date, Holders of Class 2 Claims will receive their Pro Rata Share of the First Lien Stock Distribution.

For U.S. federal income tax purposes, the Debtors are members of an affiliated group of corporations, of which Walter Energy is the common parent, and file a single consolidated income tax return (the "Walter Energy Group"). The Walter Energy Group has a consolidated net operating loss ("NOL") for U.S. federal income tax purposes of approximately $403.6 million as of the end of 2014. In addition, the Walter Energy Group has approximately $46.9 million of alternative minimum tax and general business tax credits as of the end of 2014. The Walter Energy Group expects to incur further operating losses during the taxable year ending December 31, 2015. The amount of any such losses remains subject to audit and adjustment by the IRS.

The Debtors will incur substantial COD Income (as defined below) as a result of the consummation of the Plan. The amount of COD Income incurred depends, in significant part, on the fair market value of the New Walter Energy Common Stock. It is anticipated that the Walter Energy Group's consolidated NOL carryforwards and tax credits will be significantly reduced, and depending on the amount of COD Income incurred, could be eliminated. In either event, other tax attributes may also be required to be reduced.

### 1.    Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, less (b) the sum of (x) the amount of Cash paid, and (y) the fair market value of any

148

other consideration (including stock of the debtor) given in satisfaction of such indebtedness at the time of the exchange.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to a plan approved by the court in that proceeding. Instead, as a consequence of such exclusion, a debtor generally must reduce its tax attributes by the amount of COD Income that it excluded from gross income under section 108 of the Code. In general, tax attributes will be reduced in the following order: (a) net operating losses ("NOLs"); (b) most tax credits and capital loss carryovers; (c) tax basis in assets; and (d) foreign tax credits. A debtor's tax basis in its assets generally may not be reduced below the amount of liabilities remaining immediately after the discharge of indebtedness. A debtor with COD Income may elect first to reduce the basis of its depreciable assets under section 108(b)(5) of the Code. Where the borrower joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury Regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the borrower and other members of the group also be reduced. The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. Any excess COD Income over the amount of available tax attributes is not subject to United States federal income tax.

As a result of the discharge of Claims pursuant to the Plan, the Debtors will realize substantial COD Income. The extent of such COD Income and resulting attribute reduction will depend principally on the fair market value of the New Walter Energy Common Stock and any other property distributed in discharge of Claims, and on the amount of liabilities, if any, remaining immediately after the discharge of indebtedness. This value cannot be known with certainty until after the Effective Date. Thus, although it is expected that a reduction in the Debtors' tax attributes will be required, the exact amount of such reduction cannot be predicted at this time.

### 2. Potential Limitations on NOL Carryforwards and Other Tax Attributes

Following the Effective Date, any remaining loss carryforwards and certain other tax attributes (including current year NOLs or net unrealized built-in losses) allocable or attributable to periods prior to the Effective Date (collectively, "pre-change losses") may be subject to limitation under section 382 of the Code as a result of the changes in ownership of Walter Energy. These limitations apply in addition to, and not in lieu of, the attribute reduction that results from the COD Income arising in connection with the Plan.

Under section 382 of the Code, if a corporation (or consolidated group) undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception discussed below, the amount of its pre-change losses that may be utilized to offset future taxable income is subject to an annual limitation. The issuance of the New Walter Energy Common Stock pursuant to the Plan may constitute an "ownership change" which will result in a limitation under section 382 of the Code.

149

If the issuance of the New Walter Energy Common Stock pursuant to the Plan does constitute an "ownership change" under section 382 of the Code, in general, the amount of the annual limitation to which a corporation (or consolidated group) that undergoes an ownership change would be subject to is equal to the product of (i) the fair market value of the stock of the corporation (or, in the case of a consolidated group, the common parent) immediately before the ownership change (with certain adjustments) multiplied by (ii) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (2.82% for ownership changes occurring in September 2015). As discussed below, this annual limitation often may be increased in the event the corporation (or consolidated group) has an overall "built-in" gain in its assets at the time of the ownership change. Conversely, to the extent the corporation (or consolidated group) has an overall "built-in" loss, the recognition of any such losses may be subject to the section 382 limitation. For a corporation (or consolidated group) in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the stock value generally is determined immediately after (rather than before) the ownership change after giving effect to the surrender of creditors' claims, but subject to certain adjustments (which can result in a reduced stock value); in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets.

Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year. However, if the corporation (or the consolidated group) does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, or possibly if certain shareholders claim worthless stock deductions and continue to hold their stock in the corporation (or the parent of the consolidated group) at the end of the taxable year, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's pre-change losses, absent any increases due to recognized built-in gains discussed below.

Accordingly, the impact of an ownership change of Walter Energy pursuant to the Plan depends upon, among other things, the amount of pre-change losses remaining after the reduction of attributes due to the COD, the value of both the stock and assets of Reorganized Walter Energy at such time, the continuation of its businesses, and the amount and timing of future taxable income.

(a)  Built-In Gains and Losses.

Section 382 of the Code can operate to limit the deduction of built-in losses recognized subsequent to the date of the ownership change. If a loss corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income, gain, loss and deduction), then any built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss) generally will be treated as pre-change losses and similarly will be subject to the annual limitation.

150

Conversely, if the loss corporation (or consolidated group) has a net unrealized built-in gain at the time of the ownership change, any built-in gains recognized (or, according to an IRS notice, treated as recognized) during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance.

Although the rule applicable to net unrealized built-in losses generally applies to consolidated groups on a consolidated basis, certain corporations that join the consolidated group within the preceding five years may not be able to be taken into account in the group computation of net unrealized built-in loss. Such corporations would nevertheless be taken into account in determining whether the consolidated group has a net unrealized built-in gain. In general, a loss corporation's (or consolidated group's) net unrealized built-in gain or loss will be deemed to be zero unless it is greater than the lesser of (i) $10 million or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change. Whether Walter Energy will benefit from adjustment for "built-in" gains or be subject to the limitation for "built-in" losses will depend upon the value of its assets immediately before the Effective Date, but it is estimated Walter Energy had a significant consolidated net-unrealized built-in loss as of July 15, 2015.

(b)     Special Bankruptcy Exception.

The application of section 382 of the Code will be materially different from that described above if the Debtors are subject to the special rules for corporations in bankruptcy provided in section 382(l)(5) of the Code. The Debtors generally would qualify for the special rules provided in section 382(l)(5) of the Code if the historic equity holders and certain Claim Holders of the Debtors, taken together, own equity interests representing at least 50% of the voting power and equity value of the Debtors pursuant to the consummation of a chapter 11 plan. In that case, the Debtors' ability to use their pre-Effective Date NOLs would not be limited as described above. However, several other limitations would apply to the Debtors under section 382(l)(5), including (a) the Debtors' NOLs would be calculated without taking into account deductions for interest paid or accrued in the portion of the current tax year ending on the Effective Date and all other tax years ending during the three-year period prior to the current tax year with respect to the debt securities that are exchanged pursuant to the Plan, and (b) if the Debtors undergo another ownership change within two years after the Effective Date, the Debtors' section 382 limitation following that ownership change will be zero. It is uncertain whether the provisions of section 382(l)(5) will be available in the case of the ownership change that is expected to occur as a result of the consummation of the Plan. If the Debtors qualify for the special rule under section 382(l)(5), the use of the Debtors' NOLs will be subject to section 382(l)(5) of the Code unless the Debtors affirmatively elect for the provisions not to apply.

If the Debtors do not qualify for, or elect not to apply, the special rule under section 382(l)(5) of the Code described above, the provisions of section 382(l)(6) applicable to corporations under the jurisdiction of a bankruptcy court may apply in calculating the

151

annual section 382 limitation. Under this rule, the limitation will be calculated by reference to the lesser of the value of the New Walter Energy Common Stock (with certain adjustments) immediately after the ownership change or the value of the Debtorss assets (determined without regard to liabilities) immediately before the ownership change. Although such calculation may substantially increase the annual section 382 limitation, the Debtors' use of any NOLs or other tax attributes remaining after implementation of the Plan may still be substantially limited after an ownership change.

Because a relatively small number of Claim Holders will hold a significant equity position in the Reorganized Debtors following consummation of the Plan, if such Claim Holders dispose of all or a significant amount of this position after the Effective Date, it could cause the Debtors to undergo an ownership change. If an additional ownership change were to occur, it would generally limit (or possibly eliminate) the Debtors' ability to use NOLs and other tax attributes following such additional ownership change.

(c)     Alternative Minimum Tax.

In general, a U.S. federal alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular U.S. federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).

In addition, if a corporation (or consolidated group) undergoes an "ownership change" within the meaning of section 382 of the Code and it is in a net unrealized built-in loss position (as determined for AMT purposes) on the date of the ownership change, the corporation's (or consolidated group's) aggregate tax basis in its assets would be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date. The section 382(l)(5) exception does not apply to AMT adjustments for built-in losses resulting from an ownership change.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against their regular federal income tax liability in future taxable years when the corporation is no longer subject to the AMT.

**B.      Certain U.S. Federal Income Tax Considerations for U.S. Holders of First Lien Other Debt Claims**

Pursuant to the Plan and in satisfaction of their respective Claims, each Holder of First Lien Other Debt Claim will receive, in exchange for its Claim, such Holder's Pro Rata Share of the First Lien Stock Distribution. The U.S. federal income tax consequences of the Plan to a U.S. Holder depends, in part, on whether the U.S. Holder's

152

existing Claims constitute "securities" for U.S. federal income tax purposes (such that the exchange would qualify for "recapitalization" treatment under the Code).

The term "security" is not defined in the Code or in the Treasury Regulations issued thereunder and has not been clearly defined by judicial decisions. The classification of a debt instrument as a security is a determination based on all facts and circumstances, including, but not limited to: (i) the term (i.e., duration) of the instrument, (ii) whether or not the instrument is secured, (iii) the degree of subordination of the debt instrument, (iv) the ratio of debt to equity of the issuer and (v) the riskiness of the business of the issuer. One of the most significant factors considered in determining whether a particular debt is a security is their original term. In general, debt obligations issued with a weighted average maturity at issuance of less than five years do not constitute securities, whereas debt obligations with a weighted average maturity of at least ten (10) years or more constitute securities. Additionally, the IRS has ruled that new debt instruments with a term of less than five (5) years issued in exchange for and bearing the same terms (other than interest rate) as securities should also be classified as securities for this purpose, because the new debt represented a continuation of the holder's investment in the corporation in substantially the same form. The existing First Lien Notes and the First Lien Term Loan all have an original maturity of at least five (5) years. All Holders of First Lien Other Debt Claims are urged to consult their tax advisors regarding the appropriate status for U.S. federal income tax purposes of their existing Claims.

### 1.    Fully Taxable Exchange

If, in respect of any First Lien Other Debt Claim, such Claim does not constitute a security for U.S. federal income tax purposes, the U.S. Holder should recognize gain or loss in an amount equal to the difference, if any, between (i) the fair market value of any New Walter Energy Common Stock received (other than in respect of any Claim for accrued but unpaid interest), and (ii) the U.S. Holder's adjusted tax basis in the Claim exchanged (other than any basis attributable to accrued but unpaid interest). See "— Character of Gain or Loss," below. In addition, a U.S. Holder of a First Lien Other Debt Claim will have interest income for any accrued but unpaid interest not previously included in income. Generally, a U.S. Holder's adjusted tax basis in a Claim will be equal to the cost of the Claim to such U.S. Holder, increased by any original issue discount ("OID") previously included in income. If applicable, a U.S. Holder's tax basis in a Claim also will be (i) increased by any market discount previously included in income by such U.S. Holder pursuant to an election to include market discount in gross income currently as it accrues, and (ii) reduced by any Cash payments received on the Claim other than payments of qualified stated interest, and by any amortizable bond premium that the U.S. Holder has previously deducted.

A U.S. Holder's tax basis in any New Walter Energy Common Stock received should equal the fair market value of such stock on the date of the exchange. A U.S. Holder's holding period in such stock should begin the day following the exchange date.

Case 15-02741-TOM7    Doc 567    Filed 08/26/15    Entered 08/26/15 16:51:48    Desc Main
Document    Page 158 of 178

### 2.    Potential Recapitalization Treatment

The classification of an exchange as a recapitalization for U.S. federal income tax purposes generally serves to defer the recognition of any gain or loss by the holder.

If the exchange of the applicable Claims for New Walter Energy Common Stock qualifies as a recapitalization (i.e., the applicable Claims constitute securities), a U.S. Holder generally will not recognize any gain or loss upon the exchange of such Claims. A U.S. Holder of First Lien Other Debt Claims may, however, have interest income to the extent of any exchange consideration allocable to accrued and unpaid interest not previously included in income. See "—Payment of Accrued Interest," below.

In a recapitalization exchange, a U.S. Holder's aggregate tax basis in any New Walter Energy Common Stock received will equal such U.S. Holder's aggregate adjusted tax basis in the Claims exchanged therefor, increased by any gain or interest income recognized by the exchange, and decreased by any deductions claimed in respect of any previously accrued but unpaid interest. Such U.S. Holder's holding period in such stock will include its holding period in the Claims exchanged therefor, except to the extent of any exchange consideration received in respect of accrued but unpaid interest or treated as imputed interest income.

### 3.    Character of Gain or Loss

Where gain or loss is recognized by a U.S. Holder in respect of the satisfaction and exchange of its Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the U.S. Holder, whether the Claim constitutes a capital asset in the hands of the U.S. Holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the U.S. Holder previously had claimed a bad debt deduction. Each Holder of a Claim is urged to consult its tax advisor for a determination of the character of any gain or loss recognized in respect to the satisfaction of its Claim.

U.S. Holders of Claims that recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of such capital losses. For noncorporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (1) $3,000 ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains. U.S. Holders, other than corporations, may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Corporate U.S. Holders may only carry over unused capital losses for the five (5) taxable years following the capital loss year, but are allowed to carry back unused capital losses to the three (3) taxable years preceding the capital loss year.

154

A U.S. Holder that purchased its existing notes from a prior Holder at a "market discount" may be subject to the market discount rules of the Code. In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" (generally, a constant stated amount of interest payable in cash at least annually) or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Under these rules, any gain recognized on the exchange of such existing notes generally would be treated as ordinary income to the extent of the market discount accrued during the U.S. Holder's period of ownership, unless the U.S. Holder elected to include the market discount in income as it accrued. If a U.S. Holder of such notes did not elect to include market discount in income as it accrued and thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its existing notes, such deferred amounts would become deductible at the time of the exchange, up to the amount of gain that the U.S. Holder recognizes in the exchange.

### 4.    Payment of Accrued Interest

In general, to the extent that any consideration received pursuant to the Plan by a Holder of a Claim is received in satisfaction of accrued interest or OID during its holding period, such amount will be taxable to the Holder as interest income (if not previously included in the Holder's gross income). Conversely, a Holder generally recognizes a deductible loss to the extent any accrued interest claimed or amortized OID was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a holder of a security of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID. Accordingly it is also unclear whether, by analogy, a Holder of a Claim that does not constitute a security would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

With respect to a U.S. Holder of Claims, the Plan provides that consideration received in respect of such Claims is allocable first to the principal amount of the existing Claims (as determined for federal income tax purposes) and then, to the extent of any excess, to the remainder of the Claim, including any Claim for accrued but unpaid interest (in contrast, for example, to a pro rata allocation of the consideration received between principal and interest, or an allocation first to accrued but unpaid interest).

There is no assurance that the IRS will respect such allocations for federal income tax purposes. In fact, the payment ordering rules of the tax regulations generally require that interest is deemed paid prior to any principal. Each Holder of a Claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of accrued but unpaid interest for federal income tax purposes.

155

Case 15-02741-TOM7    Doc 567    Filed 08/26/15    Entered 08/26/15 16:51:48    Desc Main
Document    Page 160 of 178

## 5. Sale, Exchange or Other Disposition of New Walter Energy Common Stock

Subject to the discussion below, any gain or loss recognized by a U.S. Holder on the sale, exchange, or other disposition of the New Walter Energy Common Stock generally should be capital gain or loss in an amount equal to the difference, if any, between the amount realized by the U.S. Holder and the U.S. Holder's adjusted tax basis in the New Walter Energy Common Stock immediately before the sale, exchange, or other disposition. Any such gain or loss generally should be long-term if the U.S. Holder's holding period for its stock is more than one year at that time. The use of capital losses is subject to limitations as discussed above in "—Character of Gain or Loss."

In the event of a tax-free recapitalization, any gain recognized by the U.S. Holder upon a subsequent taxable disposition of the stock (or any stock or property received for it in a later tax-free exchange) would be treated as ordinary income for U.S. federal income tax purposes to the extent of (i) any bad debt deductions (or additions to a bad debt reserve) claimed with respect to the Claim for which stock was received and any ordinary loss deductions incurred upon satisfaction of the Claim, less any income (other than interest income) recognized by the U.S. Holder upon satisfaction of the claim, (ii) any accrued market discount related to the Claims that was not included in income, and (iii) with respect to a cash-basis U.S. Holder, also any amounts which would have been included in its gross income if the U.S. Holder's Claim had been satisfied in full but which was not included by reason of the cash method of accounting.

## 6. Net Investment Income Tax

In addition to regular U.S. federal income tax, certain U.S. Holders that are individuals, estates or trusts whose income exceeds certain thresholds are subject to a 3.8% tax on all or a portion of their "net investment income," which may include all or a portion of their income arising from New Walter Energy Common Stock or as a result of an exchange of their Claim for New Walter Energy Common Stock pursuant to the plan. U.S. Holders that are individuals, estates or trusts should consult their own tax advisors as to the effect, if any, of this tax on their receipt, ownership or disposition of any consideration received pursuant to the Plan.

## C. U.S. Federal Income Tax Considerations for Non-U.S. Holders

The following discussion includes only certain U.S. federal income tax considerations of the Plan to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state and local and the foreign tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of the New Walter Energy Common Stock.

156

Whether a Non-U.S. Holder realized gain or loss on the exchange and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. Holders.

### 1. Gain Recognition

Any gain realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the consummation of the Plan occurs and certain other conditions are met, in which event such gain (net of certain U.S. source losses) generally will be subject to U.S. federal income tax at a rate of 30% (except as provided by an applicable tax treaty if such Non-U.S. Holder certifies under penalties of perjury that it is not a U.S. person (generally by providing an IRS Form W-8BEN or W-8BEN-E) or (ii) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States, in which event such Non-U.S. Holder generally will be subject to U.S. federal income tax on such gain in substantially the same manner as a U.S. person (except as provided by an applicable tax treaty if such Non-U.S. Holder certifies under penalties of perjury that it is not a U.S. person (generally by providing an IRS Form W-8BEN or W-8BEN-E) to the applicable withholding agent) and, if it is treated as a corporation for U.S. federal income tax purposes, may also be subject to a branch profits tax at a rate of 30% (or a lower rate if provided by an applicable tax treaty).

### 2. Accrued but Untaxed Interest

Payments to a Non-U.S. Holder that are attributable to accrued but untaxed interest (including payments in respect of accrued but untaxed OID) generally will not be subject to U.S. federal withholding tax, provided that:

- such payments are not effectively connected with the conduct of a trade or business in the United States by such Non-U.S. Holder;

- such Non-U.S. Holder does not own, actually or constructively, 10% or more of the total combined voting power of all classes of New Walter Energy Common Stock;

- such Non-U.S. Holder is not a controlled foreign corporation described in section 957(a) of the Code that is related to Reorganized Walter Energy through stock ownership;

- such Non-U.S. Holder is not a bank whose receipt of such amounts is described in section 881(a)(3)(A) of the Code; and

- such Non-U.S. Holder certifies under penalties of perjury that it is not a U.S. person (generally by providing an IRS Form W-8BEN or W-8BEN-E) to the applicable withholding agent. U.S Treasury

Case 15-02741-TOM7    Doc 567    Filed 08/26/15    Entered 08/26/15 16:51:48    Desc Main
Document     Page 162 of 178

Regulations provide additional rules for a Claim held through one or more intermediaries or pass-through entities.

If the requirements set forth above are not satisfied with respect to interest that is not effectively connected with the conduct by a Non-U.S. Holder of a trade or business in the United States, amounts treated as payments of interest generally will be subject to U.S. federal withholding tax at a rate of 30% (except as provided by an applicable tax treaty if such Non-U.S. Holder certifies under penalties of perjury that it is not a U.S. person (generally by providing an IRS Form W-8BEN or W-8BEN-E) to the applicable withholding agent).

If a Non-U.S. Holder is engaged in the conduct of a trade or business in the United States, and if payments attributable to accrued but untaxed interest (including payments in respect of accrued but untaxed OID) in respect of a Claim are effectively connected with such trade or business, such Non-U.S. Holder generally will not be subject to U.S. federal withholding tax on such payments; provided that such Non-U.S. Holder provides the appropriate documentation (generally, IRS Form W-8ECI or successor form) to the withholding agent. Instead, such Non-U.S. Holder generally will be subject to U.S. federal income tax on such interest in substantially the same manner as a U.S. Holder (except as provided by an applicable tax treaty if such Non-U.S. Holder certifies under penalties of perjury that it is not a U.S. person (generally by providing an IRS Form W-8BEN or W-8BEN-E) to the applicable withholding agent). In addition, if a Non-U.S. Holder is treated as a corporation for U.S. federal income tax purposes, it may also be subject to a branch profits tax at a rate of 30% (or a lower rate if provided by an applicable tax treaty) on its effectively connected income for the taxable year, subject to certain adjustments.

### 3. Sale or Other Taxable Disposition of New Walter Energy Common Stock

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition of New Walter Energy Common Stock unless:

- such gain is effectively connected with the conduct of a trade or business in the United States by such Non-U.S. Holder, in which event such Non-U.S. Holder generally will be subject to U.S. federal income tax on such gain in substantially the same manner as a U.S. person (except as provided by an applicable tax treaty if such Non-U.S. Holder certifies under penalties of perjury that it is not a U.S. person (generally by providing an IRS Form W-8BEN or W-8BEN-E) to the applicable withholding agent) and, if it is treated as a corporation for U.S. federal income tax purposes, may also be subject to a branch profits tax at a rate of 30% (or a lower rate if provided by an applicable tax treaty) on its effectively connected income for the taxable year, subject to certain adjustments; or

158

- any Non-U.S. Holder is an individual who is present in the United States for 183 days or more during the taxable year of such sale or other taxable disposition and certain other conditions are met, in which event such gain (net of certain U.S. source losses) generally will be subject to U.S. federal income tax at a rate of 30% (except as provided by an applicable tax treaty if such Non-U.S. Holder certifies under penalties of perjury that it is not a U.S. person (generally by providing an IRS Form W-8BEN or W-8BEN-E) to the applicable withholding agent); or

- Reorganized Walter Energy is or has been a "United States real property holding corporation" (a "USRPHC") for U.S. federal income tax purposes at any time during the shorter of (x) the five-year period ending on the date of such sale, redemption or repurchase and (y) such Non-U.S. Holder's holding period with respect to New Walter Energy Common Stock, and certain other conditions are met.

Generally, a corporation is a USRPHC if the fair market value of its United States real property interests equals or exceeds 50% of the sum of the fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (all as determined for U.S. federal income tax purposes). Though not certain, the Debtors believe that Walter Energy likely is, and the Debtors anticipate that Reorganized Walter Energy likely will become, a USRPHC. If Reorganized Walter Energy were to become a USRPHC, a Non-U.S. Holder might be subject to U.S. federal income tax (but not the branch profits tax) with respect to gain realized on the disposition of New Walter Energy Common Stock. Gain arising from the sale or other taxable disposition by a Non-U.S. Holder of New Walter Energy Common Stock will not be subject to U.S. federal income tax if such class of stock is "regularly traded" on an "established securities market," as defined by applicable Treasury Regulations, and such Non-U.S. Holder owned, actually or constructively, 5% or less of such class of New Walter Energy Common Stock throughout the shorter of the five-year period ending on the date of the sale or other disposition or the Non-U.S. Holder's holding period for such stock.

### 4.    Distributions Paid to Non-U.S. Holders

If Reorganized Walter Energy makes a distribution of cash or other property (other than certain pro rata distributions of New Walter Energy Common Stock or rights to acquire New Walter Energy Common Stock) with respect to a share of New Walter Energy Common Stock, the distribution generally will be treated as a dividend to the extent it is paid from Reorganized Walter Energy's current and accumulated earnings and profits, such excess generally will be treated first as a tax-free return of capital to the extent of the Non-U.S. Holder's adjusted tax basis in such share of New Walter Energy Common Stock, and then as capital gain (which will be treated in the manner described above under "Sale or Other Taxable Disposition of New Walter Energy Common Stock"). Distributions treated as dividends on New Walter Energy Common Stock that are paid to or for the account of a Non-U.S. Holder generally will be subject to U.S. federal withholding tax at a rate of 30%

159

(except as provided by an applicable tax treaty if such Non-U.S. Holder certifies under penalties of perjury that it is not a U.S. person (generally by providing an IRS Form W-8BEN or W-8BEN-E) to the applicable withholding agent).

If, however, a dividend is effectively connected with the conduct of a trade or business in the United States by a Non-U.S. Holder, such dividend generally will not be subject to the 30% U.S. federal withholding tax if such Non-U.S. Holder provides the appropriate documentation (generally, IRS Form W-8ECI) to the applicable withholding agent. Instead, such Non-U.S. Holder generally will be subject to U.S. federal income tax on such dividend in substantially the same manner as a U.S. person (except as provided by an applicable tax treaty if such Non-U.S. Holder certifies under penalties of perjury that it is not a U.S. person (generally by providing an IRS Form W-8BEN or W-8BEN-E) to the applicable withholding agent). In addition, a Non-U.S. Holder that is treated as a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax at a rate of 30% (or a lower rate if provided by an applicable tax treaty) on its effectively connected income for the taxable year, subject to certain adjustments.

The foregoing discussion is subject to the discussion below under "Withholding and Reporting Requirements."

### D. Withholding and Reporting Requirements

#### 1. Information Withholding and Backup Withholding

Information reporting generally will apply to payments to a U.S. Holder pursuant to the Plan, unless such U.S. Holder is an entity that is exempt from information reporting and, when required, demonstrates this fact. Any such payment to a U.S. Holder that is subject to information reporting generally will also be subject to backup withholding, unless such U.S. Holder provides the appropriate documentation (generally, IRS Form W-9) to the applicable withholding agent certifying that, among other things, its taxpayer identification number is correct, or otherwise establishes an exemption.

The information reporting and backup withholding rules that apply to payments to certain U.S. Holders generally will not apply to payments to a Non-U.S. Holder if such Non-U.S. Holder certifies under penalties of perjury that it is not a U.S. person (generally by providing an IRS Form W-8BEN or W-8BEN-E) to the applicable withholding agent or otherwise establishes an exemption.

Proceeds from the sale or other taxable disposition of New Walter Energy Common Stock by a Non-U.S. Holder effected outside the United States through a non-U.S. office of a non-U.S. broker generally will not be subject to the information reporting and backup withholding rules that apply to payments to certain U.S. Holders, provided that the proceeds are paid to the Non-U.S. Holder outside the United States. However, proceeds from the sale or other taxable disposition of New Walter Energy Common Stock by a Non-U.S. Holder effected through a non-U.S. office of a Non-U.S. broker with certain specified U.S. connections or a U.S. broker generally will be subject to these information reporting

160

rules (but generally not to these backup withholding rules), even if the proceeds are paid to such Non-U.S. Holder outside the United States, unless such Non-U.S. Holder certifies under penalty of perjury that it is not a U.S. person (generally by providing an IRS Form W-8BEN or W-8BEN-E to the applicable withholding agent) or otherwise establishes an exemption. Proceeds from the sale or other taxable disposition of New Walter Energy Common Stock by a Non-U.S. Holder effected through a U.S. office of a broker generally will be subject to these information reporting and backup withholding rules unless such Non-U.S. Holder certifies under penalty of perjury that it is not a U.S. person (generally by providing an IRS Form W-8BEN or W-8BEN-E to the applicable withholding agent) or otherwise establishes an exemption.

Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules generally will be allowed as a refund or a credit against a U.S. Holder's or Non-U.S. Holder's U.S. federal income tax liability if the required information is furnished by such U.S. Holder or Non-U.S. Holder on a timely basis to the IRS.

## 2. FATCA

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30% on the receipt of "withholdable payments." For this purpose, "withholdable payments" are any U.S.-source payments of fixed or determinable, annual or periodical income (including dividends, if any, on shares of New Walter Energy Common Stock or payments received that are attributable to accrued but untaxed interest), as well as gross proceeds from the sale of any property of a type which can produce U.S.-source interest or dividends (which would include New Walter Energy Common Stock) that occur after December 31, 2016. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax. Although administrative guidance and U.S. Treasury Regulations have been issued on FATCA, the exact scope and application of these rules remains unclear and potentially subject to material changes.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE RESTRUCTURING TRANSACTIONS, INCLUDING THE APPLICABILITY AND EFFECTS OF ANY STATE, LOCAL OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

### E. Reservation of Rights

This tax section is subject to change (possibly substantially) based on subsequent changes to other provisions of the Plan. The Debtors and their advisors reserve

the right to further modify, revise or supplement Article X of the Plan and the other tax related sections of the Plan up to the Supplement Filing Date.

## ARTICLE X.

## CERTAIN U.S. SECURITIES LAW CONSIDERATIONS

Section 1145 of the Bankruptcy Code provides certain exemptions from the securities registration requirements of federal and state securities laws with respect to the distribution of securities under a plan. Specifically, section 1145(a)(1) of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale of a debtor's stock under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or an equity interest in, such debtor, or if such securities are offered or sold principally in such an exchange and partly for cash. In reliance on this exemption, the issuance of the New Walter Energy Common Stock under the section 1145 exemption to the holder of First Lien Debt Claims will be exempt from the registration requirements of the Securities Act and of any applicable state securities laws (except, in each case, for securities issued to persons deemed to be underwriters, as described in more detail below). In general, offers and sales of securities made in reliance on the exemption afforded under section 1145(a) of the Bankruptcy Code are deemed to be made in a public offering. Accordingly, such securities may be resold without registration under the Securities Act or other federal securities laws pursuant to an exemption provided by section 4(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in the Bankruptcy Code. In addition, such securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who (a) purchases a claim against, an interest in, or a claim for an administrative expense in a case concerning a debtor, with a view to distribution of any security to be received in exchange for such claim or interest, or (b) offers to sell securities issued under a plan for the holders of such securities, or (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution of such securities and under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan, or (d) is an "issuer" with respect to the securities under section 2(a)(11) of the Securities Act, including as a "controlling person" of the issuer of the securities or other issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a

162

creditor who owns at least ten percent (10%) of the securities of a reorganized debtor may be presumed to be a "controlling person" and, therefore, an underwriter.

To the extent that persons who receive New Walter Energy Common Stock pursuant to the Plan are deemed to be "underwriters", the issuance of New Walter Energy Common Stock to such persons would be exempted by section 1145 of the Bankruptcy Code, but resales by such persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable. However, statutory underwriters may be able to sell their securities pursuant to the resale limitations of Rule 144 promulgated under the Securities Act. Rule 144 would, in effect, permit the resale of securities received by statutory underwriters pursuant to a chapter 11 plan, subject to applicable holding periods, volume limitations, notice and manner of sale requirements, and certain other conditions, including the requirement that current public information with respect to the issuer be available. Statutory underwriters may also be able to sell their securities pursuant to the resale provisions of Regulation S promulgated under the Securities Act.[4] Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own counsel concerning the availability of the exemptions provided by Rule 144 or Regulation S.

Whether any particular person would be deemed to be an "underwriter" with respect to any security issued under the Plan would depend upon the facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any particular person receiving distributions under the Plan would be an "underwriter" with respect to any security issued under the Plan and the Debtors make no representation concerning the ability of any particular person to resell the securities to be distributed under the Plan. The Debtors recommend that potential recipients of securities pursuant to the Plan consult their own counsel concerning whether they may freely trade such securities.

## ARTICLE XI

## ALTERNATIVES TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed, the Debtors have agreed to exclusively use their best efforts to pursue and consummate the 363 Sale. If that effort fails, the Debtors could be forced to liquidate under chapter 7 or chapter 11 of the Bankruptcy Code. Each of these possibilities is discussed in turn below.

### A.    Section 363 Sale

If the Plan is not confirmed on or before January 13, 2016, or if certain additional Triggering Events occur, the Restructuring Support Agreement requires the Debtors to exclusively use their best efforts to pursue and consummate the 363 Sale and to

---

[4]    Regulation S would, in effect, permit the resale of securities received by statutory underwriters pursuant to a chapter 11 plan to certain eligible non-U.S. persons, in accordance with the terms and conditions thereof.

163

withdraw and cease to pursue the Plan. Exhibit C to the RSA outlines certain terms of the 363 Sale, and all creditors are urged to review that exhibit. The RSA further contemplates a credit bid on behalf of the First Lien Lenders and First Lien Noteholders, which would be subject to higher or better offers through the 363 Sale Process. During the 363 Sale Process, the Debtors would remain in chapter 11 and continue to operate their business in the ordinary course, subject to the restrictions imposed by the Bankruptcy Code.

Upon the consummation of the 363 Sale, the Debtors would file a liquidating plan under chapter 11 to distribute the proceeds of the 363 Sale to creditors in accordance with the requirements of the Bankruptcy Code. There can be no assurances that recoveries for stakeholders would be the same under such a liquidating plan than they are under the Plan.

### B. Liquidation Under Chapter 7 or Chapter 11

If the Plan is not confirmed and the 363 Sale does not occur, the Debtors' Chapter 11 Cases could be converted to liquidation cases under chapter 7 of the Bankruptcy Code or dismissed. In chapter 7, a trustee would be appointed to promptly liquidate the assets of the Debtors.

The Debtors believe that in a liquidation under chapter 7, before creditors received any distributions, additional administrative expenses involved in the appointment of a trustee and attorneys, accountants, and other professionals to assist such trustee, along with an increase in expenses associated with an increase in the number of unsecured claims that would be expected, would cause a substantial diminution in the value of the estates. The assets available for distribution to creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of the Debtors' operations and the failure to realize the greater going concern value of the Debtors' assets.

The Debtors could also be liquidated pursuant to the provisions of a chapter 11 plan of reorganization. In a liquidation under chapter 11, the Debtors' assets could be sold in a more orderly fashion over a longer period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation might result in larger recoveries than in a chapter 7 liquidation, but the delay in distributions could result in lower present values being received and higher administrative costs. Because a trustee is not required in a chapter 11 case, expenses for professional fees could be lower than in a chapter 7 case, in which a trustee must be appointed. Any distributions to the holders of Claims or Interests under a chapter 11 liquidation plan probably would be delayed substantially.

# ARTICLE XII.

## CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation of the Plan in the Chapter 11 Cases is preferable to the alternatives described above because it will maximize recoveries for the Debtors' estates. In addition, any alternative to confirmation of the Plan in the Chapter 11 Cases could result in extensive delays and increased administrative expenses, or the ultimate liquidation of certain or all of the Debtors.

*[Remainder of Page Intentionally Left Blank]*

Accordingly, the Debtors urge all holders of Claims entitled to vote on the Plan to vote to accept the Plan in the Chapter 11 Cases.

Dated: August 26, 2015

Respectfully submitted,

Walter Energy, Inc.
Atlantic Development and Capital, LLC
Atlantic Leaseco, LLC
Blue Creek Coal Sales, Inc.
Blue Creek Energy, Inc.
J.W. Walter, Inc.
Jefferson Warrior Railroad Company, Inc.
Jim Walter Homes, LLC
Jim Walter Resources, Inc.
Maple Coal Co., LLC
Sloss-Sheffield Steel & Iron Company
SP Machine, Inc.
Taft Coal Sales & Associates, Inc.
Tuscaloosa Resources, Inc.
V Manufacturing Company
Walter Black Warrior Basin LLC
Walter Coke, Inc.
Walter Energy Holdings, LLC
Walter Exploration & Production LLC
Walter Home Improvement, Inc.
Walter Land Company
Walter Minerals, Inc.
Walter Natural Gas, LLC


By: _____ /s/ William G. Harvey _____
Name:        William G. Harvey
Title:        Authorized Signatory
             Chief Financial Officer,
             Walter Energy, Inc.

166

**EXHIBIT A**

**The Debtors' Joint Plan of Reorganization
Under Chapter 11 of the Bankruptcy Code**

## EXHIBIT B

**Company Organizational Structure**

**[TO COME]**

**<u>EXHIBIT C</u>**

**List of U.S. Guarantors of First Lien Credit Agreement**

Walter Energy, Inc.[*]

Walter Energy Holdings, LLC

Blue Creek Coal Sales, Inc.

J.W. Walter, Inc.

Jim Walter Resources, Inc.

Taft Coal Sales & Associates, Inc.

Tuscaloosa Resources, Inc.

Walter Black Warrior Basin LLC

Walter Coke, Inc.

Walter Exploration & Production LLC

Walter Land Company

Walter Minerals, Inc.

Walter Natural Gas, LLC

Maple Coal Co., LLC

Atlantic Development and Capital, LLC

Atlantic Leaseco, LLC

---

[*]    Walter Energy, Inc. does not guarantee its own obligations; rather, it guarantees obligations on account of the Canadian Borrowers and U.S. Guarantors only.

## EXHIBIT D

**List of Canadian Guarantors of First Lien Credit Agreement**

Willow Creek Coal ULC

Willow Creek Coal Partnership

Pine Valley Coal Ltd.

0541237 B.C. Ltd.

Wolverine Coal ULC

Wolverine Coal Partnership

Brule Coal Partnership

Brule Coal ULC

Walter Canadian Coal Partnership

Walter Canadian Coal ULC

Cambrian Energybuild Holdings ULC

Walter Canadian Coal Partnership[*]

---

[*] Walter Canadian Coal Partnership does not guarantee their own obligations.

**<u>EXHIBIT E</u>**

**Projected Financial Information**

**[TO COME]**

**<u>EXHIBIT F</u>**

**Liquidation Analysis**

**[TO COME]**

**<u>EXHIBIT G</u>**

**Valuation**

**[TO COME]**

2