## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WALTER ENERGY, INC., *et al.* | ) | Case No. 15-02741-TOM11 |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |
| | ) | |
| | ) | |

## FINAL ORDER (A) AUTHORIZING POSTPETITION USE
## OF CASH COLLATERAL, (B) GRANTING ADEQUATE PROTECTION TO
## PREPETITION SECURED PARTIES AND (C) GRANTING RELATED RELIEF

Upon the motion (the "Motion") [Docket No. 42][2] dated July 15, 2015 of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), pursuant to sections 105, 361, 362, 363, 507(b) and 552(b) of title 11 of the United States Code (the "Bankruptcy Code") and Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") 2002, 4001, 6003, 6004 and 9014, seeking, among other things, entry of a final order (this "Final Order"):

(I) authorizing the Debtors, subject and pursuant to the terms and conditions set forth in this Final Order, to (a) use the Cash Collateral (as defined herein), which Cash Collateral shall be used in accordance with the Budget Covenant (as defined herein), including a budget acceptable in all respects to the Steering Committee (as defined herein) and Administrative Agent (as defined herein), each in their sole discretion, including any

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Walter Energy, Inc. (9953); Atlantic Development and Capital, LLC (8121); Atlantic Leaseco LLC (5308); Blue Creek Coal Sales, Inc. (6986); Blue Creek Energy, Inc. (0986); J.W. Walter, Inc. (0648); Jefferson Warrior Railroad Company, Inc. (3200); Jim Walter Homes, LLC (4589); Jim Walter Resources, Inc. (1186); Maple Coal Co. LLC (6791); Sloss-Sheffield Steel & Iron Company (4884); SP Machine, Inc. (9945); Taft Coal Sales & Associates, Inc. (8731); Tuscaloosa Resources, Inc. (4869); V Manufacturing Company (9790); Walter Black Warrior Basin LLC (5973); Walter Coke, Inc. (9791); Walter Energy Holdings, LLC (1596); Walter Exploration & Production LLC (5786); Walter Home Improvement, Inc. (1633); Walter Land Company (7709); Walter Minerals, Inc. (9714); and Walter Natural Gas, LLC (1198). The location of the Debtors' corporate headquarters is 3000 Riverchase Galleria, Suite 1700, Birmingham, Alabama 35244-2359.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

variances therefrom and the financial covenants (as such budget may be extended, varied, supplemented, or otherwise modified in accordance with the provisions of this Final Order (as defined herein), the "<u>Approved Budget</u>") and (b) provide adequate protection on account of the diminution in the value of the Prepetition Collateral (as defined herein) as a consequence of the Debtors' use, sale or lease of the Prepetition Collateral, including any Cash Collateral (as defined below), and/or the imposition of the automatic stay to the Prepetition Secured Parties (as defined herein) who have been granted prepetition liens and security interests under the following documents (collectively, the "<u>Prepetition Debt Documents</u>"):

(a)    the Credit Agreement, dated as of April 1, 2011 (as amended, restated, amended and restated, waived, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>" and together with all mortgage, security, pledge, guaranty and collateral agreements, including the 1L Security Agreement (as defined below) and all other documentation executed in connection with any of the foregoing, each as amended, restated, amended and restated, waived, supplemented or otherwise modified from time to time, the "<u>First Lien Credit Documents</u>"), among Walter Energy, Inc. ("<u>Walter</u>"), as U.S. borrower, Western Coal Corp.[3] and Walter Energy Canada Holdings, Inc., as Canadian borrowers, the lenders from time to time party thereto (collectively, the "<u>First Lien Lenders</u>"), and Morgan Stanley Senior Funding, Inc., as administrative agent (in such capacity, the "<u>Administrative Agent</u>");

(b)    the Indenture, dated as of September 27, 2013 (as amended, waived, supplemented or otherwise modified from time to time, the "<u>First Lien Indenture</u>" and together with all mortgage, security, pledge, guaranty and collateral agreements, including the 1L Notes Collateral Agreement (as defined below) and all other documentation executed in connection with the foregoing, each as amended, restated, amended and restated, waived, supplemented or otherwise modified from time to time, the "<u>First Lien Indenture Documents</u>" and together with the First Lien Credit Documents, the "<u>First Lien Documents</u>"), among Walter, as issuer, certain of its subsidiaries, as guarantors, and Wilmington Trust, National Association (as successor to Union Bank, N.A.), as trustee (in such

---

[3]    Western Coal Corp. was a Canadian borrower at the time of entry into the First Lien Credit Agreement and related documents. In connection with a 2012 restructuring, substantially all of Western Coal Corp.'s assets were transferred to Walter Canadian Coal Partnership, and Western Coal Corp. was dissolved, with its remaining assets (including its partnership interest in Walter Canadian Coal Partnership) distributed to Walter Energy Canada Holdings, Inc.

2

capacity, the "First Lien Trustee") and collateral agent for the noteholders from time to time of the 9.50% Senior Secured Notes due 2019 (collectively, the "First Lien Noteholders" and, together with the First Lien Trustee, the Administrative Agent and the First Lien Lenders, the "First Lien Secured Parties");

(c)    the Indenture, dated as of March 27, 2014 (as amended, waived, supplemented or otherwise modified from time to time, the "Second Lien Indenture" and together with all mortgage, security, pledge, guaranty and collateral agreements, including the 2L Collateral Agreement (as defined below) and all other documentation executed in connection with the foregoing, each as amended, restated, amended and restated, waived, supplemented or otherwise modified from time to time, the "Second Lien Indenture Documents"), among Walter, as issuer, certain of its subsidiaries, as guarantors, and Wilmington Trust, National Association, as trustee (in such capacity, the "Second Lien Trustee" and, together with the First Lien Trustee, the "Indenture Trustees") and collateral agent for the noteholders from time to time of the 11.0%/12.0% Senior Secured Second Lien PIK Toggle Notes due 2020 (collectively, the "Second Lien Noteholders" and, together with the Second Lien Trustee and the First Lien Secured Parties, collectively, the "Prepetition Secured Parties");

(II)    waiving the Debtors' right to surcharge the Prepetition Collateral pursuant to Bankruptcy Code section 506(c);

(III)    modifying the automatic stay imposed by Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms of this Final Order; and

(IV)    waiving any applicable stay with respect to the effectiveness and enforceability of this Final Order (including a waiver pursuant to Bankruptcy Rule 6004(h)).

The *Interim Order (A) Authorizing PostPetition Use of Cash Collateral, (B) Granting Adequate Protection to Prepetition Secured Parties, (C) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b) and (D) Granting Related Relief* (the "Interim Order") [Docket No. 59] was entered by the Court on July 15, 2015. The Court held a hearing to consider the approval of the Motion on a final basis (the "Final Hearing") on September 2 and 3, 2015. Proper notice of the final hearing was given. The Court has considered the record made by the Debtors at the

interim hearing on the Motion (including the First Day Declaration), as well as the record at the Final Hearing made by all parties, including the testimony, evidence (including later submissions), and arguments presented and admitted by all parties.  It appears to this Court that the final relief requested by the Debtors, except as otherwise found or ordered in this Final Order, is in the best interests of the Debtors, their estates, creditors and parties-in-interest; and after due deliberation and consideration of the testimony, evidence, arguments and applicable law, the Court concludes:

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.      *The Motion*.  The Motion is granted on a final basis only as set forth herein.  Any objection to the Motion to the extent not withdrawn or resolved is hereby overruled.  All actions taken in connection with or in reliance on the Interim Order are hereby reaffirmed in full as if taken in connection with or in reliance on this Final Order.

2.      *Jurisdiction*.  This Court has core jurisdiction over the above-captioned Chapter 11 cases (the "Chapter 11 Cases") commenced on July 15, 2015 (the "Petition Date"), the Motion, the objections, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      *Statutory Committees.*  On July 30, 2015, the Office of the Bankruptcy Administrator for the Northern District of Alabama (the "Bankruptcy Administrator") appointed the official committee of unsecured creditors (the "Creditors' Committee") in the Chapter 11 Cases [Docket No. 268].  Pursuant to an order entered on July 30, 2015 [Docket No. 264], a committee of retired employees (the "Retiree Committee") has been formed pursuant to Bankruptcy Code sections 1114(c)(2) and 1114(d).  As of the date hereof, no other official committees have been appointed in the Chapter 11 Cases.

4

4.    *Notice*.    The Debtors have caused notice of the Motion, the relief requested therein and the Final Hearing to be served on:  (a) the Bankruptcy Administrator; (b) counsel to the Administrative Agent; (c) counsel to the First Lien Trustee; (d) counsel to the Second Lien Trustee; (d) counsel to a steering committee (the "Steering Committee") of First Lien Lenders and First Lien Noteholders; (e) counsel to the ad hoc group of unsecured creditors; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission; (h) the U.S. Environmental Protection Agency; (i) counsel to the United Mine Workers of America ("UMWA"); (j) counsel to the United Steel Workers; (k) the holders of the fifty (50) largest unsecured claims against the Debtors, on a consolidated basis; (l) the United States Attorney for the Northern District of Alabama; (m) counsel to the Creditors' Committee and (n) all persons and entities that have filed a request for service of filings in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002.  Under the circumstances, the notice given by the Debtors of the Motion, the relief requested therein and of the Final Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 2002 and 4001(b) and (d).

5.    *Debtors' Stipulations*.    Subject to the rights granted to certain parties, other than the Debtors, to challenge the Prepetition Secured Parties' claims and liens before the termination of the Challenge Period (as defined herein) as set forth below in paragraph 16, the Debtors admit, stipulate, and agree that:

(a)    As of the Petition Date, all of the Debtors (excluding Jefferson Warrior Railroad Company, Inc., Jim Walter Homes, LLC, Walter Home Improvement, Inc., Blue Creek Energy, Inc., Sloss-Sheffield Steel & Iron Company, SP Machine, Inc., and V Manufacturing Company) (collectively, the "Obligated Debtors") were unconditionally indebted and liable to

Case 15-02741-TOM7    Doc 723    Filed 09/14/15    Entered 09/14/15 15:36:21    Desc Main
Document      Page 5 of 56

the Prepetition Secured Parties, without defense, counterclaim or offset of any kind, for the following:

(i)    all debts, liabilities and obligations of every kind and nature owed by the Obligated Debtors under the First Lien Credit Documents, including, without limitation, the Loans (as defined in the Credit Agreement) made by the First Lien Lenders to such Debtors in the outstanding aggregate principal amount of $978,178,601.35 of term loans, and US$50,688,432.80 and C$24,070,494.00 (the "Canadian LCs") in outstanding letters of credit, plus accrued and unpaid interest, fees (including any prepayment fees), expenses, penalties, premiums and other obligations incurred in connection therewith, in each case in accordance with the terms of the First Lien Credit Documents (collectively, the "Credit Agreement Obligations"); the Credit Agreement Obligations are unconditionally guaranteed by the U.S. Subsidiary Guarantors (as defined in the Credit Agreement) and are secured by first priority security interests in and liens on (the "Credit Agreement Liens") substantially all of the assets of Walter and the U.S. Subsidiary Guarantors, including Cash Collateral (as defined herein) (the "Prepetition Collateral"), pursuant to and on the terms set forth in (A) the U.S. Guaranty and Collateral Agreement, dated as of April 1, 2011 (as amended, restated, supplemented or otherwise modified from time to time, the "1L Security Agreement"), among Walter, the U.S. Subsidiary Guarantors and Morgan Stanley Senior Funding, Inc., as collateral agent (in such capacity, the "Credit Agreement Collateral Agent"), (B) the Grant of Security Interest in United States Trademarks, dated as of April 1, 2011, made by Walter to the Credit Agreement Collateral Agent, and (C) such other mortgage, security, pledge, guaranty and collateral agreements executed in connection with the Credit Agreement;

(ii)   all debts, liabilities and obligations of every kind and nature owed by the Obligated Debtors under the First Lien Indenture Documents (collectively, the "First Lien Indenture Obligations" and together with the Credit Agreement Obligations, the "First Lien Obligations"), including, without limitation, the Notes (as defined in the First Lien Indenture) issued to the First Lien Noteholders in the outstanding aggregate principal amount of $970,000,000 under the First Lien Indenture, plus accrued and unpaid interest, fees, penalties, premium, expenses and other obligations incurred in connection therewith, in each case in accordance with the terms of the First Lien Indenture Documents; the First Lien Indenture Obligations are unconditionally guaranteed by the same entities that have guaranteed the Credit Agreement Obligations and secured, *pari passu* with the Credit Agreement Liens, by first priority security interests in and liens on the

6

Prepetition Collateral (collectively with the Credit Agreement Liens, the "Prepetition First Priority Liens"), pursuant to and in accordance with the terms of (A) the First-Lien Notes Collateral Agreement, dated as of September 27, 2013 (as amended, restated, supplemented or otherwise modified from time to time, the "1L Notes Collateral Agreement"), among Walter, certain of its subsidiaries from time to time party thereto and Wilmington Trust, National Association (as successor to Union Bank, N.A.), as collateral agent (in such capacity, the "1L Notes Collateral Agent"), (B) the Grant of Security Interest in United States Trademarks, dated as of September 27, 2013, made by Walter to the 1L Notes Collateral Agent, and (C) such other mortgage, security, pledge, guaranty and collateral agreements executed in connection with the First Lien Indenture; and

(iii)     all debts, liabilities and obligations of every kind and nature owed by the Obligated Debtors under the Second Lien Indenture Documents (collectively, the "Second Lien Indenture Obligations" and together with the First Lien Obligations, the "Prepetition Obligations"), including, without limitation, the Notes (as defined in the Second Lien Indenture) issued to the Second Lien Noteholders in the outstanding aggregate principal amount (including interest that has been capitalized) of $360.5 million under the Second Lien Indenture, plus accrued and unpaid interest, fees, penalties, premium, expenses and other obligations incurred in connection therewith, in each case in accordance with the terms of the Second Lien Indenture Documents; the Second Lien Indenture Obligations are unconditionally guaranteed by the same entities that have guaranteed the First Lien Obligations and secured by second priority security interests in and liens on the Prepetition Collateral (the "Prepetition Second Priority Liens" and together with the Prepetition First Priority Liens, the "Prepetition Liens"), pursuant to and in accordance with the terms of (A) the Second-Lien Notes Collateral Agreement, dated as of March 27, 2014 (as amended, restated, supplemented or otherwise modified from time to time, the "2L Notes Collateral Agreement"), among Walter, certain of its subsidiaries from time to time party thereto and Wilmington Trust, National Association, as collateral agent (in such capacity, the "2L Notes Collateral Agent"), (B) the Grant of Security Interest in United States Trademarks, dated as of March 27, 2014, made by Walter to the 2L Notes Collateral Agent, and (C) all other mortgage, security, pledge, guaranty and collateral agreements executed in connection with the Second Lien Indenture.

(b)     The Prepetition Obligations constitute the legal, valid, binding, non-avoidable obligations of the Obligated Debtors.

7

(c)     The Prepetition Liens are valid, binding, perfected, non-avoidable, and enforceable liens on and security interests in the Prepetition Collateral, subject in each case, solely as among the Prepetition Secured Parties, to the terms of the Intercreditor Agreement (as defined herein) and, prior to giving effect to the Interim Order, those other liens explicitly permitted by the applicable Prepetition Debt Documents (in each case, only to the extent such permitted exceptions were valid, properly perfected, non-avoidable liens senior in priority to the respective liens and security interests of the Prepetition Secured Parties on the Petition Date) (the "Permitted Priority Liens"), if any.

(d)     (i) No portion of the Prepetition Obligations, the Prepetition Debt Documents, and the transactions contemplated thereby is subject to contest, attack, objection, recoupment, defense, setoff, counterclaim, avoidance, recharacterization, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined in the Bankruptcy Code), impairment, subordination or other challenge pursuant to the Bankruptcy Code or applicable nonbankruptcy law; (ii) the Debtors do not have any claims, challenges, counterclaims, causes of action, defenses, recoupment, disgorgement, or setoff rights related to the Prepetition Obligations or the Prepetition Debt Documents, whether arising under the Bankruptcy Code or applicable nonbankruptcy law, on or prior to the date hereof, against the Prepetition Secured Parties and their respective affiliates, subsidiaries, agents, officers, directors, employees, attorneys and advisors; and (iii) the Debtors each irrevocably waive, for themselves, and their subsidiaries, shareholders, and affiliates, any right to challenge or contest in any way the perfection, validity, priority and enforceability of the Prepetition Liens or the validity or enforceability of the Prepetition Obligations and the Prepetition Debt Documents.  Any order entered by the Court in relation to the establishment of a bar date for any claims (including

8

without limitation administrative expense claims) in any of the Chapter 11 Cases or any successor cases shall not apply to the Prepetition Secured Parties. The Prepetition Obligations, Prepetition Liens, interests, rights, priorities and protections granted to, or in favor of the Prepetition Secured Parties, as set forth in the Interim Order, this Final Order and in the applicable Prepetition Debt Documents shall be deemed a timely filed proof of claim on behalf of these Prepetition Secured Parties in each of these Chapter 11 Cases, and none of the Prepetition Secured Parties shall be required to file a proof of claim with respect thereto.

(e)     Each of the Debtors and the Debtors' estates, on its own behalf and on behalf of its past, present and future predecessors, successors, heirs, subsidiaries, and assigns (collectively, the "Releasors") shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably, fully and forever release, remise, acquit, relinquish, irrevocably waive and discharge each of the Prepetition Secured Parties and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, the "Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description that exist on the date hereof relating to any of the Prepetition Debt Documents, or the transactions contemplated under such documents, including, but not limited

9

to, (i) any so-called "lender liability," equitable subordination, equitable disallowance or recharacterization claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, perfection or avoidability of the Prepetition Liens and the Prepetition Obligations. The Debtors' acknowledgments, stipulations, and releases shall be binding on the Debtors and their respective representatives, successors and assigns and, only subject to any action timely commenced by the Creditors' Committee or any other party in interest, or as otherwise ordered herein, and in any case which is granted the requisite standing before the expiration of the Challenge Period as provided in paragraph 16, on each of the Debtors' estates, all creditors thereof and each of their respective representatives, successors and assigns, except the releases contained in this paragraph shall not bind, limit or restrict any trustee or other representative appointed by the Court, whether such trustee or representative is appointed in cases under chapter 11 or chapter 7 of the Bankruptcy Code.

(f)     For purposes of this Final Order, the term "Cash Collateral" shall mean and include all "cash collateral" as defined in Bankruptcy Code section 363 in which the Prepetition Secured Parties have a perfected lien, security interest or other interest, in each case whether existing on the Petition Date, arising pursuant to the Interim Order or this Final Order, or otherwise. The Debtors stipulate that any and all of the Debtors' cash, cash equivalents, negotiable instruments, investment property, securities, and any amounts generated from the use, sale, lease or other disposition of the Prepetition Collateral, in each case wherever located, constitute Cash Collateral and Prepetition Collateral of the Prepetition Secured Parties.

(g)     As of the Petition Date, the Debtors have not brought and are not aware of any claims, objections, challenges, causes of action, including without limitation, avoidance

10

claims under chapter 5 of the Bankruptcy Code against the Prepetition Secured Parties arising out of or related to the Prepetition Obligations.

(h)     To the Debtors' knowledge, as of the Petition Date, there were no other perfected liens on or security interests in the Prepetition Collateral except for the Prepetition Liens and the Permitted Priority Liens.

6.     *Section 552(b).*  Each of the Prepetition Secured Parties shall be entitled to all of the rights and benefits of Bankruptcy Code section 552(b);  <u>provided</u> that the Prepetition Secured Parties shall remain subject to the "equities of the case" exception under Bankruptcy Code section 552(b) until expiration of the Challenge Period (as defined herein) unless the Creditors' Committee or the other party permitted to do so (including, but not limited to the UMWA) has initiated a Challenge (as defined herein), in which case the Prepetition Secured Parties shall remain subject to the "equities of the case" exception under Bankruptcy Code section 552(b) unless and until such Challenge is resolved in favor of the Prepetition Secured Parties or withdrawn by the party that commenced the Challenge.

7.     *Findings Regarding the Use of Cash Collateral and Prepetition Collateral.*

(a)     Good cause has been shown for the entry of this Final Order.

(b)     The Debtors have an immediate need to use the Cash Collateral to permit, among other things, the orderly continuation of their businesses, pay their operating expenses and preserve the going concern value of the Debtors.

(c)     All parties agree that the preservation and maintenance of the Debtors' businesses and assets is necessary to maximize value.  The continued operation of the Debtors' businesses would not be possible and there would be irreparable harm to the Debtors, their estates, and their creditors without the Debtors' ability to use cash collateral.  Authorization to

11

use Cash Collateral is therefore (i) critical to the Debtors' ability to maximize the value of these chapter 11 estates, (ii) in the best interests of the Debtors, their estates, and their creditors, and (iii) necessary to avoid immediate and irreparable harm to the Debtors, their estates, their creditors, and their assets, businesses, goodwill, reputation, employees, and former employees.

(d)     The terms of the use of the Cash Collateral pursuant to this Final Order are fair and reasonable based on the facts and circumstances as presented at the hearing and based on other pleadings in the case.

(e)     The Steering Committee, the Administrative Agent, the Credit Agreement Collateral Agent, the First Lien Trustee, the Second Lien Trustee, the 1L Notes Collateral Agent, and the 2L Notes Collateral Agent, as applicable, have consented to (or, as applicable, have been directed to, or it has been asserted that they are deemed to have consented to pursuant to the Intercreditor Agreement referred to below), conditioned upon the entry of this Final Order, the Debtors' proposed use of Cash Collateral, on the terms and conditions set forth in this Final Order and in accordance with the Budget Covenant.  Pursuant and subject to the terms of the Amended and Restated Intercreditor Agreement, dated as of March 27, 2014 (as amended, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), among Walter, the other grantors from time to time party thereto, the Credit Agreement Collateral Agent, the 1L Notes Collateral Agent, the 2L Notes Collateral Agent, and each additional Collateral Agent (as defined in the Intercreditor Agreement) and Authorized Representative (as defined in the Intercreditor Agreement) from time to time party thereto, the 1L Notes Collateral Agent, the First Lien Noteholders, the 2L Notes Collateral Agent and the Second Lien Noteholders are precluded from objecting to the use of Cash Collateral under certain

12

circumstances, including if the Credit Agreement Collateral Agent has consented thereto and the adequate protection provisions set forth herein are adhered to.

(f)     The continued use of Cash Collateral appears to this Court as having been negotiated in good faith and at arms' length among the Debtors, the Steering Committee, the Credit Agreement Collateral Agent (on behalf of the First Lien Lenders) and the Administrative Agent, as applicable, and, therefore, the use of the Cash Collateral by the Debtors in accordance with the terms of this Final Order shall be deemed to have been extended, issued, or made in "good faith."

(g)     On the Petition Date, the Debtors and certain of the Prepetition Secured Parties entered into that certain Restructuring Support Agreement (as amended from time to time in accordance therewith, the "RSA"), which contains the parties' agreements and undertakings with respect to the Debtors' restructuring.

8.     *Authorization of Use of Cash Collateral.*  Subject to the terms of this Final Order and in accordance with the Budget Covenant, the Debtors are hereby authorized to use the Cash Collateral during the period from the Petition Date through and including the Termination Date for: (a) working capital requirements; (b) general corporate purposes; (c) adequate protection payments to the Prepetition Secured Parties as contemplated herein; and (d) the costs and expenses of administering these Chapter 11 Cases (including payments benefiting from the Carve-Out) incurred in the Chapter 11 Cases; provided that the Debtors shall not be authorized to use Cash Collateral to pay fees or expenses (x) in excess of $175,000 per month for each of the Creditors' Committee and the Retiree Committee (the "Committee Monthly Cap") on account of all Professional Persons (as defined herein) retained by each such committee in the aggregate, (y) in excess of $100,000 (the "Investigation Budget") for the Creditors' Committee to investigate

13

(but not prepare, initiate or prosecute) Claims and Defenses (as defined herein) against the Prepetition Secured Parties before the termination of the Challenge Period (as defined herein), or (z) to initiate or prosecute proceedings or actions (a "Challenge") on account of any Claims and Defenses against the Prepetition Secured Parties.   For the avoidance of doubt and notwithstanding any other provision of this Final Order, other than the Investigation Budget (which may be used solely for the purposes authorized in paragraph 8 of this Final Order), no Cash Collateral, Prepetition Collateral, Collateral or any proceeds thereof, or any portion of the Carve-Out may be used directly or indirectly by any Debtor, any official committee appointed in the case, including the Creditors' Committee and Retiree Committee, or any trustee appointed in the Chapter 11 Cases or any successor case, or any other person, party or entity to (i) investigate, object, contest, or raise any defense to the validity, perfection, priority, extent, or enforceability of the Prepetition Obligations, the Prepetition Liens or any action purporting to do any of the foregoing; (ii) investigate, assert or prosecute any Claims and Defenses against the Prepetition Secured Parties or their respective predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors or any action purporting to do the foregoing in respect of the Prepetition Obligations and/or the Prepetition Liens; (iii) prevent, hinder, or otherwise delay the Prepetition Secured Parties' enforcement, or realization on the Prepetition Obligations, Cash Collateral, the Prepetition Liens, the Adequate Protection Obligations, or the Adequate Protection Liens in accordance with the Final Order; (iv) seek to modify any of the rights granted to the Prepetition Secured Parties hereunder (other than with the consents contemplated hereunder); (v) apply to the Court for authority to approve superpriority claims or grant liens (other than the Approved Liens (as defined below)) in the Collateral or any portion thereof that are senior to, or on parity with, the Adequate Protection Liens, the Superpriority Claims or the Prepetition Liens, unless all

14

Prepetition Obligations and claims under the Interim Order and this Final Order have been refinanced or paid in full in cash (including the cash collateralization of any letters of credit) or otherwise agreed to in writing by the Administrative Agent and the Steering Committee, each in its reasonable discretion; or (vi) seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are agreed to in writing by the Steering Committee in its reasonable discretion, are authorized in any "first day" orders, are otherwise included in the Approved Budget, or as ordered, authorized or approved by this Court.

9.    *Entitlement to Adequate Protection.*  The Prepetition Secured Parties are entitled to adequate protection of their respective interests in the Prepetition Collateral (including, but not limited to, the Cash Collateral) on which the Prepetition Secured Parties hold perfected security interests as of the Petition Date in an amount equal to the aggregate postpetition diminution in value of the Prepetition Collateral, including any Cash Collateral, from and after the Petition Date (such diminution in value, the "Diminution in Value"), including, but not limited to, the extent such diminution results from the sale, lease or use by the Debtors of the Prepetition Collateral, the subordination of the Prepetition Liens to the Carve-Out, or the imposition of the automatic stay pursuant to Bankruptcy Code section 362 (such adequate protection, as set forth in paragraphs 10 and 11 below, the "Adequate Protection Obligations").

10.    *Adequate Protection Claims and Liens.*

(a)    Adequate Protection for the First Lien Secured Parties.  As adequate protection for the Diminution in Value of the Prepetition Collateral, the First Lien Secured Parties are hereby granted the following claims, liens, rights and benefits:

(i)    ***First Lien Superpriority Claim***.  The Adequate Protection Obligations due to the First Lien Secured Parties (the "First Lien Adequate Protection Obligations") shall constitute allowed joint and several superpriority claims against each of the Debtors as provided in

15

Bankruptcy Code section 507(b) (collectively, the "First Lien Superpriority Claim"), with priority over any and all administrative expenses and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all other administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b), and over any and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including, without limitation, Bankruptcy Code sections 105, 326, 327, 328, 330, 331, 365, 503, 506, 507(a), 507(b), 546, 552, 726, 1113 or 1114, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy or attachment, subject and subordinate only to the Carve-Out, or as otherwise provided in this Final Order;

(ii)     *First Lien Adequate Protection Liens*.  Subject to the Carve-Out, as security for the First Lien Adequate Protection Obligations, effective as of the Petition Date and perfected without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the First Lien Secured Parties of any Postpetition Collateral (as defined below), the following security interests and liens are hereby granted to the First Lien Secured Parties (all such liens and security interests, the "First Lien Adequate Protection Liens"):

(A)     Pursuant to Bankruptcy Code sections 361(2) and 363(c)(2), a valid, binding, continuing, enforceable, fully-perfected, non-avoidable additional and replacement first priority lien on, and security interest in, all property (including any previously unencumbered property), whether now owned or hereafter acquired or existing and wherever located, of each Debtor and each Debtor's "estate" (as created pursuant to Bankruptcy Code section 541(a)), of any kind or nature whatsoever, real or personal, tangible or intangible, and now existing or hereafter acquired or created, including, without limitation, all cash, accounts, inventory, goods, contract rights, mineral rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor (other than Walter), other equity or

16

ownership interests held by a Debtor, including equity interests in subsidiaries and non-wholly-owned subsidiaries, money, investment property, and causes of action (excluding causes of action arising under Bankruptcy Code section 549 and any related action under Bankruptcy Code section 550 and the proceeds of any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 550 or 553 or the proceeds of any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law (collectively, the "Avoidance Actions")), Cash Collateral, and all cash and non-cash proceeds, rents, products, substitutions, accessions, and profits of any of the collateral described above (except as to the Avoidance Actions), documents, vehicles, intellectual property, securities, partnership or membership interests in limited liability companies and capital stock, including, without limitation, the products, proceeds and supporting obligations thereof, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located (all such property (including the Junior Collateral (as defined herein)), other than the Prepetition Collateral in existence immediately prior to the Petition Date, being collectively referred to as, the "Postpetition Collateral" and collectively with the Prepetition Collateral, the "Collateral"), which liens and security interests shall be senior to any and all other liens and security interests other than the Carve-Out, the Bid Protections (as defined below) and the Permitted Priority Liens, if any, and liens granted to third parties on Cash Collateral to secure Approved Collateralized Obligations (as defined below) (the "Approved Liens").

(B)     Subject to the Carve-Out, pursuant to Bankruptcy Code sections 361(2) and 363(c)(2), a valid, binding, continuing, enforceable, fully-perfected non-avoidable junior priority replacement lien on, and security interest in, all property, whether now owned or hereafter acquired or existing and wherever located, of each Debtor and each Debtor's "estate" (as created pursuant to Bankruptcy Code section 541(a)), property of any kind or nature whatsoever, real or personal, tangible or intangible, and now existing or hereafter acquired or created, including, without limitation, all cash, accounts, inventory, goods, contract rights, mineral rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, machinery and equipment, real property,

17

leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor (other than Walter), other equity or ownership interests held by a Debtor, including equity interests in subsidiaries and non-wholly-owned subsidiaries, money, investment property, causes of action, Cash Collateral, and all cash and non-cash proceeds, rents, products, substitutions, accessions, and profits of any of the collateral described above, documents, vehicles, intellectual property, securities, partnership or membership interests in limited liability companies and capital stock, including, without limitation, the products, proceeds and supporting obligations thereof, whether now existing or hereafter acquired, that is subject only to (x) the Permitted Priority Liens, (y) the Bid Protections or (z) valid and non-avoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date to the extent permitted by Bankruptcy Code section 546(b), which valid, perfected and unavoidable liens are senior in priority to the security interests and liens in favor of the Administrative Agent and the First Lien Trustee (the "Junior Collateral").

(C)    Notwithstanding anything in this Final Order to the contrary, the Collateral shall not include, and neither the Prepetition Liens not the Adequate Protection Liens (as defined herein) shall attach to, any causes of action arising under Chapter 5 of the Bankruptcy Code, the proceeds of any action arising under Chapter 5 of the Bankruptcy Code, or the proceeds of any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law (collectively, the "Avoidance Actions").

(D)    The First Lien Adequate Protection Liens shall not be subject or subordinate to, or *pari passu* with, (a) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under Bankruptcy Code section 551 or (b) any lien or security interest arising on or after the Petition Date, but subject to the Carve-Out or any stalking horse purchaser bid protections approved by the Steering Committee in its reasonable discretion and approved by the Bankruptcy Court in connection with the Sale Motion (the "Bid Protections"), or (2) except as otherwise set forth in paragraphs 10(a)(ii)(A) and 10(a)(ii)(B) hereof, subordinated to or made *pari passu* with any other lien, claim or security interest under Bankruptcy Code sections 363 or 364 or otherwise.

(iii)    ***Carve-Out***.    For purposes hereof, the "Carve-Out" shall mean, following the Termination Date, the sum of: (A) all fees required to be paid to the Clerk of the Court and the Bankruptcy Administrator

18

(without regard to the Carve-Out Trigger Notice (as defined herein)); (B) reasonable fees and expenses incurred by a trustee appointed under Bankruptcy Code section 726(b) (without regard to the Carve-Out Trigger Notice); (C) subject to the Committee Monthly Cap with respect to Professional Fees incurred by Professional Persons retained by the Creditors' Committee, the Retiree Committee or any other statutory committee appointed in the Chapter 11 Cases, and subject to any Professional Fees permitted to be incurred by the Creditors' Committee under the Investigation Budget, to the extent allowed, whether by interim order, procedural order or otherwise, all accrued and unpaid reasonable fees, costs, and expenses (the "<u>Professional Fees</u>") incurred by persons or firms retained by the Debtors, the Creditors' Committee, the Retiree Committee or any other statutory committee appointed in the Chapter 11 Cases pursuant to Bankruptcy Code section 327, 328, or 363 (collectively, the "<u>Professional Persons</u>") at any time before or on the day of delivery by the Administrative Agent or Steering Committee of a Carve-Out Trigger Notice (the "<u>Pre-Trigger Date Fees</u>"); and (D) after the delivery by the Administrative Agent or Steering Committee of the Carve-Out Trigger Notice (the "<u>Trigger Date</u>"), to the extent allowed at any time, whether by interim order, procedural order or otherwise, the payment of (1) all Professional Fees of Professional Persons retained by the Debtors and (2) subject to the Committee Monthly Cap, the payment of Professional Fees of Professional Persons incurred by the Creditors' Committee, the Retiree Committee or any other statutory committee appointed in the Chapter 11 Cases, not to exceed $5 million in the aggregate for clauses (1) and (2) incurred after the Trigger Date (the amount set forth in this clause (D) being the "<u>Post-Carve Out Trigger Notice Cap</u>"); <u>provided</u> that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (C) or (D) above, on any grounds. On the day on which a Carve-Out Trigger Notice is given to the Debtors, such Carve-Out Trigger Notice also shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an aggregate amount equal to the accrued and unpaid Pre-Trigger Date Fees plus the Post-Carve Out Trigger Notice Cap, and the Debtors shall deposit and hold any such amounts in a segregated account at a financial institution selected by the Debtors for such purpose and solely for the benefit of the Professional Persons entitled thereto. The reserved funds shall be released from time to time from the segregated account to pay when due any Pre-Trigger Date Fees and any fees and expenses incurred after Post-Carve Out Trigger Notice that are included in the Post-Carve Out Trigger Notice Cap under clause (D) above. Such account and amounts therein shall be free and clear of all liens, claims and interests of any party other than the

19

Professional Persons entitled thereto. Notwithstanding the foregoing, (X) the Carve-Out shall not include, apply to or be available for any fees or expenses incurred by any party in connection with (1) the investigation, preparation, initiation or prosecution of any claims, causes of action, proceeding, adversary proceeding or other litigation against any of the Prepetition Secured Parties (in such capacity), including challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the Prepetition Obligations and the Prepetition Liens granted under the Prepetition Debt Documents in favor of the Prepetition Secured Parties, including, but not limited to, for lender liability or pursuant to Bankruptcy Code section 105, 510, 544, 547, 548, 549, 550 or 552, applicable nonbankruptcy law or otherwise; (2) attempts to modify any of the rights granted to the Prepetition Secured Parties hereunder (other than with the consents contemplated hereunder); (3) attempts to prevent, hinder or otherwise delay any of the Prepetition Secured Parties' enforcement or realization upon any Collateral in accordance with the Prepetition Debt Documents and this Final Order; or (4) paying any amount on account of any claims arising before the Petition Date unless such payments are approved by an order of this Court, in the Approved Budget or otherwise consented to by the Steering Committee in its reasonable discretion, and (Y) so long as the Carve-Out Trigger Notice shall not have been delivered, the Carve-Out shall not be reduced by the payment of Professional Fees allowed at any time by this Court. Any claim incurred in connection with any of the activities described above (other than as permitted in connection with the Investigation Budget in an amount not exceeding such Investigation Budget) shall not be allowed, treated or payable as an administrative expense claim for purposes of Bankruptcy Code section 1129(a)(9)(A). For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by the Administrative Agent or the Steering Committee to the Debtors, Debtors' counsel, the Bankruptcy Administrator, counsel to the Creditors' Committee and counsel to the Retiree Committee, upon the occurrence and during the continuance of a Termination Event (as defined below), stating that the Post-Carve Out Trigger Notice Cap has been invoked. For the avoidance of doubt and notwithstanding anything to the contrary herein or in the Prepetition Debt Documents, the Carve-Out shall be senior to all liens and claims arising out of the Prepetition Debt Documents, including the Prepetition Liens, the Adequate Protection Liens, the Superpriority Claims, and any and all other forms of adequate protection, liens or claims securing or relating to the Prepetition Obligations.

(b) <u>Adequate Protection for the Second Lien Trustee and Second Lien Noteholders</u>. As adequate protection for the Diminution in Value of their liens and interests in the Prepetition Collateral, the Second Lien Trustee and the Second Lien Noteholders are hereby granted the following claims, liens, rights and benefits:

(i) ***Second Lien Superpriority Claims***. The Adequate Protection Obligations due to the Second Lien Trustee and the Second Lien Noteholders (the "<u>Second Lien Adequate Protection Obligations</u>") shall constitute joint and several superpriority claims against the Debtors as provided in Bankruptcy Code section 507(b) (the "<u>Second Lien Superpriority Claim</u>" and together with the First Lien Superpriority Claim, the "<u>Superpriority Claims</u>"), with priority over any and all administrative expenses and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all other administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b), and over any and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including, without limitation, Bankruptcy Code sections 105, 326, 327, 328, 330, 331, 365, 503, 506, 507(a), 507(b), 546, 552, 726, 1113 or 1114, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy or attachment, subject and subordinate only to the Carve Out, the First Lien Superpriority Claim, the First Lien Obligations and the Bid Protections.

(ii) ***Second Lien Adequate Protection Liens***. As security for the Second Lien Adequate Protection Obligations, effective as of the Petition Date and perfected without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the Second Lien Indenture Trustee of any Postpetition Collateral, security interests and liens are hereby granted to the Second Lien Indenture Trustee for the benefit of the Second Lien Noteholders on the Postpetition Collateral, subject and subordinate only to the (A) the Carve-Out, (B) the First Lien Adequate Protection Liens, (C) the liens and security interests securing the First Lien Obligations, (D) the Permitted Priority Liens, (E) the Bid Protections and (F) Approved Liens, and subject further to the Intercreditor Agreement (all such liens and security interests, the "<u>Second Lien Adequate Protection Liens</u>," and collectively with the First Lien Adequate Protection Liens, the "<u>Adequate Protection Liens</u>").

21

(iii) Notwithstanding anything in this Final Order to the contrary, the Collateral shall not include, and neither the Prepetition Liens not the Adequate Protection Liens (as defined herein) shall attach to, any causes of action arising under Chapter 5 of the Bankruptcy Code, the proceeds of any action arising under Chapter 5 of the Bankruptcy Code, or the proceeds of any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law (collectively, the "Avoidance Actions").

(iv) The Second Lien Adequate Protection Liens shall not be subject or subordinate to, or *pari passu* with, any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under Bankruptcy Code section 551.

(c) For the avoidance of doubt, (i) to the extent ACE American Insurance Company and/or any of its affiliates (collectively, "ACE") had valid and perfected liens and/or security interests on property (including Cash Collateral) of the Debtors as of the Petition Date, which liens and/or security interests were senior to the liens and/or security interests of each of the Prepetition Secured Parties, such liens and/or security interests shall be senior to any liens and/or security interests granted pursuant to this Order, (ii) the Prepetition Secured Parties do not have liens and/or security interests on any letter(s) of credit for which ACE is the beneficiary or any proceeds thereof and (iii) this Order does not grant the Debtors any right to use any property (or the proceeds thereof) held by ACE as collateral to secure obligations under insurance policies and related agreements.

11. *Additional Adequate Protection.* As additional adequate protection:

(a) Payments: The Debtors are authorized to pay in cash to the Administrative Agent, for the ratable benefit of the First Lien Lenders (including in respect of any unreimbursed drawings on letters of credit), and to the First Lien Trustee, for the ratable benefit of the First Lien Noteholders: (i) all interest accrued but unpaid as of the Petition Date calculated based on 100% of the applicable non-default contract rate as set forth in the First Lien

22

Credit Documents and the First Lien Indenture Documents, as applicable, by no later than December 31, 2015, with such payments to be received by the Administrative Agent and First Lien Trustee on or before 12:00 PM (prevailing Eastern time) on such date; and (ii) all interest accruing after the Petition Date under the First Lien Credit Documents (with the LIBOR Rate under the First Lien Credit Documents fixed at 1.00% per annum for purposes of such postpetition interest payments under the First Lien Credit Documents) and the First Lien Indenture Documents, respectively, in each case calculated based on 80% of the applicable contract non-default rate set forth in the First Lien Credit Documents and the First Lien Indenture Documents, as applicable, which postpetition interest shall be payable on a monthly basis in equal installments (but subject to adjustment if the principal amount of such indebtedness shall be reduced) on the 15th day of each month, or the next business day if the 15th day is not a business day, with such payments to be received by the Administrative Agent and First Lien Trustee on or before 12:00 PM (prevailing Eastern time) on such date.  The aforementioned payments of interest are without prejudice to the rights of the Administrative Agent and the First Lien Trustee (and any party-in-interest's right to object thereto) to assert a claim for payment of additional interest at any other rates in accordance with the applicable governing documents but without prejudice to the right of any party-in-interest with standing to do so to seek to recharacterize such payments as principal.  All computations of postpetition interest shall be made on the basis of a year of 360 days and a month of 30 days.

(b)    <u>Agent/Indenture Trustee Fees and Expenses</u>:  The Debtors shall promptly pay, in cash, (x) all Letter of Credit Fees and Facing Fees (each as defined in the Credit Agreement), and any annual administrative agent fees and other fees set forth in Section 4.01(b) through (e) of the Credit Agreement (including, in each case, all amounts set forth in Section

Case 15-02741-TOM7    Doc 723    Filed 09/14/15    Entered 09/14/15 15:36:21    Desc Main
Document        Page 23 of 56

4.01(a) through (e) of the Credit Agreement accrued with respect to periods on or prior to the Petition Date) on the respective dates for the payment (or, in the case of all amounts accrued as of the Petition Date, promptly upon entry of the Interim Order) of all such fees as provided in the Credit Agreement, at the applicable non-default rate provided for in the First Lien Credit Documents with respect to such fees and (y) upon presentment of an applicable invoice to the Debtors (with a copy of such invoice to be presented contemporaneously to the Bankruptcy Administrator and counsel for both the Creditors' Committee and Retiree Committee), all reasonable, actual, and documented (in customary detail, redacted for privilege and work product) fees, costs and expenses incurred by each of the Administrative Agent and the First Lien Trustee, including, without limitation, the fees, costs and expenses of one lead counsel, one local counsel (if necessary) and, if needed, one Canadian counsel for each of the Administrative Agent and the First Lien Trustee, in each case in accordance with the applicable engagement letters (if any) and the Prepetition Debt Documents and without further order of, or application to, the Court or notice to any party other than as provided in this paragraph 11(b) and paragraph 11(f).

(c)    <u>Steering Committee Fees and Expenses</u>.  The Debtors shall promptly pay in cash all reasonable, actual, and documented (in customary detail, redacted for privilege and work product) fees, costs and expenses of (i) Akin Gump Strauss Hauer & Feld LLP ("<u>Akin Gump</u>"), as lead counsel, Burr Forman LLP ("<u>Burr Forman</u>"), as Alabama counsel, Cassels Brock & Blackwell LLP ("<u>Cassels</u>"), as Canadian counsel, Jackson Kelly LLP ("<u>Jackson Kelly</u>"), as West Virginia counsel, Lazard Frères & Co. LLC ("<u>Lazard</u>"), as financial advisor (including the Restructuring Fee as defined in Lazard's engagement letter), and Stephen Douglas Williams Consulting LLC, as consultant, to the Steering Committee ("<u>Williams Consulting</u>" and

24

together with Akin Gump, Burr Forman, Cassels, Jackson Kelly and Lazard, the "Steering Committee Advisors") and (ii) any other consultants or advisors retained by the Steering Committee (and not by individual Steering Committee members) (the parties described in this paragraph 11(c)(ii), collectively, the "Consultants") in connection with the Restructuring (as defined in the RSA); provided that the Steering Committee shall provide notice to the Debtors prior to retaining any such Consultants, in each case, in accordance with engagement letters (if any) of such professional, and in each case, without further order of, or application to, the Court or notice to any party other than as provided in this paragraph 11(c) and paragraph 11(f); provided that no success fees shall be payable to Williams Consulting or any Consultant. In addition, the Debtors shall promptly reimburse each Steering Committee member in cash for all reasonable and documented out-of-pocket costs and expenses (without limiting the Debtors' obligations pursuant to the previous sentence, which out-of-pocket costs and expenses should not include any advisor or professional fees for such individual Steering Committee member) incurred by such member in connection with the Restructuring.

(d)    Credit Bidding.  The Administrative Agent (on behalf of the First Lien Lenders), the First Lien Trustee (on behalf of the First Lien Noteholders) and the Second Lien Trustee (on behalf of the Second Lien Noteholders) (but only if any such credit bid provides, to the extent set forth in the Intercreditor Agreement, for the payment in full and in cash of all Prepetition Obligations owed to the First Lien Secured Parties and any amounts due and owing to the First Lien Secured Parties under the Interim Order and this Final Order, and provides for the cash collateralization of any letters of credit in accordance with the First Lien Credit Documents, the Interim Order and this Final Order), as applicable, shall have the right to credit bid (X) up to the full amount of the remaining Prepetition Obligations under the First Lien Credit

25

Documents, First Lien Indenture Documents and the Second Lien Indenture Documents, respectively and (Y) the First Lien Superpriority Claims, the Second Lien Superpriority Claims, and any unpaid amounts due and owing under paragraph 11(a) through (c) hereof, as applicable, in the sale of any of the Collateral, including, without limitation, (a) pursuant to Bankruptcy Code section 363, (b) a plan of reorganization or a plan of liquidation under Bankruptcy Code section 1129, or (c) a sale or disposition by a chapter 7 trustee for any Debtor under Bankruptcy Code section 725. Any such credit bid is subject, however, to the right of the Creditors' Committee, Retiree Committee or other interested parties to seek to limit the credit bid in the event a Challenge has been filed and not yet resolved.

(e)    <u>Reporting and Budget Compliance</u>.  The Debtors shall comply in all respects with the provisions of this paragraph 11(e) (the "<u>Budget Covenant</u>").  The initial budget shall cover the 12-week period beginning the business week of the Petition Date (the "<u>Initial Budget Period</u>") and be in the form attached hereto as **<u>Exhibit A</u>** (the "<u>Initial Budget</u>").  On or before the last business day of the tenth week of the Initial Budget Period, the Debtors shall deliver an updated budget (the "<u>Second Budget</u>") for the 12-week period following the Initial Budget Period (the "<u>Second Budget Period</u>").  On or before the last business day of the tenth week of the Second Budget Period, the Debtors shall deliver an updated budget (the "<u>Third Budget</u>" and, together with the Initial Budget and the Second Budget, collectively, the "<u>Budgets</u>") for the 12-week period following the Second Budget Period (the "<u>Third Budget Period</u>").  The Budgets shall be delivered to the Steering Committee and the Administrative Agent, with a copy delivered to the Creditors' Committee; <u>provided</u> that, the Budgets may be shared on a confidential basis with those Prepetition Secured Parties that have signed a confidentiality agreement or are otherwise subject to confidentiality restrictions pursuant to the

26

Prepetition Debt Documents. The Initial Budget was the first budget utilized for reporting and permitted variance purposes (the "Approved Budget"). The Second Budget and the Third Budget provided thereafter shall be of no force and effect unless and until such budget is approved by the Steering Committee and the Administrative Agent, each in its reasonable discretion. The Steering Committee and the Administrative Agent, each in its reasonable discretion, shall approve or reject the Second Budget or the Third Budget within eleven (11) days after the last day that delivery thereof is permitted as set forth above; provided that, each of the Second Budget and the Third Budget shall be deemed approved upon the passage of such eleven (11) day period with no objection raised by the Steering Committee and the Administrative Agent. Further, each such budget shall be served on Committee Counsel and each shall have the right to object to or challenge such budget; provided, however, that if such challenge or objection is overruled or denied, no fees may be requested, allowed or approved by any professional with regard to such Budget Challenge or objection, and any related hearings. Upon the approval by the Steering Committee and the Administrative Agent, each of the Second Budget and the Third Budget shall become the "Approved Budget" for the Second Budget Period and the Third Budget Period, as applicable. Every week (beginning with the first full week after the Petition Date), on the fifth business day of such week, the Debtors shall deliver to the Steering Committee Advisors, the advisors to the Administrative Agent, the advisors to the Creditors' Committee and counsel to the Second Lien Trustee, a weekly variance report from the previous week comparing the actual cash receipts and disbursements of the Debtors with the receipts and disbursements in the Approved Budget (the "Budget Variance Report"); provided that, the Budget Variance Report may be shared on a confidential basis with the Administrative Agent, the Steering Committee and the Second Lien Trustee. The Budget Variance Report shall include, among

27

other things, (a) details regarding amounts paid under any order of the Court; (b) a detailed comparison, including commentary, of each week's performance against the Approved Budget; and (c) a detailed comparison, including commentary, of aggregate performance since the commencement of the Approved Budget against such Approved Budget. The Debtors shall not allow (x) (i) "Cumulative Net Cash Flow" for the relevant Testing Period to have a negative variance of more than $20 million from the "Cumulative Net Cash Flow" line item set forth in the Initial Budget and (ii) "Cumulative Disbursements" for the relevant Testing Period to have a negative variance of more than the greater of (a) $7.5 million and (b) 5% of "Cumulative Disbursements" set forth in the Initial Budget for the relevant Testing Period from the "Cumulative Disbursements" line item set forth in the Initial Budget, (y) (i) "Cumulative Net Cash Flow" for the relevant Testing Period to have a negative variance of more than $20 million from the "Cumulative Net Cash Flow" line item set forth in the Second Budget and (ii) "Cumulative Disbursements" for the relevant Testing Period to have a negative variance of more than the greater of (a) $7.5 million and (b) 5% of "Cumulative Disbursements" set forth in the Second Budget for the relevant Testing Period from the "Cumulative Disbursements" line item set forth in the Second Budget, and (z) (i) "Cumulative Net Cash Flow" for the relevant Testing Period to have a negative variance of more than $20 million from the "Cumulative Net Cash Flow" line item set forth in the Third Budget and (ii) "Cumulative Disbursements" for the relevant Testing Period to have a negative variance of more than the greater of (a) $7.5 million and (b) 5% of "Cumulative Disbursements" set forth in the Third Budget for the relevant Testing Period from the "Cumulative Disbursements" line item set forth in the Third Budget. For purposes of the Cumulative Net Cash Flow and Cumulative Disbursements variance tests set forth above, (i) "Testing Period" shall mean (x) with respect to clause (x) in the prior sentence,

the first two week period of the Initial Budget Period, and each cumulative period beginning with the beginning of the Initial Budget Period and ending every two weeks after the first two week period, (y) with respect to clause (y) in the prior sentence, the first two week period of the Second Budget Period, and each cumulative period beginning with the beginning of the Second Budget Period and ending every two weeks after the first two week period, and (z) with respect to clause (z) in the prior sentence, the first two week period of the Third Budget Period, and each cumulative period beginning with the beginning of the Third Budget Period and ending every two weeks after the first two week period; and (ii) "Cumulative Net Cash Flow" and "Cumulative Disbursements" shall not include, but shall otherwise be permitted to be paid in accordance herewith, (w) adequate protection payments, (x) fees and expenses of professionals retained outside the ordinary course of business, (y) the Debtors' use of the Cash Collateral to collateralize any new, replaced or renewed letters of credit, surety bonds or workers' compensation obligations, in each case, that has been consented to by the Steering Committee in its reasonable discretion (collectively, the "Approved Collateralized Obligations"), and (z) key employee retention payments approved by both the Steering Committee and the Court. The Debtors shall not allow cumulative capital expenditures beginning July 1, 2015, as calculated on a GAAP basis, to exceed the amounts set forth in the Debtors' projected capital expenditure budget attached as an exhibit to the Initial Budget by more than the greater of (x) $5 million and (y) 20%. Such capital expenditure variance shall be tested as of the end of each calendar month, and the Debtors shall deliver to the Steering Committee Advisors, the advisors to the Administrative Agent and the advisors to the Creditors' Committee a variance report calculating such variance no later than 15 business days following the end of each calendar month, beginning with July 2015.

(f)  <u>Requirement of invoices</u>.  Any and all fees, costs and expenses requested to be paid pursuant to paragraphs 11(b) or (c) of this Final Order shall be requested by submitting a monthly invoice to the Debtors, the Creditors' Committee, the Retiree Committee and the Bankruptcy Administrator (the "Fee Review Parties").  The Fee Review Parties shall have ten (10) days following receipt of a monthly invoice to review such invoice (the "Fee Review Period") and, to the extent appropriate, object to the reasonableness of any or all fees or expenses described therein.  At the expiration of the Fee Review Period the Debtors shall be authorized to pay the uncontested portion of any invoice submitted pursuant to paragraphs 11(b) or (c) of this Final Order.  To the extent that any of the Fee Review Parties have objected to a monthly invoice submitted pursuant to paragraphs 11(b) or (c) of this Final Order, the relevant Fee Review Party and First Lien Secured Party Advisor, Administrative Agent or First Lien Trustee as the case may be, shall meet and confer in an effort to resolve the dispute.  To the extent that the dispute cannot be resolved consensually within ten (10) days after the expiration of the Fee Review Period, the dispute shall be resolved by this Court.  <u>Provided</u>, however, that if this Court finds or determines that any such challenge or contest is or was unfounded, inappropriate or without merit, all fees associated with such challenge or contest asserted or claimed by a Fee Review Party will be disallowed and not approved.

(g)  <u>Access to Records/Financial Reporting</u>.  In addition to, and without limiting, whatever rights of access the Prepetition Secured Parties have under the Prepetition Debt Documents, upon reasonable notice, at reasonable times and subject to appropriate confidentiality protections, the Debtors shall permit representatives and agents of the Steering Committee, the Creditors' Committee, the Retiree Committee, and the Administrative Agent (i) to have access to and inspect the Debtors' properties, subject to reasonable safety precautions,

Case 15-02741-TOM7    Doc 723    Filed 09/14/15    Entered 09/14/15 15:36:21    Desc Main
Document      Page 30 of 56

(ii) to examine the Debtors' books and records, and (iii) to discuss the Debtors' affairs, finances and condition with the Debtors' officers and financial advisors. In addition, the Debtors shall provide to the Steering Committee Advisors, the advisors to the Administrative Agent, the Creditors' Committee, the Retiree Committee, and the UMWA, on a monthly basis, reports setting forth (i) substantive mine-by-mine details of the Debtors' operating performance, including its non-debtor subsidiaries and (ii) a detailed comparison, including commentary, of the month's actual operating performance against the projections, substantially in form and substance consistent with the Company's historical monthly reporting to the Board of Directors, as modified to include summary mine-level operating and financial data.

(h)     Executory Contracts and Unexpired Leases. The Debtors will confer with the Steering Committee and its advisors to determine which executory contracts and unexpired leases should be assumed or rejected by the Debtors. The Debtors will provide the Steering Committee and its advisors with all necessary information in order to analyze such a decision. Other than in connection with the 363 Sale (as defined in the RSA) where the Purchaser (as defined in the Sale Term Sheet attached as Exhibit C to the RSA) is not the winning bidder for the Assets (as defined in the RSA), the Debtors shall not make any decision with regard to the assumption or rejection of executory contracts and unexpired leases without first obtaining the consent of the Steering Committee, which consent shall be in its reasonable discretion.

(i)     Employee Incentive/Retention Plans. The Debtors have agreed not to seek approval of any employee incentive or retention plans (or any similar sort of retention or incentive program) without the prior written consent of the Steering Committee, which consent shall be in its reasonable discretion.

31

(j)    Other Covenants.

1.   The Debtors shall maintain their cash management arrangements in a manner consistent in all material respects with that described in *The Debtors' Motion for an Order (A) (I) Approving Continued Use of the Debtors' Existing Cash Management System; (II) Authorizing Use of Existing Bank Accounts and Checks; (III) Waiving the Requirements of 11 U.S.C. 345(b); (IV) Granting Administrative Expense Status to Certain Postpetition Intercompany Claims; and (V) Authorizing the Continuation of Certain Intercompany Transactions; and (B) Granting Related Relief* (the "Cash Management Motion") [Docket No. 38], as modified by the order approving the Cash Management Motion [Docket No. 332] (as may be further amended).

2.   Except as expressly permitted under the RSA, the Sale Motion (as defined in the RSA) or other "first day" pleadings, the Debtors shall not use, sell or lease any material assets outside the ordinary course of business, or seek authority of this Court to the extent required by Bankruptcy Code section 363, without obtaining the prior written consent of the Steering Committee, which consent shall be in its reasonable discretion, and prior consultation with the Administrative Agent and the First Lien Trustee at least five (5) business days prior to the date on which the Debtors seek the Court's authority for such use, sale or lease.  Subject to paragraph 10(a)(iii) hereof and the rights of any holder of a Permitted Priority Lien thereon, in the event of any such sale, lease, transfer, license, or other disposition of property of the Debtors (other than a disposition of all or substantially all of the Debtors' assets) that constitutes Collateral outside the ordinary course of business (to the extent permitted by the Prepetition Debt Documents and this Final Order) the Debtors are authorized, without further notice or order of this Court, to immediately pay to the Administrative Agent or Indenture Trustees, as appropriate under the Intercreditor Agreement, for the benefit of the applicable Prepetition Secured Parties, 100% of the net cash proceeds resulting therefrom no later than the second business day following receipt of such proceeds.  In the event of any casualty, condemnation, or similar event with respect to property that constitutes Collateral, the Debtors are authorized to pay to the Administrative Agent or Indenture Trustees, as appropriate under the Intercreditor Agreement, for the benefit of the applicable Prepetition Secured Parties, any insurance proceeds, condemnation award, or similar payment (excluding any amounts on account of any D&O policies) in excess of $2,000,000 no later than the second business day following receipt of payment by the Debtors unless the applicable Prepetition Secured Parties consent, each in their reasonable discretion but subject to the Intercreditor Agreement, in writing, to the funds being reinvested by the Debtors.

32

(k)     Restrictions on the Use of Collateral with Respect to Foreign and Non-Debtor Affiliates.  The Debtors shall not transfer or use any Collateral, including any Cash Collateral, to or for the benefit of any direct or indirect foreign or non-debtor affiliate or subsidiary of the Debtors, including, without limitation, in connection with any professional fees and expenses incurred with respect to any restructuring of such subsidiary or affiliate, provided that the Debtors shall be permitted to make payments for the benefit of its foreign and non-debtor affiliates or subsidiaries (i) as expressly provided in an Approved Budget or (ii) with the prior consent of the Steering Committee, which consent shall be in its reasonable discretion ("Permitted Non-Debtor Affiliate Payments") and, other than with respect to any payments made to or for the benefit of Black Warrior Methane Corp. and Black Warrior Transmission Corp., any such Permitted Non-Debtor Affiliate Payments shall be made pursuant to senior secured notes, which notes shall be pledged to the First Lien Secured Parties.  For the avoidance of doubt, in the event that any Permitted Non-Debtor Affiliate Payment is made to any one or more Canadian Entity (as defined below), each such Canadian Entity shall grant liens against all of its present and future property, assets and undertaking, and all other Canadian Entities shall (i) guarantee repayment of such Permitted Non-Debtor Affiliate Payment and  (ii) grant liens against all of their respective present and future property, assets and undertaking as security for such guarantee obligations, and each such Permitted Non-Debtor Affiliate Payment and all of such guarantees and security shall be assigned and pledged by the maker of such Permitted Non-Debtor Affiliate Payment in favor of the First Lien Secured Parties, and in each such case, the form of the note(s), security and guarantees shall be in form and substance satisfactory to the Steering Committee in its reasonable discretion.

33

(l)     Right to Seek Additional Adequate Protection. The Interim Order and this Final Order are without prejudice to, and do not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Secured Parties to request additional forms of adequate protection at any time or any party-in-interest's right to object thereto. Any such request must be consistent with the Intercreditor Agreement.

(m)     Independent Director of Canadian Entities. Within a reasonable period of time prior to taking any steps towards commencing a sale, marketing, restructuring or similar process with respect to the direct or indirect subsidiaries of Walter that are formed, incorporated or otherwise domiciled in Canada (each, a "Canadian Entity" and collectively, the "Canadian Entities"), Walter shall cause to be appointed to the board of Walter Energy Canada Holdings, Inc. an independent director mutually agreeable to the Debtors and the Steering Committee, or if the RSA is assumed, the Debtors and the Majority Holders (as defined in the RSA) (and, upon the request of such independent director, Walter shall cause such independent director to be appointed to the board of any other Canadian Entity so requested).

12.     Termination. The Debtors' right to use the Cash Collateral pursuant to this Final Order shall automatically terminate (the date of any such termination, the "Termination Date") without further notice or court proceeding on the earliest to occur of (i) the later of (x) February 13, 2016, (y) if applicable, the "Outside Date" under the Stalking Horse Agreement (or the asset purchase agreement for the Successful Bidder as per the Sale Motion) not to exceed an additional 30 days; provided, however, that in no event shall such date extend beyond March 14, 2016, unless otherwise ordered by this Court, or (z) such other date as may be agreed to by the Steering Committee in writing in its reasonable discretion, (ii) the effective date of any confirmed chapter 11 plan in any of the Chapter 11 Cases, (iii) the date of the

34

consummation of a sale or other disposition of all or substantially all of the assets of the Debtors, and (iv) the occurrence of any of the events set forth in this paragraph 12(a) through (m) below, unless waived by the Administrative Agent and the Steering Committee, each in its reasonable discretion (each of the following events, a "<u>Termination Event</u>" and collectively, the "<u>Termination Events</u>"):

       (a)    the Debtors' failure to: (i) use the Collateral, including but not limited to Cash Collateral, in a manner consistent with the Approved Budget, but subject to the Budget Covenant, and otherwise comply in any respect with any provision of this Final Order (including, but not limited to, the failure to make the payments identified in paragraphs 11(a), (b) and (c) when due in accordance with and under the terms hereof); or (ii) comply with any other covenant or agreement specified in this Final Order (including any obligations to comply with the provisions of paragraph 11 or the covenants and other obligations of the Debtors contained therein); in each case where such failure shall have continued unremedied for five (5) business days following receipt of written notice by the Debtors from the Administrative Agent or the Steering Committee of such failure;

       (b)    (i) an application, motion or other pleading shall have been filed by any Debtor seeking to amend, stay, supplement, vacate, extend or modify in any manner the Prepetition Secured Parties' rights or benefits under this Final Order; or (ii) an order shall have been entered reversing, amending, supplementing, extending, staying, vacating, or otherwise modifying in any manner this Final Order, in each case, without the prior written consent of the Steering Committee and the Administrative Agent, each in its reasonable discretion;

       (c)    the date any provision of this Final Order shall for any reason cease to be valid and binding or any Debtor shall so assert in any pleading filed in any court;

(d)    the date (i) any Chapter 11 Case shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code or any Debtor shall file a motion or other pleading seeking the dismissal or conversion of any Chapter 11 Case pursuant to Bankruptcy Code section 1112 or otherwise other than as expressly contemplated by the Restructuring (as defined in the RSA); or (ii) a trustee, responsible officer, or an examiner (other than a fee examiner) pursuant to Bankruptcy Code section 1104 is appointed or elected, as applicable, in any Chapter 11 Case, any Debtor applies for, consents to, or acquiesces in, any such appointment, or the Court shall have entered an order providing for such appointment, in each case without the prior written consent of the Steering Committee in its reasonable discretion;

(e)    the Court shall have entered an order granting relief from the automatic stay to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure of the like) on any of the Debtors' assets (other than in respect of insurance proceeds or with respect to assets having a fair market value of less than $1,000,000);

(f)    other than with respect to bid protections approved by the Steering Committee in its reasonable discretion and as part of the Sale Motion, any Debtor shall have filed a motion or application for the approval of any superpriority claim or any lien in the Chapter 11 Cases (other than such claim or lien granted or permitted pursuant to this Final Order), which is *pari passu* with or senior to any of the Adequate Protection Liens, Superpriority Claims or Prepetition Liens, without the prior consent of the Steering Committee and the Administrative Agent, each in its reasonable discretion;

(g)    other than with respect to the Carve-Out, the Approved Liens or any bid protections approved by the Steering Committee in its reasonable discretion and as part of the Sale Motion, any Debtor shall create or incur, or the Court enters an order granting, any claim

36

which is *pari passu* with or senior to any of the Prepetition Liens or Prepetition Obligations or the Adequate Protection Liens and Adequate Protection Obligations granted under the Interim Order or this Final Order;

(h)     unless otherwise agreed to in writing by the Steering Committee in its reasonable discretion or unless otherwise ordered by this Court, the (i) consummation of a sale or disposition of any material assets of the Debtors other than in the ordinary course of business, (ii) as  provided for in the Order approving the RSA, or (iii) termination of the RSA;

(i)     commencement of any action, including the filing of any pleading, by any Debtor, or direct or indirect non-debtor affiliate or subsidiary of a Debtor, against any of the Prepetition Secured Parties with respect to any of the Prepetition Obligations or Prepetition Liens other than as expressly contemplated in the RSA;

(j)     unless otherwise agreed to in writing by the Steering Committee in its reasonable discretion, or unless otherwise ordered by this Court, the Canadian Entities commence, or become subject to, any restructuring or insolvency proceeding in any jurisdiction;

(k)     unless otherwise agreed to in writing by the Steering Committee in its reasonable discretion, commencement of a sale process or other actions in furtherance of a disposition of any material assets of the Canadian Entities;

(l)     unless otherwise agreed to in writing by the Steering Committee in its reasonable discretion, incurrence of any new secured debt or any unsecured debt, which unsecured debt is incurred outside of the ordinary course of business (other than as it relates to the Permitted Non-Debtor Affiliate Payments or cash collateralization of the Canadian LCs using the cash on hand as of the Petition Date held by the Canadian Entities), by any of the Canadian Entities; or

37

(m)     unless an order approving the RSA Assumption Motion (as defined in the RSA), which order includes a waiver or modification of the automatic stay to provide any notices contemplated by and in accordance with the RSA or this Final Order, as applicable, has been entered by the Court within seventy-five (75) days of the Petition Date.

13.     *Remedies Upon a Termination Event.*  The Debtors shall immediately provide notice to the Steering Committee, the Administrative Agent and each of the Indenture Trustees (with a copy to counsel for the Creditors' Committee, counsel to the Retiree Committee, counsel to the First Lien Trustee, counsel to the Second Lien Trustee and the Bankruptcy Administrator), of the occurrence of any Termination Event, at which time the Debtors' ability to use Cash Collateral hereunder shall terminate and the Adequate Protection Obligations shall become due and payable.  Upon the occurrence of a Termination Event and following the giving of not less than five (5) business days' advance written notice (the "Enforcement Notice") to counsel to the Debtors, counsel to the Creditors' Committee, counsel to the Retiree Committee, the UMWA, and the Bankruptcy Administrator (the "Notice Period"), the Prepetition Secured Parties (subject as among themselves to the terms of the Intercreditor Agreement), may exercise any remedies available to them under this Final Order, the Prepetition Debt Documents and applicable non-bankruptcy law, including but not limited to (a) set off and apply immediately any and all amounts in accounts maintained by the Debtors against the Adequate Protection Obligations and Prepetition Obligations owed to the Prepetition Secured Parties and otherwise enforce rights against the Collateral for application towards the Adequate Protection Obligations and Prepetition Obligations; (b) take any and all actions necessary to take control of the Collateral, including any Cash Collateral; and (c) take any other actions or exercise any other rights or remedies permitted under this Final Order, the Prepetition Debt Documents or applicable law to

38

effect the repayment and satisfaction of the Adequate Protection Obligations and Prepetition Obligations owed to the Prepetition Secured Parties. The rights and remedies of the Prepetition Secured Parties specified herein are cumulative and not exclusive of any rights or remedies that they may otherwise have. The only permissible basis for the Debtors, the Creditors' Committee, the Bankruptcy Administrator or any other party to contest, challenge or object to an Enforcement Notice shall be solely with respect to the validity of the Termination Event(s) giving rise to such Enforcement Notice (*i.e.* whether such Termination Events validly occurred and have not been cured or waived in accordance with this Final Order). Unless otherwise ordered by this Court, the automatic stay pursuant to Bankruptcy Code section 362 shall be automatically terminated at the end of the Notice Period, without further notice or order of the Court, unless the Prepetition Secured Parties elect otherwise in a written notice to the Debtors, and the Prepetition Secured Parties shall be permitted to exercise all rights and remedies, including with respect to the Collateral (including, without limitation, any Cash Collateral), set forth in this Final Order, the Prepetition Debt Documents and the Intercreditor Agreement, and as otherwise available at law without further order or application or motion to the Court, and without restriction or restraint by any stay under Bankruptcy Code sections 362 or 105 or otherwise.

14.     *Perfection of Adequate Protection Liens.*

(a)     The Administrative Agent, the Credit Agreement Collateral Agent, the First Lien Trustee, the 1L Notes Collateral Agent, the Second Lien Trustee and the 2L Notes Collateral Agent are each hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted to it hereunder.

39

Whether or not the Administrative Agent, the Credit Agreement Collateral Agent, the First Lien Trustee, the 1L Notes Collateral Agent, the Second Lien Trustee or the 2L Notes Collateral Agent, each in its respective reasonable discretion, chooses to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute, subordination, contest, attack, objection, recoupment, defense, setoff, counterclaim, avoidance, recharacterization, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined in the Bankruptcy Code), impairment, subordination (whether equitable, contractual or otherwise) or other challenge of any kind pursuant to the Bankruptcy Code or applicable nonbankruptcy law as of the Petition Date. If the Administrative Agent, the Credit Agreement Collateral Agent, the First Lien Trustee, the 1L Notes Collateral Agent, the Second Lien Trustee or the 2L Notes Collateral Agent determines to file any financing statements, notices of liens or similar instruments, the Debtors will cooperate and assist in any such filings as reasonably requested by the Administrative Agent, the Credit Agreement Collateral Agent, the First Lien Trustee, the 1L Notes Collateral Agent, the Second Lien Trustee or the 2L Notes Collateral Agent, as applicable, and the automatic stay shall be modified to allow such filings.

(b)     The Administrative Agent, the Credit Agreement Collateral Agent, the First Lien Trustee, the 1L Notes Collateral Agent, the Second Lien Trustee or the 2L Notes Collateral Agent, may, each in its respective discretion, cause a certified copy of this Final Order to be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Final Order for filing and recording.

40

(c)     The Debtors shall execute and deliver to the Administrative Agent, the Credit Agreement Collateral Agent, the First Lien Trustee, the 1L Notes Collateral Agent, the Second Lien Trustee or the 2L Notes Collateral Agent all such agreements, financing statements, instruments and other documents as each such party may reasonably request to evidence, confirm, validate or perfect the Adequate Protection Liens.

(d)     Notwithstanding anything to the contrary in the Motion or this Final Order, for purposes of this Final Order, in no event shall the Collateral include or the Adequate Protection Liens granted under this Final Order attach to, any lease, license, permit, contract, or agreement (including any operating and joint venture agreements) or other property right, to which any Debtor is a party, or any of such relevant Debtor's rights or interests thereunder, if and for so long as the grant of such security interest would constitute or result in: (i) the abandonment, invalidation, unenforceability, or other impairment of any right, title, or interest of any Debtor therein, or (ii) a breach or termination pursuant to the terms of, or a default under, any such lease, license, contract, agreement, or other property right pursuant to any provision thereof, unless, in the case of each of clauses (i) and (ii), the applicable provision is rendered ineffective by applicable non-bankruptcy law or the Bankruptcy Code (such leases, licenses, contracts or agreements, or other property rights are collectively referred to as the "Specified Contracts"); provided that the foregoing shall not preclude any counterparty to a Specified Contract from an opportunity to be heard in this Court on notice with respect to whether applicable non-bankruptcy law or the Bankruptcy Code renders such provision ineffective. Notwithstanding the foregoing, the Adequate Protection Liens shall in all events attach to all proceeds, products, offspring, or profits from all sales, transfers, dispositions, or monetizations of any and all Specified Contracts.

41

15.	*Preservation of Rights Granted Under this Final Order.*

(a)	Notwithstanding any order dismissing any of these Chapter 11 Cases under Bankruptcy Code section 1112 or otherwise entered at any time, (i) the Superpriority Claims, the other administrative claims granted pursuant to the Interim Order or this Final Order, the Carve-Out and the Adequate Protection Liens shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all Adequate Protection Obligations and the Carve Out shall have been paid and satisfied in full (and such Superpriority Claims, the other administrative claims granted pursuant to the Interim Order or this Final Order, the Carve Out and the Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest), and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (i) above.

(b)	If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacatur shall not affect:  (i) the validity, priority or enforceability of any Adequate Protection Obligations incurred prior to the date of the entry of an order granting such reversal, stay, modification or vacatur (the "Reversal Order"); or (ii) the validity, priority or enforceability of the Adequate Protection Liens securing such Adequate Protection Obligations.  Notwithstanding any such reversal, stay, modification or vacatur, any use of the Collateral (including the Cash Collateral) or any Adequate Protection Obligations incurred by the Debtors hereunder or under the Interim Order, as the case may be, prior to the date of the entry of the Reversal Order shall be governed in all respects by the original provisions of this Final Order, and (x) the First Lien Secured Parties shall be entitled to all of the rights, remedies, privileges and benefits granted in Bankruptcy Code section 363(m)

42

with respect to all uses of the Collateral (including the Cash Collateral) and such First Lien Adequate Protection Obligations for periods prior to the date of the entry of the Reversal Order and (y) subject to the Intercreditor Agreement, the Second Lien Trustee and the Second Lien Noteholders shall be entitled to all of the rights, remedies, privileges and benefits granted in Bankruptcy Code section 363(m) with respect to all uses of the Collateral (including the Cash Collateral) (other than Collateral constituting setoff rights of the First Lien Secured Parties) and all Second Lien Adequate Protection Obligations for periods prior to the date of the entry of the Reversal Order.

(c)     Except as expressly provided in this Final Order, the Adequate Protection Obligations, the Superpriority Claims and all other rights, claims, security interests and remedies of the Prepetition Secured Parties granted by the provisions of this Final Order or the Interim Order shall survive, and shall not be modified, impaired, or discharged by the entry of an order (i) converting any of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, dismissing any of these Chapter 11 Cases or by any other act or omission or (ii) confirming a plan of reorganization in any of the Chapter 11 Cases, and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining Adequate Protection Obligations; provided that any plan of reorganization or liquidation approved in accordance with the RSA, or otherwise with the consent of the Steering Committee in its reasonable discretion, shall supersede and replace the terms of the Final Order upon its effectiveness in accordance therewith.  The terms and provisions of this Final Order shall continue in these Chapter 11 Cases, in any successor cases if these Chapter 11 Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code, and the Adequate Protection Liens, Superpriority Claims, other administrative claims granted pursuant to

43

this Final Order or the Interim Order, and all other rights, claims, security interests and remedies of the Prepetition Secured Parties granted by the provisions of this Final Order or the Interim Order shall continue in full force and effect as provided herein.

16.      *Effect of Stipulations on Third Parties*.  The stipulations, releases and admissions contained in this Final Order, including in paragraph 5 hereof, shall be binding upon the Debtors and any successor thereto in all circumstances except as otherwise provided in this Final Order. The stipulations, releases and admissions contained in this Final Order, including in paragraph 5 hereof, shall be binding upon all other parties in interest, including the Creditors' Committee, unless and to the extent (a) the Creditors' Committee or any other party in interest other than any Debtor, in each case, after obtaining requisite standing, has duly filed an adversary proceeding challenging in whole or part the validity, enforceability, priority or extent of the Prepetition Obligations or the liens on the Prepetition Collateral securing the Prepetition Obligations held by or on behalf of the Prepetition Secured Parties or otherwise asserting or prosecuting any Avoidance Actions, recharacterization, subordination, "lender liability", or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Claims and Defenses") against the Prepetition Secured Parties in connection with any matter related to the Prepetition Obligations, or the Prepetition Collateral or the Prepetition Liens by no later than the later of (i) in the case of any such adversary proceeding filed by a party in interest with requisite standing other than the Creditors' Committee, seventy-five (75) days after the date of entry of the Interim Order, (ii) in the case of any such adversary proceeding filed by the Creditors' Committee, ninety (90) days after the appointment of the Creditors' Committee, and (iii) any such later date agreed to in writing by the Steering Committee and the Administrative Agent, First Lien Trustee or Second Lien Trustee, as applicable, each in its reasonable discretion (the

44

time period established by the later of the foregoing clauses (i), (ii) and (iii), the "Challenge Period"), and (b) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such Challenge or claim in any such duly filed adversary proceeding. If no such adversary proceeding is timely filed prior to the expiration of the Challenge Period by the Creditors' Committee or a party in interest, which has been granted the appropriate standing, without further order of this Court: (x) the Prepetition Obligations shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, defense, avoidance, contest, attack, objection, recoupment, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined in the Bankruptcy Code), impairment, subordination (whether equitable, contractual or otherwise) or other challenge of any kind pursuant to the Bankruptcy Code or applicable nonbankruptcy law, for all purposes in these Chapter 11 Cases; and (y) the Prepetition Obligations, the Administrative Agent's, the First Lien Trustee's and the Second Lien Trustee's respective Prepetition Liens on the Prepetition Collateral and the respective Prepetition Secured Parties in such capacity shall not be subject to any other or further challenge or claim and any party in interest shall be forever enjoined and barred from seeking to exercise the rights of the Debtors' estates or taking any such action, including any successor thereto. If any such adversary proceeding is timely filed by a party in interest with appropriate standing prior to the expiration of the Challenge Period, the stipulations and admissions contained in this Final Order, including in paragraph 5 hereof, shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on the Creditors' Committee and any other Person (as defined in the Credit Agreement), except as otherwise ordered in this Final Order and except as to any such findings and admissions that were expressly and successfully challenged in such adversary

45

proceeding. Nothing in this Final Order or the Interim Order vests or confers on any Person, including the Creditors' Committee or Trustee, standing or authority to pursue any cause of action belonging to the Debtors or their estates; <u>provided</u>, however, that the Creditors' Committee shall be automatically vested with standing to initiate a Challenge prior to the expiration of the Challenge Period without any need to first seek a Court order granting such standing. Notwithstanding anything herein to the contrary, this paragraph 16 and the stipulations, releases and admissions contained in this Final Order shall not be binding upon any Chapter 7 or Chapter 11 Trustee appointed or elected in the Debtors' bankruptcy cases.

17. *Reservation of Rights of the Prepetition Secured Parties and the Steering Committee.*

(a) Notwithstanding any other provision in this Final Order or the Interim Order to the contrary, this Final Order is without prejudice to, and does not constitute a waiver, expressly or implicitly, or relinquishment, of the Prepetition Secured Parties' or the Steering Committee's respective rights with respect to any person or entity, or with respect to any other collateral owned or held by any person or entity. The rights of the Prepetition Secured Parties and the Steering Committee, respectively, are expressly reserved and entry of this Final Order shall be without prejudice to, and does not constitute a waiver, expressly or implicitly, or relinquishment, of:

(i) the Prepetition Secured Parties' or the Steering Committee's respective rights to bring or be heard on any matter brought before this Court;

(ii) the Prepetition Secured Parties' or the Steering Committee's respective rights under the Prepetition Debt Documents, the Bankruptcy Code or applicable nonbankruptcy law, including, without limitation the rights, if any, to (v) request modification of the automatic stay, (w) sell or foreclose on any Collateral under applicable law, (x) request dismissal of any of the Chapter 11 Cases, conversion of any of the Chapter 11 Cases to a case under chapter 7, or appointment of a chapter 11 trustee,

46

examiner or receiver, (y) propose, subject to the provisions of Bankruptcy Code section 1121, a chapter 11 plan; or (z) take any action specified in paragraph 11(l) above;

(iii)    the Prepetition Secured Parties' or the Steering Committee's respective rights to seek any other or supplemental relief in respect of the Debtors;

(iv)    the Administrative Agent's and the First Lien Trustee's rights, and subject to the Intercreditor Agreement, the Second Lien Trustee's right, to seek modification of the grant of adequate protection provided under this Final Order or the Interim Order so as to provide different or additional adequate protection; or

(v)    any other respective rights, claims, or privileges (whether legal, equitable, or otherwise) of the Prepetition Secured Parties or the Steering Committee;

(b)    Nothing contained herein shall be deemed a finding by the Court or an acknowledgement by the Prepetition Secured Parties or the Steering Committee, respectively, that the adequate protection granted herein does in fact adequately protect the Prepetition Secured Parties against the Diminution in Value of their interests in the Prepetition Collateral.

18.    *Compliance with the Prepetition Debt Document Covenants*.  Unless otherwise agreed to by the Steering Committee in its reasonable discretion, notwithstanding the Debtors' additional reporting requirements and obligations set forth in paragraph 11 hereof, the Debtors shall comply in all respects with all of the reporting requirements set forth in Section 9.01 (except for clauses (d) and (e)) of the Credit Agreement.

19.    *Prepetition Intercreditor Agreements*.  Nothing in this Final Order or the Interim Order shall amend or otherwise modify the terms and enforceability of the Intercreditor Agreement, which shall remain in full force and effect. The rights of the Prepetition Secured Parties shall at all times remain subject to the Intercreditor Agreement and any other applicable intercreditor agreements.

47

20. *506(c) Waiver*. Except to the extent of the Carve-Out, no costs or expenses of administration of the Chapter 11 Cases, which have been or may be incurred in any of the Chapter 11 Cases at any time shall be charged against or recovered from any Prepetition Secured Party, any of the Prepetition Obligations, any of their respective claims, or the Collateral pursuant to Bankruptcy Code sections 105(a) or 506(c), or otherwise, without the prior written consent of the affected Administrative Agent, First Lien Trustee or Second Lien Trustee and the Steering Committee, each in its reasonable discretion, and no such consent shall be implied from any other action, inaction, or acquiescence by any of the Prepetition Secured Parties or their respective representatives.

21. *No Marshaling/Application of Proceeds*. The Administrative Agent, the First Lien Trustee and the Second Lien Trustee, as applicable, shall be entitled to apply the payments or proceeds of the Collateral in accordance with this Final Order and the provisions of the Prepetition Debt Documents and the Intercreditor Agreement, and, except as expressly provided in paragraphs 10(a)(ii) and 10(b)(ii), in no event shall any of the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral or otherwise.

22. *Limitation on Use of Collateral*. For the avoidance of doubt, the Debtors shall not be allowed to use the Cash Collateral to pay fees and expenses of any Professional Person retained by the Creditors' Committee, the Retiree Committee or any other statutory committee in excess of the Committee Monthly Cap; provided that any unused amounts may be carried forward to a subsequent month.

23. *Binding Effect; Successors and Assigns*. The provisions of this Final Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11

48

Cases, including the Prepetition Secured Parties, the Creditors' Committee, the Retiree Committee, the Debtors and their respective successors and assigns (including any Trustee hereinafter appointed or elected for the estates of any of the Debtors, an examiner appointed pursuant to Bankruptcy Code section 1104, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), except as otherwise provided in this Final Order. The protections afforded to the Prepetition Secured Parties under this Final Order and any actions taken pursuant thereto, shall survive the entry of an order dismissing any or all of the Chapter 11 Cases or converting any or all of the Chapter 11 Cases into a case(s) under Chapter 7 of the Bankruptcy Code, except to the extent otherwise provided in this Final Order, and the Adequate Protection Liens and the Superpriority Claims shall continue in the Chapter 11 Cases, in any such successor case(s) or after any such dismissal. Except as otherwise provided herein, the Adequate Protection Liens and the Superpriority Claims shall maintain their priorities as provided in the Interim Order and this Final Order, and not be modified, altered or impaired in any way by any other financing, extension of credit, incurrence of indebtedness, or any conversion of any of the Chapter 11 Cases into a case(s) pursuant to chapter 7 of the Bankruptcy Code or dismissal of any of the Chapter 11 Cases, or by any other act or omission until the Prepetition Obligations are indefeasibly paid in full in cash (and any letters of credit cash collateralized in accordance with the terms of the First Lien Credit Documents).

24.     *Limitation of Liability*.   In permitting the use of the Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Final Order the Prepetition Secured Parties shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or

49

management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 <u>et seq.</u> as amended, or any similar federal or state statute), nor shall they owe any fiduciary duty to any of the Debtors, their creditors or estates, or shall constitute or be deemed to constitute a joint venture or partnership with any of the Debtors. Furthermore, nothing in this Final Order shall in any way be construed or interpreted to impose or allow the imposition upon the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in Bankruptcy Code section 101(2)).

25. *No Modification of Final Order.* Each Debtor irrevocably waives any right to seek any amendment, modification or extension of this Final Order without the prior written consent of the Steering Committee and the Administrative Agent, each in its reasonable discretion, and no such consent shall be implied by any action, inaction or acquiescence of the Steering Committee or the Administrative Agent; <u>provided</u>, however, that this Court has and retains the authority to clarify, modify, amend or supplement, its own orders.

26. *Priorities Among Prepetition Secured Parties.* Notwithstanding anything to the contrary herein or in any other order of this Court, in determining the relative priorities and rights of the Prepetition Secured Parties (including, without limitation, the relative priorities and rights of the Prepetition Secured Parties with respect to the adequate protection granted hereunder), such relative priorities and rights shall continue to be governed by the Prepetition Debt Documents and the Intercreditor Agreement.

27. *Rights of Administrative Agent and First Lien Trustee.* Nothing in this Final Order shall be construed to limit or affect the (i) Administrative Agent's right to request

Case 15-02741-TOM7    Doc 723    Filed 09/14/15    Entered 09/14/15 15:36:21    Desc Main
Document    Page 50 of 56

instructions from the Required Lenders (as defined in the Credit Agreement) in accordance with Section 12.04 of the Credit Agreement and (ii) First Lien Trustee's right to request directions from holders of a majority in aggregate principal amount of the then outstanding First Lien Notes (the "Majority First Lien Noteholders") in accordance with Sections 6.05, 7.01, and 10.02 of the First Lien Indenture. It being understood that since the Steering Committee constitutes the Required Lenders and the Majority First Lien Noteholders and can therefore direct the Administrative Agent in taking actions in connection with the Credit Agreement and the First Lien Trustee in taking actions in connection with the First Lien Indenture, in any instance in this Final Order where the Administrative Agent or the First Lien Trustee is indicated as having given its consent, as the Steering Committee has also given its consent in such case, the Administrative Agent and the First Lien Trustee shall be deemed to have given its consent at the direction of the Required Lenders and Majority First Lien Noteholders, as applicable.

28. *No Waiver*. This Final Order shall not be construed in any way as a waiver or relinquishment of any rights that the Prepetition Secured Parties may have to bring or be heard on any matter brought before this Court. Notwithstanding anything herein to the contrary, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights, claims and defenses of the issuers of surety bonds on which the Debtors are principals or indemnitors under applicable bankruptcy and non-bankruptcy law, including any such issuer's rights, claims and defenses under any existing indemnity agreements, surety bonds or related agreements or any letters of credit related thereto, all of which are expressly reserved.

29. *Automatic Stay Modified*. The automatic stay shall be modified or lifted to the extent necessary to allow the relevant Prepetition Secured Parties or the Majority Holders, as

Case 15-02741-TOM7    Doc 723    Filed 09/14/15    Entered 09/14/15 15:36:21    Desc Main
Document      Page 51 of 56

applicable, to provide any notices to the Debtors or take any other action as contemplated by and in accordance with this Final Order or the Oder approving the RSA, as applicable.

30. *Rights Preserved.*

(a) Notwithstanding anything herein to the contrary, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly the Prepetition Secured Parties' or the Steering Committee's right to seek any other or supplemental relief in respect of the Debtors, including the right to seek additional adequate protection. Nothing in this Final Order shall relieve the Debtors of any obligations under federal, state or local police or regulatory laws or under 28 U.S.C. § 959(b).

(b) Nothing in this Final Order is intended to be and shall not be deemed collateral estoppel or res judicata regarding the issues raised by Dominion Resources Black Warrior Trust that are on appeal from order(s) of this Court. Further, all parties' rights and claims regarding those issues are preserved.

31. *Effectiveness.* This Final Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect immediately upon entry hereof, and there shall be no stay of execution of effectiveness of this Final Order. Any finding of fact shall constitute a finding of fact even if it appears as a conclusion of law, and any conclusion of law shall constitute a conclusion of law even if it appears as a finding of fact.

32. *Controlling Effects of Final Order.* To the extent of any conflict between or among (a) the Motion, any other order of this Court, or any other agreements, on the one hand, and (b) the terms and provisions of this Final Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" or "as more fully described in" or "as

52

provided in" or words to that effect with respect to the Prepetition Debt Documents, the terms and provisions of this Final Order shall govern. This Final Order shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof, notwithstanding the possible application Bankruptcy Rules 6004(g), 7062, 9014, or otherwise, and the Clerk of this Court is hereby directed to enter this Final Order on this Court's dockets in the Chapter 11 Cases.

33. *Jurisdiction*. This Court shall retain jurisdiction to enforce the terms of this Final Order and to adjudicate any and all matters arising from or related to the interpretation, implementation or enforcement of this Final Order.

Dated: September 14, 2015        /s/ Tamara O. Mitchell
                                            THE HONORABLE TAMARA O. MITCHELL
                                            UNITED STATES BANKRUPTCY JUDGE

**Exhibit A**

**Initial Budget**

**Walter Energy, Inc. and Domestic Subsidiaries**
Cash Collateral Budget

*(Amounts in USD)*

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Total for 12 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actual / Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | |
| Week Ending | 7/18/15 | 7/25/15 | 8/1/15 | 8/8/15 | 8/15/15 | 8/22/15 | 8/29/15 | 9/5/15 | 9/12/15 | 9/19/15 | 9/26/15 | 10/3/15 | |
| **TOTAL NET CASH FLOW** | | | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | | | |
| Sales/AR Receipts | $ 10,844,222 | $ 15,024,788 | $ 18,727,363 | $ 12,585,487 | $ 15,645,125 | $ 15,402,161 | $ 5,956,529 | $ 4,358,090 | $ 10,743,138 | $ 15,994,156 | $ 23,583,227 | $ 13,187,610 | $ 162,051,895 |
| Other | 200,000 | 575,000 | 970,000 | 3,000 | 300,000 | 575,000 | 190,000 | 1,008,272 | - | 106,250 | 200,000 | 980,000 | 5,107,522 |
| **Total Cash Receipts** | **11,044,222** | **15,599,788** | **19,697,363** | **12,588,487** | **15,945,125** | **15,977,161** | **6,146,529** | **5,366,362** | **10,743,138** | **16,100,406** | **23,783,227** | **14,167,610** | **167,159,417** |
| **Disbursements** | | | | | | | | | | | | | |
| Payroll, Benefits & Pension | (6,331,258) | (5,695,298) | (7,292,681) | (5,722,640) | (7,483,164) | (3,345,640) | (7,495,664) | (3,905,289) | (7,060,189) | (6,297,764) | (4,536,189) | (6,797,764) | (71,963,540) |
| Leases, Taxes, Utilities, Fuel, Insurance | (1,394,453) | (577,000) | (1,227,145) | (3,345,140) | (2,295,615) | (969,600) | (587,753) | (3,916,145) | (696,809) | (2,092,836) | (959,000) | (3,806,753) | (21,868,249) |
| Freight & Royalties | (6,125,550) | (2,753,000) | (2,534,071) | (2,426,025) | (5,384,014) | (2,924,500) | (2,542,221) | (2,522,479) | (2,495,560) | (4,765,760) | (2,850,935) | (2,136,025) | (39,460,140) |
| Other Expenditures | (652,712) | (13,482,552) | (16,547,260) | (9,315,901) | (2,571,463) | (2,504,010) | (3,579,217) | (2,660,096) | (2,409,086) | (2,967,733) | (4,932,558) | (6,422,468) | (68,045,056) |
| **Total Disbursements**[1] | **(14,503,973)** | **(22,507,850)** | **(27,601,157)** | **(20,809,706)** | **(17,734,256)** | **(9,743,750)** | **(14,204,855)** | **(13,004,009)** | **(12,661,644)** | **(16,124,093)** | **(13,278,682)** | **(19,163,010)** | **(201,336,985)** |
| **TOTAL NET CASH FLOW**[2] | **$ (3,459,751)** | **$ (6,908,062)** | **$ (7,903,794)** | **$ (8,221,219)** | **$ (1,789,131)** | **$ 6,233,411** | **$ (8,058,326)** | **$ (7,637,648)** | **$ (1,918,506)** | **$ (23,687)** | **$ 10,504,544** | **$ (4,995,400)** | **$ (34,177,568)** |

| Cash Collateral Budget Metrics |
|---|

| *Cumulative Totals* | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Disbursements | (14,503,973) | (37,011,822) | (64,612,979) | (85,422,685) | (103,156,941) | (112,900,691) | (127,105,546) | (140,109,556) | (152,771,200) | (168,895,293) | (182,173,975) | (201,336,985) | |
| Total Net Cash Flow | (3,459,751) | (10,367,813) | (18,271,607) | (26,492,826) | (28,281,957) | (22,048,546) | (30,106,872) | (37,744,520) | (39,663,026) | (39,686,713) | (29,182,168) | (34,177,568) | |

*Notes:*

[1] Although permitted pursuant to the terms of the Cash Collateral Order, the figures above exclude (i) adequate protection payments, (ii) fees and expenses of professionals retained outside the ordinary course of business, (iii) the Debtors' use of the Cash Collateral to collateralize any new, replaced or renewed letters of credit, surety bonds or workers' compensation obligations in each case, that have been consented to by the Steering Committee in its sole discretion and (iv) key employee retention payments approved by both the Steering Committee and the Court that are approved to be paid pursuant to the Approved Budget and the Cash Collateral Order.

[2] Budget assumes continuation of ordinary course transactions between the Debtors and Non-Debtor Affiliates Black Warrior Methane and Black Warrior Transmission.

**Walter Energy - Domestic Capital Expenditures Budget**

*$ in 000s*

| | 2015 | | | | | | 2016 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Jul-15 | Aug-15 | Sep-15 | Oct-15 | Nov-15 | Dec-15 | Jan-16 | Cumulative |
| Capital Expenditures | 8,460 | 6,044 | 4,551 | 3,315 | 4,514 | 5,739 | 8,273 | 40,897 |