**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

--------------------------------------------------------- x
In re:                             :    Chapter 11
                                      :
WALTER ENERGY, INC., <u>et al</u>.,      :    Case No. 15-02741-TOM11
                                        :
           Debtors.[1]           :    Jointly Administered
                                        :
--------------------------------------------------------- x

**DEBTORS' MOTION FOR (A) AN ORDER (I) ESTABLISHING BIDDING**
**PROCEDURES FOR THE SALE(S) OF ALL, OR SUBSTANTIALLY ALL, OF THE**
**DEBTORS' ASSETS; (II) APPROVING BID PROTECTIONS; (III) ESTABLISHING**
**PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (IV) APPROVING FORM**
**AND MANNER OF THE SALE, CURE AND OTHER NOTICES; AND (V)**
**SCHEDULING AN AUCTION AND A HEARING TO CONSIDER THE APPROVAL OF**
**THE SALE(S); (B) ORDER(S) (I) APPROVING THE SALE(S) OF THE DEBTORS'**
**ASSETS FREE AND CLEAR OF CLAIMS, LIENS AND ENCUMBRANCES; AND (II)**
**APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY**
**CONTRACTS AND UNEXPIRED LEASES; AND (C) CERTAIN RELATED RELIEF**

        The debtors and debtors in possession in the above-captioned cases (collectively, the

"**Debtors**" or the "**Company**"), by and through their undersigned counsel, hereby submit this

motion (the "**Motion**") pursuant to sections 105, 363, 364, 365 and 503 of title 11 of the United

States Code, 11 U.S.C. § 101 *et seq.* (as amended, the "**Bankruptcy Code**"), and rules 2002,

6004, 6006, 9006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (each a

"**Bankruptcy Rule**," and collectively, the "**Bankruptcy Rules**"), for (A) an order (the "**Bidding**

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Walter Energy, Inc. (9953); Atlantic Development and Capital, LLC (8121); Atlantic Leaseco, LLC (5308); Blue Creek Coal Sales, Inc. (6986); Blue Creek Energy, Inc. (0986); J.W. Walter, Inc. (0648); Jefferson Warrior Railroad Company, Inc. (3200); Jim Walter Homes, LLC (4589); Jim Walter Resources, Inc. (1186); Maple Coal Co., LLC (6791); Sloss-Sheffield Steel & Iron Company (4884); SP Machine, Inc. (9945); Taft Coal Sales & Associates, Inc. (8731); Tuscaloosa Resources, Inc. (4869); V Manufacturing Company (9790); Walter Black Warrior Basin LLC (5973); Walter Coke, Inc. (0791); Walter Energy Holdings, LLC (1596); Walter Exploration & Production LLC (5786); Walter Home Improvement, Inc. (1633); Walter Land Company (7709); Walter Minerals, Inc. (9714); and Walter Natural Gas, LLC (1198). The location of the Debtors' corporate headquarters is 3000 Riverchase Galleria, Suite 1700, Birmingham, Alabama 35244-2359.

**Procedures Order**") substantially in the form attached hereto as **Exhibit A** (I) approving the Debtors' proposed auction and bidding procedures (the "**Bidding Procedures**"), in substantially the form attached as an exhibit to the Bidding Procedures Order, to be employed in connection with the proposed sale(s) (the "**Sale(s)**") of one or more categories of the Debtors' assets (each a "**Lot**" and collectively, the "**Lots**"), which Lots are identified in an exhibit to the Bidding Procedures and comprise all, or substantially all, of the Debtors' assets (collectively, the "**Subject Assets**"); (II) approving Bid Protections (as defined below) pursuant to the terms of that certain stalking horse asset purchase agreement (including all exhibits, schedules and ancillary agreements related thereto, and as amended and in effect, the "**Stalking Horse Agreement**") by and among Walter Energy, Inc. and its debtor subsidiaries (collectively, the "**Sellers**") and Coal Acquisition LLC (the "**Stalking Horse Purchaser**" or "**Buyer**"), dated as of November 5, 2015, a copy of which is attached hereto as **Exhibit B**; (III) establishing procedures for the assumption and assignment of executory contracts and unexpired leases; (IV) approving the form and manner of notice of the Sale(s), the notice of assumption and assignment of executory contracts and unexpired leases, including the form and manner of notice of proposed cure amounts (the "**Cure Notice**") and the other notices set forth herein; and (V) scheduling an auction (the "**Auction**") and a hearing (the "**Sale Hearing**") to consider approval of the Sale(s); and (B) order(s) (the "**Sale Order(s)**")[2] authorizing (I) the Sale(s) of one or more Lots to the bidder(s) with the highest or otherwise best bid(s) (each, a "**Successful Bidder**") pursuant to the Stalking Horse Agreement, Short Form APA(s) and/or Modified Asset Purchase Agreement(s), in each case free and clear of all claims, liens and encumbrances as provided therein; and (II) the Debtors' assumption and assignment of the applicable executory contracts and/or unexpired

---

[2]  The proposed form of a Sale Order will be available before the Bid Deadline (as defined below).

2

leases to the Successful Bidder(s) for the relevant Lot(s); and (C) certain related relief.[3]  In

support of the Motion, the Debtors respectfully represent as follows:

**JURISDICTION AND VENUE**

1.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. § 1334.  This

matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2).  Venue of this proceeding and

this Motion is proper in this judicial district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief sought herein are in Bankruptcy Code

sections 105, 363, 364, 365 and 503 and Bankruptcy Rules 2002, 6004, 6006, 9006, 9007 and

9014.

**BACKGROUND**

3.      On July 15, 2015 (the "**Petition Date**"), each of the Debtors filed a voluntary

petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing the above-

captioned cases (collectively, the "**Chapter 11 Cases**").  The Debtors have continued in

possession of their respective properties and to operate and maintain their businesses as debtors

in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

4.      On the Petition Date, this Court entered an order consolidating the Chapter 11

Cases for procedural purposes only.

5.      The Bankruptcy Administrator for the Northern District of Alabama (the

"**Bankruptcy Administrator**") has appointed two official committees in the Chapter 11 Cases:

a statutory committee of unsecured creditors (the "**Creditors' Committee**"); and a committee of

---

[3]      Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Stalking Horse
Agreement or the Bidding Procedures, as applicable.

3

retired employees pursuant to Bankruptcy Code sections 1114(c)(2) and 1114(d) (the "**Section 1114 Committee**").

6.      At the beginning of this year, the Debtors were facing the prospect of running out of cash by early 2016 if the met coal market did not improve.  In response, the Debtors' advisors began negotiating with advisors to an ad hoc committee (the "**Steering Committee**") of certain unaffiliated lenders and noteholders (the "**First Lien Creditors**") holding a majority in amount of first lien senior secured obligations (the "**First Lien Obligations**").  The First Lien Obligations are secured by first priority liens (the "**First Priority Liens**") on substantially all of the Debtors' assets.  The negotiations between the Debtors and the Steering Committee culminated in a Restructuring Support Agreement (the "**RSA**") and the terms of an agreed order approving the Debtors' use of cash collateral.  Together, these documents provided for the consensual use of cash collateral for seven months to enable the Debtors to pursue confirmation of a pre-negotiated chapter 11 plan, while simultaneously pursuing a sale of substantially all of the Debtors' assets, if one or more of the Triggering Events (as defined in the RSA) occurred.

7.      On the Petition Date, the Debtors filed motions to approve the assumption of the RSA [Docket No. 44] (the "**RSA Motion**") and the consensual use of cash collateral [Docket No. 42] (the "**Cash Collateral Motion**").  Several parties-in-interest objected to the relief requested in the RSA Motion and Cash Collateral Motion.

8.      The Court conducted hearings on the RSA Motion and final approval of the Cash Collateral Motion on September 2-3, 2015, and thereafter entered orders approving each motion but with modifications unacceptable to the Steering Committee.  *See* Docket Nos. 723 & 724. As a result, the Steering Committee filed an Emergency Motion requesting that the Court (a) confirm that the RSA was terminated, (b) terminate the Debtors' use of cash collateral on a

4

nonconsensual basis, and (c) authorize the Debtors' use of cash collateral through October 21, 2015 pursuant to an amended final cash collateral order acceptable to the Steering Committee (the "**Cash Collateral Order**") [Docket No. 746] (the "**Emergency Motion**").  The Court held a hearing on the Emergency Motion on September 24, 2015 and, on September 28, 2015, entered (i) an order granting the Emergency Motion and (ii) the Cash Collateral Order.  *See* Docket Nos. 796 & 797.  Pursuant to the Cash Collateral Order, the Debtors were granted the right to use cash collateral until October 21, 2015, which right was extended by agreement with the Steering Committee to November 20, 2015 [Docket No. 857].

9.     The Debtors' financial condition is continuing to deteriorate and unexpected operational difficulties have exacerbated the situation.  Thus, the Debtors have determined, in the exercise of their business judgment, that the best way to maximize the value of substantially all of their assets is to sell those assets through the Sale(s) pursuant to Bankruptcy Code section 363. To this end, the Debtors have executed the Stalking Horse Agreement with the Stalking Horse Purchaser to provide for the sale of the Acquired Assets to the Stalking Horse Purchaser (subject to higher or otherwise better bids) for, among other things, cash and a credit bid of a material portion of the First Lien Obligations and First Lien Adequate Protection Obligations (as defined in the Cash Collateral Order) as set forth in the Stalking Horse Agreement.  In addition, the Debtors propose to sell one or more Lots, or any combination thereof, comprising the Non-Core Assets pursuant to the auction and bidding process contemplated herein and in the Bidding Procedures.  As part of the Sale(s) the relevant buyer(s) will assume the applicable executory contracts and/or unexpired leases and pay any associated Cure Costs relating to such executory contracts and/or unexpired leases.  The Sale(s) of the Subject Assets are intended to preserve the jobs of a substantial portion of the Debtors' employees, relieve the estates of substantial

5

obligations relating to such assets (including certain reclamation obligations), reduce estates' liabilities through the assumption and assignment of the relevant executory contracts and/or unexpired leases and avoid the further deterioration in the value of the Subject Assets—all through the prompt sale of such assets. Moreover, the Sale(s) should provide the estates with the liquidity necessary to wind down the estates in a responsible fashion, including the establishment by Buyer of certain trusts at closing for designated purposes, including the wind down of the Debtors' West Virginia and Walter Coke operations if neither is sold to a Successful Bidder.

   10. The Debtors have been and will continue exposing the Subject Assets to competitive bidding through a sale and auction process pursuant to the Bidding Procedures. If no timely, conforming Qualified Bids, other than the Qualified Bid submitted by the Stalking Horse Purchaser, for the Core Acquired Assets, Blue Creek Assets and/or Miscellaneous Real Property Assets are received, there shall be no Auction for such Core Acquired Assets, Blue Creek Assets and/or Miscellaneous Real Property Assets, as applicable, and the Stalking Horse Purchaser shall be the Successful Bidder for the Core Acquired Assets, Blue Creek Assets and/or Miscellaneous Real Property Assets, as applicable. If a Walter Coke Election is not made, and no timely, conforming Qualified Bids (other than the Qualified Bid submitted by the Stalking Horse Purchaser) for the Walter Coke Assets are received, then there shall be no Auction for such Walter Coke Assets and, as provided in the Stalking Horse Agreement, the Stalking Horse Purchaser shall be the Successful Bidder for the Walter Coke Assets. With respect to Bids for any Non-Core Assets (other than as expressly set forth in the Bidding Procedures with respect to the minimum bid amounts for the Blue Creek Assets and the Walter Coke Assets, if the Walter Coke Election is not made), the Debtors will determine whether any individual Bid or combination of Bids is a Qualified Bid and will conduct an Auction with respect to such Bids for

Case 15-02741-TOM7 Doc 993 Filed 11/05/15 Entered 11/05/15 14:35:05 Desc Main
Document Page 6 of 233

the Non-Core Assets as Debtors, in consultation with the Consultation Parties, deem appropriate and in the best interests of Debtors and their estates.

11.     The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, are set forth in detail in the Declaration of William G. Harvey, the Chief Financial Officer of Walter Energy, Inc., in Support of Chapter 11 Petitions and First-Day Pleadings [Docket No. 3] (the "**Harvey Declaration**"), filed on the Petition Date and fully incorporated herein by reference.

**A.     Marketing Efforts and the Stalking Horse Agreement**

12.     Before the Petition Date, the Company retained PJT Partners Inc. (formerly Blackstone Advisory Services, L.P.) ("**PJT**") as its investment banker, and AlixPartners LLC, ("**Alix**") as restructuring advisor, to assist the Company with developing responses to its worsening financial condition, including sale and restructuring alternatives.

13.     Following the formation of the Steering Committee, the Debtors opened an "advisors' only" electronic data site containing extensive financial, legal and corporate diligence materials.  With the guidance and direction of the Company's Board of Directors, the Debtors devoted significant time and resources to exploring the strategic alternatives available to the Company, including discussions with the Steering Committee's advisors regarding a comprehensive restructuring of the Debtors through a dual-track plan and sale process that was contemplated in the RSA.  In addition, prior to the Petition Date, PJT and Alix commenced an informal marketing process by preparing materials and reaching out to potential purchasers and other interested parties in connection with the sale of all, or substantially all, of the Debtors' assets.  Despite these efforts, the Debtors did not receive any viable sale proposals, other than the proposal from the Stalking Horse Purchaser.

7

14.     Following the Petition Date, pursuant to the RSA, the Debtors and their advisors refreshed the data from their pre-petition marketing process in preparation for a potential section 363 sales process.  In addition, PJT prepared updated marketing materials, contacted potential purchasers and provided those that executed non-disclosure agreements with access to the due diligence data room.  This dual-track contingency planning has proven prudent.  Notwithstanding the RSA's termination, the Debtors have fostered an environment that encourages a robust sale and auction process.  Moreover, the Debtors believe, in consultation with their advisors, that pursuing the Sale(s) as contemplated in the Bidding Procedures, including a Sale of the Acquired Assets to the Stalking Horse Purchaser (subject to higher and better offers), is the course of action likely to maximize the value of the Subject Assets, while ensuring that a consummation of a Sale of at least the Acquired Assets will occur if no other bids are received.  As a result, and in an exercise of their fiduciary obligation to maximize the recoverable value of their estates, the Debtors have determined to execute the Stalking Horse Agreement and to launch further the Sale(s) process contemplated by this Motion.  Since the Stalking Horse Purchaser is not willing to purchase certain of the Debtors' assets, the Debtors are seeking to sell those assets through the auction process contemplated by the Bidding Procedures.  This approach represents a sound exercise of the Debtors' business judgment, is consistent with their fiduciary obligation to maximize the recoverable value of their estates, and is in the best interest of the Debtors' estates and creditors.

15.     Accordingly, by this Motion, the Debtors seek authority to implement the Bidding Procedures outlined herein so as to efficiently market and solicit offers for the Subject Assets. Pursuant to this Motion, the Debtors request that the Court enter the proposed Bidding Procedures Order, which approves the Bidding Procedures, the Bid Protections, the Assumption

8

and Assignment Procedures (as defined below) and the various notices set forth herein. In addition, the Bidding Procedures set forth the timetable for conducting the Auction and having a Sale Hearing. Upon conclusion of the Auction and selection of the highest or otherwise best bid(s), the Debtors will request that the Court enter the proposed Sale Order(s) authorizing the Sale(s). At the Sale Hearing, the Debtors will also seek approval pursuant to Bankruptcy Code section 365 of the assumption and assignment of the relevant executory contracts and/or unexpired leases to the Successful Bidder(s) for the applicable Subject Assets.

## RELIEF REQUESTED

16. By this Motion, the Debtors respectfully request, pursuant to Bankruptcy Code sections 105, 363, 364, 365 and 503 and Bankruptcy Rules 2002, 6004, 6006, 9006, 9007 and 9014, the entry of (A) an order (i) establishing bidding procedures for the Sale(s) of the Subject Assets; (ii) approving Bid Protections; (iii) establishing procedures relating to the assumption and assignment of executory contracts and unexpired leases (the "**Assumption and Assignment Procedures**"); (iv) approving form and manner of sale, cure and other related notices; and (v) scheduling an auction and a hearing to consider the proposed Sale(s); (B) an order (i) approving the Sale(s) of the Subject Assets free and clear of all claims, liens and encumbrances; and (ii) approving the assumption and assignment of the relevant executory contracts and unexpired leases to the Successful Bidder(s); and (C) certain related relief.

## THE PROPOSED SALE OF THE ACQUIRED ASSETS

**B.**     **The Stalking Horse Agreement**

17. A summary of the principal terms of the Stalking Horse Agreement is as follows:[4]

---

[4]     The following summary is qualified in its entirety by reference to the provisions of the Stalking Horse Agreement. In the event of any inconsistencies between the provisions of the Stalking Horse Agreement and the terms herein, the terms of the Stalking Horse Agreement shall govern. Capitalized terms used in this Section B

Case 15-02741-TOM7    Doc 993    Filed 11/05/15    Entered 11/05/15 14:35:05    Desc Main
Document      Page 9 of 233

a.  Purchase Price: Under section 3.1 of the Stalking Horse Agreement, the aggregate consideration (the "**Purchase Price**") for the purchase, sale, assignment and conveyance of the Acquired Assets consists of: (i) cash (the "**Cash Consideration**") in an amount equal to $5,400,000 (provided that such amount shall be reduced to $4,100,000 if Buyer makes a Buyer TS Election);  (ii) the assumption by the Stalking Horse Purchaser or a Buyer Designee, as applicable, of the Assumed Liabilities from Sellers, including the assumption of the obligation to pay Cure Costs to counterparties of Assumed Contracts under section 2.5 of the Stalking Horse Agreement; and (iii) the release of the Sellers that are borrowers or guarantors under the Credit Agreement and the Indenture of the First Lien Obligations and the First Lien Adequate Protection Obligations, in an aggregate amount equal to $1,250,000,000 (the "**Credit Bid and Release**") under Bankruptcy Code section 363, as the same may be (x) decreased or increased in accordance with section 7.8 of the Stalking Horse Agreement and/or (y) increased by the Stalking Horse Purchaser in its sole discretion (including with respect to all or any portion of the Credit Bid and Release) at any time during the Auction (or if there is no Auction, prior to the Closing Date).

b.  Acquired Assets: Under section 2.1 of the Stalking Horse Agreement, Acquired Assets consist of, among other things: (i) Inventory; (ii) Equipment; (iii) Assumed Contracts; (iv) Real Property; (v) Lessor Leases; (vi) Transferred Permits; (vii) Intellectual Property; (viii) Accounts Receivable; (ix) Pre-Paid Expenses; (x) Acquired Actions; (xi) cash and cash equivalents (subject to the limitations set forth in section 2.1(n) of the Stalking Horse Agreement); (xii) certain insurance policies of Sellers; and (xiii) Sellers' right and interest in and right to manage the 501(c)(21) Black Lung Benefit Trust funded by the Sellers in respect of Black Lung Liability of the Sellers.

c.  Excluded Assets: Section 2.2 of the Stalking Horse Agreement provides that the Sellers shall retain and the Stalking Horse Purchaser will not acquire any right, title or interest in, among others, the following assets, properties, rights and interests of the Sellers: (i) the Non-Core Assets and the assets, if any, listed on Schedule 2.2(a) of the Stalking Horse Agreement; (ii) any and all Collective Bargaining Agreements; (iii) any Employee personnel files or records and Excluded Benefit Plan and any assets, trust agreements, insurance policies, administrative service agreements and other contracts, files and records in respect thereof; (iv) shares of capital stock or other equity interest in or issued by any Seller or any other entity in which any Seller holds an equity interest, with certain exceptions; (v) any executory contract or unexpired lease that is not an

---

that are not otherwise defined in this Motion shall have the meanings assigned to such terms in the Stalking Horse Agreement.

Assumed Contract; (vi) any prepaid deposits related to professional fee retainers and Cash Collateral securing Approved Collateralized Obligations; (vii) the Cash Consideration; (viii) all current and prior D&O insurance policies and all rights of any nature with respect thereto, (ix) any rights, claims or causes of action of Sellers under the Stalking Horse Agreement or any other Transaction Document; (x) subject to section 2.5(c) of the Stalking Horse Agreement, any Permits and licenses held by the Sellers that are not assignable or transferrable; (xi) certain surety bonds or other financial assurances; (xii) intercompany receivables; (xiii) (a) the Walter Coke Assets, if the Walter Coke Election or the Pre-Closing Walter Election is made or if the Walter Coke Assets are sold to a Successful Bidder (other than the Stalking Horse Purchaser or a Buyer Designee), (b) the Blue Creek Assets, if the Blue Creek Assets are sold to a Successful Bidder (other than the Stalking Horse Purchaser or a Buyer Designee) and (c) if any Miscellaneous Real Property Assets are designated by the Stalking Horse Purchaser as "Excluded Assets" or if any Miscellaneous Real Property Assets are sold to a Successful Bidder (other than the Stalking Horse Purchaser or a Buyer Designee), such Miscellaneous Real Property Assets.

d.    <u>Assumed Liabilities</u>: Section 2.3 of the Stalking Horse Agreement provides that the Stalking Horse Purchaser will assume and perform and discharge in accordance with their respective terms, among others, the following Liabilities: (i) all Liabilities under the Assumed Contracts, including Cure Costs; (ii) outstanding Trade Payables; (iii) Liabilities arising out of the operation of the Acquired Assets or the Business for the periods following the Closing Date and any and all Black Lung Assumed Liabilities; (iv) Assumed Benefits; (v) all unpaid fees and expenses of the Steering Committee, the Credit Agreement Agent, or the Indenture Trustee to the extent not paid at or prior to the Closing; (vi) all Liabilities of Sellers to the extent arising out of or relating to the Transferred Permits; (vii) regulatory violations and obligations on or in relation to the Transferred Permits arising post-Closing; (viii) all Liabilities relating to compliance with Mining and Safety Laws and Environmental Laws related to the Acquired Assets, other than monetary fines and penalties for which notice has been given prior to Closing to Sellers; (ix) all Liabilities and obligations under non-disclosure, confidentiality, non-compete or non-solicitation agreements (in each case, to the extent transferrable) or key employee retention plans or similar arrangements; (x) Transfer Taxes and Secured Taxes; (xi) all Liabilities as a result of any action taken by the Sellers at the Stalking Horse Purchaser's or its Affiliates' request pursuant to the Stalking Horse Agreement; and (xii) all Liabilities for Reclamation (and, if applicable, post-mining and post-Gas Well operation Liabilities) to the extent that such Liabilities are not funded by the issuers of Sellers' surety bonds, unless, as to any Non-Core Assets, such Liabilities are assumed by any purchaser of the relevant Non-Core Assets, in which case such Liabilities will not be assumed by the Stalking Horse Purchaser;

11

provided, that Schedule 2.3(m) of the Stalking Horse Agreement may also be amended by the Stalking Horse Purchaser from and after the Execution Date in its sole discretion to add Liabilities to (but not remove Liabilities from) Schedule 2.3(m) of the Stalking Horse Agreement.

e.    Excluded Liabilities: Section 2.4 of the Stalking Horse Agreement provides that the Stalking Horse Purchaser shall not assume and shall not be deemed to have assumed, among others, any of the following Liabilities: (i) all Liabilities with respect to Taxes that are not expressly assumed by the Stalking Horse Purchaser pursuant to the Stalking Horse Agreement; (ii) all Liabilities with respect to Actions and Proceedings pending on or before the Closing Date or to the extent against or giving rise to Liability against the Business or the Acquired Assets prior to the Closing Date even if instituted after the Closing Date other than the Acquired Actions; (iii) all Liabilities to any owner or former owner of capital stock or warrants with respect to such capital stock or warrants, holder of Indebtedness for borrowed money or current or former officer or director of any Seller or Subsidiary Seller in such capacities; (iv) except as expressly provided in the Stalking Horse Agreement, all Liabilities with respect to any Excluded Asset, including any and all Collective Bargaining Agreements, Excluded Benefit Plans and liabilities in respect of the benefit plans, programs and arrangements of any ERISA Affiliate; (v) all Liabilities under any futures contracts, options on futures, swap agreements or forward sale agreements; (vi) other than Trade Payables and the Estate Retained Professional Fees Trust Amount, all Liabilities for costs and expenses relating to the administration of the Chapter 11 Cases and costs and expenses incurred by Sellers in connection with the negotiation, execution and consummation of the transactions under the Stalking Horse Agreement; (vii) except as set forth in section 2.3(d) of the Stalking Horse Agreement, all workers' compensation claims and occupational health claims related to the Acquired Assets, including and with respect to Buyer Employees and former employees of Sellers who worked or who were employed at the Acquired Assets; (viii) any Liability or other obligations of Sellers or any ERISA Affiliate arising under, relating to or with respect to any multiemployer pension plan, single employer pension plan or Multiemployer Plan; (ix) except for the Assumed Benefits, all Liabilities with respect to Employees, or former Employees, or both (or their representatives or beneficiaries), or employees of any ERISA Affiliate, for any action or inaction of any Seller (or any predecessor of any Seller) occurring prior to or on the Closing Date; (x) except for the Assumed Benefits, any Liability arising under any employment agreement, Collective Bargaining Agreement or arrangement, severance, retention or termination agreement or other similar arrangement with any employee, consultant or contractor (or its representatives) of any Seller; (xi) all Liabilities (other than Assumed Liabilities) relating to any federal, state or local investigations of any Seller or Employee, agents, vendors or representatives of any Seller

12

arising from actions occurring prior to the Closing; and (xii) except for certain Liabilities of Sellers for Reclamation as provided in section 2.3(m) of the Stalking Horse Agreement, (A) if the Walter Coke Election or the Pre-Closing Walter Coke Election is made or if the Walter Coke Assets are sold to a Successful Bidder (other than the Stalking Horse Purchaser or a Buyer Designee), Liabilities to the extent related to the Walter Coke Assets, (B) if the Blue Creek Assets are sold to a Successful Bidder (other than the Stalking Horse Purchaser or a Buyer Designee), Liabilities to the extent related to the Blue Creek Assets, (C) if any Miscellaneous Real Property Assets are designated by the Stalking Horse Purchaser as "Excluded Assets" or if any Miscellaneous Real Property Assets are sold to a Successful Bidder (other than the Stalking Horse Purchaser or a Buyer Designee), Liabilities to the extent related to such Miscellaneous Real Property Assets and (D) to the extent that there are Acquired Non-Core Assets, Liabilities to the extent related to such Acquired Non-Core Assets.

f. <u>Termination</u>. Section 11.1 of the Stalking Horse Agreement provides for the termination thereof prior to the Closing or the Outside Date, if applicable, as follows: (I) by the mutual written consent of Sellers and the Stalking Horse Purchaser; (II) by written notice from either the Stalking Horse Purchaser or the Sellers (i) if a Governmental Authority issues a final, non-appealable ruling or order permanently restraining, enjoining or otherwise prohibiting the Sale; (ii) if the Closing shall not have occurred by February 29, 2016, subject to a thirty-day extension for regulatory approval; (iii) if at the end of the Auction, the Stalking Horse Purchaser is not determined to be either the Successful Bidder or the Backup Bidder with respect to the Acquired Assets; (iv) if the Bankruptcy Court shall have entered an order dismissing or converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; (v) upon the occurrence of a Termination Event (as defined in the Cash Collateral Order); (vi) if the Stalking Horse Purchaser and Seller are unable to reach an agreement with respect to each of the Deferred Matters, by the date that is fourteen (14) days prior to the Bid Deadline or (vii) upon a denial of the Governmental Authorizations described in sections 9.4 and 10.4 of the Stalking Horse Agreement; (III) by written notice from the Stalking Horse Purchaser (i) if any of the sale milestones set forth in clauses (a) through (d) of section 7.5 of the Stalking Horse Agreement shall not have occurred by the respective dates set forth therein; (ii) other than as contemplated by the Sale Motion or Bidding Procedures Order, if any Seller seeks to have the Bankruptcy Court enter an Order dismissing, or converting into cases under chapter 7 of the Bankruptcy Code, any of the Chapter 11 Cases, or if a responsible officer or an examiner with enlarged powers is appointed (other than a fee examiner) relating to the operation of Sellers' businesses pursuant to Bankruptcy Code section 1104 and the order of appointment is not vacated or reversed within fourteen (14) days after the entry thereof; (iii) in the event of any breach or failure to perform by Sellers of any of their agreements, covenants, representations or warranties contained in the

Case 15-02741-TOM7 Doc 993 Filed 11/05/15 Entered 11/05/15 14:35:05 Desc Main
Document Page 13 of 233

Stalking Horse Agreement or Sale Order approving the Stalking Horse Agreement, which breach or failure to perform (a) would result in Sellers being unable to satisfy a condition set forth in article 9 of the Stalking Horse Agreement and (b) cannot be cured within ten (10) Business Days after the Stalking Horse Purchaser notifies Sellers of such breach; provided that the Stalking Horse Purchaser shall not have such right of termination if it is then in material breach of any of its agreements, covenants, representations or warranties in the Stalking Horse Agreement or in the Sale Order approving the Stalking Horse Agreement; or (iv) if, the Stalking Horse Purchaser (other than as a result of (1) the Stalking Horse Purchaser's own breach of the Stalking Horse Agreement or (2) the disallowance or avoidance of a substantial portion of the First Lien Obligations and/or the Prepetition First Priority Liens (as defined in the Cash Collateral Order)) is unable, pursuant to Bankruptcy Code section 363(k), to credit bid in payment of all or any portion of the Purchase Price (other than the Assumed Liabilities and the cash portion of the Purchase Price); provided, that the inability to credit bid post-petition interest payable under Bankruptcy Code section 506(b) or any other amount not in excess of $1,000,000 shall not give rise to a termination right; or (IV) by written notice from Sellers in the event of any breach, or failure to perform, by the Stalking Horse Purchaser of any of its agreements, covenants, representations or warranties contained in the Stalking Horse Agreement or Sale Order approving the Stalking Horse Agreement, which breach or failure to perform (A) would result in the Stalking Horse Purchaser being unable to satisfy a condition set forth in article 10 of the Stalking Horse Agreement and (B) cannot be cured within ten (10) Business Days after Sellers notify the Stalking Horse Purchaser; provided, that Sellers shall not have such right of termination if Sellers are then in material breach of any of their agreements, covenants, representations or warranties in the Stalking Horse Agreement or in the Sale Order approving the Stalking Horse Agreement.

g.   Bid Protections:  Sellers shall pay to the Stalking Horse Purchaser, in cash, an amount equal to the Expense Reimbursement (less any amount of the Expense Reimbursement to the extent already paid in respect of the Blue Creek Assets pursuant to section 7.8(b)(ii) of the Stalking Horse Agreement) as a result of either (i) consummation of an Alternative Transaction or, if earlier, upon the date that is 60 days following Court approval of an Alternative Transaction thereof, in either case, following termination of the Stalking Horse Agreement pursuant to section 11.1(b)(iii) of the Stalking Horse Agreement; (ii) termination of the Stalking Horse Agreement (other than a termination pursuant to section 11.1(b)(i) or 11.1(b)(iii) of the Stalking Horse Agreement) if, as of such termination, any Seller (but not the Stalking Horse Purchaser) was in breach of any of its representations, warranties, covenants or other agreements so as to cause any of the conditions set forth in article 9 of the Stalking Horse Agreement not to be satisfied; or (iii) if the Stalking Horse

14

Agreement is terminated (other than as set forth in clause (i) or (ii) above or as a result of the Stalking Horse Purchaser's breach of any of its representations, warranties, covenants or other agreements so as to cause any of the conditions set forth in article 10 of the Stalking Horse Agreement not to be satisfied) and the Sellers consummate an Alternative Transaction within nine (9) months of such termination.  In addition, pursuant to section 7.8(b)(ii) of the Stalking Horse Agreement, the Sellers shall promptly pay, in cash, the fees and expenses incurred by the Stalking Horse Purchaser, the Steering Committee, the Credit Agreement Agent, and the Indenture Trustee, including reasonable attorney fees (that are not otherwise paid by the Sellers under the Cash Collateral Orders), with regard to the Blue Creek Assets in an aggregate amount up to $250,000 plus a break-up fee payable to the Stalking Horse Purchaser of $1,500,000 if the Blue Creek Assets are sold to a Successful Bidder, other than the Stalking Horse Purchaser or a Buyer Designee.  The amounts referred to above in this paragraph are collectively referred to herein as the "**Bid Protections**."

h.     <u>Acquired Actions</u>:  Pursuant to section 2.1(m) of the Stalking Horse Agreement, the Acquired Actions include all Avoidance Actions and any other causes of action available to any of the Sellers or their estates to the extent they either (i) relate to Acquired Assets, Assumed Liabilities or the Acquired Non-Core Assets or (ii) are against any of the Sellers, the First Lien Lenders, the First Lien Noteholders, the Credit Agreement Agent, the Indenture Trustee, the Second Lien Noteholders, the Second Lien Trustee, any of the directors, officers, managers, employees, shareholders, members and advisors of the Sellers, the First Lien Lenders, the First Lien Noteholders, the Credit Agreement Agent, the Indenture Trustee or any other Persons as set forth in the Waiver; <u>provided</u>, that the Acquired Actions against the Sellers, the First Lien Lenders, the First Lien Noteholders, the Credit Agreement Agent, the Indenture Trustee, and the directors, officers, managers, employees, shareholders, members and advisors of the First Lien Lenders, the First Lien Noteholders, the Credit Agreement Agent, the Indenture Trustee, any of the Sellers and other Persons set forth in the Waiver shall have been waived effective as of the Closing Date by execution of the Waiver.

i.     <u>No Liability; Releases</u>.

(1)     (i) No past, present or future director, officer, manager, employee, incorporator, member, partner or equityholder or other Affiliates of (A) Sellers (other than Sellers in their capacities as such), or (B) Buyer (other than any obligations under the Stalking Horse Agreement or assumed therein), and (ii) none of the members of the Steering Committee, the First Lien Lenders, the First Lien Noteholders, the Credit Agreement Agent, or the Indenture Trustee, in any case, shall have any Liability for any obligations or

liabilities of Sellers or Buyer, as applicable, under the Stalking Horse Agreement or any agreement, document or instrument entered into in connection therewith of or for any claim based on, in respect of, or by reason of, the transactions contemplated thereby. Any claim or cause of action based upon, arising out of, or related to the Stalking Horse Agreement or any agreement, document or instrument contemplated thereby may only be brought against Persons that are expressly named as parties thereto, and then only with respect to the specific obligations set forth therein. Other than the Parties, no other party shall have any Liability or obligation for any of the representations, warranties, covenants, agreements, obligations or liabilities of any party under the Stalking Horse Agreement or the agreements, documents or instruments contemplated thereby or of or for any Legal Proceeding based on, in respect of, or by reason of, the transactions contemplated thereby (including the breach, termination or failure to consummate such transactions), in each case whether based on contract, tort, fraud, strict liability, other Legal Requirements or otherwise and whether by piercing the corporate veil, by a claim by or on behalf of a Party or another Person or otherwise.

(2)     Effective upon the Closing Date, each Seller acknowledges that it has no claim, counterclaim, setoff, recoupment, action or cause of action of any kind or nature whatsoever against any of the individuals or entities within the Buyer Group, any member of the Steering Committee, any of the First Lien Lenders or the First Lien Noteholders, the Credit Agreement Agent, or the Indenture Trustee, that directly or indirectly arises out of, is based upon, or is in any manner connected with any Prior Event (collectively, the "**Seller Released Claims**"); and, should any Seller Released Claims nonetheless exist, each Seller (i) releases and discharges each member of the Buyer Group, any member of the Steering Committee, each of the First Lien Lenders and the First Lien Noteholders, the Credit Agreement Agent and the Indenture Trustee from any liability whatsoever on such Seller Released Claims that directly or indirectly arises out of, is based upon, or is in any manner connected with a Prior Event, and (ii) releases, remises, waives and discharges all such Seller Released Claims against the Buyer Group, any member of the Steering Committee, each of the First Lien Lenders and the First Lien Noteholders, the Credit Agreement Agent and the Indenture Trustee; provided that nothing contained in the Stalking Horse Agreement shall release the Buyer or a Seller of its obligations under the Stalking Horse Agreement.

(3)     Effective upon the Closing Date, Buyer acknowledges that it has no claim, counterclaim, setoff, recoupment, action or cause of

16

action of any kind or nature whatsoever against any of the individuals or entities within the Sellers Group, that directly or indirectly arises out of, is based upon, or is in any manner connected with any Prior Event (collectively, the "**Buyer Released Claims**"); and, should any Buyer Released Claims nonetheless exist, Buyer (i) releases and discharges each member of the Sellers Group from any liability whatsoever on such Buyer Released Claims that directly or indirectly arises out of, is based upon, or is in any manner connected with a Prior Event, and (ii) releases, remises, waives and discharges all such Buyer Released Claims against the Sellers Group.

(4)     Without limiting in any way the scope of the release described in subparagraph (i)(2) or (i)(3) above and effective upon the Closing Date, each Seller and Buyer, to the fullest extent allowed under applicable law, waives and relinquishes all statutory and common law protections purporting to limit the scope or effect of a general release, whether due to lack of knowledge of any claim or otherwise, including, waiving and relinquishing the terms of any law which provides that a release may not apply to material unknown Claims. Each Seller and Buyer affirms its intent to waive and relinquish such unknown Claims and to waive and relinquish any statutory or common law protection available in any applicable jurisdiction with respect thereto. Notwithstanding anything set forth in the Stalking Horse Agreement to the contrary, the releases set forth in section 12.16 of the Stalking Horse Agreement do not extend to (A) any obligations that are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the willful misconduct, fraud or gross negligence of such Person, (B) any obligations of the Parties under the Stalking Horse Agreement or (C) any claims held by the First Lien Lenders, the First Lien Noteholders, the Credit Agreement Agent or the Indenture Trustee against the Sellers Group (including the rights of the Credit Agreement Agent under Sections 12.06 and 13.01 of the Credit Agreement and the rights of the Indenture Trustee under Sections 7.06 and 10.02 of the Indenture, but excluding the First Lien Obligations and the First Lien Adequate Protection Obligations which are included in the Credit Bid and Release) and any rights, remedies or causes of action arising out of such claims or Liens and security interests relating to such claims; provided that any claims, including First Lien Obligations and First Lien Adequate Protection Obligations, or any Liens or superpriority claims related thereto that would otherwise attach or be payable out of the Cash Consideration, shall be waived, and the Buyer and Sellers direct that the Cash Consideration, as a permitted use of Cash Collateral under and as defined in the Cash Collateral Orders, be deposited into the Wind

17

Down Trust at Closing and utilized in accordance with section 7.8(e) of the Stalking Horse Agreement, including by any Chapter 7 trustee.

j.    Closing Conditions.  In addition to customary closing conditions, including Court approval and certain regulatory matters, the obligation of the Stalking Horse Purchaser to consummate the transactions contemplated by the Stalking Horse Agreement is subject to the satisfaction of, among others, the following conditions:

(1)    Either (i) the Court shall have determined that Sellers can sell the Acquired Assets free and clear of any successor clause in the UMWA Collective Bargaining Agreements, (ii) the UMWA shall have agreed to waive or remove the successor clause in the UMWA Collective Bargaining Agreements or (iii) the Court shall have approved a motion acceptable to the Stalking Horse Purchaser filed by the applicable Seller pursuant to Bankruptcy Code section 1113(c) authorizing the applicable Seller to reject the UMWA Collective Bargaining Agreements;

(2)    Prior to Closing, the USW will have successfully ratified and executed an initial Collective Bargaining Agreement with the Stalking Horse Purchaser, with all terms and conditions therein being acceptable to the Stalking Horse Purchaser as determined by the Stalking Horse Purchaser in its sole discretion;

(3)    Either (i) the Court shall have determined that Sellers can sell the Acquired Assets free and clear of any successor clause in the USW Collective Bargaining Agreements, (ii) the USW shall have agreed to waive or remove the successor clause in the USW Collective Bargaining Agreements or (iii) the Court shall have approved a motion acceptable to the Stalking Horse Purchaser filed by the applicable Seller pursuant to Bankruptcy Code section 1113(c) authorizing the applicable Seller to reject the USW Collective Bargaining Agreements; and

(4)    In the event that (i) the Walter Coke Election or the Pre-Closing Walter Coke Election is made by the Stalking Horse Purchaser or (ii) there is a Successful Bidder (other than the Stalking Horse Purchaser or a Buyer Designee) for the Walter Coke Assets and such sale closes, subparagraph (2) above shall not be applicable. In addition, if there is a Successful Bidder (other than the Stalking Horse Purchaser or a Buyer Designee) for the Walter Coke Assets and such sale closes, upon the final closing date of such sale the Stalking Horse Purchaser agrees at that time to waive section 9.9(c) of the Stalking Horse Agreement; provided however, Sellers take all steps to satisfy section 9.9(c) of the Stalking Horse

18

Agreement until the Stalking Horse Purchaser waives section 9.9(c) of the Stalking Horse Agreement.

k.   Closing Date Trusts.  Pursuant to section 4.2 of the Stalking Horse Agreement, the following amounts will be deposited in separate trusts at Closing to be administered by one or more trustees reasonably acceptable to the Buyer and Sellers:  (a) the Estate Retained Professional Fees Trust Amount; (b) the Payroll Trust Amount; (c) the Wind Down Trust Amount; and (d) the Walter Coke Trust Amount, if the Walter Coke Election or the Pre-Closing Walter Coke Election is made.

l.   Transition Services.  The Stalking Horse Purchaser and Sellers will negotiate the form of an agreement pursuant to which Sellers and/or their designee(s) shall provide certain services to the Stalking Horse Purchaser after Closing and vice versa on terms mutually acceptable to Sellers and the Stalking Horse Purchaser.

m.   Other Agreements.  From and after the Closing, the Sellers shall irrevocably waive any right to use, utilize or otherwise access any funds or monies pursuant to any provisions of the Cash Collateral Order relating to the "Carve-Out."  The Sellers shall use best efforts to cause the Cash Collateral Order to be modified to reflect the terms of the relevant section in the Stalking Horse Agreement, including by eliminating the Carve-Out.

## C.   **Bidding Procedures**

18.   While all interested bidders should read the Bidding Procedures in their entirety, the following describes the salient points of the Bidding Procedures:[5]

a.   Bid Requirements: Any bid by a Bidder must be submitted in writing and be reasonably determined by the Debtors, in consultation with the Consultation Parties, to have satisfied the following requirements:

(1)   Good Faith Deposit:  Each Bid must be accompanied by a cash deposit in the amount of ten percent (10%) of the purchase price (excluding any Assumed Liabilities) contained in the Modified Asset Purchase Agreement or Short Form APA, as applicable, which deposit shall be held in an interest-bearing escrow account to be identified and established by the Debtors.

---

[5]   The following summary is qualified in its entirety by reference to the provisions of the Bidding Procedures.  In the event of any inconsistencies between the provisions of the Bidding Procedures and the terms herein, the terms of the Bidding Procedures shall govern.  Unless otherwise defined in the summary set forth in the accompanying text or elsewhere in this Motion, capitalized terms shall have the meanings ascribed to them in the Bidding Procedures.

Case 15-02741-TOM7    Doc 993    Filed 11/05/15    Entered 11/05/15 14:35:05    Desc Main
Document      Page 19 of 233

(2)    <u>Same or Better Terms</u>:  In connection with any Bid for the Core Acquired Assets, such Bid must be on terms that the Debtors, in their business judgment and after consulting with the Consultation Parties, determine are the same or better for the Debtors than the terms of the Stalking Horse Agreement.

(3)    <u>Executed Agreement</u>:  Each Bid must be based on the Stalking Horse Agreement or the Short Form APA, as applicable, and must include binding, executed transaction documents, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate an Alternate Transaction or Supplemental Transaction, as applicable. A Bid must also include a copy of the Modified Asset Purchase Agreement (including all exhibits thereto) marked against the Stalking Horse Agreement or the Short Form APA, as applicable, to show all changes requested by the Bidder (including those related to purchase price and to remove any provisions that apply only to the Stalking Horse Purchaser, such as the expense reimbursement and break-up fee provisions contained in the Stalking Horse Agreement, which shall not be in any Modified Asset Purchase Agreement). Each Modified Asset Purchase Agreement must provide a representation that the Qualified Bidder will (i) make all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "**HSR Act**"), if applicable, and (ii) submit and pay the fees associated with all necessary filings under the HSR Act as soon as reasonably practicable; <u>provided</u>, <u>however</u>, that the timing and likelihood of receiving HSR Act approval will be a consideration in determining the highest or otherwise best Bid.

(4)    <u>Scope of Bid</u>:  A Bid must be for (i) all or substantially all of the Core Acquired Assets and/or (ii) specifically identified Lots, or combinations of Lots, comprising all or any portion of the Non-Core Assets that such Bidder may desire, in such case the Bid must identify which Lot(s) are included in the Bid.  Any Bid for any assets of the Debtors that have Liabilities for Reclamation associated therewith must also expressly assume all such Liabilities for Reclamation as part of the Bid.

(5)    <u>Minimum Bid</u>:  A Bid for all or substantially all of the Core Acquired Assets must, individually or in conjunction with one or more other Bids, have a purchase price, including any assumption of liabilities, that in the Debtors' reasonable business judgment (after consultation with the Consultation Parties) has a value greater than the sum of (i) the Purchase Price (as defined in the Stalking Horse Agreement) *plus* (ii) $10 million. A Bid for the Blue Creek Assets must, individually or in conjunction with one or more other Bids, have a purchase price, including any assumption

20

of liabilities associated with the Blue Creek Assets, that in the Debtors' reasonable business judgment (after consultation with the Consultation Parties) has a value greater than $55 million. If a Walter Coke Election is not made, a Bid for the Walter Coke Assets must, individually or in conjunction with one or more other Bids, have a purchase price, including any assumption of liabilities associated with the Walter Coke Assets, that in the Debtors' reasonable business judgment (after consultation with the Consultation Parties) has a value greater than $105 million. If a Walter Coke Election is made, there will be no minimum bid in connection with any Bid for the Walter Coke Assets. Except as set forth in the immediately preceding paragraph, in the event that a potential Bidder submits a Bid for one or more Lots comprising all or any portion of the Non-Core Assets, the Debtors, after consultation with the Consultation Parties, shall determine whether such Bid is a Qualified Bid with respect to such Lot(s). Any Bid for a combination of Lots, other than the Bid by the Stalking Horse Purchaser, must (x) allocate the purchase consideration among such Lots, (y) state whether the Bid is conditioned upon the Bidder being the Successful Bidder (as defined below) on more than one Lot and, if so, which are the Lots that the Bid is conditioned upon, and (z) state whether the Bidder is willing to purchase any of the Lots included in the Bid individually, and if so, the Bid must state the price the Bidder would pay for each such Lot.

(6)  <u>Designation of Assigned Contracts and Leases</u>:  A Bid must identify the executory contracts and unexpired leases with respect to which the Bidder seeks assignment from the Sellers.

(7)  <u>Designation of Assumed Liabilities</u>:  A Bid must identify all liabilities which the Bidder proposes to assume.

(8)  <u>Corporate Authority</u>:  A Bid must include written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate authorization to consummate the proposed Alternate Transaction or Supplemental Transaction, as applicable; <u>provided</u> that, if the Bidder is an entity specially formed for the purpose of effectuating the Alternate Transaction or Supplemental Transaction, as applicable, then the Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the Alternate Transaction or Supplemental Transaction, as applicable, by the equity holder(s) of such Bidder.

(9)  <u>Disclosure of Identity of Bidder</u>:  A Bid must fully disclose the identity of each entity that will be bidding for or purchasing the Subject Assets (or one or more Lots), including any equity holders in the case of a Bidder which is an entity specially formed for the

21

purpose of effectuating the contemplated transaction, or otherwise participating in connection with such Bid, and the complete terms of any such participation, including any agreements, arrangements or understandings concerning a collaborative or joint bid or any other combination concerning the proposed Bid. A Bid must also fully disclose any connections or agreements with the Debtors, the Stalking Horse Purchaser or any other known, potential, prospective Bidder or Qualified Bidder, and/or any officer, director or equity security holder of the Debtors. All information disclosed pursuant to this paragraph shall be made available by the Debtors to the Steering Committee promptly upon Debtors' receipt thereof but in any event no later than one (1) business day following the Bid Deadline

(10)   Proof of Financial Ability to Perform: A Bid must include written evidence that the Debtors may conclude, in consultation with their advisors and the Consultation Parties, demonstrates that the Bidder has the necessary financial ability to close the Alternate Transaction or Supplemental Transaction, as applicable, and comply with section 365 of the Bankruptcy Code, including providing adequate assurance of future performance under all contracts to be assumed and assigned in such Alternate Transaction or Supplemental Transaction. Such information must include, *inter alia*, the following:

(a)   contact names and numbers for verification of financing sources;

(b)   evidence of the Bidder's internal resources and proof of unconditional debt funding commitments from a recognized banking institution and, if applicable, equity commitments in an aggregate amount equal to the cash portion of such Bid or the posting of an irrevocable letter of credit from a recognized banking institution issued in favor of the Debtors in the amount of the cash portion of such Bid, in each case, as are needed to close such Alternate Transaction or Supplemental Transaction;

(c)   the Bidder's current financial statements (audited if they exist) or other similar financial information reasonably acceptable to the Debtors;

(d)   a description of the Bidder's pro forma capital structure; and

(e)   any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable

22

to the Debtors, in consultation with the Consultation Parties, demonstrating that such Bidder has the ability to close the Alternate Transaction or Supplemental Transaction, as applicable.

(11)     Regulatory and Third Party Approvals:

(a)     A Bid must set forth each regulatory and third-party approval required for the Bidder to consummate the Alternate Transaction or Supplemental Transaction, as applicable, and the time period within which the Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the Modified Asset Purchase Agreement, those actions the Bidder will take to ensure receipt of such approval(s) as promptly as possible).

(b)     By the Bid Deadline, a Bidder for any of the Lots which contain mining assets must demonstrate to the satisfaction of the Debtors that it will pass a compliance check of the Applicant Violator System managed by the federal Office of Surface Mining Reclamation and Enforcement and that the Bidder will be able to continue to pass such a compliance check until all permits of Debtor related to mining in such Lot(s) are transferred to Bidder if it is the Successful Bidder for such Lot(s). This process will require disclosure of information about the organizational structure of Bidder and its affiliates and certain other information to Debtors.

(12)     Contact Information and Affiliates:  A Bid must provide the identity and contact information for the Bidder and full disclosure of any affiliates of the Bidder.

(13)     Contingencies:  Each Bid (i) may not contain representations and warranties, covenants, or termination rights materially more onerous in the aggregate to the Debtors than those set forth in the Stalking Horse Agreement or the Short Form APA, as applicable, as determined by the Debtors in good faith, and (ii) may not be conditioned on obtaining financing, any internal approvals or credit committee approvals, or on the outcome or review of due diligence, including with respect to any Environmental Laws, Mining and Mining Safety Laws or employee, labor, health and/or safety matters.

23

(14)    <u>Irrevocable</u>:  Each Bid must be irrevocable until five (5) business days after the Sale Hearing; <u>provided</u> that if such Bid is accepted as the Successful Bid or the Backup Bid for any one or more of the Lots, such Bid shall continue to remain irrevocable until the closing of the sale of such Lot(s).

(15)    <u>Compliance with Diligence Requests</u>:  The Bidder submitting the Bid must have complied with reasonable requests for additional information and due diligence access from the Debtors to the reasonable satisfaction of the Debtors, in consultation with the Consultation Parties.

(16)    <u>Confidentiality Agreement</u>:  To the extent not already executed, the Bid must include an executed confidentiality agreement in substantially the form attached to the Bidding Procedures.

(17)    <u>Termination Fees</u>:  The Bid (other than the Bid pursuant to the Stalking Horse Agreement) must not entitle the Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement and, by submitting the Bid, the Bidder waives the right to pursue a substantial contribution claim under 11 U.S.C. § 503 related in any way to the submission of its Bid or participation in any Auction.

(18)    <u>Closing Date</u>: The Bid must include a commitment to close the transactions contemplated by the Modified Asset Purchase Agreement by no later than February 29, 2016; <u>provided</u> that such date may be extended for a period not to exceed thirty (30) days and solely for the purpose of obtaining any necessary regulatory approvals.

(19)    <u>Bid Deadline</u>:  All Bids must be submitted on or prior to January 5, 2016 at 12:00 p.m. (prevailing Eastern Time) (the "**Bid Deadline**").

19.    The Debtors will permit existing interested parties and any new prospective purchaser to perform reasonable due diligence with respect to the Subject Assets and will assist them with such efforts.

**D.**    **<u>The Notices</u>**

20.    Under Bankruptcy Rule 2002(a) and (c), the Debtors must notify their creditors of the proposed Sale(s) of the Subject Assets, including disclosure of the time and place of the Auction and the Sale Hearing, the terms and conditions of the Sale(s), the Bidding Procedures

Case 15-02741-TOM7   Doc 993   Filed 11/05/15   Entered 11/05/15 14:35:05   Desc Main Document   Page 24 of 233

and the deadline for filing any objections thereto. Accordingly, the Debtors have served a copy of this Motion and the proposed Bidding Procedures Order (the "**Notice of Motion**") in the manner set forth in paragraph 70 below.

21. The Debtors also propose, within three (3) Business Days after the entry of this Order, or as soon thereafter as practicable (the "**Mailing Date**"), to serve a copy of the Sale Notice (as defined below), the Bidding Procedures Order, and the Bidding Procedures by first-class mail, postage prepaid, or by email, where available, upon (a) all entities known to have expressed a *bona fide* interest in purchasing any of the Subject Assets at any time and such other parties identified by the Consultation Parties prior to the date hereof; (b) all entities known to have asserted any lien, claim or encumbrance in or upon any of the Subject Assets; (c) all federal, state and local environmental, regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion; (d) the Bankruptcy Administrator; (e) counsel to the Credit Agreement Agent; (f) counsel to each of the indenture trustees for each of the Debtors' outstanding bond issuances; (g) counsel to the Steering Committee; (h) the Internal Revenue Service; (i) the Securities and Exchange Commission; (j) the U.S. Environmental Protection Agency; (k) the U.S. Attorney for the Northern District of Alabama; (l) counsel to the UMWA; (m) counsel to the USW; (n) counsel to the UCC; (o) counsel to the Section 1114 Committee; (p) any surety bond issuers; and (q) all persons and entities that have filed a request for service of filings in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002.

22. In addition, on the Mailing Date, or as soon thereafter as practicable, the Debtors (or their agents) will serve by first-class mail, postage prepaid, the notice of the sale(s), substantially in the form attached to the Bidding Procedures Order (the "**Sale Notice**"), upon all

Case 15-02741-TOM7    Doc 993    Filed 11/05/15    Entered 11/05/15 14:35:05    Desc Main
Document    Page 25 of 233

other known creditors of the Debtors and all counterparties to the Debtors' executory contracts and unexpired leases.

23.    Finally, on the Mailing Date or as soon as practicable thereafter, the Debtors will cause the Sale Notice to be published on one occasion, in *The Wall Street Journal*, National Edition.

**E.    Assumption and Assignment of the Executory Contracts and Unexpired Leases**

24.    In accordance with the proposed Bidding Procedures Order, within five (5) Business Days after the entry of the Bidding Procedures Order or as soon thereafter as is practicable, the Debtors will file with this Court and serve on each counterparty to an executory contract or unexpired lease related to the Subject Assets the Cure Notice, substantially in the form attached to the Bidding Procedures Order, which Cure Notice shall:  (i) state the cure amounts, if any, that the Debtors believe are necessary to assume such contracts or leases pursuant to Bankruptcy Code section 365 (the "**Cure Amount**"); (ii) notify the non-Debtor counterparty that such party's contract(s) or lease(s) may be assumed and assigned to the Successful Bidder of one or more of the Subject Assets at the conclusion of the Auction; (iii) state the date of the Sale Hearing and that objections to any Cure Amount or to assumption and assignment will be heard at the Sale Hearing, or at a later hearing, as determined by the Debtors; and (iv) state the deadline by which the non-Debtor counterparty shall file an objection to the Cure Amount(s) or to the assumption and assignment of the applicable contract(s) and/or lease(s); provided, however, that the inclusion of a contract, lease or agreement on the Cure Notice shall not constitute an admission that such contract, lease or agreement is an executory contract or unexpired lease or that it will, in fact, be assumed and assigned in connection with the Sale(s) of the Subject Assets.  If no Cure Amount is listed, the Debtors believe that no amount to cure defaults under the respective executory contract or unexpired lease is owed by it thereunder.

26

The Debtors reserve all of their rights, claims and causes of action with respect to the contracts, leases and agreements listed on the Cure Notice.

25.     The Debtors propose that any objection to the Cure Amount or the assumption and assignment of the applicable contract(s) and/or lease(s) must be filed with the Clerk of the Court, 1800 Fifth Avenue North Birmingham, Alabama 35203, and served so as to be received by:  (a) counsel to the Debtors, Paul, Weiss, Rifkind, Wharton & Garrison, LLP, 1285 Avenue of the Americas, New York, New York, 10019, Attention: Kelley A. Cornish (kcornish@paulweiss.com) and Stephen J. Shimshak (sshimshak@paulweiss.com), and Bradley Arant Boult Cummings LLP, One Federal Place, 1819 Fifth Avenue North, Birmingham, Alabama 35203, Attention: Patrick J. Darby (pdarby@babc.com ); (b) counsel to the Steering Committee, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, Attention: Ira Dizengoff (idizengoff@akingump.com), and Akin Gump Strauss Hauer & Feld LLP, 1333 New Hampshire Avenue, NW, Washington, DC 20036, Attention: James Savin (jsavin@akingump.com); (c) counsel to the UCC, Morrison & Foerster LLP, 250 West 55th Street, New York, New York 10019, Attention: Brett H. Miller (brettmiller@mofo.com), Lorenzo Marinuzzi (lmarinuzzi@mofo.com), and Jennifer L. Marines (jmarines@mofo.com); (d) counsel to the Section 1114 Committee, Jenner & Block LLP, 353 North Clark Street, Chicago, IL 60654, Attention: Catherine Steege (csteege@jenner.com) and Melissa Root (mroot@jenner.com); and (e) the Bankruptcy Administrator, 1800 5th Avenue North, Birmingham, Alabama 35203, Attention: Tom Corbett (Thomas_Corbett@alnba.uscourts.gov) (collectively, the "**Notice Parties**"), on or before **December 17, 2015 at 4:00 p.m. (prevailing Central Time)** (the "**Cure Objection Deadline**").  Any such objection must also state (i) the basis for such objection and (ii) with specificity what Cure Amount(s) the non-Debtor

27

counterparty to the relevant executory contract(s) or unexpired lease(s) believes is required (in all cases with appropriate documentation in support thereof).

26. Any objection solely to the Cure Amount(s) may not prevent or delay the Debtors' assumption and assignment of assumed and assigned contract(s) or lease(s). If a party objects solely to Cure Amount(s), the Debtors may, with the consent of the relevant Successful Bidder, hold the claimed Cure Amount(s) in reserve pending further order of the Court or mutual agreement of the parties. So long as the Cure Amount(s) are held in reserve, and there are no other unresolved objections to assumption and assignment of the applicable assumed and assigned contract(s) or lease(s), the Debtors can, without further delay, assume and assign such contract(s) or lease(s). Under such circumstances, the objecting non-Debtor counterparty's recourse is limited to the funds held in reserve.

27. If no objection to the Cure Amount(s) is timely received, the Cure Amount(s) set forth in the Cure Notice shall be controlling notwithstanding anything to the contrary in any assigned contract(s) or lease(s) or other document(s) as of the date of the Cure Notice.

28. On or before January 4, 2016, as further described in the Stalking Horse Agreement, the Stalking Horse Purchaser will provide to the Debtors a list of those executory contracts and unexpired leases that the Stalking Horse Purchaser elects to have assumed and assigned (the "**Stalking Horse Purchaser Designated Contracts**") to the Stalking Horse Purchaser at Closing pursuant to Bankruptcy Code section 365, subject to the Stalking Horse Purchaser's right to add or delete executory contracts or unexpired leases in accordance with section 2.5(a) of the Stalking Horse Agreement.

29. On or before January 5, 2016, the Debtors will post on the website for the Chapter 11 Cases, http://www.kccllc.net/WalterEnergy (the "**Case Website**"), (i) the list of the Stalking

28

Horse Purchaser Designated Contracts, which the Debtors will update as and when executory contracts or unexpired leases are added or deleted by the Stalking Horse Purchaser and (ii) a description of the Stalking Horse Purchaser and information as to the Stalking Horse Purchaser's ability to perform the Debtors' obligations under the Stalking Horse Purchaser Designated Contracts.

30.     As soon as reasonably practicable after receiving the schedule from each Qualified Bidder of those executory contracts or unexpired leases it wishes to assume, and no later than the date of the Auction, the Debtors shall post such schedule on the Case Website together with information related to the adequate assurance with respect to such Qualified Bidder.

31.     To the extent that any non-Debtor counterparty wishes to object to the adequate assurance of future performance by the Stalking Horse Purchaser or another Qualified Bidder under the applicable executory contract(s) or unexpired lease(s), then such non-Debtor counterparty shall file a written objection with the Court and serve on the Notice Parties and the applicable Qualified Bidder(s) so that such objection is received on or before **12:00 p.m. (prevailing Central Time)** one (1) day prior to the Sale Hearing.

32.     To the extent that any non-Debtor counterparty does not timely file and serve an objection as set forth above, such counterparty will be:  (i) deemed to have consented to the Cure Amount(s), if any, set forth in the Cure Notice; (ii) barred, estopped and enjoined from asserting any additional Cure Amount(s) under the assumed and assigned executory contract(s) or unexpired lease(s); (iii) barred from objecting to the assumption and assignment of the applicable assumed and assigned executory contract(s) or unexpired lease(s) to the Successful Bidder(s),

29

and (iv) barred from objecting to adequate assurance of future performance by the Successful Bidder(s).

## GROUNDS FOR APPROVAL OF THE MOTION

**F.    The Bidding Procedures Are Fair and Reasonable**

33.    In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by auction.  In accordance with the Bidding Procedures, the Debtors seek to market the Subject Assets, including the Acquired Assets, through a competitive bidding process to maximize value and avoid the further deterioration of the Debtors' business through a prompt sale of the Subject Assets. Consequently, the Debtors believe that good cause exists to expose their assets to sale at auction and to approve the procedures proposed herein.  An auction conducted substantially in accordance with the Bidding Procedures, together with the Stalking Horse Agreement, will enable the Debtors to obtain the highest and best offers for the Subject Assets.

34.    The Debtors believe that the Bidding Procedures are appropriate under Bankruptcy Code sections 105 and 363 to ensure that the bidding and sale process is conducted fairly and will yield the highest value for their estates and creditors.  The Bidding Procedures are designed to facilitate a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids, including bids for all or a portion of the Subject Assets as provided in the Bidding Procedures.  The Bidding Procedures also provide potential bidders with sufficient notice and opportunity to acquire information necessary to submit a timely and informed bid.  Thus, the Debtors and all parties in interest can be assured that the consideration for the Subject Assets, including the Purchase Price being paid by the Stalking Horse Purchaser for the Acquired Assets if no other party submits a Qualified Bid for such assets, will be fair and reasonable.  At the same time, the Bidding Procedures provide the Debtors with the opportunity

30

to consider all competing offers and to select, in their reasonable business judgment, and after consultation with the Consultation Parties, the highest or otherwise best offer, individually or in combination with other bids, for the Subject Assets.

35.     The Debtors believe that the Bidding Procedures provide an appropriate framework for the sale of their assets that will enable the Debtors to review, analyze and compare, in a relatively uniform fashion, all offers received to determine which offer (or offers) is the highest or otherwise best and in the best interests of the Debtors' estates and creditors. Moreover, given the discussions the Sellers and their advisors have had with other potential bidders both before and after the Petition Date, the Debtors believe that the proposed deadlines and milestones for noticing, marketing and selling the Subject Assets offer potential bidders ample opportunity to prepare and submit Qualified Bids for such assets.

36.     Accordingly, the Debtors believe the Court should approve the Bidding Procedures. Similar procedures have been routinely approved. See, e.g., In re Moore-Handley, Inc., Case No. 09-04198-TBB-11 (Bankr. N.D. Ala. Sept. 4, 2009); In re Bruno's Supermarkets, Case No. 09-00634-BGC-11 (Bankr. N.D. Ala. April 14, 2009); In re Bill Heard Enterprises, Case No. 08-83029-JAC-11 (Bankr. N.D. Ala. Oct. 5, 2008); In re Carraway Methodist Health Systems, Case No. 06-03501-TOM-11 (Bankr. N.D. Ala. Oct. 6, 2006); In re the Great Atlantic & Pacific Tea Company, Inc., Case No. 15-23007 (SCC) (Bankr. S.D.N.Y. Aug. 11, 2015); In re Delia's, Inc., Case No. 14-23678 (RDD) (Bankr. S.D.N.Y. Feb. 10, 2015); In re Synagro Technologies, Inc., Case No. 13-11041 (BLS) (Bankr. D. Del. May 13, 2013); In re ICL Holding Company, Inc. (f/k/a LCI Holding Company, Inc.), Case No. 12-13319 (KG) (Bankr. D. Del. Jan. 25, 2013).

**G.** **Approval of the Sale(s) is Warranted Under Bankruptcy Code Section 363(b)**

37.     Compelling business justifications exist for the proposed Sale(s).  First, the Debtors do not have sufficient liquidity or access to financing to fund their operations past early 2016, let alone through a protracted and contentious chapter 11 case.  As a result, and cognizant of their current monthly cash outlay, the deteriorating commodities market, continued use of cash collateral, the depletion of their assets through normal operations, the cost of fulfilling their reclamation and other regulatory obligations, and their fiduciary obligation to maximize distributable value for all creditors, the Debtors believe that a sale of substantially all of their assets offers the best available alternative at this juncture.  Accordingly, the Debtors have determined that they should pursue the Sale(s) of the Subject Assets, including the Sale of the Acquired Assets to the Stalking Horse Purchaser on the terms set forth in the Stalking Horse Agreement, subject to higher and better offers as provided in the Bidding Procedures.

38.     Notwithstanding the Debtors' conclusion that the terms of the Stalking Horse Agreement are fair and reasonable, they will nonetheless expose the Acquired Assets as well as the other Subject Assets to higher or otherwise better offers.  The Sale(s) of the Subject Assets pursuant to Bankruptcy Code section 363 will enable the expeditious transfer of such assets, an approach necessary to maximize and preserve the going-concern value of such assets.

39.     Bankruptcy Code section 363(b) provides that "[t]he [debtor-in-possession], after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate . . . ."  11 U.S.C. § 363(b)(1).  Following the decision in In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986), courts have used the "sound business purpose" standard for approving sales pursuant to section 363.  See, e.g., In re Gulf States Steel, Inc. of Ala., 285 B.R. 497, 515 (Bankr. N.D. Ala. 2002); In re Dunhill Entities, L.P., 2010 WL 6982622 (Bankr. S.D. Ala. May 25, 2010); In re Bryan, 2013 WL 4716194 (Bankr. M.D. Ala.

Sept. 3, 2013); <u>Myers v. Martin (In re Martin)</u>, 91 F.3d 389, 395 (3d Cir. 1996); <u>In re Lionel Corp.</u>, 722 F.2d 1063, 1070-71 (2d Cir. 1983); <u>In re Gulf Coast Oil Corp.</u>, 404 B.R. 407, 417-18 (Bankr. S.D. Tex. 2009); <u>Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)</u>, 242 B.R. 147, 153 (Bankr. D. Del. 1999).

40.    The "sound business purpose" test requires a debtor to establish:  "(1) a sound business purpose exists; (2) the sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the purchaser has acted in good faith."  <u>In re Decora Indus., Inc.</u>, No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing <u>Del. & Hudson Ry. Co.</u>, 124 B.R. at 176).

41.    As discussed above, the Debtors have concluded that, in light of the distressed nature of the Debtors' business, the regulatory and environmental challenges they face and the adverse commodities market, the Sale(s) of the Subject Assets represents the best alternative currently available to them.  Commencing the Sale(s) process now, particularly with the benefit of a Stalking Horse Agreement with respect to a portion of the Subject Assets, will ensure that the Debtors can complete a transaction within a reasonable time.  Consequently, the proposed Sale(s) of the Subject Assets in accordance with the Bidding Procedures satisfies the "sound business purpose" test for the sale of assets outside the ordinary course of business under Bankruptcy Code section 363(b).

42.    While the Debtors are confident that their efforts have yielded fair and reasonable consideration for the Subject Assets, adequate "market exposure" and the auction process – the best means for establishing whether a fair and reasonable price is being paid – will provide additional support.

43.     In addition to a fair and reasonable value offered by the Stalking Horse Purchaser (or the Successful Bidder) for the Acquired Assets and by Successful Bidder(s) for the other Subject Assets, the Stalking Horse Agreement, the Short Form APA or the Modified Asset Purchase Agreement, as applicable, will be the product of vigorous arms'-length, good faith negotiations between the relevant parties.  In particular, the negotiations of the Stalking Horse Agreement involved substantial time and energy by the Sellers and the Stalking Horse Purchaser and their respective professionals, and the Stalking Horse Agreement reflects a give-and-take, with substantial compromises and concessions made by both sides.

44.     Accordingly, the Debtors submit that the Sale(s) of the Subject Assets, including the Acquired Assets, as contemplated herein and in the Bidding Procedures is in the best interests of the Debtors, their estates and creditors, and should be approved.

**H.     The Subject Assets Should be Sold Free and Clear of Claims, Liens and Encumbrances Under 11 U.S.C. § 363(f)**

45.     The Debtors also submit that the Sale(s) of the Subject Assets should be free and clear of any and all claims, liens and encumbrances under Bankruptcy Code section 363(f) (other than Assumed Liabilities and Permitted Encumbrances as provided in the Stalking Horse Agreement, the Short Form APA or the Modified Asset Purchase Agreement, as applicable). Bankruptcy Code section 363(f) permits a debtor to sell property free and clear of third-party interests only if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interests; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

34

11 U.S.C. § 363(f).  Since section 363(f) is written in the disjunctive, any of the five conditions provides authority to sell free and clear of claims, liens and encumbrances.  See Gulf States Steel, 285 B.R. at 506; In re Pacific Energy Resources Ltd., et al., Case No. 09-10785 (KJC) (Bankr. D. Del. Aug. 18, 2009); In re Flying J Inc., et al., Case No. 08-1334 (MFW) (Bankr. D. Del. July 27, 2009); In re Dundee Equity Corp., 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992); In re Collins, 180 B.R. 447, 450 (Bankr. E.D. Va. 1995).

46.     The Debtors submit that each lien that is not an assumed liability or permitted encumbrance under the Stalking Horse Agreement, Short Form APA or Modified Asset Purchase Agreement, as applicable, satisfies at least one of the five conditions of Bankruptcy Code section 363(f).  The First Lien Creditors have not only consented to the Sale(s) of the Subject Assets but have agreed to purchase the Acquired Assets through the Stalking Horse Purchaser.[6]  If an entity with liens on the Subject Assets does not consent to the proposed Sale(s) of such assets, the Debtors intend to demonstrate at the Sale Hearing their satisfaction of the requirements of Bankruptcy Code section 363(f).  Alternatively, the Debtors may sell the Subject Assets free and clear of any other interests under section 363(f)(5) because the liens on any assets sold will attach to the cash proceeds of such Sale(s) in their order of priority and entities holding such interests could be compelled to accept money satisfaction in legal or equitable proceedings.  Accordingly, pursuant to Bankruptcy Code section 363, the Debtors may sell the Subject Assets free and clear of all claims, liens and encumbrances.

---

[6]  The Second Lien Secured Creditors (as defined in the Intercreditor Agreement referenced below) are deemed to have consented to the sale of the Acquired Assets by virtue of the Amended and Restated Intercreditor Agreement among Walter Energy, Inc., the Other Grantors Party Thereto, Morgan Stanley Senior Funding, Inc., Union Bank, N.A. and Wilmington Trust, National Association dated March 27, 2014 (the "**Intercreditor Agreement**").  In fact, among other provisions, Section 2.07 of the Intercreditor Agreement provides that the Liens in favor of the Second Lien Secured Creditors are automatically released upon a foreclosure or other exercise of remedies by the Collateral Agent (as defined therein) acting for the Senior Lenders resulting in a sale or disposition of Shared Collateral (as defined in the Intercreditor Agreement).

47.     Moreover, the Debtors have sent or will send the Sale Notice to any purported lienholders.  If such lienholders do not object to the proposed Sale(s), then their consent should reasonably be presumed.  Accordingly, the Debtors request that unless a party asserting a lien on any of the Subject Assets (other than with respect to Assumed Liabilities and Permitted Encumbrances) timely objects to this Motion, such party shall be deemed to have consented to any Sale(s) approved at the Sale Hearing.

48.     It is also appropriate to sell the Subject Assets free and clear of successor liability relating to the Debtors' businesses.  Such limitations on successor liability ensure that the Successful Bidder(s) is protected from any claims or lawsuits premised on the theory that the Successful Bidder(s) is a successor in interest to one or more of the Debtors.  Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free and clear from successor liability relating to the debtor's business.  See e.g., In re Tran World Airlines, Inc., 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); In re Leckie Smokeless Coal Co., 99 F.3d 573, 585 (4th Cir. 1996) (affirming the sale of debtors' assets free and clear of certain taxes); In re Dixie Pellets LLC, 2009 WL 8189341 (Bankr. N.D. Ala. Sept. 13, 2009) (approving sale of substantially all of Debtor's assets free and clear of all liens, including but not limited to "all rights or claims based on any theory or principle of successor liability."); In re Ormet, 2014 WL 3542133 (Bankr. D. Del. July 17, 2014) (permitting a sale free and clear of successor liability claims relating to an under-funded pension plan); In re Insilco Techs., Inc., 351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a 363 sale permits a buyer to take ownership of property without concern that a creditor will file suite based on a successor liability theory); see also In re General Motors Corp., 407 B.R. 463, 505-06

36

(Bankr. S.D.N.Y. 2009) (holding that "[T]he law in this Circuit and District is clear; the Court will permit GM's assets to pass to the purchaser free and clear of successor liability claims, and in that connection, will issue the requested findings and associated injunction"); In re Chrysler LLC, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ("*[I]n personam* claims, including any potential state successor or transferee liability claims against New Chrysler, as well as *in rem* interests, are encompassed by section 363(f) and are therefore extinguished by the Sale Transaction").

49.     The purpose of a sale order purporting to authorize the transfer of assets free and clear of all claims, liens and encumbrances would be defeated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct. Moreover, without such assurances, potential bidders may choose not to participate in the Auction or, if they did, would submit reduced bid amounts. To that end, the Successful Bidder(s) should not be liable under any theory of successor liability relating to the Debtors' businesses, but should hold the Subject Assets free and clear.

**I.     A Successful Bidder Should be Entitled to the Protections of Bankruptcy Code Section 363(m)**

50.     Pursuant to Bankruptcy Code section 363(m), a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. See Miami Ctr. Ltd. P'ship v. Bank of New York, 838 F.2d 1547, 1554 (11th Cir. 1988); In re Mark Bell Furniture Warehouse, Inc., 992 F.2d 7, 9 (1st Cir. 1993); In re Willemain v. Kivitz, 764 F.2d 1019, 1023 (4th Cir. 1985); In re Congoleum Corp., Case No. 03-51524, 2007 WL 1428477 (Bankr. D.N.J. May 11, 2007); Abbotts Dairies of Penn., 788 F.2d at 147.

51.     As noted above, the Stalking Horse Agreement was negotiated at arm's-length, with each of the parties represented by its own advisors and counsel, and the Short Form APA or the Modified Asset Purchase Agreement, as applicable, each would have been negotiated in good

Case 15-02741-TOM7     Doc 993     Filed 11/05/15     Entered 11/05/15 14:35:05     Desc Main
Document     Page 37 of 233

faith in accordance with the Bidding Procedures. Accordingly, the Debtors request that the Sale Order(s) include a provision that the Successful Bidder for the relevant Subject Asset(s) is a "good faith" purchaser within the meaning of Bankruptcy Code section 363(m). The Debtors maintain that providing the Successful Bidder(s) with such protection will ensure that the maximum price will be received by the Debtors for the Subject Assets.

**J.      Assumption and Assignment of Certain Executory Contracts and Unexpired Leases**

52.      To enhance the value of the Debtors' estates (by curtailing further administrative liability and eliminating substantial rejection claims), the Debtors request authority under Bankruptcy Code section 365 to assume and assign the executory contracts and/or unexpired leases associated with the Subject Assets to the relevant Successful Bidder. The Debtors further request that the Sale Order(s) provide that the assigned executory contracts and/or unexpired leases will be transferred to, and remain in full force and effect for the benefit of, the Successful Bidder(s) notwithstanding any provisions in such assigned contracts and/or leases, including those described in Bankruptcy Code sections 365(b)(2), (f)(1) and (f)(3), that prohibit such assignments.

53.      The Debtors may, subject to Court approval, assume and assign executory contracts and unexpired leases under Bankruptcy Code section 365. 11 U.S.C. § 365(a). Courts routinely approve motions to assume, assume and assign, or reject executory contracts or unexpired leases upon a showing that a debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment. See, e.g., In re Gardinier, Inc., 831 F.2d 974, 976 n.2 (11th Cir. 1987); L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.), 209 F.3d 291, 298 (3d Cir. 2000); Sharon Steel Corp. v. National Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.), 872 F.2d 36, 39-40 (3d Cir. 1989); In re NII Holdings, Inc., Case No. 14-12611 (SCC) (Bankr. S.D.N.Y. Apr. 20, 2015); In re Delia's, Inc., Case No.

14-23678 (RDD) (Bankr. S.D.N.Y. Dec. 24, 2014). The assumption and assignment of the executory contracts and/or unexpired leases related to the Subject Assets, which include, among other things, numerous mineral leases, is an integral component of the Sale(s), without which the Sale(s) would not be a viable option.

54.     Bankruptcy Code section 365(b)(1) requires that, if there has been a default in a debtor's unexpired lease or executory contract, other than certain nonmonetary defaults as set forth in the statute, such unexpired lease or executory contract may not be assumed unless, at the time of the assumption, (i) such default is cured or there is adequate assurance that such default will be cured, (ii) compensation or adequate assurance of compensation is provided for any actual pecuniary loss resulting from such default and (iii) adequate assurance of future performance under the lease is provided. 11 U.S.C. § 365(b)(1)(A)-(C).

55.     As set forth above, pursuant to the terms of the proposed Bidding Procedures Order, the Debtors will send the Cure Notice to all counterparties to the executory contracts and unexpired leases notifying such counterparties of the potential assumption by the Debtors and assignment to the relevant Successful Bidder(s) of such contract(s) and/or lease (s). The Cure Notice will also set forth the Cure Amount, if any, owing for each such contract(s) and/or lease(s) according to the Debtors' books and records.

56.     Counterparties to such contract(s) and/or lease(s) will be given sufficient time (as set forth herein and in the proposed Bidding Procedures Order) to object to the proposed Cure Amounts, if any, set forth in the Cure Notice. If no objection is filed with regard to a particular Cure Amount, such Cure Amount shall be binding on the Debtors, the Successful Bidder(s) and the applicable non-Debtor counterparty. The payment of the Cure Amounts specified in the Cure Notice (or a different amount, either agreed to by the Debtors or resolved by the Court as a result

39

of a timely-filed objection by the relevant non-Debtor counterparty) will be in full and final satisfaction of all obligations to cure defaults and compensate the counterparties for any pecuniary losses under the applicable executory contract(s) and/or lease(s) pursuant to Bankruptcy Code section 365(b)(1), unless the Debtors determine, before the Sale Hearing, that a particular lease or contract is not truly executory, and does not need to be cured to transfer the relevant Subject Assets to the Successful Bidder(s).

57. Bankruptcy Code section 365(f)(2)(B) states that a debtor may assign its unexpired leases and executory contracts if, *inter alia*, the assignee provides "adequate assurance of future performance." 11 U.S.C. § 365(f)(2)(B). If necessary, the Successful Bidder(s) must submit, among other things, written evidence of the ability to provide adequate assurance of future performance under the applicable contracts or leases as set forth above and in the Bidding Procedures Order. The affected non-Debtor counterparties will also be able to challenge the ability of the Successful Bidder(s) to provide adequate assurance as provided in the Bidding Procedures Order.

58. Any assumption and assignment of an assigned contract(s) and/or lease(s) will be subject to all of the provisions of such contract(s) and/or lease(s), to the extent required by applicable law and in accordance with applicable provisions of the Bankruptcy Code. The Bidding Procedures are designed to ensure that any Successful Bidder is financially able and prepared to undertake all of the relevant obligations under the assigned contract(s) and/or lease(s), and the Debtors, together with the relevant Successful Bidder, will establish, as necessary, at the Sale Hearing, the requisite adequate assurance of future performance pursuant to Bankruptcy Code section 365 with respect to the potential assumption and assignment of the applicable assigned contract(s) and/or lease(s). Consequently, assumption and assignment of the

40

assigned executory contract(s) and/or lease(s) in connection with the Sale(s) of the Subject

Assets is appropriate under the circumstances.

**K.**     **The Stalking Horse Purchaser Should Be Allowed To Credit Bid its Allowed Claim**

59.     As set forth in paragraph 11(d) of the Cash Collateral Order, the First Lien

Creditors (acting through Credit Agreement Agent or Indenture Trustee, as applicable) have the

right to credit bid up to the full amount of the First Lien Obligations, together with any adequate

protection obligations owing to them under the Cash Collateral Order. Moreover, Bankruptcy

Code section 363(k) states: "[a]t a sale under subsection (b) of [Section 363] of property that is

subject to a lien that secures an allowed claim, if the holder of such claim purchases such

property, such holder may offset such claim against the purchase price of such property."

11 U.S.C. § 363(k). Based upon this provision of the Bankruptcy Code, "[i]t is well settled

among district and bankruptcy courts that creditors can bid the full face value of their secured

claims under § 363(k)." Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.), 432

F.3d 448, 459 (3d Cir. 2006); see also RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 132

S. Ct. 2065 (2012) (upholding a secured creditor's right to credit bid, stating that it "helps to

protect . . . against the risk that its collateral will be sold at a depressed price"). In addition,

district and bankruptcy courts in this and other circuits have endorsed credit bidding in the full

amount of the secured creditor's claim. See, e.g., In re SunCruz Casinos, LLC, 298 B.R. 833,

839 (Bankr. S.D. Fla. 2003) ("[T]he plain language of [Section 363(k)] makes clear that the

secured creditor may credit bid its *entire claim*, including any unsecured deficiency portion

thereof." (emphasis in original)); In re Morgan House Gen. P'ship, Nos. 96-MC-l84 & 96-MC-

185, 1997 WL 50419, at *1 (E.D. Pa. Feb. 7, 1997) (holding that secured creditors may bid "to

the extent of [their] claim" under § 363(k)); In re Midway Invs., Ltd., 187 B.R. 382, 391 n. 12

(Bankr. S.D. Fla. 1995) ("[A] secured creditor may bid in the full amount of the creditor's

allowed claim, including the secured portion and any unsecured portion thereof" (citing legislative history) (alteration in original) (internal quotation marks omitted)); In re Realty Invs., Ltd. V, 72 B.R. 143, 146 (Bankr. C.D. Cal. 1987) (same); see also Criimi Mae Servs. Ltd. P'ship v. WDH Howell, LLC (In re WDH Howell, LLC), 298 B.R. 527, 532 n. 8 (Bankr. D.N.J. 2003); In re Dixie Pellets, 2009 WL 8189340 (Bankr. N.D. Ala. Sept. 13, 2009) ("The Administrative Agent shall have the right, on behalf of the Lenders, to credit bid at the Auction in accordance with Section 363(k) of the Bankruptcy Code up to the total amount outstanding under the Loan as of the Auction"). Accordingly, the Stalking Horse Purchaser can bid any portion of the First Lien Obligations, all related First Lien Adequate Protection Obligations (as defined in the Cash Collateral Order) and the Bid Protections to the fullest extent permitted by the Cash Collateral Order and Bankruptcy Code section 363(k).

**L.      The Bid Protections Are Fair and Reasonable and Should Be Approved**

60.      Approval of bid protections in connection with the sale of significant assets is analyzed under the business judgment standard and courts routinely deem bid protections appropriate in chapter 11 cases.  See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 657-58 (S.D.N.Y. 1992) (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); In re 995 Fifth Ave. Assoc., L.P., 96B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (holding that the business judgment standard protects break-up fees and other provisions negotiated in good faith).  See, e.g., Reliant Energy Channelview LP v. Kelson Channelview LLC (In re Reliant Energy Channelview LP), 594 F.3d 200, 206–08 (3d Cir. 2010); Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl.

Energy, Inc.), 181 F.3d 527 (3d Cir. 1999) (bid incentives must provide some post-petition benefit to the debtor's estate).

61. Courts routinely approve protections in the form of a break-up fee and expense reimbursement. See In re Carraway Methodist Health Systems, No. 06-03501-TOM-11 (Bankr. N.D. Ala. Oct. 6, 2006); In re Bill Heard Enterprises, Inc., No. 08-83029-JAC-11 (Bankr. N.D. Ala. Oct. 15, 2008); In re Moore-Handley, Inc., Case No. 09-04198-TBB-11 (Bankr. N.D. Ala. Sept. 4, 2009); In re Caché Inc., No. 15-10172 (MFW) (Bankr. D. Del. Feb. 25, 2015) (authorizing expense reimbursement and break-up fee); In re Deb Stores Holding LLC, No. 14-12676 (KG) (Bankr. D. Del. Dec. 18, 2014) (same); In re Hostess Brands, Inc., No. 12-22052 (RDD) (Bankr. S.D.N.Y. Feb. 11, 2013).

62. Here the Bid Protections are reasonable and appropriate in light of the size and nature of the transactions contemplated in the Stalking Horse Agreement, the efforts that have been expended by the Stalking Horse Purchaser in connection therewith and the circumstances of these Chapter 11 Cases, and therefore should be approved. Moreover, the Bid Protections here are a necessary incentive to ensure that the Stalking Horse Purchaser is committed to the Sale(s) process and to purchasing the Acquired Assets and assuming the Assumed Liabilities for what the Debtors believe is fair consideration. Without the Bid Protections, the Stalking Horse Purchaser may not be willing to enter into a Stalking Horse Agreement. The fact that a portion of the Purchase Price is in the form of a credit bid does not change the analysis. Further, payment of the Bid Protections will not diminish the value of the Debtors' estates, as the Debtors do not intend to terminate or breach the Stalking Horse Agreement and pay the Bid Protections, unless doing so would permit the Debtors to accept a better Bid.

Case 15-02741-TOM7    Doc 993    Filed 11/05/15    Entered 11/05/15 14:35:05    Desc Main
Document    Page 43 of 233

63.     Pursuant to the Stalking Horse Agreement and Bidding Procedures Order, in the absence of a breach by the Sellers, the Bid Protections are payable in accordance with the terms of the Stalking Horse Agreement.  Upon payment by Sellers of the Bid Protections, the Buyer is precluded from pursuing any other remedy against the Sellers.

**M.      The Form, Manner and Extent of Notice of the Motion and the Proposed Sale(s) are Appropriate and Adequate Under the Circumstances**

64.     The Debtors will serve the Sale Notice and the Cure Notice in accordance with the Bidding Procedures Order, and have served the Notice of Motion as set forth above.  The notice of the proposed Sale(s) to be provided by the Debtors as set forth herein sufficiently describes the terms and conditions of the proposed Sale(s).

65.     Several sections of the Bankruptcy Code and Bankruptcy Rules dictate the sufficiency of notice and adequacy of service.  As discussed below, the content and manner of service of this Motion and the related notices satisfy all such requirements:

    a.     Section 363 Notice – Bankruptcy Code section 363 provides that a trustee may sell property "after notice and hearing."  Under Section 102(1) of the Bankruptcy Code, the phrase "after notice and hearing" means "notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances."  11 U.S.C. § 102(1)(A).  As set forth above, creditors have been provided notice of the salient details regarding this Motion and the Sale Hearing.  Accordingly, notice is sufficient under Bankruptcy Code section 363.

    b.     Bankruptcy Rule 2002 – Bankruptcy Rule 2002 requires twenty-one (21) days' notice of the proposed sale of property other than in the ordinary course of business.  In addition, Bankruptcy Rule 2002 provides that notice of a sale shall "include the time and place of any public sale, the terms and conditions of any private sale and the time fixed for filing objections." Fed. R. Bankr. P. 2002.  As set forth above, the notice of this Motion that has been and will be provided by the Debtors satisfies each of these requirements.

    c.     Bankruptcy Rules 6004 and 6006 – Bankruptcy Rule 6004 requires that notice of sales of property out of the ordinary course of business complies with Bankruptcy Rule 2002.  As set forth above, the Debtors have complied with Bankruptcy Rule 2002.  Bankruptcy Rule 6006 requires

44

notice of a motion to assume and assign an executory contract or unexpired lease to be served on the counterparty to such contract or lease, as well as on other parties in interest as the Court may direct. The Sale Notice and the Cure Notice have been or will be served on counterparties to the Assigned Contracts, thereby satisfying this requirement.

d. <u>Procedural Due Process</u> – The notices of this Motion that are being provided as described herein, including the notice being provided by publication as set forth above, are "reasonably calculated" to apprise interested parties of the pendency of the matter and to afford them an opportunity to object. <u>See</u> <u>Mullane v. Central Hanover Bank & Trust Co.</u>, 339 U.S. 306 (1950). Parties in interest have been and should be found to have been afforded adequate notice of this Motion, the Sale(s), the Bidding Procedures and the other relief requested herein.

66.     The Debtors submit that the notice they have provided and intend to provide as outlined above with respect to the proposed Sale(s), the Bidding Procedures, the Bid Protections, and the Cure Amounts, as applicable, is reasonable and appropriate and constitutes good and adequate notice of the sale of the Subject Assets and the procedures and proceedings related thereto and therefore should be approved by this Court.

**N.     The Stay of the Sale Order(s) Should be Waived**

67.     Pursuant to Bankruptcy Rules 6004(h) and 6006(d), an order authorizing the sale of property or the assignment of an unexpired lease is stayed for fourteen (14) days after the entry of an order unless the Court orders otherwise.

68.     The Debtors request that this Court order that such stay is not applicable with respect to the sale of the Subject Assets and assignment and assumption of the related executory contracts and/or unexpired leases. To require the Debtors to effectively be liable under the applicable executory contracts and/or unexpired leases for an extra fourteen (14) days and to delay the closing and the resulting reductions of the Debtors' secured obligations and related adequate protection obligations will burden the estates and require unnecessary expenditures of the Debtors' limited resources. The Debtors note that similar requests to waive the stay imposed

Case 15-02741-TOM7     Doc 993     Filed 11/05/15     Entered 11/05/15 14:35:05     Desc Main
Document      Page 45 of 233

under Bankruptcy Rules 6004(h) and 6006(d) are routinely granted.  In re The Colonial Bancgroup, Inc., 2011 WL 6014076 (Bankr. M.D. Ala. Oct. 13, 2011); In re Moore-Handley, Inc., Case No. 09-04198-TBB-11 (Bankr. N.D. Ala. Oct. 2, 2009); In re the Great Atlantic & Pacific Tea Company, Inc., Case No. 15-23007 (SCC) (Bankr. S.D.N.Y. Aug. 11, 2015); In re Delia's, Inc., Case No. 14-23678 (RDD) (Bankr. S.D.N.Y. Feb. 10, 2015); See, e.g., In re Midway Games Inc., Case No. 09-10465 (KG) (Bankr. D. Del. June 3, 2009); In re Nortel Networks Inc., et al., Case No. 09-10138 (Bankr. D. Del. Mar. 3, 2009).

## NO PRIOR REQUEST

69.     No prior request for the relief sought herein has been requested from this Court or any other court.

## NOTICE

70.     Notice of this Motion has been provided to: (a) the Bankruptcy Administrator; (b) counsel to the Credit Agreement Agent; (c) counsel to each of the indenture trustees for each of the Debtors' outstanding bond issuances; (d) counsel to the Steering Committee; (e) the Internal Revenue Service; (f) the Securities and Exchange Commission; (g) the U.S. Environmental Protection Agency; (h) the U.S. Attorney for the Northern District of Alabama; (i) counsel to the UMWA; (j) counsel to the USW; (k) counsel to the Creditors' Committee; (l) counsel to the 1114 Retiree Committee; (m) each of the surety bond issuers; and (n) all persons and entities that have filed a request for service of filings in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002.

71.     The Debtors submit that, under the circumstances, no other or further notice is required.

Case 15-02741-TOM7    Doc 993    Filed 11/05/15    Entered 11/05/15 14:35:05    Desc Main
Document      Page 46 of 233

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested in this Motion and grant the Debtors such other and further relief as this Court deems just and proper.

Dated: November 5, 2015        BRADLEY ARANT BOULT CUMMINGS LLP
       Birmingham, Alabama

By:  /s/ Patrick Darby        
Patrick Darby
Jay Bender
Cathleen Moore
James Bailey
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203
Telephone: (205) 521-8000
Email: pdarby@babc.com, jbender@babc.com,
    ccmoore@babc.com, jbailey@babc.com

- and -

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Stephen J. Shimshak (*pro hac vice*)
Kelley A. Cornish (*pro hac vice*)
Claudia R. Tobler (*pro hac vice*)
Ann K. Young (*pro hac vice*)
Michael S. Rudnick (*pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Email: sshimshak@paulweiss.com, kcornish@paulweiss.com,
    ctobler@paulweiss.com, ayoung@paulweiss.com,
    mrudnick@paulweiss.com

*Counsel to the Debtors and*
*Debtors-in-Possession*

## EXHIBIT A

## BIDDING PROCEDURES ORDER

## THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

```
------------------------------------------------------- x
In re:                                                  :   Chapter 11
                                                        :
WALTER ENERGY, INC., et al.,                            :   Case No. 15-02741-TOM11
                                                        :
                    Debtors.[1]                         :   Jointly Administered
------------------------------------------------------- x
```

**ORDER (I) ESTABLISHING BIDDING PROCEDURES FOR THE SALE(S) OF ALL, OR SUBSTANTIALLY ALL, OF THE DEBTORS' ASSETS; (II) APPROVING BID PROTECTIONS; (III) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (IV) APPROVING FORM AND MANNER OF THE SALE, CURE AND OTHER NOTICES; (V) SCHEDULING AN AUCTION AND A HEARING TO CONSIDER THE APPROVAL OF THE SALE(S); AND (VI) GRANTING CERTAIN RELATED RELIEF**

Upon the motion (the "**Motion**")[2] of the Debtors (A) for an order (this "**Order**" or the "**Bidding Procedures Order**"):  (I) approving the proposed auction and bidding procedures, which are attached as **Exhibit A** hereto (the "**Bidding Procedures**"), to be employed in connection with the proposed sale(s) (the "**Sale(s)**") of one or more categories of the Debtors' assets (each a "**Lot**" and collectively, the "**Lots**"), which Lots are identified in an exhibit to the Bidding Procedures and comprise all, or substantially all, of the Debtors' assets (collectively, the "**Subject Assets**"); (II) approving Bid Protections pursuant to the terms of that certain stalking

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Walter Energy, Inc. (9953); Atlantic Development and Capital, LLC (8121); Atlantic Leaseco, LLC (5308); Blue Creek Coal Sales, Inc. (6986); Blue Creek Energy, Inc. (6986); J.W. Walter, Inc. (0648); Jefferson Warrior Railroad Company, Inc. (3200); Jim Walter Homes, LLC (4589); Jim Walter Resources, Inc. (1186); Maple Coal Co., LLC (6791); Sloss-Sheffield Steel & Iron Company (4884); SP Machine, Inc. (9945); Taft Coal Sales & Associates, Inc. (8731); Tuscaloosa Resources, Inc. (4869); V Manufacturing Company (9790); Walter Black Warrior Basin LLC (5973); Walter Coke, Inc. (9791); Walter Energy Holdings, LLC (1596); Walter Exploration & Production LLC (5786); Walter Home Improvement, Inc. (1633); Walter Land Company (7709); Walter Minerals, Inc. (9714); and Walter Natural Gas, LLC (1198). The location of the Debtors' corporate headquarters is 3000 Riverchase Galleria, Suite 1700, Birmingham, Alabama 35244-2359.

[2]    Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Motion, the Bidding Procedures (as defined below) or the Stalking Horse Agreement (as defined below), as applicable.

2

horse asset purchase agreement (including all exhibits, schedules and ancillary agreements related thereto, and as amended and in effect, the "**Stalking Horse Agreement**") by and among Walter Energy, Inc. and its debtor subsidiaries (collectively, the "**Sellers**") and Coal Acquisition LLC (the "**Stalking Horse Purchaser**" or "**Buyer**"), dated as of November 5, 2015; (III) establishing procedures for the assumption and assignment of executory contracts and unexpired leases; (IV) approving the form and manner of notice of the Sale(s), the notice of assumption and assignment of executory contracts and unexpired leases, including the form and manner of notice of proposed cure amounts (the "**Cure Notice**") and the other notices set forth herein; (V) scheduling an auction (the "**Auction**") and a hearing (the "**Sale Hearing**") to consider approval of the Sale(s) and (VI) granting related relief (collectively, (A)(I) through (VI) above, the "**Bidding Procedures Relief**"); and (B) for order(s) (the "**Sale Order(s)**") authorizing (I) the Sale(s) of one or more of the Lots to the bidder(s) with the highest or otherwise best bid(s) (each, a "**Successful Bidder**") pursuant to the Stalking Horse Agreement, Short Form APA(s) and/or Modified Asset Purchase Agreement(s), in each case free and clear of all claims, liens and encumbrances as provided therein; and (II) the Debtors' assumption and assignment of the applicable executory contracts and/or unexpired leases to the Successful Bidder(s) for the relevant Lot(s); and the Court having considered that portion of the Motion seeking the Bidding Procedures Relief, and the arguments of counsel made and the evidence adduced, at the hearing on that portion of the Motion (the "**Bidding Procedures Hearing**"); and due and sufficient notice of the Bidding Procedures Hearing and the relief sought therein having been given under the particular circumstances; and it appearing that no other or further notice need be provided; and it appearing that the Bidding Procedures Relief requested in the Motion is

in the best interests of the Debtors, their estates, their creditors and other parties in interest; and after due deliberation thereon and good and sufficient cause appearing therefor, it is hereby,

## FOUND, CONCLUDED AND DETERMINED THAT:[3]

A.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief requested in the Motion are Bankruptcy Code sections 105, 363, 364, 365, 503 and Bankruptcy Rules 2002, 6004, 6006 and 9014.

B.      The relief granted herein is in the best interests of the Debtors, their estates and creditors, and other parties in interest.

C.      The Debtors have articulated good and sufficient business reasons for the Court to (i) approve the Bidding Procedures, Bid Protections, the Assumption and Assignment Procedures, the form and manner of the Sale Notice, the Cure Notice and the other notices of the Motion, the Auction and the Sale Hearing as set forth herein, (ii) set the date for the Auction, the Sale Hearing and the other dates set forth herein and (iii) grant the relief requested in the Motion as provided herein.

D.      Due, sufficient and adequate notice of the Bidding Procedures Hearing and the relief granted in this Order has been given in light of the circumstances and the nature of the relief requested, and no other or further notice thereof is required.  The Debtors' notice of the Motion and the relief requested in the Motion for which approval was sought at the Bidding Procedures Hearing is appropriate and reasonably calculated to provide all interested parties with

---

[3]    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

timely and proper notice under Bankruptcy Rules 2002, 4001, 6004 and 6006, and no other or further notice of, or hearing on, this Order and that portion of the Motion being approved hereby is required.

E.        The Debtors' proposed Sale Notice, Cure Notice and other notices contemplated hereunder with respect to the Sale(s), the Auction, the Assumption and Assignment Procedures, and the Sale Hearing are appropriate and reasonably calculated to provide all interested parties with timely and proper notice thereof and no further notice of each is necessary or required.

F.        The Bidding Procedures, substantially in the form attached hereto as **Exhibit A**, and incorporated herein by reference as if fully set forth herein, and the Bid Protections are fair, reasonable and appropriate, were negotiated in good faith by the Debtors and the Stalking Horse Purchaser and represent the best method for maximizing the value of the Debtors' estates in connection with the Sale(s).

G.        The Bid Protections, to the extent payable under the Stalking Horse Agreement, (i) shall be deemed an actual and necessary cost of preserving the Debtors' estates within the meaning of Bankruptcy Code section 503(b), (ii) are of substantial benefit to the Debtors' estates, (iii) are reasonable and appropriate, including in light of the size and nature of the transactions and the efforts that have been and will be expended by the Stalking Horse Purchaser, (iv) have been negotiated by the parties and their respective advisors at arm's-length and in good faith and (v) are necessary to ensure that the Stalking Horse Purchaser will continue to pursue the proposed Sale of the Acquired Assets. The Bid Protections are material inducements for, and a condition of, the Stalking Horse Purchaser's entry into the Stalking Horse Agreement. The Stalking Horse Purchaser is unwilling to commit to purchase the Acquired

5

Assets under the terms of the Stalking Horse Agreement unless the Stalking Horse Purchaser receives the Bid Protections.

H.     The Assumption and Assignment Procedures are reasonable and appropriate.

**IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED THAT:**

1.     Those portions of the Motion seeking approval of the Bidding Procedures Relief are GRANTED.

2.     Any objection to the portions of the Motion seeking approval of the Bidding Procedures Relief or any other relief granted in this Order, to the extent not resolved, waived or withdrawn, and all reservations of rights included therein, is hereby overruled and denied on the merits.

3.     The form of the Stalking Horse Agreement[4] (which may be downloaded at http://www.kccllc.net/walterenergy or obtained from counsel to the Debtors upon written request), is hereby approved and is appropriate and reasonably calculated to enable the Debtors and other parties in interest to easily compare and contrast the differing terms of the bids presented at the Auction.

## Bid Procedures

4.     The Bidding Procedures in the form attached hereto as **Exhibit A** and incorporated herein by reference as if fully set forth in this Order are hereby approved.  The Debtors are authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.  The failure to specifically include or reference any particular provision of

---

[4]     As provided in the Bidding Procedures, the Debtors will post in the virtual data room one or more forms of the asset purchase agreement (each a "**Short Form APA**") that will be substantially similar to the Stalking Horse Agreement, but with modifications appropriate for the purchase of such applicable Lot(s) without the other Subject Assets.

6

the Bidding Procedures in this Order shall not diminish or impair the effectiveness of such procedures, it being the intent of this Court that the Bidding Procedures be authorized and approved in their entirety.

## The Bid Deadline

5. As further described in the Bidding Procedures, a potential Bidder who desires to make a Bid for one or more Lots shall deliver its Bid for such Lot(s) that satisfies the bidding requirements set forth in the Bidding Procedures to: (a) the Debtors, 3000 Riverchase Galleria, Suite 1700, Birmingham, Alabama 35244-2359, Attention: Earl Doppelt (earl.doppelt@walterenergy.com); (b) counsel to the Debtors, Paul, Weiss, Rifkind, Wharton & Garrison, LLP, 1285 Avenue of the Americas, New York, New York, 10019, Attention: Kelley A. Cornish (kcornish@paulweiss.com) and Stephen J. Shimshak (sshimshak@paulweiss.com), and Bradley Arant Boult Cummings LLP, One Federal Place, 1819 Fifth Avenue North, Birmingham, Alabama 35203, Attention: Patrick J. Darby (pdarby@babc.com ); (c) financial advisor to the Debtors, PJT Partners Inc., 280 Park Avenue, New York, New York 10017, Attention: Adam Schlesinger (schlesinger@pjtpartners.com) and Kerry Greer (greer@pjtpartners.com); (d) counsel to the Steering Committee, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, Attention: Ira Dizengoff (idizengoff@akingump.com) and Akin Gump Strauss Hauer & Feld LLP, 1333 New Hampshire Avenue, NW, Washington, DC 20036, Attention: James Savin (jsavin@akingump.com); (e) financial advisor to the Steering Committee, Lazard Frères & Co. LLC, 190 South LaSalle Street, Chicago, IL 60603, Attention: Tyler Cowan (tyler.cowan@lazard.com); and (f) counsel to the UCC, Morrison & Foerster LLP, 250 West 55th Street, New York, New York 10019, Attention: Brett H. Miller (brettmiller@mofo.com), Lorenzo Marinuzzi (lmarinuzzi@mofo.com)

7

and Jennifer L. Marines (jmarines@mofo.com), so as to be received by no later than **12:00 p.m. (prevailing Eastern Time)** on **January 5, 2016** (the "**Bid Deadline**").

**Notices of Sale(s), Bidding Procedures, Bid Protections and the Sale Hearing**

6.      The notices described below are hereby approved, and service or publication thereof (as applicable) as set forth below constitutes proper, timely, adequate and sufficient notice of the Sale(s), the Bidding Procedures, the Bid Protections and the Sale Hearing, and no other or further notice shall be required.

7.      Within three (3) Business Days after the entry of this Order, or as soon thereafter as practicable (the "**Mailing Date**"), the Debtors (or their agents) shall serve a copy of the Sale Notice (as defined below), this Order, and the Bidding Procedures by first-class mail, postage prepaid, or by email, where available, upon (a) all entities known to have expressed a *bona fide* interest in purchasing any of the Subject Assets at any time and such other parties identified by the Consultation Parties prior to the date hereof; (b) all entities known to have asserted any lien, claim or encumbrance in or upon any of the Subject Assets; (c) all federal, state and local environmental, regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion; (d) the Bankruptcy Administrator; (e) counsel to the Credit Agreement Agent; (f) counsel to each of the indenture trustees for each of the Debtors' outstanding bond issuances; (g) counsel to the Steering Committee; (h) the Internal Revenue Service; (i) the Securities and Exchange Commission; (j) the U.S. Environmental Protection Agency; (k) the U.S. Attorney for the Northern District of Alabama; (l) counsel to the UMWA; (m) counsel to the USW; (n) counsel to the UCC; (o) counsel to the Section 1114 Committee; (p) any surety bond issuers; and (q) all persons and

8

entities that have filed a request for service of filings in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002.

8. On the Mailing Date, or as soon thereafter as practicable, the Debtors (or their agents) shall serve by first-class mail, postage prepaid, the notice of the Sale(s), substantially in the form attached hereto as **Exhibit B** (the "**Sale Notice**"), upon all other known creditors of the Debtors and all counterparties to the Debtors' executory contracts and unexpired leases.

9. The Debtors shall publish a notice, substantially in the form of the Sale Notice, on one occasion, in *The Wall Street Journal*, National Edition, on the Mailing Date or as soon as practicable thereafter. Such publication notice shall be deemed sufficient and proper notice of the Sale(s) to any other interested parties whose identities are unknown to the Debtors.

10. The Sale Hearing to approve the Sale(s) shall be held on **January 12, 2016 at 10:00 a.m. (prevailing Central Time)**, at the United States Bankruptcy Court for the Northern District of Alabama, Southern Division, 1800 Fifth Avenue North Birmingham, Alabama 35203, before the Honorable Tamara O. Mitchell.

11. Objections, if any, to the relief sought in the Sale Order ("**Sale Objection(s)**")[5] shall be in writing, filed with the Clerk of this Court (the "**Clerk**"), 1800 Fifth Avenue North Birmingham, Alabama 35203, together with proof of service, and served so as to be received by: (a) counsel to the Debtors, Paul, Weiss, Rifkind, Wharton & Garrison, LLP, 1285 Avenue of the Americas, New York, New York, 10019, Attention: Kelley A. Cornish (kcornish@paulweiss.com) and Stephen J. Shimshak (sshimshak@paulweiss.com), and Bradley

---

[5] Procedures for filing objections to the assumption and assignment of relevant executory contracts and unexpired leases are addressed below.

Case 15-02741-TOM7    Doc 993    Filed 11/05/15    Entered 11/05/15 14:35:05    Desc Main
Document    Page 56 of 233

Arant Boult Cummings LLP, One Federal Place, 1819 Fifth Avenue North, Birmingham, Alabama 35203, Attention: Patrick J. Darby (pdarby@babc.com ); (b) counsel to the Steering Committee, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, Attention: Ira Dizengoff (idizengoff@akingump.com) and Akin Gump Strauss Hauer & Feld LLP, 1333 New Hampshire Avenue, NW, Washington, DC 20036, Attention: James Savin (jsavin@akingump.com); (c) counsel to the UCC, Morrison & Foerster LLP, 250 West 55th Street, New York, New York 10019, Attention: Brett H. Miller (brettmiller@mofo.com), Lorenzo Marinuzzi (lmarinuzzi@mofo.com), and Jennifer L. Marines (jmarines@mofo.com); (d) counsel to the Section 1114 Committee, Jenner & Block LLP, 353 North Clark Street, Chicago, IL 60654, Attention: Catherine Steege (csteege@jenner.com) and Melissa Root (mroot@jenner.com); and (e) the Bankruptcy Administrator, 1800 5th Avenue North, Birmingham, Alabama 35203, Attention: Tom Corbett (Thomas_Corbett@alnba.uscourts.gov) (collectively, the "**Notice Parties**"), on or before **December 17, 2015 at 4:00 p.m. (prevailing Central Time)**; provided, however, that objections to the conduct of the Auction or selection of the Successful Bid(s) or Back-Up Bids(s) (the "**Supplement**") shall be in writing, filed with the Clerk, together with proof of service, and served so as to be received by the Notice Parties on or before **12:00 p.m. (prevailing Central Time)** one (1) day prior to the Sale Hearing.

12.     Failure to file and serve a Sale Objection or Supplement as aforesaid shall be deemed to be consent to the Sale(s) for purposes of Bankruptcy Code section 363(f).

13.     The Sale Hearing may be adjourned by the Debtors, in consultation with the Consultation Parties, from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing, or by filing a notice on the docket of the Debtors' Chapter 11 Cases.

## The Auction

14.     The Debtors are authorized to conduct an auction (the "**Auction**") with respect to the Subject Assets.  The Auction shall take place on **January 7, 2016 at 10:00 a.m. (prevailing Eastern Time)** at the offices of Paul, Weiss, Rifkind, Wharton & Garrison, LLP, 1285 Avenue of the Americas, New York, New York, 10019, or such other place and time as the Debtors shall notify all Qualified Bidders, the Consultation Parties and each of their respective counsel and advisors.  The Debtors are authorized, subject to the terms of this Order, to take actions reasonably necessary, in the discretion of the Debtors, to conduct and implement the Auction.

15.     Only the Debtors, the Consultation Parties, the Stalking Horse Purchaser and any other Qualified Bidder, in each case, along with their respective representatives and counsel, may attend the Auction (such attendance to be in person) and only the Credit Agreement Agent, the Indenture Trustee, the Stalking Horse Purchaser and such other Qualified Bidder(s) will be entitled to make any Bids at the Auction; provided, however, that any creditor or other indenture trustee may attend (but, other than the Credit Agreement Agent and the Indenture Trustee, may not participate in) the Auction if it provides the Debtors written notice of its intention to attend the Auction on or before the Bid Deadline.  Such written notice must be sent to counsel for the Debtors via electronic mail to Claudia R. Tobler (ctobler@paulweiss.com) and Ann K. Young (ayoung@paulweiss.com).  The Debtors and their professionals shall direct and preside over the Auction and the Auction shall be transcribed.

16.     The Stalking Horse Purchaser (in its capacity as a Qualified Bidder) and each other Qualified Bidder participating in the Auction must confirm that it has (a) not engaged in any collusion with respect to the bidding or Sale(s) of any of the Subject Assets, (b) reviewed, understands and accepts the Bidding Procedures and (c) consented to the core jurisdiction of this

11

Court and to the entry of a final order by this Court on any matter related to this Order, the Sale(s) or the Auction if it is determined that this Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

17.     Subject to the rights of parties in interest to (i) challenge the Sale(s) or the sale process, (ii) challenge the Debtors' decisions with respect to the sale process, (iii) argue that such decisions are not governed by the "business judgment" standard or (iv) such other rights as such parties may have under applicable law, the Debtors may, after consultation with the Consultation Parties, (a) determine, in their business judgment, pursuant to the Bidding Procedures, which Qualified Bid is the highest or best proposal for the applicable Lot(s) and which is the next highest or best proposal for such Lot(s) and (b) reject any bid that, in the Debtors' business judgment, is (x) inadequate or insufficient, (y) not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules or the Bidding Procedures or (z) contrary to the best interests of the Debtors and their estates, creditors, interest holders or other parties-in-interest.

18.     Notwithstanding anything to the contrary herein, and for the avoidance of doubt, for all purposes under the Bidding Procedures, the Stalking Horse Purchaser shall be considered a Qualified Bidder.

19.     Pursuant to Bankruptcy Code section 363(k), the Stalking Horse Purchaser may submit subsequent and increased credit bids at the Auction in compliance with the Bidding Procedures.

### The Stalking Horse Agreement and Bid Protections

20.     Any obligations of the Debtors set forth in the Stalking Horse Agreement that are intended to be performed prior to the Sale Hearing and/or entry of the Sale Order are authorized as set forth herein.

12

21.     The Bid Protections, to the extent payable under the Stalking Horse Agreement, are granted.

22.     Pursuant to Bankruptcy Code sections 105, 363, 364 and 503, the Debtors are hereby authorized to pay the Bid Protections pursuant to and subject to the terms and conditions set forth in the Stalking Horse Agreement.

23.     Upon entry of this Order, the Bid Protections shall constitute a superpriority administrative expense of the Debtors with priority over any and all administrative expenses of any kind, including those specified in Bankruptcy Code sections 503(b) or 507(b), but shall be *pari passu* with the First Lien Adequate Protection Obligations and subordinate only to the Carve-Out.

24.     In accordance with section 11.2 of the Stalking Horse Agreement, Sellers shall pay to the Stalking Horse Purchaser, in cash, by wire transfer of immediately available funds, an amount equal to the Expense Reimbursement (less any amount of the Expense Reimbursement to the extent already paid in respect of the Blue Creek Assets pursuant to section 7.8(b)(ii) of the Stalking Horse Agreement) as a result of either (i) consummation of an Alternative Transaction or, if earlier, upon the date that is sixty (60) days following Court approval of an Alternative Transaction thereof, in either case, following termination of the Stalking Horse Agreement pursuant to section 11.1(b)(iii) of the Stalking Horse Agreement; (ii) termination of the Stalking Horse Agreement (other than a termination pursuant to section 11.1(b)(i) or 11.1(b)(iii) of the Stalking Horse Agreement) if, as of such termination, any Seller (but not the Stalking Horse Purchaser) was in breach of any of its representations, warranties, covenants or other agreements so as to cause any of the conditions set forth in article 9 of the Stalking Horse Agreement not to be satisfied; or (iii) if the Stalking Horse Agreement is

13

terminated (other than as set forth in clause (i) or (ii) above or as a result of the Stalking Horse Purchaser's breach of any of its representations, warranties, covenants or other agreements so as to cause any of the conditions set forth in article 10 of the Stalking Horse Agreement not to be satisfied) and the Sellers consummate an Alternative Transaction within nine (9) months of such termination.  In addition, pursuant to section 7.8(b)(ii) of the Stalking Horse Agreement, the Sellers shall promptly pay, in cash, the fees and expenses incurred by the Stalking Horse Purchaser, the Steering Committee, the Credit Agreement Agent, and the Indenture Trustee, including reasonable attorney fees (that are not otherwise paid by the Sellers under the Cash Collateral Orders), with regard to the Blue Creek Assets in an aggregate amount up to $250,000 plus a break-up fee payable to the Stalking Horse Purchaser of $1,500,000 if the Blue Creek Assets are sold to a Successful Bidder, other than the Stalking Horse Purchaser or a Buyer Designee.

25.      The Debtors confirm that it is critical to the process of maximizing the value, and arranging an orderly sale, of the Acquired Assets to proceed by selecting the Stalking Horse Purchaser to enter into the Stalking Horse Agreement; without the Stalking Horse Purchaser having committed considerable time and expense in connection with the Sale of the Acquired Assets, the Debtors would potentially realize a lower price for such assets; and, therefore, the contributions of the Stalking Horse Purchaser to the process have indisputably provided a substantial benefit to the Debtors and their estates and creditors.

26.      The Bid Protections shall be the sole remedy of the Stalking Horse Purchaser if the Stalking Horse Agreement is terminated under circumstances where the Bid Protections are payable.

14

## Assumption and Assignment Procedures

27.     The Assumption and Assignment Procedures as set forth in the Motion are hereby approved and made part of this Order as if fully set forth herein.  The Assumption and Assignment Procedures are appropriate and fair to all non-Debtor counterparties and comply in all respects with the Bankruptcy Code.

28.     The decision to assume and assign the applicable assumed and assigned contracts and/or leases to the Successful Bidder(s) is subject to Court approval and the consummation of a Sale(s) of the applicable Subject Assets.  Accordingly, absent closing of such Sale(s), the applicable assumed and assigned contracts and/or leases shall not be deemed assumed and/or assigned and shall, in all respects, be subject to further administration under the Bankruptcy Code.

### a.     *Cure Notice*

29.     The Cure Notice, substantially in the form attached hereto as **Exhibit C**, is (i) reasonably calculated to provide sufficient effective notice to all non-Debtor counterparties to assumed and assigned contracts or leases and any other affected parties of the Debtors' intent to assume and assign some or all of such contracts or leases and to afford the non-Debtor counterparty to each such contract or lease the opportunity to exercise any rights affected by the Motion pursuant to Bankruptcy Rules 2002, 6004 and 6006, and (ii) hereby approved.

30.     The inclusion of a contract on a Cure Notice shall not constitute or be deemed a determination or admission by the Debtors, the Stalking Horse Purchaser, any Successful Bidder or any other party in interest that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code or that such contract or lease will be assumed in connection with the Sale(s) of the Subject Assets.  The Debtors reserve

15

all of their rights, claims and causes of action with respect to the contracts or leases listed on the Cure Notice.

31.     Within five (5) Business Days after the entry of this Order, or as soon thereafter as is practicable, the Debtors shall file with this Court and serve the Cure Notice on each counterparty to an executory contract or unexpired lease related to the Subject Assets, which Cure Notice shall:  (i) state the cure amounts, if any, that the Debtors believe are necessary to assume such contracts or leases pursuant to Bankruptcy Code section 365 (the "**Cure Amount**"); (ii) notify the non-Debtor counterparty that such party's contract or lease may be assumed and assigned to a Successful Bidder of one or more of the relevant Subject Assets at the conclusion of the Auction; (iii) state the date of the Sale Hearing and that objections to any Cure Amount or to assumption and assignment will be heard at the Sale Hearing, or at a later hearing, as determined by the Debtors; and (iv) state the deadline by which the non-Debtor counterparty shall file an objection to the Cure Amount(s) or to the assumption and assignment of the applicable contract(s) and/or lease(s).

32.     Any objection to the Cure Amount or the assumption and assignment of the applicable contract(s) and/or lease(s) must be filed with the Clerk and served on the Notice Parties so as to be received on or before **December 17, 2015 at 4:00 p.m. (prevailing Central Time)** (the "**Cure Objection Deadline**").  Any such objection must also state (i) the basis for such objection and (ii) with specificity what Cure Amount(s) the non-Debtor counterparty to the relevant executory contract(s) or unexpired lease(s) believes is required (in all cases with appropriate documentation in support thereof).

33.     Any objection solely to the Cure Amount(s) may not prevent or delay the Debtors' assumption and assignment of assumed and assigned contract(s) or lease(s).  If a party

16

objects solely to Cure Amount(s), the Debtors may, with the consent of the relevant Successful

Bidder(s), hold the claimed Cure Amount(s) in reserve pending further order of the Court or

mutual agreement of the parties.  So long as the Cure Amount(s) are held in reserve, and there

are no other unresolved objections to assumption and assignment of the applicable assumed and

assigned contract(s) or lease(s), the Debtors can, without further delay, assume and assign such

contract(s) or lease(s) to the applicable Successful Bidder.  Under such circumstances, the

objecting non-Debtor counterparty's recourse is limited to the funds held in reserve.

   34. If no objection to the Cure Amount(s) is timely received, the Cure

Amount(s) set forth in the Cure Notice shall be controlling notwithstanding anything to the

contrary in any assigned contract(s) or lease(s) or other document(s) as of the date of the Cure

Notice.

   ***b. Designation of Contracts/Leases and Adequate Assurance of Future Performance***

   35. On or before January 4, 2016, as further described in the Stalking Horse

Agreement, the Stalking Horse Purchaser will provide to the Debtors a list of those executory

contracts and unexpired leases that the Stalking Horse Purchaser elects to have assumed and

assigned (the "**Stalking Horse Purchaser Designated Contracts**") to the Stalking Horse

Purchaser at Closing pursuant to Bankruptcy Code section 365, subject to the Stalking Horse

Purchaser's right to add or delete executory contracts or unexpired leases in accordance with

section 2.5(a) of the Stalking Horse Agreement.

   36. On or before January 5, 2016, the Debtors shall post on the website for the

Chapter 11 Cases, http://www.kccllc.net/WalterEnergy (the "**Case Website**"), (i) the list of the

Stalking Horse Purchaser Designated Contracts, which the Debtors will update as and when

executory contracts or unexpired leases are added or deleted by the Stalking Horse Purchaser and

17

Case 15-02741-TOM7 Doc 993 Filed 11/05/15 Entered 11/05/15 14:35:05 Desc Main
Document Page 64 of 233

(ii) a description of the Stalking Horse Purchaser and information as to the Stalking Horse Purchaser's ability to perform the Debtors' obligations under the Stalking Horse Purchaser Designated Contracts.

37.     As soon as reasonably practicable after receiving the schedule from each Qualified Bidder of those executory contracts or unexpired leases it wishes to assume, and no later than the date of the Auction, the Debtors shall post such schedule on the Case Website together with information related to the adequate assurance with respect to such Qualified Bidder.

38.     To the extent that any non-Debtor counterparty wishes to object to the adequate assurance of future performance by the Stalking Horse Purchaser or another Qualified Bidder under the applicable executory contract(s) or unexpired lease(s), then such non-Debtor counterparty shall file a written objection with the Court and serve on the Notice Parties and the applicable Qualified Bidder(s) so that such objection is received on or before **12:00 p.m. (prevailing Central Time)** one (1) day prior to the Sale Hearing.

39.     To the extent that any non-Debtor counterparty does not timely file and serve an objection as set forth above, such counterparty will be:  (i) deemed to have consented to the Cure Amount(s), if any, set forth in the Cure Notice; (ii) barred, estopped and enjoined from asserting any additional Cure Amount(s) under the assumed and assigned executory contract(s) or unexpired lease(s); (iii) barred from objecting to the assumption and assignment of the applicable assumed and assigned executory contract(s) or unexpired lease(s) to the Successful Bidder(s), and (iv) barred from objecting to adequate assurance of future performance by the Successful Bidder(s).

18

**<u>Related Relief</u>**

40.     The Debtors are hereby authorized and empowered to take such actions as may be reasonably necessary to implement and effect the terms and requirements established by this Order.

41.     This Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof.

42.     The Debtors are authorized to proceed with the Sale(s) without the necessity of complying with any state or local bulk transfer laws or requirements.

43.     This Order shall be binding on the Debtors, including any chapter 7 or chapter 11 trustee or other fiduciary appointed for the Debtors' estates.

44.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7052, 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

45.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Order.

Dated:  November_____, 2015
            Birmingham, Alabama

_____
TAMARA O. MITCHELL
UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT A

## BIDDING PROCEDURES[1]

By motion, Walter Energy, Inc. (the "**Company**") and certain of its subsidiaries (together with the Company, the "**Debtors**"),[2] which are debtors and debtors in possession in jointly administered chapter 11 cases (the "**Chapter 11 Cases**") pending in the United States Bankruptcy Court for the Northern District of Alabama (the "**Bankruptcy Court**") under Case No. 15-02741 (TOM), sought approval of, among other things, the procedures through which they will, in consultation with a steering committee of first lien lenders and first lien noteholders (the "**Steering Committee**") and the other Consultation Parties (as defined below) determine the highest or otherwise best offer(s) for the sale(s) of one or more categories of the Debtors' assets (each, a "**Lot**" and collectively, the "**Lots**"), which Lots are identified in **Exhibit A** hereto, together with the assets therein, comprise and constitute all, or substantially all, of the Debtors' assets (collectively, the "**Subject Assets**") (the "**Motion**").

As referenced in the Motion, a stalking horse asset purchase agreement (including all exhibits, schedules and ancillary agreements related thereto, and as amended and in effect, the "**Stalking Horse Agreement**") has been entered into by and among the Company, the other Debtors (together with the Company, the "**Sellers**") and Coal Acquisition LLC (the "**Stalking Horse Purchaser**"), dated as of November 5, 2015, which Stalking Horse Agreement contemplates a purchase and sale of the Acquired Assets to the Stalking Horse Purchaser, on the terms and subject to the conditions provided therein. A copy of the Stalking Horse Agreement is attached as an exhibit to the Motion.

On November [ ], 2015, the Bankruptcy Court entered an order (the "**Bidding Procedures Order**"), which, among other things, authorized the Debtors to determine the highest or otherwise best offer(s) for one or more of the Lots through the process and procedures set forth below (the "**Bidding Procedures**").

To the extent the Bidding Procedures require the Debtors to consult with the Steering Committee or any other Consultation Party (as defined below) in connection with making a determination or taking an action, or in connection with any other matter related to the Bidding

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Stalking Horse Agreement.

[2] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Walter Energy, Inc. (9953); Atlantic Development and Capital, LLC (8121); Atlantic Leaseco, LLC (5308); Blue Creek Coal Sales, Inc. (6986); Blue Creek Energy, Inc. (0986); J.W. Walter, Inc. (0648); Jefferson Warrior Railroad Company, Inc. (3200); Jim Walter Homes, LLC (4589); Jim Walter Resources, Inc. (1186); Maple Coal Co., LLC (6791); Sloss-Sheffield Steel & Iron Company (4884); SP Machine, Inc. (9945); Taft Coal Sales & Associates, Inc. (8731); Tuscaloosa Resources, Inc. (4869); V Manufacturing Company (9790); Walter Black Warrior Basin LLC (5973); Walter Coke, Inc. (9791); Walter Energy Holdings, LLC (1596); Walter Exploration & Production LLC (5786); Walter Home Improvement, Inc. (1633); Walter Land Company (7709); Walter Minerals, Inc. (9714); and Walter Natural Gas, LLC (1198). The location of the Debtors' corporate headquarters is 3000 Riverchase Galleria, Suite 1700, Birmingham, Alabama 35244-2359.

Procedures or the Auction (as defined below), the Debtors shall do so in a regular and timely manner prior to making such determination or taking such action.

## Assets to Be Sold

A party may participate in the bidding process by submitting a Bid (as defined below) for (a) all or substantially all of the Core Acquired Assets (as defined below) and/or (b) one or more, or any combination of, Lots comprising the Non-Core Assets (as defined below) that such party may desire.

The Stalking Horse Agreement is an offer to purchase all of the Acquired Assets. The "**Core Acquired Assets**" is defined herein to mean the Acquired Assets minus (i) Blue Creek Assets, (ii) the Miscellaneous Real Property Assets and (iii) the Walter Coke Assets, each as identified and described in **Exhibit A**. Bidders who intend to submit Bids for all or substantially all of the Core Acquired Assets should reference the Stalking Horse Agreement in connection with such Bids. For Bidders who intend to submit Bids for one or more, or any combination of, Lots comprising the Taft Assets, the Select JWR Assets, the West Virginia Assets, the Blue Creek Assets, one or more of the Miscellaneous Real Property Assets and the Walter Coke Assets, in each case as identified and described in **Exhibit A** (collectively, the "**Non-Core Assets**"), on or before the date that is ten (10) days prior to the Bid Deadline (as defined below), the Debtors will make available to Preliminary Interested Investors (as defined below) one or more forms of asset purchase agreement(s) that will be substantially similar to the Stalking Horse Agreement, but with modifications appropriate for the purchase of such applicable Lot(s), and not the other Subject Assets (each such agreement, a "**Short Form APA**").

All of the Debtors' right, title and interest in and to the Subject Assets subject thereto shall be sold free and clear of any pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon (collectively, the "**Liens**"), with such Liens to attach to the proceeds of the sale of the Subject Assets with the same validity and priority as such Liens applied against the Subject Assets, except as otherwise specifically provided in the Stalking Horse Agreement or a Modified Asset Purchase Agreement (as defined below) submitted by a Successful Bidder (as defined below) (including any exhibits or schedules thereto) and reflected in the Sale Order.

## Bidding Process

The Debtors and their advisors shall, subject to the other provisions of these Bidding Procedures, including the consultation obligations set forth herein, (a) determine whether any person is a Qualified Bidder (as defined below), (b) coordinate the efforts of Preliminary Interested Investors (as defined below) in conducting their due diligence investigations, (c) receive offers from Bidders, and (d) negotiate any offers made to purchase (i) all or substantially all of the Core Acquired Assets and/or (ii) one or more Lots, or any combination thereof, constituting the Non-Core Assets.

## Key Dates For Potential Competing Bidders

The Bidding Procedures provide interested parties with the opportunity to qualify for and participate in the Auction to be conducted by the Debtors and to submit competing bids for the Subject Assets. The Debtors shall assist Preliminary Interested Investors in conducting their

2

respective due diligence investigations and shall accept Bids until **January 5, 2016 at 12:00 p.m. (prevailing Eastern time)** (the "**Bid Deadline**").

The key dates for the sale process are as follows:[3]

| | |
|---|---|
| January 5, 2016 at 12:00 p.m. (prevailing Eastern time) | Bid Deadline - Due Date for Bids and Deposits |
| January 7, 2016 at 10:00 a.m. (prevailing Eastern time) | Auction, which will be held at Paul, Weiss, Rifkind, Wharton & Garrison, LLP, 1285 Avenue of the Americas, New York, New York, 10019 |
| January 12, 2016 at 10:00 a.m. (prevailing Central time) | Sale Hearing, which will be held at the United States Bankruptcy Court for the Northern District of Alabama, Southern Division, 1800 Fifth Avenue, North Birmingham, Alabama 35203 |

Unless otherwise approved by the Bankruptcy Court, no amendment or other modification to these Bidding Procedures (including the extension of any of the deadlines set forth herein) shall be made by the Debtors without the prior written approval of the Steering Committee and after consultation with the Official Committee of Unsecured Creditors ("**UCC**").

***Access to Diligence Materials.***

To participate in the bidding process and to receive access to due diligence materials (the "**Diligence Materials**"), a party must submit to the Debtors (i) an executed confidentiality agreement in substantially the form attached hereto as **Exhibit B**, the material provisions of which the Debtors shall not waive and shall use reasonable efforts to enforce, and (ii) reasonable evidence demonstrating the party's financial capability to consummate a sale transaction for the Core Acquired Assets (an "**Alternate Transaction**"), and/or one or more Lots comprising the Non-Core Assets (a "**Supplemental Transaction**"), as applicable, as determined by the Debtors in consultation with the Consultation Parties.

A party who qualifies for access to Diligence Materials shall be a "**Preliminary Interested Investor**." The Debtors will afford any Preliminary Interested Investor the time and opportunity to conduct reasonable due diligence; provided, however, that the Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline to any party that has not submitted a Qualified Bid (as defined below) and may, in consultation with the Consultation Parties, limit the amount of further due diligence available to Qualified Bidders after the Bid Deadline.

The Debtors reserve the right to withhold any Diligence Materials that the Debtors, in consultation with the Consultation Parties, determine are business-sensitive or otherwise not appropriate for disclosure to a Preliminary Interested Investor who is a competitor of the Debtors or is affiliated with any competitor of the Debtors. Neither the Debtors nor their representatives

---

[3]  These dates are subject to extension or adjournment as provided for herein.

shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Preliminary Interested Investor.

All due diligence requests must be directed to PJT Partners Inc., Attn: Kerry Greer (greer@pjtpartners.com).

***Due Diligence from Bidders.***

Each Preliminary Interested Investor and each Bidder shall comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors regarding such Preliminary Interested Investor or Bidder, as applicable, and its contemplated transaction. Failure by a Preliminary Interested Investor or Bidder (other than the Stalking Horse Purchaser) to comply with requests for additional information and due diligence access may be a basis for the Debtors to determine that such Bidder is not a Qualified Bidder.

## Auction Qualification Process

To be eligible to participate in the Auction, each offer, solicitation or proposal (each, a "**Bid**"), and each party submitting such a Bid (other than the Stalking Horse Purchaser) (each, a "**Bidder**"), must be reasonably determined by the Debtors, in consultation with the Consultation Parties, to satisfy each of the following conditions:

(a) **Good Faith Deposit**: Each Bid must be accompanied by a cash deposit in the amount of ten percent (10%) of the purchase price (excluding any Assumed Liabilities) contained in the Modified Asset Purchase Agreement or Short Form APA, as applicable, which deposit shall be held in an interest-bearing escrow account to be identified and established by the Debtors (the "**Good Faith Deposit**").

(b) **Same or Better Terms**: In connection with any Bid for the Core Acquired Assets, such Bid must be on terms that the Debtors, in their business judgment and after consulting with the Consultation Parties, determine are the same or better for the Debtors than the terms of the Stalking Horse Agreement.

(c) **Executed Agreement**: Each Bid must be based on the Stalking Horse Agreement or the Short Form APA, as applicable, and must include binding, executed transaction documents, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate an Alternate Transaction or Supplemental Transaction, as applicable (a "**Modified Asset Purchase Agreement**"). A Bid must also include a copy of the Modified Asset Purchase Agreement (including all exhibits thereto) marked against the Stalking Horse Agreement or the Short Form APA, as applicable, to show all changes requested by the Bidder (including those related to purchase price and to remove any provisions that apply only to the Stalking Horse Purchaser, such as the expense reimbursement and break-up fee provisions contained in the Stalking Horse Agreement, which shall not be in any Modified Asset Purchase Agreement). Each Modified Asset Purchase Agreement must provide a representation that the Qualified Bidder will (i) make all necessary filings under the Hart-Scott-Rodino

4

Antitrust Improvements Act of 1976, as amended (the "**HSR Act**"), if applicable, and (ii) submit and pay the fees associated with all necessary filings under the HSR Act as soon as reasonably practicable; <u>provided</u>, <u>however</u>, that the timing and likelihood of receiving HSR Act approval will be a consideration in determining the highest or otherwise best Bid.

(d)     **Scope of Bid**: A Bid must be for (i) all or substantially all of the Core Acquired Assets and/or (ii) specifically identified Lots, or combinations of Lots, comprising all or any portion of the Non-Core Assets that such Bidder may desire, in such case the Bid must identify which Lot(s) are included in the Bid. Any Bid for any assets of the Debtors that have Reclamation Liabilities associated therewith must also expressly assume all such Reclamation Liabilities as part of the Bid.

(e)     **Minimum Bid**: A Bid for all or substantially all of the Core Acquired Assets must, individually or in conjunction with one or more other Bids, have a purchase price, including any assumption of liabilities, that in the Debtors' reasonable business judgment (after consultation with the Consultation Parties) has a value greater than the sum of (i) the Purchase Price (as defined in the Stalking Horse Agreement) *plus* (ii) $10 million. A Bid for the Blue Creek Assets must, individually or in conjunction with one or more other Bids, have a purchase price, including any assumption of liabilities associated with the Blue Creek Assets, that in the Debtors' reasonable business judgment (after consultation with the Consultation Parties) has a value greater than $55 million. If a Walter Coke Election is not made, a Bid for the Walter Coke Assets must, individually or in conjunction with one or more other Bids, have a purchase price, including any assumption of liabilities associated with the Walter Coke Assets, that in the Debtors' reasonable business judgment (after consultation with the Consultation Parties) has a value greater than $105 million. If a Walter Coke Election is made, there will be no minimum bid in connection with any Bid for the Walter Coke Assets.

Except as set forth in the immediately preceding paragraph, in the event that a potential Bidder submits a Bid for one or more Lots comprising all or any portion of the Non-Core Assets, the Debtors, after consultation with the Consultation Parties, shall determine whether such Bid is a Qualified Bid (defined herein) with respect to such Lot(s). Any Bid for a combination of Lots, other than the Bid by the Stalking Horse Purchaser, must (x) allocate the purchase consideration among such Lots, (y) state whether the Bid is conditioned upon the Bidder being the Successful Bidder (as defined below) on more than one Lot and, if so, which are the Lots that the Bid is conditioned upon, and (z) state whether the Bidder is willing to purchase any of the Lots included in the Bid individually, and if so, the Bid must state the price the Bidder would pay for each such Lot.

(f)     **Designation of Assigned Contracts and Leases**: A Bid must identify the executory contracts and unexpired leases with respect to which the Bidder seeks assignment from the Sellers.

(g)     **Designation of Assumed Liabilities**: A Bid must identify all liabilities which the Bidder proposes to assume.

(h)     **Corporate Authority**: A Bid must include written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate authorization to consummate the proposed Alternate Transaction or Supplemental Transaction, as applicable; provided that, if the Bidder is an entity specially formed for the purpose of effectuating the Alternate Transaction or Supplemental Transaction, as applicable, then the Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the Alternate Transaction or Supplemental Transaction, as applicable, by the equity holder(s) of such Bidder.

(i)     **Disclosure of Identity of Bidder**: A Bid must fully disclose the identity of each entity that will be bidding for or purchasing the Subject Assets (or one or more Lots), including any equity holders in the case of a Bidder which is an entity specially formed for the purpose of effectuating the contemplated transaction, or otherwise participating in connection with such Bid, and the complete terms of any such participation, including any agreements, arrangements or understandings concerning a collaborative or joint bid or any other combination concerning the proposed Bid. A Bid must also fully disclose any connections or agreements with the Debtors, the Stalking Horse Purchaser or any other known, potential, prospective Bidder or Qualified Bidder, and/or any officer, director or equity security holder of the Debtors. All information disclosed pursuant to this paragraph shall be made available by the Debtors to the Steering Committee promptly upon Debtors' receipt thereof but in any event no later than one (1) business day following the Bid Deadline.

(j)     **Proof of Financial Ability to Perform**: A Bid must include written evidence that the Debtors may conclude, in consultation with their advisors and the Consultation Parties, demonstrates that the Bidder has the necessary financial ability to close the Alternate Transaction or Supplemental Transaction, as applicable, and comply with section 365 of the Bankruptcy Code, including providing adequate assurance of future performance under all contracts to be assumed and assigned in such Alternate Transaction or Supplemental Transaction. Such information must include, *inter alia*, the following:

      (1)     contact names and numbers for verification of financing sources;

      (2)     evidence of the Bidder's internal resources and proof of unconditional debt funding commitments from a recognized banking institution and, if applicable, equity commitments in an aggregate amount equal to the cash portion of such Bid or the posting of an irrevocable letter of credit from a recognized banking institution issued in favor of the Debtors in the amount of the cash portion of such Bid, in each case, as are needed to close such Alternate Transaction or Supplemental Transaction;

6

(3)    the Bidder's current financial statements (audited if they exist) or other similar financial information reasonably acceptable to the Debtors;

(4)    a description of the Bidder's pro forma capital structure; and

(5)    any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors, in consultation with the Consultation Parties, demonstrating that such Bidder has the ability to close the Alternate Transaction or Supplemental Transaction, as applicable.

(k)    **Regulatory and Third Party Approvals**:

(i)    A Bid must set forth each regulatory and third-party approval required for the Bidder to consummate the Alternate Transaction or Supplemental Transaction, as applicable, and the time period within which the Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the Modified Asset Purchase Agreement, those actions the Bidder will take to ensure receipt of such approval(s) as promptly as possible).

(ii)    By the Bid Deadline, a Bidder for any of the Lots which contain mining assets must demonstrate to the satisfaction of the Debtors that it will pass a compliance check of the Applicant Violator System managed by the federal Office of Surface Mining Reclamation and Enforcement and that the Bidder will be able to continue to pass such a compliance check until all permits of Debtor related to mining in such Lot(s) are transferred to Bidder if it is the Successful Bidder for such Lot(s). This process will require disclosure of information about the organizational structure of Bidder and its affiliates and certain other information to Debtors.

(l)    **Contact Information and Affiliates**: A Bid must provide the identity and contact information for the Bidder and full disclosure of any affiliates of the Bidder.

(m)    **Contingencies**: Each Bid (i) may not contain representations and warranties, covenants, or termination rights materially more onerous in the aggregate to the Debtors than those set forth in the Stalking Horse Agreement or the Short Form APA, as applicable, as determined by the Debtors in good faith, and (ii) may not be conditioned on obtaining financing, any internal approvals or credit committee approvals, or on the outcome or review of due diligence, including with respect to any Environmental Laws, Mining and Mining Safety Laws or employee, labor, health and/or safety matters.

(n)    **Irrevocable**: Each Bid must be irrevocable until five (5) business days after the Sale Hearing; provided that if such Bid is accepted as the Successful Bid or the Backup Bid (each as defined herein) for any one or more of the Lots, such Bid shall continue to remain irrevocable until the closing of the sale of such Lot(s).

7

(o)     **Compliance with Diligence Requests**: The Bidder submitting the Bid must have complied with reasonable requests for additional information and due diligence access from the Debtors to the reasonable satisfaction of the Debtors, in consultation with the Consultation Parties.

(p)     **Confidentiality Agreement**: To the extent not already executed, the Bid must include an executed confidentiality agreement in substantially the form attached as **Exhibit B**.

(q)     **Termination Fees**: The Bid (other than the Bid pursuant to the Stalking Horse Agreement) must not entitle the Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement and, by submitting the Bid, the Bidder waives the right to pursue a substantial contribution claim under 11 U.S.C. § 503 related in any way to the submission of its Bid or participation in any Auction.

(r)     **Closing Date**: The Bid must include a commitment to close the transactions contemplated by the Modified Asset Purchase Agreement by no later than February 29, 2016; provided that such date may be extended for a period not to exceed thirty (30) days and solely for the purpose of obtaining any necessary regulatory approvals.

(s)     **Bid Deadline**: The following parties must receive a Bid in writing (in both PDF and Word format), on or before the Bid Deadline: (i) the Debtors, 3000 Riverchase Galleria, Suite 1700, Birmingham, Alabama 35244-2359, Attention: Earl Doppelt (earl.doppelt@walterenergy.com); (ii) counsel to the Debtors, Paul, Weiss, Rifkind, Wharton & Garrison, LLP, 1285 Avenue of the Americas, New York, New York, 10019, Attention: Kelley A. Cornish (kcornish@paulweiss.com) and Stephen J. Shimshak (sshimshak@paulweiss.com); (iii) co-counsel to the Debtors, Bradley Arant Boult Cummings LLP, One Federal Place, 1819 Fifth Avenue North, Birmingham, Alabama 35203, Attention: Patrick Darby (pdarby@babc.com); (iv) financial advisor to the Debtors, PJT Partners Inc., 280 Park Avenue, New York, New York 10017, Attention: Adam Schlesinger (schlesinger@pjtpartners.com) and Kerry Greer (greer@pjtpartners.com); (v) counsel to the Steering Committee, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, Attention: Ira Dizengoff (idizengoff@akingump.com) and 1333 New Hampshire Ave NW, Washington, DC 20036, Attention: James Savin (jsavin@akingump.com); (vi) financial advisor to the Steering Committee, Lazard Frères & Co. LLC, 190 South LaSalle Street, Chicago, IL 60603, Attention: Tyler Cowan (tyler.cowan@lazard.com) and (vii) counsel to the UCC, Morrison & Foerster LLP, 250 West 55th Street, New York, New York 10019, Attention: Brett H. Miller (brettmiller@mofo.com), Lorenzo Marinuzzi (lmarinuzzi@mofo.com), and Jennifer L. Marines (jmarines@mofo.com).

A Bid received from a Bidder before the Bid Deadline that meets the above requirements for (a) all or substantially all of the Core Acquired Assets and/or (b) specifically identified Lots, or combinations of Lots, comprising all or any portion of the Non-Core Assets that such Bidder

8

may desire, in each case as determined by the Debtors in consultation with the Consultation Parties, shall constitute a "**Qualified Bid**" with respect to such Lot(s), and such Bidder shall constitute a "**Qualified Bidder**" for such Lot(s); provided that if the Debtors receive a Bid prior to the Bid Deadline that is not a Qualified Bid, the Debtors may, in consultation with the Consultation Parties, provide the Bidder with the opportunity to remedy any deficiencies prior to the Auction; provided, further, that, for the avoidance of doubt, if any Qualified Bidder fails to comply with reasonable requests for additional information and due diligence access from the Debtors to the satisfaction of the Debtors, in consultation with the Consultation Parties, the Debtors may, after consulting with the Consultation Parties, disqualify any Qualified Bidder and Qualified Bid, in the Debtors' discretion and such Bidder shall not be entitled to attend or participate in the Auction. Any amendments, supplements or other modifications to any Bids (including pursuant to this paragraph) shall be delivered to the parties listed in paragraph (s) above as provided therein. All Qualified Bids will be considered, but the Debtors reserve their right to reject any or all bids. However, bids that are unconditional and contemplate sales that may be consummated on or soon after the Sale Hearing are preferred. Additionally, notwithstanding anything herein to the contrary, the Stalking Horse Agreement submitted by the Stalking Horse Purchaser shall be deemed a Qualified Bid, and the Stalking Horse Purchaser a Qualified Bidder. The Debtors shall inform counsel to the Stalking Horse Purchaser, the Consultation Parties and any Qualified Bidders whether the Debtors consider any Bid to be a Qualified Bid as soon as practicable but no event later than one (1) business day before the Auction.

Each Qualified Bidder, by submitting a Bid, shall be deemed to acknowledge and agree that it is not relying upon any written or oral statements, representations, promises, warranties or guarantees of any kind whether expressed or implied, by operation of law or otherwise, made by any person or party, including the Sellers and their agents and representatives (other than as may be set forth in a definitive agreement executed by the Debtors), regarding the Debtors, any of the Subject Assets, the Auction, these Bidding Procedures or any information provided in connection therewith.

## Auction

If (a) one or more Qualified Bids (other than the Stalking Horse Agreement) comprising all or substantially all of the Core Acquired Assets are submitted by the Bid Deadline and/or (b) two or more Qualified Bids with respect to any particular Lot or group of Lots comprising all or any portion of the Non-Core Assets are submitted by the Bid Deadline, the Debtors will conduct an auction (the "**Auction**") to determine the highest or otherwise best Qualified Bid with respect to the applicable Lot(s). This determination shall take into account any factors the Debtors, in consultation with the Consultation Parties, reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates and may include, but are not limited to, the following: (i) the amount and nature of the consideration, including any assumed liabilities; (ii) the number, type and nature of any modifications to the Stalking Horse Agreement or Short Form APA, as applicable, requested by each Bidder in such Bidder's Modified Asset Purchase Agreement; (iii) the extent to which such modifications are likely to delay closing of the sale of the applicable asset(s) and the cost to the Debtors of such modifications or delay; (iv) the total consideration to be received by the Debtors; (v) the likelihood of the Bidder's ability to close a transaction and the timing thereof; (vi) the timing and likelihood of HSR Act approval; and (vii) the net benefit to the Debtors' estates (collectively, the "**Bid Assessment Criteria**").

9

If no timely, conforming Qualified Bids (other than the Qualified Bid submitted by the Stalking Horse Purchaser) for the Core Acquired Assets are received, the Auction for the Core Acquired Assets shall be canceled and the Stalking Horse Agreement shall be the Successful Bid for the Core Acquired Assets and the Stalking Horse Purchaser shall be the Successful Bidder for the Core Acquired Assets.

If no timely, conforming Qualified Bids (other than the Qualified Bid submitted by the Stalking Horse Purchaser) for Blue Creek Assets and/or Miscellaneous Real Property Assets are received, there shall be no Auction for such Blue Creek Assets and/or Miscellaneous Real Property Assets, as applicable, and the Stalking Horse Agreement shall be the Successful Bid for the Blue Creek Assets and/or Miscellaneous Real Property Assets, as applicable, and the Stalking Horse Purchaser shall be the Successful Bidder for the Blue Creek Assets and/or Miscellaneous Real Property Assets, as applicable.

If a Walter Coke Election is not made with respect to the Walter Coke Assets, and no timely, conforming Qualified Bids (other than the Qualified Bid submitted by the Stalking Horse Purchaser) for the Walter Coke Assets are received, there shall be no Auction for such Walter Coke Assets and, as provided in the Stalking Horse Agreement, the Stalking Horse Purchaser shall be the Successful Bidder for the Walter Coke Assets.

Other than as expressly set forth herein (including with respect to the minimum bid amounts for the Blue Creek Assets and the Walter Coke Assets), with respect to Bids for any Non-Core Assets, the Debtors will determine whether any individual Bid or combination of Bids is a Qualified Bid and will conduct an Auction with respect to such Bids for the Non-Core Assets as Debtors, in consultation with the Consultation Parties, deem appropriate and in the best interests of Debtors and their estates.

## Procedures for Auction

If (a) one or more Qualified Bids (other than the Stalking Horse Agreement) comprising all or substantially all of the Core Acquired Assets are submitted by the Bid Deadline or (b) two or more Qualified Bids with respect to any particular Lot or group of Lots comprising all or any portion of the Non-Core Assets are submitted by the Bid Deadline, the Debtors shall conduct the Auction on January 7, 2016 at 10:00 a.m. (prevailing Eastern Time) at the offices of Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York, 10019 or such other place and time as the Debtors shall notify all Qualified Bidders, the Stalking Horse Purchaser, the Steering Committee, the Credit Agreement Agent, the Indenture Trustee, the UCC and each of their respective counsel and advisors. The Auction shall be conducted according to the following procedures:

***Participation.***

Only the Debtors, the Consultation Parties, the Stalking Horse Purchaser and any other Qualified Bidder, in each case, along with their representatives and counsel, may attend the Auction (such attendance to be in person) and only the Credit Agreement Agent, the Indenture Trustee, the Stalking Horse Purchaser and such other Qualified Bidders will be entitled to make any Bids at the Auction; provided, however, that any other creditor or other indenture trustee may

attend (but not participate in) the Auction if it provides the Debtors written notice of its intention to attend the Auction on or before the Bid Deadline. Such written notice must be sent to counsel for the Debtors via electronic mail, to Claudia R. Tobler (ctobler@paulweiss.com) and Ann K. Young (ayoung@paulweiss.com).

***The Debtors Shall Conduct the Auction.***

The Debtors and their professionals shall direct and preside over the Auction and the Auction shall be transcribed. Other than as expressly set forth herein, the Debtors (in consultation with the Consultation Parties) may conduct the Auction in the manner they reasonably determine will result in the highest or otherwise best Qualified Bid(s).

One (1) day prior to the Auction, the Debtors will:

(i)     notify each Qualified Bidder that has timely submitted a Qualified Bid that its Bid is a Qualified Bid;

(ii)    provide each Qualified Bidder participating in the Auction with a copy of the Modified Asset Purchase Agreements associated with all Qualified Bids and an indication as to which Qualified Bid is the highest or otherwise best Qualified Bid with respect to any Lot or group of Lots, as determined by the Debtors in consultation with the Consultation Parties, received before the Bid Deadline (such highest or otherwise best Qualified Bid with respect to any Lot or group of Lots, each "**Auction Baseline Bid**").

In addition, at the start of the Auction, the Debtors shall describe the terms of each Auction Baseline Bid. Each Qualified Bidder participating in the Auction must confirm that it (a) has not engaged in any collusion with respect to the bidding or sale of any of the assets described herein, (b) has reviewed, understands and accepts the Bidding Procedures and (c) has consented to the core jurisdiction of the Bankruptcy Court.

The Debtors shall consult in good faith with the Consultation Parties throughout the Auction process to the extent reasonably practicable. Any rules developed by the Debtors (after consulting with the Consultation Parties) will provide that all bids will be made and received in one room, on an open basis, and all other Bidders will be entitled to be present for all bidding with the understanding that the true identity of each Bidder will be fully disclosed to all other Bidders and that all material terms of each Qualified Bid submitted in response to an Auction Baseline Bid, or to any successive bids made at the Auction, will be fully disclosed to all other Bidders bidding on such applicable Lots throughout the entire Auction, and each Qualified Bidder will be permitted what the Debtors determine to be an appropriate amount of time to respond to the previous bid at the Auction.

***Terms of Overbids.***

An "**Overbid**" is any bid made at the Auction subsequent to the Debtors' announcement of the respective Auction Baseline Bid. To submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions:

11

(a) **Minimum Overbid Increments**: Any Overbid for all or substantially all of the Core Acquired Assets, after and above its respective Auction Baseline Bid shall be made in increments valued at not less than $10,000,000 (or such other amount as shall be announced at the Auction by the Debtors after consultation with the Consultation Parties) in cash or in cash equivalents, or other forms of consideration acceptable to the Debtors, with the consent of the Consultation Parties. Any Overbid for the Blue Creek Assets or the Walter Coke Assets, in each case, after and above their respective Auction Baseline Bid shall be made in increments valued at not less than $1,000,000 (or such other amount as shall be announced at the Auction by the Debtors after consultation with the Consultation Parties) in cash or in cash equivalents, or other forms of consideration acceptable to the Debtors, with the consent of the Consultation Parties. Except as set forth in the immediately preceding sentence, any Overbid for a Lot comprising the Non-Core Asset(s) after and above the respective Auction Baseline Bid shall be made in increments as shall be announced at Auction, in cash or in cash equivalents, or other forms of consideration acceptable to the Debtors, with the consent of the Consultation Parties.

(b) **Stalking Horse Purchaser May Credit Bid First Lien Claims**[4]: The Stalking Horse Purchaser shall be entitled to submit Overbids in cash, cash equivalents or other forms of consideration, as described above, or additional credit bid amounts up to the aggregate amount of the prepetition first lien senior secured obligations (including any accrued but unpaid prepetition interest), together with the amount of the Bid Protections and all first lien adequate protection claims arising under the Cash Collateral Orders (collectively, the "**First Lien Claims**").

(c) **Remaining Terms Are the Same as for Qualified Bids**: Except as modified herein, an Overbid at the Auction must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline shall not apply. Any Overbid must include, in addition to the amount and the form of consideration of the Overbid, a description of all changes requested by the Bidder to the Stalking Horse Agreement or Modified Asset Purchase Agreement, as the case may be, in connection therewith. Any Overbid must remain open and binding on the Bidder as provided herein.

At the Debtors' discretion, to the extent not previously provided (which shall be determined by the Debtors in consultation with the Consultation Parties), a Bidder submitting an Overbid at the Auction must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors, in consultation with the Consultation Parties) reasonably demonstrating such Bidder's ability to close the Alternate Transaction or Supplemental Transaction, as applicable, proposed by such Overbid.

---

[4] For the avoidance of doubt, with respect to credit bids of the First Lien Claims, such credit bids may be made by the Indenture Trustee and Credit Agreement Agent, as applicable, on behalf of the Stalking Horse Purchaser.

*Announcement and Consideration of Overbids.*

(a) **Announcement of Overbids**: The Debtors shall announce at the Auction the material terms of each Overbid, the total amount of consideration offered in each such Overbid, and the basis for calculating such total consideration. The Debtors shall also provide all terms of each Overbid, including non-economic terms, to the Consultation Parties.

(b) **Consideration of Overbids**: Subject to the deadlines set forth herein, the Debtors reserve the right, in their reasonable business judgment in consultation with the Consultation Parties, to make one or more continuances of the Auction to, among other things: facilitate discussions between the Debtors and individual Qualified Bidders; allow individual Qualified Bidders to consider how they wish to proceed; or give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors in their reasonable business judgment (after consulting with the Consultation Parties) may require, that the Qualified Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Alternate Transaction or Supplemental Transaction, as applicable, at the prevailing Overbid amount. When comparing Overbids to the Qualified Bid made by the Stalking Horse Purchaser, the Debtors shall treat the credit bid (including any Overbid) made by the Stalking Horse Purchaser as being made in cash or in cash equivalents.

*Other Procedures.*

(a) **Jurisdiction of Bankruptcy Court**: All Qualified Bidders (including the Stalking Horse Purchaser) at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to the marketing process, the Auction, and the construction and enforcement of the Qualified Bidder's fully executed sale and transaction documents, as applicable.

(b) **Stalking Horse Purchaser Bid**: The Stalking Horse Purchaser shall be entitled to (i) credit bid all or a portion of the First Lien Claims, consistent with Bankruptcy Code section 363(k); (ii) allocate such credit bid among the Lots comprised of assets which are subject to Liens securing the First Lien Claims, as provided in the Stalking Horse Agreement; (iii) reduce the amount of the credit bid to the extent the Stalking Horse Purchaser is not the Successful Bidder with respect to any Lot that includes assets which are subject to Liens securing the First Lien Claims, as provided in the Stalking Horse Agreement; and (iv) submit additional bids and make modifications to the Stalking Horse Agreement (including submitting one or more Short Form APAs with respect to one or more Lots constituting Non-Core Assets to the extent contemplated by the Stalking Horse Agreement) at the Auction consistent with these Bidding Procedures. It is agreed that the Stalking Horse Purchaser shall not be obligated to consummate the Stalking Horse Agreement or purchase all or any portion of the Acquired Assets if it is unable to credit bid in

13

payment of all or any portion of the credit bid portion of the purchase price for such assets as set forth in the Stalking Horse Agreement.

(c) **Additional Bids; Modifications**: All Qualified Bidders, including the Stalking Horse Purchaser, shall have the right to submit additional bids and make additional modifications to the Stalking Horse Agreement, the Short Form APA or Modified Asset Purchase Agreement at the Auction, as applicable, provided that any such modifications to the Stalking Horse Agreement, the Short Form APA or Modified Asset Purchase Agreement on an aggregate basis and viewed in whole, shall not, in the Debtors' business judgment, be less favorable to the Debtors with respect to the particular Lots than the terms of the Stalking Horse Agreement or the Short Form APA, as applicable.

## Additional Procedures.

The Debtors (after consulting with the Consultation Parties) may announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction so long as such rules are not inconsistent in any material respect with the Bidding Procedures or the Stalking Horse Agreement. Any Auction rules adopted by the Debtors will not modify any of the terms of the Stalking Horse Agreement or the rights of the Stalking Horse Purchaser under the Bid Procedures (as may be consensually modified at the Auction) without the consent of the Stalking Horse Purchaser.

## Sale Is As Is/Where Is.

Except as otherwise provided in the Stalking Horse Agreement, any Modified Asset Purchase Agreement, including any Short Form APA, or any order by the Bankruptcy Court approving any Sale(s) of the Subject Assets as contemplated hereunder, the applicable Subject Assets sold pursuant to the Bidding Procedures shall be conveyed at the closing of the purchase and sale of the applicable Subject Assets in their then-present condition, "**AS IS, WITH ALL FAULTS, AND WITHOUT ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED.**"

## Closing the Auction.

The Auction shall continue in additional rounds of bidding until the Debtors select, after consultation with the Consultation Parties, the Bid that is the highest or otherwise best offer for (a) all or substantially all of the Core Acquired Assets or (b) any of the Lots comprising the Non-Core Assets, as applicable, from among the Qualified Bids submitted at the Auction (each, a "**Successful Bid**," and the Bidder submitting such Successful Bid with respect to any Lot, a "**Successful Bidder**"). The Successful Bidder(s) shall have the rights and responsibilities of the purchaser(s) as set forth in the applicable Stalking Horse Agreement, Short Form APA or Modified Asset Purchase Agreement. There may be more than one Successful Bid and Successful Bidder if bids for one or more Lots are determined to be Successful Bids. In selecting each Successful Bid, the Debtors and the Consultation Parties shall consider the Bid Assessment Criteria.

14

The Auction for the applicable Subject Asset shall close when each Successful Bidder submits fully executed sale and transaction documents memorializing the terms of its Successful Bid.

Promptly following the Debtors' selection, after consulting with the Consultation Parties, of each Successful Bid and the conclusion of the Auction, the Debtors shall announce each Successful Bid and Successful Bidder and shall file with the Bankruptcy Court notice of each Successful Bid and Successful Bidder.

The Debtors shall not consider any Bids submitted after the conclusion of the Auction.

*Backup Bidder.*

Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next highest or otherwise best Bid at the Auction with respect to (a) all or substantially all of the Core Acquired Assets and/or (b) any of the Lots comprising the Non-Core Assets, as applicable, as determined by the Debtors, in the exercise of their business judgment and after consulting with the Consultation Parties, will be designated as the backup bidder (the "**Backup Bidder**") for such Lot(s), as applicable. Each Backup Bidder shall be required to keep its initial Bid (or if such Backup Bidder submitted one or more Overbids at the Auction, the Backup Bidder's final Overbid) (the "**Backup Bid**") open and irrevocable until the closing of the relevant transaction with the Successful Bidder with respect to such Lot(s).

Following the Sale Hearing, if the Successful Bidder fails to consummate the purchase of any relevant Lot(s)), the Debtors may, after consultation with the Consultation Parties, deem the Backup Bidder with respect to such Lot(s) to have the new Successful Bid, and the Debtors will be authorized, without further order of the Bankruptcy Court, to consummate the transaction with such Backup Bidder at the price of its last bid with respect to such Lot(s). Such Backup Bidder will be deemed to be the Successful Bidder with respect to such Lot(s) and the Debtors will be authorized, but not directed, to effectuate a sale of such Lot(s) to such Backup Bidder subject to the terms of the Backup Bid without further order of the Bankruptcy Court. All Qualified Bids (other than each Successful Bid and Backup Bid) shall be deemed rejected by the Debtors on and as of the date of approval of each Successful Bid and Backup Bid by the Bankruptcy Court. The Debtors, on their behalf and on behalf of each of their respective estates, specifically reserve the right to seek all available damages, including specific performance, from any defaulting Successful Bidder (including any Backup Bidder designated as a Successful Bidder) in accordance with the terms of the Bidding Procedures.

For the avoidance of doubt, in the event that there is a Successful Bidder (other than the Stalking Horse Purchaser) with respect to all or substantially all of the Core Acquired Assets, and the Stalking Horse Purchaser is the Backup Bidder, the Stalking Horse Purchaser will be deemed to be the Back-Up Bidder at the price of its last overbid with respect to such Core Acquired Assets and will be subject to the terms contained in the immediately preceding paragraph.

## Bid Protections

Pursuant to the Bidding Procedures Order, the Stalking Horse Purchaser is entitled to the Bid Protections in the amounts set forth in, and in accordance with the terms of, the Stalking Horse Agreement and the Bidding Procedures Order.

Pursuant to the Bidding Procedures Order, except for the Stalking Horse Purchaser, no other party submitting an offer or Bid or a Qualified Bid shall be entitled to any expense reimbursement, break-up fee, termination fee, or similar fee or payment.

## Sale Hearing

Each Successful Bid and Backup Bid (or, if no Qualified Bid other than that of the Stalking Horse Purchaser is received, then the Stalking Horse Agreement) will be subject to approval by the Bankruptcy Court. The sale hearing to approve each Successful Bid and any Backup Bid (or, the Stalking Horse Agreement for the Acquired Assets, if no Qualified Bid other than that of the Stalking Horse Purchaser is received) shall take place on January 12, 2016 at 10:00 a.m. (prevailing Central time) before the Bankruptcy Court (the "**Sale Hearing**"). The Sale Hearing may be adjourned by the Debtors, in consultation with the Consultation Parties, from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing, or by filing a notice on the docket of the Debtors' Chapter 11 Cases.

## Return of Good Faith Deposits

The Good Faith Deposits of all Qualified Bidders shall be held in one or more interest-bearing escrow accounts by the Debtors, but shall not become property of the Debtors' estates absent further order of the Bankruptcy Court or as expressly provided below. The Good Faith Deposit of any Qualified Bidder that is neither a Successful Bidder nor a Backup Bidder shall be returned to such Qualified Bidder not later than five (5) business days after the Sale Hearing. The Good Faith Deposit of each Backup Bidder, if any, shall be returned to such Backup Bidder no later than seventy-two (72) hours after the closing of the transaction with the relevant Successful Bidder for the assets bid upon by such Backup Bidder. Upon the return of the Good Faith Deposits, their respective owners shall receive any and all interest that will have accrued thereon. If a Successful Bidder timely closes on its winning transaction, its Good Faith Deposit shall be credited towards the applicable purchase price(s). If a Successful Bidder (or Backup Bidder, if applicable) fails to consummate an Alternate Transaction or Supplemental Transaction, as applicable, because of a breach or failure to perform on the part of such Successful Bidder (or Backup Bidder, if applicable), the Debtors will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder (or Backup Bidder, if applicable), and such Good Faith Deposit shall irrevocably become property of the Debtors.

## The Consultation Parties

The Debtors shall consult with the Steering Committee, the UCC, the Credit Agreement Agent and Indenture Trustee, and each of their respective counsel and advisors (each, a "**Consultation Party**" and collectively, the "**Consultation Parties**") as explicitly provided for in the Bidding Procedures; provided, however, that the Debtors shall not be required to consult with

16

any Consultation Party during the Auction process to the extent such Consultation Party has submitted a Bid or has had a Bid submitted on its behalf for so long as such Bid remains open, if the Debtors determine, in their reasonable business judgment, that consulting with such Consultation Party regarding any issue, selection or determination would be likely to have a chilling effect on potential bidding or otherwise be contrary to goal of maximizing value for the Debtors' estates from the sale process. Subject to the terms of any Orders entered in these Chapter 11 Cases, after consultation with the Consultation Parties, the Debtors shall have the right and obligation to make all decisions regarding Bids and the Auction as provided herein as it determines to be in the best interest of their estates, whether or not Consultation Parties agree with such decisions.

## Reservation of Rights of the Debtors

Except as otherwise provided in the Stalking Horse Agreement, the Bidding Procedures or the Bidding Procedures Order, the Debtors further reserve the right as they may reasonably determine to be in the best interest of their estates, after consultation with the Consultation Parties to: (a) determine which Bidder(s) is a Qualified Bidder(s); (b) determine which Bid(s) is a Qualified Bid(s); (c) determine which Qualified Bid is the highest or otherwise best proposal for the Lot(s) and which is the next highest or otherwise best proposal for the Lot(s); (d) reject any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (iii) contrary to the best interests of the Debtors and their estates; (e) waive terms and conditions set forth herein with respect to all potential Bidders; (f) impose additional terms and conditions with respect to all potential Bidders; (g) extend the deadlines set forth herein; (h) continue or cancel the Auction and/or Sale Hearing in open court, or by filing a notice on the docket of the Debtors' Chapter 11 Cases, without further notice to creditors or other parties in interest; and (i) modify the Bidding Procedures and implement additional procedural rules that the Debtors determine, in their business judgment, after consultation with the Consultation Parties, will better promote the goals of the bidding process and discharge the Debtors' fiduciary duties; provided however that any modification or additions to the Bidding Procedures shall not be inconsistent with the Stalking Horse Agreement, the Bidding Procedures Order or any other Order of the Bankruptcy Court, unless otherwise ordered by the Bankruptcy Court.

# EXHIBIT A TO BIDDING PROCEDURES

## EXHIBIT A

## LOTS

| Lot Number | Assets | General Description |
|---|---|---|
| 1. | Core Acquired Assets[1] | • Alabama Underground and Gas, including Mine No. 4 and Mine No. 7<br><br>• JWR Mine No. 5<br><br>• Barge Loadout located in Tuscaloosa County, Alabama (owned by Walter Minerals, Inc.)<br><br>• Highway 59 Mine<br><br>• East Brookwood Mine<br><br>• Blue Creek Coal Sales, Inc.<br><br>• Black Warrior Methane Corp. Stock/Black Warrior Transmission Corp. Stock<br><br>• Port of Mobile Lease<br><br>• Walter Black Warrior Basin LLC<br><br>• Tuscaloosa Resources, Inc. (Swanns Crossing/Carter Mine) |
| 2. | Blue Creek Assets | Blue Creek Energy Project |
| 3. | West Virginia Assets | • Maple Coal Co., LLC - Eagle Mine and Sycamore Mine, including the primary lease with respect to the mining property that is presently subleased from J. W. Walter, Inc. (which currently holds the primary lease with Pardee Minerals, Inc.)<br><br>• Atlantic Leaseco, LLC - Gauley Eagle Mines |
| 4. | Taft Assets | Choctaw, Robbins Road, Reid School, Blue Ridge, Gayosa |
| 5. | Walter Minerals land holdings | Alabama non-mining property interests ( including the Panther and Howton mines) |
| 6. | J.W. Walter, Inc. | West Virginia non-mining property interests (does not include lease from Pardee Minerals, Inc. which will be part of Lot 3) |

---

[1] Lot 1 is a non-exhaustive description of the Core Acquired Assets, which is defined as the "Acquired Assets" (as defined in the Stalking Horse Agreement) other than the assets and property comprising the Miscellaneous Real Property Assets, the Blue Creek Assets and if a Walter Coke Election is not made as provided in the Stalking Horse Agreement, the Walter Coke Assets (each, as defined in the Stalking Horse Agreement). Bidders may Bid on the Core Acquired Assets only as a complete package (with certain immaterial or *de minimis* exceptions).

Other than with respect to Lot 1, none of the Lots includes cash.

Bidders may separately Bid on one or more Lots, or any combination thereof, comprising the Miscellaneous Real Property Assets, which are included in this **Exhibit A** as Lots 5-7, the Blue Creek Assets, which are included in this **Exhibit A** as Lot 2, or the Walter Coke Assets, which are included in this **Exhibit A** as Lot 9. In the event of a Successful Bid for one or more of the Lots comprising the Miscellaneous Real Property Assets and/or the Blue Creek Assets, as applicable, such assets shall be designated "Excluded Assets" pursuant to the terms of the Stalking Horse Agreement. For the avoidance of doubt, assets comprising Lots 3, 4, 8 and, to the extent a Walter Coke Election is made, 9 are "Excluded Assets" under the Stalking Horse Agreement and accordingly, may be bid on in one or more Lots, or any combination thereof, on the terms and subject to the conditions set forth in these Bidding Procedures.

| Lot Number | Assets | General Description |
|---|---|---|
| 7. | Walter Land Company | Louisiana non-mining property interests |
| 8. | Select JWR Assets | Mine No. 3, North River, Kellerman Prep Plant |
| 9. | Walter Coke Assets | Walter Coke, Inc. |

Case 15-02741-TOM7    Doc 993    Filed 11/05/15    Entered 11/05/15 14:35:05    Desc Main
Document      Page 85 of 233

**EXHIBIT B**
**FORM OF CONFIDENTIALITY AGREEMENT**

[**Name of Potential Bidder**] ("[_____]")
[**Address**]
Attention: [_____]

Ladies & Gentlemen:

      In connection with [_____]'s (the "Recipient") consideration of a possible sale transaction (a "Transaction") involving Walter Energy, Inc. and its wholly owned domestic subsidiaries, each a debtor and debtor-in-possession (collectively, the "Company"), the Company may, subject to the terms and conditions of this letter agreement (this "Agreement") and the Bidding Procedures Order (as defined below), make available to the Recipient certain Confidential Information (as defined below).  By countersigning in the space below, the Recipient agrees as follows:

      1.    Use of Confidential Information.

      (a)    The Recipient will keep the Confidential Information strictly confidential and use the Confidential Information solely for the purpose of evaluating and negotiating a Transaction and not for any other purpose, including in any way detrimental to the Company, except as permitted herein.  The Recipient will treat the Confidential Information in all material respects in the same way that it treats its own non-public proprietary information, but in any event using no less than a reasonable degree of care.  The Recipient may disclose the Confidential Information to its Representatives (as defined below) whom the Recipient reasonably determines need to know the information for the purpose of evaluating a Transaction; *provided*, that the Recipient will (a) inform such Representatives receiving the Confidential Information of the confidential nature thereof and cause them to comply with the provisions of this Agreement as if they were a party to this Agreement and had undertaken the same obligations as are undertaken by the Recipient and (b) be responsible and indemnify the Company for any actions taken (or omissions) by the Recipient's Representatives that would constitute a breach of the terms of this Agreement applicable to the Recipient's Representatives as if such Representative had been a party to this Agreement.  Subject to the immediately following sentence, as used in this Agreement, "Representatives" means, with respect to any party hereto, such party's affiliates and its and their respective directors, officers, employees, advisors (including attorneys, accountants, investment bankers, financial advisors and specialist consultants) and debt financing sources (which you will identify to us upon request) of such party and such party's affiliates.  Notwithstanding anything to the contrary contained herein, without the prior written consent of the Company, the Recipient agrees that neither the Recipient nor any of its Representatives will disclose any Confidential Information to any actual or potential equity financing sources, joint bidders or co-bidders.

      The Recipient agrees that neither it nor any of its Representatives will, without the prior written consent of the Company, directly or indirectly, (i) disclose to any other person, other than

its Representatives, (x) the fact that discussions or negotiations may take place, are taking place or have taken place concerning a Transaction or any of the terms or other facts relating thereto, including the status thereof, (y) the existence or the terms of this Agreement or (z) the fact that any party or its Representatives has received or produced any Confidential Information or (ii) make any public statement concerning the Transaction (items (i) and (ii), collectively, "Transaction Information") in each case, other than pursuant to the terms and requirements of the *Order (I) Establishing Bidding Procedures Relating to the Sale(s) of All, or Substantially All, of the Debtors' Assets; (II) Approving Bid Protections; (III) Establishing Procedures Relating to the Assumption and Assignment of Executory Contracts and Unexpired Leases; (IV) Approving Form and Manner of the Sale, Cure and Other Notices; (V) Scheduling a Hearing to Consider the Approval of the Sale(s); and (VI) Granting Certain Related Relief* (the "Bidding Procedures Order")[1]; *provided, however*, that any party may disclose Transaction Information to the extent (1) required by, and subject to, Section 4 of this Agreement, (2) pursuant to and in accordance with the Bidding Procedures Order, or (3) it has received written advice from its outside counsel that it is required to make such disclosure in order to avoid violating the federal securities laws and, in the case of clauses (1) or (3), the requirement to make such disclosure does not arise from any breach of this Agreement by such party or its Representatives or as a result of unilateral actions by such party or its Representatives; and, *provided, further,* that, in the case of clause (3), to the extent legally permissible, the Recipient will and will cause its Representatives to give the Company reasonable advance notice of, and a copy of, such intended disclosure, will limit such disclosure to that which is legally required, and will consider, in good faith, including any comments or modifications proposed by the other party concerning the nature and scope of such intended disclosure.

      2.      <u>Definition of Confidential Information</u>.  For purposes of this agreement, the term "Confidential Information" includes (a) all information, whether in oral, visual, written, electronic or other form, concerning the Company and/or its subsidiaries (whether prepared by the Company or its agents or other Representatives, irrespective of the form of communication and when such communication was made, and whether or not marked as confidential) that is or has been furnished to the Recipient by or on behalf of the Company and (b) all notes, memoranda, analyses, reports, forecasts, data, compilations, studies, interpretations, summaries or other documents that are prepared by the Recipient or any of its Representatives that contain, reflect or are based on, in whole or in part, any of the foregoing ("Derived Confidential Information"), *provided, however*, that the term "Confidential Information" does not include information that:

      (a)      is or becomes generally available to the public other than as a result of a breach of this agreement by the Recipient or its Representatives;

      (b)      was within the Recipient's or its Representatives' possession before it was furnished to the Recipient by or on behalf of the Company, if the source of the information was not bound by a confidentiality agreement with, or other contractual, legal or fiduciary obligation of confidentiality to, the Company or any other party with respect to that information;

---

[1]    Capitalized terms not defined herein shall have the meanings ascribed to them in the Bidding Procedures Order.

(c)     is or becomes available to the Recipient or its Representatives on a non-confidential basis from a source other than the Company, if, to the knowledge of the Recipient or its Representatives, the source of the information was not bound by a confidentiality agreement with, or other contractual, legal or fiduciary obligation of confidentiality to, the Company or any other party with respect to that information;

(d)     is independently developed by the Recipient or its Representatives without use of information disclosed by or on behalf of the Company or in breach of this Agreement; or

(e)     is expressly permitted in writing by the Company to be disclosed to third parties on a non-confidential basis.

3.      Termination of Discussions.  Other than as required in the Bidding Procedures Order, the Company will not be under any contractual or legal obligation of any kind whatsoever to furnish Transaction Information or Confidential Information to the Recipient and reserves the right, in its sole discretion, to terminate providing Transaction Information or Confidential Information at any time.  Following the Sale Hearing, if the Recipient is neither a Successful Bidder nor a Backup Bidder, upon the request of the Company, the Recipient will, and will cause its Representatives to, promptly deliver to the Company or destroy all Transaction Information and Confidential Information, including all Derived Confidential Information (and all copies thereof and extracts therefrom).  Compliance with the preceding sentence will be certified in writing to the Company by an authorized officer of the Recipient as promptly as practicable upon the delivery of the notice by the Company.  Notwithstanding the foregoing, the Recipient and its Representatives may retain copies of the Confidential Informational (in electronic or paper form) (i) contained in an automatic archived computer system backup  to the extent such copies are not readily available to end users and cannot readily be expunged from such computer system backup (i.e., if doing so would entail more than a de minimis level of effort) or (ii) to the extent that such retention is required to demonstrate compliance with applicable law, rule, regulation or professional standards, or to comply with the Recipient's bona fide document retention policy; *provided*, *however*, that any such information so retained shall be held in compliance with the terms of this Agreement for so long as such Confidential Information is retained and notwithstanding the termination of this Agreement.  Any and all duties and obligations existing under this Agreement shall remain in full force and effect, notwithstanding the delivery or destruction of the Transaction Information and Confidential Information required by this Section 3.

4.      Requested or Required Disclosure.  If the Recipient or any of its Representatives is requested or required by judicial, regulatory, governmental, administrative or other similar legal proceeding or process (by oral questions, interrogatories, requests for information or documents in a legal proceeding, subpoena, civil investigation, demand or other similar process) to disclose any of the Transaction Information or Confidential Information, the Recipient will and will cause its Representatives to provide the Company to the extent permitted by applicable law, rule or regulation with prompt written notice of the existence, terms and circumstances surrounding such request or requirement so that the Company may seek, at its sole expense, an appropriate protective order and/or, in its sole discretion, waive in writing compliance by the Recipient and/or its Representatives with the applicable provisions of this Agreement. If, and to the extent, in the

- 3 -

absence of a protective order or the receipt of a waiver from the Company after a request in writing therefor is made by the Recipient (such request to be made as soon as practicable to allow the Company a reasonable amount of time to respond thereto), the Recipient or any of its Representatives or their respective affiliates are legally required as advised by counsel in writing to disclose Transaction Information or Confidential Information to any judicial, governmental, regulatory, administrative or other similar entity, the Recipient or any of its Representatives or their respective affiliates will limit such disclosure to that which is legally required and, to the extent available, will use commercially reasonable efforts to obtain confidential treatment of such disclosure, and thereafter may disclose such information without liability hereunder. In no event will the Recipient or any of its Representatives oppose action by the Company to obtain a protective order or other relief to prevent the disclosure of the Transaction Information or Confidential Information or to obtain reliable assurance that confidential treatment will be afforded the Transaction Information or Confidential Information and, if the Company seeks such an order or other relief, the Recipient agrees to, and shall cause its Representatives to, cooperate as the Company shall reasonably request at the Company's sole expense. Notwithstanding the restrictions imposed by this paragraph, the Recipient and its Representatives shall be permitted to disclose any Transaction Information or Confidential Information without notice pursuant to an ordinary course audit examination by, or a blanket document request from, a regulator, auditor, bank examiner, self-regulatory organization or similar person that does not specifically identify the Company by name.

5. <u>Securities Laws</u>. The Recipient hereby (a) acknowledges that it is aware (and that its agents or other Representatives who are apprised of the matters contemplated hereby have been or will be advised) that federal and state laws prohibit persons with material non-public information about a company obtained directly or indirectly from that company from purchasing or selling debt or equity securities (including derivative securities) of such company, or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person may purchase or sell such securities, and (b) agrees not to purchase or offer to purchase any securities of the Company while in the possession of any such information.

6. <u>Certain Additional Covenants</u>.

(a) *Standstill*. As of the date of this Agreement, except as previously disclosed to the Company in writing, the Recipient represents that neither it nor any of its affiliates directly or beneficially owns, (i) any of the Company's or its subsidiaries' debt (including any interest in any term loans or revolving credit loans to the Company) or equity securities, (ii) any direct or indirect options, contract or other rights (including, any puts, calls, swaps or other derivative securities) to acquire or dispose of any such securities or otherwise related to the trading price or market value of such securities, or (iii) any economic or voting interests associated with any such securities ((i)-(iii) collectively, the "<u>Company Securities</u>"). Without limiting the generality or effect of any other provision hereof, the Recipient agrees that for a period ending 12 months after the date of this Agreement (such period, the "<u>Assessment Period</u>"), except within the terms of a specific written request from the Company or pursuant to a Transaction Agreement (as hereinafter defined), neither the Recipient nor any of its affiliates nor any of their respective Representatives acting on behalf of the Recipient or such affiliates, will, directly or indirectly (except in the context of negotiations with the Company pursuant to the Bidding Procedures Order):

- 4 -

(i)        propose or publicly announce or otherwise disclose an intent to propose, or enter into or agree to enter into, singly or with any other person:

        (A)        any form of business combination, acquisition or other transaction relating to the Company or any of its affiliates; or

        (B)        any form of restructuring, recapitalization or similar transaction with respect to the Company or any of its affiliates;

(ii)        acquire, or offer, propose or agree to acquire, by purchase or otherwise, record or beneficial ownership or other economic ownership of any Company Securities;

(iii)       make, or in any way participate in, any solicitation of proxies with respect to any Company Securities (including by the execution of action by written consent), become a participant in any election contest with respect to the Company, seek to influence any person with respect to any Company Securities or demand a copy of the Company's list of stockholders or other books and records;

(iv)       act in concert, participate in or encourage the formation of any partnership, syndicate or other group that owns or seeks or offers to acquire beneficial ownership of any Company Securities or that seeks to affect control of the Company or has the purpose of circumventing any provision of this Agreement;

(v)        otherwise act, alone or in concert with others (including by providing financing for another person), to seek or to offer to control or influence, in any manner, the Company's management, board of directors, governing instruments or policies or affairs;

(vi)       request any waiver or amendment to any provision of this Agreement; or

(vii)      make any proposal or other communication designed to, or reasonably likely to, compel the Company to make a public announcement thereof in respect of any matter referred to in this Agreement.

(b)     *No Solicitation; No Hire*.  For a period of 12 months from the date of this Agreement, neither the Recipient nor any of its affiliates nor any of their respective Representatives acting on behalf of the Recipient or such affiliates, will, directly or indirectly, hire as an employee or engage as a consultant, or solicit to hire as an employee or to engage as a consultant any employee of the Company or any of its affiliates who first became known to the Recipient in connection with the Recipient's consideration of a Transaction, except that the foregoing will not preclude the Recipient or its affiliates or their respective Representatives from engaging in general public advertisement that is not directed at any of such officers or employees.

(c)     *Broker; Co-Bidders; Financing Lock-Ups*.  The Recipient hereby represents and warrants that it is not acting and will not act as a broker for or representative of any other person in connection with a Transaction or any other transaction with the Company or its affiliates and is considering a Transaction only for its own account and for the account of its affiliates.  Unless disclosed and with the prior written consent of the Company, the Recipient will not act as a joint-

- 5 -

bidder or co-bidder with any other person with respect to a Transaction or any other transaction with the Company or its affiliates and will not enter into any discussions, negotiations, agreements or understandings, whether written or oral, with any other person (other than any of its Representatives in such capacity) regarding a Transaction or any other transaction with the Company or its affiliates other than the Company and its Representatives and the Recipient's Representatives as permitted hereunder. The Recipient agrees not to, directly or indirectly, enter into any agreement, arrangement or any other understanding, whether written or oral, with any potential financing source or sources that may reasonably be expected to limit, restrict, restrain or otherwise impair, in any manner, directly or indirectly, the ability of such financing source or sources to provide financing or other assistance to any other party in any other possible transaction involving the Company or its affiliates.

7. <u>Coordination of Contacts</u>. The Recipient will not, and will cause its Representatives not to, initiate or maintain contact with any officer, director, employee, security holder, customer, supplier, distributor or other business relationship of the Company or its subsidiaries regarding the business, operations or prospects of the Company, except with the express written consent of a duly authorized officer of the Company (collectively, "<u>Company Authorized Persons</u>"); *provided, however*, that the foregoing shall not restrict the Recipient or its Representatives from contacting any of the aforementioned persons or entities in the ordinary course of business so long as such contact does not relate to a Transaction. Except upon the prior written consent of the Company, all (a) communications regarding a Transaction, participation in a Transaction or the Company's and its subsidiaries' business, operations, prospects or finances, (b) requests for additional information, facility or mine tours or management meetings, and (c) discussions or questions regarding procedures in connection with a Transaction will be submitted or directed to one of the Company Authorized Persons

8. <u>No Warranty or Accuracy; Transaction Agreement</u>. The Recipient understands and agrees that neither the Company nor its affiliates or Representatives (a) makes any representations or warranties, express or implied, with respect to any of the Transaction Information or Confidential Information or (b) will assume any responsibility or have any liability, including in contract, tort or under federal or state securities laws, to the Recipient or its Representatives resulting from the selection or use of the Transaction Information or Confidential Information by the Recipient or its Representatives. The Recipient further agrees that it is not entitled to rely on the accuracy or completeness of the Transaction Information or Confidential Information and that the Recipient will be entitled to rely solely on such representations and warranties as may be included in any Transaction Agreement (as defined below), if any, subject to such limitations and restrictions as may be contained therein. The Recipient and the Company agree that no contract or agreement providing for a Transaction will be deemed to exist between the Recipient and the Company unless and until the Recipient and the Company execute and deliver a final definitive agreement relating thereto (a "<u>Transaction Agreement</u>"), if any, and the Recipient and the Company hereby waive, in advance, any claims (including breach of contract) in connection with a Transaction unless and until the Recipient and the Company execute and deliver a Transaction Agreement. The Recipient further acknowledges and agrees that the Company reserves the right, in its sole discretion, to reject any and all proposals made by the Recipient or its Representatives with regard to a Transaction and to terminate discussions and negotiations with the Recipient at any time and for any reason (or no reason). The Recipient further understands that the Company will be free to establish and change any process or procedure with respect to a Transaction as the

Company in its sole discretion determines (including negotiating with any other interested party and entering into a final definitive agreement relating to a Transaction with any other party without prior notice to the Recipient or any other person).

9. <u>Equitable Relief</u>. It is further understood and agreed that money damage would not be a sufficient remedy for any breach of this Agreement, that the Transaction Information and Confidential Information is valuable and unique and that any disclosure thereof in breach of this Agreement will result in irreparable injury to the Company and that the Company will be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach, and the Recipient further agrees to waive any requirement for the security or posting of any bond in connection with such remedy. Such remedy will not be the exclusive remedy for breach of this Agreement but will be in addition to all other remedies available at law or equity to the Company. The Recipient agrees that it will not oppose the granting of such relief on the basis that the Company has an adequate remedy at law. In addition, the Recipient agrees that if it is held by any court of competent jurisdiction to be in violation, breach or nonperformance of any of the terms of this Agreement, then it will pay all costs of the Company of such action or suit, including reasonable attorneys' fees.

10. <u>Termination</u>. Except as otherwise set forth in Section 3, this Agreement will be effective as of the date of this Agreement and will terminate without further action one (1) year after the date of this Agreement. Such termination will not, however, affect the liability of any party for any prior breach of any provision hereof.

11. <u>Third Party Beneficiaries</u>. The Recipient agrees that, except for such parties or as contemplated by Section 15, nothing herein expressed or implied is intended to confer upon or give any rights or remedies to any other person under or by reason of this Agreement.

12. <u>Governing Law</u>. This Agreement will be governed by New York law, without giving effect to the principles of conflict of laws thereof. Each party hereto consents to personal jurisdiction in New York and Alabama and voluntarily submits to the jurisdiction of any State of New York court, Federal court sitting in the State of New York, and the Bankruptcy Court of the Northern District of Alabama, Southern Division, in any action or proceeding with respect to this Agreement and hereby waives unconditionally any objection to the laying of venue in such forum, including any claim of inconvenient forum, and neither party will bring any claim regarding this Agreement in any other court. **ANY RIGHTS TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM, ACTION OR PROCEEDING, DIRECTLY OR INDIRECTLY, ARISING OUT OF, OR RELATING TO, THIS AGREEMENT ARE EXPRESSLY AND IRREVOCABLY WAIVED BY THE RECIPIENT AND THE COMPANY.**

13. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which will be deemed to be an original copy of this Agreement, and all of which, when taken together, will be deemed to constitute one and the same agreement.

14. <u>Certain Definitions</u>. In addition to the terms defined elsewhere herein, for purposes of this Agreement, (a) the term "<u>affiliate</u>" has the meaning set forth in Rule 12b-2 promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934 and (b) the term "<u>person</u>" means any individual or legal entity, including any corporation, general or limited

- 7 -

partnership, limited liability company, trust or other entity or company. The term "<u>including</u>" and any variation thereof shall be deemed to be followed by the words "without limitation" except where the meaning clearly indicates otherwise.

15.  <u>Miscellaneous</u>.  This Agreement may be modified or waived only by a separate writing duly executed by both parties hereto expressly so modifying or waiving this Agreement. This Agreement contains the entire agreement between the Company and the Recipient concerning the subject matter hereof and supersedes all previous agreements, written or oral, to the extent relating to the exchange, disclosure or treatment of Transaction Information and Confidential Information contemplated hereby or any consideration, investigations, discussions or negotiations of a Transaction.  No failure or delay by any party or any of its respective Representatives in exercising any right, power or privilege under this Agreement will operate as a waiver thereof, nor will any single or partial exercise thereof preclude any other or further exercise of any right, power or privilege under this Agreement.  If any provision of this Agreement is deemed to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions of this Agreement will not in any way be affected or impaired thereby.  No party hereto may assign its rights or obligations under this Agreement to any person without the prior written consent of the other parties hereto, except that the Company may assign this Agreement to any affiliate or successor or acquirer (including assets) thereof without the Recipient's prior written consent.  This Agreement will be binding upon each party hereto and its respective successors and permitted assigns and will inure to the benefit of, and be enforceable by, each other party hereto and its respective successors and assigns.  The Company has retained PJT Partners LP, AlixPartners, LLP, Kekst and Company, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Bradley Arant Boult Cummings LLP and KPMG as its financial, communications, legal and accounting advisors, respectively, in connection with the possible Transaction.  By executing this Agreement, the Recipient irrevocably consents to, and waives all objections to any conflict of interest on the part of PJT Partners LP, AlixPartners, LLP, Kekst and Company, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Bradley Arant Boult Cummings LLP and KPMG that may result from, such representation.

16.  <u>Privilege</u>. To the extent that any Confidential Information may include materials subject to the attorney-client privilege, work product doctrine or any other applicable privilege concerning pending or threatened legal proceedings or governmental investigations, the parties hereto understand and agree that they have a commonality of interest with respect to such matters and it is their desire, intention and mutual understanding that the sharing of such material is not intended to, and shall not, waive or diminish in any way the confidentiality of such material or its continued protection under the attorney-client privilege, work product doctrine or other applicable privilege.  All Confidential Information that is entitled to protection under the attorney-client privilege, work product doctrine or other applicable privilege shall remain entitled to such protection under these privileges, this Agreement, and under the joint defense doctrine.

[<em>Remainder of page intentionally left blank</em>]

Case 15-02741-TOM7    Doc 993    Filed 11/05/15    Entered 11/05/15 14:35:05    Desc Main
Document     Page 94 of 233

If you are in agreement with the foregoing, please sign and return one copy of this Agreement, which thereupon will constitute our agreement with respect to its subject matter.

Very truly yours,

WALTER ENERGY, INC.


By: _____
    Name:
    Title:


ACCEPTED AND AGREED
AS OF THE DATE BELOW:

RECIPIENT:  [_____]


By: _____
    Name:
    Title:


Dated: _____, 2015

[Signature Page to Confidentiality Agreement]

## EXHIBIT B

## SALE NOTICE

# THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

```
------------------------------------------------------- x
In re:                                                  :  Chapter 11
                                                        :
WALTER ENERGY, INC., et al.,                            :  Case No. 15-02741-TOM11
                                                        :
                   Debtors.¹                            :  Jointly Administered
                                                        :
------------------------------------------------------- x
```

## NOTICE OF BIDDING PROCEDURES, AUCTION DATE, AND SALE HEARING

### PLEASE TAKE NOTICE THAT:

1.     On November 5, 2015 Walter Energy, Inc. (the "**Company**") and its affiliated debtors and debtors in possession in the above-captioned bankruptcy cases (collectively with the Company, the "**Debtors**" or "**Sellers**") filed their Motion (the "**Motion**") for (A) an Order (I) Establishing Bidding Procedures for the Sale(s) of All, or Substantially All, of the Debtors' Assets; (II) Approving Bid Protections; (III) Establishing Procedures Relating to the Assumption and Assignment of Executory Contracts and Unexpired Leases; (IV) Approving Form and Manner of the Sale, Cure and Other Notices; and (V) Scheduling an Auction and a Hearing to Consider the Approval of the Sale(s); (B) Order(s) (I) Approving the Sale(s) of the Debtors' Assets Free and Clear of Claims, Liens and Encumbrances; and (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (C) Certain Related Relief.² By the Motion, the Debtors seek, *inter alia*, to sell (the "**Sale(s)**") all or substantially all of their assets (the "**Subject Assets**") and to assume and assign certain executory contracts and unexpired leases (the "**Available Contracts**") to Coal Acquisition LLC (the "**Stalking Horse Purchaser**") pursuant to a stalking horse asset purchase agreement by and among the Sellers and the Stalking Horse Purchaser (the "**Stalking Horse Agreement**"), subject to higher or otherwise better offers, and/or one or more Successful Bidder(s) at the Auction, as applicable.

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Walter Energy, Inc. (9953); Atlantic Development and Capital, LLC (8121); Atlantic Leaseco, LLC (5308); Blue Creek Coal Sales, Inc. (6986); Blue Creek Energy, Inc. (0986); J.W. Walter, Inc. (0648); Jefferson Warrior Railroad Company, Inc. (3200); Jim Walter Homes, LLC (4589); Jim Walter Resources, Inc. (1186); Maple Coal Co., LLC (6791); Sloss-Sheffield Steel & Iron Company (4884); SP Machine, Inc. (9945); Taft Coal Sales & Associates, Inc. (8731); Tuscaloosa Resources, Inc. (4869); V Manufacturing Company (9790); Walter Black Warrior Basin LLC (5973); Walter Coke, Inc. (9791); Walter Energy Holdings, LLC (1596); Walter Exploration & Production LLC (5786); Walter Home Improvement, Inc. (1633); Walter Land Company (7709); Walter Minerals, Inc. (9714); and Walter Natural Gas, LLC (1198). The location of the Debtors' corporate headquarters is 3000 Riverchase Galleria, Suite 1700, Birmingham, Alabama 35244-2359.

[2]     Capitalized terms used herein but not otherwise defined in this notice (the "**Notice**") shall have the meanings ascribed to them in the Motion.

2

Case 15-02741-TOM7    Doc 993    Filed 11/05/15    Entered 11/05/15 14:35:05    Desc Main
Document      Page 97 of 233

2.      On November ___, 2015, pursuant to the Motion, the Court entered an Order (the "**Bidding Procedures Order**") approving auction and bidding procedures (the "**Bidding Procedures**") in connection with the proposed Sale(s).  A copy of the Motion, the Bidding Procedures Order and the Bidding Procedures can be obtained free of charge on http://www.kccllc.net/walterenergy.

3.      The Auction shall take place on **January 7, 2016 at 10:00 a.m. (prevailing Eastern Time)** at the offices of Paul, Weiss, Rifkind, Wharton & Garrison, LLP, 1285 Avenue of the Americas, New York, New York, 10019, or such other place and time as the Debtors shall notify all Qualified Bidders, the Consultation Parties and each of their respective counsel and advisors.

4.      A hearing to approve the Sale(s) (the "**Sale Hearing**"), including the assumption and assignment of certain Available Contracts, will be held on **January 12, 2016 at 10:00 a.m. (prevailing Central Time)**, at the United States Bankruptcy Court for the Northern District of Alabama, Southern Division, 1800 Fifth Avenue North Birmingham, Alabama 35203, before the Honorable Tamara O. Mitchell.  The Sale Hearing may be adjourned by the Debtors, in consultation with the Consultation Parties, from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing, or by filing a notice on the docket of the Debtors' Chapter 11 Cases.

5.      Pursuant to the Bidding Procedures Order, any objections to the Sale(s) ("**Sale Objections**") must be set forth in writing and must state with particularity the grounds for such objections or other statements of position.  Sale Objections must be filed with the Clerk and served on (a) counsel to the Debtors, Paul, Weiss, Rifkind, Wharton & Garrison, LLP, 1285 Avenue of the Americas, New York, New York, 10019, Attention: Kelley A. Cornish (kcornish@paulweiss.com) and Stephen J. Shimshak (sshimshak@paulweiss.com), and Bradley Arant Boult Cummings LLP, One Federal Place, 1819 Fifth Avenue North, Birmingham, Alabama 35203, Attention: Patrick J. Darby (pdarby@babc.com); (b) counsel to the Steering Committee, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, Attention: Ira Dizengoff (idizengoff@akingump.com) and Akin Gump Strauss Hauer & Feld LLP, 1333 New Hampshire Avenue, NW, Washington, DC 20036, Attention: James Savin (jsavin@akingump.com); (c) counsel to the UCC, Morrison & Foerster LLP, 250 West 55th Street, New York, New York 10019, Attention: Brett H. Miller (brettmiller@mofo.com), Lorenzo Marinuzzi (lmarinuzzi@mofo.com), and Jennifer L. Marines (jmarines@mofo.com); (d) counsel to the Section 1114 Committee, Jenner & Block LLP, 353 North Clark Street, Chicago, IL 60654, Attention: Catherine Steege (csteege@jenner.com) and Melissa Root (mroot@jenner.com); and (e) the Bankruptcy Administrator, 1800 5th Avenue North, Birmingham, Alabama 35203, Attention: Tom Corbett (Thomas_Corbett@alnba.uscourts.gov) (collectively, the "**Notice Parties**") by **4:00 p.m. (prevailing Central Time) on December 17, 2015**; provided that objections to the conduct of the Auction or selection of the Successful Bid(s) or Back-Up Bid(s) shall be in writing, filed with the Clerk, together with proof of service, and served so as to be received by the Notice Parties on or before **12:00 p.m. (prevailing Central Time) one (1) day prior to the Sale Hearing**.  UNLESS AN OBJECTION IS TIMELY FILED AND SERVED IN ACCORDANCE WITH THIS NOTICE, IT MAY NOT BE CONSIDERED

BY THE COURT AND THE COURT MAY GRANT THE RELIEF REQUESTED WITHOUT FURTHER HEARING AND NOTICE.

6.      This Notice is subject to the fuller terms and conditions of the Motion and the Bidding Procedures Order, which shall control in the event of any conflict, and the Debtors encourage parties-in-interest to review such documents in their entirety.

Dated: _____, 2015          BRADLEY ARANT BOULT CUMMINGS LLP
        Birmingham, Alabama


                                        By: _____
                                        Patrick Darby
                                        Jay Bender
                                        Cathleen Moore
                                        James Bailey
                                        One Federal Place
                                        1819 Fifth Avenue North
                                        Birmingham, Alabama  35203
                                        Telephone:  (205) 521-8000
                                        Email: pdarby@babc.com, jbender@babc.com,
                                            ccmoore@babc.com, jbailey@babc.com

                                        - and -

                                        PAUL, WEISS, RIFKIND, WHARTON &
                                        GARRISON LLP
                                        Stephen J. Shimshak (*pro hac vice*)
                                        Kelley A. Cornish (*pro hac vice*)
                                        Claudia R. Tobler (*pro hac vice*)
                                        Ann K. Young (*pro hac vice*)
                                        Michael S. Rudnick (*pro hac vice*)
                                        1285 Avenue of the Americas
                                        New York, New York  10019
                                        Telephone:  (212) 373-3000
                                        Email: sshimshak@paulweiss.com, kcornish@paulweiss.com,
                                            ctobler@paulweiss.com, ayoung@paulweiss.com,
                                            mrudnick@paulweiss.com

                                        *Counsel to the Debtors and*
                                        *Debtors-in-Possession*

4

**EXHIBIT C TO BIDDING PROCEDURES ORDER**

**<u>EXHIBIT C</u>**

**<u>CURE NOTICE</u>**

**THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

```
------------------------------------------------------------ x
In re:                                        :  Chapter 11
                                              :
WALTER ENERGY, INC., et al.,                  :  Case No. 15-02741-TOM11
                                              :
                    Debtors.¹                 :  Jointly Administered
                                              :
------------------------------------------------------------ x
```

**NOTICE OF POTENTIAL ASSUMPTION AND ASSIGNMENT OF**
**CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES**
**AND PROPOSED CURE AMOUNTS**

      **PLEASE BE ADVISED** that on November 5, 2015 Walter Energy, Inc. (the "**Company**") and its affiliated debtors and debtors in possession in the above-captioned bankruptcy cases (collectively with the Company, the "**Debtors**" or "**Sellers**") filed their Motion (the "**Motion**") for (A) an Order (I) Establishing Bidding Procedures for the Sale(s) of All, or Substantially All, of the Debtors' Assets; (II) Approving Bid Protections; (III) Establishing Procedures Relating to the Assumption and Assignment of Executory Contracts and Unexpired Leases; (IV) Approving Form and Manner of the Sale, Cure and Other Notices; and (V) Scheduling an Auction and a Hearing to Consider the Approval of the Sale(s); (B) Order(s) (I) Approving the Sale(s) of the Debtors' Assets Free and Clear of Claims, Liens and Encumbrances; and (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (C) Certain Related Relief.² By the Motion, the Debtors seek, *inter alia*, to sell (the "**Sale(s)**") all or substantially all of their assets (the "**Subject Assets**") and to assume and assign certain executory contracts and unexpired leases (the "**Available Contracts**") to Coal Acquisition LLC (the "**Stalking Horse Purchaser**") pursuant to a stalking horse asset purchase agreement by and among the Sellers and the Stalking Horse Purchaser (the "**Stalking Horse Agreement**"), subject to higher or otherwise better offers, and/or one or more Successful Bidder(s) at the Auction, as applicable.

---

¹   The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Walter Energy, Inc. (9953); Atlantic Development and Capital, LLC (8121); Atlantic Leaseco, LLC (5308); Blue Creek Coal Sales, Inc. (6986); Blue Creek Energy, Inc. (0986); J.W. Walter, Inc. (0648); Jefferson Warrior Railroad Company, Inc. (3200); Jim Walter Homes, LLC (4589); Jim Walter Resources, Inc. (1186); Maple Coal Co., LLC (6791); Sloss-Sheffield Steel & Iron Company (4884); SP Machine, Inc. (9945); Taft Coal Sales & Associates, Inc. (8731); Tuscaloosa Resources, Inc. (4869); V Manufacturing Company (9790); Walter Black Warrior Basin LLC (5973); Walter Coke, Inc. (9791); Walter Energy Holdings, LLC (1596); Walter Exploration & Production LLC (5823); Walter Home Improvement, Inc. (1633); Walter Land Company (7709); Walter Minerals, Inc. (9714); and Walter Natural Gas, LLC (1198). The location of the Debtors' corporate headquarters is 3000 Riverchase Galleria, Suite 1700, Birmingham, Alabama 35244-2359.

²   Capitalized terms used herein but not otherwise defined in this notice (the "**Notice**") shall have the meanings ascribed to them in the Motion.

2

**PLEASE BE FURTHER ADVISED** that, on November ___, 2015, pursuant to the Motion, the Court entered an Order (the "**Bidding Procedures Order**") approving auction and bidding procedures (the "**Bidding Procedures**") in connection with the proposed Sale(s). A copy of the Motion, the Bidding Procedures Order and the Bidding Procedures can be obtained free of charge on http://www.kccllc.net/walterenergy.

**PLEASE BE FURTHER ADVISED** that a hearing to approve the Sale(s) (the "**Sale Hearing**"), including the assumption and assignment of certain Available Contracts, will be held on **January 12, 2016 at 10:00 a.m. (prevailing Central Time)**, at the United States Bankruptcy Court for the Northern District of Alabama, Southern Division, 1800 Fifth Avenue North Birmingham, Alabama 35203, before the Honorable Tamara O. Mitchell. The Sale Hearing may be adjourned by the Debtors, in consultation with the Consultation Parties, from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing, or by filing a notice on the docket of the Debtors' Chapter 11 Cases.

**PLEASE BE FURTHER ADVISED** that pursuant to the Motion, the Debtors may assume and assign the Available Contract(s) identified on Exhibit A (the "**Subject Contract(s)**") to the Successful Bidder(s) at the Auction.[3] The cure amount (the "**Cure Amount**"), if any, the Debtors believe is required to satisfy all amounts and obligations due and owing under each Subject Contract by the Debtors, including any monetary defaults and compensation for pecuniary losses, is listed on Exhibit A (the "**Cure Schedule**").

**PLEASE BE FURTHER ADVISED** that the deadline to file an objection to the assumption and assignment of the Subject Contract(s) and the Cure Amount(s) for such Subject Contract(s) (together, "**Cure Objections**") is **December 17, 2015 at 4:00 p.m. (prevailing Central Time)** (the "**Cure Objection Deadline**"). Cure Objections, if any, must be filed with the Court and served upon (a) counsel to the Debtors, Paul, Weiss, Rifkind, Wharton & Garrison, LLP, 1285 Avenue of the Americas, New York, New York, 10019, Attention: Kelley A. Cornish (kcornish@paulweiss.com) and Stephen J. Shimshak (sshimshak@paulweiss.com), and Bradley Arant Boult Cummings LLP, One Federal Place, 1819 Fifth Avenue North, Birmingham, Alabama 35203, Attention: Patrick J. Darby (pdarby@babc.com ); (b) counsel to the Steering Committee, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, Attention: Ira Dizengoff (idizengoff@akingump.com) and Akin Gump Strauss Hauer & Feld LLP, 1333 New Hampshire Avenue, NW, Washington, DC 20036, Attention: James Savin (jsavin@akingump.com); (c) counsel to the UCC, Morrison & Foerster LLP, 250 West 55th Street, New York, New York 10019, Attention: Brett H. Miller (brettmiller@mofo.com), Lorenzo Marinuzzi (lmarinuzzi@mofo.com), and Jennifer L. Marines (jmarines@mofo.com); (d) counsel to the Section 1114 Committee, Jenner & Block LLP, 353 North Clark Street, Chicago, IL 60654, Attention: Catherine Steege (csteege@jenner.com) and Melissa Root (mroot@jenner.com); and (e) the Bankruptcy Administrator, 1800 5th Avenue North,

---

[3]  The Debtors may modify the list of Available Contracts that will be assumed and assigned in connection with the Sale(s). In addition, the inclusion of any contract or agreement on Exhibit A shall not constitute an admission by the Debtors that any such Subject Contract is an executory contract or unexpired lease within the meaning of Bankruptcy Code section 365 and the Debtors reserve all rights with respect thereto.

Case 15-02741-TOM7    Doc 993    Filed 11/05/15    Entered 11/05/15 14:35:05    Desc Main
Document      Page 102 of 233

Birmingham, Alabama 35203, Attention: Tom Corbett (Thomas_Corbett@alnba.uscourts.gov) (collectively, the "**Notice Parties**").

       **PLEASE BE FURTHER ADVISED** that the Cure Objection must state (i) the basis for the objection and (ii) with specificity, what Cure Amount(s) the party to the Available Contract(s) believes is required (in all cases with appropriate documentation in support thereof).

       **PLEASE BE FURTHER ADVISED** that any objection solely to the Cure Amount(s) may not prevent or delay the Debtors' assumption and assignment of the Subject Contract(s). If a non-Debtor counterparty (a "**Non-Debtor Counterparty**") objects solely to Cure Amount(s), the Debtors may, with the consent of the Successful Bidder(s), hold the claimed Cure Amount(s) in reserve pending further order of the Court or mutual agreement of the parties. So long as Cure Amount(s) are held in reserve, and there are no other unresolved objections to assumption and assignment of the applicable Subject Contract(s), the Debtors can, without further delay, assume and assign such Subject Contract(s) to the applicable Successful Bidder(s). Under such circumstances, the objecting Non-Debtor Counterparty's recourse is limited to the funds held in reserve.

       **PLEASE BE FURTHER ADVISED** that any objections to the adequate assurance of future performance by the Stalking Horse Purchaser and/or another Successful Bidder(s) under the applicable Subject Contract(s) must be filed with the Court and served on the Notice Parties and the applicable Successful Bidder(s) so that such objection is received on or before **12:00 p.m. (prevailing Central Time)** the day before the Sale Hearing (the "**Adequate Assurance Objection Deadline**").

       **PLEASE BE FURTHER ADVISED** that unless a Cure Objection or an objection to adequate assurance of future performance, as applicable, is filed and served by a Non-Debtor Counterparty to any Subject Contract by the Cure Objection Deadline or the Adequate Assurance Objection Deadline, as applicable, such Non-Debtor Counterparty shall be (i) deemed to have waived and released any right to assert a Cure Objection and to have otherwise consented to the assignment of such Subject Contract, (ii) forever barred from objecting to the assumption and assignment of such Subject Contract or the failure of the Successful Bidder(s) to provide adequate assurance of future performance and (iii) forever barred and estopped from asserting or claiming any Cure Amount, other than the Cure Amount listed on the Cure Schedule.

       **PLEASE BE FURTHER ADVISED** that the hearings with respect to Cure Objection(s) or objection(s) to the adequate assurance of future performance may be held (a) at the Sale Hearing, or (b) at such other date as the Court may designate.

       **PLEASE BE FURTHER ADVISED** that all requests for information concerning the Sale(s) should be in writing and directed to counsel to the Debtors at the address referenced below.

Dated: _____, 2015          BRADLEY ARANT BOULT CUMMINGS LLP
          Birmingham, Alabama


                                     By:  /s/ Patrick Darby
                                     Patrick Darby
                                     Jay Bender
                                     Cathleen Moore
                                     James Bailey
                                     One Federal Place
                                     1819 Fifth Avenue North
                                     Birmingham, Alabama  35203
                                     Telephone:  (205) 521-8000
                                     Email: pdarby@babc.com, jbender@babc.com,
                                         ccmoore@babc.com, jbailey@babc.com

                                     - and -

                                     PAUL, WEISS, RIFKIND, WHARTON &
                                     GARRISON LLP
                                     Stephen J. Shimshak (*pro hac vice*)
                                     Kelley A. Cornish (*pro hac vice*)
                                     Claudia R. Tobler (*pro hac vice*)
                                     Ann K. Young (*pro hac vice*)
                                     Michael S. Rudnick (*pro hac vice*)
                                     1285 Avenue of the Americas
                                     New York, New York  10019
                                     Telephone:  (212) 373-3000
                                     Email: sshimshak@paulweiss.com, kcornish@paulweiss.com,
                                         ctobler@paulweiss.com, ayoung@paulweiss.com,
                                         mrudnick@paulweiss.com

                                     *Counsel to the Debtors and*
                                     *Debtors-in-Possession*

5

**Exhibit A**

**Cure Schedule**

| **Name of Subject Contract** | **Name of Non-Debtor Counterparty** | **Cure Amount** |
|---|---|---|
| | | |
| | | |
| | | |

# **EXHIBIT B**

# **STALKING HORSE AGREEMENT**

ASSET PURCHASE AGREEMENT

DATED AS OF NOVEMBER 5, 2015

BY AND AMONG

COAL ACQUISITION LLC, AS BUYER

AND

WALTER ENERGY, INC.,

AND

CERTAIN SUBSIDIARIES OF WALTER ENERGY, INC., AS SELLERS

TABLE OF CONTENTS

# ARTICLE 1

## DEFINITIONS

| | | |
|---|---|---|
| 1.1 | Definitions | 2 |
| 1.2 | Other Definitions and Interpretive Matters | 21 |

# ARTICLE 2

## PURCHASE AND SALE

| | | |
|---|---|---|
| 2.1 | Purchase and Sale | 23 |
| 2.2 | Excluded Assets | 26 |
| 2.3 | Assumed Liabilities | 28 |
| 2.4 | Excluded Liabilities | 30 |
| 2.5 | Assignment and Assumption of Contracts | 31 |
| 2.6 | Further Assurances | 34 |

# ARTICLE 3

## PURCHASE PRICE

| | | |
|---|---|---|
| 3.1 | Consideration | 35 |
| 3.2 | Allocation of Purchase Price | 36 |
| 3.3 | Limitation on Buyer Liability | 37 |
| 3.4 | Withholding | 37 |

# ARTICLE 4

## CLOSING AND DELIVERIES

| | | |
|---|---|---|
| 4.1 | Closing Date | 37 |
| 4.2 | Buyer's Deliveries | 38 |
| 4.3 | Sellers' Deliveries | 39 |
| 4.4 | Buyer Designees | 40 |

# ARTICLE 5

## REPRESENTATIONS AND WARRANTIES OF SELLERS

| | | |
|---|---|---|
| 5.1 | Organization and Good Standing | 41 |
| 5.2 | Authority; Validity; Consents | 41 |
| 5.3 | No Conflict | 42 |
| 5.4 | Real Property | 42 |
| 5.5 | Environmental Matters | 43 |
| 5.6 | Title to Acquired Assets | 45 |

i

| 5.7 | Taxes | 45 |
| 5.8 | Legal Proceedings | 46 |
| 5.9 | Compliance with Legal Requirements; Permits | 46 |
| 5.10 | Labor Matters | 48 |
| 5.11 | Employee Benefits | 49 |
| 5.12 | Sellers' Intellectual Property | 52 |
| 5.13 | Contracts | 52 |
| 5.14 | Insurance | 52 |
| 5.15 | Brokers or Finders | 53 |
| 5.16 | Affiliate Interests | 53 |
| 5.17 | Bank Accounts | 53 |
| 5.18 | Undue Influence | 53 |
| 5.19 | Financial Statements | 54 |
| 5.20 | Absence of Certain Changes | 54 |
| 5.21 | Seller SEC Documents | 55 |
| 5.22 | Mining | 56 |
| 5.23 | MSHA; OSHA | 56 |
| 5.24 | Coal Act; Black Lung Act | 57 |
| 5.25 | Warranties Exclusive | 57 |

## ARTICLE 6

### REPRESENTATIONS AND WARRANTIES OF BUYER

| 6.1 | Organization and Good Standing | 58 |
| 6.2 | Authority; Validity; Consents | 58 |
| 6.3 | No Conflict | 58 |
| 6.4 | Brokers or Finders | 59 |
| 6.5 | Legal Proceedings | 59 |
| 6.6 | Financing | 59 |
| 6.7 | Qualification | 59 |
| 6.8 | No Other Representations or Warranties; Condition of the Business; Buyer's Reliance | 60 |
| 6.9 | Information | 60 |

## ARTICLE 7

### ACTIONS PRIOR TO THE CLOSING DATE

| 7.1 | Access and Reports; Confidentiality | 60 |
| 7.2 | Operations Prior to the Closing Date | 62 |
| 7.3 | Regulatory Matters; Cooperation | 64 |
| 7.4 | Tax Cooperation | 65 |
| 7.5 | Bankruptcy Court Matters | 66 |
| 7.6 | Expense Reimbursement | 67 |
| 7.7 | Update of Disclosure Schedules; Notice of Developments | 67 |
| 7.8 | Certain Excluded Assets | 67 |

Case 15-02741-TOM7    Doc 993    Filed 11/05/15    Entered 11/05/15 14:35:05    Desc Main
Document    Page 109 of 233

| | | |
|---|---|---|
| 7.9 | Surety Bonds; Permits | 70 |
| 7.10 | Overlapping Permits | 74 |
| 7.11 | Transition of Business | 75 |
| 7.12 | Sale Free and Clear | 75 |
| 7.13 | Acquisition Proposals | 76 |
| 7.14 | SEC Filings | 76 |
| 7.15 | Other Actions | 76 |

# ARTICLE 8

## ADDITIONAL AGREEMENTS

| | | |
|---|---|---|
| 8.1 | Taxes | 76 |
| 8.2 | Bulk Sales | 77 |
| 8.3 | Payments Received | 77 |
| 8.4 | Assumed Contracts: Adequate Assurance and Performance | 77 |
| 8.5 | Employee Matters | 78 |
| 8.6 | Post-Closing Books and Records; Properties; and Personnel | 80 |
| 8.7 | Casualty Loss | 80 |
| 8.8 | Change of Name | 81 |
| 8.9 | No Successor Liability | 81 |
| 8.10 | Liens | 82 |
| 8.11 | Other Agreements | 82 |
| 8.12 | Insurance | 82 |

# ARTICLE 9

## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

| | | |
|---|---|---|
| 9.1 | Accuracy of Representations | 83 |
| 9.2 | Sellers' Performance | 84 |
| 9.3 | No Order | 84 |
| 9.4 | Governmental Authorizations | 84 |
| 9.5 | Sellers' Deliveries | 84 |
| 9.6 | Sale Order | 84 |
| 9.7 | Assumed Contracts | 84 |
| 9.8 | Material Adverse Effect | 85 |
| 9.9 | UMWA; USW | 85 |

# ARTICLE 10

## CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLERS TO CLOSE

| | | |
|---|---|---|
| 10.1 | Accuracy of Representations | 85 |
| 10.2 | Buyer's Performance | 86 |
| 10.3 | No Order | 86 |
| 10.4 | Governmental Authorizations | 86 |

iii

| | | |
|---|---|---|
| 10.5 | Buyer's Deliveries | 86 |
| 10.6 | Sale Order | 86 |
| 10.7 | Release | 86 |

## ARTICLE 11

### TERMINATION

| | | |
|---|---|---|
| 11.1 | Termination Events | 87 |
| 11.2 | Effect of Termination | 89 |

## ARTICLE 12

### GENERAL PROVISIONS

| | | |
|---|---|---|
| 12.1 | Survival | 91 |
| 12.2 | Confidentiality | 91 |
| 12.3 | Public Announcements | 92 |
| 12.4 | Notices | 92 |
| 12.5 | Waiver | 93 |
| 12.6 | Entire Agreement; Amendment | 93 |
| 12.7 | Assignment | 94 |
| 12.8 | Severability | 94 |
| 12.9 | Expenses | 94 |
| 12.10 | Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver | 94 |
| 12.11 | Counterparts | 95 |
| 12.12 | Parties in Interest; Third Party Beneficiaries; No Amendment | 95 |
| 12.13 | Remedies | 95 |
| 12.14 | Specific Performance | 96 |
| 12.15 | Sellers' Representative; Reliance | 96 |
| 12.16 | No Liability; Releases | 97 |

iv

**SCHEDULES**

| | |
|---|---|
| Schedule 1.1(a) | Sellers' Knowledge Persons |
| Schedule 1.1(b) | Miscellaneous Real Property Assets |
| Schedule 2.1(b) | Equipment |
| Schedule 2.1(g) | Transferred Permits |
| Schedule 2.1(l) | Claims and Causes of Action |
| Schedule 2.1(m) | Acquired Actions |
| Schedule 2.1(r) | Equity Interests Acquired |
| Schedule 2.1(s) | Other Acquired Assets |
| Schedule 2.2(a) | Certain Excluded Assets |
| Schedule 2.2(d) | Excluded Capital Stock and Equity |
| Schedule 2.2(o) | Financial Assurances |
| Schedule 2.3(e) | Employee Liabilities |
| Schedule 2.3(m) | Assumed Reclamation Liabilities |
| Schedule 2.5(a) | Available Contracts |
| Schedule 5.2 | Required Consents |
| Schedule 5.3 | Conflicts |
| Schedule 5.4(a)(i) | Owned Real Property |
| Schedule 5.4(a)(ii) | Options and Rights of First Refusal |
| Schedule 5.4(b) | Lessor Leases |
| Schedule 5.4(c) | Leases (for Leased Real Property) |
| Schedule 5.5 | Environmental Matters |
| Schedule 5.5(i) | Assumed Liabilities - Environmental |
| Schedule 5.5(k) | Underground Storage Tanks and Related Matters |
| Schedule 5.7(a) | Taxes |
| Schedule 5.7(b) | Tax Deficiencies |
| Schedule 5.7(c) | Tax Incentive Defaults |
| Schedule 5.7(d) | Withholding Taxes |
| Schedule 5.7(e) | Tax Allocation or Sharing Agreements |
| Schedule 5.8 | Legal Proceedings |
| Schedule 5.9(a) | Permits |
| Schedule 5.9(b) | Compliance with Legal Requirements, Orders and Permits |
| Schedule 5.9(c) | Adverse Environmental Actions |
| Schedule 5.10(a) | Collective Bargaining Agreements and Other Contracts |
| Schedule 5.10(b) | Labor Matters |
| Schedule 5.10(c) | WARN Act and Other Proceedings |
| Schedule 5.11(a) | Title IV Plans |
| Schedule 5.11(d) | Termination of Title IV Plans |
| Schedule 5.11(i) | Welfare Plans |
| Schedule 5.11(j) | Payments Becoming Due |
| Schedule 5.12(a) | Patents, Trademarks and Copyrights |
| Schedule 5.12(b) | Claims Relating to Intellectual Property Rights |
| Schedule 5.13(i) | Material Contracts |
| Schedule 5.13(ii) | Effectiveness of Material Contracts |
| Schedule 5.13(iii) | Breaches and Defaults |
| Schedule 5.14 | Insurance |

Doc#: US1:10163646v46

Schedule 5.16        Affiliate Interests
Schedule 5.17        Bank Accounts
Schedule 5.20(b)     Certain Changes
Schedule 5.23        MSHA; OSHA
Schedule 6.2         Buyer Consents
Schedule 7.2         Operations Prior to Closing
Schedule 8.5(c)      Buyer Benefit Plans

**EXHIBITS**

Exhibit A            Bidding Procedures
Exhibit B            Form of Bidding Procedures Order

Doc#: US1:10163646v46

**ASSET PURCHASE AGREEMENT**

**THIS ASSET PURCHASE AGREEMENT** (this "<u>Agreement</u>"), dated as of November 5, 2015 (the "<u>Execution Date</u>"), is made and entered into by and among Coal Acquisition LLC, a limited liability company organized under the laws of the State of Delaware ("<u>Buyer</u>"), Walter Energy, Inc., a Delaware corporation (the "<u>Company</u>"), and the Additional Sellers (together with the Company, "<u>Sellers</u>" and each entity individually a "<u>Seller</u>"). Capitalized terms used herein and not otherwise defined herein have the meanings set forth in <u>Article 1</u>.

**RECITALS**

**WHEREAS**, Sellers are engaged in the business of producing metallurgical coal, thermal coal, anthracite, metallurgical coke and coal bed methane gas;

**WHEREAS**, on July 15, 2015, Sellers filed voluntary petitions (the "<u>Bankruptcy Case</u>") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Alabama (the "<u>Bankruptcy Court</u>");

**WHEREAS**, in accordance with the Bidding Procedures and subject to the terms and conditions set forth in this Agreement and the entry of the Sale Order, Sellers desire to sell to Buyer all of the Acquired Assets and to assign to Buyer all of the Assumed Liabilities, Buyer desires to purchase from Sellers all of the Acquired Assets and assume all of the Assumed Liabilities, and the Parties intend to effectuate the transactions contemplated by this Agreement, upon the terms and conditions hereinafter set forth;

**WHEREAS**, the Acquired Assets and Assumed Liabilities shall be purchased and assumed by Buyer pursuant to the Sale Order, free and clear of all Encumbrances (other than Permitted Encumbrances), pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure;

**WHEREAS**, Sellers' ability to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court; and

**WHEREAS**, the board of directors (or similar governing body) of each Seller has determined that it is advisable and in the best interests of such Seller and its constituencies to enter into this Agreement and to consummate the transactions provided for herein, subject to entry of the Sale Order, and each has approved the same.

**NOW, THEREFORE**, in consideration of the premises and the mutual promises herein made, and in consideration of the foregoing and of the representations, warranties, covenants, agreements and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

1

Case 15-02741-TOM7    Doc 993    Filed 11/05/15    Entered 11/05/15 14:35:05    Desc Main
Document    Page 114 of 233

# ARTICLE 1

## DEFINITIONS

1.1     Definitions.

For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"Accounting Referee" has the meaning set forth in Section 3.2(d).

"Accounts Receivable" means, with respect to each Seller, all accounts receivable, notes receivable, purchase orders, negotiable instruments, completed work or services that has not been billed, chattel paper, notes and other rights to payment, including those consisting of all accounts receivable in respect of services rendered or products sold to customers by such Seller, any other miscellaneous accounts receivable of such Seller, and any claim, remedy or other right of such Seller related to any of the foregoing, together with all unpaid financing charges accrued thereon and any payments with respect thereto.

"Accrued Payroll" means all wages and other related obligations that have accrued since the end of the last payroll period immediately prior to the Closing Date.

"Acquired Actions" has the meaning set forth in Section 2.1(m).

"Acquired Assets" has the meaning set forth in Section 2.1.

"Acquired Non-Core Assets" means Non-Core Assets (excluding the Walter Coke Assets and the Blue Creek Assets and excluding any real property, improvements, or other assets or types of assets designated by Buyer) that are not sold to a Successful Bidder (excluding Buyer) in accordance with the Bidding Procedures.

"Acquisition Proposal" has the meaning set forth in Section 7.13.

"Action" means any action, suit, petition, plea, charge, claim, demand, hearing, inquiry, arbitration, complaint, grievance, summons, litigation, mediation, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, inquest, audit, examination, investigation or similar matter by or before any Governmental Authority.

"Additional Sellers" means:

(i)     Atlantic Development and Capital, LLC, Atlantic Leaseco, LLC, Maple Coal Co., LLC, Walter Black Warrior Basin LLC, Walter Energy Holdings, LLC, Walter Exploration & Production LLC, Walter Natural Gas, LLC, each a Delaware limited liability company;

Doc#: US1:10163646v46

(ii)    Blue Creek Energy, Inc., J.W. Walter, Inc., SP Machine, Inc., V Manufacturing Company, Walter Coke, Inc., Walter Land Company, Walter Minerals, Inc., each a Delaware corporation;

(iii)   Blue Creek Coal Sales, Inc., Jefferson Warrior Railroad Company, Inc., Jim Walter Resources, Inc., Sloss-Sheffield Steel & Iron Company, Taft Coal Sales & Associates, Inc., Tuscaloosa Resources, Inc., each an Alabama corporation; and

(iv)    Jim Walter Homes, LLC and Walter Home Improvement, Inc., each a Florida corporation.

"Affiliate" has the meaning set forth in Rule 12b-2 of the regulations promulgated under the Exchange Act.

"Agreement" has the meaning set forth in the introductory paragraph.

"Alabama Contract Mining Agreement" has the meaning set forth in Section 7.9(a)(iv).

"Alabama Mining License" has the meaning set forth in Section 7.9(a)(ii)(1).

"Alabama Mining Permits" has the meaning set forth in Section 7.9(a)(iii)(1).

"Allocation Statement" has the meaning set forth in Section 3.2(b).

"Alternative Outside Date" has the meaning set forth in Section 11.1(b)(iii).

"Alternative Transaction" means (i) any investment in, financing of, capital contribution or loan to, or restructuring or recapitalization of all or a substantial portion of Sellers (including any exchange of all or a substantial portion of Sellers' outstanding debt obligations for equity securities of any Seller), (ii) any merger, consolidation, share exchange or other similar transaction to which any Seller is a party that has the effect of transferring, directly or indirectly, all or a substantial portion of the assets of, or any issuance, sale or transfer of equity interests in, Sellers, the Acquired Assets or the Business (iii) any direct or indirect sale of all or a substantial portion of the assets of, or any issuance, sale or transfer of equity interests in, Sellers, the Acquired Assets or the Business or (iv) any other transaction, including a plan of liquidation or reorganization, that transfers or vests ownership of, economic rights to, or benefits in all or a substantial portion of the assets of Sellers, the Acquired Assets or the Business to any party other than Buyer or one or more Buyer Designees, in each case excluding the transactions contemplated under this Agreement; provided, that, in no event shall a sale or liquidation of the Blue Creek Assets, the Walter Coke Assets, the Miscellaneous Real Property Assets or any other Non-Core Asset, in each case pursuant to the Bidding Procedures or a sale of any of the direct or indirect Bermuda, Canadian or United Kingdom Subsidiaries of Sellers (or any of the assets of such Subsidiaries) constitute an Alternative Transaction.

"Antitrust Law" means, collectively, the HSR Act, Title 15 of the United States Code §§ 1-7 (the Sherman Act), Title 15 of the United States Code §§ 12-27 and Title 29 of the

Doc#: US1:10163646v46

United States Code §§ 52-53 (the Clayton Act), the Federal Trade Commission Act (15 U.S.C.§ 41 et seq.), and the rules and regulations promulgated thereunder, and any other Legal Requirements that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition, as such of the foregoing are enacted and in effect as of the date hereof.

"Applicable Rate" means, for a particular day, the prime rate as reported in The Wall Street Journal published for such day or, if such rate is regularly reported in The Wall Street Journal, but is not reported on such day, such rate as most-recently reported in The Wall Street Journal (or, if such rate is no longer reported in The Wall Street Journal, a comparable rate), calculated on a daily basis based on a 365-day year.

"Applicant Violator System" has the meaning set forth in Section 5.9(c).

"Approved Budget" has the meaning set forth in the Cash Collateral Orders.

"Approved Retention Payments" means payments owing to Sellers' employees that have been approved by the Steering Committee in connection with a key employee retention program approved by the Bankruptcy Court.

"Assumed Benefits" has the meaning set forth in Section 2.3(e).

"Assumed Contracts" has the meaning set forth in Section 2.5(a)(i).

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Assumed SMCRA Permit" has the meaning set forth in Section 7.10(a).

"Assumption Agreement" means an Assignment and Assumption Agreement in customary form reasonably acceptable to the Parties.

"Audited Financial Statements" has the meaning set forth in Section 5.19.

"Available Contracts" has the meaning set forth in Section 2.5(a)(i).

"Avoidance Action" means any claim, right or cause of action of any Seller arising under chapter 5 of the Bankruptcy Code and any analogous state law claims relating to the Acquired Assets or the Business.

"Backup Bidder" has the meaning set forth in the Bidding Procedures.

"Bankruptcy Case" has the meaning set forth in the recitals.

"Bankruptcy Code" means Title 11 of the United States Code, Sections 101 et seq.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Benefit Plan" means any (i) "employee benefit plan" within the meaning of Section 3(3) of ERISA or (ii) other employee benefit plans, agreements, programs, policies,

arrangements or payroll practices, whether or not subject to ERISA (including any funding mechanism therefor now in effect or required in the future as a result of the transactions contemplated by this Agreement or otherwise), including any plan, program, arrangement or agreement that is a pension, profit-sharing, savings, retirement, employment, consulting, severance pay, termination, executive compensation, incentive compensation, deferred compensation, bonus, stock purchase, stock option, phantom stock or other equity-based compensation, change in control, retention, salary continuation, vacation, sick leave, disability, death benefit, group insurance, hospitalization, medical, dental, life (including all individual life insurance policies as to which any Seller(s) is the owner, the beneficiary, or both), Code Section 125 "cafeteria" or "flexible" benefit, employee loan, educational assistance or fringe benefit plan, program, arrangement or agreement, whether written or oral, in each case, that (x) is sponsored, maintained or contributed to by Sellers, or for which Sellers have any obligation to sponsor, maintain or contribute to, or for which Sellers have any direct or indirect liability, whether contingent or otherwise and (y) under which any current or former officer, director, employee, consultant (or their respective beneficiaries) of Sellers has any present or future right to benefits, except for any Multiemployer Plan.

"Bid Deadline" has the meaning set forth in Section 7.5(c).

"Bidding Procedures" means bid procedures in the form attached hereto as **Exhibit A** (with other changes approved by Buyer and Sellers), to be approved by the Bankruptcy Court pursuant to the Bidding Procedures Order.

"Bidding Procedures Order" means an Order of the Bankruptcy Court in the form attached hereto as **Exhibit B** (with other changes approved by Buyer and Sellers).

"Bill of Sale" means a bill of sale in customary form reasonably acceptable to the Parties.

"Black Lung Act" means the Federal Coal Mine Safety and Health Act of 1969, the Black Lung Benefits Act of 1972, the MSHA, the Black Lung Benefits Reform Act of 1977, and the Black Lung Benefits Amendments of 1981, in each case as amended.

"Black Lung Assumed Liabilities" means all Black Lung Liability of the Sellers whether now existing or hereafter arising and all Black Lung Liability of the Buyer arising after the Closing.

"Black Lung Liability" means any liability or benefit obligations related to black lung claims and benefits under the Black Lung Act, and liabilities and benefits related to pneumoconiosis, silicosis, exposure to isocyanates or other lung disease arising under any federal or state law.

"Blue Creek Assets" means the Acquired Assets owned by Blue Creek Energy, Inc.

"Blue Creek Bid Protections" has the meaning set forth in Section 7.8(b)(ii) hereof.

5

"Business" means the business and operations of Sellers (wherever such business and operations are situated or conducted) related to the Acquired Assets, including the business and operations related to (i) metallurgical coal, thermal coal, anthracite, hard coking coal, metallurgical coke and coal bed methane gas drilling, exploration and related operations and (ii) the selling, marketing, purchasing and blending of coal and gas and related operations, in each case of the foregoing clauses (i) and (ii), other than with respect to such business and operations to the extent they relate to any Excluded Assets or Excluded Liabilities.

"Business Day" means any day of the year on which national banking institutions in New York or Alabama are open to the public for conducting business and are not required or authorized to close.

"Buyer" has the meaning set forth in the introductory paragraph and shall also include any Buyer Designee.

"Buyer Benefit Plans" has the meaning set forth in Section 8.5(c).

"Buyer Designee" has the meaning set forth in Section 4.4.

"Buyer Employees" has the meaning set forth in Section 8.5(a).

"Buyer Group" means (1) any of Buyer and its directors, officers, control persons (as defined in Section 15 of the Securities Act or Section 20 of the Exchange Act), members, employees, agents, attorneys, financial advisors, consultants, legal representatives, shareholders, partners, estates, successors and assigns, (2) the First Lien Lenders, the First Lien Noteholders and members of the Steering Committee, in each case, in such capacity, (3) the Credit Agreement Agent and the Indenture Trustee and (4) any of the respective agents, attorneys, financial advisors, legal advisors, affiliates, directors, managers, officers, control persons, shareholders, members or employees of the foregoing (1) through (3), in each case, in such capacity.

"Buyer Released Claims" has the meaning set forth in Section 12.16(c).

"Buyer TS Election" has the meaning set forth in the definition of "Wind Down Trust Amount."

"Cash Collateral Orders" means, collectively, the (i) Interim Order (A) Authorizing Postpetition Use of Cash Collateral, (B) Granting Adequate Protection to Prepetition Secured Parties, (C) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b) and (D) Granting Related Relief Docket No. 59 and (ii) Amended Final Order (A) Authorizing Postpetition Use of Cash Collateral, (B) Granting Adequate Protection to Prepetition Secured Parties, and (C) Granting Related Relief Docket No. 797, as may be further extended or amended.

"Cash Consideration" has the meaning set forth in Section 3.1(a).

"Claim" means a "claim" as defined in Section 101(5) of the Bankruptcy Code, against any Seller.

"Closing" has the meaning set forth in Section 4.1.

"Closing Date" means the date and time as of which the Closing occurs as set forth in Section 4.1.

"Closing Required Permits" means all Governmental Authorizations (including Permits) that are necessary for the operation and conduct of the Business or the Acquired Assets as of the Closing Date, other than any Governmental Authorizations or Permits the absence of which would be immaterial to the operation of the Business as of and after the Closing.

"Coal Act" means the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. §§ 9701, et seq.

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985.

"Code" means the Internal Revenue Code of 1986.

"Collective Bargaining Agreement" has the meaning set forth in Section 5.10(a).

"Company" has the meaning set forth in the introductory paragraph.

"Confidential Information" has the meaning set forth in Section 12.2.

"Contract" means any legally binding agreement, contract, obligation, promise, undertaking, lease (including Leases and Lessor Leases), sublease, purchase order, arrangement, license, commitment, or other binding arrangement or understanding (in each case whether written or oral), and any amendments, modifications or supplements thereto.

"Copyrights" means all United States and foreign copyright rights in any original works of authorship, whether registered or unregistered, including all copyright registrations and applications.

"Credit Agreement" means that certain Credit Agreement dated as of April 1, 2011, by and among the Company, as the U.S. borrower, Western Coal Corp. and Walter Energy Canada Holdings, Inc., as the Canadian borrowers, the lenders party thereto, and the Credit Agreement Agent, as restated, amended and restated, supplemented, waived and/or otherwise modified prior to the date hereof.

"Credit Agreement Agent" means Morgan Stanley Senior Funding, Inc., in its capacity as administrative agent and collateral agent.

"Credit Bid and Release" has the meaning set forth in Section 3.1(c).

"Cure Costs" means all monetary liabilities, including pre-petition monetary liabilities, of Sellers that must be paid or otherwise satisfied to cure all of Sellers' monetary defaults under the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code at the time of the assumption thereof and assignment to Buyer as provided hereunder as such amounts

7

are determined by the Bankruptcy Court or approved pursuant to the assignment and assumption procedures provided for in the Bidding Procedures Order.

"Cure Notice" means, with respect to each Available Contract, the notice submitted by Sellers to the counterparty or counterparties thereto pursuant to the Bidding Procedures Order setting forth, among other things, the Cure Cost amount with respect thereto as calculated by Sellers.

"Dataroom" or "Data Room" means that certain Sapphire Data Room of the Company.

"Deeds" means special (or limited) warranty deeds, or jurisdictional equivalents, as the case may be, in recordable form for the appropriate jurisdiction, reasonably acceptable to Buyer, transferring title to the Real Property other than Leased Real Property and Improvements thereon (subject only to Permitted Encumbrances).

"Deferred Matters" means each of (a) the Sale Order and (b) the Transition Services Agreement.

"Determination Date" has the meaning set forth in Section 2.5(a)(i).

"Disclosure Schedules" means the disclosure schedules attached hereto, dated as of the date hereof, delivered or made available by Sellers to Buyer in connection with the execution of this Agreement, as the same may be supplemented and amended pursuant to Section 7.7.

"Disclosure Statement" means the Disclosure Statement for the Debtors' Joint Plan of Reorganization filed under Chapter 11 of the Bankruptcy Code, filed by Sellers with the Bankruptcy Court on August 26, 2015, as the same may be amended, supplemented, or restated from time to time prior to the Execution Date.

"Documents" means all of the documents that are used or useful in, or held for use in, the Business.

"DOL" has the meaning set forth in Section 5.11(b).

"Employees" means all of the employees of Sellers on the Execution Date, as well as any additional persons who become employees of Sellers during the period from the Execution Date through and including the Closing Date.

"Encumbrance" means any "interest" as that term is used in Section 363(f) of the Bankruptcy Code, mortgage, deed of trust, pledge, security interest, encumbrance, easement, condition, reservation, lien (statutory or otherwise), mechanics lien, Claim, covenant, encroachment, lease, right of use or possession, or other similar third party interest, or other survey defect, charge, hypothecation, deemed trust, action, easement, right-of-way or covenant on real property, other than any license of Intellectual Property, whether imposed by Contract, Legal Requirement, equity or otherwise.

Doc#: US1:10163646v46

"Environmental Laws" means any and all current and future Legal Requirements concerning or relating to (a) public health and safety as may be affected by the Release of, or exposure to, Hazardous Substances or (b) pollution or protection of the environment, including those relating to (i) the presence, use, manufacturing, refining, production, generation, handling, transportation, treatment, recycling, storage, disposal, distribution, importing, labeling, testing, processing, discharge, Release, threatened Release, control, cleanup, or other action or failure to act involving pollutants, contaminants, chemicals, or industrial, toxic or hazardous materials, substances or wastes; (ii) human health as affected by hazardous or toxic substances; and (iii) acid mine drainage, but not including any and all Legal Requirements concerning or relating to environmental provisions of any applicable Mining and Safety Law.

"Environmental Permit" means any and all permits, licenses, approvals, consents, waivers, franchises, filings, accreditations, registrations, certifications, notifications, exemptions, clearances and any other authorization required under any applicable Environmental Law or the environmental provisions of any applicable Mining and Mining Safety Law.

"Equipment" means all furniture, fixtures, equipment, computers, machinery, vehicles, apparatus, appliances, implements, telephone systems, signage, supplies and all other tangible personal property of every kind and description, and Improvements and tooling used, or held for use, in connection with the operation of the Business, wherever located, including communications equipment, information technology assets, and any attached and associated hardware, routers, devices, panels, cables, manuals, cords, connectors, cards, and vendor documents, and including all warranties of the vendor applicable thereto.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any Person that would be considered a single employer with Sellers under Sections 414(b), (c), (m) or (o) of the Code.

"Estate Retained Professional Fees Trust Amount" means a reasonable estimate of the aggregate amount of reasonable and documented fees and out-of-pocket expenses of, or incurred by, Professionals retained by Sellers pursuant to Section 327 of the Bankruptcy Code or retained by a statutory committee appointed in the Bankruptcy Case (subject to and limited by the Committee Monthly Cap (as defined in the Cash Collateral Orders)) and the fees and expenses of the Bankruptcy Administrator (as defined in the Cash Collateral Orders), in each case, that are (i) are accrued and unpaid as of the Closing Date, or (ii) are transaction-based fees owed to PJT Partners LP provided for in an engagement letter in effect as of the Execution Date, which engagement letter has been disclosed to the Buyer prior to the Execution Date, so long as the payment of such transaction-based fees are authorized to be paid by the Bankruptcy Court either before or after the Closing.

"Estate Retained Professional Fees Trust" means a trust account established pursuant to the Estate Retained Professional Fees Trust Agreement.

"Estate Retained Professional Fees Trust Agreement" means a trust agreement reasonably acceptable to the Parties for the disbursement of the Estate Retained Professional Fees Trust Amount.

Doc#: US1:10163646v46

"Exchange Act" means the Securities Exchange Act of 1934.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Benefit Plans" means all Benefit Plans other than the Buyer Benefit Plans set forth on Schedule 8.5(c).

"Excluded Contracts" has the meaning set forth in Section 2.5(a)(i).

"Excluded Insurance Claims" has the meaning set forth in Section 8.12(a).

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Excluded NPDES Permit" has the meaning set forth in Section 7.10(a).

"Execution Date" has the meaning set forth in the introductory paragraph.

"Expense Reimbursement" means an amount equal to the reasonable out-of-pocket costs, fees and expenses of Buyer, the Steering Committee, the Credit Agreement Agent and the Indenture Trustee (including reasonable expenses of legal, financial advisory, accounting and other similar costs, fees and expenses and all filing fees under the HSR Act) related to the formation and operation of Buyer and the transactions contemplated by this Agreement but only to the extent such reasonable out-of-pocket costs, fees and expenses are not otherwise paid or reimbursed by Sellers under the Cash Collateral Orders promptly upon the terms and conditions set forth in Section 11.2(b) and the Bidding Procedures Order, which amount, upon entry of the Bidding Procedures Order, shall constitute a super priority administrative expense of Sellers with priority over any and all administrative expenses of any kind, including those specified in Sections 503(b) or 507(b) of the Bankruptcy Code, but shall be subject to the Carve-Out (as defined in the Cash Collateral Orders), in each case, with the priority that is provided for in the Cash Collateral Orders.

"Extended Contract Period" has the meaning set forth in Section 2.5(a)(i).

"FASB 410" has the meaning set forth in Section 5.22(b).

"FCPA" has the meaning set forth in Section 5.18.

"Final Order" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Case (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed (other than such modifications or amendments that are consented to by Buyer) and as to which (A) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (B) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such Order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have expired,

Doc#: US1:10163646v46

as a result of which such Action or Order shall have become final in accordance with Bankruptcy Rule 8002; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Bankruptcy Rules, may be filed relating to such Order, shall not cause an Order not to be a Final Order.

"First Lien Adequate Protection Obligations" has the meaning set forth in the Cash Collateral Orders.

"First Lien Lenders" has the meaning set forth in the Cash Collateral Orders.

"First Lien Noteholders" has the meaning set forth in the Cash Collateral Orders.

"First Lien Obligations" has the meaning set forth in the Cash Collateral Orders.

"Financial Statements" has the meaning set forth in Section 5.19.

"FLSA" means Fair Labor Standards Act of the United States Department of Labor, and any state or local laws governing wages, hours, and/or overtime pay.

"GAAP" has the meaning set forth in Section 5.19.

"Gas Well" means a coal bed methane gas well operated by any Seller.

"Governmental Authority" means any United States federal, state or local or any foreign government, multi-national organization, quasi-governmental authority, or other similar recognized governmental authority or regulatory or administrative authority, agency or commission or any court, tribunal or judicial body having jurisdiction.

"Governmental Authorization" means any approval, consent, license, Permit, waiver or other authorization issued, granted or otherwise made available by or under the authority of any Governmental Authority.

"Hazardous Substance" means any "pollutant," "contaminant," "hazardous waste," "hazardous material" or "hazardous substance" under any Environmental Law or Mining and Mining Safety Law, or any other substance, pollutant, contaminant, waste or related material, or combination thereof, whether solid, liquid, or gaseous in nature, subject to regulation, investigation, remediation, control or corrective action under any Environmental Laws.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, and the rules and regulations promulgated thereunder.

"Improvements" means the buildings, plants, structures, fixtures, systems, facilities, infrastructure and other improvements affixed or appurtenant to the Owned Real Property or Leased Real Property.

"Incorporated Information" means and includes any and all matters disclosed in (i) the Company's filings with the SEC, including, its annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K, (ii) the Statements of Financial Affairs

Doc#: US1:10163646v46

filed by each of Sellers with the Bankruptcy Court on August 28, 2015, as the same may be amended or supplemented from time to time, (iii) the Schedules of Assets and Liabilities filed by each of Sellers with the Bankruptcy Court on August 28, 2015, (iv) the Disclosure Statement and (v) any and all other filings made by or on behalf of any Seller(s) with the Bankruptcy Court in connection with the Bankruptcy Case, in each case prior to the Execution Date.

"Indebtedness" means, at any time and with respect to any Person: (a) all indebtedness of such Person for borrowed money; (b) all indebtedness of such Person for the deferred purchase price of property or services (other than trade payables, other expense accruals and deferred compensation items arising in the Ordinary Course of Business); (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments (other than performance, surety and appeal bonds arising in the Ordinary Course of Business in respect of which such Person's liability remains contingent); (d) all indebtedness of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), other than inventory or other property purchased by such Person in the Ordinary Course of Business; (e) all obligations of such Person under leases which have been or should be, in accordance with GAAP, recorded as capital leases, to the extent required to be so recorded; (f) all reimbursement, payment or similar obligations of such Person, contingent or otherwise, under acceptance, letter of credit or similar facilities, in each case only to the extent drawn; (g) all Indebtedness of others referred to in clauses (a) through (f) above guaranteed directly or indirectly by such Person, or in effect guaranteed directly or indirectly by such Person through an agreement (i) to pay or purchase such Indebtedness or to advance or supply funds for the payment or purchase of such Indebtedness; (ii) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Indebtedness; (iii) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered); or (iv) otherwise to assure a creditor against loss in respect of such Indebtedness; and (h) all Indebtedness referred to in clauses (a) through (g) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any lien upon or in property owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness.

"Indenture" means that certain Indenture, dated as of September 27, 2013, among the Company, as issuer, each of the guarantors party thereto, and the Indenture Trustee, relating to the 9.500% Senior Secured Notes Due 2019.

"Indenture Trustee" means Wilmington Trust, National Association, as successor trustee and collateral agent under the Indenture.

"Intellectual Property" means all intellectual property, including all Copyrights, Patents, Trademarks and Trade Secrets, owned by Sellers and used or held for use in the Business or the Acquired Assets.

"Inventory" has the meaning set forth in Section 2.1(a).

12

"IRS" has the meaning set forth in Section 5.11(b).

"Knowledge" means, with respect to any matter in question, in the case of Sellers, the actual knowledge of any of the individuals listed on Schedule 1.1(a).

"Lease" has the meaning set forth in the definition of "Leased Real Property."

"Leased Real Property" means, specifically excluding any Excluded Asset, the interests in real property let, leased or subleased by Sellers, as tenant, subtenant, lessee or sublessee, or in which a Seller has been granted a possessory interest or right to use or occupy all or any portion of the same including, as the same are evidenced by any and all mining leases, coal leases, coal mining leases, underground coal mining and gob gas leases, coal land leases, coal degasification leases, use agreements, or other occupancy agreements and all short form leases, memoranda and amendments relating to the foregoing, together with, to the extent let, leased, used or occupied by Sellers in connection with the Business or the Acquired Assets, any and all underground and surface coal reserves, mineral rights, oil and gas rights and interests, mining rights, surface rights, water rights, rights of way, unrecouped minimum, advance or pre-paid production royalties, all buildings and other structures, facilities or Improvements located thereon (and any present or future rights, title and interests arising from or related to the foregoing) (each such lease, a "Lease," and collectively, the "Leases").

"Legal Requirement" means any federal, state, provincial, local, municipal, foreign, international, or multinational law (statutory, common or otherwise), constitution, treaty, convention, ordinance, equitable principle, code, rule, regulation or Order enacted, adopted, promulgated, issued or applied by any Governmental Authority or other similar authority, including for the avoidance of doubt, OSHA and any Mining and Mining Safety Law.

"Lessor Leases" has the meaning set forth in Section 5.4(b).

"Liability" means a Claim or Encumbrance of any kind or nature whatsoever (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due).

"Material Adverse Effect" means any change, event, state of facts or occurrence that individually or in the aggregate (taking into account all other such changes, events, states of fact or occurrences) has had, or would be reasonably expected to have, a material adverse change in or material adverse effect on (1) the Acquired Assets or the assets, properties, prospects, financial condition or results of operations of the Business (excluding the Excluded Assets and the Excluded Liabilities), in each case taken as a whole or (2) the ability of Sellers to consummate the transactions contemplated by this Agreement or to perform any of their obligations under this Agreement, but excluding any change or effect to the extent that it results from or arises out of (i) any reasonably anticipated effects of the commencement or prosecution of the Bankruptcy Case; (ii) the execution and delivery of this Agreement or the announcement thereof or consummation of the transactions contemplated hereby, including the effects of the transactions hereby on business relationships with suppliers and customers; (iii) changes in Legal Requirements or accounting regulations (including GAAP); (iv) any specific action required to be taken (or omitted) by this Agreement or taken (or omitted) at the written request of Buyer; (v)

13

general industry changes in the industries in which Sellers compete; (vi) acts of God (including earthquakes, storms, severe weather, fires, floods and natural catastrophes); (vii) any failure of the Business to achieve external or internal forecasts or financial projections; (viii) any breach of this Agreement by Buyer; or (ix) any change or effect of economic or political conditions (including acts of terrorism, hostilities, sabotage, military actions or war, or any material worsening of such acts of terrorism, hostilities, sabotage, military actions or war), in each case of clauses (iii), (v) and (ix) to the extent that such conditions do not disproportionately affect Sellers, taken as a whole, as compared to other companies that are principally engaged in the same Business as Sellers.

"Material Contract" means any Contract pursuant to which any Seller is reasonably expected to incur potential aggregate Liabilities in an amount greater than or equal to $3,000,000 per annum and has a term of greater than one year.

"Mining" means the exploration, extraction, processing, storage and transportation of coal and non-coal minerals and to the Reclamation of lands used for such activities.

"Mining Financial Assurances" has the meaning set forth in Section 5.22(a).

"Mining and Mining Safety Law" means all Legal Requirements relating to Mining and Mining safety, including (i) SMCRA (including its implementing regulations and any state analogs); (ii) MSHA; (iii) OSHA; (iv) acid and toxic mine drainage requirements; and (v) regulations relating to Mining operations and activities, including Reclamation.

"Mining Permits" means all applicable Permits related to Mining or otherwise required by Mining and Mining Safety Law.

"Miscellaneous Real Property Assets" means the assets of Sellers set forth on Schedule 1.1(b).

"MSHA" means the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § § 801 et. seq.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA.

"New NPDES Permit" has the meaning set forth in Section 7.10(a).

"Non-Core Assets" has the meaning set forth in the Bidding Procedures; provided, that (a) the Walter Coke Assets shall constitute "Non-Core Assets" solely to the extent that the Walter Coke Election is made or there is a sale of the Walter Coke Assets to a Successful Bidder (other than Buyer or a Buyer Designee), (b) the Blue Creek Assets shall constitute "Non-Core Assets" solely to the extent that there is a sale of the Blue Creek Assets to a Successful Bidder (other than Buyer or a Buyer Designee) and (c) the Miscellaneous Real Property Assets shall constitute "Non-Core Assets" solely to the extent that the Miscellaneous Real Property Assets are designated by Buyer as "Excluded Assets" or there is a sale of the Miscellaneous Real Property Assets to a Successful Bidder (other than Buyer or a Buyer Designee).

14

"NPDES Interim Period" has the meaning set forth in Section 7.10(a).

"Objections Notice" has the meaning set forth in Section 3.2(c).

"Order" means any award, writ, injunction, judgment, order, ruling, decision, subpoena, precept, directive, consent, approval, award, decree or similar determination or finding entered, issued, made or rendered by any Governmental Authority or an arbitrator, mediator or other judicially sanctioned Person or body.

"Ordinary Course of Business" means, with respect to any Person, the ordinary and usual course of normal day-to-day operations of such Person and its business, consistent with its past practice; provided that in the case of Sellers, "Ordinary Course of Business" shall take into account the business and operating practices that have been utilized by Sellers since the commencement of the Bankruptcy Case.

"OSHA" means the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651 et. seq.

"Outside Date" has the meaning set forth in Section 11.1(b)(ii).

"Overlapping NPDES Areas" has the meaning set forth in Section 7.10(a).

"Owned Real Property" means, specifically excluding any Excluded Asset, all real property owned by any Seller, and all right, title and interest of such Seller therein, together with all of such Seller's right, title and interest in and to the following: (i) all buildings, structures, systems, hereditaments and Improvements located on such real property owned by such Seller; (ii) all Improvements owned by such Seller; and (iii) all easements, if any, in or upon such real property owned by such Seller, licenses and all rights-of-way, beneficial easements, licenses, and other rights, privileges and appurtenances belonging or in any way pertaining to such real property owned by such Seller (including the right, title and interest of such Seller in and to any coal reserves, mineral rights, underground and surface coal and mining rights, royalty rights, support rights and waivers of the same, subsidence rights, water and water rights relating or appurtenant to such real property owned by such Seller).

"Party" or "Parties" means, individually or collectively, as applicable, Buyer and Sellers.

"Payroll Trust Amount" means a reasonable estimate of the amount necessary to fund Accrued Payroll, Approved Retention Payments to the extent not assumed by Buyer or paid at Closing and payroll taxes related thereto, which estimate shall be provided by Sellers to Buyer no later than two (2) weeks prior to the Closing Date, which amount shall be deposited on the Closing Date in one or more trusts established pursuant to trust agreements, dated as of the Closing Date, that are in form and substance satisfactory to Buyer and Sellers and expressly provide for any unused funds to be remitted to Buyer within sixty (60) days of the Closing Date.

"Patents" means United States and foreign patents and patent applications, as well as any continuations, continuations-in-part, divisions, extensions, reexaminations, reissues, renewals and patent disclosures related thereto.

15

"PBGC" has the meaning set forth in Section 5.11(c).

"Permits" means any and all permits (including Environmental Permits and Mining Permits), licenses, approvals, consents, waivers, franchises, filings, accreditations, registrations, certifications, certificates of occupancy, easements, rights of way, notifications, exemptions, clearances, and authorizations, together with all modifications, renewals, amendments, supplements and extensions thereof and applications therefor, of or from any Governmental Authority.

"Permitted Encumbrances" means Encumbrances specifically permitted by the Sale Order.

"Person" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, unincorporated organization, estate, trust, association, organization or other legal entity or group (as defined in Section 13(d)(3) of the Exchange Act) or Governmental Authority.

"Petition Date" means July 15, 2015.

"Pre-Closing Tax Period" means a Tax period or year, or portion thereof, that ends on or before the Closing Date.

"Pre-Closing Walter Coke Election" has the meaning set forth in Section 7.8(f).

"Pre-Paid Expenses" means all deposits (including customer deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise), advances, pre-paid expenses, prepayments, rights under warranties or guarantees, vendor rebates and other refunds of every kind and nature (whether or not known or unknown or contingent or non-contingent), except that professional fee retainers and pre-paid deposits related thereto shall not be included in the definition of "Pre-Paid Expenses."

"Previously Omitted Contract" has the meaning set forth in Section 2.5(b)(i).

"Previously Omitted Contract Designation" has the meaning set forth in Section 2.5(b)(i).

"Previously Omitted Contract Notice" has the meaning set forth in Section 2.5(b)(ii).

"Prior Event" means any transaction, event, circumstances, action, failure to act or occurrence of any sort or type, including any approval or acceptance given or denied, whether known or unknown, which occurred, existed, was taken or begun prior to the consummation of the transactions contemplated hereunder. For the avoidance of doubt, "Prior Event" shall include but not be limited to any transaction, event, circumstances, action, failure to act or occurrence of any sort or type which occurred, existed, was taken or begun in accordance with, pursuant to or by virtue of: (i) any terms of this Agreement, (ii) the transactions referred to herein, (iii) the First Lien Obligations, (iv) the Credit Agreement, (v) the Indenture (vi) the Bankruptcy Case or the

16

events leading to the commencement thereof, or (vii) any oral or written agreement relating to the foregoing (i) to (vi) of this sentence.

"Proceeding" means any Action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted, or heard by or before any Governmental Authority.

"Professional" means any Person retained by Sellers, including any ordinary course professionals and a fee examiner, or a statutory committee of unsecured creditors in the Bankruptcy Case pursuant to an Order of the Bankruptcy Court under Section 327, 363 or 1103 of the Bankruptcy Code.

"Protection Event" has the meaning set forth in Section 11.2(b)

"Purchase Price" has the meaning set forth in Section 3.1.

"Qualified Bid" has the meaning set forth in the Bidding Procedures.

"Real Property" and "Real Properties" means (i) the Owned Real Property; (ii) the Leased Real Property; (iii) all Improvements; (iv) all strips and gores and any land lying in the bed of any public road, highway or other access way, open or proposed, adjoining any Owned Real Property; and (v) all easements, licenses, rights and appurtenances relating to the foregoing to the extent that any Seller has a legally recognized interest therein.

"Reclamation" means reclamation, revegetation, recontouring, abatement, control or prevention of adverse effects of mining activities.

"Related Party" and, collectively, the "Related Parties" have the meaning set forth in Section 11.2(c).

"Release" means, except as authorized by a valid Permit issued under Environmental Law, (a) any releasing, spilling, discharging, disposing, leaking, pumping, injecting, pouring, depositing, emitting, leaching of any Hazardous Substance into the outdoor environment, including ambient air, surface water, groundwater and surface or subsurface strata, and (b) migration of Hazardous Substances into or out of any of the Real Property through soil, surface water, or groundwater.

"Representative" means, with respect to a particular Person, any director, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"Response Period" has the meaning set forth in Section 3.2(c).

"Sale Hearing" means the hearing to consider the entry of the Sale Order.

"Sale Motion" means the motion filed by Sellers pursuant to, *inter alia*, Sections 363 and 365 of the Bankruptcy Code to obtain the Bidding Procedures Order and the Sale Order and approve the transactions contemplated by this Agreement.

17

Doc#: US1:10163646v46

"Sale Order" means an Order of the Bankruptcy Court, in form and substance satisfactory to Buyer and Sellers, pursuant to, *inter alia*, Sections 105, 363 and 365 of the Bankruptcy Code authorizing and approving, *inter alia*, the sale of the Acquired Assets to Buyer on the terms and conditions set forth herein, free and clear of all Encumbrances (other than Permitted Encumbrances), and the assumption and assignment of the Assumed Contracts and the Assumed Liabilities by and to Buyer, and containing findings of fact and conclusions of law that Buyer has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code, which order shall in any event provide that, on the Closing Date and concurrently with the Closing, the Acquired Assets shall be transferred to Buyer free and clear of all then existing Encumbrances (including, for the avoidance of doubt, all successor liability, including any successorship obligations under any Collective Bargaining Agreement, and/or with respect to any Benefit Plan that is not a Buyer Benefit Plan), other than Permitted Encumbrances and Assumed Liabilities.

"SEC" means the Securities and Exchange Commission.

"Second Lien Noteholders" has the meaning set forth in the Cash Collateral Orders.

"Second Lien Trustee" has the meaning set forth in the Cash Collateral Orders.

"Secured Taxes" means (i) Taxes that if unpaid would give rise to a statutory lien on the Acquired Assets and (ii) taxes that if unpaid could impose liability on Buyer or a responsible person of any Seller under Code Section 6672 (or any similar provision of state, local or foreign law), or could subject any Seller to criminal penalties for failure to pay such taxes, including, for the avoidance of doubt, the following Taxes to the extent they qualify for such description: sales and use Taxes, ad valorem and property Taxes, severance Taxes, black lung excise Taxes, Reclamation fees or Taxes, and payroll, employment, withholding, unemployment insurance, social security or similar taxes.

"Securities Act" means the Securities Act of 1933.

"Seller Released Claims" has the meaning set forth in Section 12.16(b).

"Seller SEC Documents" has the meaning set forth in Section 5.21.

"Sellers" and "Seller" have the meaning set forth in the introductory paragraph.

"Sellers Group" means (1) each of the Sellers and their respective directors, officers, control persons (as defined in Section 15 of the Securities Act or Section 20 of the Exchange Act), members, employees, agents, attorneys, financial advisors, consultants, legal representatives, shareholders, partners, estates, successors and assigns solely in their capacity as such, and (2) any of their respective agents, attorneys, financial advisors, legal advisors, affiliates, directors, managers, officers, control persons, shareholders, members or employees.

"Shared Insurance Policies" has the meaning set forth in Section 8.12(a).

Doc#: US1:10163646v46

"SMCRA" means the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. §§1201 et seq.

"Steering Committee" has the meaning set forth in the Cash Collateral Orders.

"Subsidiary" means any legal entity with respect to which a specified Person (or a subsidiary thereof) owns, directly or indirectly, more than 50% of the voting stock or other equity or partnership interests, the holders of which are generally entitled to vote for the election of the board of directors or other governing body of such legal entity, or of which the specified Person controls the management.

"Successful Bid" has the meaning set forth in the Bidding Procedures.

"Successful Bidder" has the meaning set forth in the Bidding Procedures.

"Tax" or "Taxes" (and with correlative meaning, "Taxable" and "Taxing") means (i) any federal, state, provincial, local, foreign or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental (including taxes under Section 59A of the Code), natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar tax, duty, levy or other governmental charge or assessment or deficiency thereof (including all interest and penalties thereon and additions thereto whether disputed or not) and (ii) any liability for any items described in clause (i) payable by reason of contract, transferee liability or operation of law (including Treasury Regulation Section 1.1502-6) or otherwise.

"Tax Return" means any return, declaration, report, claim for refund, information return or other document (including any related or supporting estimates, elections, schedules, statements, or information) filed or required to be filed in connection with the determination, assessment or collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax.

"Title IV Plan" means any Benefit Plan subject to Title IV of ERISA (which, for the avoidance of doubt, excludes any Multiemployer Plan).

"Trade Payables" means trade obligations and accrued operating expenses incurred in the ordinary course of business of Sellers to the extent that such obligations relate to the Acquired Assets or the Business and are approved to be paid pursuant to the Approved Budget.

"Trade Secrets" means trade secrets and other confidential and proprietary information and know-how.

"Trademarks" means United States, state and foreign trademarks, service marks, logos, slogans, trade dress and trade names, Internet domain names and any other similar

19

designations of source of goods or services, whether registered or unregistered, and registrations and pending applications to register the foregoing, and all goodwill related to or symbolized by the foregoing.

"Transaction Documents" means this Agreement, the Assumption Agreement, the Bill of Sale, the Estate Retained Professional Fees Trust Agreement, the Transition Services Agreement, the other trust agreements contemplated by Section 4.2 and any other agreements, instruments or documents entered into at the Closing pursuant to this Agreement.

"Transfer Taxes" means any real property transfer Tax, sales Tax, use Tax, real property recording Tax or fee, intangible Tax, documentary stamp Tax or similar Tax attributable to the sale or transfer of the Acquired Assets (and the perfecting or recording of evidence thereof) and not exempted under the Sale Order, by Section 1146(c) of the Bankruptcy Code or applicable state or municipal law.

"Transferred Permits" has the meaning set forth in Section 2.1(g).

"Transition Services Agreement" means a transition services agreement pursuant to which Sellers and/or their designee(s) shall provide certain services to Buyer after Closing and vice versa on terms mutually acceptable to Sellers and Buyer.

"Treasury Regulations" means the Treasury regulations promulgated under the Code.

"Trustee" means one or more trustees acceptable to Buyer and Sellers.

"UMWA" means the United Mine Workers of America.

"UMWA Collective Bargaining Agreements" means all Collective Bargaining Agreements between the UMWA and any Seller.

"USW" means the United Steelworkers.

"USW Collective Bargaining Agreements" means all Collective Bargaining Agreements between the USW and any Seller.

"Unaudited Financial Statements" has the meaning set forth in Section 5.19.

"Union" and "Unions" have the meanings set forth in Section 5.10(a).

"Waiver" means a written waiver in form and substance acceptable to Buyer and Sellers signed by Buyer at the Closing waiving on behalf of Buyer all potential and existing Avoidance Actions and any other causes of action available to Sellers or their estates against the directors, officers, employees, shareholders, attorneys and advisors of Sellers and other Persons as set forth therein.

"Walter Coke Assets" means the assets owned, leased, licensed, used or held for use by Walter Coke, Inc., a Delaware corporation and a subsidiary of the Company.

Doc#: US1:10163646v46

"Walter Coke Election" has the meaning set forth in Section 7.8(a).

"Walter Coke Trust" means a trust established pursuant to a trust agreement in form and substance satisfactory to Buyer and Sellers pursuant to which the Walter Coke Working Capital Assets shall be transferred by the Buyer in the event that the Walter Coke Election or the Pre-Closing Walter Coke Election is made and there is no Successful Bidder for the Walter Coke Assets as determined in accordance with the Bidding Procedures or the sale of the Walter Coke Assets to a Successful Bidder or Backup Bidder (if any) does not close and the relevant sale agreement is terminated.

"Walter Coke Trust Amount" means $1,400,000.

"Walter Coke Working Capital Assets" means the inventory and accounts receivable of Walter Coke.

"WARN Act" has the meaning set forth in Section 5.10(c).

"WC Loan" has the meaning set forth in Section 7.8(a).

"West Virginia Assets" has the meaning set forth in the Bidding Procedures.

"Wind Down Trust" means a trust established pursuant to a trust agreement in form and substance satisfactory to Buyer and Sellers which shall be funded by Buyer with the Wind Down Trust Amount and the Cash Consideration.

"Wind Down Trust Amount" means $3,000,000; provided that such $3,000,000 shall be reduced to zero ($0) automatically and without any further action by the Parties if Buyer prior to the Closing agrees (in its sole discretion) to provide, or agrees to hire third parties to provide (in each case, at Buyer's sole cost and expense) all necessary technical professional services relating to the wind down of the West Virginia Assets, including technical professional services relating to remediation and Reclamation of the West Virginia Assets (a "Buyer TS Election").

1.2    Other Definitions and Interpretive Matters.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Period. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.

Contracts, Agreements and Orders. Any reference in this Agreement to any contract, license, agreement or order means such contract, license, agreement or order as amended, supplemented or modified from time to time in accordance with the terms thereof.

21

Doc#: US1:10163646v46

**Day.** Any reference in this Agreement to "days" (but not Business Days) means to calendar days.

**Dollars.** Any reference in this Agreement to "$" means United States dollars.

**Exhibits/Schedules.** All Exhibits and Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

**Gender and Number.** Any reference in this Agreement to gender includes all genders, and words imparting the singular number include the plural and vice versa.

**Headings.** The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement. All references in this Agreement to any "Section," "Article" or "Schedule" are to the corresponding Section, Article or Schedule of this Agreement unless otherwise specified.

**Herein.** Words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear.

**Including.** The word "including" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

**Law.** Any reference to any law in this Agreement means such law as amended, modified, codified, reenacted, supplemented or superseded in whole or in part, and in effect from time to time.

**Other.** The words "to the extent" shall be interpreted to mean "to the extent (but only to the extent)".

**Person.** Any reference to a Person shall include such Person's successors and permitted assigns.

**Made Available.** Any reference in this Agreement to "made available" shall mean (i) the Incorporated Information and (ii) with respect to any other documents or information, that such documents or information referenced shall have been provided in the Dataroom for Buyer and its Representatives prior to the Execution Date or shall have been provided directly to Buyer prior to the Execution Date.

(b)    **No Strict Construction.** Buyer, on the one hand, and Sellers, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Sellers, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. Without limiting the foregoing, no rule of strict

22

construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

# ARTICLE 2

## PURCHASE AND SALE

2.1     Purchase and Sale.

Subject to the entry of the Sale Order and upon the terms and subject to the conditions of this Agreement, on the Closing Date, Sellers shall unconditionally sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer and/or to one or more Buyer Designees, and Buyer and/or such Buyer Designees shall purchase, acquire and accept from Sellers, free and clear of all Encumbrances (other than Permitted Encumbrances), all of Sellers' right, title and interest in, to or under the Business and all of Sellers' properties, rights, claims and assets (in each case, other than the Excluded Assets), wherever situated or located, whether real, personal or mixed, whether tangible or intangible, whether identifiable or contingent, whether owned, leased, licensed, used or held for use in or relating to the Business, and whether or not reflected on the books and records of Sellers, as the same shall exist on the Closing Date, including the following (collectively, the "Acquired Assets"):

(a)     all inventory of any kind or nature, merchandise and goods, related to the Business or the Acquired Assets and maintained, held or stored by or for Sellers on the Closing Date, whether or not prepaid, and wherever located, held or owned, and any prepaid deposits for any of the same, including all coal inventory located upon or within Sellers' Real Property or belonging to Sellers, disposables and consumables used, or held for use, in connection with the Business, including any goods in transit, other than any such items to the extent related to the Excluded Assets ("Inventory");

(b)     all Equipment, including the Equipment set forth on Schedule 2.1(b), except to the extent primarily used in connection with the Excluded Assets;

(c)     subject to Section 2.5, all Assumed Contracts, except to the extent used in connection with the Excluded Assets;

(d)     all (i) Real Property (other than the Leased Real Property to the extent the Leases related thereto are not Assumed Contracts) and (ii) the Lessor Leases (to the extent that a Lessor Lease is an Assumed Contract);

(e)     all rights to subside lands associated with mining operations and all rights to the waiver of and release from subsidence liability and indemnity rights under any and all conveyances, representations and instruments or agreements of any kind and nature applicable to Sellers' coal mining activities and interests, except to the extent related to the Excluded Assets or the Excluded Liabilities;

(f)     except to the extent prohibited by law, any rights of Sellers to the warranties and licenses received from manufacturers and Sellers of the Equipment,

Doc#: US1:10163646v46

Improvements or any component thereof, except to the extent related to the Excluded Assets or the Excluded Liabilities;

(g)     subject to <u>Section 2.5(c)</u> and <u>Section 7.9</u> and obtaining the consents set forth on <u>Schedule 5.2</u>, all Permits and licenses held by Sellers, including those identified on <u>Schedule 2.1(g)</u> (the "<u>Transferred Permits</u>"); <u>provided</u>, that <u>Schedule 2.1(g)</u> and the definition of "Transferred Permits" shall be deemed updated and amended to exclude, without further action by either Party, any Permit that relates to an Excluded Asset;

(h)     all Intellectual Property, except to the extent related to the Excluded Assets or the Excluded Liabilities;

(i)     all Accounts Receivable, except to the extent related to the Excluded Assets or the Excluded Liabilities;

(j)     all Pre-Paid Expenses, except to the extent related to the Excluded Assets or the Excluded Liabilities;

(k)     to the extent not prohibited by Legal Requirements and not subject to attorney-client privilege or other work product privilege, all Documents and other books and records (financial, accounting, personnel files of Buyer Employees, and other), except to the extent related to the Excluded Assets or the Excluded Liabilities, and correspondence, and all customer sales, marketing, advertising, packaging and promotional materials, files, data, software (whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), drawings, engineering and manufacturing data and other technical information and data, and all other business and other records, in each case, that are used or useful in, held for use in, or that arise in any way out of or are related to, the Acquired Assets, the Assumed Liabilities or the Business; <u>provided</u>, that Sellers shall be permitted to keep copies of all of the foregoing to the extent necessary or required by the Bankruptcy Court or in connection with the Bankruptcy Case or related to the Excluded Assets or the Excluded Liabilities, subject to <u>Section 12.2</u>;

(l)     except as set forth on <u>Schedule 2.1(l)</u> or to the extent related to the Excluded Assets or the Excluded Liabilities, all claims (other than Avoidance Actions which shall be addressed solely by Section 2.1(m)), interests, rights, rebates, abatements, remedies, recoveries, goodwill, customer and referral relationships, other intangible property and all privileges, set-offs and benefits of Sellers, and all claims, demands, indemnification rights, causes of action, arising under or relating to any of the Acquired Assets (including Intellectual Property to the extent transferrable or assignable), the Assumed Liabilities or the Business, including those arising out of Assumed Contracts, express or implied warranties, representations and guarantees from suppliers, manufacturers, contractors or others to the extent relating to the operation of the Business or affecting the Equipment, Inventory or other tangible Acquired Assets;

(m)     all Avoidance Actions and any other causes of action available to any of the Sellers or their estates to the extent they either (1) relate to the Acquired Assets, Assumed Liabilities or the Acquired Non-Core Assets or (2) are against any of the Sellers, the

24

First Lien Lenders, the First Lien Noteholders, the Credit Agreement Agent, the Indenture Trustee, the Second Lien Noteholders, the Second Lien Trustee, any of the directors, officers, managers, employees, shareholders, members and advisors of the Sellers, the First Lien Lenders, the First Lien Noteholders, the Credit Agreement Agent, the Indenture Trustee or any other Persons as set forth in the Waiver (including the Actions set forth on Schedule 2.1(m)) (collectively, the "Acquired Actions"); provided, that the Acquired Actions against the Sellers, the First Lien Lenders, the First Lien Noteholders, the Credit Agreement Agent, the Indenture Trustee, and the directors, officers, managers, employees, shareholders, members and advisors of the First Lien Lenders, the First Lien Noteholders, the Credit Agreement Agent, the Indenture Trustee, any of the Sellers and other Persons set forth in the Waiver shall have been waived effective as of the Closing Date by execution of the Waiver;

(n)     all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit, bank accounts (to the extent transferrable) and other bank deposits, instruments and investments of Sellers; provided, however, that prepaid deposits related to professional fee retainers and other Cash Collateral securing Approved Collateralized Obligations (as defined in the Cash Collateral Orders) shall not be included; provided, further, that cash in an amount necessary and sufficient to cover checks in transit relating to items that were permitted to be paid, but have not been paid, pursuant to the Cash Collateral Orders as of the Closing Date shall not be included;

(o)     all third party business interruption, property or casualty insurance proceeds, to the extent receivable by Sellers in respect of the Business or the Acquired Assets or the Assumed Liabilities after the Closing Date;

(p)     all rights under non-disclosure or confidentiality, non-compete, or non-solicitation agreements (in each case, to the extent transferrable) or key employee retention plans or similar arrangements with (or for the benefit of) Employees and agents of Sellers or with third parties (including any non-disclosure or confidentiality, non-compete, or non-solicitation agreements (in each case, to the extent transferrable) or any key employee retention plans or similar arrangements entered into in connection with or in contemplation of the auction contemplated by the Bidding Procedures), to the extent included as an Assumed Contract;

(q)     all telephone, telex and telephone facsimile numbers and other directory listings, except to the extent they relate to the Excluded Assets;

(r)     all shares of capital stock or other equity interests in the entities listed on Schedule 2.1(r);

(s)     all assets, if any, listed on Schedule 2.1(s) (regardless of whether such assets are covered by any of the foregoing);

(t)     (i) with respect to any Buyer Benefit Plan that is funded by a trust (other than a so-called "rabbi trust"), the assets of such related trust; (ii) with respect to any Buyer Benefit Plan that is funded by an insurance policy, the related insurance policy (to the extent transferrable); and (iii) with respect to any Buyer Benefit Plan, to the extent applicable

Doc#: US1:10163646v46

and subject to conformity with Legal Requirements, the administrative service agreements and other contracts, files and records in respect thereof;

(u)  all Contracts (i) between any of the Sellers with either of Black Warrior Methane Corp. and Black Warrior Transmission Corp. (or both) or (ii) set forth on Schedule 5.16, all of which shall be Assumed Contracts;

(v)  all proceeds and products of any and all of the foregoing Acquired Assets, except to the extent related to the Excluded Assets or the Excluded Liabilities;

(w)  (i) any tax assets or attributes that carryover to Buyer or are deemed the property of Buyer pursuant to subchapter C of the Code and (ii) all rights to refunds of Taxes; provided that Buyer shall be entitled, at its sole cost and expense, to prosecute or defend any claims, suits or proceedings (including any pending adversary proceedings) relating to any rights to refunds of Taxes paid by Sellers (including Buyer's rights to receive such refunds), and to the extent of any offsets applied or proposed to be applied to such refunds at any time after the Closing Date, whether in such suit or proceedings or otherwise, Buyer shall be entitled to take such actions as it deems necessary or appropriate to defend or contest such offsets;

(x)  to the extent not prohibited by Legal Requirements and not subject to attorney-client privilege or other work product privilege, the Tax records and work papers of Sellers (other than those that relate to the Excluded Assets); provided, however, that Sellers can retain copies of the foregoing items;

(y)  subject to Section 8.12, any insurance policies of Sellers (to the extent transferrable and subject to the receipt of any requisite consents) relating to the Acquired Assets or the Assumed Liabilities solely to the extent Buyer has provided written notice to Sellers prior to the Bid Deadline of its intention to acquire such insurance policies; and

(z)  all of the Sellers' right and interest in and right to manage the 501(c)(21) Black Lung Benefit Trust funded by the Sellers in respect of Black Lung Liability of the Sellers.

2.2  Excluded Assets.

Notwithstanding anything to the contrary in this Agreement, nothing herein shall be deemed to sell, transfer, assign, convey or deliver any of the Excluded Assets to Buyer, and Sellers shall retain all right, title and interest to, in and under, and all Liabilities with respect to, the Excluded Assets. For all purposes of and under this Agreement, the term "Excluded Assets" shall consist of only the following items, assets and properties (whether or not such assets are otherwise described in Section 2.1):

(a)  the Non-Core Assets and the assets, if any, listed on Schedule 2.2(a);

(b)  any and all Collective Bargaining Agreements;

26

(c)       any (i) Employee personnel files or records and (ii) Excluded Benefit Plan and any assets, trust agreements, insurance policies, administrative service agreements and other contracts, files and records in respect thereof;

(d)       other than as set forth on Schedule 2.1(r), any shares of capital stock or other equity interest in or issued by any Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest in or issued by any Seller, and any shares of capital stock or other equity interest in or issued by any Subsidiary of any Seller (including, for the avoidance of doubt, any foreign Subsidiary) or other entity in which any Seller holds an equity interest, or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest in or issued by any Subsidiary of any Seller or other entity in which any Seller holds an equity interest, including the capital stock or equity interest set forth on Schedule 2.2(d);

(e)       the limited liability company, partnership and corporate books and records of internal limited liability company, partnership and corporate proceedings, minute books, organizational or governing documents, stock ledgers, and, to the extent not set forth in Section 2.1(x), other records of Sellers; provided, however, that copies of the foregoing items have been made available by Sellers to Buyer;

(f)       Documents that Sellers are required by Legal Requirements to retain and documents subject to attorney-client privilege or other work product privilege; provided, that such documents shall remain subject to Section 12.2, if applicable;

(g)       any Contract that is not an Assumed Contract;

(h)       insurance policies and all rights under or arising out of insurance policies to the extent not set forth in Section 2.1(o);

(i)       any prepaid deposits related to professional fee retainers and Cash Collateral securing Approved Collateralized Obligations;

(j)       the Cash Consideration;

(k)       all current and prior director and officer insurance policies of Sellers and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(l)       any rights, claims or causes of action of Sellers under this Agreement or any other Transaction Document;

(m)       subject to Section 2.5(c), any Permits and licenses held by Sellers that are not assignable or transferrable;

(n)       any surety bonds or other financial assurances, placed by any Seller with the Alabama Surface Mining Commission, the Alabama Oil and Gas Board, or any other Governmental Authority to the extent primarily related to and in connection with any of the Permits held by Sellers or the Reclamation or other Liabilities related thereto, any cash placed by

27

any Seller with the Alabama Surface Mining Commission, the Alabama Oil and Gas Board, or any other Governmental Authority to the extent primarily related to and in connection with any such Permits held by Sellers or Liabilities that are not Transferred Permits or Assumed Liabilities and any cash of any Seller (wherever held) that secures or otherwise supports letters of credit serving as, securing or supporting financial assurances in connection with any of the Permits held by Sellers or Liabilities that are not Transferred Permits or Assumed Liabilities;

(o)     any deposits, escrows, surety bonds or other financial assurances and any cash or cash equivalents securing any surety bonds or financial assurances, in each case, to the extent relating to the Excluded Assets or Excluded Liabilities and the amounts, deposits and other financial assurances described on Schedule 2.2(o);

(p)     cash in an amount necessary and sufficient to cover checks in transit as of the Closing;

(q)     any intercompany receivables between one or more of the Sellers or their Subsidiaries; and

(r)     for the avoidance of doubt (i) if the Walter Coke Election or the Pre-Closing Walter Coke Election is made or if the Walter Coke Assets are sold to a Successful Bidder (other than the Buyer or a Buyer Designee), the Walter Coke Assets, (ii) if the Blue Creek Assets are sold to a Successful Bidder (other than the Buyer or a Buyer Designee), the Blue Creek Assets and (iii) if any Miscellaneous Real Property Assets are designated by Buyer as "Excluded Assets" or if any Miscellaneous Real Property Assets are sold to a Successful Bidder (other than the Buyer or a Buyer Designee), such Miscellaneous Real Property Assets.

2.3     Assumed Liabilities.

Subject to entry of the Sale Order, upon the terms and subject to the conditions of this Agreement, on the Closing Date, Buyer and/or each relevant Buyer Designee, shall, effective at the time of the Closing, assume and agree to discharge and perform when due, the Liabilities of Sellers (and only those Liabilities of Sellers) which are enumerated in this Section 2.3 (the "Assumed Liabilities"). The following Liabilities of Sellers (and only the following Liabilities) shall constitute, without duplication, the Assumed Liabilities:

(a)     all Liabilities under the Assumed Contracts;

(b)     all Cure Costs;

(c)     outstanding Trade Payables;

(d)     (1) Liabilities arising out of the operation of the Acquired Assets or the Business for periods following the Closing Date, including with respect to workers' compensation or occupational health claims relating to any Buyer Employee arising out of an event that occurs on or after the Closing Date and (2) any and all Black Lung Assumed Liabilities;

Doc#: US1:10163646v46

(e)      (i) those specific Liabilities of Sellers (if any) related to Employees as identified on Schedule 2.3(e) (such schedule to be provided to Sellers by Buyer not later than five (5) Business Days prior to the Bid Deadline) and (ii) the sponsorship of, and Liabilities under, each Buyer Benefit Plan (collectively, the "Assumed Benefits");

(f)      all unpaid fees and expenses of the Steering Committee, the Credit Agreement Agent, the Indenture Trustee or Buyer to the extent not paid at or prior to the Closing;

(g)      all Liabilities of Sellers to the extent arising out of or relating to the Transferred Permits, including (i) all Liabilities for Reclamation and post-mining and post-Gas Well operation Liabilities; (ii) compliance with performance obligations or standards under the Transferred Permits and associated Legal Requirements; and (iii) obligations to replace and/or increase bonds or other financial assurance instruments associated with the Transferred Permits;

(h)      regulatory violations and obligations on or in relation to the Transferred Permits arising post-Closing;

(i)      all Liabilities to the extent arising out of or relating to: (i) compliance with any Mining and Mine Safety Law, and any mine or Gas Well operating or safety compliance matters, related to the Acquired Assets or the acquired Gas Wells and mining areas of the Business; (ii) the Acquired Assets' or the Business' compliance with Environmental Laws; and (iii) the remediation or corrective action required to resolve any environmental, safety or health conditions present at, under or migrating from the Acquired Assets, including any arising from or related to a Release resulting from the operation of the Acquired Assets, excluding, in each of the preceding cases (i)-(iii), any monetary fines and penalties imposed by any Governmental Authority for which Sellers or any of their Affiliates have received a written notice of violation or notice of claim (or other written notice of similar legal intent or meaning) on or prior to the Closing Date (whether or not disclosed on the Disclosure Schedules);

(j)      all Liabilities and obligations of Sellers under non-disclosure or confidentiality, non-compete or non-solicitation agreements (in each case, to the extent transferrable) or key employee retention plans or similar arrangements with (or for the benefit of) employees and agents of Sellers or with third parties, to the extent Sellers' rights under such agreements, plans or arrangements are Acquired Assets;

(k)      (i) Transfer Taxes and (ii) the Secured Taxes;

(l)      all Liabilities of Sellers as a result of any action taken by Sellers at Buyer's or its Affiliates' request pursuant to Sections 7.9(a)(iv), 7.9(a)(v) and 7.9(a)(vi); and

(m)      all Liabilities of Sellers for Reclamation (and, if applicable, post-mining and post-Gas Well operation Liabilities) set forth on Schedule 2.3(m) to the extent that such Liabilities are not funded by the issuers of Sellers' surety bonds, unless such Liabilities are assumed by any Successful Bidder of the relevant Non-Core Assets in which case Schedule 2.3(m) shall be automatically amended to remove such Liabilities to the extent assumed by any such Successful Bidder; provided, that Schedule 2.3(m) may also be amended by the Buyer from

Doc#: US1:10163646v46

and after the Execution Date in its sole discretion to add Liabilities to (but not remove Liabilities from) Schedule 2.3(m).

2.4   Excluded Liabilities.

Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be obligated to assume or be obliged to pay, perform or otherwise discharge any Liability of, or Liability against, Sellers, Sellers' Subsidiaries, the Business or the Acquired Assets, of any kind or nature, whether or not direct or indirect, and Sellers shall be solely and exclusively liable with respect to all Liabilities of Sellers, other than the Assumed Liabilities (such Liabilities other than Assumed Liabilities, collectively, the "Excluded Liabilities"). Without limiting the generality of the foregoing, the Excluded Liabilities shall include each of the following Liabilities of Sellers and Sellers' Subsidiaries, except to the extent they are set forth in Sections 2.3(a)-(m):

(a) all Liabilities with respect to any Taxes that are not expressly assumed by the Buyer pursuant to Section 2.3(k);

(b) all Liabilities with respect to Actions and Proceedings pending on or before the Closing Date or to the extent against or giving rise to Liability against the Business or the Acquired Assets prior to the Closing Date even if instituted after the Closing Date other than the Acquired Actions;

(c) all Liabilities to any owner or former owner of capital stock or warrants with respect to such capital stock or warrants, holder of Indebtedness for borrowed money, or current or former officer or director of, in each case, any Seller or Subsidiary of any Seller in such capacities;

(d) except as expressly provided herein, all Liabilities with respect to any Excluded Asset, including any and all Collective Bargaining Agreements, Excluded Benefit Plans and liabilities in respect of the benefit plans, programs and arrangements of any ERISA Affiliate;

(e) all Liabilities under any futures contracts, options on futures, swap agreements or forward sale agreements;

(f) other than Trade Payables and the Estate Retained Professional Fees Trust Amount, all Liabilities for: (i) costs and expenses incurred or owed in connection with the administration of the Bankruptcy Case (including all Estate Retained Professional Fees); and (ii) all costs and expenses incurred by Sellers in connection with the negotiation, execution and consummation of the transactions contemplated under this Agreement;

(g) except as set forth in Section 2.3(d), all workers' compensation claims and occupational health claims related to the Acquired Assets, including and with respect to Buyer Employees and former employees of Sellers who worked or who were employed at the Acquired Assets;

30

(h)     any Liability or other obligations of Sellers or any ERISA Affiliate arising under, relating to or with respect to any multiemployer pension plan, single employer pension plan or Multiemployer Plan;

(i)     except for the Assumed Benefits, all Liabilities with respect to Employees, or former Employees, or both (or their representatives or beneficiaries) or employees of any ERISA Affiliate, for any action or inaction of any Seller (or any predecessor of any Seller) occurring prior to or on the Closing Date, including with respect to vacation, payroll, sick leave, unemployment benefits, retirement benefits, pension benefits, employee stock option, equity compensation, employee stock purchase, or profit sharing plans, health care and other welfare plans or benefits (including COBRA or the Coal Act), or any other employee plans or arrangements or benefits or other compensation of any kind to any employee, including under any Excluded Benefit Plan or benefit plans, programs and arrangements of an ERISA Affiliate, and Liabilities of Sellers and their predecessors pursuant to the WARN Act;

(j)     except for the Assumed Benefits, any Liability arising under any employment agreement, Collective Bargaining Agreement or arrangement, severance, retention or termination agreement or other similar arrangement with any employee, consultant or contractor (or its representatives) of any Seller;

(k)     all Liabilities (other than Assumed Liabilities) accruing, arising out of, or relating to any federal, state or local investigations of any Seller or any Employee, agents, vendors or representatives of any Seller arising out of actions prior to the Closing (other than rights of setoff and recoupment claims); and

(l)     except as set forth in Section 2.3(m), (i) if the Walter Coke Election or the Pre-Closing Walter Coke Election is made or if the Walter Coke Assets are sold to a Successful Bidder (other than the Buyer or a Buyer Designee), Liabilities to the extent related to the Walter Coke Assets, (ii) if the Blue Creek Assets are sold to a Successful Bidder (other than the Buyer or a Buyer Designee), Liabilities to the extent related to the Blue Creek Assets, (iii) if any Miscellaneous Real Property Assets are designated by Buyer as "Excluded Assets" or if any Miscellaneous Real Property Assets are sold to a Successful Bidder (other than the Buyer or a Buyer Designee), Liabilities to the extent related to such Miscellaneous Real Property Assets and (iv) to the extent that there are Acquired Non-Core Assets, Liabilities to the extent related to such Acquired Non-Core Assets.

2.5     Assignment and Assumption of Contracts.

(a)

(i)     Schedule 2.5(a) sets forth a list of all executory Contracts (including all supply agreements, joint venture agreements, operating and joint operating agreements, participation agreements, exploration agreements (including minerals and coalbed gas exploration agreements), Leases and Lessor Leases) relating to the Business or the Acquired Assets to which one or more of Sellers are party (the "Available Contracts") which Schedule 2.5(a) may be updated from time to time to add or remove any Contracts inadvertently included or excluded from such schedule. On or

before January 4, 2016 (such date, the "Determination Date"), Buyer shall designate in writing which Available Contracts from Schedule 2.5(a) relating to the Business or the Acquired Assets that Buyer wishes to "Assume" (the "Assumed Contracts"). All Contracts of Sellers that are listed on Schedule 2.5(a) and which Buyer does not designate in writing for assumption shall not be considered Assumed Contracts or Acquired Assets and shall automatically be deemed "Excluded Contracts" (and for the avoidance of doubt, Buyer shall not be responsible for any related Cure Costs); provided, however, that if an Available Contract is subject to a cure dispute or other dispute as to the assumption or assignment of such Available Contract that has not been resolved to the mutual satisfaction of Buyer and Sellers prior to the Determination Date, then the Determination Date shall be extended (but only with respect to such Available Contract) to no later than the earlier of (A) the date on which such dispute has been resolved to the mutual satisfaction of Buyer and Sellers, (B) one hundred and twenty (120) days following the Closing Date, (C) the date on which such Available Contract is deemed rejected by operation of 11 U.S.C. § 365(d)(4) and (D) the date required by the Bankruptcy Court and set forth in either the Bidding Procedures Order or the Sale Order (the "Extended Contract Period"). If such Available Contract is not expressly assumed by Buyer in writing by the end of such Extended Contract Period, such Available Contract shall be automatically deemed an Excluded Contract. Buyer shall be responsible for any obligations or Liabilities arising during any Extended Contract Period relating to any Available Contract that has not been assumed or rejected as of the Determination Date as provided in this Section 2.5(a). For the avoidance of doubt, except as set forth in Section 2.3 and other than as provided in the preceding sentence, (x) Buyer shall not assume or otherwise have any Liability with respect to any Excluded Contract and (y) each Collective Bargaining Agreement to which any Seller is bound or party to shall be an Excluded Contract.

(ii)     Each of Sellers and Buyer, as applicable, shall use commercially reasonable efforts to assign, or cause to be assigned, the Assumed Contracts to Buyer or to the applicable Buyer Designee, including taking all actions required by the Bankruptcy Court to obtain an Order containing a finding that the proposed assumption and assignment of the Assumed Contracts to Buyer satisfies all applicable requirements of Section 365 of the Bankruptcy Code. Buyer and/or each Buyer Designee shall use commercially reasonable efforts to comply with all of the requirements of Section 365 of the Bankruptcy Code necessary to permit such assumption and assignment.

(iii)     If, prior to the Closing Date, there are Available Contracts that have not been designated as an Assumed Contract or an Excluded Contract, Sellers shall not assume or reject any such Available Contract pursuant to Section 365 of the Bankruptcy Code and any order of the Bankruptcy Court, until the earlier of (x) the date Buyer so directs Sellers and (y) the end of the Extended Contract Period, if applicable (which assumption shall be at Buyer's sole cost and expense); provided, that Buyer shall be responsible for any obligations or Liabilities arising during any Extended Contract Period.

Doc#: US1:10163646v46

(iv)     At Closing, (x) Sellers shall, pursuant to the Sale Order and the Assumption Agreement, assume and assign, or cause to be assigned, to Buyer or to the applicable Buyer Designee (the consideration for which is included in the Purchase Price) each of the Assumed Contracts that is capable of being assumed and assigned and (y) Buyer shall pay promptly all Cure Costs (if any) in connection with such assumption and assignment (as agreed to among Buyer and Sellers or as determined by the Bankruptcy Court) and assume and perform and discharge the Assumed Liabilities (if any) under the Assumed Contracts, pursuant to the Sale Order and the Assumption Agreement.

(b)     <u>Previously Omitted Contracts</u>.

(i)     If prior to or following Closing, it is discovered that a Contract should have been listed on <u>Schedule 2.5(a)</u> but was not listed on <u>Schedule 2.5(a)</u> and has not been rejected by Sellers (any such Contract, a "<u>Previously Omitted Contract</u>"), Sellers shall, promptly following the discovery thereof (but in no event later than two (2) Business Days following the discovery thereof), notify Buyer in writing of such Previously Omitted Contract and all Cure Costs (if any) for such Previously Omitted Contract. Buyer shall thereafter deliver written notice to Sellers, no later than five (5) Business Days following notification of such Previously Omitted Contract from Sellers, designating such Previously Omitted Contract as "Assumed" or "Rejected" (a "<u>Previously Omitted Contract Designation</u>"). A Previously Omitted Contract designated in accordance with this <u>Section 2.5(b)(i)</u> as "Rejected," or with respect to which Buyer fails to timely deliver a Previously Omitted Contract Designation, shall be an Excluded Contract.

(ii)     If Buyer designates a Previously Omitted Contract as "Assumed" in accordance with <u>Section 2.5(b)(i)</u>, Sellers shall serve a notice (the "<u>Previously Omitted Contract Notice</u>") on the counterparties to such Previously Omitted Contract notifying such counterparties of the Cure Costs with respect to such Previously Omitted Contract and Sellers' intention to assume and assign such Previously Omitted Contract in accordance with this <u>Section 2.5</u>. The Previously Omitted Contract Notice shall provide the counterparties to such Previously Omitted Contract with ten (10) Business Days to object, in writing to Sellers and Buyer, to the Cure Costs or the assumption of its Contract. If the counterparties, Sellers and Buyer are unable to reach a consensual resolution with respect to the objection, Sellers shall seek an expedited hearing before the Bankruptcy Court to determine the Cure Costs and approve the assumption. If no objection is served on Sellers and Buyer, Sellers shall obtain an order of the Bankruptcy Court fixing the Cure Costs and approving the assumption of the Previously Omitted Contract. Buyer shall be responsible for all Cure Costs relating to such "Assumed" Previously Omitted Contracts and for any obligations or Liabilities relating to such "Assumed" Previously Omitted Contracts arising during the Extended Contract Period.

(c)     <u>Non-Assignment of Contracts and Permits</u>. Notwithstanding anything contained in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any Contract or any Permit, if, notwithstanding the provisions of

33

Sections 363 and 365 of the Bankruptcy Code, an attempt at assignment or transfer thereof, without the consent or approval required or necessary for such assignment or transfer, would constitute a violation of a Legal Requirement or a breach of such Contract or Permit. If, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code and the commercially reasonable efforts of Sellers, such consent or approval is required but not obtained with respect to an Assumed Contract or a Permit, neither Sellers nor Buyer shall be in breach of this Agreement nor shall the Purchase Price be adjusted nor (but subject to Buyer's termination right set forth in Section 11.1) shall the Closing be delayed in respect of the Assumed Contracts or the Permits; provided, however, if the Closing occurs, then, with respect to any Assumed Contract or Permit for which consent or approval is required but not obtained, from and after the Closing for a period of no more than six (6) months, Sellers shall reasonably cooperate, at Buyer's sole cost and expense, with Buyer in any reasonable arrangement that Buyer may request to provide Buyer with all of the benefits of, or under, the applicable Assumed Contract or Transferred Permit, including enforcement for the benefit of Buyer of any and all rights of Sellers against any party to the applicable Assumed Contract or Transferred Permit arising out of the breach or cancellation thereof by such party; provided, however, to the extent that any such arrangement has been made to provide Buyer with the benefits of, or under, the applicable Assumed Contract or Transferred Permit, from and after the Closing, Buyer shall be responsible for, and shall promptly pay and perform all payment and other obligations under such Assumed Contract or Permit (all of which shall constitute, and shall be deemed to be, Assumed Liabilities hereunder) to the same extent as if such Assumed Contract or Permit had been assigned or transferred at Closing with respect to Assumed Contracts and Permits, and at such applicable later date specified in this Section 2.5(c) with respect to any additional Assumed Contracts. Any assignment to Buyer of any Assumed Contract or Permit that shall, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, require the consent or approval of any Person for such assignment as aforesaid shall be made subject to such consent or approval being obtained. Notwithstanding anything to the contrary contained herein, Buyer shall reimburse, indemnify and hold harmless Sellers and/or their Affiliates from any and all Liabilities incurred by Sellers and/or their Affiliates in connection with any action taken by Sellers at Buyer's or its Affiliates' request pursuant to this Section 2.5(c).

2.6    Further Assurances.

(a)    Except as otherwise provided herein and subject to the terms and conditions of this Agreement, the Bankruptcy Code and any orders of the Bankruptcy Court, from and after the Execution Date, Sellers and Buyer shall use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under applicable Legal Requirements to consummate the transactions contemplated by this Agreement, including (i) preparing and filing as promptly as practicable with any Governmental Authority or other third party all documentation to effect all necessary filings, notices, petitions, statements, registrations, submissions of information, applications and other documents and (ii) obtaining and maintaining all approvals, consents, registrations, permits, authorizations and other confirmations required to be obtained from any Governmental Authority or other third party that are necessary, proper or advisable to consummate the transactions contemplated by this Agreement, in each case, after giving effect to the Sale Order.

Doc#: US1:10163646v46

(b)     At and after the Closing, Sellers shall execute and deliver to Buyer such further instruments and certificates as reasonably requested by Buyer and Buyer will reimburse Sellers for any out-of-pocket expenses incurred by Sellers in connection with actions taken by Sellers (i) to vest, perfect or confirm ownership (of record or otherwise) in Buyer and/or one or more Buyer Designees, Sellers' right, title or interest in, to or under any or all of the Acquired Assets and Business, including the Real Property, free and clear of all Encumbrances (other than Permitted Encumbrances and Assumed Liabilities) or (ii) to otherwise effectuate the purposes and intent of this Agreement and the other Transaction Documents. From and after the Closing Date, Buyer will reimburse Sellers for any out-of-pocket expenses incurred by Sellers in connection with actions taken by Sellers and each of the Parties shall take, or cause to be taken, and cooperate with the other Parties to take, or cause to be taken, all actions, do or cause to be done all things as may be reasonably requested by the other Parties in order to vest, perfect or confirm any and all right, title and interest in, to and under such rights, properties or assets in Buyer or one or more Buyer Designees or otherwise to carry out this Agreement, and shall execute and deliver all deeds, bills of sale, instruments of conveyance, powers of attorney, assignments, assumptions and assurances, and as may be required to consummate the transactions contemplated by this Agreement, it being specifically understood that, notwithstanding anything to the contrary herein, no Seller shall have any obligation to (i) record or pay any recording fees and Taxes in connection with the foregoing (except to the extent Buyer agrees to reimburse Sellers for any out-of-pocket expenses incurred by Sellers in connection with such recordation or payment), or (ii) pay any title insurance fee or premium in connection with any title insurance commitment or policy Buyer may obtain, in each case, included any related costs and expenses (except to the extent Buyer agrees to reimburse Sellers for any out-of-pocket expenses incurred by Sellers in connection with such commitment or policy).

## ARTICLE 3

### PURCHASE PRICE

3.1     Consideration.

The aggregate consideration (the "Purchase Price") for the purchase, sale, assignment and conveyance of the Acquired Assets shall consist of:

(a)     cash (the "Cash Consideration") in an amount equal to $5,400,000 (provided that such amount shall be reduced to $4,100,000 if Buyer makes a Buyer TS Election);

(b)     the assumption by Buyer or a Buyer Designee, as applicable, of the Assumed Liabilities from Sellers, including the assumption of the obligation to pay to the applicable counterparties of the applicable Assumed Contracts the Cure Costs payable by Buyer under Section 2.5; and

(c)     the release of Sellers that are borrowers or guarantors under the Credit Agreement and the Indenture of the First Lien Obligations arising under, or otherwise relating to the Credit Agreement and the Indenture, and the First Lien Adequate Protection Obligations, in an aggregate amount equal to $1,250,000,000 (the "Credit Bid and Release") under Section 363(k) of the Bankruptcy Code, as the same may be (w) decreased or increased in accordance with Section 7.8(a), (x) decreased in accordance with Section 7.8(b), (y) increased in

35

accordance with Section 7.8(d), and/or (z) increased by Buyer in its sole discretion (including with respect to all or any portion of the Credit Bid and Release) at any time during the auction contemplated by the Bidding Procedures (or, if there is no such auction, prior to the Closing Date).

At the option of Buyer, Sellers shall retain a designated amount of unrestricted cash that would otherwise be included in the Acquired Assets, and such unrestricted cash so retained shall reduce, on a dollar for dollar basis, the cash amounts that would otherwise be required to be included in the Purchase Price pursuant to this Section 3.1.

        3.2     Allocation of Purchase Price.

        (a)     To the extent the acquisition of the Acquired Assets and/or the Business is not treated as a reorganization under Section 368(a) of the Code, Buyer and Sellers agree that, for Buyer's and Sellers' respective federal, state and local income tax purposes, the Purchase Price, the Assumed Liabilities and other relevant items shall be allocated among the Acquired Assets as mutually agreed by Buyer and Sellers in a manner consistent with Section 1060 of the Code and the Treasury Regulations promulgated thereunder.

        (b)     Within one hundred and twenty (120) days of the Closing Date Buyer shall prepare and deliver to Sellers a statement allocating the sum of the Purchase Price, the Assumed Liabilities and other relevant items among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (such statement, the "Allocation Statement").

        (c)     Sellers shall have a period of thirty (30) Business Days after the delivery of the Allocation Statement (the "Response Period") to present in writing to Buyer notice of any objections that Sellers may have to the allocations set forth therein (an "Objections Notice"). Unless Sellers timely object, such Allocation Statement shall be binding on the Parties without further adjustment.

        (d)     If Sellers shall raise any objections within the Response Period, Buyer and Sellers shall negotiate in good faith and use their commercially reasonable efforts to resolve such dispute. If the Parties fail to agree within fifteen (15) days after the delivery of the Objections Notice, then the disputed items shall be resolved by a firm of independent nationally recognized accountants reasonably chosen and mutually accepted by both Parties (the "Accounting Referee"), whose determination shall be final and binding on the Parties. The Accounting Referee shall resolve the dispute within thirty (30) days after the item has been referred to it. The costs, fees and expenses of the Accounting Referee shall be split in half and borne equally by Sellers and Buyer.

        (e)     Unless otherwise required by law, the IRS or any other taxing authority, the allocation of the Purchase Price pursuant to the Allocation Statement (if applicable, as modified by Section 3.2(d) hereof) shall be final and binding on the Parties, and the Parties shall follow the Allocation Statement for purposes of filing IRS Form 8594 (and any supplements to such form) and all other Tax Returns, and shall not take any position inconsistent therewith. If the IRS or any other taxation authority proposes a different allocation, Sellers or

Doc#: US1:10163646v46

Buyer, as the case may be, shall promptly notify the other party of such proposed allocation. Sellers or Buyer, as the case may be, shall provide the other party with such information and shall take such actions (including executing documents and powers of attorney in connection with such proceedings) as may be reasonably requested by such other party to carry out the purposes of this Section 3.2. Except as otherwise required by any Legal Requirement or pursuant to a "determination" under Section 1313(a) of the Code (or any comparable provision of United States state, local, or non-United States law), (i) the transactions contemplated by Article 2 of this Agreement shall be reported for all Tax purposes in a manner consistent with the terms of this Section 3.2, and (ii) neither Party (nor any of their Affiliates) will take any position inconsistent with this Section 3.2 in any Tax Return, in any refund claim, in any litigation or otherwise. Notwithstanding the allocation of the Purchase Price set forth in the Allocation Statement (if applicable, as modified by Section 3.2(d) hereof), nothing in the foregoing shall be determinative of values ascribed to the Acquired Assets or the allocation of the value of the Acquired Assets in any plan or reorganization or liquidation that may be proposed.

3.3     Limitation on Buyer Liability.

For the avoidance of doubt, except for amounts deposited at Closing pursuant to Section 4.2 (to the extent such amounts are required to be deposited pursuant to this Agreement) or as otherwise expressly provided in this Agreement, Buyer shall have no liability with respect to the Estate Retained Professional Fees Trust, Estate Retained Professional Fees Trust Amount (and any other estate professional fees), the Payroll Trust Amount (and any trust established pursuant thereto), the Wind Down Trust, the Wind Down Trust Amount, the Walter Coke Trust or the Walter Coke Trust Amount.

3.4     Withholding.

Buyer shall be entitled to deduct and withhold from the Purchase Price otherwise payable pursuant to this Agreement to Sellers such amounts as Buyer is required to deduct and withhold under applicable Legal Requirements. To the extent that amounts are so deducted and withheld, such amounts shall be treated for all purposes of this Agreement as having been paid to Sellers.

**ARTICLE 4**

**CLOSING AND DELIVERIES**

4.1     Closing Date.

Upon the terms and subject to the conditions hereof, the closing of the sale of the Acquired Assets and the assumption of the Assumed Liabilities (other than those pertaining to Previously Omitted Contracts pursuant to Section 2.5(b) and Assumed Contracts subject to a cure dispute pursuant to Section 2.5(a)(i) contemplated hereby) (the "Closing") shall take place at the offices of Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019, no later than two (2) Business Days following the date on which all the conditions set forth in Article 9 and Article 10 have been satisfied or (if permissible) waived by the Party entitled to waive such condition (other than the conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or (if permissible) waiver of such

Doc#: US1:10163646v46

conditions), or on such other date and time as Sellers and Buyer may mutually agree in writing. The date and time at which the Closing actually occurs is hereinafter referred to as the "Closing Date." Upon consummation of the Closing, the purchase and sale of the Acquired Assets and the assumption of the Assumed Liabilities hereunder, and the Closing, shall be deemed to have occurred as of 12:01 a.m. (Alabama time) on the Closing Date.

4.2     Buyer's Deliveries.

Subject to satisfaction or (if permissible) waiver of the other conditions set forth in Article 9 and Article 10, at the Closing, Buyer shall deliver (and/or cause one or more of its Affiliates or Buyer Designees to deliver):

(a)     to Sellers, cash required by Section 3.1(a) (as may be adjusted pursuant to Section 3.1), to the Trustee on behalf of the Wind Down Trust;

(b)     to Sellers, the Assumption Agreement, duly executed by Buyer and/or the Buyer Designees, as applicable;

(c)     to Sellers, the Alabama Contract Mining Agreement, duly executed by Buyer and/or the Buyer Designees, as applicable;

(d)     to Sellers, the Transition Services Agreement, duly executed by Buyer and/or the Buyer Designees, as applicable;

(e)     to Sellers, each other Transaction Document to which Buyer or a Buyer Designee is a party, duly executed by Buyer or such Buyer Designee, as applicable;

(f)     to Sellers, the certificates of Buyer to be received by Sellers pursuant to Sections 10.1 and 10.2;

(g)     to Sellers, releases and termination statements sufficient for Buyer to receive the Acquired Assets free and clear of all Encumbrances (other than Permitted Encumbrances);

(h)     to Sellers, a Waiver, duly executed by Buyer or any Buyer Designee, as applicable;

(i)     to Sellers, a payoff letter, release letter or other similar document, duly executed by Buyer and the other applicable parties, regarding the Credit Bid and Release;

(j)     to Sellers, evidence, in form and substance reasonably acceptable to Sellers, of receipt of the Alabama Mining License;

(k)     to Sellers, evidence, in form and substance reasonably acceptable to Sellers, that one or more credit bids have been properly authorized with respect to the First Lien Obligations on behalf of Buyer in payment of, in the aggregate, all of the Purchase Price as set forth in Section 3.1 (other than the Assumed Liabilities and the cash portion of the Purchase Price) has been authorized;

Doc#: US1:10163646v46

(l)    to Sellers, evidence reasonably satisfactory to Sellers of performance of the matters required to be performed prior to, by, or as of, the Closing Date in Section 7.9; and

(m)    to Sellers, such other documents as Sellers may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated by this Agreement.

(n)    to the applicable Trustee, a cash amount equal to the Estate Retained Professional Fees Trust Amount;

(o)    to the applicable Trustee, a cash amount equal to the Payroll Trust Amount;

(p)    to the applicable Trustee, a cash amount equal to the Wind Down Trust Amount; and

(q)    to the applicable Trustee, a cash amount equal to the Walter Coke Trust Amount, if the Walter Coke Election or the Pre-Closing Walter Coke Election is made and, in any event, the sale of the Walter Coke Assets to a Successful Bidder or Backup Bidder for the Walter Coke Assets does not close.

4.3    Sellers' Deliveries.

At the Closing, Sellers shall deliver to Buyer:

(a)    the Bills of Sale, Deeds and the Assumption Agreement (in each case, relating to the Acquired Assets), the Alabama Contract Mining Agreement, the Transition Services Agreement, and each other Transaction Document to which any Seller is a party, duly executed by the applicable Sellers;

(b)    short form instruments of assignment of the Patents and Trademarks and other Intellectual Property that are owned by Sellers and included in the Acquired Assets, if any, duly executed by the applicable Sellers, in form for recordation with the appropriate United States Governmental Authorities, and in customary form reasonably acceptable to the Parties;

(c)    with respect to the Real Property included in the Acquired Assets, possession of such Real Property, together with copies (and originals in Sellers' possession) of all instruments, Leases and agreements evidencing Sellers' interest in the same, and any existing surveys, legal descriptions and title policies concerning such Real Property that are in the possession of Sellers which shall be deemed to be delivered to the extent located at any of the Real Property;

(d)    a certified copy of the Sale Order;

(e)    the certificates of Sellers to be received by Buyer pursuant to Sections 9.1 and 9.2;

Doc#: US1:10163646v46

Case 15-02741-TOM7    Doc 993    Filed 11/05/15    Entered 11/05/15 14:35:05    Desc Main
Document    Page 152 of 233

(f)     certificates executed by each Seller, in the form prescribed under Treasury Regulation Section 1.1445-2(b), that such Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code;

(g)     such other bills of sale, Deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Buyer, as Buyer may reasonably request to vest in Buyer all of the right, title and interest of Sellers in, to or under any or all of the Acquired Assets, including all Real Property, subject only to Permitted Encumbrances and Assumed Liabilities;

(h)     such ordinary and customary documents (including affidavits) as may be required by a title insurance company to issue owners' title insurance policies (or "pro formas" or marked up commitments having the same effect of a title insurance policy), at Buyer's sole election and Buyer's sole cost and expense, insuring title to any or all of the Real Property included in the Acquired Assets (in any event, subject to Permitted Encumbrances and Assumed Liabilities); and

(i)     such other documents as Buyer may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated by this Agreement.

4.4     Buyer Designees.

At least three (3) Business Days prior to the Sale Hearing, Buyer shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 4.4, one or more Affiliates of Buyer to (i) purchase specified Acquired Assets; (ii) assume specified Assumed Liabilities; and/or (iii) employ Buyer Employees, in each case, as of the Closing Date (any Person that shall be properly designated by Buyer in accordance with this clause, a "Buyer Designee"); it being understood and agreed, however, that any such right of Buyer to designate a Buyer Designee is conditioned upon (x) such Buyer Designee being able to perform the applicable covenants under this Agreement and, as applicable, any other transaction agreement to which Buyer is party and demonstrate satisfaction of the requirements of Section 365 of the Bankruptcy Code (to the extent applicable), including the provision of adequate assurance for future performance with respect to the Acquired Assets and Assumed Liabilities, (y) any such designation not creating any Liability (including any Liability relating to Taxes other than Taxes for which Buyer is liable pursuant to Section 2.3(k)) for Sellers or their Affiliates that would not have existed had Buyer purchased the Acquired Assets, assumed the Assumed Liabilities and/or employed the Buyer Employees, and which Liability is not fully reimbursed by or on behalf of Buyer and (z) such designation not being reasonably expected to cause a delay, or prevent or hinder the consummation of the transactions contemplated by this Agreement. As soon as reasonably practicable and in no event later than three (3) Business Days prior to the Sale Hearing, Buyer shall make any such designations of Buyer Designees by way of a written notice to be delivered to Sellers, and Buyer Designees shall deliver a signed counterpart to this Agreement or joinder agreement to this Agreement and each other Transaction Document to which Buyer is party. No such designation shall relieve Buyer of any of its obligations hereunder and any breach hereof by a Buyer Designee shall be deemed a breach by Buyer. Buyer and Buyer Designees shall be jointly and severally liable for any obligations of Buyer and such

40

Buyer Designees hereunder. For the avoidance of doubt, and notwithstanding anything to the contrary herein, all Buyer Designees appointed in accordance with this Section 4.4 shall be included in the definition of "Buyer" for all purposes under this Agreement and all such Buyer Designees shall be deemed to have made all of the representations and warranties of Buyer set forth in this Agreement.

# ARTICLE 5

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers hereby jointly and severally represent and warrant to Buyer as of the date hereof as follows, except as disclosed in the Disclosure Schedules or, except with respect to the representations and warranties set forth in Sections 5.5 and 5.9 with respect to material environmental matters, contained in the Incorporated Information:

5.1     Organization and Good Standing.

Each Seller is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. Subject to the applicable provisions of the Bankruptcy Code, each Seller has all requisite corporate or limited liability company power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted. Sellers are duly qualified or licensed to do business and are in good standing in each jurisdiction where the character of their Business or the nature of their properties makes such qualification or licensing necessary, except for such failures to be so qualified or licensed or in good standing as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

5.2     Authority; Validity; Consents.

Each Seller has, subject to entry of the Sale Order, the requisite corporate or limited liability company power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which such Seller is a party and to consummate the transactions contemplated hereby and thereby, and, subject to entry of the Sale Order, the execution, delivery and performance of this Agreement and such other Transaction Documents by such Seller and the consummation by such Seller of the transactions contemplated herein and therein have been duly and validly authorized by all requisite corporate or limited liability company action on the part of Sellers. Subject to entry of the Sale Order, this Agreement has been duly and validly executed and delivered by each Seller and each other Transaction Document required to be executed and delivered by a Seller at the Closing will be duly and validly executed and delivered by such Seller at the Closing. Subject to entry of the Sale Order, this Agreement and the other Transaction Documents constitute, with respect to each Seller that is party thereto, the legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Subject to entry of the Sale Order, except (a) as required to comply with the HSR Act and the antitrust legislation of any other relevant jurisdiction applicable to the purchase of the Acquired Assets or the Business,

Doc#: US1:10163646v46

(b) for entry of the Sale Order, (c) for notices, filings and consents required in connection with the Bankruptcy Case, including the requirements of the Bidding Procedures Order, and (d) for the notices, filings and consents set forth on Schedule 5.2, Sellers are not required to give any notice to, make any registration, declaration or filing with or obtain any consent, waiver or approval from, any Governmental Authority in connection with the execution and delivery of this Agreement and the other Transaction Documents to which a Seller is a Party or the consummation or performance of any of the transactions contemplated hereby and thereby, except for such notices, registrations, declarations or filings, the failure of which to make or obtain would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

5.3     No Conflict.

Except as a result of the Bankruptcy Case or as set forth in Schedule 5.3, neither the execution and delivery by any Seller of this Agreement or any other Transaction Document to which it is (or will be) a party nor after giving effect to the Sale Order, the consummation of the transactions contemplated hereby or thereby nor, after giving effect to the Sale Order and the Bidding Procedures Order, compliance by it with any of the provisions hereof or thereof will, (a) conflict with or result in a violation of (i) any provision of the certificate of incorporation or bylaws (or other organizational or governing documents) of such Seller or (ii) any material Order binding upon such Seller or by which the Business or any Acquired Assets are subject or bound, (b) (i) violate, conflict with, or result in a material breach of any of the terms of, or constitute a material default under, or give rise to any right of termination, modification, cancellation or acceleration under any material license or Permit held by Sellers, authorization, consent, order or approval of, or registration, declaration or filings with, any Governmental Authority or (ii) result in a material breach of or constitute a default under or give rise to any right of termination, modification, cancellation or acceleration under any Material Contract which is an Available Contract, or (c) result in the creation of any Encumbrance (other than a Permitted Encumbrance or Assumed Liability) upon the properties or assets of such Seller being sold or transferred hereunder.

5.4     Real Property.

(a)     Owned Real Property. Schedule 5.4(a)(i) sets forth an accurate and complete list of the Owned Real Property. Except for Permitted Encumbrances, Sellers have good and marketable title in the Owned Real Property set forth on Schedule 5.4(a)(i). Except for the Lessor Leases, none of the Owned Real Property is subject to any lease or grant to any third-party of any right to the use, purchase, occupancy or enjoyment of such Owned Real Property or any material portion thereof required to conduct the Business. Except for Permitted Encumbrances and the applicable terms of Permits held by Sellers and their Affiliates, the Owned Real Property is not subject to any Encumbrances (other than liens that will be removed pursuant to the Sale Order), which in any material respect interfere with or impair the present and continued use thereof in the Ordinary Course of Business. There are no pending or, to Sellers' Knowledge, threatened condemnation proceedings relating to any of the Owned Real Property except those which do not materially impair or restrict the current use of the Owned Real Property subject thereto. Other than as set forth on Schedule 5.4(a)(ii) hereto, there are no

42

outstanding options or rights of first refusal to purchase any of the Owned Real Property or any interest therein.

(b)     Lessor Leases. Schedule 5.4(b) lists, as of the Execution Date, all material unexpired leases, subleases, licenses, sublicenses, occupancy or other agreements whereby any Seller leases, subleases, licenses or grants an interest in any Owned Real Property or Leased Real Property to a third party (the "Lessor Leases"). Sellers have made available, to the extent that they are in Sellers' possession or control, true, complete and correct copies of the Lessor Leases to Buyer, including any amendments thereto. Other than as set forth on Schedule 5.4(b) or as a result of the Bankruptcy Case, Sellers are not in material breach of or in default under the Lessor Leases and, to Sellers' Knowledge, no party to any Lessor Lease has given Sellers written notice of or, to Sellers' Knowledge, made a claim with respect to any material breach or material default by Sellers thereunder (other than as a result of the Bankruptcy Case).

(c)     Leased Real Property. Schedule 5.4(c) contains a list of all Leased Real Property held or used for, or necessary to the operation of the Business. Sellers have made available, to the extent in Sellers' possession or control, true and complete copies of all Leases to Buyer. Other than as set forth on Schedule 5.4(c) or other than as a result of the Bankruptcy Case, Sellers are not in material (x) breach of any material term or (y) "default" under any Lease and, to Sellers' Knowledge, no party to any Lease has given Sellers written notice of or made a claim with respect to any material breach or material default thereunder. To Sellers' Knowledge or other than as a result of the Bankruptcy Case, there are no conditions that currently exist or which with the passage of time will result in a material default or material breach of any material term by any party to a Lease. Except as set forth on Schedule 5.4(c), to Sellers' Knowledge, none of the Leased Real Property is subject to any sublease or grant to any third-party of any right to the use, occupancy or enjoyment of the Leased Real Property or any portion thereof that would materially impair the use of the Leased Real Property in the operation of the Business. Sellers have not received written notice of any pending or threatened condemnation or other proceedings or claims relating to Seller's interest in any of the Leased Real Property, except those which do not materially impair or restrict the current use of the Leased Real Properties subject thereto.

5.5     Environmental Matters.

Except as set forth on Schedule 5.5 and except as would not reasonably be expected to be material to the Business or the Acquired Assets:

(a)     Sellers' operation of the Business, and Real Properties related thereto, have complied during the previous three (3) years and are in compliance with all applicable Environmental Law;

(b)     Sellers have not received any written or other notice, report or other information alleging any pending or threatened material violation, non-compliance, liability or potential liability regarding Environmental Laws with regard to any of the Real Properties or the Business, or any prior business for which Sellers have retained liability under

43

any Contract or Environmental Law, nor do Sellers have any unresolved claims alleging any violations of Environmental Law;

        (c)     the Real Properties do not contain any Hazardous Substances in amounts or concentrations which (i) constitute a violation of, or (ii) would reasonably be expected to give rise to liability, including liability for response costs, corrective action costs, personal injury, property damage or natural resources damage, under any applicable Environmental Law;

        (d)     no Seller or, to Sellers' Knowledge, other Person, has treated, recycled, stored, disposed of, arranged for or permitted the disposal of, transported, handled, or Released any Hazardous Substances, or owned or operated any property or facility in a manner that has given or could reasonably be expected to give rise to liability, including liability for response costs, corrective action costs, personal injury, property damage or natural resources damage, under any applicable Environmental Law;

        (e)     no Action is pending or, to Sellers' Knowledge, threatened under any Environmental Law or environmental provision of any Mining and Mining Safety Law against Sellers or with respect to the Real Properties or the Business, nor are there any Orders outstanding under any Environmental Law or environmental provision of any Mining and Mining Safety Law with respect to the Real Properties or the Business;

        (f)     Sellers (i) hold and are in compliance with all Permits required under Environmental Law (each of which is in full force and effect and is not subject to appeal, except in such instances where the requirement to hold an Environmental Permit is being contested in good faith by Sellers by appropriate proceedings diligently conducted) for any of their current operations or for the current ownership, operation or use of the Real Properties, including all Environmental Permits required for the coal mining-related operations of Sellers or, to the extent currently required, any pending construction or expansion related thereto; (ii) are, or have been, in compliance with all Environmental Permits, except in such instances where the requirement of a Permit required under Environmental Law is being contested in good faith by Sellers by appropriate proceedings diligently conducted; (iii) have used commercially reasonable efforts to cause all contractors, lessees and other Persons occupying, operating or using the Real Properties to comply with Environmental Law and obtain all necessary Permits required under Environmental Law; and (iv) have not received any written notice that the Permits required under Environmental Law will not be renewed;

        (g)     to Sellers' Knowledge, none of the Real Properties have any associated direct or indirect acid mine drainage which (i) constitutes or constituted a violation of or (ii) could reasonably be expected to give rise to liability under, any applicable Environmental Law or environmental provision of any Mining and Mining Safety Law;

        (h)     to Sellers' Knowledge, neither the Transaction Documents nor the consumation or performance of any of the transactions contemplated hereby will result in any additional material liabilities for site investigation or cleanup pursuant to any Environmental Law or environmental provision of any Mining and Mining Safety Law, including any so-called "transaction-triggered" or "responsible property transfer" requirements;

44

(i)     Except as set forth on Schedule 5.5(i) and in Section 2.3, Sellers have not, since January 1, 2005, contractually assumed any liabilities, including any obligation for corrective or remedial action, of any other Person relating to Environmental Laws;

(j)     Sellers have made available copies of all material environmental assessments, audits (including compliance audits), evaluations, studies, and tests from the past five (5) years within their possession, relating to the Owned Real Property or the Leased Real Property, whether generated by Sellers or others, including environmental audits and environmental site assessments; and

(k)     except as listed on Schedule 5.5(k), to Seller's Knowledge, none of the Acquired Assets contains underground storage tanks, above ground storage tanks, transformers or other equipment containing PCBs, underground injection wells, non-naturally occurring radioactive materials or septic tanks or waste disposal pits (to the extent such tanks or pits constitute Acquired Assets).

5.6     Title to Acquired Assets.

Sellers have good, valid and marketable title to, or, in the case of property leased or licensed by Sellers, a valid leasehold or licensed interest in, all of the Acquired Assets, free and clear of all Encumbrances, except (a) for the Assumed Liabilities and (b) for Permitted Encumbrances.

5.7     Taxes.

(a)     Sellers have each timely filed all material Tax Returns required to be filed with the appropriate Governmental Authorities (taking into account any extension of time to file granted to Sellers). All such Tax Returns are true and correct in all material respects and were prepared in substantial compliance with all applicable law, and, except as set forth on Schedule 5.7(a), all material Taxes, including those relating to the Business and/or the Acquired Assets, that are due and payable, whether or not shown to be payable on such Tax Returns, have been timely paid, except for any unpaid Taxes to be paid at Closing or expressly assumed by Buyer herein and paid after Closing. Except as set forth on Schedule 5.7(a), (i) no examination of any such Tax Return of Sellers is currently in progress by any Governmental Authority and no Seller has received notice of any contemplated examination of any such Tax Return; and (ii) no material adjustment has been proposed in writing with respect to any such Tax Returns for the previous five (5) fiscal years by any Governmental Authority.

(b)     Except as set forth in Schedule 5.7(b), Sellers have not received written notice of any material Tax deficiency outstanding, proposed or assessed against or allocable to Sellers and have not executed any waiver of any statute of limitations in respect of Taxes nor agreed to any extension of time with respect to a Tax assessment or deficiency with respect to the Acquired Assets. Except as set forth in Schedule 5.7(b), there are no pending or threatened audits, investigations, disputes, notices of deficiency, claims or other actions for or relating to any Liability for Taxes, and there is no dispute or claim concerning any Tax liability of Sellers claimed or raised by any Governmental Authority in writing.

45

(c)     Except as set forth on Schedule 5.7(c), Sellers are not in default under, nor to Sellers' Knowledge does there exist any condition which, with the giving of notice or passage of time would constitute a default by Sellers under, any agreement with any Governmental Authority that provides for or results in a reduction, rebate or exemption from Taxes or any other form of Tax incentive applicable to the Business, except for such defaults or conditions which would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(d)     Except as set forth on Schedule 5.7(d), each Seller has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party and all IRS Forms W-2 and Forms 1099 (or any other applicable form) required with respect thereto have been properly and timely distributed.

(e)     Except as set forth on Schedule 5.7(e), no Seller is a party to any Tax allocation or sharing agreement. No Seller (i) has been a member of an affiliated group filing a consolidated federal income Tax Return (other than a consolidated group in which the Company is the parent of such group) or (ii) has any liability for the Taxes of any Person (other than a Seller) under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local, or non-U.S. law), as a transferee or successor, by contract, or otherwise.

(f)     No Seller is or has been a party to any "listed transaction," as defined in Code Section 6707A(c)(2) and Treasury Regulation Section 1.6011-4(b)(2).

(g)     No claim has been made in writing by any Governmental Authority in a jurisdiction where Sellers do not file Tax Returns that Sellers are or may be subject to taxation by that jurisdiction.

5.8     Legal Proceedings.

Except (x) for the Bankruptcy Case (and proceedings related thereto) and (y) as set forth on Schedule 5.8, there is no Proceeding or Order pending, outstanding or, to Sellers' Knowledge, threatened in writing against or related to the Business, whether at law or in equity, whether civil or criminal in nature or by or before any arbitrator or Governmental Authority, nor, to Sellers' Knowledge, are there any investigations relating to the Business pending or, to Sellers' Knowledge, threatened in writing by or before any arbitrator or any Governmental Authority, which would reasonably be expected to be material to the Business or the Acquired Assets, taken as a whole.

5.9     Compliance with Legal Requirements; Permits.

(a)     Except as set forth in Schedule 5.9(a), and, with respect to Permits required under any Environmental Law or environmental provision of any Mining and Mining Safety Law, which Permits are addressed in Section 5.5, Sellers hold all of the Permits necessary for the current operation and conduct of the Business and the Acquired Assets in compliance with Legal Requirements, including Mining and Mining Safety Law, the absence of which would be immaterial to the operation of the Business or the Acquired Assets from and after the Closing. The Permits set forth on Schedule 2.1(g) are all of the Permits held by Sellers with respect to the

46

current operation and conduct of the Business and the Acquired Assets, the absence of which would be reasonably expected to adversely affect the operation of the Business or the Acquired Assets from and after the Closing.

(b)     Except (x) as set forth on Schedule 5.9(b), and, with respect to compliance with Environmental Law or environmental provision of any Mining and Mining Safety Law, Schedule 5.5, (y) for fully paid, discharged and finally settled citations and notices of violations issued by MSHA, the Alabama Surface Mining Commission, the Alabama Department of Environmental Management, the West Virginia Department of Environmental Protection, or other Governmental Authorities and (z) as would not reasonably be expected to be material to the Business or the Acquired Assets, Sellers have conducted the Business for the past three (3) years and currently own and operate the Acquired Assets in accordance, in all material respects, with all Legal Requirements, Orders and Permits applicable to Sellers and the Acquired Assets during such period, and the Business is in compliance in all material respects with all applicable Legal Requirements, Orders and Permits (including any anti-bribery Legal Requirements) and has obtained all approvals necessary for owning and operating its assets and has made all necessary filings with all Governmental Authorities having jurisdiction necessary for owning and operating its assets, and there are no Orders outstanding under any Mining and Mining Safety Law with respect to the Real Properties or the Business.

(c)     Except (x) as set forth on Schedule 5.9(c) and, with respect to actions under Environmental Law, which are covered under Section 5.5, (y) for fully paid, discharged and finally settled citations and notices of violations issued by MSHA, the Alabama Surface Mining Commission, the Alabama Department of Environmental Management, the West Virginia Department of Environmental Protection, or other Governmental Authorities, and (z) as would not reasonably be expected to be material to the Business or the Acquired Assets neither Sellers, nor to Sellers' Knowledge, any of their Representatives have received within the past three (3) years any written notice or other communication from a Governmental Authority that alleges that the Business is not in compliance with any Legal Requirement, Order or Permit applicable to the Business or the operations or properties of the Business or the Acquired Assets or that threatens or states the intention on the part of any issuing authority to revoke, cancel, suspend or modify any Permit necessary for the current operation and conduct of the Business and the Acquired Assets (except with respect to regular periodic expirations and renewals thereof). Except as would not reasonably be expected to be material to the Business or the Acquired Assets: (i) no Seller has had any Permits that are necessary for the operation and conduct of the Business and the Acquired Assets appealed, denied, revoked, restricted or suspended during the past three (3) years; (ii) no Seller is currently a party to any proceedings involving the possible appeal, denial, revocation, restriction or suspension of any Permits that are necessary for the current operation and conduct of the Business and the Acquired Assets or any of the privileges granted thereunder (except where the obligation to hold such a Permit is being contested in good faith by appropriate proceedings diligently conducted or is excused by the Bankruptcy Court); and (iii) no Seller nor any officer or director of any Seller is "permit blocked" on the Applicant Violator System established pursuant to the SMCRA (or any applicable state system) (the "Applicant Violator System") by any Governmental Authority.

Doc#: US1:10163646v46

5.10    Labor Matters.

(a)     Except as set forth on Schedule 5.10(a), none of Sellers are party to or subject to any collective bargaining agreements, works council agreements, labor union contracts, trade union agreements, and other similar agreements (each a "Collective Bargaining Agreement") with any union, works council, or labor organization (each a "Union" and collectively "Unions").

(b)     Except as set forth on Schedule 5.10(b), to Sellers' Knowledge, in the past three (3) years, other than pursuant to procedures established in connection with the Bankruptcy Case, (i) no Union or group of Employees or former Employees has organized any employees for purposes of collective bargaining, sought to bargain collectively with any of Sellers, made a demand for recognition or certification as an employee representative for purposes of collective bargaining or filed a petition for recognition with any Governmental Authority; (ii) as of this date, no Collective Bargaining Agreement is being negotiated by any of Sellers, other than pursuant to procedures established in connection with the Bankruptcy Case; and (iii) in the past three (3) years, there have been no material strikes, lockouts, slowdowns, work stoppages, boycotts, handbilling, picketing, walkouts, demonstrations, leafleting, sit-ins, sick-outs, or other material forms of organized labor disruption with respect to any of Sellers.

(c)     Except as set forth on Schedule 5.10(c) within the past three (3) years, Sellers have not failed to provide advance notice of layoffs or terminations as required by, or incurred any material Liability under, the Worker Adjustment and Retraining Notification Act of 1988, and including any similar state or local Legal Requirement (the "WARN Act"), or any applicable Legal Requirement for employees outside the United States regarding the termination or layoff of employees. Except as set forth on Schedule 5.10(c) or as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or pursuant to procedures established in connection with the Bankruptcy Case, (i) within the past three (3) years, Sellers have been in compliance with all applicable Legal Requirements relating to labor and employment, including all Legal Requirements relating to employment practices; the hiring, promotion, assignment, and termination of employees; discrimination; equal employment opportunities; disability; labor relations; wages and hours; FLSA, classification of independent contractors, hours of work; payment of wages; immigration; workers' compensation; employee benefits; background and credit checks; working conditions; occupational safety and health; family and medical leave; employee terminations; and data privacy and data protection; (ii) there are no pending, or to Sellers' Knowledge, threatened, lawsuits, grievances, unfair labor practice charges, arbitrations, charges, investigations, hearings, actions, claims, or proceedings (including any administrative investigations, charges, claims, actions, or proceedings), against Sellers brought by or on behalf of any applicant for employment, any current or former Employee, any person alleging to be a current or former employee, any representative, agent, consultant, independent contractor, subcontractor, or leased employee, volunteer, or "temp" of Sellers, or any group or class of the foregoing, or any Governmental Authority, alleging violation of any labor or employment Legal Requirements, breach of any Collective Bargaining Agreement, breach of any express or implied contract of employment, wrongful termination of employment, or any other discriminatory, wrongful, or tortious conduct in connection with the employment relationship; (iii) each of the Employees has all work permits, immigration permits, visas, or other authorizations required by any Legal Requirement for such Employee given the

48

duties and nature of such Employee's employment; and (iv) no individual has been improperly excluded from, or wrongly denied benefits under, any Benefit Plan.

5.11    Employee Benefits.

(a)    Except as set forth in Schedule 5.11(a), (i) no Benefit Plan (or any benefit plans, programs or arrangements of an ERISA Affiliate that would be a Benefit Plan if such ERISA Affiliate were a Seller) (A) is, or has been within the past six (6) years, a Title IV Plan or subject to Section 412 of the Code; (B) is maintained by more than one employer within the meaning of Section 413(c) of the Code; (C) is subject to Sections 4063 or 4064 of ERISA; (ii) no Benefit Plan is (A) a "multiple employer welfare arrangement" as defined in Section 3(40) of ERISA; or (B) an "employee pension benefit plan" (within the meaning of Section 3(2) of ERISA) that is not intended to be qualified under Section 401(a) of the Code; and (iii) none of the Sellers or any of their respective ERISA Affiliates contributes to, or is obligated to contribute to, or within the six (6) years preceding this Agreement contributed to or was obligated to contribute to, a Multiemployer Plan.

(b)    (i) Each Buyer Benefit Plan has been established and administered by Sellers in all material respects in accordance with its terms and in compliance with the applicable provisions of ERISA, the Code and all other Legal Requirements; (ii) with respect to each Buyer Benefit Plan, except as would not reasonably be expected to be material, all reports, returns, notices and other documentation that are required to have been filed with or furnished to the Internal Revenue Service (the "IRS"), the United States Department of Labor ("DOL") or any other Governmental Authority, or to the participants or beneficiaries of such Buyer Benefit Plan in the past three (3) years have been filed or furnished on a timely basis; (iii) each Buyer Benefit Plan that is intended to be qualified within the meaning of Section 401(a) of the Code has received a favorable opinion or determination letter from the IRS (covering all required Tax laws) to the effect that such Buyer Benefit Plan satisfies the requirements of Section 401(a) of the Code and that its related trust is exempt from taxation under Section 501(a) of the Code and, to Sellers' Knowledge, there are no facts or circumstances that could reasonably be expected to cause the loss of such qualification or the imposition of any material liability, penalty or tax under ERISA, the Code or any other Legal Requirements; (iv) no Benefit Plan that is intended to be qualified within the meaning of Section 401(a) of the Code has been partially or completely terminated; (v) other than routine claims for benefits, no material liens, lawsuits or complaints to or by any person or Governmental Authority have been filed in the past three (3) years against any Buyer Benefit Plan or against Sellers with respect to any Buyer Benefit Plan and, to Sellers' Knowledge, no such material liens, lawsuits or complaints are contemplated or threatened with respect to any Buyer Benefit Plan; and (vi) there are no corrections, audits or proceedings initiated pursuant to the IRS Employee Plans Compliance Resolution System (currently set forth in Revenue Procedure 2013-12) or similar proceedings pending with the IRS or DOL with respect to any Buyer Benefit Plan or any tax qualified Benefit Plan from which distributions are eligible to be rolled over.

(c)    Within the past three (3) years, there has been no "reportable event" (as defined in Section 4043 of ERISA and the regulations thereunder) with respect to any Title IV Plan set forth in Schedule 5.11(a) that would require the giving of notice to the Pension Benefit Guaranty Corporation (the "PBGC") under Section 4041(c)(3)(C) or 4063(a) of ERISA.

49

(d)     Except as set forth in Schedule 5.11(d), (i) no Seller has terminated any Title IV Plan within the last six (6) years or incurred any outstanding liability under Section 4062 of ERISA to the PBGC, or to a trustee appointed under Section 4042 of ERISA; (ii) all premiums due the PBGC with respect to the Title IV Plans set forth in Schedule 5.11(a) have been paid; (iii) no Seller has filed a notice of intent to terminate any Title IV Plan set forth in Schedule 5.11(a) and has not adopted any amendment to treat such Title IV Plan as terminated; (iv) the PBGC has not instituted, or to Sellers' Knowledge, threatened to institute, proceedings to treat any Title IV Plan set forth in Schedule 5.11(a) as terminated; and (v) no event has occurred or circumstance exists that may constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Title IV Plan set forth in Schedule 5.11(a).

(e)     No Seller or ERISA Affiliate has, within the past six (6) years, withdrawn from a Multiemployer Plan in a "complete withdrawal" or a "partial withdrawal" as defined in Sections 4203 and 4205 of ERISA, respectively, so as to result in an unsatisfied liability, contingent or otherwise (including the obligations pursuant to an agreement entered into in accordance with Section 4204 of ERISA), of such Seller or ERISA Affiliate.

(f)     No Seller or any organization to which such Seller is a successor or parent corporation, within the meaning of Section 4069(b) of ERISA, has engaged in any transaction described in Sections 4069 or 4212(c) of ERISA.

(g)     Neither Sellers nor, to Sellers' Knowledge, any other "party in interest" or "disqualified person" with respect to any Buyer Benefit Plan has engaged in a non-exempt "prohibited transaction" within the meaning of Section 406 of ERISA or Section 4975 of the Code involving such Buyer Benefit Plan which, individually or in the aggregate, could reasonably be expected to subject Sellers to Liability, tax or penalty imposed by Section 4975 of the Code or Sections 501, 502 or 510 of ERISA. To Sellers' Knowledge, no fiduciary has incurred any liability for breach of fiduciary duty or any other failure to act or comply with the requirements of ERISA, the Code or any other Legal Requirements in connection with the administration or investment of the assets of any Buyer Benefit Plan.

(h)     Except as would not, individually or in the aggregate, reasonably be expected to result in a material Liability, (i) all liabilities or expenses of Sellers in respect of any Buyer Benefit Plan which are due and payable but have not been paid, have been properly accrued on the applicable Financial Statements; and (ii) all contributions (including all employer contributions and employee salary reduction contributions) or premium payments required to have been made to or in respect of any Buyer Benefit Plan under the terms of such Buyer Benefit Plan or in accordance with Legal Requirements, as of the Execution Date have been timely made or reflected on the applicable Financial Statements.

(i)     Except as set forth in Schedule 5.11(i), Sellers have no obligation to provide or make available post-employment benefits under any Buyer Benefit Plan which is a "welfare plan" (as defined in Section 3(1) of ERISA), except as may be required under COBRA or similar Legal Requirements, and at the sole expense of such individual.

(j)     Except as set forth in Schedule 5.11(j) or expressly provided herein or in the Approved Budget or if the payment thereof is otherwise excused as a result of the

50

Bankruptcy Case, neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (either alone or in combination with another event) (i) result in any payment becoming due and payable, or increase the amount of any compensation due and payable, to any current or former officer, director, employee, leased employee, consultant or agent (or their respective beneficiaries) of Sellers; (ii) increase any benefits otherwise payable under any Buyer Benefit Plan; or (iii) result in the acceleration of the time of payment or vesting of any compensation or benefits under any Buyer Benefit Plan.

(k)     To the extent applicable, each Buyer Benefit Plan that is a "nonqualified deferred compensation plan" within the meaning of Section 409A(d)(1) of the Code (i) complies and has been operated in all material respects in compliance with the requirements of Section 409A of the Code and the final regulations and official guidance promulgated thereunder, or (ii) is exempt from compliance under the "grandfather" provisions of IRS Notice 2005-1 and applicable regulations and has not been "materially modified" (within the meaning of IRS Notice 2005-1 and Treasury Regulation §1.409A-6(a)(4)) subsequent to October 3, 2004.

(l)     With respect to each Buyer Benefit Plan, except with respect to such Buyer Benefit Plans copies of which have been publicly filed under the Exchange Act, Sellers have made available to Buyer, true, correct (in all material respects) and materially complete copies of, to the extent applicable: (i) all documents constituting such Buyer Benefit Plans and all amendments thereto (or, to the extent no such copies exist or the Buyer Benefit Plan is not in writing, a materially accurate written description); (ii) any related trust agreement or other funding instrument and all other material contracts currently in effect with respect to such Buyer Benefit Plans (including all administrative agreements, group insurance contracts and group annuity contracts); (iii) the most recent IRS determination letter and/or opinion letter for each such Buyer Benefit Plan, if applicable; (iv) the most recent summary plan description, summary of material modifications and any other written communication (or a written description of any material oral communication) by Sellers to Employees within the two (2) years immediately preceding the Execution Date concerning the extent of benefits provided under a Buyer Benefit Plan; (v) to the extent not publicly available, the three most recent (A) Forms 5500 and schedules thereto, and (B) audited financial statements; (vi) for the past three (3) years, all material correspondence with the IRS, the DOL and any other Governmental Authority regarding the operation or the administration of such Buyer Benefit Plans; and (vii) all discrimination tests for the most recent plan year.

(m)     Sellers have no direct or indirect material liability, whether absolute or contingent, under any Buyer Benefit Plan, with respect to any misclassification of any person as an independent contractor rather than as an employee, or with respect to any employee leased from another employer.

(n)     Except in connection with the Bankruptcy Case, Sellers have no plan, contract or commitment, whether legally binding or not, to create any new employee benefit or compensation plans, policies or arrangements for any Buyer Employee or, except as may be required by applicable Legal Requirements, to modify any Buyer Benefit Plan.

Doc#: US1:10163646v46

5.12   Sellers' Intellectual Property.

(a)   Schedule 5.12(a) sets forth a true and complete list of all U.S. and foreign (i) issued Patents and pending applications for Patents; (ii) registered Trademarks and pending applications for Trademarks; and (iii) registered Copyrights and pending applications for Copyrights, in each case which are owned by a Seller as of the Execution Date and which are material to the Acquired Assets. Except as set forth on Schedule 5.12(a), Sellers are the sole owners of all of the applications and registrations set forth on Schedule 5.12(a), and all such applications and registrations are in effect and subsisting.

(b)   Except as disclosed on Schedule 5.12(b), and except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, to Sellers' Knowledge, (i) the conduct of the Business by Sellers as currently conducted (including the products and services currently sold or provided by Sellers) does not infringe or otherwise violate any Person's intellectual property rights, and no such claims are pending or threatened in writing against Sellers, and (ii) no Person is infringing or otherwise violating any Intellectual Property owned by Sellers, and no such claims are pending or threatened in writing against any Person by Sellers.

(c)   To Sellers' Knowledge, the Acquired Assets and any rights provided to Buyer pursuant to the Transaction Documents include all material third party intellectual property rights licensed to Sellers that are required to conduct the Business in a substantially similar manner as it is presently being conducted by Sellers, except such intellectual property rights as exist under the Excluded Contracts.

5.13   Contracts. Schedule 5.13(i) sets forth a complete list, as of the date hereof, of all Material Contracts to which any Seller is a party. Each Material Contract is in full force and effect and is a valid and binding obligation of each Seller party thereto in accordance with its terms and conditions, in each case except (x) as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity, (y) as set forth on Schedule 5.13(ii) and (z) as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Except as set forth on Schedule 5.13(iii), upon entry of the Sale Order, other than the payment of Cure Costs (i) no Seller will be in breach or default of its obligations under any Material Contract; (ii) no condition exists that with notice or lapse of time or both would constitute a default by any Seller under any Material Contract; and (iii) to Sellers' Knowledge, no other party to any Material Contract is in breach or default thereunder, except in the case of clauses (i), (ii) and (iii) for any breaches or defaults that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

5.14   Insurance.

Schedule 5.14 sets forth all insurance policies held by Sellers covering the property, assets, Employees and operations of the Business (including policies providing property, casualty, liability and workers' compensation coverage). Such policies are in full force and effect (subject to periodic renewals thereof). Except as set forth on Schedule 5.14, Sellers have paid all premiums on such policies due and payable prior to the Execution Date, or, if not

52

Case 15-02741-TOM7    Doc 993    Filed 11/05/15    Entered 11/05/15 14:35:05    Desc Main
Document      Page 165 of 233

yet due, have properly accrued for such payables. Since the Petition Date, to Sellers' Knowledge, Sellers have not done anything by way of action or inaction that invalidates any such policies in whole or in part.

5.15   Brokers or Finders.

Other than the Estate Retained Professional Fees, Sellers have not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which Buyer is or will become liable, and, except as otherwise contemplated hereby with respect to Estate Retained Professional Fees, Sellers shall indemnify and hold harmless Buyer from any claims with respect to any such fees or commissions.

5.16   Affiliate Interests.

Other than any Benefit Plan and travel advances entered into the Ordinary Course of Business, all Contracts between any Seller and any Affiliate of any Seller (but not including another Seller or a Subsidiary of a Seller) are listed on Schedule 5.16. Other than employment arrangements, compensation benefits and travel advances entered into in the Ordinary Course of Business, and other than arrangements or relationships that would not be required to be disclosed in the Company's SEC filings pursuant to Regulation S-K of the Securities Act, to Sellers' Knowledge, no such Affiliate of any Seller controls or is a director, officer, employee or partner of, or consultant to, or lender to or borrower from or has the right to participate in the profits of, other than through the ownership of any publicly traded entity, (i) any Person which does business with any Seller or is competitive with the Business in any material respect, or (ii) any material property, asset or right which is used by any Seller. All Indebtedness of any such Affiliate to any Seller, and all Indebtedness of any Seller to any Affiliate of any Seller, is listed on Schedule 5.16.

5.17   Bank Accounts.

Schedule 5.17 sets forth a complete list of all bank accounts (including any deposit accounts, securities accounts and any sub-accounts) of Sellers.

5.18   Undue Influence.

In connection with the operation of the Business, no Seller or, to Sellers' Knowledge, any director, officer, agent, employee or Affiliate of Sellers, has taken any action, directly or indirectly, with respect to the Business that would result in a violation of the Foreign Corrupt Practices Act of 1977 and the rules and regulations thereunder (the "FCPA"). Sellers, and, to Sellers' Knowledge, their Affiliates, have conducted the Business in compliance with the FCPA in all material respects and maintain procedures which are reasonably expected to ensure compliance therewith.

Doc#: US1:10163646v46

5.19    Financial Statements.

Sellers have made available to Buyer the consolidated balance sheets of the Company and its Subsidiaries as of, and consolidated statements of operations, comprehensive income, changes in stockholder's equity and cash flows for, the fiscal year ended December 31, 2014 (collectively, the "Audited Financial Statements"). The Audited Financial Statements have been prepared in accordance with generally accepted accounting principles ("GAAP") consistently applied in accordance with the Company's past practice throughout the periods indicated. Sellers have made available to Buyer unaudited condensed consolidated balance sheets for the Company and its Subsidiaries as of June 30, 2015 and the condensed consolidated statements of operations, stockholder's equity (deficit) and cash flows for the six-month period ending June 30, 2015 (collectively, the "Unaudited Financial Statements"). The Unaudited Financial Statements have been prepared in accordance with GAAP consistently applied in accordance with Sellers' past practice except for the absence of footnotes and customary year-end adjustments. The Audited Financial Statements and the Unaudited Financial Statements (together the "Financial Statements") (i) were prepared based on the books and records of Sellers and (ii) fairly present in all material respects the financial position of Sellers at and as of the dates specified and the results of their operations for the period covered, subject to customary year-end adjustments. The copies of the Financial Statements made available to Buyer are true and complete copies of such Financial Statements.

5.20    Absence of Certain Changes.

(a)    Since the Petition Date through the date hereof, there has not been a Material Adverse Effect.

(b)    Except as set forth on Schedule 5.20(b), or as expressly contemplated by this Agreement, the Approved Budget or the Cash Collateral Orders or any other orders entered in the Bankruptcy Case from and after the Petition Date through the date hereof, Sellers have not:

(i)    except for executory contracts and unexpired leases rejected by Sellers with the prior written consent of Buyer or the Steering Committee, terminated, modified or amended any Available Contract that is a Material Contract other than due to the expiration of the term or automatic renewals, in each case, in accordance with the terms of any such Available Contract that is a Material Contract;

(ii)    purchased or otherwise acquired any material properties or assets (tangible or intangible) or sold, leased, transferred or otherwise disposed of any Acquired Assets, except for purchases of materials and sales of coal, coke and surplus equipment Inventory in the Ordinary Course of Business, (A) permitted, allowed or suffered any of the Acquired Assets to be subjected to any Encumbrance (other than Permitted Encumbrances), or (B) removed any (non-surplus) Equipment or other material assets (other than Inventory) from the Real Property other than in the Ordinary Course of Business; provided, that, any such action with respect to any asset previously identified in the Disclosure Statement as an asset held for sale shall be considered Ordinary Course of Business;

54

(iii)    suffered any material damage or destruction to or loss of any material assets or properties whether or not covered by insurance;

(iv)    other than the Approved Retention Payments, (A) increased the annual rate of base salary or any target bonus opportunity of any Employee whose annual rate of base salary prior to such increase was in excess of $200,000; (B) paid any bonus, benefit, or other direct or indirect incentive compensation (other than any such payments authorized pursuant to any first or second day orders in the Bankruptcy Case); (C) awarded any equity compensation awards (whether phantom or equity) with respect to the equity of the Company or its Affiliates; (D) modified, amended or terminated any Benefit Plan; (E) entered into any employment, compensation, severance, non-competition, or similar contract (or amended any such contract) to which any Seller is a party; or (F) adopted any new severance pay, termination pay, deferred compensation, bonus, or other employee benefit plan with respect to Employees that would be a Benefit Plan if it existed on the Execution Date (including any employment agreement, severance agreement, change in control agreement, or transaction or retention bonus agreements), except, in the case of each of clauses (A) through (F), (i) to the extent permitted by any order of the Bankruptcy Court or as required by applicable Legal Requirements (including to avoid the imposition of Taxes or to conform to the requirements of Tax qualification); (ii) pursuant to the terms of any Benefit Plan, as in effect on the date hereof; or (iii) for immaterial changes to Benefit Plans available to all employees generally (other than changes that materially increase the amount, or accelerate the timing, of the payment of benefits);

(v)    changed in any material respect Sellers' accounting methods, principles or practices other than required by changes in GAAP;

(vi)    allowed any material Permit held by any Seller to terminate, expire or lapse; or

(vii)    agreed or committed in writing to do any of the foregoing.

5.21    Seller SEC Documents.

Each Seller has filed or furnished with the SEC all filings it has been required to make since January 1, 2014 (collectively the "Seller SEC Documents"). As of their respective filing dates, the Seller SEC Documents complied in all material respects with the requirements of the Securities Act or the Exchange Act, as applicable. None of the Seller SEC Documents filed under the Exchange Act as of their filing dates contained any untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading, except to the extent corrected by a subsequently filed document with the SEC. None of the Seller SEC Documents filed under the Securities Act contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein in light of the circumstances in which they were made not misleading at the time such Seller SEC Documents became effective under the Securities Act.

Doc#: US1:10163646v46

5.22    Mining.

(a)    Sellers have, in the amounts and forms required pursuant to applicable Mining and Mining Safety Laws, obtained all performance bonds and surety bonds, or otherwise provided any financial assurance as (i) required under the applicable Mining Permits or Mining and Mining Safety Laws for Reclamation of land, water or other natural resources at any current mines, (ii) required pursuant to any applicable Mining Permit or Mining and Mining Safety Law to mitigate any actual or potential environmental impact of such mines, or (iii) otherwise obtained in the Ordinary Course of Business (collectively, "Mining Financial Assurances"), except for such Mining Financial Assurances that do not exceed $1,000,000 in the aggregate. The Company has posted or otherwise provided all Mining Financial Assurances that have been requested in writing by the applicable Governmental Authorities in respect of any applicable Permits and Legal Requirements having to do with Reclamation in connection with Sellers' mining operations as currently conducted, subject to the discretion of any applicable Governmental Authority to require additional or supplemental Mining Financial Assurances from time to time.

(b)    All Reclamation performed by or on behalf of any Seller meets in all material respects the requirements of the applicable Mining Permit and any associated mine Reclamation requirements of any applicable Governmental Authority. The liability for mine closing and Reclamation obligations recorded on the most recent balance sheet of Sellers provided to Buyer has been properly accrued in accordance with the requirements of Financial Accounting Standards Board Codification Topic 410, Asset Retirement and Environmental Obligations, formerly known as Financial Accounting Standard No. 143 ("FASB 410"), and the amount of such liability is equal to or in excess of the amount of such obligations, determined on the basis of Sellers' actual historic Reclamation and closure costs and currently planned mine life and escalated for inflation, in accordance with FASB 410 and applicable Legal Requirements.

5.23    MSHA; OSHA. For the past three (3) years, except as set forth on Schedule 5.23 and except for fully paid, discharged and settled citations and notices of violation issued by MSHA, the Alabama Surface Mining Commission, the West Virginia Office of Miners' Health, Safety and Training or other Governmental Authority, Sellers have conducted their respective business and operations, and their respective assets have been maintained, in compliance in all material respects with MSHA or OSHA, as applicable. Except as set forth on Schedule 5.23, there are no investigations pending or, to Sellers' Knowledge, threatened by any Governmental Authority or other third Person that would result in the imposition of any material Liability on any Seller pursuant to MSHA or OSHA. Except as set forth on Schedule 5.23, Sellers do not owe any material assessments, penalties, fines, liens, charges, surcharges, nor are there any other material amounts due or owing pursuant to MSHA or OSHA, and there have been no imminent danger orders, unwarrantable failure orders, failure to abate orders, or cessation orders, notices of a pattern of violations, or material assessments, under MSHA or OSHA during the past three (3) years. Schedule 5.23 sets forth all material reports of any MSHA or OSHA audits with respect to the Business of which Sellers have Knowledge performed within the past three (3) years by any Person (including Sellers). Schedule 5.23 sets forth all orders issued under MSHA or OSHA, together with any appeals thereof, with respect to the Business within the past three (3) years by any Governmental Authority. Sellers have made available to Buyer copies of all orders and reports under MSHA or OSHA within their possession, together

56

with the minutes of all joint health and safety committee meetings within their possession, with respect to Sellers for the past three (3) years.

5.24   <u>Coal Act; Black Lung Act</u>.

(a)     Sellers and their "related persons" (as defined in the Coal Act) are in compliance in all material respects with the Coal Act and any regulations promulgated thereunder, except which compliance is being contested in good faith by appropriate proceedings diligently conducted or excused by the Bankruptcy Court or the Bankruptcy Code, and none of Sellers or their "related persons" (as defined in the Coal Act) has any liability under the Coal Act, except as disclosed in the Financial Statements or which would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, or with respect to premiums or other material payments required thereunder which have been paid when due, or which liability is being contested in good faith by appropriate proceedings diligently conducted or the current payment of which is excused by the Bankruptcy Court or the Bankruptcy Code.

(b)     Sellers are in compliance in all material respects with the Black Lung Act, except which compliance is being contested in good faith by appropriate proceedings diligently conducted or excused by the Bankruptcy Court or the Bankruptcy Code, and Sellers have not incurred any Black Lung Liability or assumed any other Black Lung Liability, except as disclosed in the Financial Statements or which would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, or with respect to premiums, contributions or other material payments required thereunder which have been paid when due or which Black Lung Liability is being contested in good faith by appropriate proceedings diligently conducted or the current payment of which is excused by the Bankruptcy Court or the Bankruptcy Code.

5.25   <u>Warranties Exclusive</u>.

EXCEPT AS EXPRESSLY SET FORTH IN THIS <u>ARTICLE 5</u> (AS MODIFIED BY THE DISCLOSURE SCHEDULES) OR IN THE BILL OF SALE AND THE ASSUMPTION AGREEMENT, SELLERS MAKE NO REPRESENTATION OR WARRANTY, STATUTORY, EXPRESS OR IMPLIED, WRITTEN OR ORAL, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF THEIR ASSETS (INCLUDING THE ACQUIRED ASSETS), LIABILITIES (INCLUDING THE ASSUMED LIABILITIES) OR THE BUSINESS, INCLUDING, WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, OR NON-INFRINGEMENT, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY. NEITHER SELLERS NOR ANY OTHER PERSON, DIRECTLY OR INDIRECTLY, HAS MADE OR IS MAKING, ANY REPRESENTATION OR WARRANTY, WHETHER WRITTEN OR ORAL, REGARDING THE PRO-FORMA FINANCIAL INFORMATION, FINANCIAL PROJECTIONS OR OTHER FORWARD-LOOKING STATEMENTS OF SELLERS.

57

# ARTICLE 6

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers as follows:

6.1     Organization and Good Standing.

Buyer is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Delaware. Buyer has the requisite power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.

6.2     Authority; Validity; Consents.

Buyer has the requisite power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement and the other Transaction Documents by Buyer and the consummation by Buyer of the transactions contemplated herein and therein have been duly and validly authorized by all requisite limited liability company or corporate actions in respect thereof. This Agreement has been duly and validly executed and delivered by Buyer and each other Transaction Document to which Buyer is a Party will be duly and validly executed and delivered by Buyer, as applicable, at the Closing. This Agreement and the other Transaction Documents to which Buyer is a party constitute the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except in each case as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Except as required to comply with the HSR Act or as set forth on Schedule 6.2, Buyer is not or will be required to give any notice to, make any registration, declaration or filing with or obtain any consent, waiver or approval from any Person in connection with the execution and delivery of this Agreement and the other Transaction Documents to which it is a Party or the consummation or performance of any of the transactions contemplated hereby or thereby, except for such notices, registrations, declarations or filings and consents, the failure of which to provide, make or obtain, would not, individually or in the aggregate, materially affect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

6.3     No Conflict.

Neither the execution and delivery by Buyer of this Agreement or the other Transaction Documents to which it is a party nor the consummation of the transactions contemplated hereby or thereby nor compliance by it with any of the provisions hereof or thereof (a) conflict with or result in a violation of (i) any provision of the organizational documents of Buyer or (ii) any judgment, order, writ, injunction, decree, statute, law, ordinance, rule or regulation in any material respect binding upon Buyer or (b) violate, conflict with, or result in a breach of any of the terms of, or constitute a default under, or give rise to any right of termination, modification, cancellation or acceleration under (i) any note, bond, mortgage,

Doc#: US1:10163646v46

indenture, deed of trust, contract, commitment, arrangement, license, agreement, lease or other instrument or obligation to which Buyer is a party or by which Buyer may be bound or to which any of Buyer's assets may be subject or affected in any material respect and that, in each case, is material to the business of Buyer, or (ii) any material license, permit, authorization, consent, order or approval of, or registration, declaration or filings with, any Governmental Authority.

6.4    Brokers or Finders.

Neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the transactions contemplated by this Agreement for which any Seller is or will become liable, and Buyer shall hold harmless and indemnify Sellers from any claims with respect to any such fees or commissions.

6.5    Legal Proceedings.

There is no Proceeding or Order pending against, or to Buyer's Knowledge, threatened against or affecting, Buyer before any arbitrator or any Governmental Authority which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the transactions contemplated by this Agreement and the other Transaction Documents or which would or would reasonably be expected to impair Buyer's ability to consummate the transactions contemplated by this Agreement and the other Transaction Documents.

6.6    Financing.

Buyer shall, on the Execution Date and at the Closing, have the ability to make the Credit Bid and Release and, at the Closing, shall have sufficient available funds to permit Buyer to pay the Cash Consideration and all other amounts to be paid or repaid by Buyer under the Transaction Documents to the extent payable on or about the Closing Date, including amounts to be paid for the Cure Costs and including all requisite financial assurances to be provided by Buyer pursuant to Section 7.9.

6.7    Qualification.

(a)    To Buyer's Knowledge, there exist no facts or circumstances that would cause, or be reasonably expected to cause, Buyer and/or its Affiliates not to qualify as "good faith" purchasers under Section 363(m) of the Bankruptcy Code.

(b)    As of the Closing, Buyer and/or each relevant Buyer Designee, as applicable, will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assumed Contracts.

(c)    As of the Closing, Buyer and/or each relevant Buyer Designee, as applicable, will be capable of taking transfer of, or obtaining replacement or overlapping permits for, the Closing Required Permits held by Sellers and, to Buyer's Knowledge, as of the date hereof and as of the Closing, there exists no reason why approval for any application for any Mining Permit or other Governmental Authorization should be denied, other than any denial for violations that may reasonably be expected to be cured by the time of such transfer or obtaining

59

of Permits as contemplated by <u>Section 7.9</u> and <u>Section 7.10</u>, and no Buyer, relevant Buyer Designee, or any officer or director thereof, as applicable, is or will be "permit blocked" on the Applicant Violator System by any Governmental Authority.

6.8 <u>No Other Representations or Warranties; Condition of the Business; Buyer's Reliance</u>.

Buyer acknowledges that neither Sellers nor any other Person is making, and Buyer is not relying on, any representations or warranties whatsoever, statutory, expressed or implied, written or oral, at law or in equity, beyond those expressly made by Sellers in <u>Article 5</u> hereof (as modified by the Disclosure Schedules). Buyer acknowledges that, except as expressly set forth in <u>Article 5</u> (as modified by the Disclosure Schedules), neither Sellers nor any other Person has, directly or indirectly, made any representation or warranty, statutory, expressed or implied, written or oral, at law or in equity, as to the accuracy or completeness of any information that Sellers furnished or made available to Buyer and its Representatives in respect of the Business, and Sellers' operations, assets, stock, Liabilities, condition (financial or otherwise) or prospects. Buyer acknowledges that neither Sellers nor any other Person, directly or indirectly, has made, and Buyer has not relied on, any representation or warranty, whether written or oral, regarding the pro-forma financial information, financial projections or other forward-looking statements of Sellers, and Buyer will make no claim with respect thereto. Buyer acknowledges that the Acquired Assets are being transferred on an "AS IS, WHERE IS" basis.

6.9 <u>Information</u>.

Buyer has conducted such investigations of the Company and its Subsidiaries as it deems necessary and appropriate in connection with the execution and delivery of this Agreement and the other Transaction Documents to which Buyer is a party and the consummation of the transactions contemplated hereby and thereby. Buyer acknowledges that it and its Representatives have been permitted full and complete access to the books and records, facilities, equipment, Tax Returns, Contracts, insurance policies (or summaries thereof) and other properties and assets of Sellers, that it and its Representatives have desired or requested to see or review, and that it and its Representatives have had a full opportunity to meet with the officers and employees of Sellers to discuss the Business. Neither Sellers nor any other Person (including any officer, director, member or partner of Sellers or any of their Affiliates) shall have or be subject to any liability to Buyer, or any other Person, resulting from Buyer's use of any information, documents or material made available to Buyer in any "data rooms," management presentations, due diligence or in any other form in expectation of the transactions contemplated hereby or by the other Transaction Documents.

## ARTICLE 7

### <u>ACTIONS PRIOR TO THE CLOSING DATE</u>

7.1 <u>Access and Reports; Confidentiality</u>.

(a) From and after the Execution Date through and including the Closing Date or the earlier termination of this Agreement in accordance with the provisions of

Article 11, Sellers shall (i) afford Buyer and its Representatives reasonable access, upon reasonable notice, to its personnel, properties, books, Permits, Contracts and records, and furnish promptly to Buyer all reasonable information concerning the Acquired Assets, the Business, properties, any Benefit Plans and personnel as may be reasonably requested; (ii) furnish to Buyer such financial and operating data and other information relating to Sellers, the Business and the Acquired Assets as may be reasonably requested; (iii) permit Buyer, to make such reasonable inspections and, at Buyer's sole cost and expense, copies thereof as Buyer may require; and (iv) instruct the executive officers and senior business managers, counsel, auditors and financing advisors of Sellers to reasonably cooperate with Buyer and its Representatives regarding the same; provided, that any such access shall be conducted consistent with and not in violation of the Bidding Procedures Order and in a manner not to unreasonably interfere with the Business. All requests for information made pursuant to this Section 7.1 shall be directed to Adam Schlesinger, PJT Partners LP, 280 Park Avenue, 16th Floor, New York, NY 10017 or other person as designated by such person or Sellers. Notwithstanding the foregoing, Buyer and its Representatives shall not (A) have access to personnel records of Sellers relating to individual performance or evaluation records, medical histories or other information which in Sellers' good faith opinion is sensitive or the disclosure of which could subject a Seller to risk of liability and (B) have any right to perform or conduct, or cause to be performed or conducted, any environmental sampling or testing at, in, on or underneath any of Sellers' properties without written consent from the Company. No investigation pursuant to this Section 7.1 or by Buyer or its Representatives at any time prior to or following the date hereof shall affect or be deemed to modify any representation or warranty made by Sellers herein.

(b)     Notwithstanding the foregoing but subject in all respects to the Bidding Procedures Order, this Section 7.1 shall not require Sellers to permit any access to, or to disclose (i) any information that, in the reasonable, good faith judgment (after consultation with counsel, which may be in-house counsel) of the Company, is reasonably likely to result in any violation of any Legal Requirement or any Contract to which the Company or any Seller is a party or cause any privilege (including attorney-client privilege) or work product protection that Sellers would be entitled to assert to be waived or (ii) if the Company or any Seller, on the one hand, and Buyer or any of its Affiliates, on the other hand, are adverse parties in a litigation, any information that is reasonably pertinent thereto; provided, that, in the case of clause (i), the Parties shall reasonably cooperate in seeking to find a way to allow disclosure of such information to the extent doing so (A) would not (in the good faith belief of the Company (after consultation with counsel, which may be in-house counsel)) be reasonably likely to result in the violation of any such Legal Requirement or Contract or be reasonably likely to cause such privilege or work product protection to be undermined with respect to such information or (B) could reasonably (in the good faith belief of the Company (after consultation with counsel, which may be in-house counsel)) be managed through the use of customary "clean-room" arrangements pursuant to which non-employee Representatives of Buyer could be provided access to such information.

(c)     Buyer shall, and shall use its best efforts to cause its Affiliates and Representatives to, hold all confidential documents and information concerning the Business furnished to Buyer or its Affiliates in connection with the transactions contemplated by this Agreement and the other Transaction Documents in accordance with the provisions of the

61

confidentiality agreement attached to the Bidding Procedures Order which Buyer shall execute in accordance with the Bidding Procedures Order.

7.2     Operations Prior to the Closing Date.

Sellers covenant and agree that, except (v) as expressly contemplated by this Agreement, (w) as disclosed in Schedule 7.2, (x) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), (y) as otherwise required by Legal Requirements or (z) to the extent not inconsistent with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, any orders entered by the Bankruptcy Court in the Bankruptcy Case, or as permitted under the Cash Collateral Orders, after the Execution Date and prior to the Closing Date:

(a)     Sellers shall:

(i)     carry on the Business in the Ordinary Course of Business and use commercially reasonable efforts to maintain, preserve and protect the Acquired Assets in the condition in which they exist on the date hereof, except for ordinary wear and tear and except for replacements, modifications or maintenance in the Ordinary Course of Business;

(ii)     maintain their books, accounts and records in the Ordinary Course of Business;

(iii)     use commercially reasonable efforts to pay all post-petition Trade Payables and collect all Accounts Receivable after the Petition Date (subject to the Budget Covenant (as defined in the Cash Collateral Orders));

(iv)     use commercially reasonable efforts to (A) retain the services of its current executive officers (or their successors) who are in good standing and who are necessary to conduct the Business as it is currently being conducted in all material respects and (B) maintain their relationships with and preserve for the Business the goodwill of their key suppliers and customers in all material respects (it being understood that no increases to any payments or compensation, including any incentive, retention or similar compensation, shall be required in respect of either clause (A) or (B) hereof or other expenditures of funds (other than pursuant to the existing terms of any Contracts) or modification of Contract terms);

(v)     (A) comply in all material respects with all Legal Requirements applicable to them or having jurisdiction over the Business or any Acquired Asset, (B) comply in all material respects with contractual obligations applicable to or binding upon them pursuant to any Material Contracts (other than those obligations the compliance with which is excused during the Bankruptcy Case), and (C) maintain in full force and effect all material Permits and comply with the terms of each such Permit (but only to the extent such Permits are necessary for the Business and the Acquired Assets in the Ordinary Course of Business);

62

(vi)  cause any of their current property insurance policies with respect to the Business or any of the other Acquired Assets not to be canceled or terminated or any of the coverage thereunder to lapse unless, simultaneously with such termination, cancellation or lapse, replacement, policies providing coverage equal to or greater than the coverage under the canceled, terminated or lapsed policies are in full force and effect, to the extent such coverage is reasonably available;

(vii)  maintain each Buyer Benefit Plan in accordance with their terms and Legal Requirements;

(viii)  maintain, preserve and protect in full force and effect the existence of all material Intellectual Property owned by Sellers and included in the Acquired Assets, except for abandonment of Intellectual Property that is de minimis to the Business in Sellers' reasonable business judgment; and

(ix)  use commercially reasonable efforts not to take or agree to or commit to assist any other Person in taking any action (i) that would reasonably be expected to result in a failure of any of the conditions to the Closing or (ii) that would reasonably be expected to impair the ability of Sellers or Buyer to consummate the Closing in accordance with the terms hereof or to materially delay such consummation.

(b)  Sellers shall not:

(i)  take any action enumerated in Section 5.20(b), except as set forth on Schedule 5.20(b);

(ii)  assume, reject or assign any Material Contract, other than pursuant to Section 2.5;

(iii)  enter into or renew any Material Contract (other than automatic renewals of Material Contracts in the Ordinary Course of Business in accordance with the terms thereof as in effect on the Execution Date) without the consent of Buyer; or

(iv)  other than the Approved Retention Payments, (A) hire any Employees having annual base or guaranteed compensation in excess of $200,000; (B) increase the annual rate of base salary or any target bonus opportunity of any Employee whose annual rate of base salary prior to such increase was in excess of $200,000; (C) pay or award any bonus, benefit, or other direct or indirect incentive compensation (other than any such payments authorized pursuant to any first or second day orders in the Bankruptcy Case); (D) award any equity compensation awards (whether phantom or equity) with respect to the equity of the Company or its Affiliates; (E) modify, amend or terminate any Benefit Plan; (F) enter into any employment, compensation, severance, non-competition, or similar contract (or amended any such contract) to which any Seller is a party; or (G) adopt any new severance pay, termination pay, deferred compensation, bonus, or other employee benefit plan with respect to Employees that would be a Benefit Plan if it existed on the Execution Date (including any employment

63

agreement, severance agreement, change in control agreement, or transaction or retention bonus agreements), except, in the case of each of clauses (A) through (G), (i) to the extent permitted by any order of the Bankruptcy Court or as required by applicable Legal Requirements (including to avoid the imposition of Taxes or to conform to the requirements of Tax qualification); (ii) pursuant to the terms of any Benefit Plan, as in effect on the date hereof; or (iii) for immaterial changes to Benefit Plans available to all employees generally (other than changes that materially increase the amount, or accelerate the timing, of the payment of benefits).

       7.3   <u>Regulatory Matters; Cooperation</u>.

       (a)   Subject to <u>Section 7.3(c)</u>, as soon as reasonably practicable following entry of the Bidding Procedures Order but in any event on or before January 12, 2016 (or such later date as agreed in writing by all of the Parties hereto), Sellers, on the one hand, and Buyer, on the other hand, shall each prepare and file, or cause to be prepared and filed, any notifications required to be filed under the HSR Act with the United States Federal Trade Commission and the Antitrust Division of the United States Department of Justice, and request early termination of the waiting period under the HSR Act. Buyer, on the one hand, and Sellers, on the other hand, shall promptly respond to any requests for additional information or documentary materials in connection with such filings and shall take all other actions necessary to cause the waiting periods under the HSR Act to terminate or expire at the earliest practicable date after the date of filing. Buyer shall be responsible for payment of the applicable filing fee under the HSR Act, and each Party shall be responsible for any other payment of its own respective costs and expenses incurred by such Party (including attorneys' fees and other legal fees and expenses) associated with the preparation of its portion of any antitrust filings.

       (b)   Sellers, on the one hand, and Buyer, on the other hand, shall use commercially reasonable efforts to obtain (and Buyer shall cause its Subsidiaries to use commercially reasonable efforts to obtain), at the earliest practicable date, all necessary Governmental Authorizations and all necessary registrations, declarations and filings (including registrations, declarations and filings with Governmental Authorities, if any) and take all reasonable steps as may be necessary to avoid any Proceeding by any Governmental Authority. In addition to such actions and the actions to be taken under <u>Section 7.3(a)</u>, Sellers, on the one hand, and Buyer, on the other hand, shall use commercially reasonable efforts to take (and Buyer shall cause its Subsidiaries to use commercially reasonable efforts to take), or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby, including using commercially reasonable efforts to accomplish the following: (i) taking all reasonable acts necessary to cause the conditions precedent set forth in <u>Article 9</u> and <u>Article 10</u> to be satisfied; (ii) defending of any Proceedings challenging this Agreement or the consummation of the transaction contemplated hereby, including seeking to have any stay or temporary restraining order entered by any court or other Governmental Authority vacated or reversed; (iii) taking all reasonable acts necessary in connection with meeting with any Governmental Authority regarding the transferring of the Permits held by Sellers; and (iv) executing and delivering any additional instruments necessary to consummate the transactions contemplated hereby and to fully carry out the purposes of this Agreement.

64

(c)     Sellers, on the one hand, and Buyer, on the other hand, shall, (i) promptly inform each other of any communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval and (ii) permit the other to review in advance any proposed written or material oral communication or information submitted to any such Governmental Authority in response thereto. In addition, none of Parties shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement or the transactions contemplated hereby, unless such Party consults with the other Parties in advance and, to the extent permitted by any such Governmental Authority, gives the other Parties the opportunity to attend and participate thereat, in each case to the maximum extent practicable. Subject to restrictions under any Legal Requirements, Buyer, on the one hand, and Sellers, on the other hand, shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective Representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine or which refer to valuation of the Business) or any such filing, notification or request for approval. Each Party shall also furnish the other Party with such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration or submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval.

(d)     Subject to the terms and conditions of this Agreement, Buyer shall, and shall cause its Subsidiaries to, take any and all steps reasonably necessary to avoid or eliminate impediments under any Antitrust Law that may be asserted by any Governmental Authority with respect to the transactions contemplated hereby so as to enable the Closing to occur as soon as reasonably possible, including, proposing, negotiating, committing to and effecting, by consent decree or otherwise, the sale, divestiture or disposition of such assets or businesses of Buyer or any of its Subsidiaries as may be required in order to avoid the entry, or to effect the dissolution, of any injunction, temporary restraining order or other order in any suit or proceeding, which would otherwise have the effect of preventing, delaying or restricting the consummation of the transactions contemplated by this Agreement; provided, that (i) Sellers shall not take any such action without the prior written consent of Buyer and (ii) Buyer shall not be obligated to take any such action if such action would have a Material Adverse Effect on the Business or the Acquired Assets, taken as a whole.

7.4     Tax Cooperation.

Sellers and Buyer agree to cooperate in good faith, including upon Buyer's determination amending this Agreement to structure the transaction, for U.S. federal income tax purposes, as either a taxable asset purchase or as a reorganization pursuant to Section 368(a) of the Code, as long as any such amendment does not impose a material burden on, or result in an incremental cost or expense (which cost or expense is not reimbursed by Buyer) to, Sellers.

Doc#: US1:10163646v46

7.5    <u>Bankruptcy Court Matters</u>.

(a)    <u>Sale Motion</u>. In connection with the transactions contemplated by this Agreement, Sellers shall have filed with the Bankruptcy Court on or within three (3) Business Days of the Execution Date (or such later date as agreed in writing by all of the Parties hereto), the proposed Sale Motion, including a proposed form of the Bidding Procedures Order and appropriate supporting declarations, in each case, in form and substance acceptable to Sellers and Buyer. Sellers shall affix a true and complete copy of this Agreement (without Disclosure Schedules) to the Sale Motion filed with the Bankruptcy Court.

(b)    <u>Bankruptcy Procedures Hearing and Bidding Procedures Order</u>. On or prior to November 25, 2015 (or such later date as agreed in writing by all of the Parties hereto), the Bankruptcy Court shall have (i) held a hearing to consider approval of the Bidding Procedures and (ii) entered the Bidding Procedures Order in form and substance acceptable to Sellers and Buyer.

(c)    <u>Qualified Bids</u>. Pursuant to the Bidding Procedures Order, any and all Qualified Bids shall have been submitted on or prior to January 5, 2016 (or such later date as agreed in writing by all of the Parties hereto) (the "<u>Bid Deadline</u>"). If any Qualified Bid is submitted prior to the Bid Deadline, Sellers shall have commenced the auction contemplated by the Bidding Procedures on or prior to January 7, 2016 (or such later date as agreed in writing by all of the Parties hereto).

(d)    <u>Sale Order</u>. On or prior to January 12, 2016 (or such later date as agreed in writing by all of the Parties hereto), the Bankruptcy Court shall have entered the Sale Order, which shall be in form and substance acceptable to Sellers and Buyer (solely to the extent Buyer is the Successful Bidder or the Backup Bidder).

(e)    <u>Contracts</u>. Sellers shall serve on all non-debtor counterparties to all of their Available Contracts a Cure Notice stating that Sellers are or may be seeking the assumption and assignment of such Available Contracts and shall notify such non-debtor counterparties of the deadline for objecting to the Cure Costs, if any, which deadline shall not be later than December 17, 2015 or as otherwise provided in the Bidding Procedures Order.

(f)    <u>Bankruptcy Filings</u>. From and after the Execution Date and until the Closing Date, Sellers shall deliver to Buyer, at least two (2) Business Days in advance of Sellers' filing or submission thereof, drafts of any and all material pleadings, motions, notices, statements, schedules, applications, reports and other papers to be filed or submitted in connection with this Agreement for Buyer's prior review and comment by Sellers, and such filings shall be acceptable to Buyer in its reasonable discretion to the extent they relate to the Acquired Assets, any Assumed Liabilities or any of Buyer's obligations hereunder. Sellers agree to diligently prosecute the entry of the Bidding Procedures Order and the Sale Order as provided herein. In the event the entry of the Bidding Procedures Order or the Sale Order shall be appealed, Sellers and Buyer shall use their reasonable efforts to defend such appeal. Sellers shall comply with all notice requirements (i) of the Bidding Procedures Order or (ii) imposed by the Sale Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith.

66

7.6     Expense Reimbursement.

Notwithstanding anything in this Agreement to the contrary, from and after entry of the Bidding Procedures Order, Sellers agree to pay to Buyer the Expense Reimbursement (less any amount of the Expense Reimbursement to the extent already paid in respect of the Blue Creek Assets pursuant to Section 7.8(b)(ii)) in the event this Agreement is terminated if and to the extent provided in Section 11.2. The Parties acknowledge and agree that the terms and conditions set forth in Section 11.2 with respect to the payment of the Expense Reimbursement shall become operative only if and to the extent that the Bankruptcy Court enters the Bidding Procedures Order.

7.7     Update of Disclosure Schedules; Notice of Developments.

(a)     Seller Supplements and Amendments. From the Execution Date until the Closing Date, Sellers shall as promptly as reasonably practicable deliver any new schedules or supplement or amend the Disclosure Schedules with respect to any matter that, if existing, occurring or known at the Execution Date, would have been required to be set forth or described in the Disclosure Schedules. Any such supplement or amendment shall be deemed to modify the Disclosure Schedules for purposes of this Agreement except to the extent the matters set forth in such supplement or amendment are material to the Acquired Assets or the Business. Notwithstanding anything in this Section 7.7 to the contrary, in no event will Sellers be permitted to supplement or amend any Disclosure Schedules other than Disclosure Schedules required under Article 5 without the prior written consent of Buyer and any such supplements or amendments will not be deemed to modify any Schedules other than the Disclosure Schedules required under Article 5.

(b)     Notice of Developments. Sellers shall promptly notify Buyer of, and furnish Buyer any information it may reasonably request with respect to, any event that would reasonably be expected to cause any of the conditions set forth in Article 9 not to be fulfilled by the Outside Date.

(c)     Schedule 2.3(m). Schedule 2.3(m) shall be amended at any time before or after Closing pursuant to and in accordance with Section 2.3(m).

(d)     Buyer may supplement or amend Schedule 2.1(l) at any time in its sole discretion (except that no Avoidance Actions shall be added to Schedule 2.1(l) at any time).

7.8     Certain Excluded Assets.

(a)     From and after the date hereof until five (5) Business Days prior to the Bid Deadline, upon prior written notice to Sellers, Buyer shall have the right to amend Schedule 2.2(a) to designate the Walter Coke Assets to be an Excluded Asset (the "Walter Coke Election"). Whether or not the Walter Coke Election or the Pre-Closing Walter Coke Election is made, if there is a Successful Bidder (other than the Buyer or a Buyer Designee) for the Walter Coke Assets and such sale closes, the Credit Bid and Release shall be reduced by $100,000,000. In the event that the Walter Coke Election is made and there is no Successful Bidder for the Walter Coke Assets or the sale of the Walter Coke Assets to a Successful Bidder or Backup Bidder (if any) for the Walter Coke Assets does not close: (1) the Credit Bid and Release shall be

67

reduced by $100,000,000, and Buyer shall credit bid for the Walter Coke Working Capital Assets in an amount equal to $22,000,000; (2) at the Closing, or as soon thereafter as is practicable, the Walter Coke Working Capital Assets shall be transferred by Buyer free and clear of all Liens and Encumbrances to the Walter Coke Trust; (3) the Walter Coke Working Capital Assets shall be liquidated by the trustee of the Walter Coke Trust and the proceeds of the Walter Coke Working Capital Assets net of liquidation costs shall be deposited in the Walter Coke Trust as provided in the applicable trust agreement; and (4) the Credit Agreement Agent and the Indenture Trustee shall be directed to release their respective Liens on the remaining Walter Coke Assets. The funds in the Walter Coke Trust will be used by the trustee of the Walter Coke Trust to fund the fees and expenses of the trustee of the Walter Coke Trust, the fees of a Chapter 7 trustee if one is appointed for Walter Coke, payment of professional fees for any professionals retained by such Chapter 7 trustee, payment to employees for services rendered in connection with the liquidation of the Walter Coke Assets, any accrued and unpaid payroll and benefits incurred by Walter Coke prior to conversion to Chapter 7 under the Bankruptcy Code, environmental remediation costs for the Walter Coke Assets, and plant decommissioning costs for the Walter Coke Assets, including any necessary technical professional services in connection therewith. No dollar amounts set forth in this Section 7.8(a) shall be construed as a minimum amount required to be bid by a Qualified Bidder (as defined in the Bidding Procedures) for all or any part of the Walter Coke Assets; it being acknowledged and agreed by the parties hereto, that, any minimum bid requirements shall be as provided in the Bidding Procedures. If a Walter Coke Election is made and there is no Successful Bidder for the Walter Coke Assets or the sale of the Walter Coke Assets to a Successful Bidder or Backup Bidder (if any) for the Walter Coke Assets does not close, at the Closing, or as soon thereafter as is practicable, Buyer shall provide, if requested by the Trustee of the Walter Coke Trust, the Walter Coke Trust with a short term (sixty (60) to ninety (90) day) loan of up to $5,500,000, which loan shall bear interest at an annual rate not to exceed LIBOR plus 3.00%, and which loan shall be secured by the Walter Coke Working Capital Assets and shall be repaid by the trustee of the Walter Coke Trust from the proceeds of such collateral ahead of any and all other expenses, debts or other liabilities or obligations of the Walter Coke Trust (the "WC Loan"). The Walter Coke Trust may disburse the proceeds from such loan based on a budget prepared by the Sellers' estates or the trustee of the Walter Coke Trust, subject to Buyer's reasonable approval.

(b)

(i)     From and after the date hereof until the Closing Date, upon prior written notice to Sellers, Buyer shall have the right to amend Schedule 2.2(a) to designate one or more of the Miscellaneous Real Property Assets to be an Excluded Asset.

(ii)     If the Blue Creek Assets are sold to a Successful Bidder (other than Buyer or a Buyer Designee) pursuant to the Bidding Procedures, (A) the Credit Bid and Release shall be reduced by $50,000,000 and (B) notwithstanding anything in this Agreement to the contrary (but without limiting Buyer's rights and remedies under Section 11.2), Sellers shall promptly pay to Buyer in cash an amount equal to (x) the fees and expenses incurred by the Buyer, the Steering Committee, the Credit Agreement Agent and the Indenture Trustee, including reasonable attorney fees, (that are not otherwise paid by the Sellers under the Cash Collateral Orders) with regard

Doc#: US1:10163646v46

to the Blue Creek Assets in an aggregate amount up to $250,000, plus (y) a break-up fee payable to Buyer equal to $1,500,000 (the amounts payable under the preceding clauses (x) and (y) are collectively referred to herein as the "Blue Creek Bid Protections"), by wire transfer of immediately available funds immediately upon the closing of such sale of the Blue Creek Assets.

(c) Notwithstanding anything in this Agreement to the contrary, effective automatically upon (i) the Walter Coke Election (or the sale of the Walter Coke Assets to a Successful Bidder other than the Buyer or a Buyer Designee), (ii) the designation of any Miscellaneous Real Property Assets as "Excluded Assets" or if any Miscellaneous Real Property Assets are sold to a Successful Bidder (other than the Buyer or a Buyer Designee), or (iii) the sale of the Blue Creek Assets to a Successful Bidder other than Buyer or a Buyer Designee, in each case, pursuant to the Bidding Procedures, (1) any "Acquired Assets" to the extent relating to the Walter Coke Assets, such Miscellaneous Real Property Assets or Blue Creek Assets, as applicable, shall no longer constitute "Acquired Assets" and shall instead constitute "Excluded Assets" for all purposes hereunder (including for purposes of the representations and warranties set forth in Article 5 and the conditions to Closing set forth in Article 9 and Article 10) to the extent relating to the Walter Coke Assets, such Miscellaneous Real Property Assets or Blue Creek Assets, as applicable, and (2) any "Assumed Liabilities" to the extent relating to the Walter Coke Assets, Miscellaneous Real Property Assets or Blue Creek Assets, as applicable, shall no longer constitute "Assumed Liabilities" and shall instead constitute "Excluded Liabilities" for all purposes hereunder to the extent relating to the Walter Coke Assets, Miscellaneous Real Property Assets or Blue Creek Assets, as applicable (including for purposes of Article 4, Article 7, Article 9 and Article 10), and shall be rendered inapplicable and inoperative to the extent that such provisions relate to "Excluded Assets" or "Excluded Liabilities" after giving effect to clauses (i) and (ii) of this Section 7.8(c), including the Walter Coke Assets, such Miscellaneous Real Property Assets or Blue Creek Assets, as the case may be. Notwithstanding the foregoing, (x) the Acquired Assets set forth in Section 2.1(m), (n) or (p) shall not constitute "Excluded Assets" as a result of the Walter Coke Assets, such Miscellaneous Real Property Assets or Blue Creek Assets being designated "Excluded Assets" and (y) the Walter Coke Working Capital Assets shall not constitute "Excluded Assets" as a result of the Walter Coke Assets being designated "Excluded Assets", other than on account of the sale of the Walter Coke Assets to a Successful Bidder other than the Buyer or a Buyer Designee.

(d) To the extent that there is no Successful Bidder for any of the Non-Core Assets (excluding the Walter Coke Assets and the Blue Creek Assets) or the sale of the Non-Core Assets (excluding the Walter Coke Assets and the Blue Creek Assets) to a Successful Bidder or Backup Bidder (if any) for such Non-Core Assets does not close, (1) Buyer shall credit bid for the Acquired Non-Core Assets and the Credit Bid and Release shall be increased by $49,000,000; provided, that such amount may be allocated among the Non-Core Assets (excluding the Walter Coke Assets and the Blue Creek Assets) by Buyer or Buyer Designee within forty five (45) days after the Execution Date but in no event later than five (5) Business Days prior to the Bid Deadline in Buyer's sole discretion, (2) at the Closing, such Acquired Non-Core Assets shall be transferred to the Buyer free and clear of all Liens and Encumbrances other than Permitted Encumbrances; and (3) the Credit Agreement Agent and the Indenture Trustee shall be directed to release their respective Liens on such Non-Core Assets (other than Liens on the Acquired Non-Core Assets, the Walter Coke Assets and the Blue Creek Assets, the release of

69

which is provided for in Section 8.10). For the avoidance of doubt, if there is no Successful Bidder (other than Buyer or a Buyer Designee) for the Blue Creek Assets or the sale of the Blue Creek Assets to a Successful Bidder or Backup Bidder (if any) for the Blue Creek Assets does not close, the Blue Creek Assets shall constitute "Acquired Assets" for all purposes under this Agreement.

(e)     The Wind Down Trust will be used to fund the fees and expenses of the trustee of the Wind Down Trust, the fees of a Chapter 7 trustee if one is appointed for the entities owning the Non-Core Assets (excluding the Acquired Non-Core Assets, the Walter Coke Assets and the Blue Creek Assets), payment of professional fees for any professionals retained by such Chapter 7 trustee, payment to employees for services rendered in connection with the liquidation of Non-Core Assets (excluding the Walter Coke Assets and the Blue Creek Assets), any necessary technical professional services in connection with the wind down of the Non-Core Assets (excluding the Walter Coke Assets and the Blue Creek Assets) including, for the avoidance of doubt, technical professional services relating to remediation and Reclamation of such assets, and any accrued and unpaid payroll and benefits incurred in connection with the Non-Core Assets (excluding the Walter Coke Assets and the Blue Creek Assets) prior to conversion to Chapter 7 under the Bankruptcy Code. Any funds remaining in the Wind Down Trust after payment of the expenses described in this Section 7.8(e) shall be transferred to Buyer.

(f)     If (x) the Walter Coke Election is not made, (y) there is no Successful Bidder (other than the Buyer or a Buyer Designee) for the Walter Coke Assets or the sale of the Walter Coke Assets to a Successful Bidder or Backup Bidder (if any) for the Walter Coke Assets does not close and (z) the condition to Closing set forth in Section 9.9(b) has not been satisfied, then on the date that is two weeks prior to the projected Closing Date (which shall be agreed upon in advance by the Parties), Buyer shall elect to either (1) designate the Walter Coke Assets to be an Excluded Asset, (a "Pre-Closing Walter Coke Election") or (2) waive the condition to Closing set forth in Section 9.9(b). If a Pre-Closing Walter Coke Election occurs, Sections 7.8(a) and (c) shall apply as if a Walter Coke Election had occurred.

7.9     Surety Bonds; Permits

(a)     Business and Acquired Assets in Alabama.

(i)     Promptly, but in no event later than ten (10) Business Days following the Execution Date, Sellers shall make available to Buyer a true and complete list of (A) all Permits held by Sellers or any of their Affiliates in the operation of the Business and Acquired Assets in the State of Alabama, together with a description of the permitted property, facility or operation, together with a true and complete list of all pending applications for additional Permits, renewals of existing Permits, or amendments to existing Permits held by Sellers, which have been submitted to any Governmental Authority or other entity by any Seller or any of its Subsidiaries applicable to the operation of the Business and Acquired Assets in Alabama and (B) the applicable surety bonds (or other financial assurances) and the amount of the surety bonds (or other financial assurances) under such Permits, in each case, as amended, supplemented and modified through the Execution Date. Sellers shall as promptly as

Doc#: US1:10163646v46

practicable deliver to Buyer any updates, modifications or corrections to the foregoing information.

(ii)     As promptly as reasonably practicable after the Execution Date:

(1)     Buyer shall file an application with the Alabama Surface Mining Commission for a license to engage in coal mining operations in the State of Alabama ("Alabama Mining License"), in a format and manner acceptable to the Alabama Surface Mining Commission, along with all applicable fees, and shall have obtained such Alabama Mining License, and continue to hold the same, on and as of the Closing Date and thereafter until the transfer to Buyer of all of the Alabama Mining Permits (as hereinafter defined) is completed;

(2)     Buyer shall use commercially reasonable efforts to provide, not later than the Bid Deadline, evidence of appropriate financial commitments, in form, manner and amount acceptable to Sellers and the Alabama Surface Mining Commission, for replacement surety bonds or other financial assurances necessary to allow the transfer of the Alabama Mining Permits from Sellers to Buyer, and in any event, Buyer shall provide such evidence at or before Closing; and

(3)     Buyer shall use commercially reasonable efforts to provide, no later than the Bid Deadline, evidence of appropriate financial commitments, in form, manner and amount acceptable to Sellers and the Alabama Oil and Gas Board, for replacement surety bonds or other financial assurances necessary to allow the transfer of the Permits for the Gas Wells from Sellers to Buyer, and in any event, Buyer shall provide such evidence at or before Closing.

(iii)     As promptly as reasonably practicable after the Execution Date:

(1)     Buyer and Sellers shall file an application for a transfer of all Transferred Permits to engage in mining operations at particular locations in the State of Alabama with the Alabama Surface Mining Commission ("Alabama Mining Permits"), in a format and manner acceptable to the Alabama Surface Mining Commission, along with all applicable fees and shall publish notice of such applications in accordance with the applicable Legal Requirements;

(2)     Buyer and Sellers shall file with the Alabama Department of Environmental Management an application for a transfer of Transferred Permits issued to Sellers by the Alabama Department of Environmental Management, in a format and manner acceptable to the Alabama Department of Environmental Management, along with all applicable fees;

71

Doc#: US1:10163646v46

(3)     Buyer and Sellers shall file with the Jefferson County Department of Health an application for a transfer of any Transferred Permits relating to the emission of pollutants into the air, in a format and manner acceptable to the Jefferson County Department of Health, along with all applicable fees;

(4)     Buyer and Sellers shall file with the Alabama Department of Environmental Management an application for a transfer of any Transferred Permits relating to the emission of pollutants into the air, in a format and manner acceptable to the Alabama Department of Environmental Management, along with all applicable fees;

(5)     Buyer and Sellers shall file with the State Oil and Gas Board of Alabama written notification of the execution of this Agreement for Buyer to become the new operator for any applicable well or wells, and all associated facilities and equipment, in a format and manner acceptable to the State Oil and Gas Board of Alabama, along with all applicable fees;

(6)     Buyer shall file with the Federal Explosives Licensing Center an application for each applicable Federal Explosives license or Permits, in a format and manner acceptable to the Federal Explosives Licensing Center, along with all applicable fees; and

(7)     Sellers, on the one hand, and Buyer, on the other hand, shall use commercially reasonable efforts to properly file all documents or applications required to transfer, to amend, or to acquire all other Transferred Permits necessary for the operation and conduct of the Business or Acquired Assets in Alabama, and Buyer and Sellers shall reasonably cooperate in all actions necessary to seek and obtain approval for the transfer thereof.

(iv)     Buyer and Sellers shall, and shall cause their Subsidiaries to, (A) take all actions and do, or cause to be done, all things necessary or desirable under the applicable Legal Requirements with the appropriate Governmental Authority to put in place, to transfer, to amend, or to acquire all Transferred Permits that are necessary for the operation and conduct of the Business or Acquired Assets in Alabama by or on the Closing Date, unless the applicable Legal Requirements regarding such a Permit require certain actions to be taken upon or after Closing, and, in that event, Buyer, at Buyer's sole cost and expense from and after the Closing, shall take, or cause its Subsidiaries to take, all actions and do, or cause to be done, all things necessary or desirable under the applicable Legal Requirements with the appropriate Governmental Authority which can only be taken or done after the Closing to put in place, to transfer, to amend, or to acquire such remaining Permits as promptly as reasonably practicable after the Closing; and (B) take all actions and do, or cause to be done, all things necessary or desirable under the applicable Legal Requirements to put in place with the Alabama Surface Mining Commission as promptly as commercially reasonably possible after the Closing, financial assurances necessary to transfer the Alabama Mining Permits from Sellers and to Buyer and to obtain the release to Sellers of the financial assurances

72

previously placed by Sellers with respect thereto. Sellers agree to provide, at Buyer's sole cost and expense from and after Closing, any reasonable cooperation as reasonably requested by Buyer to bring about the transfer of the Alabama Mining Permits or the issuance of new such permits to Buyer, as applicable. From and after the Closing, Buyer shall use commercially reasonable efforts to pursue the transfer of the Alabama Mining Permits or issuances of new Alabama Mining Permits to Buyer as promptly as possible, and Buyer shall operate under the Alabama Mining Permits as the designated operator and contract miner until the Alabama Mining Permits are transferred or new Permits are issued to Buyer, which contract mining operation shall be pursuant to the terms of a contract mining agreement in form mutually agreeable to Buyer and Sellers and executed and delivered by the Parties at Closing (the "Alabama Contract Mining Agreement"). To the fullest extent allowed by and in accordance with the applicable Legal Requirements, Sellers grant Buyer the right to conduct, at the sole cost and expense of Buyer, mining operations following the Closing on the Real Property under the Alabama Mining Permits, pursuant to and on the terms and conditions of the Alabama Contract Mining Agreement, as the designated operator until such time as the Alabama Mining Permits are transferred to, or new Permits are issued to, Buyer. Sellers shall take all steps that are reasonably necessary to maintain the Alabama Mining Permits prior to transfer thereof to Buyer and shall have (and Buyer grants) all rights of entry onto the Real Property that are reasonably necessary therefor. Notwithstanding anything to the contrary contained herein, Buyer shall reimburse, indemnify and hold harmless Sellers and/or their Affiliates from any and all Liabilities incurred by Sellers and/or their Affiliates as a result of any action taken by Sellers at Buyer's or its Affiliates' request pursuant to this Section 7.9(a)(iv).

(v)     As promptly as practicable after the Closing (or such earlier time as may be permitted by the Alabama Oil and Gas Board), Buyer and Sellers shall execute and deliver to the Alabama Oil and Gas Board one or more applications to change operator (Form OGB 1E) and such other forms that may be necessary or required by the Alabama Oil and Gas Board to change the operator of the Gas Wells to Buyer or Buyer Designee, and Buyer shall post replacement surety bonds or other financial assurances necessary to allow the transfer of the applicable Permits for the Gas Wells from Sellers to Buyer or Buyer Designee. If required by the Alabama Oil and Gas Board, Sellers shall leave in place any bonds or other financial assurances in connection with the applicable Permits for the Gas Wells, subject to the provisions of subsection 7.9(a)(vii) below, until the transfer of the applicable Permits for the Gas Wells from Sellers to Buyer or Buyer Designee. Notwithstanding anything to the contrary contained herein, Buyer shall reimburse, indemnify and hold harmless Sellers and/or their Affiliates from any and all Liabilities incurred by Sellers and/or their Affiliates as a result of any action taken by Sellers at Buyer's or its Affiliates' request pursuant to this Section 7.9(a)(v).

(vi)     Sellers shall use commercially reasonable efforts (at Buyer's sole cost and expense from and after the Closing) to cause any surety bonds (or other financial assurances) in place as of the Closing with respect to applicable Transferred Permits to remain in place and to maintain current levels of surety bond coverage with respect to their Permits that are not Transferred Permits until such time as the final approval for the transfer of such applicable Transferred Permits to Buyer is

Doc#: US1:10163646v46

received. At all times from and after Closing and prior to the transfer to Buyer of the Alabama Mining Permits and any other Permits not acquired by Buyer before the Closing Date (including the Permits relating to the Gas Wells in Alabama), Buyer shall, and shall cause its Subsidiaries to, at Buyer's sole cost and expense comply with all of the applicable Legal Requirements governing, and all conditions and requirements of, or pertaining to, any such Permits. Buyer shall promptly deliver to Sellers written notice of any incidents, violations or occurrences, which Sellers shall have the right, but not the obligation, to cure (including right of entry onto the applicable Real Property), and Buyer shall promptly reimburse Sellers for the reasonable costs of any such cure. Notwithstanding anything to the contrary contained herein, Buyer shall reimburse, indemnify and hold harmless Sellers and/or their Affiliates from any and all Liabilities incurred by Sellers and/or their Affiliates as a result of any action taken by Sellers at Buyer's or its Affiliates' request pursuant to this Section 7.9(a)(vi).

(vii)    Notwithstanding anything in this Agreement to the contrary, from and after the Closing, Buyer shall, at its sole cost and expense, (x) until such time as Buyer has posted replacement surety bonds or other required financial assurances, pay or reimburse Sellers (within five (5) Business Days of receipt of notice from Sellers' Representative, which such notice shall contain the applicable surety bond numbers and corresponding premium amounts, or other appropriate references as to other forms of financial assurance) for the cost of any premiums that become due after the Closing Date with respect to such surety bonds or the cost of other financial assurances, (y) post any addition to the principal amount of any such surety bond or other financial assurance required by the Alabama Surface Mining Commission, the Alabama Oil and Gas Board or any Governmental Authority after the Closing Date as a result of any action taken by Buyer with respect to the Business and Acquired Assets in Alabama and (z) Buyer shall reimburse Sellers for all out-of-pocket costs and expenses incurred by Sellers in connection with any action taken by Sellers at the request of Buyer.

(viii)    Until such time as the Alabama Mining Permits are transferred to Buyer, Buyer shall, and shall cause its Subsidiaries to, take all reasonable and necessary actions such that Buyer will not have been denied, or be made subject to denial of, any application for any Permit or other Governmental Authorization due to application of the Applicant Violator System established pursuant to the SMCRA or any similar applicable state system.

(b)    All fees, bonds or financial assurances required to be paid or provided in connection with the actions to be taken under this Section 7.9 shall be paid or provided by Buyer.

7.10    Overlapping Permits

(a)    To the extent that the permitted areas and outfalls covered by any National Pollutant Discharge Elimination System permit which is an Excluded Asset (each, an "Excluded NPDES Permit") overlaps with the permitted areas and outfalls covered by one or more Transferred Permits issued pursuant to the Surface Mining Reclamation and Control Act (each, an "Assumed SMCRA Permit"), Buyer and Sellers shall cooperate and use commercially

74

reasonable efforts to remove, as soon as commercially practicable after the Closing, the permitted areas and outfalls covered by such Assumed SMCRA Permit(s) from such Excluded NPDES Permit. Without limiting the generality of the foregoing, as soon as commercially practicable after the Closing, (i) Buyer shall, and shall cause its Subsidiaries to, file with the appropriate Governmental Authority an application for a new National Pollutant Discharge Elimination System permit (each, a "New NPDES Permit") with respect to the areas and outfalls covered by such Assumed SMCRA Permit(s) and (ii) the applicable Seller shall, at Buyer's sole cost and expense, take all actions reasonably necessary or desirable under applicable Legal Requirements to modify such Excluded NPDES Permit to remove from such Excluded NPDES Permit the outfalls and areas covered by such Assumed SMCRA Permit(s) (the "Overlapping NPDES Areas"). Sellers shall have (and Buyer grants) all rights of entry onto the Overlapping NPDES Areas necessary for Sellers to maintain the applicable Excluded NPDES Permit at all times following the Closing until Buyer's application for the applicable New NPDES Permit with respect to such Overlapping NPDES Areas is approved by the applicable Governmental Authority (the "NPDES Interim Period") and thereafter until final release of each Excluded NPDES Permit.

(b)     During the NPDES Interim Period, Buyer shall, and shall cause its Subsidiaries to, (i) comply with all of the Legal Requirements governing, and all conditions and requirements of, or pertaining to, any Excluded NPDES Permit with respect to any Overlapping NPDES Areas and (ii) be solely responsible for all incidents of violation, non-compliance, and similar occurrences related to the Overlapping NPDES Areas covered by an Excluded NPDES Permit that arise following the Closing. Buyer shall promptly deliver to Sellers written notice of any such incidents, violations or occurrences, which Sellers shall have the right, but not the obligation, to cure (including right of entry onto the applicable Overlapping NPDES Areas) in the event Buyer does not timely cure, and Buyer shall promptly reimburse Sellers for the reasonable costs of any such cure.

7.11     Transition of Business.

From and after the Execution Date, Sellers shall use commercially reasonable efforts to assist Buyer in accomplishing a smooth transition of the Business from Sellers to Buyer, including, holding discussions with respect to personnel policies and procedures, and other operational matters relating to the Business; provided, that Buyer shall reimburse Sellers for their out of pocket expenses in connection therewith for periods following the Closing.

7.12     Sale Free and Clear.

On the Closing Date, the Acquired Assets shall be transferred to Buyer and/or one or more Buyer Designees, as applicable, free and clear of all Encumbrances and Liabilities (including, for the avoidance of doubt, all successor liability, including any successorship obligations under any Collective Bargaining Agreement, and/or with respect to any Benefit Plan that is not an Buyer Benefit Plan), other than the Permitted Encumbrances and the Assumed Liabilities, including any Reclamation obligations that are Assumed Liabilities.

75

7.13    Acquisition Proposals.

Other than in accordance with the Bidding Procedures, Sellers shall not, and shall not authorize or permit any of their Affiliates or their respective Representatives to, directly or indirectly, (i) encourage, solicit, initiate, facilitate or continue inquiries regarding an Acquisition Proposal; (ii) enter into discussions or negotiations with, or provide any information to, any Person concerning a possible Acquisition Proposal; or (iii) enter into any agreements or other instruments (whether or not binding) regarding an Acquisition Proposal. "Acquisition Proposal" shall mean any inquiry, proposal or offer from any Person (other than Buyer or any of its Affiliates) concerning an Alternative Transaction, in each case, other than pursuant to the Bidding Procedures.

7.14    SEC Filings.

From and after the Execution Date until the earlier of (x) the Closing Date and (y) February 29, 2016, Sellers shall cause to be filed with the SEC all annual, quarterly and current reports and other filings or furnishings as are required to be filed with the SEC under Section 13 or 15(d) of the Exchange Act.

7.15    Other Actions.

Buyer covenants and agrees that, except (w) as expressly contemplated by this Agreement, (x) with the prior written consent of Sellers (which consent shall not be unreasonably withheld, conditioned or delayed), (y) as otherwise required by Legal Requirements or (z) to the extent not inconsistent with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, any orders entered by the Bankruptcy Court in the Bankruptcy Case, or as permitted under the Cash Collateral Orders, after the Execution Date and prior to the Closing Date, Buyer shall use commercially reasonable efforts not to take or agree to or commit to assist any other Person in taking any action (i) that would reasonably be expected to result in a failure of any of the conditions to the Closing or (ii) that would reasonably be expected to impair the ability of Buyer or Sellers to consummate the Closing in accordance with the terms hereof or to materially delay such consummation.

## ARTICLE 8

### ADDITIONAL AGREEMENTS

8.1    Taxes.

Sellers and Buyer agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Acquired Assets (including access to books and records and Tax Returns and related working papers dated before Closing) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, the prosecution or defense of any claims, suit or proceeding relating to any Tax, and the claiming by Buyer of any federal, state or local business tax credits or incentives that Buyer may qualify for in any of the jurisdictions in which any of the Acquired Assets are located; provided, however, that neither Buyer nor any Seller shall be required to disclose the contents of its income

Doc#: US1:10163646v46

Tax Returns to any Person other than the Parties. Any expenses incurred in furnishing such information or assistance pursuant to this Section 8.1 shall be borne by Buyer. Notwithstanding the foregoing but subject in all respects to the Bidding Procedures Order, this Section 8.1 shall not require Sellers to permit any access to, or to disclose (i) any information that, in the reasonable, good faith judgment (after consultation with counsel, which may be in-house counsel) of the Company, is reasonably likely to result in any violation of any Legal Requirement or any Contract to which the Company or any Seller is a party or cause any privilege (including attorney-client privilege) or work product protection that Sellers would be entitled to assert to be waived or (ii) if the Company or any Seller, on the one hand, and Buyer or any of its Subsidiaries, on the other hand, are adverse parties in a litigation, any information that is reasonably pertinent thereto; provided, that, in the case of clause (i), the Parties shall reasonably cooperate in seeking to find a way to allow disclosure of such information to the extent doing so (A) would not (in the good faith belief of the Company (after consultation with counsel, which may be in-house counsel)) be reasonably likely to result in the violation of any such Legal Requirement or Contract or be reasonably likely to cause such privilege or work product protection to be undermined with respect to such information or (B) could reasonably (in the good faith belief of the Company (after consultation with counsel, which may be in-house counsel)) be managed through the use of customary "clean-room" arrangements pursuant to which non-employee Representatives of Buyer could be provided access to such information.

8.2     Bulk Sales.

The Sale Order shall provide either that (i) Sellers have complied with the requirements of any Legal Requirement relating to bulk sales and transfer or (ii) compliance with the Legal Requirements relating to bulk sales and transfers is not necessary or appropriate under the circumstances.

8.3     Payments Received.

Sellers, on the one hand, and Buyer, on the other hand, each agree that, after the Closing, each will hold and will promptly transfer and deliver to the other, from time to time as and when received by them, any cash, checks with appropriate endorsements (using commercially reasonable efforts not to convert such checks into cash) or other property that they may receive on or after the Closing which belongs to the other and will account to the other for all such receipts.

8.4     Assumed Contracts: Adequate Assurance and Performance.

Buyer shall, and shall cause its Subsidiaries to, use commercially reasonable efforts to provide adequate assurance of the future performance by Buyer of each Assumed Contract as required under Section 365 of the Bankruptcy Code. Buyer and Sellers agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code, such as furnishing timely requested and factually accurate affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Buyer's and Sellers' Representatives available to testify before the Bankruptcy Court.

Doc#: US1:10163646v46

8.5    Employee Matters

(a)    Employees. Prior to the Closing Date, Buyer shall set initial terms and conditions of employment, including wages, benefits, job duties and responsibilities and work assignment. Buyer shall determine which Employees, if any, to offer employment to, in its sole discretion. Only Employees who are offered and accept such offers of employment with Buyer based on the initial terms and conditions set by Buyer and further then actually commence employment with Buyer will become "Buyer Employees" after the Closing. Sellers shall terminate, or shall cause to be terminated, on or prior to the Closing Date the employment of all Employees who are offered and accept offers of employment with Buyer pursuant to this Section 8.5(a). Notwithstanding the foregoing, nothing herein will, after the Closing Date, impose on Buyer any obligation to retain any Buyer Employee in its employment for any amount of time or on any terms and conditions of employment. The employment of each such Buyer Employee with Buyer (including any Buyer Employee who may be on leave of absence) will commence immediately after the Closing Date. Except as otherwise required by Legal Requirement, specified in this Agreement, or otherwise agreed in writing by Buyer, Buyer shall not be obligated to provide any severance, separation pay, or other payments or benefits, including any key employee retention payments, to any Employee on account of any termination of such Employee's employment on or before the Closing Date, and such benefits (if any) shall remain obligations of Sellers.

(b)    Access to Information. Subject to Section 7.11, after the Execution Date, Sellers shall provide Buyer, its Affiliates, and their Representatives with reasonable access to the Employees and with information, including employee records and Benefit Plan data, reasonably requested by Buyer and such Affiliates, except as otherwise prohibited by Legal Requirements.

(c)    Benefit Plans. Buyer shall assume all obligations under, and Liabilities with respect to, any Benefit Plans set forth on Schedule 8.5(c) (such schedule to be provided to Sellers by Buyer not later than five (5) Business Days prior to the Bid Deadline) (such plans, the "Buyer Benefit Plans") consistent with Section 2.3(e) of this Agreement as Assumed Liabilities. The Buyer Benefit Plans shall be assumed by and assigned to Buyer as of the Closing Date (or such Buyer Affiliates as Buyer so directs) in the manner described in this Agreement. To the extent that service is relevant for purposes of eligibility and vesting, but not accrual under any employee benefit plan, program, policy or arrangement of Buyer or its Subsidiaries, Buyer shall credit (or cause to be credited) the Buyer Employees for service earned prior to the Closing with Sellers in addition to service earned with Buyer on and after the Closing. To the extent the Buyer Employees and their eligible dependents enroll in any welfare benefit plan of Buyer or its Subsidiaries, subject to the terms of any such plan, Buyer shall undertake commercially reasonable efforts to waive, or cause such waiver of, any preexisting condition limitations applicable to such Buyer Employees to the extent that Buyer Employee's or eligible dependent's condition would not have operated as a preexisting condition under the applicable corresponding welfare benefit plan as maintained by Sellers. In addition, subject to the terms the applicable welfare benefit plan of Buyer or its Subsidiaries, Buyer shall undertake commercially reasonable efforts to (i) waive all waiting periods under such welfare benefit plan otherwise applicable to the Buyer Employees and their eligible dependents, other than waiting periods that are in effect with respect to such individuals as of the Closing to the extent not satisfied under Sellers' applicable Benefit Plans, and (ii) provide each Buyer Employee and his or her

Doc#: US1:10163646v46

dependents with corresponding credit under such welfare benefit plan for any co-payments and deductibles paid by them under Sellers' applicable corresponding Benefit Plans during the portion of the respective plan year prior to the Closing. At any time and from time to time after the Execution Date, Sellers and Buyer shall take, or cause to be taken, any and all actions necessary to effectuate the terms of this <u>Section 8.5(c)</u>, including taking all action necessary to assign and assume and adopt each Buyer Benefit Plan in the manner contemplated by this Agreement effective as of the Closing. Prior to the Closing, Sellers shall reasonably cooperate with Buyer and its Affiliates and give commercially reasonable assistance as Buyer may reasonably request in order to effectuate the foregoing. Nothing herein shall prohibit Buyer or its Affiliates, as applicable, from terminating, amending, or otherwise affecting any Buyer Benefit Plan, at any time and from time to time following the Closing.

(d) <u>Change in Control, Severance or Similar Benefits</u>. Prior to the Closing Date, and to the extent necessary to implement this sentence, Sellers shall to the extent permitted by applicable Legal Requirements and, provided that the terms of the applicable Buyer Benefit Plan or any other agreement with the beneficiary under such Buyer Benefit Plan and any other applicable agreement or arrangement with the affected participant or beneficiary permit such amendments and other actions to be made unilaterally and without the consent of any other party, amend all Buyer Benefit Plans and take or cause to be taken all other actions as may be required or necessary to provide that (i) the transactions contemplated hereunder shall not constitute a "change in control" (or similar transaction) for purposes of providing or accelerating benefits or payments under any such Buyer Benefit Plans, and (ii) severance or separation payments and/or benefits (including payments of accrued vacation) shall not be payable to any Buyer Employee on account of the termination of such employee's employment with Sellers, and that the termination by Sellers of any Buyer Employee shall not constitute a "separation from service" under Treasury Regulations Section 1.409A-1(h).

(e) <u>Payroll Taxes</u>. For purposes of payroll taxes with respect to the Buyer Employees, Sellers shall treat the transactions contemplated by this Agreement, as a transaction described in Treasury Regulation Sections 31.3121(a)(1)-1(b)(2) and 31.3306(b)(1)-(b)(2) (i.e., Buyer shall be treated as a successor for payroll tax purposes); and as such, Sellers and Buyer shall report on a predecessor/successor basis as set forth under the "Standard Procedure" provided in Section 4 of Revenue Procedure 2004-53, 2004-2 C.B. 320.

(f) <u>WARN Act</u>. With respect to Buyer Employees, Buyer will have full responsibility under the WARN Act relating to (i) any act or omission of Buyer after the Closing Date. With respect to the Employees, Sellers will have full responsibility under the WARN Act relating to any act or omission of Sellers prior to and on the Closing Date. Sellers shall be responsible for all other WARN Act Liabilities relating to the periods prior to and on the Closing Date, including any such Liabilities that result from Employees' separation of employment from Sellers and/or Employees not becoming Buyer Employees pursuant to this <u>Section 8.5</u>. Unless otherwise agreed to by Sellers and Buyer, Sellers agree to issue, no later than sixty (60) days prior to the Closing Date, all WARN Act notices, in a form acceptable to Buyer, to the Employees and all other parties required to receive notice under the WARN Acts.

(g) <u>Collective Bargaining Agreements; Employee Benefits</u>. Buyer does not accept or assume any Collective Bargaining Agreements to which any Seller is a party

Doc#: US1:10163646v46

to or subject to, and expressly declines to be bound by or accept the terms of any such Collective Bargaining Agreements. Other than the Assumed Benefits, Buyer shall not be obligated to, and does not, accept or adopt any wage rates, employee benefits, employee policies, or any other terms and conditions of employment.

(h)     No Third-Party Beneficiaries; Employment Status. All provisions contained in this Agreement with respect to employee benefit plans or compensation of Buyer Employees are included for the sole benefit of the respective parties hereto. Nothing contained herein (i) shall confer upon any former, current or future employee of Sellers or Buyer or any legal representative or beneficiary thereof any rights or remedies, including any right to employment or continued employment, of any nature, for any specified period; (ii) shall cause the employment status of any former, present or future Employee to be other than terminable at will; or (iii) shall confer any third party beneficiary rights upon any Buyer Employee or any dependent or beneficiary thereof or any heirs or assigns thereof.

8.6     Post-Closing Books and Records; Properties; and Personnel.

From and after the Closing Date for a period of one (1) year, each Party shall provide the other Parties (and their respective Representatives) with access, at reasonable times and in a manner so as not to unreasonably interfere with their normal business, to the assets, books, records, systems and other property and any employees of the other Parties so as to enable Buyer and Sellers to prepare Tax, financial or court filings or reports, to respond to court orders, subpoenas or inquiries, investigations, audits or other proceedings of Governmental Authorities, to prosecute and defend legal Actions or for other like purposes, including Claims, objections and resolutions, and to enable Sellers to wind down the Business. During such one (1) year period, each Party (and their respective Representatives) shall be permitted to make copies of any books and records described in this Section 8.6, subject to the confidentiality requirements set forth in Section 7.1. If any Party desires to dispose of any such books and records, such Party shall, thirty (30) days prior to such disposal, provide the other Party with a reasonable opportunity to remove or copy such records to be disposed of at the removing Party's expense. Buyer shall retain such books and records for a period of six (6) years following the Closing.

8.7     Casualty Loss.

Notwithstanding any provision in this Agreement to the contrary, if, before the Closing, all or any portion of the Acquired Assets is condemned or taken by eminent domain, or is damaged or destroyed by fire, flood or other casualty, Sellers shall notify Buyer promptly in writing of such fact, and (a) in the case of condemnation or taking, Sellers shall assign or pay, as the case may be, any condemnation or taking proceeds thereof (of which are payable to Sellers) to Buyer at the Closing, and (b) in the case of fire, flood or other casualty to the Acquired Assets, Sellers shall, at Buyer's option, either use insurance proceeds to restore such damage, or to the extent such proceeds were not previously applied, assign the insurance proceeds therefrom to Buyer at Closing.

Doc#: US1:10163646v46

8.8    Change of Name.

Promptly following the Closing, each Seller shall, and shall cause its direct and indirect Subsidiaries to, discontinue the use of its current name (and any other trade names or "d/b/a" names currently utilized by each Seller or its direct or indirect Subsidiaries) and shall not subsequently change its name to or otherwise use or employ any name which includes the words "Walter" without the prior written consent of Buyer, and each Seller shall cause the names of Sellers in the caption of the Bankruptcy Case to be changed to the new names of each Seller as provided in the last sentence of this Section 8.8; provided, however, that each Seller and each of its direct and indirect Subsidiaries may use its current name (and any other trade name or "d/b/a" names currently utilized by each Seller or its direct or indirect Subsidiaries) included on any business cards, stationery and other similar materials following the Closing for a period of up to one hundred and eighty (180) days solely for purposes of winding down the affairs of each Seller, provided that when utilizing such materials, other than in incidental respects, each Seller and each of its direct and indirect Subsidiaries shall use commercially reasonable efforts to indicate its new name and reference its current name (and any other trade names or "d/b/a" names currently utilized by each Seller or its direct Subsidiaries) as "formally known as" or similar designation. From and after the Closing, except as otherwise set forth in this Agreement (including this Section 8.8), each Seller covenants and agrees not to use or otherwise employ any of the trade names, corporate names, "d/b/a" names or any mark that is confusingly similar to the Trademarks that (i) are rights utilized in the conduct of the Business and (ii) are Acquired Assets. Buyer acknowledges and agrees that, as of the Execution Date, it is not Buyer's intention to use or otherwise use or employ any name which includes the words "Walter" in its conduct and operation of the Business and the Acquired Assets other than with respect to a transition period. Within ninety (90) days following the Closing, Sellers shall file, and shall cause its direct and indirect Subsidiaries to file, all necessary organizational amendments with the applicable Secretary of State of each Seller's jurisdiction of formation and in each State in which each such Seller is qualified to do business and with the Bankruptcy Court to effectuate the foregoing.

8.9    No Successor Liability.

The Parties intend that, except as included in the Assumed Liabilities, upon the Closing, Buyer shall not be deemed to: (a) be the successor of or successor employer (as described under COBRA and applicable regulations thereunder) to Sellers, including with respect to any Collective Bargaining Agreements and any Benefit Plans (except for Buyer Benefit Plans), under the Coal Act, and any common law successor liability in relation to the UMWA 1974 Pension Plan, including with respect to withdrawal liability; (b) have, *de facto*, or otherwise, merged with or into Sellers; (c) be a mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers; or (d) be liable for any acts or omissions of Sellers in the conduct of the Business or arising under or related to the Acquired Assets other than as set forth in this Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the Parties intend that Buyer shall not be liable for any Encumbrances (other than Assumed Liabilities and Permitted Encumbrances) against any Seller or any of its predecessors or Affiliates, and that Buyer have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date or whether fixed or contingent, existing or hereafter arising, with respect to the Business, the Acquired Assets or any

81

Liabilities of any Seller arising prior to the Closing Date. The Parties agree that the provisions substantially in the form of this <u>Section 8.9</u> shall be reflected in the Sale Order.

8.10    <u>Liens</u>.

Buyer agrees to direct that the liens securing the First Lien Obligations and the First Lien Adequate Protection Obligations and any debtor-in-possession financing liens be released and terminated with respect solely to (a) the Acquired Assets (or the Walter Coke Assets, the Blue Creek Assets or any other Non-Core Assets upon the closing of the sale thereof to a Successful Bidder in accordance with the Sale Motion and Bidding Procedures, provided that such release and termination shall be solely with respect to such assets and such liens shall continue to attach to the proceeds from such sale in accordance with the Bankruptcy Code), (b) any Walter Coke Assets, upon the transfer of the Walter Coke Working Capital Assets to the Walter Coke Trust, if the Walter Coke Election or the Pre-Closing Walter Coke Election is made and there is no Successful Bidder for the Walter Coke Assets as determined in accordance with the Bidding Procedures or the sale of the Walter Coke Assets to a Successful Bidder or Backup Bidder (if any) for the Walter Coke Assets does not close and (c) any Non-Core Assets (excluding the Walter Coke Assets and the Blue Creek Assets), upon the transfer of Non-Core Assets to Buyer or the sale of such Non-Core Assets to a Successful Bidder or Backup Bidder (if any). For the avoidance of doubt, following payment of the Cash Consideration pursuant to <u>Section 3.1(a)</u>, Buyer acknowledges and agrees that none of the First Lien Lenders, the First Lien Noteholders, the Indenture Trustee or the Credit Agreement Agent may assert any Lien on or superpriority administrative claim against the Cash Consideration, notwithstanding anything in the Cash Collateral Orders to the contrary, and Buyer and Sellers hereby direct that the Cash Consideration, as a permitted use of Cash Collateral under and as defined in the Cash Collateral Orders, shall be deposited at Closing into the Wind Down Trust and utilized in accordance with <u>Section 7.8(e)</u>, including by any Chapter 7 trustee.

8.11    <u>Other Agreements</u>.

(a)    Unless otherwise consented to in writing by Buyer in its sole discretion, Sellers shall not cause or permit any Non-Core Assets to be sold, assigned, transferred or otherwise conveyed to any Person other than Buyer, unless such Person assumes (and is capable of assumption and performance of) all Liabilities for Reclamation relating to any such Non-Core Assets to be sold.

(b)    From and after the Closing, the Sellers shall irrevocably waive any right to use, utilize or otherwise access any funds or monies pursuant to any provisions of the Cash Collateral Orders relating to the "Carve-Out." The Sellers shall use best efforts to cause the Cash Collateral Orders to be modified to reflect the terms of this section, including by eliminating the Carve-Out.

8.12    <u>Insurance</u>.

(a)    With respect to any insurance policy included in the Acquired Assets pursuant to <u>Section 2.1(y)</u>, that, immediately prior to the Closing, by its terms provides coverage with respect to acts, omissions and events relating to the Acquired Assets and Assumed

Doc#: US1:10163646v46

Liabilities, on the one hand, and Excluded Assets and/or Excluded Liabilities, on the other hand, (such insurance policies, the "Shared Insurance Policies"), Buyer shall use commercially reasonable efforts to provide Sellers and any applicable Affiliate of any Seller with access to coverage under such Shared Insurance Policies from and after the Closing for claims relating to acts, omissions, and events respecting any Excluded Assets and Excluded Liabilities (such claims, "Excluded Insurance Claims"). Buyer and Sellers agree that any Excluded Insurance Claims by Sellers and any applicable Affiliate of any Seller under any Shared Insurance Policy shall receive the same priority and be subject to any deductibles and retentions with all claims by Buyer under such Shared Insurance Policies (whether or not such Excluded Insurance Claims are made before or after any claims made by Buyer under the Shared Insurance Policies). Claims made by Sellers and any applicable Affiliate of any Seller and Buyer under the Shared Insurance Policies shall be treated on a *pari passu* basis.

(b)     With respect to claims made under the Shared Insurance Policies, whether or not known or reported prior to the Closing, each of Sellers and Buyer shall report such claims directly to the applicable insurer (with a copy to the other Parties) and the reporting Party shall individually, and not jointly, assume and be responsible for the reimbursement liability (i.e., deductible or retention) and/or any retrospective premium charges associated with the claim so submitted by it, unless otherwise agreed in writing by the other Parties.

(c)     Without limiting the provisions in this Section 8.12, no Party shall be liable to any Person for claims, or portions of claims, not reimbursed by insurers under any insurance policy for any reason, including coinsurance provisions, deductibles, quota share deductibles, self-insured retentions, bankruptcy or insolvency of any insurance carrier(s), policy limitations or restrictions (including exhaustion of limits), any coverage disputes, any failure to timely file a claim, or any defect in such claim or its processing.

# ARTICLE 9

## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to fulfillment, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived by Buyer in writing, in its sole and absolute discretion:

9.1     Accuracy of Representations.

The representations and warranties of Sellers set forth in Article 5 shall be true and correct in all respects (without giving effect to any qualification as to materiality or Material Adverse Effect) on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (provided that representations and warranties which are confined to a specified date shall speak only as of such date); provided, however, that in the event of a breach of a representation or warranty, the condition set forth in this Section 9.1 shall be deemed satisfied unless the effect of all such breaches of representations and warranties taken together results in a Material Adverse Effect.

Doc#: US1:10163646v46

Buyer shall have received a certificate of Sellers to such effect signed by a duly authorized officer of each Seller.

9.2     Sellers' Performance.

The covenants and agreements that Sellers are required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects and Buyer shall have received a certificate of Sellers to such effect signed by a duly authorized officer thereof.

9.3     No Order.

No Governmental Authority shall have enacted, issued, promulgated, decreed or entered any Order from and after the Execution Date, which is in effect and has the effect of prohibiting (or delaying beyond the Outside Date) the consummation of the transactions contemplated by this Agreement.

9.4     Governmental Authorizations.

(a)     To the extent that the HSR Act is applicable, any waiting period (and any extension thereof) under the HSR Act and the antitrust legislation of any other relevant jurisdiction applicable to the purchase of the Acquired Assets or the Business contemplated by this Agreement shall have expired or shall have been terminated; and

(b)     Subject to Section 2.5, (i) all of the Closing Required Permits shall have been transferred to, or obtained by, Buyer or (ii) with respect to any Transferred Permits that have not been transferred at or prior to Closing, Buyer shall have the right to conduct, pursuant to Section 7.9, mining operations following the Closing on the applicable Real Property.

9.5     Sellers' Deliveries.

Each of the deliveries required to be made to Buyer pursuant to Section 4.3 shall have been so delivered.

9.6     Sale Order.

Subject to Section 2.5, the Bankruptcy Court shall have entered the Sale Order in form and substance, including with respect to all findings of fact and conclusions of law, acceptable to Sellers and Buyer, and the Sale Order shall have become a Final Order.

9.7     Assumed Contracts.

The Bankruptcy Court shall have approved and authorized, other than with respect to Cure Costs, the assumption and assignment of each Assumed Contract, except as would not have a material effect on the Business from and after the Closing.

Doc#: US1:10163646v46

9.8    <u>Material Adverse Effect</u>.

Since the Execution Date, no Material Adverse Effect shall have occurred.

9.9    <u>UMWA; USW</u>.

(a)    (i) the Bankruptcy Court shall have determined that Sellers can sell the Acquired Assets free and clear of any successor clause in the UMWA Collective Bargaining Agreements, (ii) the UMWA shall have agreed to waive or remove the successor clause in the UMWA Collective Bargaining Agreements, or (iii) the Bankruptcy Court shall have granted a motion acceptable to Buyer filed by the applicable Seller pursuant to Section 1113(c) of the Bankruptcy Code authorizing the applicable Seller to reject the UMWA Collective Bargaining Agreements; and

(b)    Prior to Closing the USW will have successfully ratified and executed an initial Collective Bargaining Agreement with Buyer, with all terms and conditions therein being acceptable to Buyer as determined by Buyer in its sole discretion; and

(c)    (i) the Bankruptcy Court shall have determined that Sellers can sell the Acquired Assets free and clear of any successor clause in the USW Collective Bargaining Agreements, (ii) the USW shall have agreed to waive or remove the successor clause in the USW Collective Bargaining Agreements, or (iii) the Bankruptcy Court shall have granted a motion acceptable to Buyer filed by the applicable Seller pursuant to Section 1113(c) of the Bankruptcy Code authorizing the applicable Seller to reject the USW Collective Bargaining Agreements.

(d)    In the event that (i) the Walter Coke Election or the Pre-Closing Walter Coke Election is made by Buyer or (ii) there is a Successful Bidder (other than Buyer or a Buyer Designee) for the Walter Coke Assets and such sale closes, <u>Section 9.9(b)</u> shall not be applicable. In addition, if there is a Successful Bidder (other than Buyer or a Buyer Designee) for the Walter Coke Assets and such sale closes, upon the final closing date of such sale Buyer agrees at that time to waive <u>Section 9.9(c)</u>; provided however, Sellers take all steps to satisfy <u>Section 9.9(c)</u> until Buyer waives <u>Section 9.9(c)</u>.

## ARTICLE 10

### CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLERS TO CLOSE

The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to fulfillment, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived by Sellers in writing, in their sole and absolute discretion:

10.1    <u>Accuracy of Representations</u>.

The representations and warranties of Buyer set forth in <u>Article 6</u> shall be true and correct in all respects (without giving effect to any qualification as to materiality or Material Adverse Effect) on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (provided that

representations and warranties which are confined to a specified date shall speak only as of such date); provided, however, that in the event of a breach of a representation or warranty, the condition set forth in this Section 10.1 shall be deemed satisfied unless the effect of all such breaches of representations and warranties taken together results in a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement. Sellers shall have received a certificate of Buyer to such effect signed by a duly authorized officer of Buyer.

10.2    Buyer's Performance.

The covenants and agreements that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects, and Sellers shall have received a certificate of Buyer to such effect signed by a duly authorized representative thereof.

10.3    No Order.

No Governmental Authority shall have enacted, issued, promulgated, decreed, or entered any Order from and after the Execution Date, which is in effect and has the effect of prohibiting (or delaying beyond the Outside Date) the consummation of the transactions contemplated by this Agreement.

10.4    Governmental Authorizations.

(a)    To the extent that the HSR Act is applicable, any waiting period (and any extension thereof) under the HSR Act and the antitrust legislation of any other relevant jurisdiction applicable to the purchase of the Acquired Assets or the Business contemplated by this Agreement shall have expired or shall have been terminated; and

(b)    Subject to Section 2.5, (i) all of the Closing Required Permits shall have been transferred to, or obtained by, Buyer or (ii) with respect to any Transferred Permits that have not been transferred at or prior to Closing, Buyer shall have the right to conduct, pursuant to Section 7.9, mining operations immediately following the Closing on the Real Property.

10.5    Buyer's Deliveries.

Each of the deliveries required to be made to Sellers pursuant to Section 4.2 shall have been so delivered.

10.6    Sale Order. Subject to Section 2.5, the Bankruptcy Court shall have entered the Sale Order in form and substance, including with respect to all findings of fact and conclusions of law, acceptable to Sellers and Buyer, and the Sale Order shall have become a Final Order.

10.7    Release. Sellers shall have received a release on substantially the same terms as the release provided by the Buyer as set forth in Section 12.16(a), (c) and (d) executed

Doc#: US1:10163646v46

by each of the members of the Steering Committee, the Credit Agreement Agent (on behalf of itself) and the Indenture Trustee (on behalf of itself) as of the Closing Date.

# ARTICLE 11

## TERMINATION

11.1    Termination Events.

Notwithstanding anything to the contrary in this Agreement, this Agreement may be terminated at any time prior to the Closing only as follows (for the avoidance of doubt, if the auction contemplated by the Bidding Procedures has occurred and Buyer is not the Successful Bidder but has been declared the Backup Bidder, Buyer agrees that it will not exercise its termination rights hereunder pursuant to Section 11.1(b)(ii) or (iii), until the earliest of (x) the Alternative Outside Date (as defined below), if applicable, (y) the closing of the sale to either the Successful Bidder or Buyer) or (z) the Outside Date, if applicable.

(a)    by mutual written consent of Sellers and Buyer;

(b)    by written notice from either Sellers or Buyer:

(i)    if a Governmental Authority issues a final, non-appealable ruling or Order permanently restraining, enjoining or otherwise prohibiting consummation of the transactions contemplated hereby where such ruling or Order was not requested, encouraged or supported by any of Sellers or Buyer; provided that the right to terminate this Agreement under this Section 11.1(b)(i) shall not be available to any Party whose willful failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur on or prior to the Outside Date;

(ii)    if the Closing shall not have occurred on or prior to February 29, 2016 (the "Outside Date"); provided, however, that if the Closing has not occurred by such date, but on such date all of the conditions set forth in Article 9 and Article 10 have been satisfied or waived (to the extent such conditions may be waived) other than the conditions set forth in Sections 9.4 and 10.4, then the Outside Date shall automatically be extended until thirty (30) days after such initial Outside Date (and such extended date shall be deemed to be the "Outside Date" for all purposes hereunder); provided, further that the terminating Party under this Section 11.1(b)(ii) is not (at such time of termination) in breach of any representation, warranty, covenant or other agreement in this Agreement so as to cause any conditions to Closing not to be satisfied and shall not have been the proximate cause of the failure of the Closing to occur on or prior to the Outside Date;

(iii)    if at the end of the auction contemplated by the Bidding Procedures, Buyer is not determined by Sellers to be the (A) Successful Bidder or (B) Backup Bidder with respect to the Acquired Assets; provided that in the event Buyer is determined to be the Backup Bidder with respect to the Acquired Assets, then, this Agreement will terminate automatically without further action by any Party upon the

87

earlier to occur of (X) the closing of a Successful Bid and (Y) the date that is sixty (60) days after the date of the sale hearing contemplated by the Bidding Procedures (the "Alternative Outside Date");

(iv)    if the Bankruptcy Court shall have entered an Order dismissing, or converting into cases under chapter 7 of the Bankruptcy Code, any of the cases commenced by Sellers under chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Case;

(v)    upon the occurrence of any Termination Event (as defined in the Cash Collateral Orders);

(vi)    upon the date that is fourteen (14) days prior to the Bid Deadline, unless Buyer and Sellers shall have reached agreement in their sole discretion on each of the Deferred Matters, and this Agreement has been amended accordingly to reflect such agreement; or

(vii)    upon the final, non-appealable ruling or denial of the Governmental Authorizations described in Sections 9.4 and 10.4 and required to be obtained by Closing.

(c)    by written notice from Buyer:

(i)    if any of the events set forth in clauses (a) through (d) of Section 7.5 shall not have occurred by the respective dates set forth therein;

(ii)    other than as contemplated by the Sale Motion or Bidding Procedures Order, if any Seller seeks to have the Bankruptcy Court enter an Order dismissing, or converting into cases under chapter 7 of the Bankruptcy Code, any of the cases commenced by Sellers under chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Case, or if a responsible officer or an examiner with enlarged powers is appointed (other than a fee examiner) relating to the operation of Sellers' businesses pursuant to Section 1104 of the Bankruptcy Code and the order of appointment is not vacated or reversed within fourteen (14) days after the entry thereof;

(iii)    in the event of any breach of, or failure to perform, by Sellers of any of their agreements, covenants, representations or warranties contained herein or in the Sale Order, which breach or failure to perform (A) would result in a condition set forth in Article 9 not to be satisfied and (B) cannot be cured within ten (10) Business Days after Buyer notifies Sellers of such breach in writing; provided that Buyer shall not have a right of termination pursuant to this Section 11.1(c)(iii) if it is then in material breach of any of its agreements, covenants, representations or warranties contained herein or in the Sale Order; or

(iv)    if, Buyer (other than as a result of (1) Buyer's own breach of this Agreement or (2) the disallowance or avoidance of a substantial portion of the First Lien Obligations and/or the Prepetition First Priority Liens (as defined in the Cash Collateral Orders)) is unable, pursuant to Section 363(k) of the Bankruptcy Code, to

88

Doc#: US1:10163646v46

credit bid in payment of all or any portion of the Purchase Price as set forth in <u>Section 3.1</u> (other than the Assumed Liabilities and the cash portion of the Purchase Price); <u>provided</u>, that the inability to credit bid post-petition interest payable under Section 506(b) of the Bankruptcy Code or any other amount not in excess of $1,000,000 shall not give rise to a termination right under this <u>Section 11.1(c)(iv)</u>.

(d)        by written notice from Sellers:

in the event of any breach of, or failure to perform, by Buyer of any of its agreements, covenants, representations or warranties contained herein or in the Sale Order, which breach or failure to perform (A) would result in a condition set forth in <u>Article 10</u> not to be satisfied and (B) cannot be cured within ten (10) Business Days after Sellers notify Buyer of such breach in writing; <u>provided</u> that Sellers shall not have a right of termination pursuant to this <u>Section 11.1(d)</u> if Sellers are then in material breach of any of their agreements, covenants, representations or warranties contained herein or in the Sale Order.

Each condition set forth in this <u>Section 11.1</u> shall be considered separate and distinct from each other such condition. If more than one of the termination conditions set forth in this <u>Section 11.1</u> are applicable, the applicable party shall have the right to choose the termination condition pursuant to which this Agreement is to be terminated.

11.2    <u>Effect of Termination</u>.

(a)        In the event of termination of this Agreement by Buyer or Sellers pursuant to this <u>Article 11</u>, this Agreement shall become null and void and have no effect, and all rights and obligations of the Parties under this Agreement shall terminate without any Liability of any Party to any other Party (other than as expressly provided herein); <u>provided</u>, that the provisions of <u>Sections 7.1(c)</u> (Access and Reports; Confidentiality), <u>7.6</u> (Expense Reimbursement), <u>12.9</u> (Expenses), <u>12.10</u> (Governing Law, Consent to Jurisdiction and Venue; Jury Trial Waiver), and <u>12.16</u> (No Liability) and this <u>Section 11.2</u> (and, to the extent applicable to the interpretation or enforcement of such provisions, <u>Article 1</u>), shall expressly survive the termination of this Agreement.

(b)        Subject in all respects to the Bidding Procedures Order, Sellers shall pay to Buyer the Expense Reimbursement by wire transfer of immediately available funds immediately upon the first to occur of: (i) the earlier of (x) the consummation by Sellers of an Alternative Transaction and (y) the date that is 60 days following Bankruptcy Court approval of an Alternative Transaction, in each case, following termination of this Agreement pursuant to <u>Section 11.1(b)(iii)</u>; (ii) termination of this Agreement (other than a termination pursuant to <u>Section 11.1(b)(i) or (iii)</u>) if, as of such termination, any Seller (but not Buyer) was in breach of any of its representations, warranties, covenants or other agreements under this Agreement so as to cause any of the conditions set forth in <u>Article 9</u> not to be satisfied; or (iii) if this Agreement is terminated (other than as set forth in clauses (i) and (ii) above or as a result of Buyer's breach of any of its representations, warranties, covenants or other agreements under this Agreement so as to cause any of the conditions set forth in <u>Article 10</u> not to be satisfied), then upon consummation by Sellers of an Alternative Transaction within nine (9) months of such

89

termination (any such event, a "Protection Event"); provided that under no circumstances shall Sellers be obligated to pay the Expense Reimbursement more than once; and provided, further that, if Sellers fail to pay any amounts due to Buyer pursuant to this Section 11.2(b) within the time period specified herein, Sellers shall pay the costs and expenses (including reasonable legal fees and expenses) incurred by Buyer in connection with any Action or Proceeding taken to collect payment of such amounts, together with interest on such unpaid amounts at the Applicable Rate, calculated on a daily basis from the date such amounts were required to be paid until the date of actual payment. Notwithstanding anything herein, upon payment by Sellers of the Expense Reimbursement pursuant to this Section 11.2(b), Buyer shall be precluded from any other remedy against Sellers, at law or in equity or otherwise, and Buyer shall not seek to obtain any other recovery, judgment or damages of any kind against Sellers in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby.

(c)     The Parties acknowledge and agree that any payment of the Blue Creek Bid Protections pursuant to Section 7.8(b)(ii) and the Expense Reimbursement described in this Section 11.2 shall constitute liquidated damages (and not a penalty) and shall be deemed to be the sole and exclusive remedy of Buyer and any other Person against Sellers in connection with this Agreement and the transactions contemplated hereby, and each Seller's respective former, current or future equity holders, controlling persons, directors, officers, employees, agents, general or limited partners, managers, management companies, members, stockholders, Affiliates or assignees and any and all former, current or future equity holders, controlling persons, directors, officers, employees agents, general or limited partners, managers, management companies, members, stockholders, Affiliates or assignees of any of the foregoing, and any and all former, current or future heirs, executors, administrators, trustees, successors or assign of any of the foregoing, and each Affiliate, officer, director, employee, controlling person, advisor, agent, attorney or representatives of any such Person (each, a "Related Party" and, collectively, the "Related Parties"), and no Related Party of any Seller shall have any Liability or obligation (including any Liability or obligation to pay the Blue Creek Bid Protections and the Expense Reimbursement) for any or all damages suffered or incurred by Buyer or any other Person in connection with this Agreement (and the termination hereof), the transactions contemplated by this Agreement (and the abandonment thereof) or any matter forming the basis for such termination, and, upon payment of the Blue Creek Bid Protections and the Expense Reimbursement under such circumstances to Buyer, neither Buyer nor any other Person shall be entitled to bring or maintain any other legal Action against Sellers or any Related Party of any Seller and none of Sellers or any Related Party of any Seller shall have any further Liability or obligation to Buyer arising out of this Agreement or any of the transactions contemplated hereby or any matters forming the basis for such termination. The Parties acknowledge and agree that (i) the agreements contained in this Section 11.2(c) are an integral part of this Agreement and the transactions contemplated hereby and (ii) in light of the difficulty of accurately determining actual damages with respect to the foregoing, the right to any such payment of the Blue Creek Bid Protections and the Expense Reimbursement constitute a reasonable estimate of the damages that will compensate Buyer in the circumstances in which such fees are payable for the efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated by this Agreement.

Doc#: US1:10163646v46

## ARTICLE 12

### GENERAL PROVISIONS

12.1   Survival.

All covenants and agreements contained herein which by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to the Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to the Closing, survive the Closing in accordance with their terms until fully performed or satisfied. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder shall not survive the Closing and shall thereupon terminate, including any Actions for damages in respect of any breach thereof.

12.2   Confidentiality.

Following the Closing, each Seller agrees not to, and to cause its Subsidiaries not to, disclose any confidential or non-public information concerning the Acquired Assets, the Business, the negotiation or existence and terms of this Agreement or the business affairs of Buyer or the Assumed Liabilities ("Confidential Information") except disclosure of Confidential Information that (a) was or is lawfully obtained from a source that, to the knowledge of such Seller, was not under an obligation of confidentiality to Buyer with respect to such information, (b) is independently developed by such Seller without violating any of its obligations under this Agreement, (c) is or becomes available to the public, (d) is or may be necessary to wind down any of Sellers' estates, or in connection with the enforcement of the rights of, or the defense of any Proceeding against or involving, any Seller provided that the Confidential Information is afforded confidential treatment, (e) primarily relates to any Excluded Assets and/or Excluded Liabilities, (f) is or may be necessary in connection with the Bankruptcy Case provided that the Confidential Information is afforded confidential treatment or (g) is disclosed to a bidder in connection with an Alternative Transaction; provided, that the bidder in such Alternative Transaction agrees for the benefit of Buyer to maintain the confidentiality of the Confidential Information. Notwithstanding the foregoing, a Seller may disclose Confidential Information if such Seller believes (upon the advice of counsel) it is legally required to make such disclosure in order to comply with applicable law, regulation, rule or legal, judicial or administrative process (including any rule, regulation or policy statement of (i) any organized securities exchange, market or automated quotation system on which the Company's securities are listed or quoted, (ii) any self-regulatory organization of which a party is a member) or (iii) in connection with the Bankruptcy Case. If a Seller or any of its Representatives becomes required (including by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process) or it becomes necessary in connection with the Bankruptcy Case to disclose any of the Confidential Information, such Seller or Representative shall use reasonable efforts to provide Buyer with prompt notice, to the extent allowed by law, rule and regulation, of such requirement. Each Seller agrees to disclose only that portion of the Confidential Information which it believes it is necessary or required to disclose and to use commercially reasonable efforts to obtain confidential treatment of such Confidential Information.

Doc#: US1:10163646v46

12.3    <u>Public Announcements</u>.

Prior to the Closing, unless otherwise required by applicable Legal Requirement or by obligations of Buyer or Sellers or their respective Affiliates pursuant to any listing agreement with or rules of any securities exchange, Buyer, on the one hand, and Sellers, on the other hand, shall consult with each other before issuing any press release or otherwise making any public statement with respect to this Agreement or the transactions contemplated hereby and shall not issue any such release or make any such statement without the prior written consent of the other (such consent not to be unreasonably withheld, conditioned or delayed). From and after the Closing, the Parties may make public statements with respect to this Agreement or the transactions contemplated hereby so long as such announcements do not disclose the specific terms or conditions of this Agreement except where such terms and conditions have already been disclosed as required by Legal Requirement or by obligations of Buyer or Sellers or their respective Affiliates pursuant to any listing agreement with or rules of any securities exchange; <u>provided</u>, that the issuing party shall use its commercially reasonable efforts to consult with the other party with respect to the text thereof to the extent practicable.

12.4    <u>Notices</u>.

All notices, requests, demands, waivers and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if delivered personally or sent by overnight courier or facsimile transmission:

(a)    If to Sellers, then to:

Walter Energy, Inc.
3000 Riverchase Galleria
Suite 1700
Birmingham, AL 35244
Attn: Earl H. Doppelt
Facsimile: (205)776-7859

with a copy (which shall not constitute notice) to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Attn: Kelley A. Cornish
Facsimile: 212-757-3990

and

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Attn: Ariel J. Deckelbaum
     Toby S. Myerson
Facsimile: 212-757-3990

92

(b)      If to Buyer:

> Coal Acquisition LLC
> c/o Daniel Fisher
> Akin Gump Strauss Hauer & Feld LLP
> 1333 New Hampshire Avenue, N.W.
> Washington, DC 20036
> Facsimile: 202-887-4288

with a copy (which shall not constitute notice) to:

> Akin Gump Strauss Hauer & Feld LLP
> One Bryant Park
> New York, NY 10036
> Attn: Ira S. Dizengoff
> Facsimile: 212-872-1002

and

> Akin Gump Strauss Hauer & Feld LLP
> 1333 New Hampshire Avenue, N.W.
> Washington, DC 20036
> Attn: James Savin
> Facsimile: 202-887-4288

or to such other person or address as any party shall specify by notice in writing to the other party. All such notices, requests, demands, waivers and communications shall be deemed to have been received on the date on which so personally-delivered or faxed or delivered by overnight courier.

12.5   Waiver.

Neither the failure nor any delay by any Party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power, or privilege shall preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by Legal Requirements, (a) no waiver that may be given by a Party shall be applicable except in the specific instance for which it is given, and (b) no notice to or demand on one Party shall be deemed to be a waiver of any right of the Party giving such notice or demand to take further action without notice or demand.

12.6   Entire Agreement; Amendment.

This Agreement (including the Disclosure Schedules and the Exhibits), the Sale Order, the Bidding Procedures Order and the other Transaction Documents supersede all prior agreements between Buyer, on the one hand, and Sellers, on the other hand, with respect to its subject matter and constitute a complete and exclusive statement of the terms of the agreements

Doc#: US1:10163646v46

between Buyer, on the one hand, and Sellers, on the other hand, with respect to their subject matter. This Agreement may not be amended, modified or supplements except by a written agreement executed by each of the Parties.

12.7    Assignment.

This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any Party by operation of law or otherwise without the express written consent of all of the other Parties (which consent may be granted or withheld in the sole discretion of such other Party) and any assignment in contravention of this Section 12.7 shall be null and void *ab initio*; provided, however, that, subject to compliance with Section 4.4, Buyer shall be permitted to assign all or part of its rights or obligations hereunder to one or more Buyer Designees without the prior consent of Sellers; provided, further, that Sellers shall be permitted to assign their rights hereunder in part to one or more Successful Bidders or to the acquiror of any Excluded Assets or Excluded Liabilities without the prior consent of Buyer; provided that no such assignment shall relieve Sellers from their liabilities or obligations hereunder, other than with respect to such Excluded Assets or Excluded Liabilities.

12.8    Severability.

The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible; and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

12.9    Expenses.

Except as otherwise expressly provided in this Agreement, including Section 11.2, whether or not the transactions contemplated by this Agreement are consummated, the Parties shall bear their own respective expenses (including all compensation and expenses of counsel, financial advisors, consultants, actuaries and independent accountants) incurred in connection with this Agreement and the transactions contemplated hereby.

12.10    Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of New York applicable hereto.

(b)    Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the

94

terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or Proceeding; provided, however, that, if the Bankruptcy Case has been closed pursuant to Section 350(a) of the Bankruptcy Code, all Actions and Proceedings arising out of or relating to this Agreement shall be heard and determined in a New York state court or a federal court sitting in the state of New York, and the Parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such Action or Proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or Proceeding. The Parties consent to service of process by mail (in accordance with Section 12.4) or any other manner permitted by law.

(c)     THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF SELLERS, BUYER OR THEIR RESPECTIVE REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

12.11   Counterparts.

This Agreement and any amendment hereto may be executed in two or more counterparts, each of which shall be deemed to be an original of this Agreement or such amendment and all of which, when taken together, shall constitute one and the same instrument. Notwithstanding anything to the contrary in Section 12.4, delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by telecopier, facsimile or email attachment that contains a portable document format (.pdf) file of an executed signature shall be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

12.12   Parties in Interest; Third Party Beneficiaries; No Amendment.

This Agreement and the other Transaction Documents shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. Except with respect to the parties released and/or exculpated pursuant to Section 12.16, this Agreement and the other Transaction Documents are for the sole benefit of the Parties and their permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind. Notwithstanding anything to the contrary, nothing in this Agreement shall constitute an amendment to any Benefit Plan.

12.13   Remedies.

Neither the exercise of nor the failure to exercise a right of set-off or to give notice of a claim under this Agreement will constitute an election of remedies or limit Sellers or

Doc#: US1:10163646v46

Buyer in any manner in the enforcement of any other remedies that may be available to any of them, whether at law or in equity.

### 12.14   Specific Performance.

Each Party recognizes that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by them in accordance with the terms hereof or were otherwise breached, and that monetary damages alone would not be adequate to compensate the non-breaching Party or Parties for their injuries. Accordingly, a non-breaching Party shall be entitled to injunctive relief to enforce the terms and provisions of this Agreement. If any Action or Proceeding is brought by the non-breaching Party or Parties to enforce any of the terms or provisions of this Agreement pursuant to this Section 12.14, the Party in breach shall waive the defense that there is an adequate remedy at law. Each Party agrees to waive any requirement for the security or posting of any bond in connection with any Action or Proceeding seeking specific performance of such terms or provisions and that the only permitted objection that it may raise in response to any action for specific performance of such terms or provisions is that it contests the existence of a breach or threatened breach of such provisions. The rights set forth in this Section 12.14 shall be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

### 12.15   Sellers' Representative; Reliance.

Subject to entry of the Sale Order, Sellers, jointly and severally, hereby represent and warrant that the statements in this Section 12.15 are true and correct as of the Execution Date:

(a)     The Company has been appointed, and is authorized, and empowered to act, in connection with, and to facilitate the consummation of, the transactions contemplated by this Agreement and the other Transaction Documents and in connection with any activities to be performed by Sellers under this Agreement and the other Transaction Documents, for the purposes and with the powers, and authority set forth in this Agreement, which will include the sole power and authority:

(i)     to receive and distribute the Purchase Price or any other amount paid in connection with this Agreement or the other Transaction Documents to Sellers or to the Persons legally entitled thereto;

(ii)     to enforce and protect the rights and interests of Sellers arising out of or under or in any manner relating to this Agreement and the other Transaction Documents (including in connection with any claims related to the transactions contemplated hereby and thereby) and, in connection therewith, to (A) assert any claim or institute any action, (B) investigate, defend, contest or litigate any action initiated by Buyer or any other Person pursuant to this Agreement and the other Transaction Documents and receive process on behalf of each Seller in any such action and compromise or settle on such terms as the Company will determine to be appropriate, give receipts, releases and discharges on behalf of all or any Seller with respect to any such action, (C) file any proofs, debts, claims and petitions as the Company may deem advisable or necessary, (D) settle or compromise any claims related to the transactions

Doc#: US1:10163646v46

contemplated by this Agreement and the other Transaction Documents, (E) assume, on each Sellers' behalf, the defense of any claims related to the transactions contemplated by this Agreement and the other Transaction Documents, and (F) file and prosecute appeals from any decision, judgment or award rendered in any of the foregoing actions;

(iii)     to enforce or refrain from enforcing any right of any Seller (prior to the Closing) and/or of the Company arising out of or under or in any manner relating to this Agreement or the other Transaction Documents;

(iv)     to take any action to be taken by one or more Sellers under or in connection with this Agreement or the other Transaction Documents; or

(v)     to make, execute, acknowledge and deliver all such other Contracts, guarantees, orders, receipts, endorsements, notices, requests, instructions, certificates, stock powers, letters and other writings, and, in general, to do any and all things and to take any and all action that the Company, in its sole and absolute discretion, may consider necessary or proper or convenient in connection with or to carry out the activities described in Section 12.15(a)(i) through Section 12.15(a)(iii) and the transactions contemplated by this Agreement and the Transaction Documents.

(b)     The Company's power and grant of authority is (i) coupled with an interest and is irrevocable and survives the bankruptcy or liquidation of any Seller and will be binding on any successor thereto; and (ii) may be exercised by the Company acting by signing as the representative of any Seller.

(c)     Buyer and its Affiliates and representatives may conclusively and absolutely rely, without inquiry, upon the action of the Company as the action of each Seller (and may ignore any action taken or notice given by any Seller other than the Company) in all matters relating to this Agreement, the Transaction Documents or the transactions contemplated hereby and thereby. Any document delivered or notice delivered by or on behalf of Buyer or its Affiliates to, or action taken by or on behalf of Buyer or its Affiliates with respect to, the Company shall be deemed to have been delivered to, or taken with respect to, all Sellers. Any amounts to be paid by Buyer to Sellers pursuant to this Agreement shall be divided by Sellers among themselves, but may be paid by Buyer to the Company. Sellers shall be jointly and severally liable for any amounts due to be paid or owed by Sellers to Buyer pursuant to this Agreement.

12.16     No Liability; Releases.

(a)     (i) No past, present or future director, officer, manager, employee, incorporator, member, partner or equityholder or other Affiliates of (A) Sellers (other than Sellers in their capacities as such), or (B) Buyer (other than any obligations hereunder or assumed herein), and (ii) none of the members of the Steering Committee, the First Lien Lenders, the First Lien Noteholders, the Credit Agreement Agent, or the Indenture Trustee, in any case, shall have any Liability for any obligations or liabilities of Sellers or Buyer, as applicable, under this Agreement or any agreement, document or instrument entered into in connection herewith of

97

or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby. Any claim or cause of action based upon, arising out of, or related to this Agreement or any agreement, document or instrument contemplated hereby may only be brought against Persons that are expressly named as parties hereto or thereto, and then only with respect to the specific obligations set forth herein or therein. Other than the Parties, no other party shall have any Liability or obligation for any of the representations, warranties, covenants, agreements, obligations or liabilities of any party under this Agreement or the agreements, documents or instruments contemplated hereby or of or for any Legal Proceeding based on, in respect of, or by reason of, the transactions contemplated hereby or thereby (including the breach, termination or failure to consummate such transactions), in each case whether based on contract, tort, fraud, strict liability, other Legal Requirements or otherwise and whether by piercing the corporate veil, by a claim by or on behalf of a Party or another Person or otherwise.

(b)    Effective upon the Closing Date, each Seller acknowledges that it has no claim, counterclaim, setoff, recoupment, action or cause of action of any kind or nature whatsoever against any of the individuals or entities within the Buyer Group, any member of the Steering Committee, any of the First Lien Lenders or the First Lien Noteholders, the Credit Agreement Agent, or the Indenture Trustee, that directly or indirectly arises out of, is based upon, or is in any manner connected with any Prior Event (collectively, the "Seller Released Claims"); and, should any Seller Released Claims nonetheless exist, each Seller hereby (i) releases and discharges each member of the Buyer Group, any member of the Steering Committee, each of the First Lien Lenders and the First Lien Noteholders, the Credit Agreement Agent and the Indenture Trustee from any liability whatsoever on such Seller Released Claims that directly or indirectly arises out of, is based upon, or is in any manner connected with a Prior Event, and (ii) releases, remises, waives and discharges all such Seller Released Claims against the Buyer Group, any member of the Steering Committee, each of the First Lien Lenders and the First Lien Noteholders, the Credit Agreement Agent and the Indenture Trustee; provided that nothing herein shall release the Buyer or a Seller of its obligations under this Agreement.

(c)    Effective upon the Closing Date, Buyer acknowledges that it has no claim, counterclaim, setoff, recoupment, action or cause of action of any kind or nature whatsoever against any of the individuals or entities within the Sellers Group, that directly or indirectly arises out of, is based upon, or is in any manner connected with any Prior Event (collectively, the "Buyer Released Claims"); and, should any Buyer Released Claims nonetheless exist, Buyer hereby (i) releases and discharges each member of the Sellers Group from any liability whatsoever on such Buyer Released Claims that directly or indirectly arises out of, is based upon, or is in any manner connected with a Prior Event, and (ii) releases, remises, waives and discharges all such Buyer Released Claims against the Sellers Group.

(d)    Without limiting in any way the scope of the release contained in subparagraph (a),(b) or (c) of this Section 12.16 and effective upon the Closing Date, each Seller and Buyer, to the fullest extent allowed under applicable law, hereby waives and relinquishes all statutory and common law protections purporting to limit the scope or effect of a general release, whether due to lack of knowledge of any claim or otherwise, including, waiving and relinquishing the terms of any law which provides that a release may not apply to material unknown Claims. Each Seller and Buyer hereby affirms its intent to waive and relinquish such unknown Claims and to waive and relinquish any statutory or common law protection available

in any applicable jurisdiction with respect thereto. Notwithstanding anything set forth herein to the contrary, the releases set forth in this Section 12.16 do not extend to (A) any obligations that are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the willful misconduct, fraud or gross negligence of such Person, (B) any obligations of the Parties under this Agreement or (C) any claims held by the First Lien Lenders, the First Lien Noteholders, the Credit Agreement Agent or the Indenture Trustee against the Sellers Group (including the rights of the Credit Agreement Agent under Section 12.06 and 13.01 of the Credit Agreement and the rights of the Indenture Trustee under Sections 7.06 and 10.02 of the Indenture, but excluding the First Lien Obligations and the First Lien Adequate Protection Obligations which are included in the Credit Bid and Release) and any rights, remedies or causes of action arising out of such claims or Liens and security interests relating to such claims; provided that any claims, including First Lien Obligations and First Lien Adequate Protection Obligations, or any Liens or superpriority claims related thereto that would otherwise attach or be payable out of the Cash Consideration, shall be waived, and the Buyer and Sellers hereby direct that the Cash Consideration, as a permitted use of Cash Collateral under and as defined in the Cash Collateral Orders, be deposited into the Wind Down Trust at Closing and utilized in accordance with Section 7.8(e), including by any Chapter 7 trustee.

*[Signature pages follow.]*

Doc#: US1:10163646v46

IN WITNESS WHEREOF, the Parties have caused this Asset Purchase Agreement to be executed and delivered by their duly authorized representatives, all as of the Execution Date.

COAL ACQUISITION LLC

By: _____

Name: Stephen D. (Doug) Williams
Title: Chief Executive Officer

WALTER ENERGY, INC.

By: _____
Name: Walter J. Scheller
Title:  Chief Executive Officer


ATLANTIC DEVELOPMENT AND CAPITAL, LLC


By: _____
Name: Danny L. Stickel
Title:  President and Chief Executive Officer


ATLANTIC LEASECO, LLC


By: _____
Name: Danny L. Stickel
Title:  President and Chief Executive Officer


SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT

WALTER ENERGY, INC.

By: _____
Name: Walter J. Scheller
Title:  Chief Executive Officer


ATLANTIC DEVELOPMENT AND CAPITAL, LLC

By: _____
Name: Danny L. Stickel
Title:   President and Chief Executive Officer


ATLANTIC LEASECO, LLC

By: _____
Name: Danny L. Stickel
Title:   President and Chief Executive Officer

Case 15-02741-TOM7    Doc 993    Filed 11/05/15    Entered 11/05/15 14:35:05    Desc Main
Document      Page 215 of 233

BLUE CREEK COAL SALES, INC.


By: _____
Name: Michael T. Madden
Title:   President


BLUE CREEK ENERGY, INC.



By: _____
Name: Danny L. Stickel
Title:   President


JEFFERSON WARRIOR RAILROAD COMPANY, INC.



By: _____
Name: Carol W. Farrell
Title:   President


JIM WALTER HOMES, LLC



By: _____
Name: William Harvey
Title:   Manager

BLUE CREEK COAL SALES, INC.


By: _____
Name: Michael T. Madden
Title:  President


BLUE CREEK ENERGY, INC.


By: _____
Name: Danny L. Stickel
Title:  President


JEFFERSON WARRIOR RAILROAD COMPANY, INC.


By: _____
Name: Carol W. Farrell
Title:  President


JIM WALTER HOMES, LLC


By: _____
Name: William Harvey
Title:  Manager


SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT

BLUE CREEK COAL SALES, INC.

By: _____
Name: Michael T. Madden
Title:   President

BLUE CREEK ENERGY, INC.

By: _____
Name: Danny L. Stickel
Title:   President

JEFFERSON WARRIOR RAILROAD COMPANY, INC.

By: _____*Carol W. Farrell*_____
Name: Carol W. Farrell
Title:   President

JIM WALTER HOMES, LLC

By: _____
Name: William Harvey
Title:   Manager

BLUE CREEK COAL SALES, INC.

By: _____
Name: Michael T. Madden
Title:  President

BLUE CREEK ENERGY, INC.

By: _____
Name: Danny L. Stickel
Title:  President

JEFFERSON WARRIOR RAILROAD COMPANY, INC.

By: _____
Name: Carol W. Farrell
Title:  President

JIM WALTER HOMES, LLC

By: *W S Harvey*
Name: William Harvey
Title:  Manager

JIM WALTER RESOURCES, INC.

By: _____
Name: Richard A. Donnelly
Title:   President and Chief Operating Officer


J.W. WALTER, INC.


By: _____
Name: Kathy Love
Title:   President


MAPLE COAL CO., LLC


By: _____
Name: Danny L. Stickel
Title:   President and Chief Executive Officer


SLOSS SHEFFIELD STEEL AND IRON COMPANY


By: _____
Name: Carol W. Farrell
Title:   President

JIM WALTER RESOURCES, INC.

By: _____
Name: Richard A. Donnelly
Title:   President and Chief Operating Officer


J.W. WALTER, INC.


By: _Kathy Love_____
Name: Kathy Love
Title:   President


MAPLE COAL CO., LLC


By: _____
Name: Danny L. Stickel
Title:   President and Chief Executive Officer


SLOSS SHEFFIELD STEEL AND IRON COMPANY


By: _____
Name: Carol W. Farrell
Title:   President

JIM WALTER RESOURCES, INC.


By: _____
Name: Richard A. Donnelly
Title:   President and Chief Operating Officer


J.W. WALTER, INC.


By: _____
Name: Kathy Love
Title:   President


MAPLE COAL CO., LLC


By: _____
Name: Danny L. Stickel
Title:   President and Chief Executive Officer


SLOSS SHEFFIELD STEEL AND IRON COMPANY


By: _____
Name: Carol W. Farrell
Title:   President

JIM WALTER RESOURCES, INC.

By: _____
Name: Richard A. Donnelly
Title:   President and Chief Operating Officer

J.W. WALTER, INC.

By: _____
Name: Kathy Love
Title:   President

MAPLE COAL CO., LLC

By: _____
Name: Danny L. Stickel
Title:   President and Chief Executive Officer

SLOSS SHEFFIELD STEEL AND IRON COMPANY

By: *Carol W. Farrell*
Name: Carol W. Farrell
Title:   President

SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT

SP MACHINE, INC.

By: _William G. Harvey_
Name: William G. Harvey
Title: President


TAFT COAL SALES & ASSOCIATES, INC.


By: _____
Name: Danny L. Stickel
Title: President


TUSCALOOSA RESOURCES, INC.


By: _____
Name: Danny L. Stickel
Title: President


V MANUFACTURING COMPANY


By: _William G. Harvey_
Name: William G. Harvey
Title: President

SP MACHINE, INC.

By: _____
Name: William G. Harvey
Title:  President


TAFT COAL SALES & ASSOCIATES, INC.

By: _____
Name: Danny L. Stickel
Title:  President


TUSCALOOSA RESOURCES, INC.

By: _____
Name: Danny L. Stickel
Title:  President


V MANUFACTURING COMPANY

By: _____
Name: William G. Harvey
Title:  President

WALTER BLACK WARRIOR BASIN LLC

By: _____
Name: William G. Harvey
Title:  Manager


WALTER COKE, INC.



By: _____
Name: Carol W. Farrell
Title:  President



WALTER ENERGY HOLDINGS, LLC



By: _____
Name: Brian M. Chopin
Title:  Manager

WALTER BLACK WARRIOR BASIN LLC


By: _____
Name: William G. Harvey
Title:  Manager


WALTER COKE, INC.


By: *Carol W. Farrell*
Name: Carol W. Farrell
Title:  President


WALTER ENERGY HOLDINGS, LLC


By: _____
Name: Brian M. Chopin
Title:  Manager

WALTER BLACK WARRIOR BASIN LLC


By: _____
Name: William G. Harvey
Title:   Manager


WALTER COKE, INC.



By: _____
Name: Carol W. Farrell
Title:   President


WALTER ENERGY HOLDINGS, LLC



By: _____
Name: Brian M. Chopin
Title:   Manager


SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT

WALTER EXPLORATION & PRODUCTION LLC


By: _____
Name: Brian M. Chopin
Title:   Manager


WALTER HOME IMPROVEMENT, INC.



By: _____
Name: William G. Harvey
Title:   President


WALTER LAND COMPANY



By: _____
Name: Kathy Love
Title:   President


WALTER MINERALS, INC.



By: _____
Name: Danny L. Stickel
Title:   President and Chief Operating Officer

WALTER EXPLORATION & PRODUCTION LLC


By: _____
Name: Brian M. Chopin
Title: Manager


WALTER HOME IMPROVEMENT, INC.


By: _____
Name: William G. Harvey
Title: President


WALTER LAND COMPANY


By: _____
Name: Kathy Love
Title: President


WALTER MINERALS, INC.


By: _____
Name: Danny L. Stickel
Title: President and Chief Operating Officer

WALTER EXPLORATION & PRODUCTION LLC

By: _____
Name: Brian M. Chopin
Title:   Manager

WALTER HOME IMPROVEMENT, INC.

By: _____
Name: William G. Harvey
Title:   President

WALTER LAND COMPANY

By: *Kathy Love*
Name: Kathy Love
Title:   President

WALTER MINERALS, INC.

By: _____
Name: Danny L. Stickel
Title:   President and Chief Operating Officer

WALTER EXPLORATION & PRODUCTION LLC

By: _____
Name: Brian M. Chopin
Title: Manager

WALTER HOME IMPROVEMENT, INC.

By: _____
Name: William G. Harvey
Title: President

WALTER LAND COMPANY

By: _____
Name: Kathy Love
Title: President

WALTER MINERALS, INC.

By: _____
Name: Danny L. Stickel
Title: President and Chief Operating Officer

SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT

WALTER NATURAL GAS, LLC

By: _____
Name: Brian M. Chopin
Title:   Manager