# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| WALTER ENERGY, INC., et al.,[1] | Case No. 15-02741-TOM11 |
| Debtors. | Jointly Administered |

## MEMORANDUM OPINION AND ORDER
## GRANTING DEBTORS' MOTION FOR AN ORDER
## (I) AUTHORIZING THE DEBTORS TO (A) REJECT COLLECTIVE
## BARGAINING AGREEMENTS, (B) IMPLEMENT FINAL LABOR PROPOSALS, AND
## (C) TERMINATE RETIREE BENEFITS; AND (II) GRANTING RELATED RELIEF

This case came before the Court for hearing on December 15 and 16, 2015 on *Debtors' Motion for an Order (I) Authorizing the Debtors to (A) Reject Collective Bargaining Agreements, (B) Implement Final Labor Proposals, and (C) Terminate Retiree Benefits; and (II) Granting Related Relief; and Establishing Other Deadlines* (hereafter "1113/1114 Motion") [Doc. No. 1094] dated November 23, 2015, and objections to the 1113/1114 Motion filed by the United Mine Workers of America (hereafter "UMWA") [Doc. No. 1189] and the United Mine workers of America 1974 Pension Plan and Trust and its Trustees, United Mine Workers of America 1992 Benefit Plan and its Trustees, United Mine Workers of America 1993 Pension Plan and Trust and its Trustees, United Mine Workers of America 2012 Retiree Bonus Account

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Walter Energy, Inc. (9953); Atlantic Development and Capital, LLC (8121); Atlantic Leaseco, LLC (5308); Blue Creek Coal Sales, Inc. (6986); Blue Creek Energy, Inc. (0986); J.W. Walter, Inc. (0648); Jefferson Warrior Railroad Company, Inc. (3200); Jim Walter Homes, LLC (4589); Jim Walter Resources, Inc. (1186); Maple Coal Co., LLC (6791); Sloss-Sheffield Steel & Iron Company (4884); SP Machine, Inc. (9945); Taft Coal Sales & Associates, Inc. (8731); Tuscaloosa Resources, Inc. (4869); V Manufacturing Company (9790); Walter Black Warrior Basin LLC (5973); Walter Coke, Inc. (9791); Walter Energy Holdings, LLC (1596); Walter Exploration & Production LLC (5786); Walter Home Improvement, Inc. (1633); Walter Land Company (7709); Walter Minerals, Inc. (9714); and Walter Natural Gas, LLC (1198). The location of the Debtors' corporate headquarters is 3000 Riverchase Galleria, Suite 1700, Birmingham, Alabama 35244-2359.

Trust and its Trustees, United Mine Workers of America Cash Deferred Savings Trust of 1988 and its Trustees, United Mine Workers of America Combined Benefit Fund and its Trustees (hereafter "UMWA Funds")[Doc. No. 1198] (collectively "objections").[2]

## INTRODUCTION

At the outset, the Court notes and recognizes the impact any ruling on the pending Motion and objections has on multiple stake holders in these Chapter 11 cases. As noted on the record during the hearing, the dollar or quantitative monetary impact on each employee or retiree may not be as high an amount as to other creditors. However, the impact on each employee and each retiree is huge, and may be difficult for many, if not all, to understand, much less accept as fair, equitable or just.

In *In re Patriot Coal*, the following was noted:

> [T]here is unquestionably no dispute that the lives and livelihood of Debtors' employees, both, union and non-union, current, and retired, depend on the outcome of Debtors' reorganization. "The retirees' health and access to health care depend on the outcome of these cases. Indeed, without the dedication and sacrifice of the coal miners and their families, there would be no coal, and there would be no Patriot Coal."[3]

The *Patriot Coal* court also noted, without "men and women willing to bend their knees to excavate coal" there would be no need for the Chapter 11 cases or the mines.[4]

This Court recognizes that the miners are the backbone and crucial workforce in these mining operations. Essentially, the dilemma facing the Court is whether to shut down the mines or allow the possibility that the mining operations continue in the hopes that coal prices will

---

[2]  Objections to the 1113/1114 Motion were also filed by the Retiree Committee and the Steel Workers, but those were resolved as noted on the record in open court.

[3]  *In re Patriot Coal Corp.*, 493 B.R. 65, 78 (Bankr. E.D. Mo. 2013) (quoting *In re Patriot Coal Corp.*, 482 B.R. 718, 722 (Bankr. S.D.N.Y. 2012).

[4]  *Patriot Coal*, 493 B.R. at 78.

2

rebound in time and the miners keep valuable jobs, and are able to benefit when better times and better coal prices occur.

## **FINDINGS OF FACT**[5]

1.     The Debtors produce and export metallurgical coal ("met coal") for the global steel industry with mineral reserves in the U.S., Canada and the United Kingdom.  The Debtors also extract, process, and market thermal and anthracite coal and produce metallurgical coke and coal bed methane gas.  [Zelin Decl. ¶ 7.]   The No. 4 and 7 mines at Jim Walter Resources, Inc. ("Jim Walter"), with depths over 2,000 feet, are the heart of the Debtors' operations.  [Zelin Decl. ¶ 8.]   However, despite the high quality of met coal that the Debtors sell, the Debtors, like many other U.S. coal producers, were unable to survive the sharp decline in the global met coal industry and filed for Chapter 11 relief on July 15, 2015 (the "Petition Date"), commencing these cases (the "Chapter 11 Cases").   After a failed attempt to restructure pursuant to a Chapter 11 plan process and a restructuring support agreement, the Debtors are now liquidating their assets pursuant to a going concern sale to an entity owned by their first lien creditors (the "First Lien Creditors").   The proposed buyer, however, will not take the Debtors' assets subject to their legacy and current labor costs.  Accordingly, pursuant to sections 1113 and 1114 of the Bankruptcy Code, the Debtors are seeking to reject their collective bargaining agreements (the "CBAs" as further defined below) to eliminate the successorship provisions and to implement their final proposals pursuant to which, upon the closing of the proposed sale, the Debtors will terminate their retiree benefit obligations and any other obligations remaining under the CBAs, so the Debtors' assets may be sold free and clear any obligations pursuant to the CBAs or otherwise required.

---

[5]     Pursuant to Rule 201 of the Federal Rules of Evidence, the Court may take judicial notice of the contents of its own files.  See ITT Rayonier, Inc. v. U.S., 651 F.2d 343 (5th Cir. Unit B July 1981); Florida v. Charley Toppino & Sons, Inc., 514 F.2d 700, 704 (5th Cir. 1975).

3

2.	The Debtors' filed a motion on November 9, 2015 to approve bidding procedures and for the sale of all or substantially all of its assets.  The bidding procedures have been approved, there is a Stalking Horse Bidder, an auction is scheduled for January 5, 2016 and a hearing on the sale set for January 6, 2016.  The record in this case, as well as the testimony offered at this hearing, indicate the proposed going concern sale is the best chance for selling the Debtors' Alabama mines and to provide potential future employment for the Debtors' represented employees.  If the sale is not approved or the sale fails to close, the Debtors will have no choice but to immediately pursue shut downs of the mines and/or convert to Chapter 7, thereby destroying the going concern value of the mines and eliminating future employment opportunities.

A.	**The Debtors' Labor Obligations.**

3.	The Debtors are party to two collective bargaining agreements and a memorandum of understanding.  Specifically, (a) Jim Walter is party to the June 2011 Contract between the United Mine Workers of America and the Bituminous Coal Operators Association (the "BCOA") (together with any side letters of agreement and closing agreements and the memorandum of understanding  between Jim Walter and the UMWA, the "UMWA CBA"); and (b)  Walter Coke, Inc. ("Walter Coke") is party to an Agreement dated March 25, 2010, between the USW on behalf of Local Union No. 12014 and Walter Coke (the "USW CBA").[6]  The UMWA CBA covers approximately 700 active employees.

4.	In addition, the Debtors owe retiree benefits (as such term is defined by section 1114 of the Bankruptcy Code, the "Retiree Benefits") to approximately 3,100 retirees and spouses represented by either the UMWA or the USW, together with approximately 100

---

[6]	As noted on the record, the Debtors' and the USW stipulated that all relief requested in the Debtors' 1113/1114 Motion was withdrawn, therefore no relief is granted in this Order as to the USW or the USW CBA.

4

non-Union retirees and spouses represented by the statutory committee of retirees appointed in these Chapter 11 Cases (the "Section 1114 Committee"). These Retiree Benefits include those owed under: (i) the UMWA CBA (the "UMWA Retiree Medical Plan") which, as of December 31, 2014, had approximately $579.2 million in unfunded liabilities; (ii) a collective bargaining agreement that does not cover any active employees with the UMWA (the "Taft Retiree Medical Plan") that, as of December 31, 2014, had approximately $3.4 million in unfunded liabilities; (iii) the USW CBA (the "Walter Coke Retiree Medical Plan" and the "Walter Coke Retiree Life Plan") that, as of December 31, 2014, had approximately $11.0 million and $0.5 million in unfunded liabilities, respectively; and (iv) the medical plan for non-Union retirees[7] (the "Salaried Retiree Medical Plan") that, as of December 31, 2014, had approximately $4.3 million in unfunded liabilities. (See Scheller Decl. ¶ 4; Farrell Decl. ¶ 4; Zelin Decl. ¶ 27.)

        5.     The Debtors are also responsible for numerous forms of pension liabilities and retiree benefit obligations arising from the Debtors' relationship with the UMWA, including, as defined below, the 1974 Pension Plan, the Coal Act Funds, the 1993 Benefit Plan, the Account Plan, and the CDSP (collectively, the "UMWA Funds"). Specifically, in 2014, Jim Walter Resources contributed (a) over $17 million to the 1974 Pension Plan;[8] (b) over $80,000 to the CDSP[9]; and (c) approximately $3.6 million to the 1993 Benefit Plan.[10] The Debtors also have an

---

[7]    A separate Stipulation and Order has been entered (Doc. No. 1333) resolving all non-union retiree issues.

[8]    The United Mine Workers of America 1974 Pension Plan and Trust (the "1974 Pension Plan") is a multiemployer, defined-benefit pension plan established pursuant to 29 U.S.C. § 186(c)(5). The 1974 Pension Plan is responsible for pension and death benefits to approximately 90,000 retired or disabled miners and their eligible surviving spouses. *See Objection of UMWA Health and Retirement Funds to the Debtors' Motion for an Order (A) Approving the Debtors' Key Employee Retention Plan and (B) Granting Related Relief* (the "UMWA Funds KERP Objection")[Docket No. 1148], ¶¶ 7-8.

[9]    The United Mine Workers of America Cash Deferred Savings Plan of 1988 (the "CDSP") is a multiemployer savings plan established by the 1988 CBA between the UMWA and the BCOA. The CDSP is funded by both

annual premium of approximately $170,000 (payable monthly) owed to the Combined Benefit Fund,[11] and currently administer a Coal Act individual employer plan (an "IEP") that provides retiree health benefits to approximately 572 retirees and their dependents.[12] Finally, in 2014, Jim Walter contributed approximately $5.1 million to a retiree bonus Account Plan.[13]

6.    In aggregate, the Debtors pay approximately $25-30 million per year on account of their Retiree Benefits.

**B.    The Chapter 11 Cases and Going-Concern Sale.**

7.    The decline of the global met coal industry since 2011 is well established and has devastated the industry. Fundamental downward shifts in the Chinese economy, coupled with the increase of low-cost supply of met coal from Australia and Russia, have driven met coal prices down from their historic high of $330 per metric ton in 2011 to their current low of $89 per metric ton. [Zelin Decl. ¶ 8.] The spot price for met coal is currently less than $80 per

---

voluntary employee wage deferrals and numerous contributions from employers. *See* UMWA Funds KERP Objection, ¶ 12.

[10]  The United Mine Workers of America 1993 Benefit Plan and Trust (the "1993 Benefit Plan") provides retiree health benefits to approximately 10,837 retired coal miners and dependents. *See* UMWA Funds KERP Objection, ¶ 13; Declaration of William G. Harvey in Support of First Day Motions (the "Harvey Declaration")[Docket No. 3]; ¶ 85.

[11]  The United Mine Workers of America Combined Benefit Fund (the "Combined Benefit Fund") provides health and death benefits to coal industry retirees who, as of July 20, 1992, were receiving benefits from the 1950 Benefit Trust or the 1974 Benefit Trust. The Combined Benefit Fund is financed by an annual premium assessed every October and certain transfers from the federal government. UMWA Funds KERP Objection, ¶5; Harvey Declaration, ¶83.

[12]  The United Mine Workers of America 1992 Benefit Plan (the "1992 Plan," and, together with the Combined Benefit Fund, the "Coal Act Funds") provides benefits to (a) those who, based on their age and service record as of February 1, 1993, could have retired and received benefits under the 1950 Benefit Trust or the 1974 Benefit Trust if those trusts had not been merged by statute, and who actually retired between July 20, 1992 and October 1, 1994; and (b) those who would be covered by an IEP maintained pursuant to the Coal Act but who no longer receive such coverage. *See* UMWA Funds KERP Objection, ¶ 6, Harvey Declaration, ¶ 83.

[13]  The United Mine Workers of America 2012 Retiree Bonus Account Plan (the "Account Plan") was established in the 2011 NBCWA to make annual single-sum payments to beneficiaries on November 1, 2014, November 1, 2015, and November 1, 2016. Depending on the beneficiary's pension under the 1974 Pension Plan, a beneficiary receives either $455 or $580 from the Account Plan. *See* UMWA Funds KERP Objection, ¶ 11, Harvey Declaration, ¶ 86.

metric ton. As met coal prices began to decline, the Debtors' management responded to the changing industry environment by implementing numerous operational and cash-flow savings measures.[14] [Zelin Decl. ¶ 9.]

8. Despite these efforts, the burden on the Debtors of their funded debt obligations and labor-related liabilities was unsustainable. With cash reserves of as of July 15, 2015, of approximately $250 million, inclusive of cash at their Canadian and U.K. entities, the Debtors continued to suffer substantial losses from operations despite the far-reaching cost cuts already taken. Accordingly, the Debtors' investment banking and financial advisors began negotiating with advisors to an informal committee that comprises the holders of a majority in amount of the Debtors' first lien senior secured debt (the "Steering Committee"). The negotiations culminated in a Restructuring Support Agreement (the "RSA") and the terms of an agreed order approving the Debtors' use of the First Lien Creditors' cash collateral. [Zelin Decl. ¶ 12.]

9. The RSA created a dual-track framework for the Debtors' restructuring: the Debtors would first seek to confirm a debt-for-equity Chapter 11 restructuring plan (the "Plan"), but at the same time, the Debtors would also pursue a going-concern sale in the event that the Debtors could not confirm the Plan. [Zelin Decl. ¶ 12.] In fact, one of the milestones in the RSA mandated that the Debtors commence the marketing of their assets on or before August 19, 2015, in case a going-concern sale became the only viable option. [Zelin Decl. ¶ 12.]

10. The Court held contested hearings on the Debtors' motion to assume the RSA on September 2 and 3, 2015. On September 14, 2015, the Court entered an order approving

---

[14] These included a reduction of SG&A by 20% ($32 million), 25% ($33 million) and 28% ($28 million) in 2012, 2013 and 2014 respectively. The Debtors also cut their capital expenditures by 10% ($45 million), 61% ($238 million), and 28% ($28 million) in 2012, 2013 and 2014 respectively. Among other things, the Debtors idled numerous mines and implemented significant reduction in force initiatives. [Zelin Decl. ¶ 9.]

Case 15-02741-TOM7    Doc 1489    Filed 12/28/15    Entered 12/28/15 11:14:31    Desc
Main Document    Page 7 of 57

the RSA on amended terms. [Doc. No. 723.] Subsequently, on September 18, 2015, the Steering Committee filed a motion, which the Debtors later joined, seeking confirmation that the RSA had terminated on its own terms. [Doc. Nos. 746, 774.] Following a hearing on September 24, 2015, the Court entered an order confirming that the RSA had terminated. [Doc. No. 796.]

11.     When the RSA terminated, the Debtors were left with its cash resources and liquidity running out and no viable source of funding. The Debtors evaluated all of their options but could not find a feasible path towards consummating a Plan. [*See* Zelin Decl. ¶ 13.] In addition, no third party buyer had come forward for the Debtors' core assets. [*See* Zelin Decl. ¶ 14.] As a result, the Debtors commenced negotiations with the Steering Committee and its advisors with respect to a going-concern sale. [*See* Zelin Decl. ¶ 14.] In particular, the Debtors were focused on (i) preserving the Debtors' Alabama Coal Operations (as defined below) to the greatest extent possible, (ii) maximizing potential for future employment for the Debtors' workers, and (iii) ensuring that the Debtors' estates after a sale closing would retain sufficient assets to wind-down in a safe and orderly manner. [*See* Zelin Decl. ¶ 15, 29.]

12.     After two months of negotiations, on November 5, 2015, the Debtors executed an asset purchase agreement (the "Stalking Horse APA") with Coal Acquisition LLC, an entity owned by the First Lien Creditors (the "Proposed Buyer"). [Zelin Decl. ¶ 15.] Under the Stalking Horse APA, the Debtors will sell their core Alabama mining operations (i.e., the Jim Walter No. 4 and 7 mines, related methane gas operations, and certain additional assets incidental thereto) (the "Alabama Coal Operations") to the Proposed Buyer for $1.15 billion (the "363 Sale"). The consideration for the purchase price will be a credit bid by the First Lien Creditors of their prepetition liens and their adequate protection claims. In addition, the

Proposed Buyer will (a) purchase the Debtors' avoidance actions for $5.4 million in cash (subject to certain reductions); (b) fund various wind down trusts to safely liquidate the Debtors' assets remaining after consummation of the sale to the Proposed Buyer; and (c) assume an estimated $115 million in liabilities, including Black Lung obligations, reclamation, trade payables, cure costs and professional fees and expenses. The Stalking Horse APA is subject to higher or better offers and an open auction at which other qualified bidders may seek to purchase the Alabama Coal Operations and other assets on higher or better terms.

13.     The testimony presented at this hearing indicated that the discussions between the Debtors and their advisors and the Proposed Buyer and its advisors were protracted, difficult, contentious, frustrating, but at arm's-length. [*See also* Zelin Decl. ¶ 15.] To facilitate continued negotiations, the Steering Committee agreed to extend the Debtors' use of Cash Collateral twice during this time: first on October 8, 2015, extending the use of Cash Collateral to November 20, 2015, and again on November 17, 2015, extending the use of Cash Collateral to December 1, 2015.[15] [Doc. Nos. 857, 1053.] In response to the Debtors' deteriorating financial condition, the Steering Committee also agreed to defer the adequate protection payments due on October 15 and November 15 that the Debtors were otherwise obligated to make to the First Lien Creditors. [Doc. Nos. 890, 1037.]

14.     The Proposed Buyer refused to acquire the Alabama Coal Operations burdened by the Debtors' legacy and current labor costs. The Stalking Horse APA thus requires a sale "free and clear" of legacy union liabilities. [Zelin Decl. ¶ 16.] Towards that end, the Stalking Horse APA requires the elimination of any clause or provision imposing on the Debtors the requirement that any buyer assume the Debtors' CBAs or any of the Debtors' liabilities or

---

[15]     On December 1, 2015, the Steering Committee granted an additional extension, permitting the Debtors' use of Cash Collateral to January 8, 2016. [Doc. No. 1158.]

obligations under their CBAs (collectively, the "Successorship Provisions") or alternatively, rejection of the Debtor's collective bargaining agreements.

15.     Successorship clauses are contractual provisions in collective bargaining agreements that seek to require an employer to bind a purchasing employer to all the terms and conditions of an existing collective bargaining agreement in the event of a sale or assignment of the business.  The UMWA CBA provides, for example:

> This Agreement shall be binding upon all signatories hereto, including those Employers which are members of signatory associations, and their successors and assigns.  In consideration of the Union's execution of this Agreement, each Employer promises that its operations covered by this Agreement shall not be sold, conveyed, or otherwise transferred or assigned to any successor without first securing the agreement of the successor to assume the Employer's obligations under this Agreement.  Immediately upon the conclusion of such sale, conveyance, assignment or transfer of its operations, the Employer shall notify the Union of the transaction.  Such notification shall be by certified mail to the Secretary-Treasurer of the International Union and shall be accompanied by documentation that the successor obligation has been satisfied.  Provided that the Employer shall not be a guarantor or be held liable for any breach by the successor or assignee of its obligations, and the UMWA will look exclusively to the successor or assignee for compliance with the terms of this Agreement.

UMWA CBA, p. 5.

16.     Because the Proposed Buyer is unwilling to purchase the Alabama Coal Operations subject to the CBAs, with respect to the UMWA CBA, the Stalking Horse APA provides:

> On the Closing Date, the Acquired Assets shall be transferred to Buyer and/or one or more Buyer Designees, as applicable, free and clear of all Encumbrances and Liabilities (including, for the avoidance of doubt, all successor liability, ***including any successorship obligations under any Collective Bargaining Agreement,*** and/or with respect to any Benefit Plan that is not an Buyer Benefit Plan), other than the Permitted Encumbrances and the Assumed Liabilities, including any Reclamation obligations that are Assumed Liabilities.

10

Stalking Horse APA § 7.12 (emphasis added).

17.     The Stalking Horse APA further requires as a closing condition that:

> (i) the Bankruptcy Court shall have determined that Sellers can sell the Acquired Assets free and clear of any successor clause in the UMWA Collective Bargaining Agreements, (ii) the UMWA shall have agreed to waive or remove the successor clause in the UMWA Collective Bargaining Agreements, or (iii) *the Bankruptcy Court shall have granted a motion acceptable to Buyer filed by the applicable Seller pursuant to Section 1113(c) of the Bankruptcy Code authorizing the applicable Seller to reject the UMWA Collective Bargaining Agreements*.

Stalking Horse APA § 9.9(a)(i) (emphasis added).

18.     Despite extensive efforts, the Debtors did not find any buyer willing to purchase the Debtors' assets subject to the CBAs.  In fact, no buyer other than the Proposed Buyer expressed any interest in the Alabama Coal Operations at all.  This was true even though, as of the date of the Section 1113/1114 Motion, the Debtors' investment banking advisor PJT Partners LP ("PJT") had contacted 47 strategic acquirers (including domestic coal producers, international coal producers and integrated steel companies) and 37 financial sponsors. Throughout the marketing process, PJT did not receive a single indication of interest to purchase all of the Debtors' Alabama Coal Operations although PJT did receive a few proposals with respect to certain of the Debtors' other assets.  [Zelin Decl. ¶ 25; *see also* Tab 10, Zelin Trial Notebook.]

19.     Today, the Debtors continue to rapidly lose cash, even excluding interest expenses and notwithstanding substantial cash conservation initiatives the Debtors implemented. If the Stalking Horse APA is not approved, and if no alternative successful bidder emerges, the Debtors will run out of cash by early 2016 and will have no choice but to liquidate.  [Zelin Decl. ¶ 29; *see also* Tab 1, Zelin Trial Notebook.]   In addition, if the proposed 363 Sale is

consummated, the Debtors will be left with insufficient funds to make payments on the Retiree Benefits and any ongoing obligations under the UMWA CBA. [Zelin Decl. ¶ 16.]

C. **The Debtors' Labor Negotiations with the UMWA.**[16]

20.     Starting before the Petition Date, the Debtors have met and negotiated with the UMWA concerning proposed modifications to the UMWA CBA. [Scheller Decl. ¶ 5.] When the Chapter 11 Cases first commenced, the Debtors negotiated with the UMWA intending to reorganize and confirm a Chapter 11 plan consistent with the RSA. [Scheller Decl. ¶ 11.] Prior to the Petition Date, on July 8, 2015, the Debtors met with the UMWA to provide the UMWA with an overview of market conditions, the Debtors' historical financial performance, and the reasons and goals for the Debtors' anticipated restructuring. [Scheller Decl. ¶ 6.]

21.     On August 26, 2015, the Debtors presented the UMWA with their first proposal (the "First UMWA Proposal") for a set of terms and conditions to effectuate a reorganization as contemplated in the RSA, including deletion of the Successorship Provisions. [Scheller Decl. ¶ 13.] In the First UMWA Proposal, the Debtors also sought aggregate annual savings of approximately $150 million which they then believed was the minimum needed to eventually return the Debtors to profitability. [Scheller Decl. ¶ 12.] Even with those savings, the Debtors' financial advisors projected that the feasibility of any Chapter 11 plan would require significant capital investment over a period of years. [Zelin Decl. ¶ 17.]

22.     The Debtors met with the UMWA to discuss the First UMWA Proposal five times in September 2015. The First UMWA Proposal included elimination of Retiree Benefits and modifications to healthcare, all of which were discussed in these meetings.

---

[16] "The UMWA is a labor union which was formed in Columbus, Ohio on January 22, 1890 with the stated purpose of 'educating all mine workers in America to realize the necessity of unity of action and purpose, in demanding and securing by lawful means the just fruits of our toil.'" *Patriot Coal*, 493 B.R. at 80 (quoting Mair B. Fox, *United We Stand: The United Mine Workers of America 1890-1990* 22 (International Union, United Mine Workers of America 1990, in turn citing the UMWA Preamble, 1890).

[Scheller Decl. ¶ 14.]  Following those discussions, on October 1, 2015, the UMWA made its first counter-proposal to the First UMWA Proposal.  [Scheller Decl. ¶ 15.]

23.     When the RSA was terminated and confirmation of a plan of reorganization proved impossible, the Debtors switched their focus to a sale path and continued to meet with the UMWA to discuss the Debtors' options in light of the sale process.  [Scheller Decl. ¶ 17.]  As the Stalking Horse APA was crystallizing, the Debtors engaged again with the UMWA to discuss the UMWA CBA.  [*See* Scheller Decl. ¶¶ 19-21.]  Specifically, the Debtors met with the UMWA twice in October to provide status reports on the Stalking Horse APA negotiations and the Debtors' deteriorating liquidity position.  [Scheller Decl. ¶¶ 20-21.]

24.     Five days after entering into the Stalking Horse APA, the Debtors met with the UMWA, withdrew their First Proposal and presented their final proposal (the "Final UMWA Proposal").  [Scheller Decl. ¶ 23 & Ex. 2.]  The Final UMWA Proposal included the following terms:

(a)     Successorship clause.  Deletion of the successorship clause in its entirety to comply with the terms of the Stalking Horse APA and facilitate the 363 Sale process.  [Scheller Decl. ¶ 24.]

(b)     Healthcare for laid-off employees.  Elimination of the requirement to provide healthcare benefits for employees who are laid off for up to 12 months after the month in which the layoff occurs, providing instead that no healthcare or other welfare benefits will be provided to any active or laid-off employee after the sale of the mines under the 363 Sale closes.  [Scheller Decl. ¶ 24.]

(c)     Termination of agreement.  Termination effective as of the date the 363 Sale closes, on which date all of the Debtors' obligations to make any payment that arises from any contractual requirement, grievance settlement, arbitration decision or other obligation that vested or was incurred prior to the date of the sale of the mines to the Proposed Buyer under the Stalking Horse APA would also terminate. [Scheller Decl. ¶ 24.]

13

(d)     Effects bargaining. Continued good faith discussions regarding any proposal that the UMWA may have concerning the effects of the sale of the mines on the UMWA's members. [Scheller Decl. ¶ 24.]

(e)     Health and welfare benefits for retirees. Termination of health and welfare benefits, including the UMWA Retiree Medical Plan and Taft Retiree Medical Plan, for all of the UMWA's retirees effective no later than the closing date of the Section 363 Sale, as the Buyers are not agreeing to assume responsibility for such healthcare benefits for retirees under the Stalking Horse APA, and the Debtors will no longer have any funds available to provide any benefits to the UMWA retirees post-closing. [Scheller Decl. ¶ 24.]

(f)     Coal Act retirees. Coordination with the UMWA and with the UMWA 1992 Plan officials to arrange for the transition of retirees entitled to Coal Act Benefits to the UMWA 1992 Benefit Plan with no loss of benefits. (The Coal Act provides that when an employer becomes financially unable to provide healthcare benefits to its Coal Act-eligible retirees, the UMWA 1992 Benefit Plan will enroll the impacted retirees and provide their benefits.) [Scheller Decl. ¶ 24.]

25.     On November 20, 2015, the UMWA rejected the Debtors' Final UMWA Proposal. [Scheller Decl. ¶ 27 & Ex. 3.] The UMWA response was that it would agree to facilitate the termination or modification of the UMWA CBA obligations "as appropriate for the winding down of JWR and its exit from the coal industry" but "only upon" ratification of a new collective bargaining agreement with the Proposed Buyer that, among other things, addresses healthcare for retired Jim Walter miners. [*Id.*]

26.     The testimony at the hearing showed that the UMWA has been negotiating with the Proposed Buyer. On November 6, 2015, the day after the Stalking Horse APA was signed, Mr. Doug Williams, CEO of Coal Acquisitions, LLC, sent a letter to Cecil E. Roberts, the UMWA's President, introducing himself to Mr. Roberts and hoping to set the stage for further discussions and negotiations. Further, Mr. Williams advised that Coal Acquisition

14

planned to begin interviewing individuals for employment after a sale and that some of the individuals who may be interviewed are currently represented by the UMWA at Jim Walter's number 4 and 7 mines, surface facilities and preparation plants. After the letter was sent to Mr. Roberts, the advisors to the Proposed Buyer exchanged numerous emails and calls and meetings with the UMWA were scheduled for and held November 16, December 2, and December 8, 2015, and another meeting is scheduled for December 18, 2015. [Williams Decl. ¶ 5 and testimony.] At the November 16th meeting, the Proposed Buyer made an initial contract proposal to the UMWA, subject to a number of conditions, including the Proposed Buyer providing offers of employment to the bargaining unit employees previously employed at Jim Walter's mines numbers 4 and 7, preparation plants and surface facilities, and a majority of those bargaining unit employees accepting such offers. [Williams Decl. ¶ 6.] A counterproposal has since been provided by the UMWA, and the hearing, the testimony indicated the parties intend to continue to negotiate.

27.     Throughout the negotiation process, the Debtors provided the UMWA with full access to extensive diligence information, including approximately 75,000 pages of the relevant operational, financial, business planning and other documents. Towards that end, the Debtors established an electronic data room to facilitate information sharing on a confidential basis. The data room was made available to the UWMA on July 14, 2015. [Scheller Decl. ¶ 8.] In addition to providing access to thousands of pages of data, the Debtors and their advisors gave the UMWA numerous detailed presentations about the Company, its businesses, financial conditions, business plan and projected performance. [Scheller Decl. ¶ 9.]

D.     **The Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 1113(c), and 1114(g).**

28.     On November 23, 2015, the Debtors filed this Section 1113/1114 Motion pursuant to sections 105(a), 1113(c), and 1114(g) of title 11 of the United States Code for an

15

order (I) (A) authorizing the rejection of the collective bargaining agreements of Jim Walter and Walter Coke, (B) implementing Jim Walter's and Walter Coke's final labor proposals, and (C) terminating the Debtors' retiree benefits and related obligations; and (II) granting related relief. Along with the Motion, Debtors filed declarations of Steven Zelin, a Partner at PJT Partners, Debtors' financial advisor; Walter J. Scheller, III, the CEO of Walter Energy, Inc.; and Carol W. Ferrell, President of Walter Coke, Inc. In addition, as a proponent of the Motion, the lenders filed the declaration of Stephen Douglas Williams, the CEO of Coal Acquisitions, LLC, the Stalking Horse Bidder. In addition to these declarations admitted as evidence at the hearing, Mr. Zelin, Mr. Scheller and Mr. Williams testified.

29.     In the Section 1113/1114 Motion, the Debtors request the authority to (a) reject the UMWA CBA in its entirety and (b) implement the Final Proposals pursuant to which any Successorship Provision would be eliminated and upon the closing of the 363 Sale, the UMWA CBA and the other obligations remaining under the UMWA CBA, as well as the Retiree Benefits, would terminate.

30.     The UMWA[17] and the UMWA Funds,[18] (collectively, the "Objectors") filed objections to the Section 1113/1114 Motion.[19] The Objectors make the following

---

[17]     *See Objection of the United Mine Workers of America to Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 1113(c) and 1114(g) for an Order (I) Authorizing the Debtors to (A) Reject Collective Bargaining Agreements, (B) Implement Final Labor Proposals, and (C) Terminate Retiree Benefits; and (II) Granting Related Relief* [Doc. No. 1189] (the "UMWA Objection").

[18]     *See Objection of the United Mine Workers of American 1974 Pension Plan and Trust, the United Workers of America 1993 Benefit Plan, the United Mine Workers of America 2012 Retiree Bonus Account Plan, the United Mine Workers of America Cash Deferred Savings Plan of 1988, the United Mine Workers of America Combined Benefit Plan and the United Mine Workers of America 1992 Benefit Plan to (1) Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 1113(c) and 1114(g) for an Order (I) Authorizing the Debtors to (A) Reject Collective Bargaining Agreements, (B) Implement Final Labor Proposals, and (C) Terminate Retiree Benefits; and (II) Granting Related Relief* [Doc. No. 1198] (the "UMWA Funds Objection").

[19]     The USW also filed an objection to the Section 1113/14 Motion. *See Opposition of the United Steelworkers to the Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 1113(c) and 1114(g)* [Doc. No. 1195] (the "USW Objection"). The Debtors filed a notice of withdrawal of the Section 1113/14 Motion as it relates to the USW

16

arguments: (a) relief under sections 1113 and 1114 of the Bankruptcy Code is not appropriate here, where the Debtors are selling substantially all of their assets only to then possibly liquidate in a Chapter 7, as opposed to restructuring or reorganizing; (b) even assuming that a liquidating debtor can seek relief under sections 1113 and 1114 of the Bankruptcy Code, at a minimum, these sections require the Debtors to demonstrate an ability to confirm a Chapter 11 plan, which the Debtors cannot do here because they lack the funding needed to satisfy accrued but unpaid administrative claims, including environmental, pension, and certain other legacy retiree/employee liabilities; (c) the Section 1113/1114 Motion inappropriately seeks to terminate the Debtors' obligations to its employees and retirees under the Coal Act statutory obligations that the Debtors cannot modify under section 1114 of the Bankruptcy Code; and (d) the Section 1113/1114 Motion fails to satisfy the substantive requirements of sections 1113 and 1114 of the Bankruptcy Code for a plethora of other reasons, including that termination of the Successorship Provisions is not necessary to permit the reorganization of the Debtors as contemplated by the Bankruptcy Code and that the requested relief is otherwise not fair and equitable.

## JURISDICTION[20]

31. The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding under 28 U.S.C. § 157(b).

32. The statutory and legal predicates for the relief sought herein are sections 105(a), 1113(c), and 1114(g) of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004.

---

[Doc. No. 1227]. The Court confirmed with USW counsel that he had no objection to the withdrawal and that essentially the withdrawal constituted a stipulation of dismissal as to the USW provisions of the Motion.

[20] This Memorandum Opinion and Order constitutes findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, applicable to adversary proceedings in bankruptcy pursuant to Federal Rule of Bankruptcy Procedure 7052.

Case 15-02741-TOM7    Doc 1489    Filed 12/28/15    Entered 12/28/15 11:14:31    Desc
Main Document      Page 17 of 57

33. On July 30, 2015, the Bankruptcy Administrator for the Northern District of Alabama appointed an eleven member Official Committee of Unsecured Creditors (the "Creditors Committee"). [Doc. No. 268.] On August 4, 2015, the Bankruptcy Administrator appointed two additional members to the Creditors Committee [Doc. Nos. 336, 342.]

34. On July 30, 2015, the Court entered an order authorizing the formation of a committee of retired employees pursuant to sections 1114(c)(2) and 1114(d) of the Bankruptcy Code (the "Section 1114 Committee"). [Doc. No. 264.] Both the UMWA and the United Steelworkers (the "USW," and, together with the UMWA, the "Unions") are members of the Creditors Committee and each serves as the authorized representative of the retirees of their respective Unions on the Section 1114 Committee. [Doc. Nos. 268, 264.] No trustee or examiner has been appointed in the Chapter 11 Cases.

## CONCLUSIONS OF LAW

### A. Sections 1113 and 1114 of the Bankruptcy Code.

35. Congress enacted section 1113 of the Bankruptcy Code in response to the Supreme Court's decision in *NLRB* v. *Bildisco & Bildisco*, 465 U.S. 513 (1984). In *Bildisco,* the Supreme Court "held that a debtor may unilaterally reject a collective bargaining agreement under section 365(a) of the Bankruptcy Code by showing that the agreement 'burdens the estate, and that after careful scrutiny, the equities balance in favor of rejecting the labor contract.'"[21] To address concerns that the Supreme Court's decision would permit debtors to use bankruptcy as a weapon in the collective bargain process, Congress enacted section 1113 to "replace the *Bildisco* standard with one that was more sensitive to the national policy favoring collective bargaining

---

[21] *In re AMR Corp.*, 477 B.R. 384, 405 (Bankr. S.D.N.Y. 2012) (quoting *NLRB* v. *Bildisco & Bildisco*, 465 U.S. 513, 526 (1984)).

18

agreements . . . ."[22]  Section 1113 accordingly is intended "to ensure that well-informed and good faith negotiations occur in the market place, not as part of the judicial process."[23]  It does so by imposing more stringent standards and rigorous procedures for rejecting a collective bargaining agreement than apply to an ordinary executory contract.  Section 1113 thereby encourages the debtor-employer and the union to reach a negotiated settlement.  *See* Collier on Bankruptcy ¶ 1113.01 (citing the language and history of section 1113).

36.  Section 1113 provides in relevant part:

(a) The debtor in possession, or the trustee if one has been appointed under the provisions of this Chapter, other than a trustee in a case covered by subChapter IV of this Chapter and by title I of the Railway Labor Act, may assume or reject a collective bargaining agreement only in accordance with the provisions of this section.

(b) (1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section "trustee" shall include a debtor in possession), shall—

(A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and

(B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

(2) During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on

---

[22]  *Wheeling-Pittsburgh Steel Corp.* v. *United Steelworkers of America*, 791 F.2d 1074, 1089 (3d Cir. 1986).

[23]  *New York Typographical Union No. 6* v. *Maxwell Newspapers, Inc.* (*In re Maxwell Newspapers, Inc.*), 981 F.2d 85, 90 (2d Cir. 1992).

the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.

(c) The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—

(1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);

(2) the authorized representative of the employees has refused to accept such proposal without good cause; and

(3) the balance of the equities clearly favors rejection of such agreement.

37.    "Section 1113(b) requires that a debtor take a number of procedural steps prior to rejecting a collective bargaining agreement."[24]   At the outset, the debtor must provide the union with its proposed modifications to a collective bargaining agreement prior to filing an application with the court to reject the agreement.  Moreover, the proposed modifications must be (a) "based on the most complete and reliable information available at the time of the proposal," (b) "necessary to permit the reorganization of the debtor," and (c) "assure[] that all creditors, the debtor and all of the affected parties are treated fairly and equitably."[25]   The debtors must also provide the union with the relevant information necessary for the union to evaluate the proposal.[26]   Finally, "the debtor must bargain in good faith with the union in an attempt to reach an agreement" between the time that the section 1113 proposal is made by the debtor and the date that any section 1113 application is set to be heard.[27]

---

[24]    *AMR Corp.*, 477 B.R. at 406.

[25]    11 U.S.C. § 1113(b)(1)(A); *AMR Corp.*, 477 B.R. at 406 (citing 11 U.S.C. § 1113(b)(1)(A).

[26]    *Id.*

[27]    *AMR Corp.*, 477 B.R. at 406.

20

38.     Section 1113(c) also requires that a debtor establish the following three substantive requirements to reject a collective bargaining agreement: (a) that the debtor's section 1113 proposal fulfills the requirements of the statute, (b) that the union refused to accept the proposal without good cause, and (c) that the balance of the equities favors rejection of the agreement.[28] "The debtor bears the burden of proof by the preponderance of the evidence on the elements of section 1113."[29]

39.     Similarly, the debtor may modify or terminate retiree benefits upon satisfying the following conditions:

> (1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (f);
>
> (2) the authorized representative of the retirees has refused to accept such proposal without good cause; and
>
> (3) such modification is necessary to permit the reorganization of the debtor and assures that all creditors, the debtor, and all of the affected parties are treated fairly and equitably, and is clearly favored by the balance of the equities;
>
> except that in no case shall the court enter an order providing for such modification which provides for a modification to a level lower than that proposed by the trustee in the proposal found by the court to have complied with the requirements of this subsection and subsection (f) . . . [30]

40.     Subsection (f) requires as follows:

> (1) Subsequent to filing a petition and prior to filing an application seeking modification of the retiree benefits, the trustee shall—
>
> > (A) make a proposal to the authorized representative of the retirees, based on the most complete and reliable information available at the time of such proposal, which provides for

---

[28]   11 U.S.C. § 1113(c); *AMR Corp.*, 477 B.R. at 406.

[29]   *AMR Corp.*, 477 B.R. at 406 (citing *Truck Drivers Local 807* v. *Carey Transp., Inc.* (*Carey Transp. II*), 816 F.2d 82, 88 (2d Cir. 1987); *In re Nw. Airlines Corp.*, 346 B.R. 307, 320-21 (Bankr. S.D.N.Y. 2006)).

[30]   11 U.S.C. § 1114(g).

21

those necessary modifications in the retiree benefits that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and

(B) provide, subject to subsection (k)(3), the representative of the retirees with such relevant information as is necessary to evaluate the proposal.

(2) During the period beginning on the date of the making of a proposal provided for in paragraph (1), and ending on the date of the hearing provided for in subsection (k)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such retiree benefits.[31]

41.     The statutory "requirements for modification of retiree benefits are . . . substantially the same as the requirements for rejection of collective bargaining agreements."[32] Thus, the nine-part analysis found in *In re American Provision Company*, discussed below, applies equally to both.[33] Courts thus routinely analyze motions for relief under sections 1113 and 1114 together, and the Court will do so here.[34] Accordingly, the following discussion relating to the requirements under section 1113 also applies to the relief the Debtors request under section 1114 and as applicable to the UMWA and UMWA Funds.[35] Applicable Standard Under Sections 1113 and 1114 of the Bankruptcy Code.

---

[31]     11 U.S.C. § 1114(f)..

[32]     *In re Horizon Natural Res. Co.*, 316 B.R. 268, 281 (Bankr. E.D. Ky. 2004)

[33]     *In re Horizon Natural Res.*, 316 B.R. at 280-81. *See In re American Provision Co.*, 44 B.R. 907, 909 (Bankr. D. Minn. 1984).

[34]     *See, e.g., Horizon Natural Res.,* 316 B.R. at 279-83; *In re Horsehead Indus., Inc.*, 300 B.R. 573, 583 (Bankr. S.D.N.Y. 2003).

[35]     Thus any reference in this Opinion to the UMWA also, if applicable, shall be a reference to the UMWA Funds.

22

42.     The requirements of section 1113 were restated in a nine-part test in *In re American Provision Co.*, 44 B.R. 907, 909 (Bankr. D. Minn. 1984).[36]  The test requires that the following be met:

(a)     The debtor in possession must make a proposal to the union to modify the collective bargaining agreement;

(b)     The proposal must be based on complete and reliable information available at the time of the proposal;

(c)     The proposed modifications must be "necessary to permit the reorganization of the debtor;"

(d)     The proposed modifications must assure that all creditors, the debtor and all of the affected parties are treated fairly and equitably;

(e)     The debtor must provide to the union such relevant information as is necessary to evaluate the proposal;

(f)     Between the time of the making of the proposal and the time of the hearing on approval of the rejection of the existing collective bargaining agreement, the debtor must meet at reasonable times with the union;

(g)     At the meetings the debtor must confer in good faith in attempting to reach mutually satisfactory modifications of the collective bargaining agreement;

(h)     The union must have refused to accept the proposal without good cause; and

(i)     The balance of the equities must clearly favor rejection of the collective bargaining agreement.

43.     Before turning to this nine-factor *American Provision* test, the Court addresses the Objectors' arguments that (a) relief under sections 1113 and 1114 of the Bankruptcy Code is not appropriate here where the Debtors are selling substantially all of their

---

[36]  *In re Alabama Symphony Ass'n,* 155 B.R. 556, 573 n.38 (Bankr. N.D. Ala. 1993) ("This test is almost universally followed in the bankruptcy courts."), *rev'd on other grounds, Birmingham Musicians' Protective Ass'n, Local 256-733, of the Am. Fed. Of Musicians* v. *Alabama Symphony Ass'n* (*In re Alabama Symphony Ass'n*), 211 B.R. 65 (N.D. Ala. 1996).

23

assets and liquidating, (b) the Debtors must demonstrate the ability to confirm a liquidating Chapter 11 plan, which the Debtors cannot do because they lack the funding needed to satisfy accrued but unpaid administrative claims, including environmental, pension, and certain other legacy retiree/employee liabilities, and  (c) the Section 1113/1114 Motion inappropriately seeks to terminate the Debtors' obligations to its employees and retirees under the Coal Act, statutory obligations that the Debtors cannot modify under section 1114.

**B.** **Sections 1113 and 1114 Apply in a Liquidating Chapter 11 Case and the Debtors Need Not Demonstrate an Ability to Confirm a Liquidating Chapter 11 Plan.**

44.    The Objectors argue that sections 1113 and 1114 do not apply in a liquidating Chapter 11 case, and accordingly, the Debtors' relief should be denied.[37]   The Bankruptcy Code does not limit liquidation to Chapter 7 cases.[38]   To the contrary, Chapter 11 expressly provides for liquidating Chapter 11 plans of reorganization.[39]   As a result, when a Chapter 11 debtor is being sold or is liquidating rather than reorganizing, courts apply the requirements for section 1113(c) relief "contextually, rather than strictly," and "with the impending liquidation of the Debtor firmly in mind."[40]   And while some courts have found that

---

[37]    UMWA Obj. at ¶¶ 70-76.

[38]    *See e.g.*, *In re Chicago Constr. Specialties, Inc.*, 510 B.R. 205, 214-16 (Bankr. N.D. Ill. 2014).

[39]    11 U.S.C. § 1129(a)(11) (enumerating as a confirmation requirement that "[c]onfirmation of the plan is not likely to be followed by . . . liquidation . . . unless such liquidation . . . is proposed in the plan"); *see also* 11 U.S.C. § 1123(b)(4) (Chapter 11 plan may "provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests[.]"); *Chicago Constr. Specialties*, 510 B.R. at 215.

[40]    *Chicago Constr. Specialties, Inc.*, 510 B.R. at 217-18; *In re U.S. Truck Co. Holdings*, 2000 Bankr. LEXIS 1376, at *26-28 (Bankr. E.D. Mich. Sept. 29, 2000) ("[A]pplying § 1113 to a liquidating Chapter 11 . . . is somewhat problematic because many of the § 1113 requirements and the case law interpreting them focus on or presuppose efforts to rehabilitate an ongoing business [but] . . . these standards must necessarily be construed, if possible, in a way that gives them meaning in this liquidation setting."); *United Food & Commercial Workers Union, Local 211 v. Family Snacks, Inc. (In re Family Snacks, Inc.)*, 257 B.R. 884, 893 (8th Cir. B.A.P. 2001) ("[E]ach court that has addressed the meaning of the phrase 'reorganization of the debtor,' as found in § 1113(b)(1)(A), has held or assumed that § 1113 applies in a case where the debtor will not be engaged in business because it is selling its assets.").

24

"'the procedural requirements imposed by § 1113 appear ill-suited to a liquidation proceeding,'"[41] courts have routinely applied the provision in liquidating Chapter 11 cases.[42] Moreover, neither section 1113 nor 1114 require that the debtor establish the feasibility of a liquidating Chapter 11 plan as a condition precedent to relief.

       45.    The placement of sections 1113 and 1114 "in Chapter 11 requires its application to liquidating Chapter 11 cases."[43]  Even though Congress uses the term "reorganization" in both sections 1113 and 1114, the Bankruptcy Code does not define the term.[44]  Courts, however, interpret "reorganization" to include all types of debt adjustment, including going-concern asset sales pursuant to section 363 of the Bankruptcy Code.[45] Permitting a debtor to avail itself of section 1113 and 1114 relief to consummate a going-concern sale where the debtor cannot confirm a Chapter 11 comports with Congressional intent that sections 1113 and 1114 serve a rehabilitative purpose.

---

[41]  *Chicago Constr. Specialties*, 510 B.R. at 215 (quoting *Carpenters Health and Welfare Trust Funds v. Robertson (In re Rufener Constr., Inc.)*, 53 F.3d 1064, 1067 (9th Cir. 1995).

[42]  *See, e.g.*, *In re Maxwell Newspapers, Inc.*, 981 F.2d 85, 91 (2d Cir. 1992) ("The union . . . contends that the debtor has not shown that a collective bargaining agreement may be rejected to serve the interests of a purchaser of assets.  The two lower courts believed that 11 U.S.C. § 1113 applied to this transaction because what is to emerge, if the sale is consummated, is the Daily News reorganized as an ongoing business.  We agree."); *In re Hoffman Bros. Packing Co., Inc.*, 173 B.R. 177, 186-87 (9th Cir. B.A.P. 1994) ("We agree, and hold that § 1113 does not preclude rejection of CBAs where the purpose or plan of the debtor is to liquidate by a going concern sale of the business."); *accord Chicago Constr. Specialties*, 510 B.R. at 215; *In re Karykeion, Inc.*, 435 B.R. 663, 679 (Bankr. C.D. Cal. 2010); *Family Snacks*, 257 B.R. at 893.  Indeed, this well-established proposition is even supported by a case that the UMWA cites liberally in its objection.  *See In re Lady H. Coal Co.*, 193 B.R. 233, 240-43 (Bankr. S.D.W.Va. 1996) (denying the debtor's section 1113 motion but noting that "a collective bargaining agreement ('CBA') may be rejected in contemplation of the sale of a substantial portion of a debtor's assets as such sale is effectively the reorganization plan of a debtor").

[43]  *In re Ionosphere Club, Inc.*, 134 B.R. 515, 524 (Bankr. S.D.N.Y. 1991).

[44]  11 U.S.C. §§ 1113(b)(1)(a), 1114(f)(1)(A).

[45]  *See, e.g.*, *In re Karykeion, Inc.*, 435 B.R. 663, 679 (Bankr. C.D. Cal. 2010) ("[T]he only reorganization option for the debtor is the sale of [its hospital] to [buyer] and that sale is contingent on the court approving the debtor's rejection of these CBAs.").

Case 15-02741-TOM7    Doc 1489    Filed 12/28/15    Entered 12/28/15 11:14:31    Desc
Main Document    Page 25 of 57

46.     Sections 1113 and 1114 do not require the Debtors to establish that the requested relief will result in a confirmable Chapter 11 plan of liquidation.[46]  The Objectors confuse the rehabilitative effect of a going concern sale of the Debtors' Alabama Coal Operations to a new owner with the attendant wind-down and liquidation of the remaining bankruptcy estates, a process that occurs *after* the sale of the Debtors' Alabama Coal Operations as a going concern.  Applying the "necessary to permit the reorganization of the debtor" requirement of section 1113(c) relief "contextually, rather than strictly," sections 1113 and 1114 apply in a liquidating Chapter 11 case regardless of the debtor's ability to confirm a liquidating Chapter 11 plan.

### C.     Benefits Under the Coal Act May Be Modified or Terminated Pursuant to Section 1114 of the Bankruptcy Code.

47.     The Objectors also argue that the Section 1113/1114 Motion cannot be granted because the Final Proposals are inconsistent with federal law to the extent they seek to terminate healthcare coverage for retirees and dependents eligible for such coverage under the Coal Industry Retiree Health Benefit Act of 1992 (the "Coal Act").[47]  Modification of Coal Act retiree benefits may be permitted if such modifications are necessary to facilitate a going concern sale, rather than a piecemeal liquidation.  For the reasons set forth below, the Debtors' Final Proposals meet this standard.

48.     By way of background, the Coal Act contains three "vehicles" to provide healthcare benefits for certain coal industry retirees.  *First*, the Coal Act merges the 1950 and 1974 benefit plans into the "UMWA Combined Fund."  *Second*, the Coal Act requires signatory operators who are obligated under the 1978 or any later NBCWA to provide benefits under an

---

[46]     UMWA Obj. at ¶ 77; 1114 Committee Obj. at ¶ 11, 62.

[47]     26 U.S.C. §§ 9701-22.  *See also Patriot Coal*, 493 B.R. at 83-84 for an explanation of the Coal Act and its predecessors.

26

IEP to continue to provide such coverage to certain retirees. *Third*, the Coal Act establishes the UMWA "1992 Benefit Plan to cover two classes of beneficiaries who are not covered under the Combined Fund or [an IEP]: (a) those who, based on age and service as of February 1, 1993, would otherwise have been eligible for benefits from the 1950 or 1974 plans were it not for the merger of those plans and the cut-off date set forth in the Coal Act, and (b) any person with respect to whom coverage under an [IEP] is required but is not provided."[48] The Combined Fund and the UMWA 1992 Benefit Plan are financed by monthly and annual premiums.[49]

49. Only one published decision, *In re Horizon Natural Resources Co.*, 316 B.R. 268 (Bankr. E.D. Ky. 2004), squarely addresses whether a debtor may modify or terminate Coal Act obligations pursuant to section 1114 and concludes that it does.[50] In *Horizon*, the debtors initially pursued a plan of reorganization by which they would retain their operating assets, but later changed their focus to liquidating through Chapter 11.[51] The debtors moved under sections 1113 and 1114 to reject their collective bargaining agreements and modify or terminate retiree benefits because "[t]he unrefuted evidence . . . is that the debtors' assets cannot be sold subject to the collective bargaining agreements and retiree benefits . . . ."[52]

50. The Coal Act Funds objected, arguing that regardless of section 1114 of the Bankruptcy Code, which permits modification of retiree benefits, section 9711 of the Coal Act expressly prohibits the modification of retiree benefits for as long as the employer or its successor remains in business.[53] The Coal Act Funds maintained that the term "retiree benefits"

---

[48] *Holland* v. *Double G Coal Co., Inc.*, 898 F.Supp. 351, 354 (S.D.W.Va. 1995).

[49] *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 576-77 (4th Cir. 1996).

[50] *In re Horizon Natural Res.*, 316 B.R. at 276.

[51] *Id.* at 271.

[52] *Id.* at 282.

[53] *See id.* at 275.

27

as used in the Bankruptcy Code includes only benefits received pursuant to contract, not statutory benefits like those provided under the Coal Act.[54] The court disagreed, finding that the Bankruptcy Code defines "retiree benefits" to include both statutory benefits (*i.e.,* those arising under the Coal Act) and non-statutory benefits (*i.e.,* those arising under a collective bargaining agreement).[55]

51.     Section 1114 expressly "contemplates the modification of non-contractual obligations, because it authorizes the appointment of a committee of retirees to serve as the authorized representative . . . of those persons receiving any retiree benefits *not covered by a collective bargaining agreement.*"[56] Moreover, in reconciling the Coal Act with the Bankruptcy Code, the *Horizon* court found that the Coal Act does not expressly contradict section 1114 of the Bankruptcy Code.  Rather, section 1114 deals with "a narrow, precise, and specific subject: it governs the modification of retiree benefits only when the former employer is a debtor in a Chapter 11 case and only to the extent necessary for the reorganization effort.  The Coal Act, on the other hand, . . . 'covers a more generalized spectrum' in that it does not specify whether the former employer is or is not a debtor in possession."[57]   In other words, application of section 1114 to retiree benefits covered by the Coal Act "does not deprive the Coal Act of 'any meaning at all'; the Coal Act would remain fully applicable where the last signatory operator is not a Chapter 11 debtor in possession or cannot satisfy § 1114's requirements."[58]

52.     The *Horizon* court relied on *In re Lady H Coal Co.*, 199 B.R. 595 (S.D.W.Va. 1996), a decision addressing the relationship between the Coal Act and section

---

[54]   *See id.*

[55]   *Id.* at 275-76

[56]   *Id.* at 275 (emphasis in original).

[57]   *Id.* at 276

[58]   *Id.*

28

363(f) of the Bankruptcy Code. In *Lady H*, the Court considered the debtors' motion seeking a piecemeal liquidation of their assets free and clear of all liabilities, including those under the Coal Act.[59] The Coal Act Funds objected, but the *Lady H* court held that assets may be sold free and clear of Coal Act obligations under section 363(f) of the Bankruptcy Code.[60] The *Lady H* court reasoned that "[i]f Congress wished to exclude Coal Act liabilities from the reach of bankruptcy law, it could have done so . . . by providing express language in the Coal Act that liabilities remain unaffected by operation of the Bankruptcy Code."[61]

      53. Based on *Lady H* and the reasoning above, the *Horizon* court granted the debtors' motion under section 1114 to modify retiree benefits arising under the Coal Act, holding that "the Coal Act imposes a general prohibition against certain retiree benefit modifications, [and] the Bankruptcy Code agrees with that general prohibition but establishes an extremely limited exception."[62] The *Horizon* court further justified its holding by noting that "[i]t is in the best interests of the Coal Act Plan and Fund and their beneficiaries and creditors generally that the debtors' assets be sold for the best possible price, not on a piecemeal basis. If the modification of the Coal Act retiree benefits is necessary to accomplish that goal and the other requirements of § 1114 are satisfied, modification must be permitted."[63]

      54. The Objectors rely on *In re Sunnyside Coal Co.*, 146 F.3d 1273 (10th Cir. 1998) and other similar cases that consider the treatment of Coal Act claims in bankruptcy (but

---

[59]   *Lady H*, 199 B.R. at 599-600.

[60]   *Id.* at 603.

[61]   *Id.*; *see also In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 585 (4th Cir. 1996) ("[T]he Bankruptcy Court may extinguish Coal Act successor liability pursuant to 11 U.S.C. § 363(f)(5)."); *Horizon Natural Resources*, 316 B.R. at 279 ("[A]ny additional financial problems encountered by the 1992 Fund resulting from the application of § 1114 to Coal Act obligations should be addressed by Congress and do not justify 'disturb[ing] the statutory scheme as we have found it.'") (quoting *Leckie Smokeless Coal Co.*, 99 F.3d at 586).

[62]   *Horizon Natural Resources*, 316 B.R. at 277.

[63]   *Id.* at 279.

do not directly address whether a debtor can terminate Coal Act obligations under Section 1114), to argue that the Debtors cannot use Section 1114 here to terminate these obligations. Their reliance on these cases, none of which are binding on this Court, is misplaced. In *Sunnyside*, for example, the Court of Appeals for the Tenth Circuit held that Coal Act premiums under section 9712 of the Coal Act are "taxes incurred by the estate"[64] a conclusion with which the Court of Appeals for the Fourth Circuit agreed.[65] As is evident, these cases focus on the priority to which claims under the Coal Act are entitled in bankruptcy, an issue that is not before the Court.

55.     The UMWA Funds cite to the bankruptcy court oral ruling in *Sunnyside* as "directly on point," noting that the court there denied the debtor's application under Section 1114 to terminate its Coal Act obligations.[66] This case is readily distinguishable. At the time the *Sunnyside* debtor sought termination of the Coal Act obligations, the debtor had ceased its active mining operations. It had shut off power and let the mine fill, thereby foreclosing any possibility of reopening the mine and conducting operations. Nor did the debtor intend to engage in active coal mining. In short, the *Sunnyside* debtor was liquidating and at issue in the Section 1114 application was whether the Coal Act claims could be terminated or were entitled to priority in payment from the liquidating estates. That is not the case here. Moreover, the *Sunnyside* bankruptcy court ruling does not analyze why Section 1114 cannot modify Coal Act obligations of such obligations constitute "retiree benefits." It simply states its conclusion. *Sunnyside* is not

---

[64]    *In re Sunnyside Coal Co.*, 146 F.3d 1273, 1280 (10th Cir. 1998).

[65]    *Adventure Resources Inc.* v. *Holland*, 137 F.3d 786, 794 (4th Cir. 1998) (focusing primarily on "the question of whether the taxes levied by the Coal Act were . . . 'incurred by the estate[s].'" (quoting § 503(b)(1)(B)(i)).

[66]    *In re Sunnyside Coal Co.*, No. 94-12794-CEM (Bankr. D. Colo. July 29, 1994) (slip opinion).

helpful to the analysis here, and in any event, that ruling is not binding on this Court.[67]

56.     For the reasons set forth in *Horizon*, the Debtors may use section 1114 to modify Retiree Benefits arising under the Coal Act if the other requirements of section 1114 are satisfied.   For the reasons set forth below, the Debtors have met the statutory standard of sections 1113 and 1114 to terminate the Retiree Benefits on the terms set forth in the Final Proposals.

### D.     The Debtors Have Satisfied the Statutory Requirements of Sections 1113 and 1114 of the Bankruptcy Code.

#### (1)     The Debtors Made Proposals to the UMWA to Modify the UMWA CBA.

57.     Section 1113 requires the Debtors to provide the UMWA with proposed modifications to the UMWA CBA *prior to* filing an application to reject the agreement.[68]   The bar for satisfying this requirement is low because in most cases, this factor is a "routine formality."[69]   The Debtors made numerous proposals to the UMWA throughout the Chapter 11 Cases.  When the RSA terminated and the Chapter 11 Cases pivoted to a sale track, the Debtors had no alternative but make the Final Proposal to the UMWA.  The Debtors' Final Proposal to the UMWA post-dated the filing of the Chapter 11 Cases and pre-dated the filing of the Section 1113/1114 Motion, which was filed on November 23, 2015.   The statute requires submitting a proposal before filing the Section 1113/1114 Motion, which the Debtors did.  However, neither section 1113 nor 1114 require completion of negotiations before filing the motion.  To the contrary, section 1114 expressly contemplates that negotiations may take place

---

[67]     Even the bankruptcy court was not convinced of its own conclusion. *Id.* at 18 ("The reality is that it is a point subject to argument, but you are here asking for my judgment in this proceeding and that's what you get.  I'm sure that this problem will haunt other Courts . . . .").

[68]     11 U.S.C. § 1113(b)(1)(A); *see also In re Nw. Airlines Corp.*, 346 B.R. 307, 320 (Bankr. S.D.N.Y. 2006).

[69]     *See, e.g.*, *Chicago Constr. Specialties*, 510 B.R. at 218.

31

after the filing of the motion, and the testimony and the evidence demonstrates that is what happened here,[70] so the Final Proposal to the UMWA met this requirement.

58.     The Objectors argue that the Final Proposal to the UMWA was a "take it or leave it" unilateral rejection of the UMWA CBA and Retiree Benefits dictated by the Proposed Buyer under the Stalking Horse APA. Even if the Objectors are correct that the Final Proposal was necessitated by the Stalking Horse APA and the Debtors' financial circumstances, and even if these exigencies preclude further negotiations with the UMWA and Section 1114 Committee, the Final Proposal in and of itself was not improper. First, the Final Proposal included those modifications necessary to consummate the Stalking Horse APA. This includes elimination of the Successorship Provisions or rejection of the UMWA CBA. The Debtors had no choice about including these terms in the Stalking Horse APA. The Debtors' investment banker testified that after an extensive marketing process, no buyers emerged willing to purchase the Alabama Coal Operations as a going-concern, let alone as a going-concern burdened by the UMWA CBA. No contrary testimony or evidence was offered. Certainly, no entity is more familiar with coal operators than the UMWA, and if they had been aware of any potential purchasers, surely their representatives would have made that known.[71] The fact that certain terms of the Final Proposal were non-negotiable for reasons beyond the Debtors' control does not render the Final Proposals defective or proffered in bad faith.

59.     Second, by its terms, the Final Proposal to the UMWA made clear that the Debtors were submitting proposals and were willing to negotiate, notwithstanding the dire

---

[70]    Even counsel for the UMWA noted that a court may stop the 1113/1114 hearing and request or require the parties to negotiate.

[71]    *See Lady H*, 199 B.R. at 607 ("Therefore, it is now time for the UMWA and the 1992 Plan to do what every creditor has a right to do at such a sale; encourage bidders who they would like to have operate these properties, consider investing in or becoming an owner of the enterprise, or enter into an agreement with a buyer to assure that some of the profitability problems of the past are solved upon purchase of the Debtors' assets.")

32

circumstances in which the Debtors find themselves. Thus, for example, the UMWA Final Proposal provides:

> JWR confirms that, in addition to the foregoing [proposals], it is willing to discuss any proposal that the Union may have concerning the effects of the sale of the mines on the Union's members.[72]

60. Finally, not unlike many Chapter 11 cases, but even more so in these cases, the Debtors have had to move at "warp" speed. From day one, the Debtors, and every witness for the Debtors, at every hearing, have repeatedly made it known that the "cash burn" was occurring faster even than anticipated. Repeatedly the Debtors have advised that they had to move the cases quickly to get to an end before the cash was completely gone. Also, as in any Chapter 11, Debtors, their counsel and advisors, and the management, are not only dealing with ongoing routine business issues, but are attempting to deal with, negotiate and resolve issues on multiple fronts with multiple players. The UMWA labor issues are clearly not the only party or problems being addressed, all simultaneously.[73]

61. In sum, the Objectors ignore the express language of the Final Proposal, which clearly invites further discussion, and in fact, such discussions took place. The extent to which the Debtors' circumstances may limit the opportunity to negotiate does not, of itself, determine whether the first factor of the nine-part *American Provision* test has been satisfied.[74]

---

[72] Scheller Decl. ¶ 26 & Ex. 2.

[73] The court notes that even while preparing for this hearing, the Debtors resolved the 1114 Non-Union Retiree issues. Further, a settlement was reached with the Unsecured Creditors Committee. The UMWA attorney tried to turn these accomplishments around by suggesting that everyone was getting something but the UMWA. The court disagrees, in a complex "mega" Chapter 11, every resolution counts and all help the Debtors reach the goal line.

[74] *See In re Alabama Symphony*, 155 B.R. 556, 573 (Bankr. N.D. Ala. 1993) (noting that the Bankruptcy Code "requires only that a debtor make *one* proposal, and that proposal must occur after the filing of the petition and before the application for rejection is made.") (emphasis in original); *see also Chicago Constr. Specialties*, 510 B.R. at 219 ("[I]t may indeed be the case that opportunity to negotiate is limited by the facts. That, however, is not a consideration in determining whether the first factor of the nine-factor test has been satisfied.").

Here, the Debtors submitted the Final Proposal within the timeframe the Bankruptcy Code contemplates, and the Court thus finds that the Final Proposal to the UMWA meets the standard required and that this factor is satisfied.[75]

> ### (2) The Debtors' Final Proposal Was Based on the Most Complete and Reliable Information, and the Debtor Provided Relevant, Necessary Information to the UMWA.

62.     Both the second and fifth factors of the *American Provision* test pertain to the information necessary to support rejection of a collective bargaining agreement or retiree benefits under sections 1113 and 1114. The second factor addresses the information upon which the Debtors base their decision to reject the UMWA CBA or terminate benefits. The fifth factor, on the other hand, addresses the information the Debtors provide to the union or retirees.[76] In both cases, a debtor must gather the "most complete information at the time and . . . base its proposal on the information it considers reliable," excluding "hopeful wishes, mere possibilities and speculation."[77] "The breadth and depth of the requisite information will vary with the circumstances, including the size and complicacy of the debtor's business and work force; the complexity of the wage and benefit structure under the collective bargaining agreement; and the extent and severity of modifications the debtor is proposing."[78] To satisfy the second and fifth

---

[75] Contents of 67

[76] 11 U.S.C. §§ 1113(b)(1)(A) and (B), 1114(f)(1)(A) and (B); *Chicago Constr. Specialties*, 510 B.R. at 219; *AMR Corp.*, 477 B.R. at 409.

[77] *Chicago Constr. Specialties*, 510 B.R at 219 (*quoting AMR Corp.*, 477 B.R. at 409); *see also In re Karykeion, Inc.*, 435 B.R. 663, 678 (Bankr. C.D. Cal. 2010) ("Just as section 1113 precludes a debtor from altering union contracts based on wishful thinking and speculation, a debtor facing imminent closure cannot base its rejection of its only suitor on a speculative white knight with greater riches."); *In re Patriot Coal*, 493 B.R. 65, 119 (Bankr. E.D. Mo. 2013) (debtors must provide "*sufficient information* for the UMWA to evaluate the [p]roposals.").

[78] *AMR Corp.*, 477 B.R. at 409 (*quoting In re Mesaba Aviation, Inc.* (*Mesaba I*), 341 B.R. 693, 714 (Bankr. D. Minn. 2006), *aff'd in part, rev'd in part sub nom. Ass'n of Flight Attendants – CWA-AFL-CIO* v. *Mesaba Aviation, Inc.* (*Mesaba II*), 350 B.R. 435 (D. Minn. 2006)).

Case 15-02741-TOM7    Doc 1489    Filed 12/28/15    Entered 12/28/15 11:14:31    Desc
Main Document    Page 34 of 57

procedural requirements, a debtor need only provide that information that is within its power to provide.[79]

63. The Final Proposal to the UMWA meets the second and fifth factors of the *American Provision* test. The evidence establishes that the Debtors filed these Chapter 11 Cases fully expecting to reorganize pursuant to a Chapter 11 plan. The Debtors' proposals to the UMWA sought relief tailored to that objective.[80] Once the RSA was terminated and reorganization through a Chapter 11 plan was no longer a possibility, the Debtors formulated the Final Proposal to the UMWA based on the requirements needed to consummate the sale(s). The Final Proposal was a result of the Debtors' severe and increasingly liquidity constraints which show that the Debtors did not, and would not, have any cash to fund operations after January 2016, and that once the sale(s) closes, the Debtors will not have any money to pay for obligations remaining under the UMWA CBA.[81] No credible evidence was offered that this information is incomplete or unreliable.

64. Similarly, the Debtors provided the UMWA all the relevant information necessary to evaluate their proposals.[82] The relevant time for evaluating the sufficiency of the information is early November 2015 and thereafter, when the Chapter 11 Cases pivoted to a sale process. By the time the Debtors filed the sale motion on November 5, 2015, (a) there was no escaping the fact that reorganization under a plan was an impossibility, and (b) the Proposed Buyer had committed to purchasing the Alabama Coal Operations as a going-concern. It was not until the Debtors had no other choice but to pursue the Stalking Horse APA that they filed the

---

[79]   *See In re Pinnacle Airlines Corp.*, 483 B.R. 381, 411 (Bankr. S.D.N.Y. 2012).

[80]   *See* Scheller Decl. ¶¶ 11, 13.

[81]   *See* Zelin Decl. ¶ 16.

[82]   *See* 11 U.S.C. §§ 1113(b)(1)(A) and (B), 1114(f)(1)(A) and (B).

Section 1113/1114 Motion. By this time, the "relevant information" was simple and apparent for all to see: the Debtors could not survive absent a sale in the near term, the Proposed Buyer had emerged as the only viable bidder that would purchase the Alabama Coal Operations as a going-concern, the sale of the Alabama Coal Operations as a going-concern provides the best chance for future employment of the Debtors' employees, and the Stalking Horse APA requires elimination of the Successorship Provisions or rejection of the UMWA CBA. Moreover, upon closing of the sale(s) (or outright liquidation), the Debtors will have no money to pay Retiree Benefits.

65.     Under these facts and circumstances, the UMWA received from the Debtors all the relevant information necessary for them to evaluate the Final Proposal. Beginning July 2015, the Debtors provided the UMWA's members and advisors with access to an electronic data room that contains more than 75,000 pages of operational, financial, business planning and other documents relevant to the Objectors' evaluation of the Debtors' various proposals throughout these Chapter 11 Cases.[83]  Once the RSA terminated, the Debtors continued to meet with the UMWA to apprise it of the status of the Chapter 11 Cases. Importantly, no party has challenged the reliability of the financial basis for the Debtors' decision to sell the Alabama Coal Operations as a going-concern, although the Objectors take issue with terms of the proposed sale(s). But no party has come forward willing to purchase all f the Debtors' Alabama Coal Operations burdened with the UMWA CBA and Retiree Benefits.[84]

66.     The Objectors argue that they are entitled to "a thorough analysis of all of the incidents of income and expense that would bear on the [debtor's] ability to maintain a going-concern in the future" and that the union's objections must "go to whether the Debtor

---

[83]   Zelin Decl. at ¶ 28.

[84]   Zelin Decl. at ¶ 30.

mustered a sufficiently comprehensive, detailed portrait of its financial posture and prospects before it formulated its proposals." [85]  The Objectors suggested by their cross examination of witnesses, that because no business plan for the Proposed Buyer had been provided, that the information was insufficient to evaluate the proposals.  The Court finds otherwise, the Proposed Purchaser was formed almost simultaneously with the signing of the APA, little over one month ago.  The Proposed Buyer, Coal Acquisitions, selected Mr. Williams as its CEO.  He had been an advisor to the Lenders, and had been observing Debtors' operations.  It is clear to this Court from Mr. Williams' testimony, that other than further streamlining and pairing expenses wherever it can, the operations are expected to continue much the same.  Also, Objectors claim that the Debtors have failed to provide the information sections 1113 and 1114 require because the Debtors made the Final Proposal without providing a wind-down plan for the payment of accrued and/or vested administrative expenses owed under the UMWA CBA and without leaving sufficient assets to pay accrued post-petition obligations owed to represented employees and retirees.[86]

> 67.     The Debtors formulated the Final Proposal to facilitate the 363 Sale, a going-concern sale of their Alabama Coal Operations the Debtors entered into because their only other alternative is to shut down the mines, unlikely leaving an opportunity to be reopened, and to liquidate.  This alternative seems the more dire and severe – it would preclude almost to a certainty, any future job opportunities for the UMWA and its members.  The Debtors provided the Objectors with clear and comprehensive financial, business and operational information detailing the Debtors' cash needs and the likelihood that the Debtors would run out of money in January 2016 unless the 363 Sale closed before then.  This information was far more detailed and

---

[85]   UMWA Obj. at ¶ 95, 99 (quoting *Mesaba I*, 341 B.R. at 712-13); 1114 Committee Obj. at ¶¶ 57-60.

[86]   UMWA Obj. at ¶ 98; 1114 Committee Obj. at ¶ 63.

substantive than just a "snap-shot of current finances."[87]   In these circumstances, that information suffices to demonstrate the necessity of the section 1113 and 1114 relief.   The Debtors are not required to state what the "gap" is between their current financial performance and the performance needed to emerge, as the UMWA maintains, or what proportion of the gap is filled by the proposed labor concessions.[88]   By definition, in a going-concern sale, the Debtors are *not* emerging from Chapter 11 in their current form, and the purpose of the proposed labor concessions is to enable the sale, not to fill some hypothetical financial void.

68.     For the same reason, the Debtors need not demonstrate the cost savings necessary to fund their post-sale wind-down.[89]   Sections 1113 and 1114 require only that the Debtors demonstrate that the Final Proposal is "necessary to permit the reorganization of the Debtors," which in this context means those modifications necessary to consummate the going-concern sale of their Alabama Coal Operations.   Whether the labor concessions suffice to fund the subsequent wind-down of the estates, after the Debtors' Alabama Coal Operations have already been sold to a new owner, has no bearing on the section 1113 standard.

69.     Here, the irrefutable evidence establishes that the Debtors have no reasonable or good alternative but to sell the Alabama Coal Operations to the Proposed Buyer. Based on the above, the Court finds that the Debtors based their Final Proposal on the most complete information available at the time and that the Debtors provided the UMWA with the relevant information necessary to evaluate the Final Proposals.

---

[87]     UMWA Obj. at ¶ 105.

[88]     UMWA Obj. at ¶ 103.

[89]     UMWA Obj. at ¶ 106.

Case 15-02741-TOM7     Doc 1489     Filed 12/28/15     Entered 12/28/15 11:14:31     Desc
Main Document     Page 38 of 57

**(3)**     **The Final Proposals are Necessary to Permit the
Going-Concern Sale and the Debtors' Reorganization.**

70.     A debtor's proposed modifications to its collective bargaining agreements or retiree benefits must be "necessary to permit the reorganization of the debtor."[90] In the context of a liquidation or sale of substantially all of a debtor's assets, the phrase "'necessary to an effective reorganization' means . . . necessary to the Debtor's liquidation."[91] This factor is the most debated among the nine *American Provision* factors, and its interpretation now exists in two divergent forms: the "absolutely essential" view espoused by the Court of Appeals for the Third Circuit in *Wheeling-Pittsburgh Steel Corp.* v. *United Steelworkers of America, AFL-CIO-CLC*, 791 F.2d 1074 (3d Cir. 1986), and the "necessary, but not absolutely minimal" view formulated by the Court of Appeals for the Second Circuit in *Truck Drivers Local 807, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of America* v. *Carey Transportation, Inc.*, 816 F. 2d 82 (2d Cir. 1987).

71.     In *Wheeling-Pittsburgh*, the Third Circuit tracked the legislative history of section 1113 at length and concluded that the "necessary" language required that the debtor's proposal contain only the "minimum modifications . . . that would permit the reorganization."[92] The Third Circuit found this consistent with the purpose behind section 1113, which was to overturn the lenient *Bildisco* standard in favor of a more stringent standard.[93] It considered whether the modifications were intended to foster the debtor's ability to reorganize for the long-

---

[90]    11 U.S.C. §§ 1113(b)(1)(A), 1114(g)(3).

[91]    *Chicago Constr. Specialties*, 521 B.R. at 221; *see also Karykeion*, 435 B.R. at 678-79 (finding rejection of the CBA is "necessary to permit the debtor's reorganization" where "the only reorganization option for the debtor is the sale of [its hospital] to [buyer] and that sale is contingent on the court approving the debtor's rejection of these CBAs"); *Ionosphere Clubs*, 134 B.R. at 522 (discussing inability to apply literally section 1114's analogous "necessary to permit the reorganization of the debtor" language to a debtor liquidating in Chapter 11).

[92]    *See Alabama Symphony*, 155 B.R. at 574 (*quoting Wheeling-Pittsburgh*, 791 F.2d at 1087).

[93]    *Id.* at n.42.

39

term, or whether they were only those that allowed the debtor to avoid liquidation. Based on its understanding of the legislative history, the Third Circuit determined that section 1113 required application of a stricter standard and that "necessary" modifications were only those that served the short term goal of preventing the debtor's liquidation.[94]

72.     The Second Circuit, on the other hand, takes the view that "necessary" does not equate with "essential."[95]  Thus, the Second Circuit's test formulates the "necessary" requirement as putting the burden on the debtor to make a proposal in good faith that includes necessary changes that will enhance the debtor's ability to successfully reorganize.[96]  Under either the *Wheeling-Pittsburgh* standard or the *Carey Transportation* standard, the Debtors have satisfied their burden under the third factor of the *American Provision* test.  The Final Proposal – by eliminating the Successorship Provisions – seek only those modifications necessary to consummate the sale(s), thereby selling the Alabama Coal Operations as a going-concern and preventing the Debtors' piecemeal liquidation and/or shut down of the coal mines.

73.     More specifically, the unrefuted evidence before the Court is that the Debtors' Alabama Coal Operations cannot be sold subject to the collective bargaining agreements and Retiree Benefits.  The Debtors have engaged in and continue to engage in active efforts to sell their assets subject to the obligations, but no such offers have been received and none are anticipated.  The amount of the employee legacy costs, including the costs of medical benefits for hourly rate retirees and for Coal Act beneficiaries and the liability arising from the Debtors' withdrawal from the 1974 Pension Plan, are substantial.  The testimony and evidence shows that even if the Debtors obtained savings of $150 million from the Unions, the Debtors

---

[94]   *Id.* at 574 (*discussing Wheeling-Pittsburgh*, 791 F.2d at 1089).

[95]   *Id.* (*discussing Carey Transp. II*, 816 F.2d at 89).

[96]   *See id.*

would have required hundreds of millions of dollars in new capital on emergence to remain viable. The Court finds credible that no potential buyers have an interest in assuming such obligations, let alone assuming such obligations *and* investing such new capital. The Debtors have, accordingly, carried their burden of showing that, absent the rejection of the UMWA CBA and the termination of the Retiree Benefits, the sale(s) will not close and conversion of these cases to Chapter 7 and a piecemeal liquidation would ensue. Therefore, the relief sought is necessary to permit the Debtors' reorganization within the meaning of sections 1113 and 1114.

74.     The UMWA argues that there is no way the Debtors can establish that any of their present demands are necessary to the sale(s) transaction until the UMWA concludes its negotiations with the Proposed Buyer. The UMWA submits that it is only after the UMWA and the Proposed Buyer have had sufficient time to bargain that it would be appropriate to consider whether it is necessary to eliminate the Successorship Provisions. But the Stalking Horse APA states unequivocally that termination of the Successorship Provisions in the UMWA CBA or rejection of the UMWA CBA is a condition *precedent* to completion of the sale(s).[97] Unless the Debtors' obtain the requested relief, there will be no Proposed Buyer with whom the UMWA can bargain. Moreover, the Debtors will run out of cash by early January 2016. No time exists to delay the sale(s) solely for purposes of maximizing the UMWA's leverage in their negotiations with the Proposed Buyer.

75.     Sections 1113 and 1114 only require that the Debtors' Final Proposal be necessary to permit the *Debtors'* reorganization – *i.e.*, in these Chapter 11 Cases, those modifications necessary to consummate a going-concern sale. The Bankruptcy Code does not impose any obligation on the Debtors to ensure that the UMWA can negotiate the best possible

---

[97]     *See* Stalking Horse APA § 7.12.

deal with the new owner of the Debtors' Alabama Coal Operations. The section 1113 inquiry focuses solely on the proposal made by the Debtors, not the other parties, and the UMWA is not entitled to a veto power over a going concern sale when the undisputed evidence establishes that it is the best way to maximize value for all creditors and provide the best chance for future employment for the Debtors' employees, including, but not limited to, UMWA-represented employees.[98] Section 1113 was never intended to give unions such power. Its purpose is to prevent the Debtors from unilaterally rejecting the UMWA CBA, to encourage negotiations with the UMWA, and to plainly articulate the process for seeking rejection. Here, the Debtors have complied with these requirements and established that the modifications are necessary to permit their reorganization within the meaning of sections 1113 and 1114.

76. The Debtors' situation in these Chapter 11 Cases is very similar to that of the debtor in *In re Karykeion, Inc.*, 435 B.R. 663 (Bankr. C.D. Cal. 2010), and the reasoning of that case is persuasive. In *Karykeion,* the Chapter 11 debtor operated a community hospital that was almost out of money, and moved to reject its collective bargaining agreements with its unions in order to facilitate a going-concern sale to a third party. As is the case here, in *Karykeion,* the sale of the hospital as a going-concern to a third-party buyer was the only reorganization option for the debtor, and the sale was contingent on the court approving the debtor's rejection of the collective bargaining agreements, including the successor clauses.[99] Given these circumstances, and having found that the Debtors satisfied the requirements for rejection set forth in section 1113, the *Karykeion* court authorized the debtor to reject its

---

[98] *See AMR Corp.*, 477 B.R. at 414 (noting that "courts have rejected attempts to focus the Section 1113 inquiry on a proposal made by a party other than the debtor")

[99] *Karykeion*, 435 B.R. at 679.

42

collective bargaining agreement.[100]

77.    The Objectors' reliance on *In re Bruno's Supermarket, LLC*, 2009 WL 1148369 (Bankr. N.D. Ala. Apr. 27, 2009) is misplaced given the facts and circumstances of each case.  The Debtors' situation differs markedly from that of *Bruno's*.  As the *Karykeion* court noted:

> In *Bruno's*, the evidence showed that the debtor was seeking to reject a similar CBA successorship clause because it felt it could more effectively market itself without such a requirement.  There was no specific sale identified and all buyers were still just potential suitors.  While a number of prospective buyers had expressed concern about the successorship clause, there was testimony that certain potential buyers might still be willing to negotiate parts of the union contract.  The debtor here is not simply seeking to "enhance the market value" of its assets, as the court concluded in *Bruno's*.  The debtor tried to find a buyer who would assume the CBAs and tried to reorganize its existing structure without rejecting any CBAs.  It is now pursuing the only course of action left to it other than shutting down immediately and has already exhausted negotiations with the only prospective buyer still willing to proceed.  Whether the debtor could have avoided being painted into this corner can be debated, but it is now crowded into the corner along with the other interested parties in the case.[101]

78.    The same reasoning articulated by the *Karykeion* court applies here.  The Debtors have presented overwhelming evidence that the deal with the Proposed Buyer will collapse unless the Successorship Provisions are terminated or the UMWA CBA is rejected.  The Proposed Buyer refused to agree to a sale transaction without that requirement and, given the depressed condition of the coal industry and the Debtors themselves, no other potential buyers have emerged to purchase the Debtors as a going-concern.  In addition, once the sale(s) close, the Debtors will have no money to pay the Retiree Benefits or any other obligations remaining under the UMWA CBA.  The "wisdom" of the Proposed Buyer's position regarding which of the

---

[100]    *Id.* at 684.

[101]    *Id.* at 679.

Case 15-02741-TOM7    Doc 1489    Filed 12/28/15    Entered 12/28/15 11:14:31    Desc
Main Document      Page 43 of 57

Debtors' liabilities it is willing to assume or pay is irrelevant.[102]  The only consideration is whether the Debtors' proposed elimination of the Successorship Provisions or rejection of the CBAs is necessary to permit the going-concern sale of the Alabama Coal Operations.  The 363 Sale will not close unless the Successorship Provisions are eliminated or the CBAs are rejected, and consequently, this requirement has been met.

### (4) The Final Proposals Assure That All Parties Are Treated Fairly and Equitably.

79.     Sections 1113 and 1114 also require that a debtor's proposed modifications affect all parties in a fair and equitable manner.[103]  This requirement "spread[s] the burden of saving the company to every constituency while ensuring that all sacrifice to a similar degree."[104]  "Courts take a flexible approach in considering what constitutes fair and equitable treatment due to the difficulty in comparing the differing sacrifices of the parties in interest."[105]  A debtor can meet the requirement "by showing that its proposal treats the union fairly when compared with the burden imposed on other parties by the debtor's additional cost-cutting measures and the Chapter 11 process generally."[106]

80.     Bankruptcy Courts display significant discretion with respect to this part of the *American Provision* test.  For example, courts have found the requirement fulfilled where non-union employees and managers received increased responsibilities as a result of a reduction-

---

[102]  *Id.*

[103]  11 U.S.C. §§ 1113(b)(1)(A); 1114(g)(3).

[104]  *See AMR Corp.*, 47 B.R. at 408 (quoting *Carey Transp. II*, 816 F. 2d at 90); *see also In re Century Brass Prods. Inc.*, 795 F.2d 265, 273 (2d Cir. 1986); *In re Elec. Contracting Servs. Co.*, 305 B.R. 22, 28 (Bankr. D. Colo. 2003) ("A debtor will not be allowed to reject a union contract where it has demanded sacrifices of its union without shareholders, non-union employees and creditors also making sacrifices.").  Neither *AMR Corporation*, *Century Brass*, nor *Electric Contracting* discuss § 1114.  However, as previously noted, "[t]he requirements for modification of retiree benefits are . . . substantially the same as the requirements for rejection of collective bargaining agreements."  *Horizon*, 316 B.R. at 281; *see also Ionosphere*, 134 B.R. at 520.

[105]  *AMR Corp.*, 477 B.R. at 408.

[106]  *Nw. Airlines*, 346 B.R. at 326 (*citing Carey Transp. II*, 816 F.2d at 90).

44

in-force rather than pay cuts *per se*.[107]  Additionally, at least one court has held that where union salaries and benefits constitute the bulk of the debtor's costs, and union employees generally earn more than their non-union counterparts, the "fair and equitable" requirement does not mandate perfectly proportionate burdens on both union and non-union employees.[108]

81.     The "fair and equitable" requirement does not mean that the non-union employees must take pay reductions in equal percentages.[109]  To the contrary, the Bankruptcy Code requires that the Court look to how "all of the affected parties" are treated.[110]  The affected parties in this case include those who have intangible interests, such as the city, the state, the vendors who supply the Alabama Coal Operations, and most importantly, the employees who depend on the going concern sale as the best chance for future employment.

82.     Here, just like the UMWA retirees, the Debtors' salaried employees are also facing termination of their Retiree Benefits upon consummation of the proposed sale(s). Other creditors are also either not getting paid or are receiving far less than the debt owed. Finally, the evidence establishes that the Debtors have undertaken aggressive cost-cutting measures across their business to address the Debtors' financial troubles and preserve jobs; management has taken steps to cut excess costs and overhead before approaching labor to request economic concessions.[111]  Such cuts include significant reductions in force among

---

[107]    *In re Patriot Coal Corp.*, 493 B.R. 65, 131 (Bankr. E.D. Mo. 2013) (*citing Carey Transp. II*, 816 F.2d at 90).

[108]    *See In re Allied Delivery System Co.*, 49 B.R. 700, 702-03 (Bankr. N.D. Ohio 1985) ("Fair and equitable treatment does not of necessity mean identical or equal treatment."); *see also Carey Transp. II*, 816 F.2d at 90-91 ("[W]here . . . the employees covered by the pertinent bargaining agreements are receiving pay and benefits above industry standards, it is not unfair or inequitable to exempt the other employees from pay and benefit reductions.").

[109]    *Alabama Symphony*, 155 B.R. at 575.

[110]    *Id.* (*quoting American Provision*, 44 B.R. at 909); 11 U.S.C. § 1113(b)(1)(A).

[111]    *See In re Carey Transp.* (*Carey Transp. I*), 50 B.R. 203, 210 (Bankr. S.D.N.Y. 1985) ("It is rare that management approaches labor seeking economic concessions without being able to demonstrate that is has already taken steps to cut costs and overhead.")

45

salaried employees, renegotiating key contracts, and other creditor concessions. The Final Proposal thus does not discriminate against Union employees or retirees.

83. The Objectors argue that the Debtors' proposed key employee retention plan (the "KERP")[112] evidences that the UMWA represented parties and retirees shoulder a disproportionate share of the Debtors' financial distress. They argue that the existence of the KERP, which they claim favors senior management to the detriment of the UMWA represented employees and retirees, renders the Final Proposal inherently unfair and inequitable.[113] But the mere fact that the Debtors are pursuing the KERP does not mean that the Final Proposal is not fair and equitable with respect to employees and retirees. How the Final Proposal affects employees and retirees and whether any constituent unfairly shoulders the burden of their impact under Sections 1113 and 1114 presents a separate and distinct inquiry from whether the KERP is justified under the facts and circumstances of these Chapter 11 Cases under Section 503(c)(3). The Court will address the KERP on its own merits in the context of adjudicating the KERP motion. However, the Court notes that the evidence establishes that the overriding purpose of the KERP is to ensure the retention of twenty-six employees (not senior management generally) who the Debtors' believe are critically necessary to preserve the Alabama Coal Operations as a safe and functioning operation that can be sold as a going concern. These objectives are consistent with those of the Final Proposal, and the existence of the KERP on its own therefore does not demonstrate that the Final Proposal is not fair and equitable. Further, the testimony regarding the KERP was clear, credible and unrefuted that the funds available for the KERP are not available for any other purpose. Again, the goal of the KERP is completely consistent and

---

[112] *See Debtors' Motion for an Order (A) Approving the Debtors' Key Employee Retention Plan and (B) Granting Related Relief* [Doc. No. 1032] (the "KERP Motion").

[113] UMWA Obj. at ¶ 112; UMWA Funds Obj. at ¶ 78; 1114 Committee Obj. at ¶ 63.

46

promotes the fair and equitable treatment in that it further ensures Debtors continue to operate as required and necessary to accomplish the sale.

84.     The evidence establishes that the Alabama Coal Operations cannot be sold without rejection of the UMWA CBA and Retiree Benefits.  Thus, absent the rejection, those operations would be closed and sold on a piecemeal basis.  On the other hand, if the sale(s) consummate and the Alabama Coal Operations are sold as a going-concern, Debtors' employees have the best chance of future employment.  Consummating the sale(s) is also necessary to achieve fairness to creditors including the unsecured creditors (trade vendors and other businesses that provided goods and/or services to the Debtors), the secured and administrative creditors who would receive considerably less as a result of a piecemeal Chapter 7 liquidation. Finally, consummating the sale(s) also serves the public interest, here, represented by the local community in which the mines operate.  For example, the Proposed Buyer is assuming responsibility under various mine reclamation laws and regulations which benefits the governmental agencies charged with enforcing such laws.  Further, if the mines continue to operate, the local community and its economy benefit.

85.     Based on the foregoing, that the Debtors have shown that the Final Proposal treats all affected parties fairly and equitably, without placing a disproportionate burden on the Union members.  The Debtors have accordingly satisfied the fourth factor of the *American Provision* test.

### (5)     The Debtors Met With the UMWA at Reasonable Times and in Good Faith.

86.     Sections 1113 and 1114 require that a debtor "meet, at reasonable times" to confer "in good faith in attempting to reach mutually satisfactory modifications to [their

47

collective] bargaining agreement."[114] "'[O]nce the debtor has shown that it has met with the Union representatives, it is incumbent upon the Union to produce evidence that the debtor did not confer in good faith.'"[115] A failure to reach agreement may be "the result of the difficultness of the task, rather than the lack of 'good faith' of either party."[116]

87. "Determining what amounts to "reasonable times" to meet depends on the circumstances of the situation".[117] Here, the Debtors have met repeatedly with the UMWA to bargain and negotiate with it at every step of these Chapter 11 Cases.[118] The Debtors requested meetings on numerous occasions. Not once did the Debtors decline a single request from the UMWA to negotiate.[119]

88. The Debtors have also met in good faith with the UMWA. The good faith requirement under section 1113 has been interpreted to mean that the debtor must make a serious effort to negotiate.[120] Here, the evidence establishes that the Debtors were sincere about their efforts to plow some middle ground before resorting to the measures allowed by section 1113. Indeed, the Debtors' willingness to meet frequently with the UMWA is itself compelling evidence of the Debtors' good faith.[121]

89. The Objectors argue that the Debtors did not meet in good faith because the Final Proposal was required by the Stalking Horse APA and were not subject to

---

[114] 11 U.S.C. §§ 1113(b)(2), 1114(f)(2).

[115] *Carey Transp. I*, 50 B.R. at 211 (quoting *American Provision*, 44 B.R. at 910).

[116] *Id.* (quoting *In re Salt Creek Freightways*, 47 B.R. 835, 840 (Bankr. D. Wyo. 1985)).

[117] *See Karykeion*, 435 B.R. at 681.

[118] Scheller Decl. ¶¶ 9-14, 16-17, 20-21, 23.

[119] *Id.* at ¶ 9.

[120] *Alabama Symphony*, 155 B.R. at 576 (*citing In re Ky. Truck Sales, Inc.*, 52 B.R. 797 (Bankr. W.D. Ky. 1985).

[121] *See In re Sol-Sieff Produce Co.*, 82 B.R. 787, 795 (Bankr. W.D. Pa. 1988) (concluding that the debtor negotiated in good faith where the "Debtor ha[d] at all times been ready, willing, and able to negotiate" with its union).

Case 15-02741-TOM7    Doc 1489    Filed 12/28/15    Entered 12/28/15 11:14:31    Desc
Main Document      Page 48 of 57

negotiation.[122]  The evidence establishes, however, that the Debtors made multiple proposals to the UMWA and met with the UMWA throughout the Chapter 11 Cases.  It was only when a sale was inevitable, and the Debtors were close to running out of money, that the Debtors submitted the Final Proposal seeking elimination of the Successorship Provisions or rejection of the UMWA CBA.  The UMWA's reliance on *In re Lady H Coal, Inc.*, 193 B.R. 233 (Bankr. S.D.W.Va. 1996) is thus misplaced.  In *Lady H Coal*, the court found good faith lacking where the debtors had already obligated themselves prior to initiating modification negotiations.[123]  Here, however, the Debtors were not locked in at the time negotiations commenced.  They approached the UMWA to discuss labor cost reductions before commencing the Chapter 11 Cases, and met with the UMWA repeatedly throughout their restructuring process.

90.    Notably, once the Stalking Horse APA was executed, the Debtor encouraged the Proposed Buyer to meet and confer with the UMWA.  In fact, the Proposed Buyer has met with, and continues to negotiate with, the UMWA.  And while the UMWA understandably objects to the Proposed Buyer's insistence on the condition in the Stalking Horse APA requiring rejection of the UMWA CBA or termination of the Successorship Provisions, the relevant inquiry for purposes of the Section 1113/1114 Motion is the good faith of the Debtors and the UMWA, not the Proposed Buyer's negotiation of the Stalking Horse APA.  The Debtors have shown that they negotiated in good faith.  No evidence exists to the contrary.

---

[122]  *See In re Delta Air Lines*, 342 B.R. 685, 697 (Bankr. S.D.N.Y. 2006) ("[A] debtor cannot be said to comply with its obligation under Section 1113(b)(2) . . . when it steadfastly maintains that its initial proposal under subsection (b)(1)(A) is non-negotiable.").

[123]  *Lady H Coal, Inc.*, 193 B.R. at 242 ("[T]he Debtors could not have bargained in good faith as the Debtors were, *prior to any negotiations with the union*, locked into at [sic] an agreement where the purchaser was not assuming the [CBA].") (emphasis added).

49

91.    Sections 1113 and 1114 also require a debtor to demonstrate that its unions have "refused to accept [its] proposal without good cause."[124]   Once the debtor establishes that its proposal is necessary, fair, and in good faith, the unions must produce sufficient evidence to justify their refusal to accept the proposal.[125]   "[A]lmost invariably, if a debtor-in-possession goes through the procedural prerequisites for its motion, and if the substance of the proposal ultimately passes muster . . . , its union(s) will not have good cause to have rejected the proposal."[126]

92.    Where a proposal is necessary for the debtor's viability and the other section 1114 requirements are met, no good causes exists to reject the proposal, even if the proposal requires sacrifices by the union or retirees.[127]   "Good cause" does not include demands that are not economically feasible or alternatives that would not permit the debtor to reorganize successfully.[128]

93.    Here, the UMWA and Section 1114 Committee lack good cause for rejecting the Debtors' Final Proposal.   The Debtors' dire circumstances require them to

---

[124]    11 U.S.C. §§ 1113(c)(2), 1114(g)(2).

[125]    *Nw. Airlines*, 346 B.R. at 328 (*citing Carey Transp. II*, 816 F.2d at 92).

[126]    *Assoc. of Flight Attendants-CWA, AFL-CIO* v. *Mesaba Aviation, Inc.* (*Mesaba II*), 350 B.R. 435, 461 (D. Minn. 2006) (internal quotation omitted).

[127]    *Mesaba II*, 350 B.R. at 462 ("While the low wages imposed by the Proposals understandably motivated the Unions to reject the Proposal, they do not constitute good cause under the Bankruptcy Code."); *see also In re Valley Steel Products Co., Inc.*, 142 B.R. 337, 342 (Bankr. E.D. Mo. 1992) ("It is clear that the Proposals would have a negative impact on the Teamster Drivers' incomes.  It is equally clear that if the Debtors do not receive these concessions they will be forced to liquidate and the Teamsters will be unemployed.").

[128]    *See Nw. Airlines*, 346 B.R. at 328; *see also Salt Creek Freightways*, 47 B.R. at 840 ("[T]he court must view the Union's rejection utilizing an objective standard which narrowly construes the phrase 'without good cause' in light of the main purpose of Chapter 11, namely reorganization of financially distressed businesses."); *Alabama Symphony*, 155 B.R. at 577 (union rejected the proposal without good cause where it merely insisted that the debtor comply with the terms of the CBA before beginning negotiations because the union "knew that the [debtor] did not have the funds to pay them").

undertake the 363 Sale, or else they will cease operations and all employees' jobs will be lost. And, under the terms of the Stalking Horse APA, the 363 Sale cannot be consummated unless the Successorship Provisions of the UMWA CBA are eliminated. Similarly, the other obligations remaining under the UMWA CBA and Retiree Benefits must be terminated upon closing the 363 Sale because the Debtors will not have the money to pay them.

94. When the Chapter 11 Cases pivoted from a plan to a sale process, the Debtors encouraged the UMWA and the Proposed Buyer to meet with each other to negotiate the terms of an initial collective bargaining agreement.[129] In fact, the Proposed Buyer reached out to the UMWA as a courtesy the day after the Stalking Horse APA was signed.[130] The Proposed Buyer continues to meet with the UMWA, has already made an initial contract proposal to it, and a further meeting is already scheduled with the UMWA.[131] As a result, the fact that the Stalking Horse APA requires elimination of the Successorship Provisions and the other section 1113/1114 relief as a condition to close the 363 Sale does not itself provide the UMWA with good reason to reject the Debtors' proposals.[132]

95. Nor were the Debtors required to accept the UMWA's "counter-proposal" in which the UMWA expressed a willingness to engage in further negotiations with the Debtors, but only upon ratification of a collective bargaining agreement with the Proposed Buyer, provided such agreement addresses retiree healthcare. First, given the Debtors' lack of cash, no

---

[129] *See* Scheller Decl. ¶ 25.

[130] *See* Williams Decl. ¶¶ 3-4.

[131] *See* Williams Decl. ¶¶ 6-7.

[132] *Cf. In re Bruno's Supermarkets, LLC*, 2009 WL 1148369, at *18-19 (Bankr. N.D. Ala. Apr. 27, 2009) (finding that the union refused the debtor's proposal under section 1113 with good cause where the debtor failed to encourage negotiations between potential purchasers and the union); *In re Patriot Coal Corp.*, No. 15-32450 (Bankr. E.D. Va. Sept. 1, 2015), ECF No. 1043, Hearing Transcript at 145:5-10 (adjourning section 1113/1114 hearing for two days and ordering proposed buyer and union to "sit down across a table from each other" during that period).

more time exists to simply allow negotiations to proceed in the hope that all of the UMWA's demands will be met before a going concern sale is no longer possible. Second, the Debtors must eliminate the Successorship Provisions to consummate the 363 Sale. If the Successorship Provisions are not eliminated, there will be no Proposed Buyer with whom the UMWA can reach an initial collective bargaining agreement. Third, the UMWA's "counter-proposal" provides that the sale could not close and the Debtors would have to liquidate piecemeal if, despite the good faith efforts of the Proposed Buyer and the UMWA, such parties are unable to reach agreement on an initial collective bargaining agreement and/or such initial collective bargaining agreement is not ratified prior to closing. Fourth, the UMWA is already negotiating an initial collective bargaining agreement with the Proposed Buyer and nothing precludes them from continuing those negotiations.

96. The Court finds the statutory language "without good cause" troubling and previously found and held that this is not the same as nor synonymous with "in bad faith."[133] Rather, this requirement imposes on the Court an objective standard consistent with goals and purposes of Chapter 11 generally. "[T]he union must indicate a willingness to work with the debtor in its attempts to reorganize."[134] In this case, for the UMWA to make a counterproposal requiring a deal with the Proposed Buyer, which was and is completely beyond the control of the Debtors, is not a sufficient effort to work with the Debtors, and without good cause. It was not, and is not, reasonable, or good cause, for the Union to outright reject a proposal by demanding conduct or action the Debtors do not control. Further, the UMWA counterproposal did not offer,

---

[133] "'Without good cause' is not synonymous with 'in bad faith.'" *Alabama Symphony*, 155 B.R. at 577 (citing *In re Salt Creek Freightways*, 47 B.R. 835 (Bankr. D. Wyo. 1985)).

[134] *Alabama Symphony*, 155 B.R. at 577.

suggest, or open a door to other options or alternatives other than having a new CBA with the Proposed Buyer.

97.    In the end, the Debtors and the UMWA have reached a stalemate with respect to elimination of the Successorship Provisions. The existence of a stalemate, however, does not constitute "cause" to reject the Debtors' proposal, especially when the Debtors have no other options and the UMWA is in negotiations with the Proposed Buyer to reach an initial agreement. As a result, the Debtors have demonstrated that the UMWA lacked good cause to reject the Debtors' proposal.

### (6)    The Balance of the Equities Clearly Favor Rejection.

98.    Finally, the balance of the equities overwhelmingly favors rejection of the UMWA CBA and termination of the Retiree Benefits, as required for approval of a motion under sections 1113 and 1114.[135] When applying this test, "bankruptcy courts 'must focus on the ultimate goal of Chapter 11... [as the] Bankruptcy Code does not authorize freewheeling consideration of every conceivable equity, but rather only how the equities relate to the success of the reorganization.'"[136] This is a fact-specific inquiry, and courts consider the following six factors:

(a)    the likelihood and consequences of liquidation if rejection is not permitted;

(b)    the likely reduction in the value of creditors' claims if the bargaining agreement remains in force;

(c)    the likelihood and consequences of a strike if the bargaining agreement is voided;

---

[135]    *See* 11 U.S.C. §§ 1113(c)(3), 1114(g)(3).

[136]    *Nw. Airlines*, 346 B.R. at 329 (ellipses in original) (quoting *NLRB* v. *Bildisco & Bildisco*, 465 U.S. 513, 527 (1984)); *see also Ky. Truck Sales*, 52 B.R. at 806 ("[T]he primary question in a balancing test is the effect the rejection of the agreement will have on the debtor's prospects for reorganization.").

53

(d)     the possibility and likely effect of any employee claims for breach of contract if rejection is approved;

(e)     the cost-spreading abilities of the various parties, taking into account the number of employees covered by the bargaining agreement and how various employees' wages and benefits compare to those of others in the industry; and

(f)     the good or bad faith of the parties in dealing with the debtor's financial dilemma.[137]

99.     In addition, "[t]he balance of the equities . . . clearly favors rejection when it is apparent that a debtor is in need of substantial relief under a union contract and the bargaining process has failed to produce any results and is unlikely to produce results in the foreseeable future."[138]

100.     Here, the Debtors' liquidation is almost certain if this Court does not approve the rejection of the UMWA CBA; the testimony on this point was clear, convincing, unrefuted, and credible.[139]  The alternative to the Debtors' requested relief will be far worse for all constituencies:  the Debtors will soon run out of cash with no ability to attract additional financing.  Under such a scenario, the evidence establishes that the value of the Debtors' estates will plummet, all of the Debtors' stakeholders will suffer, all of the Debtors' employees will lose their jobs, all of the Debtors' key vendors will lose a business partner, and the Central Alabama community will lose a valuable contributor to its economy and corporate life.

101.     All of the remaining factors also favor granting the requested relief.  As described above, the recoveries of all parties in these Chapter 11 Cases, including the unsecured creditors, administrative creditors and the Debtors' secured creditors, are at significant risk.  The Proposed Buyer and the UMWA are engaged in negotiations for an initial collective bargaining

---

[137]   *Carey Transp. II*, 816 F.2d at 93.

[138]   *In re Royal Composing Room, Inc.*, 62 B.R. 403, 408 (Bankr. S.D.N.Y. 1986).

[139]   *See* Zelin Decl. ¶ 29.

Case 15-02741-TOM7    Doc 1489    Filed 12/28/15    Entered 12/28/15 11:14:31    Desc
Main Document      Page 54 of 57

agreement, each side has made a full contract proposal, and the parties have had three meetings and have scheduled a subsequent meeting, which minimizes the likelihood and consequences of a strike. If the Court does not grant the relief requested, employee breach claims are almost a certainty, as the Debtors will be unable to afford the remaining obligations under their UMWA CBA.[140] Finally, for the reasons discussed above, the Debtors have acted in good faith and requested only those savings and changes that they truly need, with the burden of those savings spread equitably among the Debtors' various constituencies.

102. The balance of the equities clearly favors implementing the Final Proposal and the Court finds this final factor of the *American Provision* test has been satisfied.

## CONCLUSION

The Union has objected to, and strongly urges this Court to deny, the Motion. It seems the Union is hopeful that if the Motion is denied, either 1) the Proposed Buyer would close the sale anyway, or 2) the Proposed Buyer would expedite and fast track the negotiations and reach an agreed-upon CBA that could be ratified so the sale could proceed. The Court notes that the sale motion hearing is set for January 6, 2015. Many objections to the sale have been filed, some by counsel for represented parties, but many have been filed by individuals employed by or retired from Walter energy. Their concerns are legitimate and clearly they seek only to retain what they have, and hope not to lose their pay, income, medical care benefits, pension benefits, and the like. This Court has reviewed these objections, even though not filed regarding this hearing and the Court has considered these concerns, as well as those voiced by UMWA counsel at the hearing. As noted in detail in one *Patriot Coal* reported decision, these miners and retirees endured "horrendous conditions," worked hard for decades below ground, many may have

---

[140] *See* Zelin Decl. ¶ 16.

Case 15-02741-TOM7    Doc 1489    Filed 12/28/15    Entered 12/28/15 11:14:31    Desc
Main Document    Page 55 of 57

permanent disabilities, physical and mental limitations, and now face frightening health care issues.[141]

Even though this Court fully appreciates the enormous potential hardship on many, the Court must follow the law and in doing so must decide what is best for ALL creditors and parties, including union and non-union employees. While the Union appears willing to risk the sale by insisting the Court deny the Motion, the Court is not in position to do so. This Court must assume the terms of the APA are firm and that if any condition is not met, there will be no sale. This Court finds that maintaining the coal operations as a going concern[142], keeping the mines open, offering future job opportunities and continuing to be a productive member of the business community all require this Court to overrule the UMWA and the UMWA Funds' objections.

This result is based on the Court's conclusion that the 1) Debtors are out of time to close a sale; 2) the Proposed Buyer will not close the sale unless all the conditions are met, including rejection of the UMWA CBA and elimination of any liability for the UMWA Funds' as to the Proposed Buyer; and, 3) based on the statutory and substantial case law cited: a) the elimination of CBA obligations is not new or novel in bankruptcy cases; and, b) there is substantial and persuasive case law to support the Proposed Buyer's conditions regarding the CBA and related obligations. The relief sought in the Debtor's Motion pursuant to 11 U.S.C. §§ 1113 and 1114 is due to be granted. Accordingly, it is hereby

---

[141]   *Patriot Coal*, 493 B.R. at 79.

[142]   The Court notes that many large businesses have been through bankruptcy and some are well known and have continued in business. Thus, many employees have retained jobs, local economies have benefited, other businesses have continued to stay in business, and consumers have continued to use and enjoy products and services produced. The following are some will recognized names of business that have emerged from bankruptcy and are still in business: General Motors, Chrysler, Kmart, Kodak, Wall Street Deli, as well as multiple companies owned and operated by Donald Trump.

ORDERED, **ADJUDGED and DECREED** that the objections by the UMWA and UMWA Funds are **OVERRULED**.  It is further

ORDERED, **ADJUDGED and DECREED** that the Motion filed by the Debtor is **GRANTED**, the Collective Bargaining Agreement is **REJECTED**, and any Sale of Assets shall be free and clear of any encumbrances and liabilities under either the CBA or with respect to any UMWA Funds.

Dated: December 28, 2015       /s/ Tamara O. Mitchell
                TAMARA O. MITCHELL
                United States Bankruptcy Judge