# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| WALTER ENERGY, INC., et al.,[1] | Case No. 15-02741-TOM11 |
| Debtors. | Jointly Administered |

## MEMORANDUM OPINION AND ORDER
## (A) GRANTING THE DEBTORS' MOTION APPROVING
## THE KEY EMPLOYEE RETENTION PLAN AND
## (B) GRANTING RELATED RELIEF

These cases came before the Court for a hearing on December 15 and 16, 2015 for consideration of the motion (the "Motion")[2] of the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"), pursuant to §§ 105, 363(b), and 503(c)(3) of title 11 of the United States Code, 11 U.S.C. §101 *et seq.* (as amended, the "Bankruptcy Code"), and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (each a "Bankruptcy Rule," and collectively, the "Bankruptcy Rules"), for an order approving the Debtors' key employee retention plan (the "KERP") and (B) granting related relief; also heard were multiple objections (collectively the "Objections") to the Motion

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Walter Energy, Inc. (9953); Atlantic Development and Capital, LLC (8121); Atlantic Leaseco, LLC (5308); Blue Creek Coal Sales, Inc. (6986); Blue Creek Energy, Inc. (0986); J.W. Walter, Inc. (0648); Jefferson Warrior Railroad Company, Inc. (3200); Jim Walter Homes, LLC (4589); Jim Walter Resources, Inc. (1186); Maple Coal Co., LLC (6791); Sloss-Sheffield Steel & Iron Company (4884); SP Machine, Inc. (9945); Taft Coal Sales & Associates, Inc. (8731); Tuscaloosa Resources, Inc. (4869); V Manufacturing Company (9790); Walter Black Warrior Basin LLC (5973); Walter Coke, Inc. (9791); Walter Energy Holdings, LLC (1596); Walter Exploration & Production LLC (5786); Walter Home Improvement, Inc. (1633); Walter Land Company (7709); Walter Minerals, Inc. (9714); and Walter Natural Gas, LLC (1198). The location of the Debtors' corporate headquarters is 3000 Riverchase Galleria, Suite 1700, Birmingham, Alabama 35244-2359.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

filed by various parties; it appearing that this Court has jurisdiction to consider the Motion and the Objections pursuant to 28 U.S.C. §§ 157 and 1334; it appearing that venue of these cases, the Motion and Objections in this district is proper pursuant to 28 pursuant to 28 U.S.C. § 157(b); it appearing that adequate and proper notice of the Motion has been given and that no other or further notice need be given; and the Court having considered the testimony, evidence, arguments and the applicable law, the Court finds and concludes as set out herein.

## JURISDICTION AND VENUE[3]

1.      This Court has jurisdiction over the Motion and the Objections pursuant to 28 U.S.C. § 157(b)(2).   Venue of these matters is proper in this judicial district pursuant to 28 U.S.C. §§1408 and 1409.

2.      The statutory predicates for the relief sought herein are in §§ 105, 363(b) and 503(c)(3) of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004.

## BACKGROUND

3.      On July 15, 2015 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned cases (collectively, the "Chapter 11 Cases").  The Debtors have continued in possession of their respective properties and to operate and maintain their businesses as debtors in possession  pursuant to Bankruptcy Code §§ 1107(a) and 1108.

4.      On the Petition Date, this Court entered an order consolidating the Chapter 11 cases for procedural purposes only.

5.      The Bankruptcy Administrator for the Northern District of Alabama

---

[3] This Memorandum Opinion and Order constitutes findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, applicable to adversary proceedings in bankruptcy pursuant to Federal Rule of Bankruptcy Procedure 7052.

(the "Bankruptcy Administrator") has appointed two official committees in the Chapter 11 Cases: a statutory committee of unsecured creditors (the "Unsecured Creditors' Committee"); and a committee of retired employees pursuant to Bankruptcy Code §§ 1114(c)(2) and 1114(d) (the "Section 1114 Committee").

6. At the beginning of this year, the Debtors were facing the prospect of running out of cash by early 2016 if the met coal market did not improve. In response, the Debtors' advisors began negotiating with advisors to an ad hoc committee (the "Steering Committee") of certain unaffiliated lenders and noteholders (the "First Lien Creditors") holding a majority in amount of first lien senior secured obligations (the "First Lien Obligations"). The First Lien Obligations are secured by first priority liens on substantially all of the Debtors' assets. The negotiations between the Debtors and the Steering Committee culminated in a Restructuring Support Agreement (the "RSA") and the terms of an agreed order approving the Debtors' use of cash collateral.

7. On the Petition Date, the Debtors filed motions to approve the assumption of the RSA [Doc. No. 44] (the "RSA Motion") and the consensual use of cash collateral [Doc. No. 42] (the "Cash Collateral Motion"). Several parties-in-interest objected to the relief requested in the RSA Motion and Cash Collateral Motion.

8. The Court conducted hearings on the RSA Motion and final approval of the Cash Collateral Motion on September 2 and 3, 2015, and thereafter entered orders approving each motion but with modifications unacceptable to the Steering Committee. *See* Doc. Nos. 723 and 724. As a result, the Steering Committee filed an emergency motion requesting that the Court (a) confirm that the RSA was terminated, (b) terminate the Debtors' use of cash collateral on a nonconsensual basis, and (c) authorize the Debtors' use of cash collateral

through October 21, 2015 pursuant to an amended final cash collateral order acceptable to the Steering Committee (the "Cash Collateral Order") [Doc. No. 746] (the "Emergency Motion"). The Court held a hearing on the Emergency Motion on September 24, 2015 and, on September 28, 2015, entered (i) an order granting the Emergency Motion, and (ii) the Cash Collateral Order. *See* Doc. Nos. 796 and 797. Pursuant to the Cash Collateral Order, the Debtors were granted the right to use cash collateral until October 21, 2015, which right has been extended by agreement with the Steering Committee several times.

9.      The Debtors have executed a stalking horse agreement (the "APA") with the stalking horse purchaser (the "Stalking Horse Purchaser") to provide for the sale of certain assets to the Stalking Horse Purchaser (subject to higher or otherwise better bids) for, among other things, cash and a credit bid of a material portion of the First Lien Obligations and first lien adequate protection obligations, all as set forth in the stalking horse agreement and as further described in the *Debtors' Motion for (A) an Order (I) Establishing Bidding Procedures for the Sale(s) of All, or Substantially All, of the Debtors' Assets; (II) Approving Bid Protections; (III) Establishing Procedures Relating to the Assumption and Assignment of Executory Contracts and Unexpired Leases; (IV) Approving Form and Manner of the Sale, Cure and Other Notices; and (V) Scheduling an Auction and a Hearing to Consider the Approval of the Sale(s); (B) Order(s) (I) Approving the Sale(s) of the Debtors' Assets Free and Clear of Claims, Liens and Encumbrances; and (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (C) Certain Related Relief* (the "Sale Motion") [Doc. No. 993].

10.      A hearing on approval of the sale is set for January 6, 2016.

# FINDINGS OF FACT[4]

11.     The Debtors offered the live testimony of Mr. James Mesterharm from Alix Partners, financial and restructuring advisors to the Debtors, and Mr. Walter Scheller, CEO of Walter Energy.  Further, the Court has considered testimony on direct and cross examination of the other live witnesses at the December 15 and 16, 2015 hearing, as well as declarations and other evidence offered by different parties.

12.     The Debtors' management team in consultation with Mr. Mesterharm, developed a plan and a process by which key employees were identified.  A total of twenty-six (26) employees were identified as particularly crucial to the operations and management, and were individuals with no one to back them up or take over if they left the company.  The Debtors determined it to be in the best interest of all to offer a retention bonus to these twenty-six individuals so long as certain requirements and/or benchmarks were met.

13.     The Debtors, along with their financial advisors, concluded that retention of these employees would help ensure a smooth transition leading up to, and including, the sale process and sale closing.

14.     The testimony offered at the hearing supports the details outlined in the Debtors' Motion and provided specific and significant details as to the selection process and criteria relating to the job description of each and every key employee designated as eligible for a KERP.

15.     The testimony was clear, convincing and credible that these twenty-six employees (all non-management and no officers or directors) are vital to the Debtors' day to day operations, including safety issues, electrical issues, and office or corporate work.

---

[4] Pursuant to Rule 201 of the Federal Rules of Evidence, the Court may take judicial notice of the contents of its own files.  See *ITT Rayonier, Inc. v. U.S.*, 651 F2d 343 (5th Cir. Unit B July 1981); *Florida* v. *Charley Toppino & Sons, Inc.*, 514 F2d 700, 704 (5th Cir. 1975).

16.     The Debtors, through these witnesses, conveyed genuine concern that without these twenty-six employees, issues interfering with maintaining a viable going concern to close a sale was a substantial risk.

17.     The following details taken from the Debtors' Motion are consistent with the testimony provided as to the KERP:

> Each Group A Key Employee will receive a Retention Award if he or she remains with the business (either with his or her current employer or with a new owner of the business) through May 1, 2016.

> Each Group B Key Employee will receive a Retention Award if he or she remains with the business (either with his or her current employer or with a new owner of the business) through May 1, 2016.

> Each Group B Key Employee will receive an additional Retention Award if he or she remains with the business (either with his or her current employer or with a new owner of the business) through November 1, 2016.

> In certain circumstances, as set forth in the relevant KERP Agreement, the Retention Award(s) may be forfeited or accelerated depending on the Key Employee's terms of continued employment or dismissal.

18.     The money to fund the KERP is cash collateral of the Lenders, they have consented to its use for this purpose, but any unused or unearned money is to be returned. Further, the money is not available for any other purposes.

19.     There were multiple objections filed to the KERP Motion.  The objecting parties, particularly the hourly mine workers, generally viewed the program as unnecessary and believe that the funds could be used for a better, fairer or more equitable use.

20.     Although the objecting parties called no witnesses, their counsel cross examined the Debtors' witnesses and asked that other testimony and evidence from the two-day hearing also be considered.

21.     Although the Unsecured Creditor's Committee, the Retiree Committee, and the

Bankruptcy Administrator had also originally filed objections, they were all resolved either before the hearing or withdrawn during the hearing.

## CONCLUSIONS OF LAW

23. The Bankruptcy Court may, pursuant to 11 U.S.C. §§ 105 and 363(b), consider and approve when appropriate a Debtors' Motion to compensate certain employees of the Debtors. The Debtors have the burden of proof. At a properly noticed hearing, the Debtors must demonstrate a sound business purpose for a fair and reasonable plan based on the particular facts of the case(s) before the Court. *In re Friedman's, Inc.*, 336 B.R. 891 (Bankr. S.D. Ga. 2005) (Davis, J.); *In re Allied Holdings, Inc.*, 337 B.R. 716 (Bankr. N.D. Ga 2005) (Drake, J.).

24. In the *Friedman* and *Allied Holdings* cases, two well respected bankruptcy judges within this Circuit held that an employee retention plan, or an employee compensation plan, could be approved if it met the criteria:

> Under the majority view, the proponent of the KERP must show that a sound business purpose exists for the plan and that the plan itself is fair and reasonable. This approach avoids the possibility that the debtor will have unfettered discretion in devising a plan and also permits the Court to "analyze factors, based on the facts and circumstances of each case," and "to tailor the Retention Plan to accomplish necessary goals."

*Allied Holdings*, 337 B.R. at 722 (quoting *In re Georgetown Steel*, 306 B.R. 549, 556 (Bankr. D.S.C. 2004)).

25. The Court in *Allied Holdings* noted that these kinds of programs "have become customary uses of estate funds in large business reorganization." *Id.* at 721. *See also In re Bruno's Supermarkets, LLC*, Chapter 11 Case No. 09-00634-BGC, ECF No. 683 (Bankr. N.D. Ala. Apr. 17, 2009); *In re Dixie Pellets, LLC*, Chapter 11 Case No. 09-5411-TOM, ECF No. 234 (Bankr. N.D. Ala. Dec. 9, 2009) (approving an employee incentive agreement under §§

105 and 363(b)); *In re Citation Corp.*, Chapter 11 Case No. 04-08130-TOM, ECF No. 577 (Bankr. N.D. Ala. Nov. 17, 2004); *In re Meadowcraft, Inc.*, Chapter 11 Case No. 02-06910-TOM ECF No. 257 (Bankr. N.D. Ala Feb. 4, 2003) (approving bonus and incentive plan).

26.    Courts have looked to and identified several factors that may be considered in considering approval of a proposed plan:

> Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market it assets . . . ?
>
> Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?
>
> Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?
>
> Is the plan or proposal consistent with industry standards?
>
> What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized . . . ?
>
> Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

*In re Patriot Coal Corp.*, 492 B.R. 518, 531 (Bankr. E.D. Mo. 2013) (quoting *In re Dana Corp.*, 358 B.R. 567, 576-77 (Bankr. S.D.N.Y. 2006)).

27.    The testimony of the witnesses was clear, convincing and credible on the following points:

a)    The Debtors obtained professional and experienced advice regarding what to offer, and how to set up a fair and reasonable selection process and criteria.

b)    The selection process and criteria including determining the vital functions of the Debtors, and then which of those functions had only person to perform them – no "deputy" or person to fill in or step up if the person left the Debtors' employment.  Multiple managers, the

CEO, and Human Resource personnel participated in the process.

c)     Upper management, officers and directors were not considered and are not included; otherwise all functions performed by employees were considered.

d)     The plan was intended to keep certain crucial employees on board through a sale process including closing.  No evidence was offered to demonstrate that any key employees had left, and based on Mr. Scheller's testimony, he indicated all were still employed.

e)     Although the individual percentage amounts of the plan seem high (50% to 100% of base salary), these Debtors are extremely vulnerable – they will have to either sell assets and close soon, or shut down.  Thus, without a significant payment, key employees would be tempted to leave.  Offering a six (6) to twelve (12) month payment is reasonable given the particular facts and circumstances of this case.

f)     The total number of employees eligible is modest.  Twenty-six employees is roughly 4% of the workforce, which is not a large number.  The total amount of money, $2,000,000.00, may also seem large.  However, the Court must, and has, considered the size of the case, and although the Court recognizes that to all concerned it appears to be a large amount, in light of the multibillion dollar debt in this case the amount pales by comparison.

g)     The money to fund this plan cannot be used for any other purpose.

h)     The unrefuted testimony of the witnesses overwhelmingly demonstrated that the Debtors painstakingly reviewed the duties and functions performed at Walter Energy. Management determined and identified crucial safety, electrical, financial or other functions that had to continue without interruption.  This process did not seek or target "favored" employees but sought jobs and work that had to be performed.

28.     The Court has considered all of the foregoing factors based on the testimony and

evidence and in light of all that has and is going on in these complex "mega" Chapter 11 cases. The objecting parties by cross examination of the witnesses attempted to challenge this program, but there was no testimony or evidence to refute the reasonableness and necessity of the plan or to dispute the fairness of it.

29. It is clear to this Court that this KERP is a reasonable exercise of the Debtors' business judgement[5] based on the substantial and detailed testimony offered in support of the Motion. Further, as noted on the record, the Unsecured Creditors' Committee, the Retiree Committee and the Bankruptcy Administrator either resolved or withdrew their objections. Thus the plan was not opposed by all creditors, but primarily by the Unions.

## CONCLUSION

It is therefore **ORDERED, ADJUDGED AND DECREED** that

The Objection of the United Mine Workers of America to Debtors' Motion for an Order Approving the Debtors' Key Employee Retention Plan and Granting Related Relief is **OVERRULED**. It is **FURTHER ORDERED, ADJUDGED AND DECREED** that

The United Steel Workers' Objection to Debtors' Motion for an Order (A) Approving the Debtors' Key Employee Retention Plan and (B) Granting Related Relief is **OVERRULED**. It is **FURTHER ORDERED, ADJUDGED AND DECREED** that

The Objection of the UMWA Health and Retirement Funds to the Debtors' Motion for an Order (A) Approving the Debtors' Key Employee Retention Plan and (B) Granting Related Relief is **OVERRULED**. It is **FURTHER ORDERED, ADJUDGED AND DECREED** that

The Debtor's Motion is **GRANTED**. The KERP as proposed is approved in its entirety and the documents identified by the Debtors as the proposed communication to the key

---

[5] "The business judgment rule is a 'policy of judicial restraint born of the recognition that directors are, in most cases, more qualified to make business decisions than are judges.'" *Friedman's*, 336 B.R. at 895 (quoting *Int'l Ins. Co. v. Johns*, 874 F.2d 1447, 1458, n.20 (11th Cir. 1989)).

employees are similarly approved and attached hereto. The Debtors are authorized to create the Prefunded Trust and transfer $2,015,234 into the Prefunded Trust for, subject to the KERP and terms of the Prefunded Trust, the express purpose of paying the Retention Award to the Key Employees and the costs of administering the Prefunded Trust. The Key Employees shall constitute the only beneficiaries of the Prefunded Trust. Once funded, the Prefunded Trust and its assets are not property of the Debtors' estates and neither the Prefunded Trust nor its assets shall be subject to claims of the Debtors' creditors, successors or assigns, including any trustee appointed in these Chapter 11 Cases or in any Chapter 7 case if the Chapter 11 Cases are converted.

Notice of the Motion as provided therein is deemed good and sufficient notice of the Motion, and the requirements of Bankruptcy Rule 6004(a) and the Local Bankruptcy Rules for the Northern District of Alabama, Southern Division, are satisfied by such notice. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: December 28, 2015

/s/ Tamara O. Mitchell
TAMARA O. MITCHELL
United States Bankruptcy Judge

November [XX], 2015

Dear [_____],

I am very pleased to report that our Board of Directors has approved you for a special $[_____] retention award (the "Award") to acknowledge your exceptional work and critical role in Walter Energy's restructuring efforts and to give you an added incentive to help us through our next chapter.  You are critical to our transition and play a valuable part of the future of our company.

Here are the details:

**I.      How does the Award work?**

You will be paid your Award if you continue employment with Walter Energy, Inc. or its subsidiaries ("Walter") or a purchaser (the "Purchaser") of the relevant Walter assets through May 1, 2016.  In certain cases, as described below, the Award can be paid sooner.  The Award will be payable in a cash lump sum (subject to applicable tax withholding).

**II.     What if my employment terminates before I'm paid?**

If, before May 1, 2016, you (a) are fired without Cause; (b) quit for Good Reason; or (c) die or become Disabled while employed, then your Award will be earned and payable by Walter upon the occurrence of one of the events in (a) through (c).  For purposes of this letter, "Cause," "Good Reason" and "Disabled" shall have the meanings in the annex to this letter.

**III.    Can I lose the Award?**

Yes.  You will forfeit the Award completely if, before May 1, 2016, you are fired for Cause or you quit without Good Reason.

**IV.     When is the Award paid?**

If earned, the Award will be paid on or within 30 days following (i) May 1, 2016 or (ii) such other earlier payment date identified in this letter.

**V.      What happens if the company is sold?**

As I'm sure you know, Walter has entered into an agreement to sell a substantial portion of its assets through a competitive bidding process, subject to Bankruptcy Court approval.  If you are offered employment by the relevant Purchaser and remain employed through May 1, 2016, then your Award will be earned and paid on May 1, 2016 or within 30 days thereafter.  If you receive an offer of comparable employment with the relevant Purchaser but do not accept it, then you will forfeit your Award.

If you do not receive an offer of comparable employment by the relevant Purchaser, then your Award will be earned and paid upon the closing of the sale subject to your continued employment with Walter through that date, or any earlier payment date identified in section II above.

**VI.** **Does the Bankruptcy Court need to approve the Award? What happens if the Bankruptcy Court does not approve?**

Yes, the Bankruptcy Court needs to approve the Award. If the Bankruptcy Court does not approve our proposed retention award program, then the Award will not be paid.

**VII.** **Walter is in bankruptcy. How do I know that I'm going to get paid?**

We are making provisions to set aside the cash to pay your Award when due.

**VIII.** **What other conditions apply to the Award?**

Subject to applicable law, you must keep the terms of this letter confidential, including the existence of the Award, our retention program, and the amount of your Award.

**IX.** **What are the rules of interpretation for this letter?**

The Human Resources Department of Walter Energy, Inc. has authority to administer your Award and to interpret the terms and conditions of this letter. This letter constitutes the entire agreement between Walter and you with respect to the Award and supersedes any prior discussions or agreements. The U.S. Bankruptcy Court for the Northern District of Alabama, in which Walter's bankruptcy cases are currently pending, will be the exclusive jurisdiction for the purposes of any suit, action or other proceeding arising out of or relating to this letter. This letter will be governed by and construed and interpreted in accordance with the laws of the State of Alabama, applied without reference to its principles of conflict of laws, except to the extent governed by the Bankruptcy Code. It is the intent of the parties that this letter and any payment hereunder comply with Section 409A of the Internal Revenue Code of 1986, as amended.

* * * * *

During the coming months, we will continue to communicate with you about Walter's financial restructuring and sale process, as well as the Bankruptcy Court's decision. If you have any questions, please reach out to Kelli Gant, Vice President of Human Resources (kelli.gant@walterenergy.com).

Please indicate your agreement to these terms and conditions by signing below and returning your signed original to Kelli Gant. You should keep a copy for your files.

Very truly yours,

[Walter J. Scheller, III]
[Chief Executive Officer]

*Accepted and Agreed:*

_____
[Employee Name]                    Date

## Definitions of Cause, Good Reason and Disabled

"**Cause**" shall mean:

    (i)    your failure to perform your duties (other than any such failure resulting from incapacity due to physical or mental illness);

    (ii)    your continuous failure to comply with any valid and legal directive of the individual to whom you report;

    (iii)    your engagement in dishonesty, illegal conduct or gross misconduct; or

    (iv)    your conviction of or plea of guilty or *nolo contendere* to a crime that constitutes a felony (or state law equivalent) or a crime that constitutes a misdemeanor involving moral turpitude.

"**Good Reason**" shall mean the occurrence of any of the following, in each case without your written consent:

    (i)    a reduction in your base salary, unless such reduction occurs in connection with a reduction in base salary applied generally to employees at your level; or

    (ii)    a relocation of your principal place of employment by more than 75 miles.

Your resignation will qualify for "Good Reason" only if (a) you first provide written notice to Walter of the occurrence of (i) or (ii) above, and Walter fails to cure the occurrence within three business days following its receipt of such notice, and (b) the effective date of your resignation occurs within 30 days following the occurrence of (i) or (ii) above.

"**Disabled**" shall mean that you are deemed "disabled" under the default rules of Treasury Regulation §1.409A-3(i)(4)(i).

A-1

November [XX], 2015

Dear [_____],

I am very pleased to report that our Board of Directors has approved you for a special $[_____] retention award (the "Award") to acknowledge your exceptional work and critical role in Walter Energy's restructuring efforts and to give you an added incentive to help us through our next chapter.  You are critical to our transition and play a valuable part of the future of our company.

Here are the details:

### I.    How does the Award work?

You will be paid 50% of your Award if you continue employment with Walter Energy, Inc. or its subsidiaries ("Walter") or a purchaser (the "Purchaser") of the relevant Walter assets through May 1, 2016.  The remaining 50% will be paid if you continue employment with Walter or the Purchaser through November 1, 2016.  In certain cases, as described below, the Award can be paid sooner.  Each installment will be payable in a cash lump sum (subject to applicable tax withholding).

### II.    What if my employment terminates before I'm paid?

Your Award can be earned and paid out earlier if, before November 1, 2016, you (a) are fired without Cause; (b) quit for Good Reason; or (c) die or become Disabled while employed.  If such a termination occurs before May 1, 2016, 100% of your Award will be earned and payable by Walter as of such termination of employment.  If such a termination occurs on or after May 1, 2016 but before November 1, 2016, the remaining unpaid 50% installment of your Award will be earned and payable as of such termination of employment by your employer at such time.  For purposes of this letter, "Cause," "Good Reason" and "Disabled" shall have the meanings in the annex to this letter.

### III.    Can I lose the Award?

Yes.  You will forfeit the Award completely if, before May 1, 2016, you are fired for Cause or you quit without Good Reason.  If you are fired for Cause or you quit without Good Reason on or after May 1, 2016 but before November 1, 2016, then you will forfeit the remaining unpaid 50% installment of your Award.

### IV.    When is the Award paid?

If earned, your Award (or relevant portion of your Award) will be paid on or within 30 days following the relevant payment date identified in this letter.

### V.    What happens if the company is sold?

As I'm sure you know, Walter has entered into an agreement to sell a substantial portion of its assets through a competitive bidding process, subject to Bankruptcy Court approval.  If you are offered employment by the relevant Purchaser and remain employed through May 1, 2016, then the portion of your Award that would otherwise be due on May 1, 2016 will be earned and paid out on May 1, 2016 or within 30 days thereafter, and the portion of your Award that would otherwise be due on November 1, 2016 will be earned and payable if you continue employment with the Purchaser through November 1, 2016.  If you receive an offer of comparable employment with the relevant Purchaser but do not accept it, then you will forfeit your Award.

If you do not receive an offer of comparable employment by the relevant Purchaser, then your Award will be earned and paid upon the closing of the sale subject to your continued employment with Walter through that date, or any earlier payment date identified in section II above.

**VI.    *Does the Bankruptcy Court need to approve the Award?  What happens if the Bankruptcy Court does not approve?***

Yes, the Bankruptcy Court needs to approve the Award.  If the Bankruptcy Court does not approve our proposed retention award program, then the Award will not be paid.

**VII.    *Walter is in bankruptcy.  How do I know that I'm going to get paid?***

We are making provisions to set aside the cash to pay your Award and/or for Purchaser in connection with a sale to assume the obligation to pay your Award when due.

**VIII.    *What other conditions apply to the Award?***

Subject to applicable law, you must keep the terms of this letter confidential, including the existence of the Award, our retention program, and the amount of your Award.

**IX.    *What are the rules of interpretation for this letter?***

The Human Resources Department of Walter Energy, Inc. has authority to administer your Award and to interpret the terms and conditions of this letter.  This letter constitutes the entire agreement between Walter and you with respect to the Award and supersedes any prior discussions or agreements. The U.S. Bankruptcy Court for the Northern District of Alabama, in which Walter's bankruptcy cases are currently pending, will be the exclusive jurisdiction for the purposes of any suit, action or other proceeding arising out of or relating to this letter.  This letter will be governed by and construed and interpreted in accordance with the laws of the State of Alabama, applied without reference to its principles of conflict of laws, except to the extent governed by the Bankruptcy Code.  It is the intent of the parties that this letter and any payments hereunder comply with Section 409A of the Internal Revenue Code of 1986, as amended.

* * * * *

During the coming months, we will continue to communicate with you about Walter's financial restructuring and sale process, as well as the Bankruptcy Court's decision.  If you have any questions, please reach out to Kelli Gant, Vice President of Human Resources (kelli.gant@walterenergy.com).

Please indicate your agreement to these terms and conditions by signing below and returning your signed original to Kelli Gant.  You should keep a copy for your files.

Very truly yours,

[Walter J. Scheller, III]
[Chief Executive Officer]

*Accepted and Agreed:*

_____
[Employee Name]                          Date

## Definitions of Cause, Good Reason and Disabled

"**Cause**" shall mean:

(i)   your failure to perform your duties (other than any such failure resulting from incapacity due to physical or mental illness);

(ii)  your continuous failure to comply with any valid and legal directive of the individual to whom you report;

(iii) your engagement in dishonesty, illegal conduct or gross misconduct; or

(iv)  your conviction of or plea of guilty or *nolo contendere* to a crime that constitutes a felony (or state law equivalent) or a crime that constitutes a misdemeanor involving moral turpitude.

"**Good Reason**" shall mean the occurrence of any of the following, in each case without your written consent:

(i)   a reduction in your base salary, unless such reduction occurs in connection with a reduction in base salary applied generally to employees at your level; or

(ii)  a relocation of your principal place of employment by more than 75 miles.

Your resignation will qualify for "Good Reason" only if (a) you first provide written notice to Walter of the occurrence of (i) or (ii) above, and Walter fails to cure the occurrence within three business days following its receipt of such notice, and (b) the effective date of your resignation occurs within 30 days following the occurrence of (i) or (ii) above.

"**Disabled**" shall mean that you are deemed "disabled" under the default rules of Treasury Regulation §1.409A-3(i)(4)(i).