UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| In re:<br><br>WALTER ENERGY, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 15-02741-TOM11<br><br>Jointly Administered |

# MEMORANDUM OPINION AND ORDER
# ON WALTER BLACK WARRIOR BASIN, LLC'S MOTION
# FOR ORDER *NUNC PRO TUNC* (A) AUTHORIZING WALTER BLACK WARRIOR
# BASIN, LLC TO REJECT CERTAIN AGREEMENTS WITH DOMINION RESOURCES
# BLACK WARRIOR TRUST, AND (B) GRANTING RELATED RELIEF

A hearing was held on November 10, 2015 on the Motion for Order Nunc Pro Tunc (A) Authorizing Walter Black Warrior Basin, LLC to Reject Certain Agreements with Dominion Resources Black Warrior Trust, and (B) Granting Related Relief filed by Walter Black Warrior Basin, LLC ("WBWB"), one of the debtors in the above-captioned bankruptcy case of Walter Energy, Inc. and its affiliated debtors and debtors-in-possession (each a "Debtor" and, collectively, the "Debtors"), and the Responses filed by Dominion Resources Black Warrior Trust ("Dominion."). The Court has considered the pleadings, arguments of counsel and the applicable law and finds and concludes as follows.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Walter Energy, Inc. (9953); Atlantic Development and Capital, LLC (8121); Atlantic Leaseco, LLC (5308); Blue Creek Coal Sales, Inc. (6986); Blue Creek Energy, Inc. (0986); J.W. Walter, Inc. (0648); Jefferson Warrior Railroad Company, Inc. (3200); Jim Walter Homes, LLC (4589); Jim Walter Resources, Inc. (1186); Maple Coal Co., LLC (6791); Sloss-Sheffield Steel & Iron Company (4884); SP Machine, Inc. (9945); Taft Coal Sales & Associates, Inc. (8731); Tuscaloosa Resources, Inc. (4869); V Manufacturing Company (9790); Walter Black Warrior Basin LLC (5973); Walter Coke, Inc. (9791); Walter Energy Holdings, LLC (1596); Walter Exploration & Production LLC (5786); Walter Home Improvement, Inc. (1633); Walter Land Company (7709); Walter Minerals, Inc. (9714); and Walter Natural Gas, LLC (1198). The location of the Debtors' corporate headquarters is 3000 Riverchase Galleria, Suite 1700, Birmingham, Alabama 35244-2359.

## JURISDICTION AND VENUE[2]

1. This Court has jurisdiction over the Motion pursuant to 28 U.S.C. section 157(b)(2). Venue of this proceeding and this Motion is proper in this judicial district pursuant to 28 U.S.C. sections 1408 and 1409.

2. The statutory predicates for the relief sought herein are in sections 105, 363(b) and 503(c)(3) of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004.

## FINDINGS OF FACT[3]

A. **History of the Disputes between the Debtors and Dominion**

3. On July 15, 2015 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing the instant cases (the "Chapter 11 Cases"). The Debtors continue to manage and operate their businesses as debtors-in-possession under sections 1107 and 1108 of the Bankruptcy Code.

4. On October 2, 2015, WBWB filed a *Motion for Order Nunc Pro Tunc (A) Authorizing Walter Black Warrior Basin, LLC to Reject Certain Agreements with Dominion Resources Black Warrior Trust, and (B) Granting Related Relief* (the "Motion") [Docket No. 824]. By way of the Motion, WBWB seeks to reject three related agreements on the basis that rejection would benefit the Debtors and their estates:

- that certain *Overriding Royalty Conveyance* dated June 1, 1994 (as it may have been amended from time to time, the "Royalty Agreement") by and between WBWB, as

---

[2] This Memorandum Opinion and Order constitutes findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, applicable to adversary proceedings in bankruptcy pursuant to Federal Rule of Bankruptcy Procedure 7052.

[3] Pursuant to Rule 201 of the Federal Rules of Evidence, the Court may take judicial notice of the contents of its own files. See *ITT Rayonier, Inc. v. U.S.*, 651 F2d 343 (5th Cir. Unit B July 1981); *Florida* v. *Charley Toppino & Sons, Inc.*, 514 F2d 700, 704 (5th Cir. 1975).

successor in interest to Dominion Black Warrior Basin, Inc. ("DBWB"), on the one hand, and NationsBank of Texas, N.A. and Mellon Bank (DE) National Association (the "Trustee"), as trustees of the Dominion Resources Black Warrior Trust ("Dominion"),[4] on the other hand;

- that certain *Trust Agreement of Dominion Resources Black Warrior Trust* dated May 31, 1994 (as it may have been amended from time to time, the "Trust Agreement") by and among WBWB, as successor in interest to DBWB; WBWB, as successor in interest to Dominion Resources, Inc. ("DOM Resources"); and the Trustee;

- that certain *Administrative Services Agreement* dated June 1, 1994 (as it may have been amended from time to time, the "Services Agreement" and, collectively with the Royalty Agreement and the Trust Agreement, the "Dominion Agreements")[5] by and among WBWB, as successor in interest to DRI, and Dominion.

5. On November 3, 2015, Dominion filed a Response to the Motion (the "Response"), in which it contended, among other things, that the purposes of the Trust Agreement had been completed, so it was not a contract that could be rejected; that the Services Agreement is between two non-debtor parties and therefore not subject to section 365; and that the Royalty Agreement is not a contract at all, but a conveyance of a fee interest to Dominion that is outside of the property of WBWB's bankruptcy estate, and, accordingly, not subject to rejection under section 365.

---

[4] Southwest Bank is currently the trustee for Dominion. *See* Original Complaint and Application for Preliminary and Permanent Injunction [Docket No. 1 in AP No. 15-00102-TOM] (the "Dominion Complaint") ¶ 8.
[5] The Dominion Agreements are attached as exhibits to the *Declaration of Ron E. Hooper* filed at Doc. No. 3 in the adversary proceeding styled *Dominion Resources Black Warrior Trust, by and through its Trustee, Southwest Bank v. Walter Black Warrior Basin, LLC*, AP No. 15-00102-TOM (the "Dominion AP").

3

## B. The Parties

6. Dominion Black Warrior Basin ("DOM Basin") held an interest in various oil, gas, and mineral leases covering lands located in the Black Warrior Basin in Tuscaloosa County, Alabama (as used herein, and defined in the Royalty Agreement, the "Leased Land"). DOM Basin also owned certain utilization, pooling and operating agreements, and orders relating to those leases (such interests are referred to in the Royalty Agreement as the "Company Interests.")

7. On May 31, 1994, DOM Basin, DOM Resources (an indirect parent of DOM Basin) and the Trustee entered into the Trust Agreement, thereby creating Dominion.

8. On June 1, 1994, DOM Basin and the Trustee entered into the Royalty Agreement,[6] which transferred the Royalty Interest (as defined in the Royalty Agreement) to Dominion.

9. On June 1, 1994, DOM Resources and the Trustee entered into the Services Agreement.

10. WBWB is the successor in interest to DOM Basin and DOM Resources under the Trust Agreement, the Royalty Agreement, and the Services Agreement. Declaration of David Hanford, ¶ 3 (attached as Exhibit B to the Motion).

## C. The Dominion Agreements

11. The Trust Agreement is the instrument that created Dominion. The stated purposes of the Trust include "to protect, conserve, and maintain, for the benefit of the Unitholders, the Trust Estate"; "to receive and hold the Royalty Interests and other assets of the Trust Estate"; and "to convert the Royalty Interests to cash either by (1) retaining the Royalty

---

[6] The Royalty Agreement was recorded in the Office of the Judge of Probate of Tuscaloosa County, Alabama on June 30, 1994.

4

Interests and collecting the proceeds from the sale of production payable with respect to the Royalty Interests until production has ceased or the Royalty Interests have terminated or (2) selling or otherwise disposing of all or any portion of the Royalty Interests in accordance with and subject to the terms of this Agreement." *See* Trust Agreement, ¶ 2.02

12. The Royalty Agreement purports to grant to Dominion "an overriding royalty interest . . . equal to and consisting of an undivided sixty-five percent (65%) interest in and to the Subject Gas, including, subject to the provisions of Section 7.02 hereof, that share of revenue from each Proration Unit . . . set forth in the 'Royalty Interests' columns on Schedule A hereto. . . ." *See* Royalty Agreement, p. 1. Pursuant to the Royalty Agreement, Dominion claims an overriding royalty interest (the "Royalty Interest") in certain production proceeds (the "Proceeds") from the sale of gas from certain gas wells operated by WBWB.

13. The Royalty Agreement defines "Subject Gas" as "all Gas in and under, and that may be produced from, and that shall be attributable to, the Company Interests from and after the Effective Time and Effective Date, subject to the qualifications set forth in Section 3.04(a)." [7] *See* Royalty Agreement, p. 6. By its express definition, Subject Gas is specifically tied to gas attributable to and produced from the "Company Interests."

14. The term "Company Interests" is defined in the Royalty Agreement as "each and every kind and character of right, title, claim or interest" that WBWB has "in the leasehold estate and the Leased Land in and under the Leases and any and all renewals and extensions of any of the same, insofar and only insofar as each such Lease covers the Leased Land," as well as utilization, pooling and operating agreements and orders relating to the Leases. *See* Royalty Agreement, p. 3.

---

[7] Section 3.04(a) of the Royalty Agreement sets forth certain parameters of what may and may not be included in the Subject Gas for purposes of the Royalty Agreement.

5

Case 15-02741-TOM7    Doc 1491    Filed 12/28/15    Entered 12/28/15 11:25:03    Desc
Main Document    Page 5 of 16

15. "Leased Land" is defined in the Royalty Agreement as "for each Lease, the land covered by such Lease insofar as such Lease covers the Pottsville Formation."[8] "Lease" is defined in the Royalty Agreement as "oil, gas, and mineral leases described in Schedule A attached hereto, and made a part hereof, and any and all extensions or renewals thereof." *See* Royalty Agreement, p. 4.

16. Pursuant to § 6.05 of the Royalty Agreement, Dominion "shall have no right to take in kind the production of Gas attributable to the Royalty Interests." Moreover, § 6.06 of the Royalty Agreement provides that Dominion has only a non-operating interest in the Company Interests, and no right or power to participate in operations or operating decisions.

17. Dominion has a right to certain payments under the Royalty Agreement. Specifically, § 3.01 of the Royalty Agreement provides that "[o]n or before the last Business Day before the 45th day after the close of the Computation Period, the Company Interests Owner shall pay to Royalty Owner by wire transfer of immediately available funds to the account specified from time to time by the Royalty Owner a sum equal to the Royalty Owner's share of the Gross Proceeds theretofore received with respect to Subject Gas sold prior to the end of such Computation Period and not previously paid, subject to Section 3.04(c) below."

18. The Royalty Agreement does not require WBWB to segregate the Proceeds attributable to Dominion's Royalty Interest. None of the parties allege that WBWB has ever segregated the Proceeds attributable to the Royalty Interest.

19. Pursuant to the Services Agreement, Dominion pays WBWB a quarterly fee in exchange for certain administrative services provided by WBWB to Dominion, including accounting, bookkeeping, and reporting necessary to determine amounts payable to Dominion

---

[8] Pottsville Formation is defined in the Royalty Agreement. *See* Royalty Agreement, p. 5.

6

under the Royalty Agreement, and assisting with reporting obligations. *See* Services Agreement, ¶¶ 3-4.

20. The Dominion Agreements are interrelated by their own terms. For example, the Trust Agreement provides (i) that WBWB shall execute the Royalty Agreement (defined in the Trust Agreement as the "Conveyance"), *see* Trust Agreement § 2.03; (ii) that the Trustee has authority to enter into the Royalty Agreement, *see* Trust Agreement § 3.01; (iii) that WBWB will pay the Trustee cash on account of the Royalty Interests pursuant to the terms of the Royalty Agreement, and WBWB shall pay other obligations under the Royalty Agreement, *see* Trust Agreement §§ 5.02, 10.01; (iv) that the Trustee shall execute the Services Agreement, which is attached as Schedule 2 to the Trust Agreement; *see* Trust Agreement § 3.06; (v) the Trustee shall pay WBWB's fees under the Services Agreement, *see* Trust Agreement § 3.13(b); and (vi) that WBWB shall provide the Trustee the information provided for under the Services Agreement, *see* Trust Agreement § 5.05. The Services Agreement similarly references obligations under the Trust Agreement and the Royalty Agreement, providing, among other things, that WBWB shall (i) provide all accounting, bookkeeping and other administrative services and reports necessary to determine the amounts payable to the Trustee pursuant to the Conveyance, (ii) provide other information necessary to enable the Trustee to comply with reporting requirements or for any other reasonable purpose of the Trust. *See* Services Agreement § 3. From their inception, the Dominion Agreements have operated together to set forth the rights and obligations of the parties.

D. **Burden of Dominion Agreements on WBWB**

21. The Dominion Agreements are burdensome and unprofitable for WBWB. According to David Hanford, Assistant Controller of Walter Energy, continued performance

7

Case 15-02741-TOM7    Doc 1491    Filed 12/28/15    Entered 12/28/15 11:25:03    Desc
Main Document    Page 7 of 16

under the Dominion Agreements would require WBWB to operate the Dominion wells at a loss, while obligating WBWB to pay Dominion millions annually. *See* Hanford Declaration, ¶7. In 2014, for example, WBWB lost approximately $770,000 in operating the Dominion wells, while paying Dominion over $7 million. Hanford Decl., ¶ 6. If WBWB is required to continue performance under the Dominion Agreements, it will continue to operate the Dominion wells at a loss. Hanford Decl., ¶ 7.

## CONCLUSIONS OF LAW

### A. The Dominion Agreements Are Executory Contracts, and Rejection of the Dominion Agreements Would Benefit WBWB and Its Creditors

22. As a threshold matter, the Dominion Agreements will rise and fall together, as they are inextricably intertwined. The Trust Agreement was created for the primary purpose of holding the Royalty Interests that Dominion received pursuant to the Royalty Agreement. The Services Agreement was executed to provide for accounting and related services needed to determine amounts owed to Dominion under the Royalty Agreement, and to comply with related reporting obligations. If WBWB is permitted to reject the Royalty Agreement, the core purposes of the Trust Agreement and Services Agreement will cease to exist. In fact, the Trust Agreement, by its own terms, provides that the trust shall terminate if "the ratio of cash received by the Trust attributable to the Royalty Interests in any Quarterly Period to Administrative Costs of the Trust for such quarterly period is less than 1.2 to 1.0 for two (2) consecutive Quarterly Periods." *See* Trust Agreement, § 9.02. Rejection of the Royalty Agreement and cessation of payments thereunder will eventually trigger the termination provisions of the Trust Agreement.

23. Here, WBWB asserts that the Dominion Agreements are executory contracts, and seeks to reject them under section 365. Assuming that the Dominion Agreements are indeed contracts, the threshold question is whether they are "executory" contracts. The Eleventh

Circuit, in recognition that "[t]he power of a debtor to reject a contract as part of its reorganization efforts is consistent with the fresh start and rehabilitative purposes of the Bankruptcy Code," has declined to limit the definition of "executory contracts" to the more restrictive Countryman definition,[9] which requires unperformed mutual obligations on both sides. *In re General Development Corp.*, 84 F.3d 1364, 1373-74 (11th Cir. 1996). Instead, when determining whether a contract is executory for purposes of rejection under section 365 of the Bankruptcy Code, the Eleventh Circuit is "more inclined to embrace the 'functional approach.'" *Id.* at 1375. Under the functional approach, even if only one of the parties to the contract has material performance obligations remaining, the contract "may nevertheless be deemed executory . . . if its assumption or rejection would ultimately benefit the estate and its creditors." *Id.* at 1374, citing *In re Arrow Air, Inc.* 60 B.R. 117, 121-22 (Bankr. S.D. Fla. 1986).

24. In evaluating whether a contract is executory under the functional approach, the Eleventh Circuit has applied a methodology that requires an examination of the purposes of rejection:

> The key, it seems, to deciphering the meaning of [section 365's lease-executory contract provision] is to work backward, proceeding from an examination of the purposes of rejection is expected to accomplish. If those objectives have already been accomplished, or if they can't be accomplished through rejection, the [agreement] is not [a lease or executory contract] within the meaning of the Bankruptcy Act.

*Id*. at 1375, citing *In re Martin Brothers Toolmakers, Inc.*, 796 F.2d 1435, 1439 (11th Cir. 1996).

25. Here, WBWB's purpose in seeking rejection of the Dominion Agreements is to eliminate the annual losses that it incurs in performing under the Dominion Agreements and to increase operational flexibility that WBWB currently lacks because of its obligations under the Dominion Agreements. These objectives have not already been accomplished, and WBWB has

---

[9] Countryman, *Executory Contracts and Bankruptcy*, Part 1, 57 Minn.L.Rev. 439 (1963).

submitted evidence that continued performance under the Dominion Agreements will require it to continue to operate the subject wells at a loss. *See* Hanford Decl., ¶ 7. Rejection of the Dominion Agreements will allow WBWB to accomplish its purpose in filing the Motion; namely, relief from the burdens of continued performance the Dominion Agreements. Rejection of the Dominion Agreements will benefit WBWB, its estate, and its creditors, both by relieving WBWB of the financial burdens imposed by the Dominion Agreements, and by allowing WBWB more flexibility in operating its wells by, for example, electing to cease production at certain wells, thereby reducing operating costs.

26. The Eleventh Circuit has recognized that "it appears the Eleventh Circuit is more amenable toward the functional approach." *General Development,* 84 F.3d at 1375. Accordingly, the Eleventh Circuit has affirmed the application of the functional approach by bankruptcy courts. *Id.* ("the Bankruptcy Court properly applied said [functional] approach to the case at bar.") As set forth above, if the Dominion Agreements are contracts, under the functional approach they are "executory contracts" that are subject to rejection under section 365 of the Bankruptcy Code.

### B. The Royalty Agreement is a Contractual Right to Payment That Is Subject to Impairment in Bankruptcy

27. Dominion alleges that the Royalty Agreement is not a contract, but a conveyance that gave Dominion an ownership interest in the Proceeds or the Subject Gas that is outside of WBWB's bankruptcy estate and not subject to rejection under section 365 of the Bankruptcy Code. WBWB, on the other hand, submits that the Royalty Agreement gives Dominion only a contractual right to payment that may be impaired in bankruptcy. The characterization of the Royalty Agreement turns on the nature of the Royalty Interest under Alabama law. *Butner v. U.S.*, 440 U.S. 48, 55 (1979) ("[P]roperty interests are created and defined by state law. Unless

10

Case 15-02741-TOM7    Doc 1491    Filed 12/28/15    Entered 12/28/15 11:25:03    Desc
Main Document    Page 10 of 16

some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.").

28. Because a grantor cannot convey any greater interest than that which he possesses,[10] the nature of a royalty interest is determined by, or derivative of, the nature of the property interest created by the underlying oil and gas lease. Therefore, if a lease is in the nature of personal property, a royalty interest in that lease will also be characterized as personal property. If the lease is characterized as a fee interest in real property, the royalty interest will also be classified as a fee interest in real property. *See Apache Corp. v. W&T Offshore, Inc.*, 626 F.3d 789, 797 (5th Cir. 2010) (plaintiff's working interest in offshore oil and gas lease only gave whatever rights plaintiff's predecessors had because party cannot assign what it does not own, or convey any rights greater than which it held.). The royalty interest cannot take on a greater dignity than the lease from which it was carved, because a grantor cannot convey a greater interest than he possesses. *See Gregg v. Lessee of Sayre*, 33 U.S. 244, 254 (1834) (grantor "could convey no greater interest in the land than he possessed").

29. To analyze the nature of the rights conveyed to a lessee under an oil and gas lease in Alabama, it is essential to first examine the nature of the interest in the gas held by the landowner. Most states follow one of two generally accepted theories of gas ownership. Some states have adopted the "ownership-in-place" theory of ownership of natural gas. Under this theory, "gas and oil in place are minerals and realty, subject to ownership, severance, and sale, while embedded in the sand or rocks beneath the earth's surface, in like manner and to the same extent as is coal or any other solid mineral." *NCNB v. West*, 631 So. 2d 212, 223 (Ala. 1993), citing *Stephens County v. Mid-Kansas Oil & Gas Co.*, 254 S.W. 290, 292 (Tex. 1923). Thus, in

---

[10] *See Chancy v. Chancy Lake Homeowners Ass'n, Inc.*, 55 So. 3d 287, 297 (Ala. Civ. App. 2010).

11

ownership-in-place states, "the owner of a tract of land holds the fee in oil and gas underlying the boundaries of his property even though the oil and gas are not the subject of actual possession until brought to the surface." *NCNB*, 631 So. 2d at 223.

30. In contrast, other states—including Alabama—determine ownership of oil and gas under the "non-ownership theory," which recognizes the migratory nature of oil and gas and requires actual possession to establish ownership. *Id.*, citing *Sun Oil Co. v. Oswell*, 62 So. 2d 783, 787 (Ala. 1953). In non-ownership states, the right held by the landowner is not a fee interest in the oil and gas in the land, but "the right to reduce the oil and gas to possession or to sever this right for economic consideration." *Id.*; *see also In re Hillsborough Holdings Corp.*, 207 B.R. 299, 303 (Bankr. M.D. Fla. 1997) (citing *NCNB v. West* and affirming that "Alabama . . . does not follow the 'ownership in place' theory of ownership"); 1 HOWARD R. WILLIAMS & CHARLES J. MEYERS, OIL AND GAS LAW at §§ 203, 203.1 (Rev. Ed. 2007) (identifying Alabama as a non-ownership state, based on the Alabama Supreme Court's decisions in *NCNB v. West* and *Sun Oil Co. v. Oswell*).

31. Thus, in non-ownership states like Alabama, a landowner does not own the gas in the ground, but only the right to reduce it to possession. What the landowner "owns" in Alabama is the right to reduce gas to possession. The material question, then, is what is the nature of a right to reduce gas to possession? Dominion has argued that the right to reduce gas to possession is a "real property interest." While an interest may be a "real property interest" in the sense that it is connected to real property in some way, it does not necessarily rise to the level of a fee or freehold interest, and Alabama case law establishes that the right to reduce gas to possession is a personal property interest.

32. For example, in distinguishing between the ownership and non-ownership theories, the *NCNB* court noted that in the former "the owner of a tract of land holds the fee in oil and gas underlying the boundaries of his property even though oil and gas are not the subject of actual possession until brought to the surface," while in the latter, actual possession is required to establish ownership, and the right of the landowner is "the right to reduce the oil and gas to possession or sever this right for economic consideration." *NCNB*, 631 So. 2d at 223. While the right to take possession of the gas may relate to the real property, the *NCNB* court makes clear that it is something less than a fee interest of the sort held by landowners in ownership-in-place states. Similarly, in evaluating the nature of a coal lease that granted the lessee the right to enter land to mine for coal, the Alabama Supreme Court held that such a right was something less than a fee or freehold interest. *State v. Roden Coal Co.,* 197 Ala. 407, 414 (1916) (finding that a mineral lease that grants only the right or privilege to enter the land for the purpose of mining and removing the minerals is not a grant of "title to or property in the minerals themselves while in the ground"). While such "a leasehold interest is property, a chattel real," the *Roden Coal* court concluded that "[s]uch a right, however, is in the nature of personal property." *Id.* at 416-417.

33. Since Alabama is a non-ownership state, the interest of an Alabama landowner with respect to the gas under the property is not a fee interest in the gas *in situ*, but the right to reduce it to possession. *NCNB*, 631 So. 2d at 223. Therefore, as a matter of law, the leases cannot convey anything more than the right to reduce gas to possession, because a grantor cannot convey a greater interest than he possesses. *See Gregg v. Lessee of Sayre*, 33 U.S. 244, 254 (1834). And though "a leasehold interest is property, a chattel real" under Alabama law, and conveys the right to explore and take minerals when found, "[s]uch a right, however, is in the

13

Case 15-02741-TOM7    Doc 1491    Filed 12/28/15    Entered 12/28/15 11:25:03    Desc
Main Document    Page 13 of 16

nature of personal property."[11] *Roden Coal*, 197 Ala. at 416-417. Since the Leases underlying Dominion's Royalty Interest are personal property interests under Alabama law, the Royalty Agreement is necessarily a personal property interest, because WBWB could not convey a greater interest than it possessed.[12] *Gregg*, 33 U.S. at 254.

34. Dominion points to language of "conveyance" in the Royalty Agreement as supposed proof of its true character, but the pertinent terms of the Royalty Agreement do not support this characterization. First, Dominion's interests are specifically limited to the "Company Interests," which are defined in the Royalty Agreement as "each and every kind and character of right, title, claim, or interest that Assignor has . . . in the leasehold estate and the Leased Land in and under the Leases . . . ." Royalty Agreement, p. 3. Moreover, Dominion's Royalty Interest under the Royalty Agreement depends on the sale of the "Subject Gas," which is defined as "all Gas in and under, and that may be produced from, and that shall be attributable to, the Company Interests . . . ." Royalty Agreement, p. 4. Under Alabama law, the "Company Interests"—i.e., WBWB's interest in the leasehold estate and the Leased Land and in and under the Leases—is not a fee interest in the gas in the ground, but only the right to reduce gas to

---

[11] See BLACK'S LAW DICTIONARY, 6th ed. 1990 (defining "chattel" as "[a]n article of personal property, as distinguished from real property" and defining "real chattels" as "such as concern real property, such as leasehold estates; interests issuing out of, or annexed to, real estate, such chattel interests as devolve after the manner of realty. An interest in real estate less than a freehold or fee.")

[12] If oil and gas leases are personal property interests, the overriding royalty interests arising out of such leases are necessarily personal property interests as well. *See Denver Nat'l Bank of Denver, Col. v. State Comm'n of Revenue and Taxation*, 272 P.2d 1070, 1073 (Kan. 1954)("It is well settled that an oil and gas lease conveys no interest in land but is merely a license to explore and is personal property, an incorporeal hereditament, a *profit á prendre*. The [overriding royalty] interests owned by the decedent arose from oil and gas leases. They take on the same character as the instrument from which they arose . . . .")(internal citations omitted)); *Dougherty v. Cal. Kettleman Oil Royalties, Inc.*, 69 P.2d 155, 164 (Cal. 1937)("It is perfectly clear that the term 'real estate,' as used in the constitutional provision, applies only to freehold interests. It does not apply to terms less than a freehold, such as an interest for a term of years. It has quite recently been held by this court that an oil and gas lease for a term of years is not real estate; that although such a lease creates an interest in real property, or in real estate, being less than a freehold it is a chattel real which is personal property. Obviously a royalty interest, such as is here involved, cannot rise to a greater dignity than the lease upon which it is predicated.")(internal citations omitted)). The holdings in *Denver Nat'l Bank* and *Dougherty* uphold the venerable principle that a grantor cannot convey a greater interest than he possesses. Here, too, WBWB's interest in the Leases is less than a freehold; it is a chattel real, which is personal property. *Dougherty*, 69 P.2d at 164; *Roden Coal*, 197 Ala. at 416-417. Dominion can have no greater interest than WBWB.

14

possession, since that is all the landowner had to convey to WBWB as lessee. *See NCNB*, 631 So. 2d at 223 ("The owner of property containing gas has the right to reduce the gas to possession or to sever the gas rights by conveyance."). The right to enter land to mine for minerals is a personal property interest under Alabama law. *Roden Coal*, 197 Ala. at 413-417. Since at no point does WBWB ever have a fee interest in the Subject Gas, under both the Royalty Agreement and Alabama law, neither does Dominion.

35. In addition, none of the Dominion Agreements require WBWB to segregate the Proceeds attributable to its Royalty Interest. One bankruptcy court noted that funds claimed by an overriding royalty holder that were not placed in an escrow account or paid in traceable funds are more likely to be found to be property of the Debtors' estate, regardless of the parties' characterization of the agreement. *In re ATP Oil & Gas Corp.*, 2015 WL 6557012 at * 12 (Bankr. S.D. Tex. Oct. 28, 2015). While segregation of the Proceeds might be indicative of an ownership interest in the Proceeds, the Dominion Agreements do not require WBWB to segregate the Proceeds, and Dominion has not alleged that WBWB has ever segregated the Proceeds.

36. What Dominion is entitled to under the Royalty Agreement is payment. Specifically, ¶ 3.01 of the Royalty Agreement provides that "[o]n or before the last Business Day before the 45th day after the close of the Computation Period, the Company Interests Owner ***shall pay*** to Royalty Owner by wire transfer of immediately available funds to the account specified from time to time by the Royalty Owner a sum equal to the Royalty Owner's share of the Gross Proceeds theretofore received with respect to Subject Gas sold prior to the end of such Computation Period and not previously paid, subject to Section 3.04(c) below." Royalty Agreement at ¶ 3.01 (emphasis added). Dominion has the right to receive payment of a non-

15

specific "sum equal to" its share of gross proceeds from the sale of Subject Gas. The Subject Gas, by definition, is attributable to the Company Interests, which are in turn limited by WBWB's interest in the Leases, which, as discussed in detail above, is not a fee interest in the Subject Gas, but the personal property right to reduce it to possession. The Royalty Interest, therefore, cannot be a fee interest either. The Royalty Agreement gives Dominion a contractual right to payment of a non-specific sum that may be impaired in bankruptcy.

37. For the foregoing reasons, the Royalty Agreement did not convey a fee interest in the Subject Gas to Dominion, but gives Dominion a contractual right to payment. Because the remaining Dominion Agreements serve only to implement the Royalty Agreement, they are also contracts that do not convey fee interests in the Subject Gas. As contracts, the Dominion Agreements may be rejected under section 365 if they are "executory." The Dominion Agreements are executory contracts under the "functional test" applied by the Eleventh Circuit in *In re General Development Corp.*, 84 F.3d 1364 (11th Cir. 1996), because they are burdensome to WBWB, and rejection will benefit WBWB, its estate, and its creditors.

38. After the conclusion of the hearing, Dominion filed a Motion to Strike certain portions of Debtors' proposed findings of facts and conclusions of law. The Court considered that motion, and except as incorporated herein, the motion is **DENIED**.

39. Based on the foregoing, it is **ORDERED, ADJUDGED, and DECREED** that WBWB's Motion is **GRANTED**, and the Dominion Agreements are hereby **REJECTED** under section 365 of the Bankruptcy Code.

Dated: December 28, 2015      /s/ Tamara O. Mitchell
　　　　　　　　　　　　　　　　TAMARA O. MITCHELL
　　　　　　　　　　　　　　　　United States Bankruptcy Judge