## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| WALTER ENERGY, INC., *et al*. | ) | Case No. 15-02741-TOM11 |
|  | ) |  |
| Debtors.[1] | ) | (Jointly Administered) |
|  | ) |  |

## ORDER (I) APPROVING THE SALE OF
## THE ACQUIRED ASSETS FREE AND CLEAR OF CLAIMS,
## LIENS, INTERESTS AND ENCUMBRANCES; (II) APPROVING
## THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
## CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF

Upon the motion [Docket No. 993] (the "**Motion**")[2] of the Debtors dated

November 5, 2015 for, among other things, entry of an order (the "**Order**") (I) approving the

sale of the Acquired Assets pursuant to the Stalking Horse Agreement, as amended, and which

for purposes of this Order shall include all exhibits, schedules and ancillary documents related

thereto, including all Transaction Documents (as defined therein) and the Escrow and Trust

Agreements referred to herein (the "**Sale Transaction**") free and clear of all claims, liens,

interests and encumbrances; (II) authorizing the assumption and assignment of certain executory

contracts and unexpired leases (the "**Assumed Contracts**") and the assumption of the Assumed

Liabilities, each as more fully described in the Stalking Horse Agreement; and (III) granting

---

[1]     The Debtors in these cases, along with the last four digits of each of the Debtors' federal tax identification number, are: Walter Energy, Inc. (9953); Atlantic Development and Capital, LLC (8121); Atlantic Leaseco LLC (5308); Blue Creek Coal Sales, Inc. (6986); Blue Creek Energy, Inc. (0986); J.W. Walter, Inc. (0648); Jefferson Warrior Railroad Company, Inc. (3200); Jim Walter Homes, LLC (4589); Jim Walter Resources, Inc. (1186); Maple Coal Co. LLC (6791); Sloss-Sheffield Steel & Iron Company (4884); SP Machine, Inc. (9945); Taft Coal Sales & Associates, Inc. (8731); Tuscaloosa Resources, Inc. (4869); V Manufacturing Company (9790); Walter Black Warrior Basin LLC (5973); Walter Coke, Inc. (9791); Walter Energy Holdings, LLC (1596); Walter Exploration & Production LLC (5786); Walter Home Improvement, Inc. (1633); Walter Land Company (7709); Walter Minerals, Inc. (9714); and Walter Natural Gas, LLC (1198).

[2]     Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Motion or the Bidding Procedures Order (as defined below), as applicable.

1

related relief; and the Court having held a hearing on January 6, 2016 (the "**Sale Hearing**") to approve the Sale Transaction; and the Court having reviewed and considered the relief sought in the Motion, declarations submitted in support of the Motion, all objections to the Motion and the Debtors' reply thereto, and the arguments of counsel made, and the testimony and evidence proffered or adduced, at the Sale Hearing; and all parties in interest having been heard or having had the opportunity to be heard regarding the Sale Transaction and the relief requested in this Order; and due and sufficient notice of the Sale Hearing and the relief sought therein having been given under the particular circumstances and in accordance with the Bidding Procedures Order; and it appearing that no other or further notice need be provided; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest; and upon the record of the Sale Hearing and these Chapter 11 Cases, and after due deliberation thereon, and good cause appearing therefor, it is hereby

**FOUND, CONCLUDED AND DETERMINED THAT:**[3]

A.       This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.  The legal predicates for the relief requested in the Motion are Bankruptcy Code sections 105, 363, 364, 365 and 503.  Such relief is also warranted pursuant to Bankruptcy Rules 2002, 6004, 6006, 9006, 9007, and 9014.

B.       Several parties filed objections to the Motion (each, an "**Objection**," and collectively, the "**Objections**") as more particularly identified and described in Exhibit A to the Debtors' Omnibus Reply to Objections to the Motion [Docket No. 1552].  The hearing on certain

---

[3]   The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Objections based solely on 11 U.S.C. § 365 (the "**Cure Objections**") has been continued to February 3, 2016, as more particularly described in the *Notice of Continued Hearing on Certain Cure Objections* [Docket No. 1515].

      C.      On November 25, 2015, the Court entered an order [Docket No. 1119] (the "**Bidding Procedures Order**"), which, among other things, (i) approved the Bidding Procedures and Bid Protections, (ii) authorized the Assumption and Assignment Procedures, (iii) approved the form and manner of notice of the Sale Transaction and the other procedures, protections, schedules and agreements related thereto, and (iv) scheduled the Auction and the Sale Hearing.

      D.      The relief granted herein is in the best interests of the Debtors, their estates and creditors, and other parties in interest.

      E.      The Debtors have articulated good and sufficient business reasons for the Court to authorize (i) the Debtors' entry into the Stalking Horse Agreement and consummation of the Sale of the Acquired Assets to the Stalking Horse Purchaser or any Buyer Designee and (ii) the assumption and assignment of the Assumed Contracts and Assumed Liabilities as set forth herein and in the Stalking Horse Agreement.

      F.      Sound business justifications also exist for the establishment of the various escrow and trust accounts (the "**Escrow and Trust Arrangements**") pursuant to the escrow and trust agreements (the "**Escrow and Trust Agreements**") as provided in Section 4.2 of the Stalking Horse Agreement.  The Escrow and Trust Arrangements will avoid a freefall shutdown of the Debtors' remaining estates, provide for, among other things, the payment of accrued and unpaid (i) professional fees and expenses and (ii) payroll and other related expenses, each in

accordance with the Stalking Horse Agreement, and provide a mechanism to assist in the orderly and responsible winddown of any Excluded Assets not otherwise sold at the Auction.

G.  As evidenced by the affidavits of service [Docket Nos. 1028, 1150, 1151, 1152, 1172, 1173, 1174, 1230, 1340, 1441, 1442, 1495, 1519] and publication [Docket Nos. 1387, 1543] previously filed with the Court, and based on the representations of counsel at the Sale Hearing, (i) proper, timely, adequate and sufficient notice of the Motion, the Sale Hearing, the Sale Transaction, the Assumption and Assignment Procedures and the assumption and assignment of the Assumed Contracts and the applicable Cure Amounts has been provided in compliance with the Bidding Procedures Order and in accordance with Bankruptcy Code sections 102(1), 363, and 365, and Bankruptcy Rules 2002, 4001, 6004, 6006, 9006, 9007 and 9014, (ii) such notice was good and sufficient, and appropriate under the particular circumstances, and (iii) no other or further notice of the Motion, the Sale Hearing, the Sale Transaction, the assumption and assignment of the Assumed Contracts or the Cure Amounts is or shall be required.  With respect to entities whose identities were not reasonably ascertained by the Debtors, publication of the Sale Notice was made in *The Wall Street Journal*, National Edition and *The Tuscaloosa News* on December 1, 2015, *The Birmingham News* on December 2, 2015, and again in *The Wall Street Journal*, National Edition, *The Tuscaloosa News* and *The Birmingham News*, as well as the *USA Today*, National Edition and the *Charleston Gazette and Daily News*, on or about December 9, 2015.  Such notice was sufficient and reasonably calculated under the circumstances to reach all known and unknown entities.

H.  The Acquired Assets sought to be transferred and/or assigned, as applicable, by the Debtors to the Stalking Horse Purchaser pursuant to the Stalking Horse Agreement are property of the Debtors' estates and title thereto is vested in the Debtors' estates.

4

For the avoidance of doubt, cylinders owned by Airgas USA, LLC that are currently in the Debtors' possession are not Acquired Assets.

      I.      The Debtors and their professionals marketed the Acquired Assets and conducted the marketing and sale process in compliance with the Bidding Procedures and the Bidding Procedures Order. Based upon the record of these proceedings, creditors and other parties in interest and prospective purchasers were afforded a reasonable and fair opportunity to bid for the Acquired Assets.

      J.      On November 5, 2015, the Debtors entered into the Stalking Horse Agreement subject to higher and better offers. In accordance with the Bidding Procedures Order, the Stalking Horse Agreement was deemed a Qualified Bid and the Stalking Horse Purchaser was eligible to participate in the Auction as a Qualified Bidder.

      K.      The Bidding Procedures were substantively and procedurally fair to all parties and all potential bidders and afforded notice and a full, fair and reasonable opportunity for any person to make a higher or otherwise better offer to purchase the Acquired Assets. The Debtors conducted the sale process without collusion and in accordance with the Bidding Procedures.

      L.      The Debtors and their professionals conducted the sale process in compliance with the Bidding Procedures Order, and afforded potential purchasers a full, fair and reasonable opportunity for any person or entity to make a higher or otherwise better offer for the Acquired Assets than that reflected in the Stalking Horse Agreement.

      M.      As no other Qualified Bid for the Acquired Assets was received prior to the bid deadline, no Auction was conducted.[4] Consequently, the Debtors have determined in a

---

[4] While indications of interest were received, in consultation with the Consultation Parties, the Debtors determined that no Qualified Bid was received for the Acquired Assets requiring an auction.

valid and sound exercise of their business judgment that the highest or otherwise best Qualified Bid for the Acquired Assets is that of the Stalking Horse Purchaser.  The First Lien Creditors hold allowed secured claims, as of the Petition Date, approximately as follows: term loans in the aggregate principal amount of $978,178,601.35, outstanding letters of credit under the Credit Agreement in the aggregate face amount of US$50,688,432.80 and C$22,570,494.00 and first lien notes in the aggregate outstanding principal amount of $970,000,000, in each case, plus interest, fees, costs and expenses (collectively, the "**First Lien Obligations**").  Pursuant to the Bidding Procedures, applicable law, including Bankruptcy Code section 363(k), and in accordance with the Cash Collateral Orders, the Stalking Horse Purchaser (on behalf of the First Lien Creditors) was authorized to credit bid any or all of such First Lien Obligations as well as the First Lien Adequate Protection Obligations.  Pursuant to the Stalking Horse Agreement, the Stalking Horse Purchaser credit bid (the "**Credit Bid and Release**") an amount of First Lien Obligations and First Lien Adequate Protection Obligations in the initial amount of $1,250,000,000 in the aggregate, subject to adjustment pursuant to Section 7.8 of the Stalking Horse Agreement, including the reduction thereof by $100,000,000 as a result of the Walter Coke Election being made and to being increased if certain Non-Core Assets are not sold to third parties, and cash (the "**Cash Consideration**") in an amount equal to $5,400,000.  The Credit Bid and Release was a valid and proper offer pursuant to the Bidding Procedures Order and Bankruptcy Code sections 363(b) and 363(k).

      N.      Subject to the entry of this Order, the Debtors:  (i) have full power and authority to execute the Stalking Horse Agreement and all other documents contemplated thereby; (ii) have all of the power and authority necessary to consummate the transactions contemplated by the Stalking Horse Agreement; and (iii) have taken all corporate action

6

necessary to authorize and approve the Stalking Horse Agreement and the Sale of the Acquired Assets, and all other actions required to be performed by the Debtors in order to consummate the transactions contemplated in the Stalking Horse Agreement. No consents or approvals, other than those expressly provided for in the Stalking Horse Agreement or this Order, are required for the Debtors to consummate the Sale of the Acquired Assets.

O.     The Stalking Horse Agreement was negotiated and is undertaken by the Debtors and the Stalking Horse Purchaser at arm's length without collusion or fraud, and in good faith within the meaning of Bankruptcy Code section 363(m). The Stalking Horse Purchaser is not an "insider" of any of the Debtors as that term is defined by Bankruptcy Code section 101(31). The Stalking Horse Purchaser recognized that the Debtors were free to deal with any other party interested in acquiring the Acquired Assets, complied with the Bidding Procedures Order, and agreed to subject its bid to the competitive Bidding Procedures approved in the Bidding Procedures Order. All releases and payments to be made by the Stalking Horse Purchaser and other agreements or arrangements entered into by the Stalking Horse Purchaser in connection with the Sale have been disclosed. The Stalking Horse Purchaser has not violated Bankruptcy Code section 363(n) by any action or inaction, and no common identity of directors or controlling stockholders exists between the Stalking Horse Purchaser and the Debtors. As a result of the foregoing, the Stalking Horse Purchaser is entitled to the protections of Bankruptcy Code section 363(m), including in the event this Order or any portion thereof is reversed or modified on appeal, and otherwise has proceeded in good faith in all respects in connection with the proceeding.

P.     The total consideration provided by the Stalking Horse Purchaser for the Acquired Assets is the highest or otherwise best offer received by the Debtors, and the Purchase

7

Price constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and any other applicable laws, and may not be avoided under Bankruptcy Code section 363(n) or under any other law of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law. No other person or entity or group of persons or entities has offered to purchase the Acquired Assets for an amount that would provide greater economic value to the Debtors than the Stalking Horse Purchaser. The Debtors' determination that the Stalking Horse Agreement constitutes the highest or otherwise best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtors' business judgment. The Court's approval of the Motion, the Sale of the Acquired Assets, the Sale Transaction and the Stalking Horse Agreement is in the best interests of the Debtors, their estates and creditors and all other parties in interest.

Q.     The Stalking Horse Purchaser would not have entered into the Stalking Horse Agreement and would not consummate the Sale Transaction if the sale of the Acquired Assets to the Stalking Horse Purchaser were not free and clear of all claims, liens, interests and encumbrances (other than Permitted Encumbrances and Assumed Liabilities) pursuant to Bankruptcy Code section 363(f) or if the Stalking Horse Purchaser would, or in the future could, be liable for any of such claims, liens, interests and encumbrances. Unless expressly included in the Assumed Liabilities and Permitted Encumbrances, the Stalking Horse Purchaser shall not be responsible for any claims, liens, interests and encumbrances, including in respect of the following: (i) any labor or employment agreements; (ii) any mortgages, deeds of trust and security interests; (iii) any intercompany loans and receivables between one or more of the Sellers and any Debtor; (iv) any pension, multiemployer plan (as such term is defined in Section

8

3(37) or Section 4001(a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**")), health or welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of any of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability; (v) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Code and of any similar state law (collectively, "**COBRA**"), (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, (k) the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. §§9701, et seq. or (l) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors; (vi) any liabilities arising under any Environmental Laws with respect to any assets owned or operated by any of the Debtors or any corporate predecessor of any of the Debtors at any time prior to the Closing Date; (vii) any bulk sales or similar law; (viii) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (ix) the Coal Act and (x) any Excluded Liabilities. There is no better available alternative for the Acquired Assets than the Sale to the Stalking Horse Purchaser. The Sale of the Acquired Assets

contemplated by the Stalking Horse Agreement is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

R.        The Debtors may sell the Acquired Assets free and clear of all claims, liens, interests and encumbrances (other than Assumed Liabilities and Permitted Encumbrances) because, with respect to each creditor asserting a claim, lien, interest or encumbrance, one or more of the standards set forth in Bankruptcy Code section 363(f)(1)-(5) has been satisfied. Those holders of claims, liens, interests or encumbrances who did not object or who withdrew their objections to the Sale of the Acquired Assets or the Motion are deemed to have consented to the Motion and the Sale pursuant to Bankruptcy Code section 363(f)(2). Those holders of claims, liens, interests or encumbrances who did object fall within one or more of the other subsections of Bankruptcy Code section 363(f). Notwithstanding the foregoing, the Acquired Assets are being sold subject to the Permitted Encumbrances and the Assumed Liabilities.

S.        Neither the Debtors nor the Stalking Horse Purchaser engaged in any conduct that would cause or permit the Stalking Horse Agreement or the consummation of the Sale of the Acquired Assets to be avoided, or costs or damages to be imposed, under Bankruptcy Code section 363(n) or under any other law of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law.

T.        The Stalking Horse Agreement, which constitutes reasonably equivalent value and fair consideration, was not entered into, and the Sale of the Acquired Assets is not consummated, for the purpose of hindering, delaying or defrauding creditors of the Debtors under the Bankruptcy Code or under any other law of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law. Neither the Debtors nor the Stalking Horse Purchaser has entered into the Stalking Horse Agreement or is

10

consummating the Sale of the Acquired Assets with any fraudulent or otherwise improper purpose.

U.      Upon the Closing, except as included in the Assumed Liabilities, the Stalking Horse Purchaser shall not, and shall not be deemed to:  (i) be the successor of or successor employer (as described under COBRA and applicable regulations thereunder) to the Sellers, including without limitation, with respect to any Collective Bargaining Agreements and any Benefit Plans, except for Buyer Benefit Plans, under the Coal Act, and any common law successorship liability in relation to the UMWA 1974 Pension Plan, including with respect to withdrawal liability, (ii) be the successor of or successor employer to the Sellers, and shall instead be, and be deemed to be, a new employer with respect to any and all federal or state unemployment laws, including any unemployment compensation or tax laws, or any other similar federal or state laws, (iii) have, *de facto*, or otherwise, merged or consolidated with or into Sellers, (iv) be a mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers, or (v) be liable for any acts or omissions of Sellers in the conduct of the Business or arising under or related to the Acquired Assets other than as set forth in the Stalking Horse Agreement.  Without limiting the generality of the foregoing, and except as otherwise provided in the Stalking Horse Agreement, the parties intend that the Stalking Horse Purchaser shall not be liable for any Encumbrance or Liability (other than Assumed Liabilities and Permitted Encumbrances) against any Seller, or any of its predecessors or Affiliates, and the Stalking Horse Purchaser shall have no successor or vicarious liability of any kind or character whatsoever, whether known or unknown as of the Closing Date, whether now existing or hereafter arising, whether asserted or unasserted, or whether fixed or contingent, with respect to the Business, the Acquired Assets or any Liabilities of any Seller arising prior to the Closing Date.  The Stalking

11

Horse Purchaser would not have acquired the Acquired Assets but for the foregoing protections against potential claims based upon "successor liability" theories.

V.      Entry into the Stalking Horse Agreement and the Sale Transaction constitutes the exercise by the Debtors of sound business judgment, and such acts are in the best interests of the Debtors, their estates and creditors, and all parties in interest.  The Debtors have articulated good and sufficient business reasons justifying the Sale of the Acquired Assets to the Stalking Horse Purchaser.  Additionally:  (i) the Stalking Horse Agreement constitutes the highest or otherwise best offer for the Acquired Assets; (ii) the Stalking Horse Agreement and the closing of the Sale Transaction will present the best opportunity to realize the highest value of the Acquired Assets and avoid further decline and devaluation of the Acquired Assets; (iii) there is risk of deterioration of the value of the Acquired Assets if the Sale Transaction is not consummated promptly; and (iv) the Stalking Horse Agreement and the Sale of the Acquired Assets to the Stalking Horse Purchaser will provide greater value to the Debtors' estates than would be provided by any other presently available alternative.

W.      Good and sufficient reasons for approval of the Stalking Horse Agreement and the Sale Transaction have been articulated by the Debtors.  The Debtors have demonstrated compelling circumstances and a good, sufficient and sound business purpose for the Sale Transaction outside:  (a) the ordinary course of business, pursuant to Bankruptcy Code section 363(b); and (b) a plan of reorganization, in that, among other things, the immediate consummation of the Sale Transaction is necessary and appropriate to maximize the value of the Debtors' estates.  To maximize the value of the Acquired Assets and preserve the viability of the operations to which the Acquired Assets relate, it is essential that the Sale occur within the time

12

constraints set forth in the Stalking Horse Agreement. Time is of the essence in consummating the Sale Transaction.

       X.     The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Assumed Contracts to the Stalking Horse Purchaser in connection with the consummation of the Sale Transaction, and the assumption and assignment of the Assumed Contracts to the Stalking Horse Purchaser is in the best interests of the Debtors, their estates and creditors and all parties in interest. The Assumed Contracts being assigned to the Stalking Horse Purchaser are an integral part of the Acquired Assets being purchased by the Stalking Horse Purchaser, and accordingly, such assumption and assignment of the Assumed Contracts is reasonable and enhances the value of the Debtors' estates. The cure amounts required to be paid pursuant to section Bankruptcy Code 365(b), whether agreed or judicially resolved (the "**Cure Amounts**"), are deemed to be the entire cure obligation due and owing under the Assumed Contracts under Bankruptcy Code section 365(b). To the extent that any non-Debtor counterparty to an Assumed Contract failed to timely file an objection to the proposed Cure Amount filed with the Bankruptcy Court, the Cure Amount listed in the Cure Notice shall be deemed to be the entire cure obligation due and owing under the applicable Assumed Contract.

       Y.     Each provision of the Assumed Contracts or applicable non-bankruptcy law that purports to prohibit, restrict or condition, or could be construed as prohibiting, restricting or conditioning, assignment of any Assumed Contracts has been satisfied or is otherwise unenforceable under Bankruptcy Code section 365.

       Z.     Upon the payment of the Cure Amount to the relevant counterparty to an Assumed Contract, there will be no outstanding default under each such Assumed Contract.

AA.     The Stalking Horse Purchaser has demonstrated adequate assurance of future performance of all Assumed Contracts within the meaning of Bankruptcy Code section 365.

BB.     Upon the assignment to the Stalking Horse Purchaser and the payment of the relevant Cure Amounts, each Assumed Contract shall be deemed valid and binding and in full force and effect in accordance with its terms, and all defaults thereunder, if any, shall be deemed cured, subject to the provisions of this Order.

CC.     An injunction against creditors and third parties pursuing claims against, and liens, interests and encumbrances on, the Acquired Assets is necessary to induce the Stalking Horse Purchaser to close the Sale Transaction, and the issuance of such injunctive relief is therefore necessary to avoid irreparable injury to the Debtors' estates and will benefit the Debtors' creditors.

DD.     With respect to any agreements entered into between the Stalking Horse Purchaser and the Debtors' management or key employees regarding compensation or future employment, if any exist, the Stalking Horse Purchaser has disclosed the material terms of such agreements.

EE.     The Sale Transaction does not constitute a *sub rosa* chapter 11 plan. The Sale Transaction neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates a liquidating plan of reorganization for any of the Debtors.

FF.     This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Order and expressly directs entry of judgment as set forth herein.

14

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:**

1. The Motion is **GRANTED**, to the extent set forth herein.

2. Any Objection to the Motion, or any other relief granted in this Order, to the extent not resolved, adjourned for hearing on a later date, waived or withdrawn or previously overruled, and all reservations of rights included therein, is hereby **OVERRULED** and **DENIED** on the merits.

3. Pursuant to Bankruptcy Code sections 105, 363, 364, 365 and 503 and the Stalking Horse Agreement, the Credit Bid and Release and the Sale Transaction are hereby approved and the Debtors are authorized to enter into and perform under the Stalking Horse Agreement. Pursuant to Bankruptcy Code sections 105, 363, 364, 365 and 503, each of the Debtors and the Stalking Horse Purchaser are hereby authorized and directed to take any and all actions necessary or appropriate to: (i) consummate the Sale Transaction and the closing of the sale in accordance with the Motion, the Stalking Horse Agreement and this Order; (ii) assume and assign the Assumed Contracts; (iii) perform, consummate, implement and close fully the Stalking Horse Agreement together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Stalking Horse Agreement; and (iv) establish and fund the Escrow and Trust Arrangements. The Debtors and each other party to the Transaction Documents, including the Escrow and Trust Agreements, are hereby authorized and directed to perform each of their covenants and undertakings as provided in the Stalking Horse Agreement and the Transaction Documents, including the Escrow and Trust Agreements, prior to or after the Closing Date without further order of the Court. The Stalking Horse Purchaser and the Debtors shall have no obligation to close the Sale Transaction except as is contemplated and provided for in the Stalking Horse Agreement.

4. Pursuant to Bankruptcy Code section 365(f), notwithstanding any provision of any Assumed Contract or applicable non-bankruptcy law that prohibits, restricts or conditions the assignment of the Assumed Contracts, the Debtors are authorized to assume the

15

Assumed Contracts and to assign the Assumed Contracts to the Stalking Horse Purchaser or to any Buyer Designee, which assignment shall take place on and be effective as of the Closing or as otherwise provided by order of this Court. There shall be no accelerations, assignment fees, increases or any other fees charged to the Stalking Horse Purchaser or the Debtors as a result of the assumption and assignment of the Assumed Contracts.

5. The Debtors' assumption of the Assumed Contracts is subject to the consummation of the Sale Transaction. To the extent that an objection by a counterparty to any Assumed Contract, including all objections related to Cure Amounts, is not resolved prior to the Closing Date, the Debtors, in consultation with the Stalking Horse Purchaser or any Buyer Designee, may elect to: (i) not assume such Assumed Contract; (ii) postpone the assumption of such Assumed Contract until the resolution of such objection; or (iii) reserve the disputed Cure Amount and assume the Assumed Contract on the Closing Date. So long as the Debtors hold the claimed Cure Amount in reserve, and there are no other unresolved objections to the assumption and assignment of the applicable Assumed Contract, the Debtors can, without further delay, assume and assign the Assumed Contract that is the subject of the objection. Under such circumstances, the respective objecting counterparty's recourse is limited to the funds held in reserve.

6. Upon the Closing: (a) the Debtors are hereby authorized and directed to consummate, and shall be deemed for all purposes to have consummated, the sale, transfer and assignment of all of the Debtors' rights, title and interest in the Acquired Assets to the Stalking Horse Purchaser free and clear of all Encumbrances and Liabilities, other than the Assumed Liabilities and the encumbrances identified on Schedule 1 hereto (the "**Permitted Encumbrances**"); and (b) except as otherwise expressly provided in the Stalking Horse Agreement, all Encumbrances and Liabilities (other than the Assumed Liabilities and the Permitted Encumbrances) shall not be enforceable as against the Stalking Horse Purchaser or the Acquired Assets. Unless otherwise expressly included in the Assumed Liabilities and Permitted Encumbrances or as otherwise expressly provided by this Order, the Stalking Horse Purchaser

16

shall not be responsible for any claims, liens, interests and encumbrances, including in respect of the following: (i) any labor or employment agreements; (ii) any mortgages, deeds of trust and security interests; (iii) any intercompany loans and receivables between one or more of the Sellers and any Debtor; (iv) any pension, multiemployer plan (as such term is defined in Section 3(37) or Section 4001(a)(3) of ERISA), health or welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of any of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability; (v) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) COBRA, (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, (k) the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. §§9701, et seq. or (l) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors; (vi) liabilities arising under any Environmental Laws with respect to any assets owned or operated by any of the Debtors or any corporate predecessor of any of the Debtors at any time prior to the Closing Date; (vii) any bulk sales or similar law; (viii) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (ix) the Coal Act and (x) any Excluded Liabilities. A certified copy of this Order may be filed with the appropriate clerk and/or recorder to act to cancel any such lien, claim, interest or encumbrance of record.

7.     The transfer to the Stalking Horse Purchaser of the Debtors' rights, title and interest in the Acquired Assets pursuant to the Stalking Horse Agreement shall be, and hereby is deemed to be, a legal, valid and effective transfer of the Debtors' rights, title and interest in the Acquired Assets, and vests with or will vest in the Stalking Horse Purchaser all

17

rights, title and interest of the Debtors in the Acquired Assets, free and clear of all claims, liens, interests and encumbrances of any kind or nature whatsoever (other than the Permitted Encumbrances and the Assumed Liabilities), with any such claims, liens, interests and encumbrances attaching to the sale proceeds in the same validity, extent and priority as immediately prior to the Sale of the Acquired Assets, subject to the provisions of the Stalking Horse Agreement, and any rights, claims and defenses of the Debtors and other parties in interest.

8.      None of the Stalking Horse Purchaser or its affiliates, successors, assigns, equity holders, employees or professionals shall have or incur any liability to, or be subject to any action by any of the Debtors or any of their estates, predecessors, successors or assigns, arising out of the negotiation, investigation, preparation, execution, delivery of the Stalking Horse Agreement and the entry into and consummation of the Sale of the Acquired Assets, except as expressly provided in the Stalking Horse Agreement and this Order.

9.      Except as expressly provided in the Stalking Horse Agreement or by this Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, vendors, suppliers, employees, trade creditors, litigation claimants and other persons, holding claims, liens, interests or encumbrances of any kind or nature whatsoever against or in the Debtors or the Debtors' interests in the Acquired Assets (whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, whether imposed by agreement, understanding, law, equity or otherwise), including, without limitation, the non-debtor party or parties to each Assumed Contract, arising under or out of, in connection with, or in any way relating to, the Acquired Assets or the transfer of the Debtors' interests in the Acquired Assets to the Stalking Horse Purchaser, shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing claims, liens, interests and encumbrances against the Stalking Horse Purchaser or its affiliates,

18

successors, assigns, equity holders, employees or professionals the Acquired Assets, or the interests of the Debtors in such Acquired Assets. Following the Closing, no holder of a claim, lien, interest or encumbrance against the Debtors shall interfere with the Stalking Horse Purchaser's title to or use and enjoyment of the Debtors' interests in the Acquired Assets based on or related to such claim, lien, interest or encumbrance, and, except as otherwise provided in the Stalking Horse Agreement, the Escrow and Trust Agreements, or this Order, all such claims, liens, interests or encumbrances, if any, shall be, and hereby are transferred and attached to the proceeds from the Sale of the Acquired Assets in the order of their priority, with the same validity, force and effect which they have against such Acquired Assets as of the Closing, subject to any rights, claims and defenses that the Debtors' estate and Debtors, as applicable, may possess with respect thereto. All persons are hereby enjoined from taking action that would interfere with or adversely affect the ability of the Debtors to transfer the Acquired Assets in accordance with the terms of the Stalking Horse Agreement, the Escrow and Trust Agreements, and this Order.

10.     Upon assumption of the Assumed Contracts by the Debtors and assignment of same to the Stalking Horse Purchaser, the Assumed Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order. As of the Closing, subject to the provisions of this Order, the Stalking Horse Purchaser shall succeed to the entirety of Debtors' rights and obligations in the Assumed Contracts first arising and attributable to the time period occurring on or after the date the assignment of the Assumed Contracts becomes effective and shall have all rights thereunder.

11.     Subject to paragraph 5 of this Order, upon the entry of this Order, (i) all defaults (monetary and non-monetary) under the Assumed Contracts through the Closing shall be deemed cured and satisfied through the payment of the Cure Amounts, (ii) no other amounts will be owed by the Debtors, their estates or the Stalking Horse Purchaser with respect to amounts first arising or accruing during, or attributable or related to, the period before Closing with respect to the Assumed Contracts, and (iii) any and all persons or entities shall be forever barred

19

and estopped from asserting a claim against the Debtors, their estates, or the Stalking Horse Purchaser that any additional amounts are due or defaults exist under the Assumed Contracts that arose or accrued, or relate to or are attributable to the period before the Closing.

12.     The creation and funding of the Escrow and Trust Arrangements are approved pursuant to Bankruptcy Code sections 105(a) and 363(b).  The Debtors and the other parties thereto are authorized, pursuant to Bankruptcy Code sections 105(a) and 363(b) and without further notice or relief from this Court, to enter into the Escrow and Trust Agreements, to take any and all actions that are necessary or appropriate in the exercise of their business judgment to implement the Escrow and Trust Arrangements, including employing third party contractors in accordance therewith, and to make or authorize the payments contemplated thereunder.  Funds deposited in accordance with the Trust and Escrow Arrangements shall not constitute property of any Debtor's estate or be subject to claw back or disgorgement, and such funds (including any residual funds) may be released and applied in accordance with the terms thereof, without further order of this Court.

13.     The Stalking Horse Agreement has been entered into by the Stalking Horse Purchaser in good faith and the Stalking Horse Purchaser is a good faith purchaser of the Acquired Assets as that term is used in Bankruptcy Code section 363(m).  The Stalking Horse Purchaser is entitled to all of the protections afforded by Bankruptcy Code section 363(m).

14.     No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale Transaction.  Except as otherwise provided in the Stalking Horse Agreement, the Estate Retained Professional Fee Escrow Agreement, and the Committee Member and Indenture Trustees Fee Escrow Agreement, no obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment is due to any person in connection with the Stalking Horse Agreement, the other transaction documents or the transactions contemplated hereby or thereby for which the Stalking Horse Purchaser is or will become liable.

Case 15-02741-TOM7    Doc 1584    Filed 01/08/16    Entered 01/08/16 15:20:21    Desc
Main Document    Page 20 of 31

15.     The consideration provided by the Stalking Horse Purchaser for the Acquired Assets under the Stalking Horse Agreement, including the portion of the consideration that consisted of the Credit Bid and Release, shall be deemed for all purposes to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law, and the Sale of the Acquired Assets may not be avoided, or costs or damages imposed or awarded under Bankruptcy Code section 363(n) or any other provision of the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act or any other similar federal or state laws.

16.     On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of all of the Debtors' rights, title and interest in the Acquired Assets or a bill of sale transferring good and marketable title in such Acquired Assets to the Stalking Horse Purchaser on the Closing Date pursuant to the terms of the Stalking Horse Agreement, free and clear of all claims, liens, interests and encumbrances (other than Assumed Liabilities and Permitted Encumbrances).

17.     Upon the Closing, except as specifically included in Assumed Liabilities, the Stalking Horse Purchaser shall not and shall not be deemed to:  (i) be the successor of or successor employer (as described under COBRA and applicable regulations thereunder) to the Sellers, including without limitation, with respect to any Collective Bargaining Agreements and any Benefit Plans, except for Buyer Benefit Plans, under the Coal Act, and any common law successorship liability in relation to the UMWA 1974 Pension Plan, including with respect to withdrawal liability; (ii) be the successor of or successor employer to the Sellers, and shall instead be, and be deemed to be, a new employer with respect to any and all federal or state unemployment laws, including any unemployment compensation or tax laws, or any other similar federal or state laws; (iii) have, de facto, or otherwise, merged or consolidated with or into Sellers; (iv) be a mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers; or (v) be liable for any acts or omissions of Sellers in the conduct of the Business or arising under or related to the Acquired Assets other than as set forth in the Stalking Horse

21

Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in the Stalking Horse Agreement, the parties intend and the Court hereby orders that the Stalking Horse Purchaser shall not be liable for any Encumbrance or Liability (other than Assumed Liabilities and Permitted Encumbrances) against any Seller, or any of its predecessors or Affiliates, and the Stalking Horse Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Acquired Assets or any Liabilities of any Seller arising prior to the Closing Date.

18. This Order: (a) is and shall be effective as a determination that other than Permitted Encumbrances and Assumed Liabilities, all claims, liens, interests and encumbrances of any kind or nature whatsoever existing as to the Acquired Assets prior to the Closing have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected; (b) shall be effective as a determination that, on the Closing Date, all of the First Lien Creditors, unsecured creditors and any other party receiving interests in Coal Acquisition LLC shall be deemed to be bound by the Limited Liability Company Agreement of Coal Acquisition LLC (as amended or restated from time to time) without any further court order or further action, approval or consent by the Credit Agreement Agent, Indenture Trustee, any First Lien Creditor, unsecured creditor or any other party receiving interests in Coal Acquisition LLC; and (c) is and shall be binding upon and shall authorize all entities, including, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Acquired Assets conveyed to the Stalking Horse Purchaser. Other than Permitted Encumbrances, all recorded

Case 15-02741-TOM7    Doc 1584    Filed 01/08/16    Entered 01/08/16 15:20:21    Desc
Main Document        Page 22 of 31

claims, liens, interests and encumbrances against the Acquired Assets from their records, official and otherwise, shall be deemed stricken.

19.     If any person or entity which has filed statements or other documents or agreements evidencing liens, interests or encumbrances on, or claims in, the Acquired Assets shall not have delivered to the Debtors before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all claims, liens, interests or encumbrances (other than Permitted Encumbrances) which the person or entity has or may assert with respect to the Acquired Assets, the Debtors and the Stalking Horse Purchaser are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Acquired Assets.

20.     All counterparties to the Assumed Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the Stalking Horse Purchaser, and shall not charge the Debtors or the Stalking Horse Purchaser for any instruments, applications, consents or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Sale of the Acquired Assets.

21.     Each and every federal, state and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Sale contemplated by the Stalking Horse Agreement.

22.     Nothing in this Order or the Stalking Horse Agreement releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the owner or operator of property after the Closing Date.  Nothing in this Order or the Stalking Horse Agreement authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or

23

(e) approval, or the discontinuation of any obligation thereunder, without compliance with any applicable legal requirements under police or regulatory law.

23.    Without limiting the provisions of paragraph 22 above, but subject to Bankruptcy Code section 525(a), no governmental unit may revoke or suspend any right, license, trademark or other permission relating to the use of the Acquired Assets sold, transferred or conveyed to the Stalking Horse Purchaser on account of the filing or pendency of these Chapter 11 Cases or the consummation of the Sale of the Acquired Assets.

24.    No provision of the Bidding Procedures Order, this Order, the Stalking Horse Agreement (or any other purchase/sale agreement) shall be a ruling or is intended to be construed as a ruling on whether the Stalking Horse Purchaser (or any other purchaser) is a successor to the debtors for purposes of registration and reporting under the federal securities laws (including relevant rules and regulations promulgated thereunder) (the "**Federal Securities Laws**"); and the Stalking Horse Purchaser's (or any other purchaser's) obligation, if any, to file periodic public reports with the United States Securities and Exchange Commission shall be governed by applicable provisions of the Federal Securities Laws. Nothing in the Bidding Procedures Order, this Order, the Stalking Horse Agreement, or any other purchase/sale agreement with any other party shall relieve or excuse the Debtor, the Stalking Horse Purchaser, or any other party from complying with any and all applicable Federal Securities Laws. Further, the Stalking Horse Agreement, and this Order are not binding upon the SEC with respect to enforcement of its police or regulatory powers and shall not limit the SEC from pursuing any police or regulatory enforcement action.

25.    Nothing in this Order, the Stalking Horse Agreement, the Transaction Documents or the Sale Transaction shall be deemed to express, imply or otherwise provide either: (a) that any surety has consented to the substitution of any principal on any outstanding surety bond; or (b) that any surety has consented to its bonds assuring any payment or performance obligation of any party other than the principal or principals named in such surety bond. Further, nothing in this Order, the Stalking Horse Agreement, the Transaction Documents

or the Sale Transaction shall be deemed to alter, modify, limit, impair or prejudice any rights, remedies or defenses that: (a) any surety has or may have under any indemnity agreements, surety bonds or related agreements or documents, or under any letters of credit relating thereto; or (b) the principal(s) has or may have under any indemnity agreements, surety bonds or related agreements or documents. Notwithstanding any provision of this Order to the contrary, any surety objections to any other sale or transaction under the Bidding Procedures Order are fully reserved and may be raised again or otherwise supplemented by such surety with respect to any such other sale or transaction.

26. Notwithstanding anything to the contrary in the Motion, the Stalking Horse Agreement, the Bidding Procedures Order, any Cure Notice, or this Order: (i) the Acquired Assets shall not include any insurance policies, surety bonds and any related agreements issued by ACE American Insurance Company or any of its affiliates listed on Schedule 2 (collectively and with each of their predecessors and successors, the "**ACE Companies**") to (or providing coverage to) any Seller (collectively, the "**ACE Contracts**"), and/or any rights, benefits, claims, rights to payments and/or recoveries under such ACE Contracts, other than as provided in section 2.1(o) of the Stalking Horse Agreement; (ii) the ACE Contracts, and/or any rights, benefits, claims, rights to payments and/or recoveries under such ACE Contracts, shall, except as provided in section 2.1(o) of the Stalking Horse Agreement, be Excluded Assets; (iii) nothing (including section 2.1(o) of the Stalking Horse Agreement) shall alter, modify or otherwise amend the terms or conditions of the ACE Contracts; and (iv) the ACE Companies may continue to pay any proceeds due under the ACE Contracts to the Sellers (as opposed to the Buyer) or other claimant thereunder as required under the relevant ACE Contracts, unless and until otherwise ordered by this Court.

27. On December 9, 2015 the Walter Coke Election was made, and the Walter Coke Facility is no longer part of the Sale. The United States and the Debtors and Sellers are engaged in good faith settlement negotiations in an effort to resolve the United States' concerns with respect to the Walter Coke Facility [Docket No. 1446]. In the event that there is

25

no Successful Bidder for the Walter Coke Assets as determined in accordance with the Bidding Procedures or the sale of the Walter Coke Assets to a Successful Bidder or Backup Bidder (if any) does not close and the relevant sale agreement is terminated, an Environmental Response Trust will be established pursuant to the execution of agreement(s) in form and substance reasonably satisfactory to the Debtors and the United States on behalf of the EPA, and approved by the Bankruptcy Court, including a trust agreement (the "**Environmental Response Trust Agreement**").  The net proceeds from the liquidation of all assets of the Walter Coke Trust (including but not limited to the Walter Coke Working Capital Assets, $1.4 million in cash, and any mobile equipment) shall be transferred to the Environmental Response Trust by the trustee of the Walter Coke Trust (the "**Walter Coke Trustee**"), after payment of all administrative costs of the Walter Coke Trust, including the Walter Coke Trustee fees, in liquidating the assets of the Walter Coke Trust, and after establishing an appropriate and reasonable reserve in the Walter Coke Trust for the payment of the fees and administrative costs of any chapter 7 trustee for Debtor Walter Coke's estate.  Any loans made by Coal Acquisition LLC to the Walter Coke Trust must be repaid before the transfer of the net proceeds to the Environmental Response Trust.  The Environmental Response Trust Agreement shall also contain appropriate provisions for funding of the start-up and administrative costs of the Environmental Response Trust.  The trustee of the Environmental Response Trust shall be a trustee recommended by the United States on behalf of EPA and the Debtors, and appointed by the Court.  Walter Coke will transfer any non-mobile equipment, remaining personal property and real property to the Environmental Response Trust.  All transfers to the Environmental Response Trust shall be free and clear of all liens, claims, and interests against the estate other than any liability to governmental units as provided in the Environmental Response Trust Agreement.  All funding and assets of the Environmental Response Trust shall be used solely for environmental action with respect to the Walter Coke facility and administration of the Environmental Response Trust Agreement.

28.     Notwithstanding anything to the contrary in this Order, without the prior written consent of Oracle America, Inc. ("**Oracle**"), the Debtors shall not assume and assign to

the Stalking Horse Purchaser or any Buyer Designee any contract between the Debtors and Oracle which includes or relates to a license of intellectual property, nor provide access to any Oracle licensed software, products, or services to the Stalking Horse Purchaser or any Buyer Designee except as expressly permitted pursuant to the applicable contract(s).  With respect to any other Sale(s) contemplated by the Sale Motion, Oracle reserves all objections to the assumption and assignment of any contracts or licenses of intellectual property between Oracle and the Debtors.

29.     Caterpillar Financial Services Corporation ("**Caterpillar**") has filed a limited objection to the Motion (the "**Caterpillar Objection**") [Docket No. 1374] in which it objects to the sale of the Acquired Assets free and clear of Caterpillar's first priority lien in certain collateral more particularly described in the Caterpillar Objection (the "**Caterpillar Collateral**").  The parties continue to negotiate a resolution to the Caterpillar Objection. Notwithstanding anything to the contrary contained herein, the Sale authorized by this Order shall not be free and clear of Caterpillar's first priority liens in the Caterpillar Collateral, and all such liens shall be unaffected by this Order pending entry of a further order by this Court.

30.     Notwithstanding anything else contained herein, ARP Production Company, LLC reserves any and all rights it may have under the Formation Agreement dated August 2, 1983 regarding any Debtor's transfer of its shares in Black Warrior Methane Corp., provided, that the foregoing reservation of rights shall be subject in all respects to applicable limitations set forth in the Bankruptcy Code.

31.     To the extent this Order is inconsistent with any prior order or pleading filed in these Chapter 11 Cases related to the Motion, the terms of this Order shall govern.  To the extent there is any inconsistency between the terms of this Order and the terms of the Stalking Horse Agreement, the terms of this Order shall govern.

32.     Except as expressly provided in the Stalking Horse Agreement, nothing in this Order shall be deemed to waive, release, extinguish or estop the Debtors or their estates from asserting, or otherwise impair or diminish, any right (including, without limitation, any

27

right of recoupment), claim, cause of action, defense, offset or counterclaim in respect of any asset that is not an Acquired Asset.

33.     All entities that are presently, or on the Closing Date may be, in possession of some or all of the Acquired Assets are hereby directed to surrender possession of the Acquired Assets to the Stalking Horse Purchaser on the Closing Date.

34.     This Order shall not be modified by any chapter 11 plan of any of the Debtors confirmed in these Chapter 11 Cases.

35.     This Order and the Stalking Horse Agreement shall be binding in all respects upon all creditors and interest holders of the Debtors, all non-debtor parties to the Assumed Contracts, the Official Committee of Unsecured Creditors, all successors and assigns of the Debtors and their affiliates and subsidiaries, and any trustees, examiners, "responsible persons" or other fiduciaries appointed in the Chapter 11 Cases or upon a conversion of the Debtors' cases to those under chapter 7 of the Bankruptcy Code, including a chapter 7 trustee, and the Stalking Horse Agreement, including, for the avoidance of doubt, the Escrow and Trust Agreements, shall not be subject to rejection or avoidance under any circumstances.  If any order under Bankruptcy Code section 1112 is entered, such order shall provide (in accordance with Bankruptcy Code sections 105 and 349) that this Order and the rights granted to the Stalking Horse Purchaser hereunder and the rights and obligations of any trustee or escrow agent appointed under the Escrow and Trust Agreements shall remain effective and, notwithstanding such dismissal, shall remain binding on parties in interest.

36.     The failure specifically to include or make reference to any particular provisions of the Stalking Horse Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Stalking Horse Agreement is authorized and approved in its entirety.

37.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order, including, without limitation, the authority to: (i) interpret, implement and enforce the terms and provisions of this Order (including the

28

injunctive relief provided in this Order) and the terms of the Stalking Horse Agreement, all amendments thereto and any waivers and consents thereunder; (ii) protect the Stalking Horse Purchaser, or the Acquired Assets, from and against any of the claims, liens, interests or encumbrances; (iii) compel delivery of all Acquired Assets to the Stalking Horse Purchaser; (iv) compel the Stalking Horse Purchaser to perform all of its obligations under the Stalking Horse Agreement; and (v) resolve any disputes arising under or related to the Stalking Horse Agreement or the Sale of the Acquired Assets.

38.     The Stalking Horse Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented through a written document signed by the parties thereto in accordance with the terms thereof without further order of the Court; provided, however, that any such modification, amendment or supplement is neither material nor materially changes the economic substance of the transactions contemplated hereby.

39.     This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding any provision in the Bankruptcy Rules to the contrary, including but not limited to Bankruptcy Rule 6004(h), the Court expressly finds there is no reason for delay in the implementation of this Order and, accordingly: (i) the terms of this Order shall be immediately effective and enforceable upon its entry; (ii) the Debtors are not subject to any stay of this Order or in the implementation, enforcement or realization of the relief granted in this Order; and (iii) the Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

40.     The provisions of this order are nonseverable and mutually dependent.

Dated: January 8, 2016

/s/ Tamara O. Mitchell
TAMARA O. MITCHELL
United States Bankruptcy Judge

Case 15-02741-TOM7    Doc 1584    Filed 01/08/16    Entered 01/08/16 15:20:21    Desc
Main Document       Page 29 of 31

Schedule 1

**PERMITTED ENCUMBRANCES**

1. The lien for ad valorem property taxes and any assessments for any tax year beginning in 2015, and all subsequent tax years, and any current use roll-back taxes, if assessed.

2. All restrictions, reservations, easements, servitudes, rights-of-way, leases, mineral leases and encumbrances, whether or not of record, that run with the land, and riparian rights incident to the land; provided that nothing herein or in the Stalking Horse Agreement shall be deemed to constitute the Grantee's consent to or acceptance of any unrecorded instrument of which Grantee does not have actual knowledge.

3. Any encroachment, overlap, violation, variation or adverse circumstances that would be disclosed by an accurate and complete survey and inspection of the land.

4. Any reservation or conveyance of minerals and other subsurface materials of every kind and character filed in the appropriate real property records on or before July 15, 2015, including, but not limited to, coal, oil, gas, sand, ore, kaolin, clay, stone and gravel in, on and under the land, together with mining rights and all other rights, privileges and immunities relating thereto, including any release of damages.

5. All applicable laws, rules, regulations, ordinances and orders of any government or governmental body, agency or entity, including, without limitation, zoning and other land use rules, regulations and ordinances and environmental laws, rules and regulations.

**<u>Schedule 2</u>**

**List of ACE Companies**

| | |
|---|---|
| 1. | ACE American Insurance Company |
| 2. | ACE Fire Underwriters Insurance Company |
| 3. | ACE Indemnity Insurance Company |
| 4. | ACE Insurance Company of Ohio |
| 5. | ACE Insurance Company of Texas |
| 6. | ACE of the Midwest Insurance Company |
| 7. | ACE Property and Casualty Insurance Company |
| 8. | Atlantic Employers Insurance Company |
| 9. | Bankers Standard Fire and Marine Company |
| 10. | Bankers Standard Insurance Company |
| 11. | Century Indemnity Company |
| 12. | ESIS, Inc. |
| 13. | Illinois Union Insurance Company |
| 14. | INA Surplus Insurance Company |
| 15. | Indemnity Insurance Company of North America |
| 16. | Insurance Company of North America |
| 17. | Pacific Employers Insurance Company |
| 18. | Westchester Fire Insurance Company |
| 19. | Westchester Surplus Lines Insurance Company |

DM3\3713841.1