# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |
|---|---|
| **In re:** | **Chapter 11** |
| **NEW WEI, INC.,** *et al.*,[1] | **Case No. 15-02741-TOM7** |
| **Debtors.** | **Jointly Administered** |

## ORDER GRANTING WARRIOR MET'S MOTION TO ENFORCE THE SALE ORDER AGAINST THE ALABAMA DEPARTMENT OF LABOR

This matter came on to be heard before the Court upon the *Motion to Enforce Order Authorizing and Approving Sale of Substantially all of the Debtors' Assets and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* [Dkt. No. 2942] (the "Motion to Enforce") of Warrior Met Coal, LLC, f/k/a Coal Acquisition LLC ("Warrior Met" or "Purchaser")[2]. A response entitled *ADOL Response to Warrior Met Coal, LLC f/k/a Coal Acquisition LLC's Motion to Enforce Order Authorizing and Approving Sale of Substantially all of the Debtor's Assets and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* (the "Objection") [Dkt. No. 2961] was filed by the Alabama Department of

---

[1]The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: New WEI, Inc. (f/k/a Walter Energy, Inc.) (9953); Atlantic Development and Capital, LLC (8121); Atlantic Leaseco, LLC (5308); Blue Creek Coal Sales, Inc. (6986); Blue Creek Energy, Inc. (0986); New WEI 7, Inc. (f/k/a J.W. Walter, Inc.) (0648); Jefferson Warrior Railroad Company, Inc. (3200); New WEI 2, LLC (f/k/a Jim Walter Homes, LLC) (4589); New WEI 13, Inc. (f/k/a Jim Walter Resources, Inc.) (1186); Maple Coal Co., LLC (6791); Sloss-Sheffield Steel & Iron Company (4884); SP Machine, Inc. (9945); Taft Coal Sales & Associates, Inc. (8731); Tuscaloosa Resources, Inc. (4869); V Manufacturing Company (9790); New WEI 19, LLC (f/k/a Walter Black Warrior Basin LLC) (5973); New WEI 18, Inc. (f/k/a Walter Coke, Inc.) (9791); New WEI 22, LLC (f/k/a Walter Energy Holdings, LLC) (1596); New WEI 20, LLC (f/k/a Walter Exploration & Production LLC) (5786); New WEI 1, Inc. (f/k/a Walter Home Improvement, Inc.) (1633); New WEI 6 Company (f/k/a Walter Land Company) (7709); New WEI 16, Inc. (f/k/a Walter Minerals, Inc.) (9714); and New WEI 21, LLC (f/k/a Walter Natural Gas, LLC) (1198). The location of the Debtors' corporate headquarters is 2100 Southbridge Parkway, Suite 650, Birmingham, Alabama 35209.

[2] Warrior Met Coal Gas, LLC and Warrior Met Coal Mining, LLC joined the *Motion to Enforce* by virtue of a joinder filed on April 3, 2017. References in this Order to Warrior Met shall include Warrior Met Coal, LLC, Warrior Met Coal Gas, LLC, and Warrior Met Coal Mining, LLC.

Labor ("ADOL").[3]  At the hearing, the Court heard testimony in open court from Senior Counsel for Warrior Met, Mitchell Mataya and its Payroll Manager, Laura Crawford, and also admitted into evidence certain exhibits offered by both Warrior Met and ADOL.  The Court considered all of the evidence offered at the hearing as well as prior proceedings in this case.

The Court finds that due and timely notice of the Motion to Enforce was given to ADOL and others pursuant to the Federal Rules of Bankruptcy Procedures and the Local Bankruptcy Rules which notice is adequate for all purposes so that no other or further notice need be given.  All interested parties, including ADOL, had due and proper notice and an opportunity to be heard, and ADOL appeared and participated at the hearing.

## FINDINGS OF FACT

After due consideration and good cause appearing therefor, the Court hereby FINDS AND CONCLUDES THAT:

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## I.    THE 363(F) SALE OF THE DEBTORS' ASSETS TO WARRIOR MET

2.      On November 5, 2015, the Debtors and Warrior Met (f/k/a Coal Acquisition, LLC) executed the Asset Purchase Agreement, pursuant to which the Debtors agreed to sell substantially all of the Debtors' Alabama methane gas and core underground coal operations, subject to higher or better offers.  The Alabama core underground coal operations include the historic number 4 and 7 mines, related methane gas operations, and certain additional assets incidental thereto. The same

---

[3] A second objection was filed on a pro se basis, but that objection was not directly applicable to the Motion to Enforce and was overruled by a separate order.

day, the Debtors filed the *Debtors' Motion for (A) an Order (I) Establishing Bidding Procedures for the Sale(s) of all, or substantially all, of the Debtors' Assets; (II) Approving Bid Protections; (III) Establishing Procedures Relating to the Assumption and Assignment of Executory Contracts and Unexpired Leases; (IV) Approving Form and Manner of the Sale, Cure, and Other Notices; and (V) Scheduling an Auction and a Hearing to Consider the Approval of the Sale(s); (B) Order(s) (I) Approving the Sale(s) of the Debtors' Assets Free and Clear of Claims, Liens and Encumbrances; and (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (C) Certain Related Relief* [Dkt. No. 993] (the "Sale Motion"). The Sale Motion consisted of a copy of the motion and a copy of a proposed asset purchase agreement between Warrior Met f/k/a/ Coal Acquisition, LLC, as the stalking-horse bidder and the Debtors (the "APA", as amended). *See Sale Motion*, Ex. B at 107-233.

3.       Notice of the Sale Motion was given to all parties in interest, including ADOL. *See* Affidavit of Service [Dkt. No. 1173].

4.       Pursuant to the APA, Warrior Met would acquire the Acquired Assets, as defined therein.  APA § 2.1. Warrior Met only agreed to assume a very narrow and limited set of liabilities. *See* APA § 2.3.  The only tax liabilities Warrior Met agreed to assume were certain transfer taxes and secured taxes. The definition of "Excluded Liabilities" in the APA specifically includes "all liabilities with respect to Taxes that are not expressly assumed by Buyer pursuant to Section 2.3(k)."  APA § 2.4.

5.       Pursuant to the APA, Warrior Met would also acquire the Acquired Assets free and clear of all Encumbrances, as broadly defined in the APA. APA §  2.1. The purchase and sale of the Acquired Assets (the "Core Asset Sale") was contingent upon an order of the Court approving

the sale of the assets free and clear of any liens, claims, interests, and encumbrances, "including, for the avoidance of doubt, all successor liability." APA §§ 10.6; 1.1 (Definition of "Sale Order").

6.     ADOL did not file any objection to or otherwise participate in the contentious proceedings and hearing on the Sale Motion.

7.     Following the hearing on the Sale Motion on January 6, 2016, the Court entered the *Order (I) Approving the Sale of the Acquired Assets Free and Clear of Claims, Liens, Interests and Encumbrances; (II) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Dkt. No. 1584] (the "Sale Order") on January 8, 2016, which approved the sale of the Acquired Assets pursuant to the APA. *See e.g., Sale Order* at 1-2. Warrior Met made the highest and only bid at the auction.

8.     The Sale Order provides in pertinent part as follows:

- The Stalking Horse Purchaser would not have entered into the Stalking Horse Agreement and would not consummate the Sale Transaction if the sale of the Acquired Assets to the Stalking Horse Purchaser were not free and clear of all claims, liens, interests and encumbrances (other than Permitted Encumbrances and Assumed Liabilities) pursuant to Bankruptcy Code section 363(f) or if the Stalking Horse Purchaser would, or in the future could, be liable for any of such claims, liens, interests and encumbrances. Unless expressly included in the Assumed Liabilities and Permitted Encumbrances, the Stalking Horse Purchaser shall not be responsible for any claims, liens, interests and encumbrances, including in respect of the following . . . (j) state unemployment compensation laws or any other similar state laws . . Sale Order, ¶ Q.

- The Debtors may sell the Acquired Assets free and clear of all claims, liens, interests and encumbrances (other than Assumed Liabilities and Permitted Encumbrances) because, with respect to each creditor asserting a claim, lien, interest or encumbrance, one or more of the standards set forth in Bankruptcy Code section 363(f)(1)-(5) has been satisfied. Those holders of claims, liens, interests or encumbrances who did not object or who withdrew their objections to the Sale of the Acquired Assets or the Motion are deemed to have consented to the Motion and the Sale pursuant to Bankruptcy Code section 363(f)(2). Sale Order, ¶ R.

- Upon the Closing, except as included in the Assumed Liabilities, the Stalking Horse Purchaser shall not, and shall not be deemed to: (i) be the

successor of or successor employer (as described under COBRA and applicable regulations thereunder) to the Sellers, including without limitation, with respect to any Collective Bargaining Agreements and any Benefit Plans, except for Buyer Benefit Plans, under the Coal Act, and any common law successorship liability in relation to the UMWA 1974 Pension Plan, including with respect to withdrawal liability, (ii) be the successor of or successor employer to the Sellers, and shall instead be, and be deemed to be, a new employer with respect to any and all federal or state unemployment laws, including any unemployment compensation or tax laws, or any other similar federal or state laws, (iii) have, *de facto*, or otherwise, merged or consolidated with or into Sellers, (iv) be a mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers, or (v) be liable for any acts or omissions of Sellers in the conduct of the Business or arising under or related to the Acquired Assets other than as set forth in the Stalking Horse Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in the Stalking Horse Agreement, the parties intend that the Stalking Horse Purchaser shall not be liable for any Encumbrance or Liability (other than Assumed Liabilities and Permitted Encumbrances) against any Seller, or any of its predecessors or Affiliates, and the Stalking Horse Purchaser shall have no successor or vicarious liability of any kind or character whatsoever, whether known or unknown as of the Closing Date, whether now existing or hereafter arising, whether asserted or unasserted, or whether fixed or contingent, with respect to the Business, the Acquired Assets or any Liabilities of any Seller arising prior to the Closing Date. The Stalking Horse Purchaser would not have acquired the Acquired Assets but for the foregoing protections against potential claims based upon "successor liability" theories. Sale Order, ¶ U.

- An injunction against creditors and third parties pursuing claims against, and liens, interests and encumbrances on, the Acquired Assets is necessary to induce the Stalking Horse Purchaser to close the Sale Transaction, and the issuance of such injunctive relief is therefore necessary to avoid irreparable injury to the Debtors' estates and will benefit the Debtors' creditors. Sale Order, ¶ CC.

- Upon the Closing: (a) the Debtors are hereby authorized and directed to consummate, and shall be deemed for all purposes to have consummated, the sale, transfer and assignment of all of the Debtors' rights, title and interest in the Acquired Assets to the Stalking Horse Purchaser free and clear of all Encumbrances and Liabilities, other than the Assumed Liabilities and the encumbrances identified on Schedule 1 hereto (the **"Permitted Encumbrances"**); and (b) except as otherwise expressly provided in the Stalking Horse Agreement, all Encumbrances and Liabilities (other than the Assumed Liabilities and the Permitted Encumbrances) shall not be enforceable as against the Stalking Horse Purchaser or the Acquired Assets. Unless otherwise expressly included in the Assumed Liabilities and Permitted Encumbrances or as otherwise expressly provided by this Order, the Stalking Horse Purchaser shall not be responsible for any claims, liens, interests and

encumbrances, including in respect of the following: . . .(j) state unemployment compensation laws or any other similar state laws.  Sale Order, ¶ 6.

- The transfer to the Stalking Horse Purchaser of the Debtors' rights, title and interest in the Acquired Assets pursuant to the Stalking Horse Agreement shall be, and hereby is deemed to be, a legal, valid and effective transfer of the Debtors' rights, title and interest in the Acquired Assets, and vests with or will vest in the Stalking Horse Purchaser all rights, title and interest of the Debtors in the Acquired Assets, free and clear of all claims, liens, interests and encumbrances of any kind or nature whatsoever (other than the Permitted Encumbrances and the Assumed Liabilities), with any such claims, liens, interests and encumbrances attaching to the sale proceeds in the same validity, extent and priority as immediately prior to the Sale of the Acquired Assets, subject to the provisions of the Stalking Horse Agreement, and any rights, claims and defenses of the Debtors and other parties in interest.  Sale Order, ¶ 7.

- Except as expressly provided in the Stalking Horse Agreement or by this Order, all persons and entities, including, but not limited to . . . governmental, tax and regulatory authorities. . . and other persons, holding claims, liens, interests or encumbrances of any kind or nature whatsoever against or in the Debtors or the Debtors' interests in the Acquired Assets (whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, whether imposed by agreement, understanding, law, equity or otherwise), including, without limitation, the non-debtor party or parties to each Assumed Contract, arising under or out of, in connection with, or in any way relating to, the Acquired Assets or the transfer of the Debtors' interests in the Acquired Assets to the Stalking Horse Purchaser, shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing claims, liens, interests and encumbrances against the Stalking Horse Purchaser or its affiliates, successors, assigns, equity holders, employees or professionals the Acquired Assets, or the interests of the Debtors in such Acquired Assets.  Sale Order, ¶ 9.

- On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of all of the Debtors' rights, title and interest in the Acquired Assets or a bill of sale transferring good and marketable title in such Acquired Assets to the Stalking Horse Purchaser on the Closing Date pursuant to the terms of the Stalking Horse Agreement, free and clear of all claims, liens, interests and encumbrances (other than Assumed Liabilities and Permitted Encumbrances). Sale Order, ¶ 16.

- Upon the Closing, except as specifically included in Assumed Liabilities, **the Stalking Horse Purchaser shall not and shall not be deemed to: (i) be the**

**successor of or successor employer** (as described under COBRA and applicable regulations thereunder) to the Sellers, including without limitation, with respect to any Collective Bargaining Agreements and any Benefit Plans, except for Buyer Benefit Plans, under the Coal Act, and any common law successorship liability in relation to the UMWA 1974 Pension Plan, including with respect to withdrawal liability; (ii) **be the successor of or successor employer to the Sellers, and shall instead be, and be deemed to be, a new employer with respect to any and all federal or state unemployment laws, including any unemployment compensation or tax laws**, or any other similar federal or state laws; (iii) have, de facto, or otherwise, merged or consolidated with or into Sellers; (iv) be a mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers; or (v) be liable for any acts or omissions of Sellers in the conduct of the Business or arising under or related to the Acquired Assets other than as set forth in the Stalking Horse Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in the Stalking Horse Agreement, the parties intend and the Court hereby orders that the Stalking Horse Purchaser shall not be liable for any Encumbrance or Liability (other than Assumed Liabilities and Permitted Encumbrances) against any Seller, or any of its predecessors or Affiliates, and the Stalking Horse Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Acquired Assets or any Liabilities of any Seller arising prior to the Closing Date. Sale Order, ¶ 17 (emphasis added).

9. Pursuant to Paragraph 37 of the Sale Order, the Court expressly retained jurisdiction and authority to interpret, implement and enforce the terms and provisions of the Sale Order and the APA, and to "protect the Stalking Horse Purchaser, or the Acquired Assets, from and against any of the claims, liens, interest or encumbrances."

10. Other parties appealed the Sales Order. *United Mine Workers of America vs. Walter Energy Inc.,* Case No. 16-00065-RDP; *United Mine Workers of America Combined Benefit Fund and the United Mine Workers of America 1992 Benefit Plan vs. Walter Energy Inc.,* Case No. 16-00064-RDP. In each appeal the District Court for the Northern District of Alabama, Southern Division affirmed the Sale Order and dismissed the appeal. *Order Dismissing Appeal*, Case No. 16-00065-RDP (February 19, 2016); *Order Dismissing Appeal*, Case No. 16-00064-RDP (March 8, 2016). ADOL filed neither a motion to reconsider the Sale Order nor an appeal of the same.

11. Closing of the sale took place on March 31, 2016 (the "Closing Date"). On April 1, 2016, the Debtors filed the *Notice of Amended Stalking Horse Agreement and Closing of "Core" Asset Sale Transaction* [Dkt No. 2235].

## II. ADOL'S POST-SALE SUCCESSORSHIP DETERMINATION

12. On July 12, 2016, Warrior Met completed ADOL's Form SR-2, "Report to Determine Liability Under the Alabama Unemployment Compensation Law" (the "SUI Rate Application(s)"), to establish State Unemployment Insurance Rates (the "SUI Rate") for Warrior Met, Warrior Met Coal Mining, LLC ("Warrior Mining"), and Warrior Met Coal Gas, LLC (individually, "Warrior Gas" and together with Warrior Met and Warrior Mining, the "Warrior Companies"). On the SUI Rate Applications, the Warrior Companies answered "yes" to question 5, which asked "[d]id you start a new business[.]"

13. Three days later on July 15, 2016, the Warrior Companies received ADOL's Official Notification of Registration (the "Registration Notice(s)") for each of the Warrior Companies. Each of the Registration Notices provided that "[t]he rate of your tax as the Employer will be 2.70 (the "Contribution Rate"), Employee .00 and Employment Security Assessment .00, until such time as you qualify for a revision under the experience rating provisions of the Law."

14. Between receipt of the Registration Notices and August 30, 2016, Melanie Grant ("Grant") an employee of ADOL, contacted Warrior Met's Payroll Manager Laura Crawford by phone to discuss the Warrior Companies' status in relation to certain Debtors. During that phone call, Grant informed Crawford that credits approximating $208,574.26 and $11,117.60 were due to Debtors Jim Walter Resources, Inc. and Walter Energy, Inc. on account of their unemployment tax accounts (the "Debtor Credits"), respectively. Grant stated that the Warrior Companies could receive both a lower Contribution Rate and the Debtor Credits, if the Warrior Companies would

indicate that they were a successor to certain Debtors, namely Walter Energy, Inc., Jim Walter Resources, Inc., and Walter Black Warrior Basin, LLC. Crawford informed Grant that the Warrior Companies were not successor companies, and that she needed to involve Warrior Met's legal department in order to respond.

15. On August 30, 2016, Counsel for the Debtors sent a letter to ADOL concerning the Debtor Credits (the "August 30th Letter"). In that letter counsel for the Debtors suggested that ADOL could either refund the Debtor Credits to the Debtors, or transfer the Debtor Credits to Warrior Met at the express direction of the Debtors.

16. On September 14, 2016 Grant drafted and executed a replacement SUI Rate Application for the Warrior Companies (the "ADOL SUI Rate Application"). On ADOL SUI Rate Application, Grant answered "no" to question 5, which asked "[d]id you start a new business" and selected "yes" to question 5a., which asked "[i]f no, did you acquire an ongoing business?" Grant also included information on question 6, which the Warrior Companies had previously not completed as the Warrior Companies were new businesses. This document was not sent to Warrior Met.

17. After the August Letter and before October 5, 2016, multiple conversations occurred between ADOL and Warrior Met, with the participants from Warrior Met including its senior counsel, Mitchell Mataya. Mataya testified credibly that he told ADOL in those conversations that Warrior Met was entitled to the Debtor Credits because Warrior Met had purchased all refunds, credits, and assets of this type from the Debtors. Mataya also stated to ADOL that the Warrior Companies were not successors to the Debtors due to the express provisions of the Bankruptcy Court's Sale Order. ADOL stated that for ADOL's internal purposes, in order to transfer the Debtor Credits it needed to say internally that the Warrior Companies were

successor companies. Mataya stated that he was not concerned about ADOL's internal workings, so long as ADOL imposed no liabilities or increased costs on the Warrior Companies as the result of ADOL's internal designation. ADOL did not disagree with Mataya's statement that this internal decision would impose no liabilities or costs on Warrior Met.

18. Following these conversations, on October 6, 2016, Warrior Met, Warrior Mining, and Warrior Gas, each received a "Correction Letter" to the Registration Notices (individually, the "Correction Notice", and together, the "Correction Notices") that each provide that "[t]he Employer tax rate for this unit is .94, Employee .00, and Employment Security Assessment tax rate is .06[.]" The Correction Notices also stated that the Warrior Companies were either full or partial successors to certain Debtors. Mataya credibly testified that Warrior Met did not respond to these notices based on its prior conversations with ADOL.

19. Sometime in October of 2016, ADOL transferred the Debtor Credits to Warrior Met.

20. Between December 5, 2016 and early January of 2017, ADOL posted on its limited access website the Form UC-216, the annual tax rate notice applicable to the Warrior Companies for calendar year 2017 (the "Tax Rate Notice(s)"). Under the Tax Rate Notices, the tax rate to be charged for 2017 was 6.74%. The notice states that the rate was based on three fiscal years prior unemployment experience, running from July 1, 2013, through June 30, 2016. Those ratings show substantial unemployment compensation activity, as well as the taxable payroll for each of those years. The amounts listed in relation to the unemployment compensation activity and the taxable payrolls are based upon the employment history of the Debtors.

21. According to the Tax Rate Notices, the fiscal year begins July 1st and ends June 30th. The Warrior Companies began operations on April 1, 2016 and could only have been

evaluated in 2016 for the second quarter of calendar year 2016, which coincides with the last quarter for purposes of the Tax Rate Notices.

22.    ADOL provided no notice of the December 5, 2016 posting of the Tax Rate Notices to Warrior Met.

23.    On January 11, 2017, Warrior Met reviewed the Tax Rate Notice to Warrior Gas issued by ADOL. On January 23, 2017, after registering and receiving new log-in information, Warrior Met first reviewed the Tax Rate Notice for Warrior Coal and Warrior Mining.

24.    The Warrior Companies continued to take the position that they are not successor companies to the Debtors.  On February 7, 2017, the Warrior Companies sent a letter to ADOL reiterating their position that they were not successors to the Debtors due primarily to the Sale Order issued by this Court.  Warrior Met maintained that its experience ratings should not be based on Debtors' experience, but only on Warrior Met's own experience beginning April 1, 2016.

25.    ADOL rejected Warrior Met's efforts.  ADOL sent a letter to Warrior Met stating its conclusion on February 22, 2017 (the "February 22nd Letter"). In the February 22nd Letter, ADOL states that "[the Warrior Companies] account succeeds to the unemployment experience (benefit charges and taxable payrolls) of [Walter Energy, Inc. and Jim Walter Resources, Inc.] on April 2, 2016."  The letter also states, "Please consider this your administrative review which is final."

26.    Warrior Met then filed its Motion to Enforce against ADOL, to which ADOL filed a response which objects to the Motion to Enforce.

## CONCLUSIONS OF LAW

27.    Warrior Met contends that ADOL's objection is due to fail for three independent reasons.  First, Warrior Met contends that because ADOL did not object to the entry of the Sale

Order it cannot now collaterally attack the Sale Order, which has already been finally resolved. Second, Warrior Met contends that Section 363(m) of the Bankruptcy Code bars ADOL's attempt to impose successor liability on Warrior Met. Third, Warrior Met contends that even if ADOL had made these arguments as an objection to the then proposed Sale Order, ADOL's position would be incorrect as a matter of law. ADOL disagrees with all of Warrior Met's positions. ADOL also argues that Warrior Met's conduct from September 2016 through January of 2017 constitutes a waiver of Warrior Met's right to object to ADOL's treatment of Warrior Met as a successor to the Debtors. Warrior Met disagrees with ADOL on the waiver issue.

28.     By its plain terms, the Sale Order provides that the assets that Warrior Met purchased from the Debtors were to be transferred to Warrior Met free and clear of any interests in that property. Under applicable precedent, the right held by ADOL to determine an employer's contribution rate against a purchaser of the Debtors' assets based on the pre-sale unemployment experience of the Debtors was such an interest. *United Mine Workers of Am. Combined Benefit Fund v. Walter Energy, Inc.*, 551 B.R. 631, 641 (N.D. Ala. 2016), *appeal dismissed* (May 4, 2016) ("while a minority of courts initially interpreted the phrase 'interest in such property' in this narrow way, Section 363(f) has more often (and more correctly) been given a broad reading to effectuate the purposes of the Bankruptcy Code."). Thus, ADOL's efforts to impute the Debtors' unemployment experience rating to Warrior Met and use that experience rating to collect additional unemployment contributions from Warrior Met are barred by the Sale Order.

I.   **ADOL's Failure to Timely Object to the Sale Motion Prohibits ADOL from Taking a Position Contrary to the Sale Order.**

29.     In *Gray v. Brignardello*, the Supreme Court found that:

It is a well settled principle of law that **the decree of a court which has jurisdiction of the person and the subject matter is binding until reversed, and cannot be collaterally attacked.** The court may have mistaken the law or

misjudged the facts, but its adjudication, when made, concludes all the world until set aside by the proper appellate tribunal; and, although the judgment or decree may be reversed, yet all right acquired at a judicial sale, while the decree or judgment was in full force, and which it authorized, will be protected. It is sufficient for the buyer to know that the court had jurisdiction and exercised it, and that the order, on the faith of which he purchased, was made and authorized the sale. With the errors of the court he has no concern.

68 U.S. 627, 634 (1863) (emphasis added). This general understanding, which has existed for well over 100 years, establishes the general prohibition of collateral attacks on sale orders.

30.     Here, ADOL was served with a notice of the Sale Motion through First Class Mail. ADOL never filed an objection or any response thereto. *See* Affidavit of Service, Ex. G at 37 [Dkt. No. 1173]. Following the entry of the Sale Order, ADOL failed to file an appeal, a Rule 59 motion for reconsideration, or a Rule 60 motion to vacate the judgment. Instead, almost a year after the sale to Warrior Met closed, ADOL seeks a determination from this Court that it be permitted to deem Warrior Met a successor to certain Debtors, *see Objection*, at 8, despite the Sale Order's language to the contrary. *See* Sale Order at 11 ¶U ("Upon the Closing, except as included in the Assumed Liabilities, the Stalking Horse Purchaser shall not, and shall not be deemed to . . . be the successor of or successor employer to the Sellers, and shall instead be, and be deemed to be, a new employer with respect to any and all . . . state unemployment laws, including any unemployment compensation or tax laws, or any other similar . . . state laws[.]"). ADOL's actions in this respect represent a collateral attack on the Sale Order, rendered impermissible by the ancient and immutable law announced in *Brignardello*. For this reason alone, the Motion to Enforce is due to be granted.

31.     In addition to the foregoing, while collateral attacks are generally prohibited and considered impermissible under *Brignardello*, some courts have found that such challenges are also prohibited by application of the doctrine of estoppel. This issue, specifically in relation to a

failure of a party-in-interest to object, has been addressed in both *In re Newport Offshore, Ltd.*, 86 B.R. 325 (Bankr. D.R.I. 1998) and *In re Calore Express Co., Inc.*, 288 F.3d 22 (1st Cir. 2002).

32.     In *Newport Offshore*, the Court held that the Army was estopped from objecting to the debtor's confirmation order given the failure of the Army to assert a setoff in or object to confirmation of the debtor's plan of reorganization despite ample notice. 86 B.R. at 326. The Court found that consummation of the plan would be jeopardized and several parties would be prejudiced were the modification of the confirmation order to be heard. *Id.* Estoppel was particularly appropriate as the Court found that parties to the transaction reasonably relied on the finality of the confirmation order that did not itself preserve the setoff rights of the Army. *Id.*

33.     In *Calore Express*, the debtor argued that where the creditor failed to object to numerous orders or motions that impacted the creditor's rights to set off, the creditor had waived its set off rights by conduct. 288 F.3d at 27-28. The First Circuit recognized that a court may imply waiver through conduct provided the conduct fairly demonstrates intent. *Id.* at 37-39. In addition, the Court found that although waivers are not typically irrevocable, when "another party to the proceedings has relied on the waiver to its detriment, the court may invoke estoppel and rule that the waiver has become irrevocable." *Id.* at 39. This being the case, the Court held that "silence at a specific time may be unequivocally inconsistent with the assertion of the setoff right." *Id.* at 40.

34.     In the present case, it certainly can be said that the failure of ADOL to object to the Sale Motion induced Warrior Met to rely on the Sale Order, close the transaction and pay the purchase price. Indeed this Court recognized the extent of the Warrior Met's reliance when, in the Sale Order, this Court found that:

> The Stalking Horse Purchaser would not have entered into the Stalking Horse Agreement and would not consummate the Sale Transaction if the sale of the Acquired Assets to the Stalking Horse Purchaser were not free and clear of all claims, liens, interests and encumbrances (other than Permitted Encumbrances and

Assumed Liabilities) pursuant to Bankruptcy Code section 363(f) or if the Stalking Horse Purchaser would, or in the future could, be liable for any of such claims, liens, interests and encumbrances. Unless expressly included in the Assumed Liabilities and Permitted Encumbrances, the Stalking Horse Purchaser shall not be responsible for any claims, liens, interests and encumbrances, including in respect of the following . . . (j) *state unemployment compensation laws or any other similar state laws*[.]

Sale Order, at ¶Q (emphasis added). This Court then ordered that Warrior Met would not be deemed to be a successor of the Debtor, *see* Sale Order, ¶U, and that, except as otherwise agreed, the Purchaser would "have no successor or vicarious liability of any kind or character whatsoever[.]" *Id.*

35.     Relying on these terms of the Sale Order, the Warrior Met went forward with the Closing, at which time the Warrior Met remitted the Cash Consideration, in addition to other consideration, to the Debtors in exchange for their assets.

36.     Warrior Met would be detrimentally impacted should the sale, now, nearly a year after the Closing Date, be subject to obligations and interests that would not otherwise have transferred to Warrior Met under the free and clear sale authorized by the Sale Order. Warrior Met paid for the Debtors' assets with, in part, Cash Consideration based on the terms of the Sale Order, including its provision that the sale would be free and clear of successor liability claims and obligations.

37.     It would be manifestly unfair to now burden Warrior Met with successor liability under Ala. C. § 25-4-54(i) (the "AL Unemployment Compensation Statute"). Such a result would effectively punish Warrior Met for ADOL's failure to object to the Sale Motion. The Court finds the rationale of *Newport Offshore* and *Calore Express* persuasive, but need not reach the issue of estoppel as this collateral attack is clearly precluded under *Brignardello* and its progeny.

II.     **SECTION 363(M) OF THE BANKRUPTCY CODE PROTECTS THE PURCHASER'S RIGHTS UNDER AND THE VALIDITY OF THE SALE ORDER.**

38.     For reasons similar to the policies underlying estoppel, section 363(m) of the Bankruptcy Code (the "Code") also bars ADOL from challenging the Sale Order. Section 363(m) provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

39.     The purpose behind section 363(m) is to protect the public's interest in finalizing bankruptcy sales to encourage buyers to purchase the debtor's property, to prevent injury to creditors, and to insure that adequate sources of financing remain available. *In re C.W. Mining Co.,* 641 F.3d 1235, 1238-39 (10th Cir. 2011). Section 363(m) serves to allow a good faith purchaser the comfort of relying upon the finality of the sale order by ensuring the finality of the bankruptcy sale. *See In re Trism, Inc.*, 328 F.3d 1003, 1006 (8th Cir. 2003). The principles of finality and the protection of good faith purchasers under section 363(m) of the Code apply to collateral attacks on sale orders to the same extent that they apply to appeals. *See In re Sax*, 796 F.2d 994, 998 (7th Cir.1986) ("[Section] 363(m) and the cases interpreting it have clearly held that a stay is necessary to challenge a bankruptcy sale authorized under § 363(b) [unless the challenger asserts lack of good faith]"); *In re Hagood Reserve, LLC*, No. 10-30725, 2010 WL 5067444, at *15, (Bankr. W.D.N.C. Dec. 7, 2010) (noting that § "363(m) makes any effort to unwind [a] sale untenable" in the absence of a stay before considering and denying adverse party's Rule 60 motion). *But see In re Alan Gable Oil Dev. Co.*, No. 91-1526, 1992 WL 329419, at *4 (4th Cir.1992) ("where an order authorizing a sale is challenged collaterally by motion under Fed. R. Civ. P. 60(b), section 363(m) on its face does not divest the bankruptcy court of the power to upset the sale under proper circumstances."); *see also In re Edwards*, 962 F.2d 641, 645 (7th Cir.1992) (speculating that § 363(m) "does not of its own force preclude collateral attack on such sales").

40.     The sole proper method for a third-party to challenge a sale order is to file an appeal *and* obtain a stay of the sale order. *In re The Charter Co.*, 829 F.2d 1054, 1056 (11th Cir. 1987) ("[i]n order to protect those who purchase property from a bankrupt estate, the Bankruptcy Code provides that once a sale is approved by the bankruptcy court and consummated by the parties, the bankruptcy court's authorization of the sale cannot be effectively altered on appeal . . . . . if a sale is not stayed[.]").

41.     This Court explicitly found and ordered that "[t]he Stalking Horse Agreement has been entered into by the Stalking Horse Purchaser in good faith and the Stalking Horse Purchaser is a good faith purchaser of the Acquired Assets as that term is used in Bankruptcy Code section 363(m)." Sale Order, at ¶13. In fact, the Court expressly found that the Purchaser would not have entered into the Stalking Horse Agreement and would not have consummated the Core Assets Sale if not for the fact that the sale was free and clear of claims, liens, interests and encumbrances arising out of, in part, state unemployment compensation laws or any other similar state laws. *Id.*, at ¶Q. These specific terms of the Sale Order were integral to the same from the time that they first appeared in similar fashion in the Sale Motion. *Sale Motion*, ¶45 ("[t]he Debtors also submit that the Sale(s) of the Subject Assets should be free and clear of any and all claims, liens and encumbrances under Bankruptcy Code section 363(f) (other than Assumed Liabilities and Permitted Encumbrances as provided in the Stalking Horse Agreement, the Short Form APA or the Modified Asset Purchase Agreement, as applicable)").

42.     It would be prejudicial to the Purchaser, and in violation of the principles and policies of reliance and finality underlying section 363(m) of the Code, to allow ADOL to belatedly challenge the protections provided under the Sale Order. ADOL failed to oppose the successor liability protections requested by the Debtor and the Purchaser. It is simply too late for ADOL to

take any position contrary to the terms of the Sale Order. The Purchaser relied in good faith upon the finality of the terms of the Sale Order. The Purchaser would be unjustly denied the benefit of its bargain if ADOL were now permitted -- nearly a year after the entry of the Sale order -- to challenge the validity of the sale free and clear of the AL Unemployment Compensation Statute and of ADOL's interest in the Debtors. Accordingly, section 363(m) bars ADOL from collaterally challenging, or now seeking to modify, reverse or obtain any other relief from the terms of the Sale Order.

### III. ALTERNATIVELY, ADOL'S ATTEMPT TO BASE THE PURCHASER'S CONTRIBUTION RATE ON THE DEBTOR'S PREPETITION EXPERIENCE RATING IS PREEMPTED BY SECTION 363(F) AND BY THE FUNDAMENTAL POLICIES UNDERLYING THE BANKRUPTCY CODE.

43. Even if ADOL had timely objected to the Sale Motion, which it did not, its objection would have been overruled under principles of preemption. Article VI of the United States Constitution provides that the laws of the United States "shall be the supreme Law of the Land." U.S. Const., art. VI, § 2. When the Bankruptcy Code and state law conflict, the Code "takes precedence over state laws under the Supremacy Clause[.]" *In re Spa at Sunset Isles Condo. Ass'n, Inc.*, 454 B.R. 898, 907 (Bankr. S.D. Fla. 2011) (*quoting Stanley ex rel. Estate of Hale v. Trinchard*, 579 F.3d 515, 519 (5th Cir. 2009)); *see also In re Osejo*, 447 B.R. 352 (Bankr. S.D. Fla. 2011) (Bankruptcy Code preempted Florida's constitutional homestead exemption); *In re Old Carco LLC*, 442 B.R. 196 (S.D.N.Y. 2010) (Bankruptcy Code preempted state franchise law that interfered with debtor's power to reject contracts); *E. Equip. & Servs. Corp. v. Factory Point Nat'l Bank, Bennington*, 236 F.3d 117, 120 (2d Cir. 2001) (Bankruptcy Code preempted state law tort claims for violation of the automatic stay). Accordingly, any attempt by ADOL to base the Purchaser's Unemployment Experience Rating on the Debtors' experience rating is preempted by section 363(f) of the Code.

### a. The Assignment of the Debtor's Experience Rating to the Purchaser is Preempted by Section 363(f).

44.     The Sale Order was entered pursuant to, *inter alia*, sections 363(f) of the Code.

Section 363(f) provides that "the trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate," if certain conditions are satisfied.[4] The language of Section 363(f) does not limit the term "interest" to an *in rem* interest in property.  *See UMWA 1992 Benefit Plan v. Leckie Smokeless Coal*, 99 F.3d 573, 582 (4th Cir. 1996); *see also In re Old Carco*, 538 B.R. 674, 682-687 (Bankr. S.D.N.Y. 2015) (approving *Leckie* court's broad interpretation of "interest in property"); *In re Ormet Corp.*, No. 13-10334, 2014 WL 3542133 at *2-3 (Bankr. D. Del. July 17, 2014); *In re PBBPC, Inc.*, 484 B.R. 860, 869 (1st Cir. 2013) (concluding that the "more expansive" reading of the terms "any interest" advanced by numerous circuit courts is "more consistent with the Bankruptcy Code and the policy expressed in § 363" and affirming sale free and clear of debtor's experience ratings for state unemployment liabilities); *In re Chrysler LLC,* 576 F.3d 108, 126 (2d Cir. 2009), *judgment vacated sub nom. Ind. State Police Pension Trust v. Chrysler LLC,* 558 U.S. 1087 (2009), *vacated sub nom. In re Chrysler, LLC,* 592 F.3d 370 (2d Cir. 2010) (affirming sale free and clear of product liability claims and agreeing with *Leckie* that "the term 'any interest in property' encompasses those claims that 'arise from the property being sold'"); *In re Trans World Airlines, Inc.,* 322 F.3d 283, 289-90

---

[4] Having not timely objected to the Sale Motion, ADOL may not now challenge whether the Sale Order was properly issued. But even if the correctness of the "free and clear sale" order were open to being relitigated, the Sale Order clearly satisfied at least one of the conditions of Section 363(f). Clause (5), permitting a sale free and clear if "such entity could be compelled, in a legal or equitable proceeding" is clearly satisfied.  Given that a right to assess unemployment contributions is by nature the right to collect payment of money, ADOL could be compelled in a legal or equitable proceeding to accept a money satisfaction of the interest it held in the property at the time of the sale. *In re PBBPC, Inc.*, 467 B.R. 1, 8 (Bankr. D. Mass 2012), *aff'd*, 484 B.R. 860 (B.A.P. 1st Cir. 2013) (finding that interest in assessing unemployment contributions based on transferred unemployment experience "is a right of taxation, a right that is usually, ordinarily, preferrably [sic], and probably exclusively satisfied precisely by the payment of money" and therefore satisfied Section 363(f)(5)). In addition, Clause (2) was satisfied because the ADOL did not object to the Sale Motion. Pursuant to the Sale Order, any holders of claims, liens, interests and encumbrances against the Debtors who had not objected to the Sale Motion are deemed to have consented. Sale Order, at ¶R.

(3d Cir. 2003) (adopting *Leckie* analysis and affirming sale free and clear of successor liability for civil rights claims and travel voucher program).

45.     Federal courts in Alabama have approved this expansive interpretation of "interest in property" advanced by the First, Second, Third, Fourth, and Seventh Circuits, recently affirming that the term "interest in property" as set forth in section 363(f) should be given a broad reading to effectuate the purposes of the Bankruptcy Code.  *See United Mine Workers of America Combined Benefit Fund v. Walter Energy,* 551 B.R. 631, 641 (N.D. Ala. 2016) ("[w]hile a minority of courts have narrowly interpreted the term 'interests in property' in this narrow way, Section 363(f) has more often (and more correctly) been given a broad reading to effectuate the purposes of the Bankruptcy Code.")  As noted by Judge Proctor in *Walter Energy*, an expansive reading of "interests in property" is consistent with the Bankruptcy Code's policy of maximizing the value of the bankruptcy estate.  *Id.*

46.     Numerous courts to have considered the precise issue have held that a Debtors' unemployment experience rating is an "interest in property" within the meaning of section 363(f) that can be extinguished by a free and clear sale order. *Massachusetts Dep't of Unemployment Assistance v. OPK Biotech, LLC*, 484 B.R. 860, 870-871 (1st Cir. BAP 2013); *In re USA United Fleet, Inc.,* 496 B.R. 79, 89 (Bankr. E.D.N.Y. 2013); *In re Tougher Indus.*, Nos. 06–12960 and 07–10022, 2013 WL 1276501, at *8 (Bankr. N.D.N.Y. Mar. 27, 2013); *Ouray Sportswear, LLC v. Industrial Claim Appeals Office*, 315 P.3d 1280, 1285 (Colo. App. 2013). In one factually identical case, the purchaser of a chapter 11 debtors' assets in a bankruptcy court-authorized free and clear sale under section 363 of the Bankruptcy Code sought enforcement of the sale order against the Massachusetts Department of Workplace Development, Division of Unemployment Assistance

(the "DUA"), to prevent the DUA from imputing the debtor's experience rating to the purchaser as a "successor employer." *PBBPC*, 484 B.R. 860.

47.     The First Circuit held that the term "any interest" should not be narrowly construed to mean only *in rem* interests in property, but should be read expansively to include any obligations that might flow from ownership of the property. *Id.* at 869. The Court concluded that "any interest" as used in section 363(f) is broad enough to encompass the Debtor's experience rating. *Id.* The court credited the bankruptcy court's view that "[t]here is good reason to view this right as an interest in estate assets: it imposes a debtor's experience rating on the buyer precisely because, and only because, the buyer purchased assets of the bankruptcy estate. By operation of state statute, the debtor's experience rating travels with the assets and encumbers their purchaser." *Id.* at 870. As noted by the court, "the transfer of an employer's contribution rate to a successor asset purchaser is really an attempt to recover the money that the predecessor employer would have paid had it continued in business." *Id.* at 869. Section 363(f) authorized the bankruptcy court to authorize the sale free and clear of that interest. *Id.* at 870; *see In re Old Carco LLC*, 551 B.R. 124, 131 (Bankr. S.D.N.Y. 2016) ("the Court concludes that paragraph 23 is not an exception to the *Sale Order* that permits Indiana to transfer Old Chrysler's Experience Rating to New Chrysler, and for the reasons explained in *Chrysler II*, the use of Old Chrysler's Experience Rating therefore violated the successor liability/free and clear provisions of the *Sale Order*") (emphasis in original); *In re Old Carco LLC*, 538 B.R. 674, 687 (Bankr. S.D.N.Y. 2015) (holding that under 11 U.S.C. § 363(f) "the *Sale Order* unambiguously extinguishes the States' right to apply Old Chrysler's Experience Rating to New Chrysler or collect increased taxes from New Chrysler as a result of Old Chrysler's discharge of its employees.") (emphasis in original); *see also In re Tougher Indus., Inc.*, No. 06-12960, 2013 WL 1276501, at *8 (Bankr. N.D.N.Y. Mar. 27, 2013) ("the right

of the DoL to tax TIE and TME, as successor to the Debtors, at the Debtors' experience rating, is an "interest" in property of the bankruptcy estate, of which Debtors' assets could be sold free and clear of").

48.     Similarly, the Bankruptcy Court in *In re USA United Fleet, Inc.*, 496 B.R. 79 (Bankr. E.D.N.Y 2013) held that the right to transfer the experience rating of a debtor to the purchaser of the debtor's assets constitutes an "interest in property" within the meaning of Section 363(f) that can be extinguished by a free and clear sale order.  In so holding, the *United Fleet* court rejected the Department of Labor of the State of New York's (the "<u>DOL</u>") argument that the experience rating was merely a computational device used to determine prospective tax rates, and noted that the obvious reason that the DOL assigned the debtors' experience rating to the purchaser was because the purchaser acquired the debtors' assets.  *Id.* at 88.  Having concluded that the DOL had an interest in property within the meaning of section 363(f), the Court had no trouble concluding that the interest was extinguished by the sale order, which defined "interests" broadly, and clearly stated that the purchaser was purchasing the assets free and clear of such interests, as well as any successor, transferee, or similar liability.  *Id.* at 89.  The Court further noted that the DOL, as a party with notice of the sale hearing, "should have had no trouble anticipating that its right to apply the debtors' experience rating to the purchaser was implicated by the sale."  *Id.*

49.     ADOL argues at length that *In re Wolverine Radio*, 930 F.2d 1132 (6th Cir. 1991) suggests that the Debtors' experience rating is not an "interest" of ADOL in the Debtors' property, as that decision held that "while 11 U.S.C. § 363(f) provides that property may be sold 'free and clear of any interest in such property,' we do not perceive the experience history of Wolverine as an 'interest' that attaches to property ownership so as to cloud its title." *Id.* at 1147. The *Wolverine Radio* Court's narrow definition of the term "interest" is clearly at odds with the better reasoned

and more expansive interpretation of that term favored by this District, *see United Mine Workers of Am. Combined Benefit Fund v. Walter Energy, Inc.*, 551 B.R. 631, 642 n.10 (N.D. Ala. 2016), *appeal dismissed* (May 4, 2016) ("The Bankruptcy Code's definition of 'claim' supports the broader reading of "interest" in Section 363(f)."), as well as the First, Second, Third, Fourth, and Seventh Circuits. *In re PBBPC, Inc.*, 484 B.R. 860, 869 (B.A.P. 1st Cir. 2013) ("We conclude that the more expansive reading of the term 'any interest' advanced by the Seventh, Fourth, Third, and Second Circuits . . . is more consistent with the language of the Bankruptcy Code and the policy expressed in § 363."); *In re Chrysler LLC*, 576 F.3d 108, 126 (2d Cir. 2009), *cert. granted and judgment vacated on other grounds*, 558 U.S. 1087 (2009) (holding that the bankruptcy court was permitted to authorize the sale of substantially all of the debtor's auto manufacturing assets free and clear of product liability claims); *UMWA 1992 Benefit Plan v. Leckie Smokeless Coal*, 99 F.3d 573, 582 (4th Cir. 1996) ("while the plain meaning of the phrase 'interest in such property' suggests that not all general rights to payment are encompassed by the statute, Congress did not expressly indicate that, by employing such language, it intended to limit the scope of 363(f) to *in rem* interests, strictly defined, and we decline to adopt such a restricted reading of the statute here."); *In re Trans World Airlines, Inc.*, 322 F.3d 283, 288 (3d Cir. 2003) (holding that the rights of flight attendants under a travel voucher program that the debtor-airline had established in settlement of a sex discrimination action qualified as an "interest in property"); *Precision Indus., Inc. v. Qualitech Steel SBQ, LLC*, 327 F.3d 537, 545 (7th Cir. 2003) (noting that an inclusive interpretation of the phrase "any interest" is "consistent with the expansive use of that same phrase in other provisions of the Code."). *Wolverine Radio* is the first published case to address the issue of whether the 363(f)'s term "interests" includes unemployment compensation ratings. Each of the decisions this Court is aware of that have addressed this issue have declined to follow *Wolverine Radio*.

50.     This Court also finds the interpretation of "interest" advanced by *Wolverine Radio* unsatisfying and at odds with the binding precedent in this case of *United Mine Workers of Am. Combined Benefit Fund v. Walter Energy, Inc.*, 551 B.R. 631 (N.D. Ala. 2016), *appeal dismissed* (May 4, 2016). As the District Court found in *Walter Energy*, the "broad interpretation is more consistent with the language of the Bankruptcy Code, and is consistent with the general policy of the Bankruptcy Code to maximize the value of the bankruptcy estate." *Id.* at 641. Section 363(f) therefore applies to the ADOL's interest. As Warrior Met argued, where Section 363(f) does apply, it preempts any state law to the contrary. The Sale Order thus preempts the application of successor status to Warrior Met under Ala. C. §§ 25-4-8, 4-54.

## IV.   WARRIOR MET DID NOT WAIVE ITS RIGHT TO ENFORCE THE SALES ORDER AGAINST ADOL.

51.     ADOL argues that Warrior Met waived its right to enforce the Sale Order against ADOL because of its failure to respond to ADOL's notice concerning successorship in October and the unemployment ratings it posted in December based on the Debtors' unemployment experience.

52.     The question of wavier is determined according to state law. *In re Sandlin*, No. 10-00048-TOM-13, 2010 WL 4260030, at *7 (Bankr. N.D. Ala. Oct. 21, 2010) ("[W]aiver is governed by state law, as opposed to uniform federal law, and turns on individualized facts."). In Alabama, waiver is defined as the voluntary, intentional relinquishment of some known right, benefit or advantage. *Hughes v. Mitchell Co.*, 49 So. 3d 192, 201 (Ala. 2010). The relinquishment of a given right, while it can be ascertained from external actions manifesting waiver, must be shown unequivocally. *Edwards v. Allied Home Mortg. Capital Corp.*, 962 So. 2d 194, 208 (Ala. 2007). In other words, it must be clear from the party's conduct that the party intended to waive that right. *Givens v. General Motors Acceptance Corp.*, 56 Ala. App. 561, 324 So. 2d 277, 279 (1975). To

qualify as a waiver, that conduct must be completely inconsistent or at odds with the assertion of the right. *Edwards v. Allied Home Mortg. Capital Corp.*, 962 So. 2d 194, 208 (Ala. 2007).

53.    In this situation, WMC's interactions with ADOL do not show an unequivocal intention to submit itself to successor liability.   In discussions with ADOL, Warrior Met continuously asserted and maintained that it was not willing to accept successorship liability and that is was not a successor.   The undisputed credible evidence in the form of testimony from witnesses establishes, at a minimum, that Warrior Met believed ADOL when ADOL informed Warrior Met that it was calling Warrior Met a successor for ADOL's internal purposes only. The evidence does not support a conclusion that Warrior Met intentionally relinquished a known right.

54.    Moreover, in this case Warrior Met was at all times relying upon a court order in a case involving both parties.  Warrior Met should be able to rely on what ADOL stated to Warrior Met, particularly where if ADOL had taken the opposite position, ADOL would be in violation of a court order.

## ORDER

For all of the foregoing reasons, and after due consideration and good cause appearing therefor, IT IS HEREBY ORDERED, ADJUDGED and DECREED THAT:

1.    Warrior Met's Motion to Enforce is GRANTED.

2.    ADOL Objection to Warrior Met's Motion to Enforce is OVERRULED.

3.    ADOL shall calculate Warrior Met's Contribution Rate and Experience Rating as a new employer, and regard and treat Warrior Met as a new employer as of April 1, 2016, with respect to any and all state unemployment laws, regulations, actions, and proceedings, including any experience ratings, payroll, unemployment compensation or tax laws, or any other similar state laws and regulations.

4.     ADOL shall not base any actions it takes regarding Warrior Met on any payroll, unemployment experience, or other facts which arise from the Walter Energy companies. This includes any and all of ADOL's actions to apply benefit charges to Warrior Met that arise from or relate to terminations, discharges, layoffs, or other employment decisions taken by the Walter Energy companies.

5.     ADOL shall give Warrior Met the full benefit of the Debtor Credits, which Warrior Met purchased from the Walter Energy Debtors.

6.     To the extent ADOL has already charged unemployment taxes to Warrior Met in excess of what Warrior Met should have been charged for 2017, ADOL shall reverse those charges.

7.     ADOL shall promptly send to Warrior Met proof that it has complied and will comply with the terms of this Order.

8.     This Order shall apply to all actions that ADOL has taken, including those actions taken before 2017, and all actions that ADOL takes hereafter in regard to Warrior Met, where such actions affect Warrior Met at any time on and after January 1, 2017.

9.     The terms of this Order shall be immediately effective and enforceable upon its entry.

10.     Even though it appears ADOL violated this Court's Sale Order, at the hearing Warrior Met did not request or seek any sanctions against ADOL.  Warrior Met, however, is not precluded from making such request if there is a failure to comply with this Order.

11.     The Court reserves jurisdiction over this matter to enforce this Order.


Dated: May 11, 2017                         /s/ Tamara O. Mitchell
                                                              Honorable Tamara O. Mitchell
                                                              United States Bankruptcy Judge